*EX-1*

# UNITED STATES DISTRICT COURT
## FOR THE
### DISTRICT OF MASSACHUSETTS

SANDY J. BATTISTA,

    Plaintiff

    v.

                             Civil Action No.  02-10137-MEL

ROBERT MURPHY, et al.,

    Defendants.

### AFFIDAVIT  OF GREGORY J. HUGHES, LICSW

I, Gregory J. Hughes, do hereby depose and say that:

1.      I am an employee of the Massachusetts Department of Correction ("DOC"), and presently serve as a Regional Administrator for the Health Services Division. I am a licensed social worker and my primary responsibility as a Regional Administrator is to monitor the mental health care provided to the inmates within Department of Correction facilities.  I have reviewed Sandy J. Battista's DOC medical records, paying particular attention to the records pertaining to his mental health treatment.  The information provided herein is based upon my personal knowledge.

2.      The DOC contracts with private vendors to provide medical, dental and mental health services to inmates within the Department's custody.  Currently, Correctional Medical Services ("CMS") is under contract to provide medical, dental and mental health services to inmates.  In addition, the University of Massachusetts Medical School ("U. Mass. Medical"), under the direction of psychiatrist Kenneth Applebaum, is presently under contract with CMS to provide direct management of all inmate mental health services.    Pursuant to the terms of the CMS contract, the private medical contractor has full responsibility for decision-making with regard to the type, timing,

2

and level of medical and mental health services. The sex offender treatment program at the Massachusetts Treatment Center is under contract with the Forensic Health Services ("FHS"), a private clinical contractor.

3.    Sandy Jo Battista is currently housed at the Massachusetts Treatment Center awaiting a trial on a sexually dangerous person petition brought by the Worcester County District Attorney pursuant to M.G.L. 123A, § 12. Since 1997, Mr Battista has been evaluated by a number of mental health professionals regarding his self reported gender disorder, including Victoria Russell, M.D. a psychiatric consultant to the DOC with experience in treating gender disorders and Tyler Carpenter, Ph.D. a psychologist employed by CMS who conducted an evaluation which included the administration of numerous psychological tests. See Attachments A and B.

4.    In response to the suggestions offered by Judge Wolf in his recent decision in the case of Kosilek v. Maloney, the DOC has decided to retain a mental health professional with experience in treating gender disorders to provide evaluations and treatment recommendations for inmates who report to be suffering from gender disorders and who seek treatment for this disorder. It is also expected that the mental health professional with experience in gender disorders sought by the DOC will provide therapy to inmates diagnosed with a gender identity disorder or supervise other mental health professionals providing therapy. Presently, the DOC is working with the U. Mass. Medical School Mental Health Program to identify mental health professionals with experience in treating gender disorders who may be available to work with the DOC in this capacity. It is my understanding that upon hiring a mental health professional with experience in gender disorders, Mr. Battista will undergo a comprehensive medical and psychological evaluation regarding his claimed gender disorder and a treatment plan will be developed to address medical and mental health issues.

3

Signed under the pains and penalties of perjury this ___7ᵗʰ___ day of October, 2002.

Gregory J. Hughes, LICSW



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
SANDY J. BATTISTA,            )
                              )
      Plaintiff,              )
                              )
      v.                      )        02-CV-10137-MEL
                              )
ROBERT MURPHY, MICHAEL T.     )
MALONEY, JOHN NOON, STEPHEN   )        05 - 11453 DPW
GLAVIN, JOSEPH MURPHY,        )
CHRISTOPHER MITCHELL,         )
BARBARA SCHWARTZ, and MARK    )
SPERRE,                       )
                              )
      Defendants.             )
                              )
```

## MEMORANDUM AND ORDER

LASKER, D.J.

　　　　Sandy J. Battista began serving a 12-20 year sentence

for rape of a child under 16 and concurrent sentences for armed

robbery and kidnapping in February 1983.  After Battista

completed her sentence, a justice of the Worcester Superior Court

found that there was probable cause to believe that Battista was

a sexually dangerous person, and she[1] has resided at the

Massachusetts Treatment Center pending a hearing on her

commitment as a sexually dangerous person, pursuant to M.G.L. ch.

---

[1]To avoid confusion, the Court will refer to Battista using
feminine pronouns.

1

DOCKETED



123, § 13 to this day. Battista, acting pro se, brings this
civil rights action against the Massachusetts Department of
Corrections (DOC) and treatment providers employed by the DOC.
Battista alleges that she suffers from gender identity disorder
(GID), and she claims that the defendants have failed to provide
for her care, custody, safety and rehabilitation as a transsexual
in the form of hormone therapy, sex reassignment surgery and
specialized psychotherapy in violation of the First, Eighth and
Fourteenth Amendments.

    Battista seeks declaratory and injunctive relief and
damages.  Specifically, she asks the court to order the
defendants to provide her with hormone therapy, psychotherapy, a
compatible roommate, and sex reassignment surgery.  Battista
brought a similar cause of action against the Commonwealth of
Massachusetts asserting similar claims concerning her GID.   In
June 1998, the Suffolk Superior Court held that the defendants
had not exhibited deliberate indifference in refusing to provide
Battista with the same type of GID treatment as she now requests.
The Suffolk Superior Court explained:

> The Court has considered whether Battista
> suffers from transsexualism and whether
> transexualism presents a 'serious medical
> need.'  In this consideration, the Court has
> found that it is Battista who has diagnosed
> herself as a transexual . . . the record is
> replete with uncontested evidence of the

2

> attempts of the prison medical staff to
> evaluate Battista's psychological problems
> and her refusal to cooperate.

Battista v. Commonwealth of Massachusetts, et al., No. 97-03487
(Suffolk Superior Court) (1998).

Both the DOC defendants and the named treatment
providers move to dismiss Battista's complaint.  The motion is
GRANTED.

I.

Defendants assert that Battista's instant complaint is
barred under the doctrines of res judicata and collateral
estoppel.  Res judicata, defendants stress, aims to prevent
parties from relitigating issues which were or could have been
raised in a prior action after a court has entered a final
judgment on the merits in the prior action.  See FDIC v.
Shearson-American Express, Inc., 996 F.2d 493, 497 (1st Cir.
1993).

The defendants contend that this case meets the three
prerequisites that trigger res judicata: (1) identity or privity
of the parties to the present and prior actions; (2) identity
the cause of action; and (3) prior final judgment on the merits.
See Glouster Marine Railways Corp. v. Parsi, Inc., 36 Mass. App.
Ct. 386, 391 (1994).  First, defendants assert that in both cases
the parties have been substantially identical -- both name DOC

3

officials.  Second, the issues in both cases concern Battista's custody and care and treatment of her GID.  Third and finally, the final judgment entered in the prior case in the 1998 Suffolk Superior Court decision, granted the DOC defendants' motion for summary judgment on all the causes of action raised by Battista. Accordingly, defendants conclude that Battista is barred from relitigating issues adjudicated in the state court decision.

The three elements required to trigger application of the res judicata doctrine are present in this case.  First, the state court has entered a final judgment on the merits.  Second, there is an identity of the parties named in the state court action and the defendants named in this action.  Third, there is an identity of the causes of action.  As in the instant case, in state court Battista alleged that she was a transsexual and raised numerous claims regarding her custody, care, and her GID treatment.  Accordingly, the final judgment entered in the state court "bars further litigation on all matters that were or should have been adjudicated in the action."  Heacock v. Heacock, 402 Mass. 21, 23 (1988).

## II.

Alternatively, defendants move to dismiss under the ripeness doctrine.  Defendants contend that even assuming

4

arguendo that Battista's involuntary civil commitment might entitle her to greater due process protections under the Fourteenth Amendment, the complaint should be dismissed as premature. Currently, Battista's commitment is temporary, pending a trial on the D.A.'s petition to civilly commit her for the term of one day to life, and the defendants assert that " the issues of [her] constitutional right to a compatible cell-mate or to treatment for [her] GID as an individual under civil commitment is not yet ripe for adjudication."

It is unnecessary to decide the ripeness issue, because the complaint is dismissed pursuant to the res judicata doctrine. However, even if Battista's complaint were not barred by res judicata, adjudicating Battista's injunctive and declaratory claims, prior to a definite order to civilly commit her would be premature. It is possible, of course, that Battista will be released from DOC custody and would then be free to obtain the treatments for her GID that she desires.

## III.

Represented by separate counsel, defendants Barbara Schwartz and Mark Sperre, move to dismiss the complaint for the reasons stated above, and further, because the complaint does not allege any facts that support a finding that Schwartz or Sperre

5

violated Battista's constitutional rights.  Sperre and Schwartz
are employees of the Justice Resource Institute, a prior contract
provider for the Massachusetts DOC for sexual offender treatment
programs at the Massachusetts Treatment Center (MTC).

Battista's complaint alleges that Battista wrote
Schwartz a letter requesting treatment for GID, and that Schwartz
sent a copy of the letter to Sperre.  Battista alleges further
that the defendants denied her request for treatment, and she
notes that Schwartz wrote "JRI is contracted to provide sex
offender treatment only."  Schwartz and Sperre stress that they
are not custodians and therefore cannot be liable under the
Eighth Amendment.  They argue that they are "clearly peripheral
to the central allegations of the complaint."  Finally, the
defendants underscore that their employer, JRI, is no longer
contracting with the DOC to provide sexual offender treatment
services and that even if there were some prospective relief
available to Battista they would not provide the service.

The motion to dismiss is GRANTED as to Sperre and
Schwartz, because the complaint alleges no facts as to Sperre's
conduct, and as to Schwartz it merely documents her response
letter to Battista's request for gender identity disorder
treatment.  JRI, a non-profit organization, contracted with the
DOC to provide sexual offender treatment, not GID treatment, to

6

patients at the MTC.

## IV.

For the reasons stated above, the motions to dismiss
are GRANTED. The complaint is dismissed.

It is so ordered.

Dated:    November 4, 2002
          Boston, Massachusetts          United States District Judge

7



EXHIBIT

tabbies®

**3**

(Pg. 1 of 15)

**Forensic Health Services, Inc.**
**214 Lincoln Street, Suite 208**
**Boston, MA – 02134**
**(617) 782-5144**

## REPORT OF QUALIFIED EXAMINER TO THE COURT

Presiding Justice
Worcester Superior Court
Court House
2 Main Street
Worcester, MA 01608

Date of Report: 4/1/2002
RE: Sandy Jo Battista FKA David Megarry
DOB: 12/30/61

### Identifying Data:

Sandy Jo Battista is a 40-year-old, never married, Caucasian male who was committed to the Massachusetts Treatment Center (MTC) May 24, 2001 to await a probable cause hearing regarding his sexual dangerousness. Probable cause was found 12/14/01 and Mr. Battista was returned to the MTC for this 60-day evaluation period. A 60-day stay was granted ending 3/1/02 allowing qualified examiners to interview him. A court order required the interview be tape-recorded. On January 27, 1983, Mr. Battista was sentenced out of Worcester Court to serve a 12-20 year sentence for one count of rape, and 9-10 year sentences for kidnapping and robbery, all to run concurrently. Upon his release he will return directly to the community with no probation.

### Warning Of Limits of Confidentiality:

I met with Mr. Battista on 3/1/02 in order to interview him for this evaluation. I informed him I am a licensed psychologist and that I was ordered by the Court to gather information that the Court could use to determine his status as a Sexually Dangerous Person (SDP). I informed him that he was not required to answer any individual question or participate in the interview, but that I would be sending a report to the Court regardless of his participation. I informed him that this interview was not confidential, as any aspect of our interview might become a part of the court proceeding through a report or oral testimony.

After providing him with the limits of confidentiality, Mr. Battista agreed to speak to me. I

I asked him to tell me, in his own words, his understanding of the limits of confidentiality. I asked him if he had spoken to his attorney regarding this matter. He stated he had recently dismissed his attorney, Mr. LoConte. He had not discussed his case in depth with this new attorney, Mr. Paul Machado, Esq. Mr. Battista reiterated his willingness to participate in any case. In my opinion, Mr. Battista demonstrated an adequate understanding of the limits of confidentiality.

I interviewed Mr. Battista for 20 minutes on the housing unit. The rest of the interview was conducted in the Health Services Unit.

### Sources Of Information:

I met with Mr. Battista on 3/1/02 at the MTC for approximately two hours.

The clinical and administrative records available at the MTC were reviewed.
I reviewed:
- His family, developmental and treatment history with him;
- The police reports, witness statements and Mr. Battista's statements regarding the governing offense as well as other sexual incidents occurring 3/77 and at least twice prior to 3/77,
- Mr. Battista's Criminal Offense Record (CORI) compiled by the Criminal History Records Board;
- His DOC six part file which includes disciplinary reports, classification forms and parole records,
-evaluations from Worcester State Hospital, adolescent unit (7/29/77, Medfield State Hospital (MSH) adolescent program summary reports (7/4/79) MSH adolescent program notes (1978- 1979),
- and Justice Resource Institute (JRI) notes, and an intake and assessment report date 11/18/98 completed by David Campopiano, MA, supervised by Robert Prentky, Ph.D.
-Sexually Dangerous Person evaluations conducted in 3/84,
-a psychological assessment conducted by J. Tyler Carpenter, Ph.D. consulting psychologist at MCI-Norfolk,
-Bridgewater State Hospital evaluations from January 1983.

Mr. Battista provided this writer with several documents for my review for the purpose of this evaluation. These included:

-A gender evaluation conducted by Diane Ellaborn at Mr. Battista's expense;
-His CORI;
-An evaluation of his sexual dangerousness completed by Carol Feldman, Ph.D., J.D. requested by the Worcester District Attorney's office for a Probable Cause hearing;
-An evaluation of his sexual dangerousness completed by Ron Ebert, Ph.D., requested by Mr. Battista and his defense attorney;
-A relapse prevention plan completed by Mr. Battista and signed by his therapist David

Cerce,
-Two articles from a newspaper regarding his request for castration, one an editorial column.

## Family History:

Mr. Battista is a 40-year-old, never married, Caucasian male. He is the second of three children. He also has a younger half brother.  Records are inconsistent regarding his age at the time of his mother's death. His father reportedly beat his mother to death after finding her in bed with someone else and served a state prison sentence for manslaughter as a result. Mr. Battista was reportedly between six and eight years old. Some records indicate he witnessed her death, but he states he has no recollection of it.  The marital relationship was reportedly conflictual and characterized by physical abuse. Mr. Battista's father was alcoholic and was known to shoot off a gun in the house to gain the attention of the household. Police were called to the house as a result of this behavior at least once. His father passed away last year. His father worked in maintenance for the city of Worcester

Mr. Battista reported regular and close contact with his older sister to this evaluator. He also indicated he would be able to reside with her in Ohio. She is divorced with four children. However, DOC records indicate that he had no contact with his family and that they disowned him as a result of the crime. During the interview he indicated his brother also resided in Ohio and that he was in regular contact with him as well. He reports he has a half brother that he has no contact with. He stated he was the only child with a significant criminal history, his brother has had drug charges.

After his father was incarcerated for the death of his mother, he and his two siblings were sent to live with his maternal grandparents. Within a year the children were removed from this placement due to charges of neglect and abuse. The children were living in the basement, sleeping on a pull out couch and without adequate food. The records also state the children were exposed to pornographic material and sexual acting out on the part of the maternal grandmother and her friends. Mr. Battista stated he did not recall being sexually abused and that he preferred to remember his family members in a positive light by not speaking poorly of them. He also minimized his treatment at his grandparents home stating that they were not abusive. Other evaluators and records indicate the children were locked in a bathroom and firecrackers were thrown in on them.

He and his siblings were next sent to live with his paternal grandmother. He reports she was good to him. Records are consistent on this point. Records indicate she sought assistance through the court to handle him as a stubborn child. He remained with her until his father's release at which time he was returned to his father's care. His father sought placement for him through the courts after three months. Records indicate he was sent to several foster homes and other placements. During our interview he recalled remaining in one placement and reported positive memories of the family and time he spent there.

In 1977, he was sent to a Department of Youth Services program on the Medfield State Hospital grounds. He was adjudicated delinquent at age 16 and remained there until age 18. He reported the program had petitioned the court for him to remain there and there is documentation to that effect. Other documentation indicates the program was closed and there is an evaluation included that does make recommendations for placement in a secure DMH facility when he was 18. Whether the court did not allow the continuation or the program actually closed is not known from the records available to this writer, but he was released.

Mr. Battista lived with his father for a short time upon his release from DYS and then moved in with a woman who was an ex-girlfriend of his father. She had two children an 11-year old girl and 10-year old boy. He lived with them until he was incarcerated for the governing offense.

## Medical/Psychiatric History:

Mr. Battista suffers from Congenital Adrenal Hyperplaysia, also known as Addison's Disease. He receives treatment in the form of medication, which he receives daily. Currently he takes "dexamethazone." In the past he has received hydrocortisone. He has been taking medication since about age 4-5.

The disease caused him to begin to grow body hair at 18 months of age. His genitals also began maturing as an infant. His mother reportedly rejected him. She would not change him or bathe him, some records indicate she refused to touch him. He was ashamed of his body and hair and indicated his childhood was further made difficult as other children would call him names and make fun of him. He indicated he was also pigeon toed, which allowed him to be excused from taking gym and suffering the public humiliation of changing for gym. He had surgery to repair his legs as a child. He reported during his interview that as he became older he was less different than anyone else was and as an adult experiences little discomfort with the disease. The disease often causes persons to be smaller than average in stature as their bones mature earlier thus they stop growing younger. Mr. Battista is slight and short in stature.

Mr. Battista received program involvement/treatment when incarcerated in DYS facilities. He has participated in one on one therapy for the last several years while in the DOC. He has never been diagnosed with a psychotic major mental illness. Evaluations consistently state that they find no evidence of a thought disorder or mental disturbance. They consistently describe him as character disordered. Therefore he has never received psychiatric treatment in the form of hospitalization or medication. This is probably the reason the Department of Mental Health (DMH) found him not appropriate for involuntary admission or commitment to a secure inpatient DMH facility when he turned 18.

In 1997, a request for a psychological evaluation was made by Victoria Russell, MD a

psychiatric consultant at MCI-Norfolk. Referral questions included assistance in "designing appropriate therapy goals and interpretations and because such tests are also given to people considering sex reassignment surgery. This was requested because Mr. Battista was requesting specialized treatment for "a sex change."

J. Tyler Carpenter, Ph.D. ABPP Consulting Staff Psychologist conducted a comprehensive psychological evaluation and provided the following description of his psychological fuctioning, structure and processing style.

*"Results described Mr. Battista as a person with average intelligence with limited ability to utilize abstract concepts, especially when it came to discussing his medical issues. He is generally able to attend and concentrate, but his judgment become impaired by strong emotions. His understanding of his milieu is grossly intact, but his understanding of his condition is somewhat superficial. He recognizes that there is something wrong with his self-image. The thinks the solution to his problem is to concretely change his anatomy to fit his fantasized identity. He has little apparent knowledge of the underpinnings of his perceptions or the full impact of these dynamics on himself or others. Mr. Battista generally appeared and acted rationally during his interviews and testing. It was his inability to reflect on alternate ways of understanding his condition and ways to deal with it that took on an irrational life of its own. At times he demonstrated some press of speech. The association of his thinking was remarkable for perseveration around his sense of being persecuted and deprived with respect to his obsession with dramatically altering his sexual appearance. His thinking is distorted by intermittent concreteness and his current preoccupation with sex reassignment surgery as a solution to all his problems reflects unrealistic fantasy and magical thinking....*

*...Predominant underlying affects are fear (of rejection and ridicule of his basic sexual identity, shame (regarding his penis and nose, e.g. both their actual form and symbol phallic meaning) and anger (at anyone who opposes his understanding of himself or thwarts his attempts to realize his fantasized solutions to his psychic pain.) These affects have their roots in classical conditioning, by his mother and peers, sub cultural conditioning in the prison environment, and psychodynamic and family systems dynamics....*

*..Mr. Battista's primary conflicts appear to center primarily around great rage and distrust of authority and poorly differentiated sexual and aggressive drives. .. His sexual conflicts are equally severe and entwined with his rage as well as anomalous in their behavioral expression. His mother was repulsed by and ridiculed the effects of his early genital development, leaving him alienated from his primary caregiver and his own sexual anatomy. It is clear that this shame over his genitals persisted well into his adulthood and appears to be intermingled with an unconscious fantasy of using his genitals in an rageful way against women. The relatively late onset of his desire to become a woman through sex reassignment surgery appears to be in part a function of his alienation from others, deep conflict over his sexual being, precipitated by an acceptance by other inmates, in an environment which by nature must place controls on sexual expression, of his experiments with crossdressing. In other words, as a lonely and angry individual who is deeply uncomfortable about his sexual being, cross-dressing helped him  deny the painful and complex conflicts, while at the same time providing stimulation, a less aggressive identity, and the deeply desired attention. Even the painful ritual of sugary would appear to be both a concrete and masochistic transformation of that which has come to be associated with shame and pain, as well as some rite of passage whereby (by (sic) ) he finally has achieved an identity he believes that he can live with. ..*

*Overt manifestations of intrapsychic issues- he has, in the past, used children as a way of bolstering his sense of himself as weak and defective. His goal of undergoing sex reassignment surgery as a solution to*

*both his perceived and apparent psychic pain and interpersonal problems, reflects a synthesis (in fantasy) of intrapsychic/interpersonal/environmental presses with a vulnerable response style, defective reality testing, and clear secondary gain within the correctional setting. The lawsuit is deeply satisfying because it is over determined. It is driven on one hand by his strong and valid desire for relief from his deep personal suffering. While on the other hand, it reflects a passive-aggressive rejection of available sources of treatment (e.g. psychotherapy for his character problems, psychopharmacotherapy for his depression, a a psycho diagnostic reformulation of his issues, and sex offender treatment for his problematic pedophiliac(sic) tendencies toward young girls), an active attack on conventional authority, and a peculiarly quixotic solution to dealing with the problems of his past, present and future. ..*

*Diagnostic Summary and Recommendations;*
*Axis I: 302.6 Gender identity disorder NOS*
       *311.00 Depressive disorder NOS*
       *R/O 294.9 Cognitive disorder NOS*
       *r/o 302.3 Transvestic Fetishism with gender dysphoria*
       *r/o 302.2 Pedophilia (attracted to females)*
       *r/o 300.7 Body Dysmorphic disorder*
       *307.50 Eating Disorder NOS*
       *305.20 Cannabis abuse - in remission due to a controlled environment*
       *305.00 Alcohol abuse- in remission due to a controlled environment*

*Axis II: 301.7 Antisocial Personality Disorder*
       *301.83 Borderline Personality Disorder*
       \* *with avoidant, passive-aggressive (negativistic), and schizotypal traits*

*Axis III: Congenital Adrenal Hyperplasia (CAH)*
       *a concurrent congenital physical intersex condition*

*Axis IV: Problems with the primary support group, with the social environment, and with housing.*
*Axis V: 42*

Dr. Carpenter did not find Mr. Battista imminently suicidal, but considered him vulnerable to suicide. He also recommended sex offender treatment which would (and the JRI program includes) a penile plethismograph in order to determine presence and nature of deviance arousal for diagnostic and treatment purposes. He recommended the specific and energetic attempt to develop a therapeutic alliance in order to develop a trusting resulting relationship for treatment. Lastly, he recommended a psychopharmacological consult regarding depression.

## Sexual and Developmental History:

Mr. Battista describes himself as bisexual. He indicated he had one relationship at age 18 with a woman with whom he had sex 20 times. He stated that as he got older, his body hair became less of an issue as the other boys also had body hair. He remarked however, that he was so shy he did not open his eyes. Records indicate he had told previous evaluators that he had never had sex with a female as he was too embarrassed and ashamed. He reported two consensual sexual relationships with men while incarcerated. He stated he knew this was against the rules, but that he felt it was important information. He also indicated that the men "looked more feminine than I do."

When asked, Mr. Battista indicated he was not sure if he would live his life as a female, "I wouldn't walk out of prison in drag if that what you mean." but that he wanted to explore a lifestyle that would include alternative life styles and clubs. He seemed unaware or unconcerned that removal of his genitalia would make sexual behavior whether gay or straight, limited in scope. He has a transsexual or transgender friend in the community he says he would be able to stay with. He states this person would be a primary support for him in the community.

Mr. Battista identifies himself as a transsexual. He has been evaluated at his own expense by a Diane Ellaborn, LICSW, and a gender specialist. In her opinion, Mr. Battista meets criteria for gender identity disorder. She further states that his Addison's disease is an intersex condition frequently related to the gender identity disorder. Treatment for this combination of issues, in her opinion, consists of surgery and cross gender hormone treatment. Surgery would involve an orchidotomy, the removal of his penis and testes. She also indicated this would reduce his risk of reoffending. He indicated a strong willingness to submit to the surgery.

He provided this evaluator with several newspaper articles related to his desire for this surgery to take place prior to his release. Apparently he contacted them in an effort to solicit the assistance of the media in his cause . Although he clearly stated during this interview that he would have the surgery at his expense, the articles focused on "taxpayers paying for a sex offender's surgery." Mr. Battista also indicated he dismissed his attorney because the attorney was unwilling to move forward on his insistence that the court allow/order the surgery. Mr. Battista wanted it to become a part of this proceeding in that he would submit to the surgery as part of his release.

Records indicate Mr. Battista wore his sister's underwear and clothes as a child. He currently presents in a feminine fashion. He has changed his name to a more feminine, but still androgenous one. He plucks his eyebrows and shaves his body hair. He has tattooed a mole above his upper lip. He stated he altered his sweatpants to make them form fitting.Records indicate he binds his genetals and has attempted to freeze them and tie them off in order to rid himself of them. He refers to himself in the feminine. He remarks that his feminine presentation has caused him a great deal of trouble in prison related both to his charges and his appearance. He has been transferred a great deal, 14 times primarily due to enemy issues or frequent d-reports, which he admits were manipulations of the system at times. He has also received 63 disciplinary (d) reports, which in some cases were related to his appearance. He has requested makeup and women's undergarments while incarcerated. This was denied due to the "inappropriateness (of it) in a male prison institution." He has received d-reports for his appearance on occasion.

Mr. Battista's record indicates that between the ages of 12 and 14 he was involved in sexual activity with female family members. Two incidents were noted. No details were given, but the suggestion is that they led to his grandmother and later his father seeking

placement outside the home for him. When asked about previous sexual offenses by this writer, he replied that the assault and battery that led to his DYS commitment was actually sexual in nature. He indicated he intended to rape her. His adolescent records indicate he made statements at the time that the three girls he assaulted "deserved it."

## Military History:

Mr. Battista served in the military for four months. He was discharged due to "fighting and drinking." Records indicate when intoxicated, a pipe was thrown by Mr. Battista during a fight and hit someone. Records also state that graduating from boot camp was the one time he felt his father felt proud of him.

## Educational History:

Mr. Battista received his GED in 1982 to gain entrance into the military. He retook the test twice since then while incarcerated. He received a higher score the second time in 5/2001. He is clearly proud of his self-education process regarding his use and application of the law library. He remarked that he had been told he had the equivalent of an associate's degree by his presentation. He indicated a desire to receive a paralegal degree and work in a law office. He was demonstrated a realistic view of his situation while discussing his plans for employment. He appears to be of average intelligence

## Employment History:

Mr. Battista has been employed in service related positions, such as McDonald's, factory and warehouse work. He does not currently hold a valid driver's license, but states he is eligible. According to classification forms he was employed during his incarceration. His records indicate he needed to work as he was supporting himself, as his family did not send money.

## Substance Abuse:

Mr. Battista used alcohol and marijuana. Mr. Battista denied using other drugs. He stated that he has used alcohol the day before the governing offense and that he had smoked marijuana prior to the offense. He does not believe he has a drug or alcohol problem.

## Criminal History:

Mr. Battista has a significant juvenile record. In March 1977, at age 15, he was arrested and charged with assault and battery. He grabbed a 10-year-old girl at the bus stop and took her to the woods. He was planning on sexually assaulting he when a neighbor intervened. He himself indicated the assault was sexual in nature, however, it was brought forward as an assault and battery. He also has juvenile charges of breaking and entering with his brother.

The official version of the governing offense involved a 10-year-old girl who was selling fudge door to door. He watched her for a while and admits to trying to trick her to get her close to his car. He stated to the evaluator hired for this proceeding and his defense attorney , that she was young, blonde and innocent. He indicated to the girl that his mother wanted some fudge and that his wallet was in the car. The girl came to the car and he grabbed her covered her mouth and put her in the car. The car had no handle or latch on the inside passenger side door. He took her to a wooded area tied and gagged her and took off her clothes. He removed his clothes and placed his penis on her vagina. He penetrated her with his fingers and required her to performed oral sex on him. He next had her masturbate him. He ejaculated into her face and hair. He then let her go, taking the $16.00 she had obtained by selling fudge.

Reports indicate statements he made that suggested he felt he was not going to get caught. Other records indicate he expected to get caught. The police stopped him several days later due to a motor vehicle issue. He did not realize he was being considered for the governing offense until he was held and a second interrogation involving questions regarding the rape were initiated.

Mr. Battista stated he had been living in an unhealthy environment as the 11-year-old girl he had been living with and her friends had "crushes" on him. He was sexually attracted to the girls, (he denies sexual contact with them) and felt out of control regarding the need to act out sexually. He stated he was unable to stop himself. He was unable to identify any other issues present at that time.

During this incarceration, in July 1996, Mr. Battista was found guilty of two counts of assault and battery against a guard. He bit an officer during an escort after a fight involving several inmates. The guilty findings were filed.

Two charges for breaking and entering at night were initially presented at a bench trial. He was sentenced to one year. Mr. Battista appealed it and a jury of six upheld the original finding and sentence.

There appear to be two warrants still open in Uxbridge District Court regarding property violation and breaking and entering at night. Arraignment dates were September 30, 1981.

Mr. Battista's juvenile record consists of the sexualized assault and battery offense previously described as well as a DYS commitment for larceny from a person occurring seven months later.

## Institutional Adjustment:

Mr. Battista has had as many as 22 enemies listed on his classification form. He has

received 63 disciplinary (D) reports during his 20-year incarceration. His most recent report was for destroying state property on 11/8/01 while at the MTC . He had placed holes in a sheet and attached laces so that it would act as a fitted sheet and stay on his mattress better. He received a report on 9/25/01 for fighting with another inmate. The report stated he admitted he started the fight by punching the other inmate in the head. He has many reports for insolence or verbal altercations with officers or not following the rules. He had also had possession of a tattoo gun. He himself has many tattoos.

He has two escapes noted on his record. While housed at the Hampshire County House of Correction for nearly two years 5/16/86 - 3/31/88 he received two serious reports. He was caught attempting to escape and was found in possession of a saw and of having nearly cut through several bars. He also was in possession of a workable window key made out of a comb. Records indicate he believed this was the only way he could get around his sentence. He indicated during our interview that his continuous attempts to have his case and sentence reviewed and appealed were only to reduce his sentence not to avoid responsibility. He also escaped from a DYS program in October 12, 1977.

The second significant d report received 10/16/86 at the Hampshire County House of Correction involved his making obscene telephone calls to young girls. He admitted to these incidents during our interview and his descriptions were consistent with official versions and stated, "they were a long time ago."

He was denied parole six times due to the seriousness of his crimes and his institutional adjustment.

## Victim and Perpetrator Characteristics:

Mr. Battista appears to have a longstanding pattern (since adolescence) of sexual arousal to pre-pubescent females. He currently denies arousal. He has never had positive, stable adult relationships other than perhaps recently with two siblings who have been estranged for a long period. He has a friend with similar gender identification issues on the outside, but it is not clear the depth, nature or length of their relationship. He appears to have been preoccupied with young girls and had fantasies at the time of the crime, continuing at least three years into his incarceration. He demonstrated compulsion and impulsivity at the time of the governing and juvenile offenses. He used force. He used trickery to gain access to one victim. The victims were strangers, although initial records indicate the first two victims were within the family constellation. He continued to contact prepubescent girls by telephone and was caught while incarcerated for the governing offense. He was aroused and ejaculated. He noted to treaters that he was attracted to "10-year-old girls, innocent with no breasts." He minimizes and distorts his behavior. He has not ceased his sexual behavior while incarcerated. He continues to present with inconsistent information. He has a history of non-criminal offenses.

The victims have all been female and around the age of 10. The first two victims were

family members. The others were strangers.

## Course of Treatment:

Mr. Battista attended Sex Offender Treatment while in the Correctional System during his incarceration. He stated that when the JRI program was instituted in 1994 the inmates were told they needed to sign up for group treatment or they would be in danger of losing the individual treatment, so he signed up. In 1998, he requested and was granted transfer to the MTC for treatment. He was passed in phase one, however, due to his disciplinary issues and his minimal level of participation in treatment, he was sent to Gardner in October 1999. He reports having participated in individual treatment for his other issues through mental health services. He reports he finds this helpful.

Mr. Battista indicated he began treatment immediately upon his transfer to the MTC in 2001. Records indicate he requested "..to start now, not one or two weeks from now."

Mr. Battista's record contains a posttest for phase one. He completed the test with minimal responses although he did receive some positive feedback.

Mr. Battista provided this writer with a copy of his comprehensive relapse prevention plan recently developed, February 2002. He evidently presented it to his therapist who reviewed it and provided him with feedback. The therapist, David Cerce, indicated that overall it demonstrated a good understanding of the concepts involved in a deviance cycle and relapse prevention plan. He suggestions for further work involved increasing the detail and depth of the individualized issues regarding his offending. One suggestion involved moving treatment up on his list of priorities.

Mr. Battista has not participated in phase three, which focuses on directly addressing a multiple levels of denial. This is accomplished through group work and eventual approval by the group and the therapist of the individual's version of the offense. The resident is then passed on to phase four to work on the individual deviance cycle and comprehensive relapse prevention plan.

During our interview he provided a consistent, but superficial version of his offense. He has issues with Dr. Feldman's report and his belief that she did not believe him or review records he proffered that would indicate that he did not penetrate the victim vaginally. He denied currently being aroused by adolescent or prepubescent girls, although he recognizes them as high risk and his need to stay away from them.

## Legal Standard for Sexually Dangerous Person:

Massachusetts General Laws, Chapter 123A, Section 1 defines a Sexually Dangerous Person as, "any person who has been convicted of (, ) or adjudicated delinquent of youthful offender by reason of (,) a sexual offense and suffers from a mental abnormality

or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility."

The Law defines the term "mental abnormality" as a, "congenital or acquired condition of a person that affects the emotional/volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes that person a menace to health and safety of other persons."

A "personality disorder" is defined by Law as a "congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses."

## Summary Assessment:

Mr. Battista has been convicted of a sex offense.

He has minimally participated in recommended sex offender treatment.

Mr. Battista has received several significant disciplinary reports for, escape, fighting, assault on a guard resulting in charges and a guilty filing, and for making obscene telephone calls to young girls while incarcerated.

Mr. Battista has had a significantly abusive, neglectful, violent and chaotic childhood and development.

Mr. Battista experiences a genetic medical condition, Addison's disease, which may effect his sexual identity. He suffers from a gender dysphonic disorder, which may be in part caused by his gender disorder. He is a bisexual transsexual.

Mr. Battista has a significant history beginning in childhood of displaying behavior that demonstrates that he has arousal, fantasy and behavior surrounding sexual activity with pre-pubescent females. In my opinion, Mr. Battista meets diagnostic criteria for Pedophilia.

In my opinion, Mr. Battista meets diagnostic criteria for antisocial personality disorder (APD).Mr. Battista has a significant history beginning in childhood of displaying behavior that suggests that he has a persistent, repetitive, and enduring pattern of a lack of regard for the rights, property and person of another.

In APD four areas of behavior are assessed. First, he demonstrates behavior prior to age 15 that meets diagnostic criteria for conduct disorder, second, there is no data that support that the behaviors in question occurred during a psychotic episode, third, he is currently over the age of 18 and fourth, he demonstrates a consistent pattern of deceit, disregard for social norms, reckless disregard for the safety of himself and others, consistent irresponsibility, a lack of remorse, impulsivity, aggressiveness and irritability.

Factors identified through research on sexual recidivism and currently fairly generally accepted involve those that can be roughly broken down in two categories, known as static and dynamic factors. Several of these factors have been associated with an increased likelihood of sexual recidivism (to be differentiated from general violent recidivism) and are noted by Hanson, R.K. and Bussiere, M.T. in their 1998 article "Predicting Relapse a Meta Analysis of Sexual Offender Recidivism." While there are some very legitimate criticisms regarding research on this topic too extensive to be discussed in this report, the following factors have been associated with recidivistic sexual violence.

Static factors (that are considered unchangeable) generally associated with increased risk of sexual recidivism include: past criminal history, prior sex offenses, antisocial personality disorder, stranger victims, a diagnosis of pedophilia, male versus female child victims and age at time offending behavior began.

In this case, static factors associated include prior criminal and prior offenses sexual in nature, stranger offenses, young when sexual offending behavior began and a diagnosis of pedophilia. These factors generally do not change.

Dynamic factors (those that are changeable) associated with increased risk of sexual offense recidivism include: the age of offender (child molesters risk for recidivism does not significantly decrease as their age increases) the influence of substances, an absence of stable adult relationships, the presence of cognitive distortions, single/never married marital status, deviant sexual arousal, high degree of sexual preoccupation with children, minimal or inadequate treatment history, an absence of probation conditions.

Mr. Battista presents with several dynamic risk factors; an absence of stable adult relationships, presence of cognitive distortions, single/never married status, deviant sexual arousal (to female children), a high degree of sexual preoccupation with children, minimal and inadequate treatment history and an absence of probation conditions.

## Conclusions and Recommendations:

Mr. Battista has been convicted of a sex offense.

In my opinion, Mr. Battista meets diagnostic criteria for Pedophilia and Antisocial Personality Disorder as defined in the DSM-IV- TR (Diagnostic and Statistical Manual, Edition IV widely used by mental health professionals to **aid** in diagnosis). In my opinion, these disorders meets statutory criteria for mental abnormality and for personality disorder.

Mr. Battista presents with high-risk characteristics. He has not acted out in a pedophilic fashion while incarcerated. Pedophilia is a chronic disorder and his victim pool has not

been available to him. This choice in sexual victim occurred as an adolescent and as an adult. He has not received significant treatment on this issue. Although he demonstrates the ability to accept responsibility for the facts, he presents a consistent and over all pattern of reducing and minimizing the details of all the significant issues in his life and their impact on him. This includes the offenses and well as his mother's death, father's violence and alcoholism and violence and abuse by his maternal family members.

In Mr. Battista's life, anger, violence and sexual behavior have been fused. Additionally, due to his genetic disorder and physical disfigurements (his legs), his self esteem and body image as a person have experienced significant injury. He was socially isolated, sexually inadequate and probably violent as a result. His environment was chaotic, abusive, sexually charged with no clear boundaries present. He has never had stable, positive adult role models present in his life. He appears to rationalize and minimize these very significant issues as a psychological defense against this very sad history. His assaults have been violent, impulsive and sexual in nature. He has continued to display significant aggressive, violent and impulsive behavior during his incarceration in the absence of a victim pool.

Mr. Battista is more able to discuss in some depth issues related to his genetic medical disorder. There maybe some biological basis as well as his psychological dysphoria (discomfort) he experiences related to his gender identity. It appears that he has a longstanding pattern beginning in childhood of cross dressing and other related experiences associated with his transsexualism. He clearly has a complex network of issues related to this, which he needs to work through. He has made what appears to be a very sincere offer to have his genitals removed to accomplish the dual task of beginning gender reassignment and reduce sex offending risk. In his zeal to accomplish this he has dismissed an attorney for not further pursuing an order to have this done.

The issues related to gender reassignment in the United States include an extensive battery of psychological tests, extensive lifestyle requirements, which are required prior to reassignment being considered. His history of sexual offense will be a significant hurdle to climb if not disallowed for this reason alone. The process is long and many factors are addressed as the person progresses to the eventual surgical procedure. He has indicated he would probably go to Thailand to have the surgery as it costs less, about $3500.00. Mr. Battista has the financial ability to accomplish this.

Mr. Battista states he is bisexual and spoke with candor about his arousal toward women. He made statements that suggest some confusion regarding his sexual preference versus his gender identity. Although none of his statements were mutually incompatible, he will need to come to grips with some of the competing statements. He is attracted to females and males. He is not sure if he would live as a woman. This would be required as part of the gender reassignment. He would be willing to remove his genitals without being clear regarding what use they may or may not have for him as he has had very limited sexual experience outside of prison. He also gave contradictory information regarding whether

has actually had sex with a female. What is important is not whether he did or not but what is the truth and why he would be unable to present this consistently.

Mr. Battista also presents with two chronic mental disorders, pedophilia and antisocial personality disorder. He has not received treatment for what appear to be, in his case, severe and complex disorders.

Mr. Battista has a history of sex offending behavior beginning as a juvenile. He also has demonstrated aggression and impulsivity. He has demonstrated a sexual preoccupation with prepubescent female children. This preoccupation in the past has led to sexual violence toward children. He minimizes responsibility in any of the incidents, therefore he demonstrates minimal insight or remorse.

In my opinion, due to the nature of the risk factors present and his general overall pattern antisocial behavior he would be likely to re-offend in a sexual manner.

In my opinion, Mr. Battista requires a secure facility at this time.

In my opinion, Mr. Battista currently meets criteria as a sexually dangerous person.

Respectfully Submitted,

Katrin Rouse, Ed.D.
Licensed Clinical Psychologist
Designated Forensic Psychologist
Qualified Examiner
Consulting Psychologist

C    nmonwealth of Massachuse
**County of Worcester**
**The Superior Court**



CIVIL DOCKET# **WOCV2001-01108**

Commonwealth of Massachusetts
    Plaintiff(s)

vs.

Sandy Jo Battista,
    Respondent(s)

## JUDGMENT ON JURY VERDICT

This action came on for trial before the Court and a jury, Constance Sweeney, Justice, presiding, the issues having been duly tried and the jury having rendered its verdict, finding that the defendant, Sandy Jo Battista, is a sexually dangerous person said Sandy Jo Battista is hereby committed to the treatment center for an indeterminate period of a minimum of one day and a maximum of the respondent's natural life until discharged pursuant to the provisions of section 9.

Dated at Worcester, Massachusetts this 15th day of May, 2003.

Francis A. Ford,
Clerk of the Courts

BY: _____

Assistant Clerk

Copies mailed 05/15/2003

cvdjudverp_1.wpd 945627 verdict brennanc



 Forensic
Health
Services
Incorporated

November 13, 2003

Sandy J. Battista #M-15930
D-1 Unit
Massachusetts Treatment Center

Dear Mr. Battista,

I have reviewed your letter (and related materials) dated November 3, 2003 requesting community access for treatment of Gender Identity Disorder.

If you are interested in applying for the Community Access Program you should first make this known to your primary group and unit treatment team. That is the first step in the application process. Your treatment team would determine whether or not your progress in the sex offender treatment program warrants endorsement of your application for consideration at the level of the Clinical Director.

Regarding treatment for Gender Identity Disorder, I would advise you to seek services via the UMass mental health program.

Sincerely,

Nichh Potr

Nicholas Petrou, Ph.D.
Clinical Director

EXHIBIT

**6**

(Pg. 1 of 5)

Sandy J. Battista, #M-15930
Mass. Treatment Center
30 Administration Rd.
Bridgewater, Mass. 02324

_____

Dated: 3/29/04.

Kathleen M. Dennehy, Commissioner
Commissioner's Office
Department of Correction
50 Maple Street, Suite 3
Milford, Mass. 01757-3698

RE: Equal Protection(Denial of Hormonal(Estrogen) Treatment, While
Prisoners Similarly Situated are Treated Differently").

Dear Commissioner Dennehy:

Hi, my name is Sandy J. Battista. I am currently "civilly" committed
to the Mass. Treatment Center, under G.L. Ch.123A, §14(d), as amended, and
have been since May 15, 2003. I have also since completed and have been dis-
charged from my previous criminal sentences of incarceration. (See IMS Inmate
Commitment No#W-39562)(effective 5/29/01). The enclosed is a complaint that
I'd like to submit to you on being denied "surgical castration" and "hormonal
(estrogen) treatment," while prisoners similarly situated are being treated
differently.

STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY:

On 5/24/01, just five days prior to my tentative release date from
prison, the Worcester County District Attorney's Office filed it's ex parte
petition seeking a determination as to my then alleged "sexual dangerousness.
See Commonwealth vs. Sandy J. Battista, WOPCV01-1108-C.

On 9/8/01, while temporarily committed and awaiting trial of my civil
commitment proceedings, I was seen at the Lemuel Shattuck ("LSH") for a hernia
repair. At this consultation, I informed the examining physician that I was
a (the) self-diagnosed "Transsexual" and requested to be "surgically castrated"
along with my hernia repair. The examining physician recommended that I be
seen at the LSH's Urology Clinic. See LSH Clinic Visit—Follow Up Consultation,
attached and marked as Exhibit-1. (Hereinafter "Ex.-   ").

On 9/10/01, I then requested upon the Treatment Center's Superintendent,
Mr. Robert Murphy to be allowed to be "surgically castrated" at my own expense.
Ex.-2.

On 9/12/01, Superintendent Murphy referred my request to the Treatment
Center's in-house Mental Health Administrator for a recommendation. Ex.-3.

On 9/18/01, the Mental Health Administrator then referred this request to the Treatment Center's in-house Psychiatric Medical Consultant, Dr. M. Bauermiester. Id. Dr. Bauermeister recommended to Superintendent Murphy that I be seen by an outside independent consultant and counseled on the physical and emotional effects of surgical castration. Id.

On 9/19/01, Superintendent Murphy refused to provide Dr. Bauermeister's recommendation. Ex.-4.

In or around September, 2001, due to Superintendent Murphy's refusal to provide Dr. Bauermeister's recommendation, I contracted with an outside independent gender expert, at my own expense. Ex.-5.

On 10/17/01, the expert I retained, a Ms. Diane Ellaborn, a licensed clinical social worker with 22 years experience in diagnosing and treating persons afflicted with gender disorders, diagnosed me as suffering from "Gender Identity Disorder(NOS)" and recommended that I be both surgically castrated and placed on female hormones. Ex.-6.

On 10/30/01, I once again made written request upon Superintendent Murphy to be surgically castrated and placed on female hormones, this time attaching a copy of the above expert's report to substantiate the need and recommendation for such. Ex.-7, and once again was denied. Ex.-8.

On 3/23/04, I was seen at the LSH's Endocrinology Clinic for a consultation on a Congenital Condition. While awaiting consultation, I spoke with a trans-gendered prisoner, Kenny Hunt, who is housed at MCI-Shirley Medium. Ms./Mr. Hunt informed me that he was at the LSH for consultation, as he was under-going hormonal(estrogen) treatment that was approved by the DOC just three months ago. Ms./Mr. Hunt also informed me that the DOC was allowing another transgendered prisoner, Michelle Kosilek, housed at MCI-Norfolk, the very same treatment, along with being allowed the privilege to retain a make-up kit.(Both inmates Hunt and Kosilek were not receiving this treatment prior to their individual incarceration, and are in general population).

DISCUSSION:

Admittedly, in the context of the prison environment, courts have gen-erally not required prison officials to provide transsexual prisoners with any particular type of treatment, such female hormone therapy, as long as they are receiving some type of treatment. Meriwether vs. Faulkner, 821 F.2d 408, 413 (7th Cir. 1987)(holding that a transsexual prisoner is entitled to some type of medical treatment, but has no constitutional right to any one particular type of treatment where another form of treatment is made avail-able). However, unlike prisoners, persons like myself who have been "civilly" committed are constitutionally entitled to "more considerate treatment and conditions of confinement, than prisoners whose conditions of confinement are designed to punish," Youngberg vs. Romeo, 457 U.S. 307, 322 (1982), and are statutorily entitled to "treatment and rehabilitation." See Commonwealth vs. Bruno, 432 Mass. 489, 735 N.E.2d 1222, 1231 (Mass. 2000); see also Common-wealth vs. Barboza, 387 Mass. 105, 438 N.E.2d 1064, 1069 (1982)(observing that Ch.123A "was enacted 'with the dual aims of protecting society against future antisocial behavior by the offender,' and of doing all that can be done to rehabilitate him")(boldface emphasis added); citing Commonwealth vs.

<u>Rodriguez,</u> 376 Mass. 632, 646 (1978).

Lastly, and on a more personal note, with all respects Commissioner, hormonal treatment is no more cost effective than all other medications currently being provided through-out both the prisoner and civil populations within the DOC. The only reasons I've been denied this treatment is for two reasons. One, because such treatment is not constitutionally required of prison officials to provide. The other, because of both safety and concerns of liability for allowing this treatment while in general population. Yet, inmates Hunt and Kosilek are obviously being provided this treatment in the general population, clearly in contrary to these contended concerns. Nevertheless, although admittedly there is no constitutional guarantee within the prison context to this form of treatment, persons like myself who have been involuntarily civilly committed are constitutionally entitled to "more considerate treatment and conditions of confinement, than prisoners who conditions of confinement are designed to punish," and statutorily are entitled to "treatment and rehabilitation" under Ch.123A. Moredirectly, it is further premised upon my civil commitment that my gender issues were a consideration of the state's examiner's justification for confining me to the Treatment Center for such "treatment and rehabilitation." See for example <u>Report of Qualified Examiner to the Court,</u> at page 14:

> ...There may be some biological basis as well as his
> psychological dysphoria(discomfort) he experiences re-
> lated to his gender identity. It appears that he has a
> longstanding pattern beginning in childhood of cross
> dressing and other related experiences associated with
> his transsexualism. He clearly has a complex network
> of issues related to this, which he needs to work
> through." (Emphasis added).

Ex.-9. 1/ This alone presents a legitimate question as to whether my civil commitment was based in part on my gender issues, thereby, statutorily entitling me to some form of treatment and rehabilitation. Indeed, implicit in the statute and its purpose is the obligation to provide an environment conductive to a "cure or an alleviation of the dangerous trait." <u>Barboza,</u> 438 N.E.2d at 1069. 2/ Upon your consideration, if allowed, in exchange, I am open to signing three (3) separate waivers of any and all claims and liability, as follows. The first waiver would voluntarily dismiss and abandon all claims recently filed in the District Court in <u>Sandy J. Battista vs. Robert Murphy, Superintendent, et al.,</u> U.S.Dist.Ct.C.A.No#03-12643-MEL(which is a pro-se Complaint I've recently filed on the subject matter enclosed, though has yet to be served upon the DOC). The second waiver would consist of me releasing the DOC from any and all future claims and liability, as a result from any future events yet occurred while remaining in the general population and being alllowed this treatment.(Which I'm quite sure your legal advisors will inform you is completely legal 3/). The remaining waiver, though admittedly against my better judgment, as I am not quite sure with retained counsel I should be discussing this matter without his intervention, would include my dismissing a seven year old lawsuit, which is scheduled to go to trial this year. This particular suit was filed back in 1997 while at MCI-Norfolk and while incarcerated, involving an incident between myself and Lieutenant Devine(now Captain Devine), alleging that he, while other officers did nothing and looked on while Lt.- Devine physically assaulted me while hand-cuffed behind my back. See <u>Sandy J. Battista vs. Paul DiPaolo, et al.,</u> Suff.Sup.Ct.C.A.No#97-5260-F(representing

DOC counsel Richard C. McFarland 5/). This is a beneficial proposition for both sides. Moreso for the DOC, as the cost of merely providing me surgical castration and hormonal(estrogen) treatment is no more cost effective than providing regular prescribed medications to both the inmate and civil populations. Contrast cost of pursuing both the above two suits, not to mention the devastation a favorable verdict will have against the DOC in a seasoned Captain beating a transgendered inmate while hand-cuffed behind his back, while other officers just looked on and did nothing. Even assuming that a negative verdict against me results here, the effects the publicity at trial will have against the DOC is just as devastating, especially so close to the Father Gaigon incident. Accordingly, upon your consideration, if allowed, you need only to arrange for the waivers to be drafted, which I'll sign voluntarily, then arrange for two separate consultations at the LSH(one at the Urology Clinic for surgical castration, the other at the endocrinology clinic for a hormonal(estrogen) regimen). 6/

In closing, I thank you for your time and consideration here, and by no means have intended any disrespect by any part of the enclosed. My only intention is to secure treatment that I've desired my whole life. As a woman yourself, please try to understand the effects this disorder has on me and the relief and comfort I'll have being provided this medication. For once in my life I will be able to look into the mirror and not see a stranger.

Thank you once again for your time, consideration and attention to the enclosed request. I patiently await your reply.

Sincerely,

Sandy J. Battista, #M-15930

cc: S.J.B.(FILE)

---

FOOTNOTES:

[1] It is noted here that, even the retained independent expert I hired has opined that my disorder, unlike a majority of self-proclaimed transsexuals, is biological. Thereby, legally constituting a recognized disability under the Social Security Disability Act, which still recognizes only those gender disorders resulting from either a "physical" or "mental" impairment as being a recognized disability. Arguably, if released, I would be entitled to such benefits and treatment at the Government's expense.

[2] Here, not only does the state's examiner(ex.-2), and my retained independant expert, Ms. Ellaborn(ex.-6), opine that such treatment would clearly "reduce my risk of re-offending sexually," but studies reveal that the populations of surgically castrated sex offenders showed recidivism

_____

FOOTNOTES CONTINUED:

rates of 1.1% to 7.4%—as opposed to presurgical reoffense rates of 50% to 76.8%. See Robert A. Prentky, Arousal Reduction in Sexual Offenders: A Review of Antiandrogen Interventions (1997). Sexual Abuse: A Journal of Research and Treatment, 9, 335-349.

[3] It is noted here that, without such a waiver, at present, with the DOC fully being aware of my documented gender issues, any such present or future wrongs would be held liable. With such a waiver, no matter what happens in the future by either staff or my peers, I'd lack standing to claim any liability upon the DOC. I could arguably be literally physically or sexually assaulted, and the DOC not be held responsible. Whereas, at present, with my feminine mannerisms/characteristics, any reasonable official exercising his discretion should be on notice that my safety is a concern among, in particular, the population of the Treatment Center.

[4] It is noted here that, the enclosed request is [not] to suggest any other special consideration, i.e., sex reassignment, female clothing, or special housing. To the contrary, the enclosed is [only] requested for consideration to be "surgically castrated" and placed on "hormonal(estrogen) treatment."

[5] Here, if upon your consideration you allow the enclosed request, I ask out of professional courtesy to my retained trial attorney, that you allow me the right to present this matter to him so that he can in turn re-present to the DOC. It is only common professional courtesy to my attorney not to negotiate any settlements without his intervention.

[6] For your convenience, please note here that I have to date provided the specialist at the LSH's endocrinology clinic, Dr. Maria R. Warth, with a copy of this Gender Evaluation. Dr. Warth has stated that she would be medically and ethically able to provide this treatment upon the DOC recommendation. No further evaluations are necessary. If allowed by the DOC, the LSH has stated it will provide me with such treatment.



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Massachusetts Treatment Center*
*30 Administration Road*
*Bridgewater, Massachusetts 02324-3230*
*(508) 279-8100*
*Fax: (508) 279-8105*
*www.mass.gov/doc*

**EXHIBIT 7**
(Pg. 1 of 16)

Mitt Romney
*Governor*

Kerry Healey
*Lieutenant Governor*

Edward A. Flynn
*Secretary*

Kathleen M. Dennehy
Acting *Commissioner*

James Bender
Acting *Deputy Commissioner*

Robert Murphy
*Superintendent*

## COMMUNITY ACCESS BOARD ANNUAL REVIEW

### I.    IDENTIFYING DATA:

**Resident's Name:** Sandy Jo Batista

**Commitment #:** M-15930

**Sentence:** N/A

**Parole Eligibility:** N/A

**Status:** Civil

**Date of Review:** 4/21/04

**D.O.B.:** 12/30/61

**Date of SDP Commitment:** 5/15/03

**Sentence Effective Date:** 2/28/83

**Maximum Date:** N/A

**Date of Last Review:** N/A

**BOARD MEMBERS PRESENT:**

Frank DiCataldo, Ph.D., Author
Katrin Rouse Weir, Ed.D.
Margery Gans, Ed.D.
Fred Krell, Ph.D.
John Novero, Director of Civil
Commitment, D.O.C.

**STAFF MEMBER PRESENT:**

Shawn Thomas, M.Ed. and Anne
Boutin-Gammons, M.A.

**SDP DETERMINATION:**

The CAB voted unanimously (5-0)
today that Mr. Batista remains a
Sexually Dangerous Person.

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 2 of 16

## II.    CIRCUMSTANCES OF THE REVIEW:

A meeting was held on this date for the purpose of an annual review of treatment as prescribed by MGL Chapter 123A, Section 6A. An evaluation was conducted by the Community Access Board at the Massachusetts Treatment Center. Components of the current review include an assessment of Mr. Batista's treatment progress since his commitment, recommendations for the upcoming year and a vote on his Sexually Dangerous Person Status. Mr. Batista chose to meet with the Board on this date and participated in an interview. The meeting was audiotaped at his request. Two members of his treatment team were interviewed.

## III.    WARNING ON THE LIMITS OF CONFIDENTIALITY

Mr. Batista attended today's meeting and was informed about the limits of confidentiality by Mr. Novero. When asked to paraphrase the admonition Mr. Batista was able to accurately paraphrase the warning in his own words.

## IV.    SOURCES OF INFORMATION:

The current report was prepared following the most recent review. The review considered information from the resident's records at the Massachusetts Treatment Center, past reviews, a presentation by a member of his treatment team, and the resident's interview on this day with the Board.

The present report is intended to summarize the major findings and conclusions of the Board. All Board members who were seated had input into the report.

## V.    RELEVANT HISTORY:

FAMILY HISTORY:

Mr. Batista was born David Megarry on December 30, 1961. He was the middle of three children born to his mother, Diana (Batista) Megarry, and father, David Megarry. His father also had another child with his second wife. It is unclear whether Mr. Batista keeps in contact with any of his siblings. In her Report of Qualified Examiner to the Court, dated 4/1/02, Dr. Rouse says that Mr. Batista told her that he keeps in close contact with his older sister. However, Dr. Rouse also notes that DOC records show that Mr. Batista has no contact with his family since they avoid him because of his crime.

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 3 of 16

When Mr. Batista was between the ages of six and eight his father beat his mother to death after finding her in bed with someone else. Mr. Batista may have witnessed his mother's death, but Mr. Batista will not confirm this. According to David Campopiano's report, dated 11/18/98. Mr. Batista said that, "he was unable to recall many events as a child, especially those involving his parents." He seems to have blocked out most of his early childhood.

Mr. Batista's father was incarcerated for the death of his wife and Mr. Batista and his two siblings were sent to live with their maternal grandparents. They were removed from this situation after only a year due to neglect and abuse. Mr. Batista does not recall being physically or sexually abused. However, records show that the children were locked in a bathroom and firecrackers were thrown at them. Apparently, the children were also living in the basement, all three sleeping on a pullout sofa bed and existing on inadequate nourishment. The children were also exposed to pornographic materials and the sexual behavior of their grandmother and her friends.

Mr. Batista and his brother and sister went next to live with their paternal grandmother. While this situation was a large improvement over the last, Mr. Batista's grandmother had to file a stubborn child report against him. He remained with her until his father was released from prison. Then the children moved back in with their father. However, Mr. Megarry turned Mr. Batista over to foster care after three months, because he could not control Mr. Batista. Mr. Batista's records indicate that he engaged in sexual activity with his stepsister and other female family members when he was 12 or 14 years old. Although he was never formally charged, this seems to be the basis for his father placing him in foster care.

He moved through a number of foster homes until he was sent to the Department of Youth Services program at Medfield State Hospital in 1977, due to his grabbing a 10-year-old girl and attempting to sexually assault her. A neighbor saw this occur and reported it. Mr. Batista was charged with Assault and Battery as a juvenile and committed to DYS until the age of 18. He escaped from Medfield State Hospital in October 1977, but was returned to custody in January of 1978. He remained at Medfield until he was 18 years old, at which point he was discharged from DYS, and then went to live with his father's ex-girlfriend. This woman had two children, an 11-year-old girl and a 10-year-old boy. He continued to live with this family until he was committed for his governing offense. He had a brief stint in the military between July and November 1982 when he was discharged due to "fighting and drinking."

Mr. Battista left school in the eighth grade when he was committed to DYS. He had tutoring while at DYS but did not get his GED until 1982. He finally took the test so that he could get into the military. He has since taken the GED two more times, while incarcerated. Dr. Rouse writes that, "He is clearly proud of his self-education process

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 4 of 16

regarding his use and application of the law library." He has expressed an interest in becoming a paralegal and working in a law office upon release.

Mr. Batista has previously been employed at McDonald's, as well as the Steven Walden Tool Factory for two years before his incarceration. He has had to work throughout his incarceration, in the unit laundry, kitchen and law library, because his family does not send him any money.

Mr. Batista reports that he used alcohol and marijuana starting at the age of about 18. He told Dr. Joss, as reported in a Sexual Dangerousness Assessment, dated 3/30/02 that he, "was not under the influence of alcohol or drugs at the time of his offense." Dr. Joss goes on to state that Mr. Batista did tell Dr. Daniel Weiss in a 1984 evaluation that he did not remember much about the offense because he was drunk and had been smoking marijuana. He also told Dr. Marc Whaley in 1983 that he had used marijuana on the day of the offense. It remains, therefore, unclear whether Mr. Batista actually had a substance abuse problem before his incarceration.

## CRIMINAL HISTORY:

In addition to the Governing offense, Mr. Batista has a prior and subsequent criminal history. According to the report by Dr. Rouse:

> During this incarceration, in July 1996, Mr. Battista was found guilty of two counts of Assault and Battery against a guard. He bit an officer during an escort after a fight involving several inmates. The guilty findings were filed.

> Two charges for Breaking and Entering at night were initially presented at a bench trial. He was sentenced to one year. Mr. Battista appealed it and a jury of six upheld the original finding and sentence.

> There appear to be two warrants still open in Uxbridge District Court regarding property violations and Breaking and Entering at Night. Arraignment dates were September 30, 1981.

Mr. Batista's juvenile record consists of the sexualized Assault and Battery offense previously described as well as a DYS commitment for Larceny From a Person occurring seven months later.

## PSYCHOLOGICAL/MEDICAL HISTORY:

Mr. Batista was born with the disease Congenital Adrenal Hyperplasia. This disease causes accelerated growth and maturation in children. Therefore Mr. Batista began

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 5 of 16

growing body hair at the age of 18 months and his genitals began to develop as an infant. It is reported that this caused his mother to reject him. She would not change him, bathe him, or in general, touch him. Because of his disease, Mr. Batista was often ridiculed by other children. His childhood was further negatively impacted by the fact that he was pigeon-toed. However, this affliction did have a positive side, in that it allowed him to be excused from gym classes and he, therefore, did not have to endure the humiliation of changing in the locker room. He had corrective surgery on his legs as an adolescent. As he became older his disease was no longer a factor, because everyone else was also maturing and he did not stick out as much. The disease impacts the stature of inflicted people, so Mr. Batista has remained relatively short and slight throughout his life. He also has had to take medication every day since he was about 4 years old. He is currently taking Dexamethazone. He was previously taking Hydrocortisone.

Mr. Batista has been involved in one-on-one therapy for the last several years. He also received treatment while he was in DYS. He has no history of major mental illness, although he has been diagnosed with a Personality Disorder with Impulsive Antisocial Features when he was hospitalized at Bridgewater State Hospital for an evaluation related to his commitment offense. Because of this he has not received psychiatric medication or ever been hospitalized for the treatment of a mental disorder. He had a Department of Mental Health evaluation when he was 18-years-old, but was found ineligible for commitment to a secure DMH facility.

In 1997, John Tyler Carpenter, Ph.D. performed a psychological evaluation on Mr. Batista. In his report, as excerpted by Dr. Rouse, he reports that Mr. Batista had Average Intelligence. He identified that Mr. Batista had awareness that "there is something wrong with his self-image. He thinks the solution to his problem is to concretely change his anatomy to fit his fantasized identity." He diagnosed him with a Gender Identity Disorder NOPS, Depressive Disorder NOS, Cognitive Disorder NOS, Transvestic Fetishism with gender dysphoria, Pedophilia (attracted to females), Body Dysmorphic Disorder, Eating Disorder NOS, Cannabis Abuse, Alcohol Abuse, Antisocial Personality Disorder, and Borderline Personality Disorder.

## SEXUAL HISTORY:

There exists some conflicting information regarding Mr. Batista's sexual history. He has made conflicting reports to his therapists and evaluators. He told Dr. Rouse that he had one sexual relationship with a woman when he was 18, but he stated to David Campopiano that he had his first sexual experience when he was 34 with a male who he was incarcerated with. He has always stated that he had two consensual sexual relationships with two men while incarcerated. He noted though, to Dr. Rouse, that the men "looked more feminine than I do."

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 6 of 16

Mr. Batista was evaluated by Diane Ellaborn, LICSW, a gender specialist. She found that he met the criteria for Gender Identity Disorder. Dr. Ellaborn also stipulated that Gender Identity Disorder often accompanies his medical problem. She recommended surgery, which would consist of removal of Mr. Batista's penis and testes, and Cross Gender Hormone Treatment. Dr. Ellaborn related that this treatment would reduce the risk of Mr. Batista reoffending. Mr. Batista has been petitioning the courts to allow him to have this surgery and he has even solicited the media to help make sure that the court pays attention to his plea. According to Dr. Rouse's report, "Records indicate he binds his genitals and has attempted to freeze them and tie them off in order to rid himself of them."

As a child, Mr. Batista wore his sister's underwear and clothing. He currently plucks his eyebrows and shaves his legs to appear more feminine. He also changed his name to Sandy Jo in an attempt to take on the persona of a female. In addition, Mr. Batista tattooed a mole on his upper lip and alters his sweatpants so that they are more form fitting. He often receives disciplinary reports as a result of his appearance and has currently been denied his request for makeup and women's underwear, because of the fact that he resides in an all male prison.

Mr. Batista has admitted to making sexually explicit phone calls to young girls he read about in newspapers during the year of 1986. He has reported that he fantasizes about women in magazines and a man making love to her. He indicated that about 6 or 7 years ago the fantasies switched to him being the woman. Mr. Batista considers himself to be a bisexual and also a transsexual.

## INCARCERATION HISTORY:

Mr. Batista has had a difficult adjustment to his incarceration. He has had 16 institutional failures; a DSU, a special segregation unit, placement; one attempted escape; 4 transfers to higher security facilities; two assaults on staff members, both of which resulted in criminal charges (guilty, filed); and he has had about 68 disciplinary reports filed on him. The attempted escape occurred in March of 1988 at the Hampshire House of Corrections. Mr. Batista had cut through some of the cell window bars using a hacksaw blade. He had also made an operational key from a comb and was planning on using that to open the window. A lot of his disciplinary reports are due to his appearance, either because cross-dressing is against policy or due to his getting into fights with other inmates because of his cross-dressing.

He has been denied parole six times because of his behavior while incarcerated and the seriousness of his crimes.

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 7 of 16

He served approximately 18 years in the state prison system. from 1983 until 2001, for his governing offenses.

He has completed Phase I of the Sex Offender Treatment Program, although he has not gone further due to his disciplinary problems. He was scheduled to begin Phase II but then was transferred to Gardner because he had threatened a correctional officer. He did not return to his Sex Offender Treatment until he was transferred to the Treatment Center. He has since continued with his treatment.

## VI.    HISTORY OF SEXUAL AGGRESSION AND GOVERNING OFFENSE:

### GOVERNING OFFENSE

According to the Milford Police report, dated 12/5/82:

As a result of a call from the station, I proceeded to the S. residence on [address given]. Upon arrival, I was met by Mrs. S. and she told me that a young girl came running into her yard all hysterical. I then saw the girl and she was crying uncontrollably. Mrs. S. stated that she had washed the girls hair off as it had a considerable amount of semen in it. After the girl calmed down somewhat, I was able to learn that she was from out of town and that a man had brought her to Milford in his car. I spoke with her in the cruiser and calmed her down more, and was able to learn that she had been forcibly put into the man's car and taken to a wooded area where the man raped her and then let her go. The following is the statement received from the victim:

I was selling fudge on West. St. and was going up the driveway to the house next to my grandmother's when a man yelled (they're not home, are you selling candy bars?) I answered no, it's fudge. He said (why don't you go up this road to the white house, my mother will buy some). Then he walked up the road. I went to a couple of more houses to sell fudge, then I started to walk up the road to go to the white house. As I was walking up the road, he came out of the field on the dirt road and I saw his car parked there. He said, (what are you selling, fudge?) I said yes and he said (let me get my wallet) and he walked back to the car. He then walked back to me with his wallet. He grabbed me and dragged me to the car and pushed me inside. I tried to kick him while he was doing this. When he got me in the car, he started it up and took a right turn and went up to the end of the street and took a left turn and then took another left turn further up the road. He went down the road and turned around and came back and went up the dirt road into the woods. When he stopped the car, he

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 8 of 16

> moved a black console from the front, and put it into the back. He took the
> fudge from me and put it into the back. On the way there, I asked him where he
> was taking me, and he said (you'll see). I told him to please take me to my
> grandmother's house, and he said no. Every time I yelled for help, he told me to
> keep quiet. After he put the fudge in the back seat, he put a purple cloth in my
> mouth and tied a nylon around my mouth and head to gag me. Then he took all
> my clothes off and took his off, too. Then he put his fingers in my vagina and
> then a short time later he made me put his penis in my mouth and then made
> me squeeze his penis with my hand. Then he peed on me. Then he told me if I
> wanted to get out now to go ahead. I grabbed my clothes and got out of the car
> and he took off. I got dressed and ran to the first house on the street.

As a result of this offense, Mr. Batista was charged and convicted of Rape of Child by
Force for which he received a 12-20 year sentence, Unarmed Robbery for which he
received a concurrent 12-20 year sentence, and a 9-10 year sentence for Kidnapping.

The records do not contain an official version of his past sexual offense that formed
the basis of his commitment to DYS. Dr. Rouse, in her report of 4/1/02, provides a
brief review of this offense:

In March, 1977, at age fifteen, he was arrested and charged with Assault and
Battery. He grabbed a ten-year-old girl at the bus stop and took her into the woods.
He was planning on sexually assaulting her when a neighbor intervened. He
himself indicated the assault was sexual in nature, however, it was brought forward
as an Assault and Battery.

A Pretrial Intake Summary was completed by Paul Bernard, Probation Officer dated,
March 9, 1984; included in the Intake Assessment of Katherine Gotch, M.A., dated
6/19/03, it is reported:

A Bridgewater State Hospital report dated January 12, 1983 reveals that subject
was admitted on December 10, 1982 having been referred by the Third District
Court of Southern Worcester. The report contains information that subject did
make a clear and definite statement that he realized and understood that having
sex of any kind with a child who is under the legal age of consent was against the
law, and he indicated that he knew this at the time that the present offense
occurred. He further stated that, "I got the feeling to do it, and I couldn't control it."
The report further stated that he has had this problem on numerous occasions in
the past and that he had similar experiences with other female children under the
age of consent in the past and that he had a "problem with sex." Other excerpts

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 9 of 16

from his report indicate that when subject was around fifteen years of age he had experience with a child that he did not detail except to say that it was similar to the instant offenses and in that case he was apprehended and prosecuted. As a result, he was placed in the Adolescent program in Medfield State Hospital where he remained from approximately fifteen years of age to the age of eighteen. He was discharged when the program went out of existence.

## RESIDENT'S VERSION OF THE GOVERNING OFFENSES

At the time of his arrest for the governing offense, Mr. Batista provided the following statement:

I was here Sunday visiting my sister because she was going home on Monday. I got to my sister's about noontime and stayed for a few minutes and then went out riding around and saw this girl with her brother. So I rode back and forth by them a few times and saw her go on her own so I parked the car on the dirt road. I walked back by the street and yelled to the girl that if she walked down the street to the white house, my mother would buy some fudge. I then walked back to the car and waited. She came walking by and I picked her up and carried her to the car and put her in the passenger side door. I then got in the car and drove away. I took a right out of the dirt road and went out to Rt. 109. I took a left off of Rt. 109 and headed into the woods. I went by a dirt road and turned around and went up the dirt road. I parked the car in a clearing and shut the car off. I moved the [undecipherable] into the back seat and told her to put the fudge in the back seat also. She didn't do it, so I took to the fudge and put it in the back. I then told her to turn around and I put a rag in her mouth and tied a nylon around it. I tried to take her sweater off but she wouldn't let me so I left it on. I then undid her pants and she tried pushing me away with her hands. I got the pants undone and pulled them off and her shoes came off at the same time. Then I took my pants off. I then laid on top of her and put my penis in her vagina for a short period of time. I had her vest over her head prior to this and then I took it off her head. The gag had come off her mouth and I put my penis in her mouth after I told her to open her [undecipherable]. I kept it in her mouth for a few seconds while I had my fingers in her vagina going in and out. I then put her hand on my penis and told her to keep stroking it and she kept stroking it for about a minute or so and then I came off. At this point I told her she could leave and I opened the door and she grabbed her clothes and got out. I left and went back out to Rt. 109 and headed home by the way of Rt. 140. While somewhere on Rt. 140 near Yogi's I threw the box with the envelope inside of it out the window. I kept the sixteen dollars that was in the envelope and then went home.

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 10 of 16

Mr. Batista provided an account of the governing offense to Dr. Joss:

> Mr. Batista's present account does not vary appreciably from the account he gave
> at the time of his arrest. He did however give some additional background
> information stating that he was out of work at the time and was cruising in his car.
> He indicates that he saw the girl going house to house selling a product. He goes
> on to indicate that he abducted her to a secluded area. He indicates that he now
> knows she was ten years old and he indicates that she was crying at the time. He
> indicates that she was asking what she did and "why did I take her?...She wanted
> to go home." He indicates that he took her to a secluded area and digitally
> penetrated her in the front seat. He indicates that there was a brief oral penetration
> and then he made her masturbate him. He indicates that he ejaculated. He
> indicates that he was with her for about fifteen minutes and in the secluded area
> with her for about five minutes. He indicates that he is able to identify no specific
> characteristics of the victim that made him chose her but noted that she was petite
> and of a similar age and size to the girl he had accosted as a juvenile.

Mr. Batista was not willing to provide an account of his governing offense to the Board
on this day citing his inability to "trust" us enough to engage in such a disclosure. But
held out that that he was sure that he would be able to in the future.


## VII.    **FACTORS CONTRIBUTING TO THE OFFENSE:**

Mr. Batista has a wide-range of significant risk factors, both static and dynamic,
likely active at the time of the governing offense and continuing, at the present
time, to place him at a substantially high risk for sexual re-offense.

Mr. Batista was reared within a chaotic and disorganized family system that
was violent and abusive, culminating in his father killing his mother. He has an
early history of conduct problems and aggressiveness beginning in childhood.
There is clear evidence of the early manifestation of sexual deviancy, when at
age 15 he kidnapped a younger girl victim, a stranger, and attempted to
sexually assault her in the woods. This offense bears an unavoidable similarity
to the Governing offense, occurring about five or six years later, strongly
suggestive that the offense scenario - the abduction of a stranger,
prepubescent female, who he rapes in a secluded and isolated area - has a
strong, enduring value and attraction to him. He has a history of other non-
sexual criminal offenses. He may have multiple paraphilias as suggested by
his prior self-report of making obscene phone calls while incarcerated to young
girls he heard about in the news. This behavior may be a separate paraphilia,
or it may be a derivative of the sexual deviance that drove his 1977 and 1982

offense, the governing offense, that was morphed by the limiting circumstances of his incarceration into the more benign paraphilia of telephone scatologia. Regardless, its presence indicates the continuing presence of sexual deviance even within the controlling confines of a correctional facility, extending from at least middle adolescence to adulthood. There is discrepant information regarding the active presence of substance abuse at the time of the offense. If present, it is likely a risk factor worthy of consideration and treatment as a facilitative, not causative factor.

## VIII.    TREATMENT HISTORY AND PROGRESS:

According to the Annual Treatment Review, written by Anne-Boutin-Gammons, M.A., dated March 10, 2004, documenting Mr. Batista's prior year of treatment participation and progress, Mr. Batista regularly attended Primary Group and was an "active" member; "however, at times he has difficulty giving and receiving feedback." He also attended the vast majority of this Unit Community Meetings, and chaired one meeting.

He completed three psycho-educational classes: Cognitive Distortions I, Relapse Prevention II, and Victim Empathy I. Evaluations from the classes were positive, describing him as active and as generally demonstrating good command of the concepts and skills. Notably, he was described as having demonstrated in his Empathy I Class "a new insight into his need to feel empathetic towards his victims and others."

He did not attend any Specialty Groups but did attend a Treatment Facilitation group from November 2003 to January 2004. The purpose of the group is to provide a therapeutic group forum for residents to discuss "specific points in treatment that are preventing them from making further progress in treatment. According to the Annual Treatment Review, dated March 10, 2004,"

Mr. Batista attended this group to address his difficulties with anger. Mr. Batista's participation in this group is described as being contradictory, as he was a very active participant in this group but he often became angry and frustrated with other members, and eventually could not contain his anger towards the group leader or members. He also had extreme difficulty tolerating the group setting, and became intolerant of others. In addition, he was noted to have difficulty seeing beyond his own immediate concerns, but he is articulate and even somewhat insightful and could be helpful to other members but his anger gets in the way. Mr. Batista terminated this group prematurely on his own initiative on January 20, 2004.

Regarding progress on Major Areas of Clinical Focus/Treatment Plan, on the issue of

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 12 of 16

Cognitive Restructuring, Mr. Batista completed the workbook "Who Am I and Why Am I in Treatment?" He demonstrated ability "to acknowledge that he engaged in blaming others, intellectualizing, and justifying." He was also able to demonstrate multiple ways in which he uses denial in his everyday life.

On the "Identification of Sexual Assault Cycle", Mr. Batista agreed with the recommendation to attend Relapse Prevention I, even though he reports having attended this class previously. He further agrees with the necessity of completing a deviant cycle before progressing on to further work on relapse prevention goals.

Mr. Batista has refused to undergo a Phallometric Assessment, recommended by his team under the Clinical Focus - Identification and Modification of Deviant Sexual Arousal.

On "Relapse Prevention", the team recommended that he complete his Relapse Prevention Plan. Mr. Batista reportedly has completed all the recommended psycho-educational classes as preparatory for working on his RP Plan with the exception of Relapse Prevention I, which he reports having taken prior to his civil commitment but for which no record exists. He agreed to take this course again. He is currently in the process of preparing to present his Plan to his Primary Group.

In accordance with the Clinical Focus - "Accountability and Accepting Responsibility" - Mr. Batista has begun the process of disclosing more of the details of his Governing Offense; although he has demonstrated some anger and resistance regarding this process. He has yet to engage in a similar process for his prior juvenile sexual offense.

He is presenting his Autobiography to his Primary Group, but, according to his Annual Treatment Review, a signed off version, indicating its acceptance as complete, was not in his file because he did not want any of his treatment paperwork in his clinical file.

Mr. Batista did not address the role of substance abuse played in his life and Governing Offense as recommended, claiming that it did not play a significant role but indicated that he is willing to examine this issue more carefully.

Mr. Batista agreed to attend the Anger and Stress Management Psycho-Educational class to begin the process of addressing the role of stress and anger on his life and Governing Offense, but he left after four classes "because he became angry about his perception of the lack of structure in the class and that he wasn't learning anything in the class." He did, however, to his credit, discuss the role of anger and stress in his life and his offense when he presented his autobiography.

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 13 of 16

He did attend Victim Empathy I and has discussed the issue in a variety of settings. He admitted this is one of the most difficult issues to discuss and that he needs to work further on this issue in treatment.

Mr. Batista did not attend the Understanding Human Sexuality Psycho-Educational Class and the Social Skills Psycho-educational Class as recommended.

On the Adult Life Skills focus, Mr. Batista has not found a job on his new unit but is actively looking.

Mr. Batista has attended 90% of his Primary Group meetings as recommended under the clinical focus - Relapse Planning and Transition Into the Community.

Mr. Batista had no Observation of Behavior Reports.

His Annual Treatment Review concluded,

> Mr. Batista presents as having gained some insight into his deviant sexual behaviors including identifying some Cognitive Distortions that he engaged in at the time of his offense. However, his anger and "prison mentality" appear to be considerable factors in his treatment as they often affect his treatment status. Although Mr. Batista presents as having slightly improved his anger since being found to be a Sexually Dangerous Person and is able to acknowledge that anger is a factor for him, he does not consider it to be interfering with his treatment. Mr. Batista should use caution minimizing the effects of his anger on his treatment, as there are several incidents where his treatment was affected. For example, during the review period he has dropped out of the two treatment groups (The Treatment Facilitation Group and Anger and Stress Management). In addition, his continued engagement in the "con code" is also a significant factor in his treatment, as he has difficulty understanding the importance of giving feedback in Primary Group and this is therefore an obstacle for him.

According to Shawn Thomas, M.Ed. and Anne Boutin Gammons, M.A., members of his treatment team, Mr. Batista is still engaged in the process of "settling in" and becoming involved in the program. The team has taken the position that Mr. Batista's Gender Identity issues are a mental health concern and have directed him to pursue this with the mental health provider. They have identified anger as a central issue that pervades his Governing Offense and affects his relationship with the program. They believe that he is only just beginning to see the far-reaching effects of his anger. They have raised some concerns about his need to "fast-track" his treatment, noting how his impatience may inhibit his treatment, rather than facilitate it.

Mr. Batista met with the Board on April 21, 2004. He identified three major areas of

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 14 of 16

progress that occurred over the course of the past year. First, he believes he is "better able to accept feedback from others in group." He remarked that it has taken time for him to adjust from being a self-protective and defended state inmate to an open therapeutic subject. Second, he has made progress on his Relapse Prevention Plan. He also stated that his treatment team told him to put this project "on hold" until he got further along on his deviance cycle. And third, he has begun to address cognitive distortions, citing his having taken Cognitive Distortions and has started to look more closely at how he "looks at things." As an example of his revision of cognitive distortions, he described how at the time of his Governing Offense he held the view that it was permissible to have a "date" or sexual relations with an under-aged person as long as it was not forced.

When asked about his current perspective on the nature of his sexual deviancy, he replied, "I haven't got that far into it yet", admitting that his anger tends to get in the way of his work on this issue. He described just starting to construct his deviant cycle, making it seem as though it were a "work in progress."

Mr. Batista was unable to provide an account of his offense to the Board on this date, stating that it will take time to "trust" enough to engage in such an activity but that he was sure he would be able to do so one day. He claims he has "an idea of why he did it...but is not 100% sure." He explains his uncertainly about the motivation for his offense by reminding the Board that "I have only been in therapy one year."

He was able to provide a version of some of the historical issues at the core of his sexual deviancy. He reports having been born with a rare disorder that contributed to his distortions in his psychosexual development that have life-altering ramifications, such as a deep-seated feeling of "inadequacy about his body" that has interfered with his ability to have sex with a woman "willingly" because of "fear of rejection" and fears that "women would "laugh at me. He is still attempting to remedy and correct this problem. He later stated the position that his "Gender Identity Disorder", an issue that is related but stands apart from the historical issues underlying his offense, are not connected with his offending in any direct way.

Mr. Batista identified himself as a bisexual who no longer has sexual interest in children anymore. He then claimed, however, "I'm trying to get them out of my head", a statement that indicates that there still were deviant fantasies that needed "getting rid" of.

He clearly stated his refusal to have a Phallometric Assessment was based on his belief that the process was demeaning and dehumanizing, and that he refused to participate in an activity that reduced him to a "lab animal." He did, however, agree to do behavioral treatment without the PPG.

He ended by identifying the expansion of his victim empathy as a major goal for the upcoming year. He admits that he still "struggles with (assuming) the "victim stance" and that it is "preventing me from growing and progressing in treatment."

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 15 of 16

Overall, he agrees that he is at the beginning phases of treat but firmly believes that
he is "off to a good start."

## IX.    ISSUES REMAINING FOR TREATMENT:

The CAB agrees with Mr. Batista that he is at the beginning stages of treatment and
that he is off to a positive start but that much work lies ahead.  We believe that Mr.
Batista needs to continue to make progress on his deviant cycle, clearly identifying all
the existing deviant sexual desires at work in his governing offense and in his prior
sexual offense.  We too endorse his idea that he needs to more directly address victim
empathy issues and begin to move away from his victim stancing and replace it with
the true victims of his offense and potential future victims.  We understand his position
on the PPG but would encourage him to re-examine and talk more about his refusal,
sexual deviancy is undoubtedly at work in his sexual offense risk, behavioral treatment
will likely be a major intervention in the future and the best way to construct behavioral
treatment is with the data yielded from a PPG.  Finally, we are uncertain of the
relations of his Gender Identity issues on his sexual offense risk and encourage him to
explore this relationship in treatment.

The CAB endorses the treatment goals set forth in the current Annual Treatment
Review.

## X.    COMMUNITY ACCESS PROGRAM:

No plan was before the Board and, therefore, none was acted on.

## XI.    CURRENT SDP STATUS:

Based on the information provided to the CAB regarding Mr. Batista, we unanimously
agree that he remains a Sexually Dangerous Person.

This conclusion is based on our review of his record, on the information provided by
the representative member of his treatment team and by Mr. Batista himself.

Notwithstanding our opinion regarding his sexual dangerousness, we commend Mr.
Batista for the beginning work he was demonstrated in treatment but it must be
acknowledged that he remains at the very beginning stages of treatment and has a

Batista, Sandy Jo
Community Access Board Annual Review
April 21, 2004
Page 16 of 16

significant amount of work to do before his risk can be considered effectively lowered enough to allow him access to the community.

Mr. Batista was committed for a Governing Offense that is truly startling: The abduction of a stranger prepubescent female who was in the community selling fudge for school. He lured the victim into his car and then raped her in an isolated area in his car whose inside door handles had been removed. The general modus operandi of this offense bears striking similarity to an offense he committed as an adolescent some five or six years earlier suggesting a continuity to his sexual deviancy over time and a strong attraction to the particular characteristics of this offense scenario.

Mr. Batista has just begun to address his sexual deviancy and until he can better identify the continuity of its presence, its motivation for his offense, and develops abilities to manage the activity of his deviance, he remains at high-risk for sexual reoffense.

Submitted by,

Frank DiCataldo, Ph.D.
Member, Community Access Board

DISTRIBUTION:

Robert Murphy, Superintendent
Michael Henry, Psy.D.
Treatment Center Records (2)
CAB Members (5)
Resident

**EXHIBIT 8**
(Pg. 1 of 3)

Sandy J. Battista, #M-15930
Mass. Treatment Center
30 Administration Rd.
Bridgewater, Mass. 02324

---

Dated: 4/27/04.

Kathleen M. Dennehy, Commissioner
Commissioner's Office
Department of Correction
50 Maple Street, Suite 3
Milford, Mass. 01757-3698

    RE: Correspondence dated 3/29/04.

Dear Commissioner Dennehy:

    I am briefly writing in regards to a letter dated 3/29/04, that I previously brought to your attention, regarding state prisoners being treated differently than I. Specifically, that two prisoners that I'm aware of are being allowed "female hormone treatment" while in the general prison population, while I, civilly committed, are denied this treatment.

With the above noted, I'd like to bring another matter to your attention, which directly bares on the above issues. Briefly, in January of 2002, while temporarily civilly committed under Ch.123A, I filed a pro-se civil complaint with the United States District Court. [1] During these proceedings, your legal department procurred a sworn affidavit from Gregory J. Hughes, LICSW, an employee of the DOC, presently serving as the Regional Administrator for the Health Services Division. Mr. Hughes swore under oath before the court, that, the DOC was (at that time) negotiating a new contract with U.Mass. Medical School to provide direct management of all inmates/residents medical and mental health needs. At which time, a specialist with experience in treating persons with gender disorders will be retained, and "Mr. Battista will undergo a comprehensive medical and psychological evaluation regarding his claimed gender disorder and a treatment plan will be developed to address medical and mental health needs." (Emphasis added). A copy of this Affidavit is attached for your convenience.

In closing, prior to pursuing the proper legal recourses in this matter, I am brining this to your attention. As I'm quite sure your aware, I do not think a court of law will look kindly on the DOC for submitting sworn affidavits from it's employees to suit it's position, then not living up to it's allegations. This is "perjury," a criminal offense.

---

[1] See Sandy J. Battista vs. Robert Murphy, Superintendent, et al., U.S.Dist.Ct.C.A.No#02-10137-MEL.

-2-

Lastly, along with the relief sought in the previous above mentioned
correspondence, here, all I am interested in is the same treatment as
offered the two state prisoners at issue. (I.e.,) "surgical castration,"
and "female hormone treatment."

Thank you for your consideration and attention in this matter. I
patiently await your reply before pursuing both criminal and civil complaints
on this matter for "perjury."

Sincerely,

Sandy J. Battista, #M-15930

cc: S.J.B.(FILE)



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Health Services Division*
*P.O. Box 426*
*Bridgewater, MA 02324*
*Phone: (508) 279-8612*
*Fax: (508) 279-8654*
*www.mass.gov/doc*



Mitt Romney
*Governor*

Kerry Healey
*Lieutenant Governor*

Edward A. Flynn
*Secretary*

Kathleen M. Dennehy
*Commissioner*

James Bender
*Acting Deputy Commissioner*

May 25, 2004

Sandy Jo Battista
M15930
MTC - Bridgewater

Dear Sandy Jo Battista:

Your March 29 and April 27, 2004 letters to Commissioner Dennehy were referred to me as the Director of Health Services for the Massachusetts Department of Correction. I was asked to review your correspondence and advise you as to how you may access consideration for Gender Identity Disorder treatment.

I have reviewed the documentation that you submitted to Commissioner Dennehy. The appropriate course of action for you is to submit a written request for treatment of Gender Identity Disorder to the contractual mental health provider via the sick call procedure or letter.

As I am sure you are aware surgical castration alone is not an accepted form of treatment for Gender Identity Disorder and, therefore, will not be considered. Upon review of your request, the contractual mental health provider will schedule an independent evaluation to determine what course of treatment may be most appropriate for you.

Sincerely,

Susan J. Martin
Director

CC:     Kathleen M. Dennehy, Commissioner

PRINTED ON RECYCLED PAPER

FENWAY COMMUNITY HEALTH

Mental Health and Addictions
Department
7 Haviland Street
Boston, Massachusetts 02115-2683

Telephone 617 927-6200
Facsimile 617 267-3667

www.fenwayhealth.org

Fenway Community Health
7 Haviland Street
Boston, MA 02115

**EXHIBIT**
tabbies
**10**
(Pg. 1 of 7)


Re: Sandy Jo Battista (formerly known as David Megarry)
DOB:  12/30/61
DOC Case #: M-15930
Date of evaluation: 8/10/04

# ≡Fenway

BOARD OF DIRECTORS
2004-2005

Stewart B. Clifford, Jr.
President

Joanne T. Ayoub
Vice President

Allison Salke
Treasurer

Lisa Damon, Esq.
Clerk

Terence M. Keane, PhD*
At-Large

Elisa Alonso
David J. Breen, Esq.
Richard Marshall, MD
Carl Nagy-Koechlin
Richard D. Olson, Jr.
Arnold E. Sapenter
Scott B. Squillace, Esq.*

* Past President

Stephen L. Boswell, MD
Executive Director

## Reason for Evaluation

This evaluation of Sandy Jo Battista was done at the request of University of Massachusetts Medical School, who provides mental health care for the Department of Corrections, to assess the possible diagnosis of Gender Identity Disorder, and to help determine treatment planning. The inmate reported that she filed a lawsuit two years ago to be evaluated for Gender Identity Disorder. She reported becoming severely depressed in May 2003, when she was civilly committed to this institution, secondary to being evaluated as a sexually dangerous person. She stated that she is not too concerned about her freedom at this time; rather she is focusing on being able to transition from male to female.

This evaluation is based on a 90-minute interview with Kevin Kapila, MD and Randi Kaufman, PsyD, as well as reviewing the inmate's chart.

## Developmental and Gender History

Inmate is a 43-year-old biological male who identifies as female.  Hereafter female pronouns will be used.  Inmate reported that she was born in Oxford, MA, the middle child of three, with a sister one year older, and a brother two years younger. Inmate was born with a medical condition called Congenital Adrenal Hyperplasia, which caused early physical maturity, and is considered to be an intersex condition. Inmate reported that mother rejected her early, due to her atypical physical presentation from CAH.  Paternal grandmother was also rejecting, reportedly saying inmate should not be bathed.  Inmate reports that she took medication to slow the growth process, but her body did not "catch up" until she was 14 or 15.  Inmate reported that she was also born "pigeon-toed", but was not put into corrective braces.  At 6 or 7 she had surgery to correct this, including full casts on her legs.

Inmate reported that father was violent toward her, beating her often for playing with her sister's toys and dressing in her clothing. Father is reported as frequently yelling at mother, and while inmate could not recall witnessing physical violence,

she states that father once beat mother so badly that she had a brain hemorrhage, which led to her death. Client was 8 at that time. Father was incarcerated for involuntary manslaughter, and maternal grandmother raised inmate for some time. Maternal grandmother reportedly did not like inmate, as she was "father's junior", the man who had killed her daughter. Inmate states she "heard" that grandmother was physically and emotionally abusive to her, but does not remember this. A previous evaluation, done by Katrin Rouse, Ed.D., indicates that inmate was subjected to pornographic material and sexual acting out by grandmother and her friends. Paternal grandmother reportedly learned that inmate was being mistreated and petitioned for, and received, legal guardianship. Inmate remained with her until father was released from prison, when inmate was 10.

Inmate stated that she could not remember her thoughts about her gender while growing up, but was always jealous of women. She thought about what it would be like to have a woman's body, and did not like her own body. Inmate stated that she thought this was "normal", and that all males thought this way. She hated sports, and played house and with dolls with her sister.

Inmate and siblings lived with father after he was released from prison. He remarried, and stepmother was reported as being "okay" toward inmate. Inmate stated that father changed while he was in prison, and no longer beat inmate. He reportedly spent much of his time drunk for the remainder of his life. Father moved the family to Homestead, Florida, where he joined a motorcycle gang called the Devil's Disciples". This brought a lifestyle of "parties, beer and girls", but inmate recalled that for the first time she felt she had a normal home. The family did things together like going on picnics and fishing. Father continued using drugs and drinking for some time, and inmate recalled that she did not like seeing father passed out. She attended school, and they ate together as a family, remaining in Florida until inmate was in the 8th grade. Inmate reported that she was a loner, without friends, but always got along with sister, who was "the only one who stuck by me". She used alcohol and marijuana in an effort to be accepted by peers. Inmate reports that she herself was violent and aggressive, getting into lots of fights, and that she lifted weights for years.

Inmate reported that she left school in the 8th grade. When she was 15 father took out a CHINS petition, as she was setting fires in garbage cans in the woods, running away, stealing from stores, and committing acts of vandalism. Previous reports indicate that inmate had sexual contact with female family members, and that this led to father seeking to place inmate outside the home. From age 15 through 18 inmate attended school in a DYS facility, and lived in two foster homes. She reported that the foster homes were "not bad", and she went on field trips and picnics.

A previous evaluation, by Katrin Rouse, Ed.D., forensic psychologist, reflects that inmate was also placed in Worcester State Hospital adolescent unit in July 1977, the Metropolitan State Hospital adolescent program in 1978 and 1979, and was housed in a DYS facility on the grounds of Medfield State Hospital in July 1979 for two years, and but this information was not discussed with these evaluators.

2

The family then moved to Mayville, Kentucky, until inmate was 18. She was unsure why they moved, but thought father might have done this to break ties with the motorcycle gang. A rival bike gang reportedly killed father's brother. Father then became religious and the family participated in retreats. The family then moved to Ohio briefly, where father got a job as an assistant cop.

Inmate reported that she dated some women, and that they always wanted to go further with her sexually than she was able or willing to do. She stated that she was never able to have sex willingly, and recalls having sex with women twice, at the age of 18. She was not able to perform, as she was extremely fearful of rejection, recalling mother's early rejection of her, and needed to have the woman put inmate inside of her.

At inmate's age of 19 the family moved back to Massachusetts and lived in a trailer in Wilkinsonville. Inmate joined the army as "there was not much work", and was ejected after a few months for wearing women's undergarments. Inmate stated that she was unaware that the army did inspections, and had been wearing women's undergarments since the age of 14 or 15. The undergarments, which were believed to have been stolen from the women's barracks, were confiscated, despite inmate claiming ownership. Inmate was sent to the army therapist, who she told she wore women's undergarments, as she felt more comfortable, but did not say that she wished to be women. Inmate was ejected with an "uncharacterized discharge", with the understanding that inmate was emotionally unstable. However it should be noted that a previous evaluation done by Katrin Rouse, Ed.D., indicated that inmate was ejected from the military due to fighting and drinking.

Inmate then lived with father's ex-wife. In 1983 inmate was convicted and began serving a sentence of 12-20 years for the rape of a child, as well as armed robbery and kidnapping, for which she received 9-10 year sentences.

Father died in 2001. Inmate reports that sister, who lives in Ohio, is inmate's only "life-line" to the outside, and only relationship she maintains outside of prison. They talk approximately every two months. Sister has five children and little money, and inmate is afraid to come out to her about her gender dysphoria. When she changed her name legally in 1995 inmate took mother's maiden name (Battista), and although she wanted a girl's name, this made her anxious, and instead she chose an androgynous name (Sandy).

Prison History:

Inmate reported that she has been in prison since February 1983, following the rape of a child, kidnapping, and robbery, for which she received a sentence of 12-20 years, and 9-10 years respectively. Inmate and previous reports indicate that when she was 15, inmate grabbed a 10-year old girl at the bus stop, and brought her into the woods to rape her, but a neighbor intervened. The incident for which she was convicted involved a 10-year old girl selling fudge. Inmate pulled her into her car, brought her to a wooded area, and sexually molested her. Further details are contained in the report of a Sexually Dangerous Person, by Katrin Rouse, Ed.D. This report also details inmate's frequent misconduct throughout her prison history,

3

including escape, fighting, assault on a guard, and making obscene phone calls to young girls.

Inmate noted that she has never been able to have sex willingly, and that because of this she was sexually frustrated. She stated that she did not see anything wrong with being sexually abusive, as she herself was abused. She noted that due to her shame, she had to put a vest over the child's face in order to perform sexually. Inmate also noted that being around young girls is risky for her, and that she should avoid such situations.

Inmate reported that she first came out about her gender dysphoria in 1996, when she was at MCI Norfolk. She reported that most of the inmates accepted her, but that this acceptance was likely due to the fear they had of inmate, who was allegedly physically built at that time. Inmate began to shave her body, and "got away with it", as body builders shave. Around that time she was put into segregation for eight months, where she did not have access to weights, and she stopped lifting. She began to lose her strength and size rapidly, and continued to shave her body. Inmate told her mental health counselor of her overwhelming thoughts, her hatred of her body and desire to change her sex. She began to starve herself, wanted her genitals removed, and thought of suicide. Inmate began to take her anger out on others, verbally and physically, and often received punishment. She reported that she tied her testicles with rubber bands and tried to freeze them. She continued to starve herself for days at a time. She complained that the prison staff did not help her, and that putting her on Prozac and in a paper johnny did not address her issues.

Inmate reported that she needed to find something to occupy herself in the absence of weightlifting, and she began to go to the library. She began to file lawsuits, beginning in 1997. The first lawsuit was inmate's attempt to get treatment for Gender Identity Disorder, alleging that her civil rights were being violated. The case was reportedly dismissed because inmate had diagnosed herself. Inmate's second case was in Federal district court, and stated that this case was dismissed because there was a chance inmate could be released, and it was not "ripe for review".

Five days before she finished serving her sentence, in May 2001, inmate was evaluated for being a sexually dangerous person. She was found to be sexually dangerous, as she had committed more than one incident, and was then committed to the Mass Treatment Center for sexual offenders in May 2003. This is a civil commitment, where inmate is entitled to more treatment considerations, and can file for annual reviews. She will remain in the treatment center until she is deemed to be sufficiently rehabilitated to be released. Inmate reported that she became severely depressed after this commitment, due to the loss of hope that she would be freed, and cried for a week.

In 2002 inmate filed another lawsuit, which was also dismissed. This suit was based on an evaluation inmate had done by Diane Ellabom, a gender therapist, to show she suffers from Gender Identity Disorder. Inmate used her own money, which she received from father's death, to pay for this evaluation. The evaluation was allegedly not considered by the court, as Ms. Ellabom was retained independently, and not through the state.

4

Inmate reported that she has attempted to have herself castrated surgically, as this would ostensibly lower the chance that she would re-offend sexually. The media covered this story, and inmate's sister viewed it on TV. Inmate initially lied about her gender issued, but later came out to sister. Inmate stated that when her attempts to have herself castrated medically failed, she has tried to get herself castrated in prison. She sent for brochures on how to do this, and has asked inmates if they would be willing to do this, looking for someone she trusts. Inmate stated that she is not currently trying to castrate herself, but might try to do so if things became "drastic" and she had no hope. She noted that recently she has become a little more hopeful, as she has heard about two other inmates being started on hormone therapy.

Inmate has continued to come out to other inmates, and has both lost friends, and made new ones. She noted that in coming out as transgender other inmates think she wants sex, and that while she has never been forced or assaulted, inmates have tried to be sexual with her. Inmate admitted to sexual contact with two men, both of whom are reported to be more feminine than herself, but finds herself attracted to women. She noted that inmates have difficulty understanding that she both wishes to be a woman, and is attracted to women. She stated that she is only able to masturbate if she fantasizes that she is a woman.

Inmate stated that she is no longer a "trouble-maker" since coming out about her gender. She continues to starve herself, as she immediately puts on muscle if she eats. She reported that she isolates herself, cries, and has tried repeatedly to get treatment. Inmate stated that she has had cognitive-behavioral treatment by Sean Thomas, to help with past behaviors, but has been told that the mental health department in prison does not treat gender identity disorder.

Inmate talked about her belief that her gender dysphoria is related to her history of being a sexual offender, in that she is angry, frustrated, and has low self-esteem.

When asked what she hopes for inmate stated that she would like to be on hormones, to be castrated, and to have cosmetic surgery for her face. She had researched this, and knew the name of Dr. Ousterhaut, a well-known feminine facial surgeon. Eventually she hopes to have full sex reassignment surgery, and had also researched this.

Medically inmate reported that she has had two hernia surgeries, and is pigeon-toed. She was on Prozac a few years ago, and was also on Doxypin for sleep difficulty, which she stated made her feel like a "zombie". Inmate asserted that she is supposed to be taking Dexymethezone at the hour of sleep, but she is not allowed to hold it on her person, as it is an oral steroid, and she cannot obtain it later than 9PM. She was taken off of the medication, administered tests, and is waiting to hear if she should continue taking it, or take another medication.

5

## Mental Status:

Sandy Jo is quite thin and petite, was dressed neatly, and had plucked eyebrows and light eye make-up, that she said she had improvised from other materials. She appeared to feel somewhat self-conscious or shy when this was inquired about. On the surface the inmate appeared to be cooperative, and she was clearly happy to be evaluated, with the hope that this would help her move into a gender transition. The history she provided contained some inconsistencies, but in general her overall story matched with previous evaluations. Her affect was flat, her answers somewhat superficial, and she appeared to want to downplay the impact of her family history.

The inmate was oriented to person, place and time. She impressed as average in intelligence. She denied hallucinations, delusions, ideas of reference, and homicidal or suicidal ideation. However, she admitted to having thought about taking pills if she did decide to kill herself. She asserted again that currently she has more hope than she has had in the past. Her speech was normal in rate and rhythm. She had no psychomotor changes, and there was no evidence of a thought disorder or cognitive impairment. Her insight was limited to poor, and her judgment appeared based on what she has learned in treatment. Inmate stated that she has learned to think more before she reacts.

## Diagnostic Impressions and Recommendations

Sandy Jo appears to fit the diagnosis for Gender Identity Disorder, NOS. There appears to be some evidence that inmate's particular intersex condition, Congenital Adrenal Hyperplasia, has some correlation with male to female transsexuals. It is notable that the history Sandy Jo presents is common for someone with GID, in that her experiences illustrate her gender dysphoria, as well as attempts to relieve her distress (wanting to tie and cut off her testicles). She has had a strong, persistent cross-sex identification as female since early childhood, long before she was aware of this clinical diagnosis. Her identification with women is seen in her early cross-dressing, her discomfort with her male sexual organs to the point of being unable to be sexual in a willing manner, and her sexual fantasies of being a woman. Finally, the inmate's symptoms have caused significant impairment in her life, both prior to, and since her incarceration.

The Harry Benjamin Standards of Care, an internationally accepted treatment protocol, the purpose of which is to "articulate ... professional consensus about the psychiatric, psychological, medical, and surgical management of gender identity disorders", notes that that are various activities and processes that people often engage in to provide more personal comfort. These activities, which often include things such as cross-dressing, spending time with females partaking in activities common to women, removing facial and body hair through laser treatment or electrolysis, and cosmetic surgery, are not available to persons who are incarcerated.

The Benjamin Standards of Care call for the patient to be both eligible, and ready, to begin hormone treatment.

6

Eligibility requirements include:

1. that the person be 18 years of age or older
2. that he demonstrates knowledge of what hormones medically can and cannot do, as well as their social benefits and risks
3. either a real-life experience in the desired gender role for a minimum period of three months, or a period of psychotherapy specified by a mental health professional after the initial evaluation.

The Readiness Criteria include:

1. the patient has had further consolidation of gender identity during the real-life experience or psychotherapy;
2. The patient has made some progress in mastering other identified problems leading to improving or continuing stable mental health (this implies satisfactory control of problems such as sociopathy, substance abuse, psychosis and suicidality;
3. The patient is likely to take hormones in a responsible manner.

The Benjamin Standards of Care includes a short discussion about incarcerated people. It states that "Persons who are receiving treatment for gender identity disorders should continue to receive appropriate treatment following these Standards of Care after incarceration. For example, those who are receiving psychotherapy and/or cross-sex hormonal treatments should be allowed to continue this medically necessary treatment to prevent or limit emotional lability, undesired regression of hormonally-induced physical effects and the sense of desperation that may lead to depression, anxiety and suicidality ... Housing for transgendered prisoners should take into account their transition status and their personal safety". This inmate had not begun treatment prior to incarceration, as she had neither been aware of, nor diagnosed with Gender Identity Disorder. However, given that this inmate qualifies for the diagnosis of Gender Identity Disorder, she should be afforded the clinical treatment outlined by the Standards of Care.

It is therefore the clinical recommendation of these evaluators that Sandy Jo have her Gender Identity Disorder addressed through hormone administration and ongoing psychotherapy to support the adjustment of the transition the hormones will bring. The psychotherapy should be with a clinician who is knowledgeable about gender identity issues, and/or is being supervised by a clinician with expertise in this area.

Respectfully submitted by:

_____                    _____
Kevin Kaplia, MD                            Randi Kaufman, PsyD

November 16, 2004

7

Ex: 11

To: Robert Murphy, Superintendent, MTC

From: Sandy J. Battista, #M-15930 *Sandy J. Battista*

RE: Request to Expedite Security Review of Medically Approved
[Cross-Gender Hormone Treatment].( * See Footnote 2/, infra)

Dated: April 27, 2005.

------------------------------------------------------------

As you may or may not be aware, on 11/16/05, state evaluators employed by
UMass. Correctional Health Care, contracted by the DOC, submitted it's report
(known as the "Fenway Report"), to the Treatment Center's Health Services Unit,
containing an assessment and recommended Treatment Plan to address my life-long
persistent gender issues. Specifically, qualified medical professionals re-
commended that I be allowed "cross-gender hormone treatment."

As a direct result of the above, on April 12th I was seen by a specialist in
endocrinology at the LSH. The examining physician, Dr. Maria Warth submitted her
recommendation for an adequate prescription to the Treatment Center's Health
Services Unit to address my gender issues.

On April 14th I was seen by the Treatment Center's "in-house" physician, Dr.-
Friedman, who processed the above recommended medical prescription. Shortly
thereafter, not receiving this prescribed medication I submitted a formal medical
grievance with the Health Services Unit. On April 25th I was seen by Maryanne
Percuoco, the Health Services Unit Administrator, who informed me that she was
advised that prior to administering this prescribed treatment that yourself,
as well as the Director of Security; the Director of Health Services for the
Department of Corrections; the Medical Director (Dr. Brewer); and the Commissioner
of Corrections must conduct a "security review" to determine whether or not the
DOC feels it can house me safely at the Treatment Center while under-going this
particular form of medical treatment. As such, in lieu of the reasons set forth
below, I am requesting that you expedite this security review, as my health and
well-being are at issue.

### Prior Precedent on the Issue at Hand:

In a factually similar situation, Judge Wolf of the First Circuit District
Court, 1/ provided clear and explicit instructions upon the DOC in making such
determinations. Specifically, the Court in Kosilek instructed the DOC to:

"[A]llow qualified medical professionals to recommend treatment,"
and that, "if hormones are recommended, [the DOC] may properly
consider whether security issues makes it impossible to provide
adequate medical care in prison" to transsexual inmates in it's
custody.

See Kosilek at page-6. The Court in Kosilek further instructed the DOC that,
such security determinations must include the following facts:

"[K]osilek is already living largely as a woman in a medium security
male prison. This has not presented a security problem. The policy
adopted by [the DOC] contemplates continuing female hormones for

In re: Sandy J. Battista, #M-15930                                    Page--2

        transsexuals for whom they have been prescribed prior to
        incarceration. [The DOC] expects that [they] would keep
        such inmates in the general population of a male prison.
        This has, evidently, been done safely in several states,
        in the United States Bureau of Prisons Systems, and in
        Canada."

Id. The Court in Kosilek lastly held that:

        "[I]f [the DOC], in good faith, reasonably decides that
        there is truly no way that he can discharge both his duty
        to protect safety and his duty to Kosilek with adequate
        medical care, and concludes that security concerns must
        trump the recommendations of qualified medical professionals,
        a court will have to decide whether the Eighth Amendment
        has been violated."

Id.


### Facts to be Considered in my Individual Particular Situation:

        Like the case in Kosilek, since 1995 (date of my legal name change), I
have lived my life in the Department of Corrections in the general population
of numerous male prisons largely as female, which has presented not one single
security problem. For the last three years while housed in your custody, your
administration, staff, medical personnel, correctional officers, as well as
the resident population have referred to me as "Sandy." And through personal
witness, as well as extensive media coverage of my civil commitment proceedings,
have learned of my desire to become female, as well as on a 'daily' basis
attempting to present my attire in a feminine fashion. All of this has not
presented one single security problem, other than a few derogatory comments
by a few of your correctional officers. Additionally, records clearly indicate
that I have never been assaulted sexually while in the custody of the DOC,
or for that matter, while in your custody, nor have I ever been accused of
having unautorized voluntary sexual relations with any inmate/resident. To
the contrary, I have continually maintained that I am not attracted to males
sexually. (See Kosilek at page-7). Records also indicate that I have repeatedly
while in the custody of the DOC, and while housed at the Treatment Center,
have demanded treatment for my gender disorder, and that, if not treated,
fully intend to self-castrate myself as a last resort to obtain treatment.
In lieu of such, any reasonable competent official would be placed on notice
that there is a high risk that I would harm myself if I did not receive treat-
ment for my severe mental illness. (See Kosilek at page-8). 2/

        Aside from the above and moreimportantly, unlike the case in Kosilek,
I am not in custody for any form of "punishment, retribution, or deterrence."
I am "civilly" committed. In the care and custody of the DOC specifically for
"treatment and rehabilitation." 3/ As my "gender issues" have clearly been
determined have some "biological basis," causing marked distress through-out
early childhood and adolescence, Forensic Health Services instructed me in
writing to explore the relationship between my "gender issues" and my "sexual
offending behaviors" in therapy, as well as to seek treatment via UMass.
Correctional Health. See correspondence from Dr. Nicholas Petrou, the Clinical

In re: Sandy J. Battista, #M-15930                          Page-3

Director of FHS, attached and marked as Exhibit-2 for your convenience. 4/

    With regards to any contemplated alleged "security concerns" in housing me within the general population while under-going female hormone treatment. Aside from the aforementioned, it is conceded here in part that, due to the nature of this facility, there are certain residents that might be easily vulnerable to being victimized by more aggressive residents. However, this determination must be made on a "case-by-case" basis. In my particular case, I refer you to both Captain Brault and Captain Cowen. Both who are seasoned officers and have known me personally for over a decade. Both who I have per-sonally spoken to of the enclosed matter, and both who will give personal test-imony to the fact that I am not one of those residents who is easily susceptible to any form of victimization, either "on" or "off" female hormones. Moreover, with this in mind, it cannot be disputed that current policy pertaining to "double-bunking" of residents within the Treatment Center, forbid the double bunking of such residents with aggressive residents. See pages 135-136 of the 1994 Management Plan for the Administration and Management of the MTC. Yet, without dispute, I am currently double-bunked with a resident (Donald Beeso, #M-16310) who is twice my size and strength, and is considered one of the Treat-ment Center's most aggressive residents. To say that I am considered a resident easily vulnerable to victimization, yet housing me with a resident considered more aggressive, clearly violates these mandatory protocols put in place by the Federal Court in a prior litigation to protect resident's rights. 5/ Here, it would appear that the DOC delegates to themselves when to declare a resident vulnerable to such victimization and when not to when it fits their particular agenda. In any event, current policy adopted by the former Commissioner contem-plates continuing hormones for any inmate for whom they were prescribed prior to incarceration. Which the former Commissioner has declared under oath before the Court in Kosilek that, in such situations they are prepared to protect the safety of such an inmate, housed in the general population of a male prison. See Kosilek at page-15.

    In closing, relevant case law makes quite clear that, prison officials must '"take reasonable measures to guarantee the safety of inmates,'" as well as to provide them with adequate medical care. See Kosilek at page-28 and cases cited. One way to attempt to discharge both of these duties to a transsexual inmate taking female hormones is to make reasonable efforts to incarcerate him with a less dangerous population of other prisoners. Id. With that in mind, in my particular case, arrangements could be made to house me in: (1) A-Unit in a single room closes to the officers booth(which unit has frequently been used for residents who have mental health issues and are less aggressive than those residents housed on units B, C & D); (2) MPU on Protective Custody Status (at which time any so-called "security concerns" would be "non-existent"); (3) Community Transition House(admittedly there is certain criteria for application to the Community Transition House which I probable do not meet. However, the security within the Community Transition House is far greater than that in place within the general population of the Treatment Center, also doing away with any so-called "security concerns"); and/or (4) MCI-Framinghams Civil Commitment Unit(here, obviously I am not a biological female. However, the Commissioner has discretion to house residents adjudged sexually dangerous in any civil commitment facility. Currently no female resident is housed within this unit, nor would I be intermingled with the female population, as the law clearly re-quires residents to be kept "separate and apart" at all time from the prison

In re: Sandy J. Battista, #M-15930                              Page-4

population. Additionally, case-law in this area provides discretion upon
the Commissioner to house a male-to-female transsexual with the female pop-
ulation. See, e.g., Crosby vs. Reynolds, 763 F.Supp. 666, 669-70 (D.Me.
1991).

    Lastly, respectfully sir, we both are aware that "security" here is not
really the concern of the DOC, but "liability." Though I am not asking you
to admit this or trying to disrespect you by alleging such allegations, I am
only being real here. If concerns for residents safety and security were a
legitimate concern your subordinates would not be housing residents in double
rooms with more aggressive inmates and clearly disregarding claims made by
such residents of being harassed and intimidated while double-bunked. For
example, resident Michael Fuller is a known pedophile who has preyed upon
such population of residents here at the Treatment Center for years and was
recently moved from unit C1 to unit C2 because of indirect idle suicidal threats
he made if not moved to Unit C-2 where he could be closer to resident Peter
DeArruda, a resident clearly vulnerable to victimization. Such allegations are
easily substantiated, as FHS Therapist S. Coorigan has on numerous occasions
attempted to persuide resident DeArruda of his concerns that resident Fuller
was "grooming him for sex." Yet the DOC disregarded these concerns in the name
of "over-crowding." Also, in previously inacting double-bunking due to the
recent increase in resident population, resident Christopher Alves, a resident
who without dispute presents adolescent mannerisms and characteristics, if he
would consider double-bunking with resident John MacIntyre, a resident civilly
commited for originally raping an adolescent male, also who had recently been
caught escaping from the Treatment Center. Yet again the DOC chose to ignore
any risk here in the name of overcrowding. So with all do respects sir lets
be real here, it's not "security concerns," but concerns of "liability." With
such said, I am agreeable to signing a waiver of any and all future claims and
liabilities of any such harm inflicted upon me as a result of remaining in the
general population while under-going female hormone treatment. This practice is
legal and binding, which I'm sure your legal advisors will contest to.

    Thank you for your attention and consideration in this matter. I await
your reply in the enclosed matter.


cc: S.J.B.(FILE)
    Director of Security, MTC
    Commissioner of Corrections, DOC

---

[1] See Michelle Kosilek vs. Michael T. Maloney, U.S.Dist.Ct.C.A.No.-
92-12820-MLW (dated Aug. 28, 2002), attached herewith and marked as
Exhibit-1 for your convenience. (Hereinafter "Kosilek").

[2] It is brought to your attention here that, due to the overwhelming
stress and anxiety I experience over this disorder on a 'daily' basis,
and the recent delay in administering treatment, medical personnel have
determined that I am at a greater risk of self-mutilation and suicide and
have had to place me on psychiatric medication recently. Hence the re-
quest to expedite security review.

In re: Sandy J. Battista, #M-15930                                   Page--5

---------------------------------------------------------------

FOOTNOTES CONTINUED:

[3] Persons like myself who are civilly committed are constitutionally
entitled to "more considerate treatment and conditions of confinement than
criminals whose conditions of confinement are designed to punish." See
Youngberg vs. Romeo, 457 U.S. 307, 322 (1982). State and local officials,
like judges, have a duty to obey the Constitution. The Bill of Rights pro-
vides citizens, including those who are incarcerated, with certain rights
that even a majority of their contemporaries cannot properly decide to
violate. Prison officials share with the Courts the duty to protect those
rights, even if they believe that it may be unpopular to do so. See Kosilek
at pages 5-6. See also Commonwealth vs. Barboza, 438 N.E.2d 1064, 1069
(1982)(obligating the DOC to do "all that can be done to treat and rehabilitate
the civilly committed"). Lack of funds, staff or facilities cannot justify
the state's failure to provide [those confined] with that treatment necessary
for rehabilitation." See, e.g., Ohlinger vs. Watson, 652 F.2d 775, 778-79
(9th Cir. 1980); see also, e.g., Leamer vs. Fauver, 288 F.2d 532, 546-47 (3d
Cir. 2002).

[4] It is further brought to your attention here that, in a recent Community
Access Board ("CAB"), the board members also determined that my gender issues
may have played a role in my sexual offending behaviors, and as such, recomm-
ended upon me to seek treatment to address my gender issues. Such recommend-
ation presents a question of a "liberty interest." As it cannot be disputed
that recommendations from the CAB must be met prior to any determination that
the individual can return to society safely. Depriving me of such recommended
treatment would imply a question to the legality of my commitment. See gener-
ally Commonwealth vs. Page, 339 Mass. 313, 317-18 (1959)(holding that "confine--
ment in a prison which is undifferentiated from the incarceration of convicted
criminals is not remedial so as to escape constitutional requirements of due
process"). There currently exists several inmates housed in the general popul-
ation of all male state prisons under-going female hormone treatment which were
not prescribed such treatment prior to their incarceration. (I.e., Inmate
Kenneth Hunt at MCI-Shirley Medium and Inmate Michelle Kosilek at MCI-Norfolk).
Both of who are housed with Murders and Rapist and presented no security pro-
blems.

[5] See King vs. Greenblatt, 53 F.Supp.2d 117 (D.Mass. 1999).



Sandy J. Battista, #M-15930
Mass. Treatment Center
30 Administration Rd.
Bridgewater, Mass. 02324-3230

Dated: April 27, 2005.


Kathleen M. Dennehy, Commissioner
Department of Corrections
50 Maple Street, Suite 3
Milford, Mass. 01757-3698

RE: Request to Expedite Security Review of Medically Approved
    "Cross-Gender Hormone Treatment."

Dear Commissioner:

I am writing in regards to an urgent matter pertaining to my health
and well-being. Briefly, I have recently been diagnosed by state examiners
as suffering from "Gender Identity Disorder" and recommended for "cross-
gender hormone treatment." This treatment was to began on April 14th. How-
ever, I am being informed by my Health Services Unit that the DOC has put
a hold on this treatment pending a security review determining whether they
feel I can be housed safely while under-going this treatment without inter-
ferring with security and safety. As a direct result, I've recently had an
emotional breakdown and have had to be placed on psychiatric medication.

In closing enclosed you will find a copy of a letter upon my facilities
Superintendent requesting that he "expedite" any pending security review.
Respectfully, I ask that you treat the enclosed letter as also directed to-
wards your attention and ensure such security review is expedited, due to
the nature of the enclosed and the question of my health and well-being.


Thank you very much for your consideration and attention in the enclosed
matter. I look forward to your reply.


Sincerely,


Sandy J. Battista, #M-15930


cc: S.J.B.(FILE)

EX-73

To: Robert Murphy, Superintendent

From: Sandy J. Battista, #M-15930

RE: Correspondence dated April 27, 2005.

Dated: May 5, 2005.

_____

I am writing in regards to my recent correspondence to you dated April 27th, which I've yet to receive any confirmation and/or reply. Here, I understand sir that its only been approximately one week. However, due to the nature of the medical issue and its daily deterioration in my mental health and well being, I contemplated this matter would have been expedited and decided as of date.

Currently, due to the recent development in the DOC putting a "hold" on my treatment I've fallen deeper into depression. Because of such I am unable to attend sex offender therapy or any of my scheduled classes. My paranoia of the DOC attempting to "over-ride" this medical treatment is over-whelming to the point that, my days consist of either laying in my bed crying or pacing the unit floors for hours on end. It's effected my eating habits, my personal appearance, hygiene, and my will to even try to fight for the right to be normal. My nights are equally restless, getting, if I'm lucky, 2-3 hours of sleep, contemplating what life would be like if I'm left with no other alternative but to live in this distorted body. The life and will seems to have been drained from my body. The greatest day of my life was so easily taken away from me when you placed a hold on this treatment.

Today, because of the above profound effects over being delayed treatment, Captain Brault requested upon Mental Health to speak with me. During this consultation, Dr. Carpenter tried to assure me that the DOC wasn't attempting to over-ride this treatment, but was attempting to decide how to house me safely. I explained to Dr. Carpenter if this was truly the case that with this treatment taking, at a minimum of 4-6 months to show even any minor changes in my anatomy that, the treatment would have been approved and any housing concerns decided thereafter. My paranoia has convinced me to the contrary. "Safety" is no more of a concern here is it is in other state adult correctional facilities. Yet state prisoners are being afforded this treatment in general population, with no apparent security or safety problems. Here, admittedly, as previously brought to your attention in my prior correspondence, admittedly this facility is designed to house persons adjudicated as being sexually dangerous. However, a majority of the resident population here is feeble and only preys upon the vulnerable resident population. Which does not describe me. Respectfully sir, in my previous correspondence I pointed this out to your attention and directed you to speak with either Captain Brault or Captain Cowen. Both seasoned officers who have known me for years and will testify to this fact. Yet for some reason or another you have not spoken with either Shift Commander as to any input they may have on this matter.

In closing, respectfully sir, there is always going to be security and safety concerns with any given resident. The population here is more relaxed and less aggressive than in state correctional facilities. Knowing this facility and its residents as I have for the last three years, any legitimate concerns in my

In re: Sandy J. Battista, #M-15930                                      Page--2

safety and housing concerns is easily addressed by changing my current
assigned room from room no.9 to room no.16, which is directly in front of
view of the units officers station, or to a smaller unit such as unit B1
room no.24, also assigned directly in view of that units officers station.
Here, the units officers could be made aware of my situation and easily in-
structed to keep an eye on my room if necessary. I am also quite sure that
your officers are trained to investigate any self-reports of perceived
threats. Do not think for one moment that I am naive to my environment. I
have always kept myself aware of others behaviors and have surrounded my-
self with friends that look out for each other. Lets be real sir, your officers
are to busy with their noses in that new toy (intra-net) that you had placed
in each housing unit, having their boots shined by another resident; eating;
bullshitting with other staff; or talking on the phones to be aware of what
is or what isn't going on in the housing units. Here, I'm not trying to
sound rude, sarcastic, or disrespectful, or even making any accusations
against officers, only telling it how it is. We (I) watch out for myself.
Shy of assigning me a "baby-sitter," what else is there to decide? Unless
my paranoia is accurate that the DOC is attempting to find a way to over
ride medical professional judgment. Delaying treatment any longer will only
contribute to the deterioration of my current mental health and well-being.
Your either going to "approve" or "deny" this treatment.

   Lastly, the enclosed is intended to both reiterate my request to expedite
your review/decision, and to place the administration on notice of the adverse
effects I go through in both not being treated and this recent 'hold' the
DOC has placed on being provided access to the approved treatment at issue.
As such, if truly this treatment is to be allowed and not overriden and there
leaves only the question of housing, there is no other legitimate reason to
delay such treatment, as it will take at a minimum of 4-6 months to show even
minor changes in my anatomy, while deciding any housing concerns, than those
which are based on personal opinion.


Thank you for your consideration and attention once again in this most
urgent matter. I look forward to your reply.



cc: S.J.B.(FILE)



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Health Services Division*
*P.O. Box 426*
*Bridgewater, MA 02324*
*Phone: (508) 279-8612*
*Fax: (508) 279-8654*
*www.mass.gov/doc*



Mitt Romney
*Governor*

Kerry Healey
*Lieutenant Governor*

Edward A. Flynn
*Secretary*

Kathleen M. Dennehy
*Commissioner*

James R. Bender
*Deputy Commissioner*

May 9, 2005

Sandy Jo Battista M 15930
Massachusetts Treatment Center
30 Administration Rd.
Bridgewater, MA 02324

Dear Sandy Jo Battista:

In response to your letter of April 20, 2005, I am aware that there was a recommendation for
treatment made by Dr. Maria Warth. At this time the recommendation is under review by both
UMCHP medical professionals (to determine it's appropriateness and necessity) and DOC
administrators (to determine any potential security contraindications). You will be advised of the
outcome of the review once it is completed.

Sincerely,

Susan Martin
Director
Health Services Division

SJM/GH

Cc: file

♻ PRINTED ON RECYCLED PAPER

Sandy J. Battista, #M-15930
Mass. Treatment Center
30 Administration Rd.
Bridgewater, Mass. 02324-3230



------------------------------------------------------------

Dated: May 13, 2005.


Arthur Brewer, MD
UMass Correctional Health Program ("UMCHP")
One Research Drive, Suite 120C
Westborough, Mass. 01581



Dear Dr. Brewer:

I am writing in regards to certain questions and concerns that I have
pertaining to a recent letter I received from a Susan J. Martin, the Director
of Health Services for the Department of Correction("DOC"). Specifically, in
her letter, Ms. Martin informed me that, aside from a pending "security review"
being conducted by DOC administrators, that UMCHP Medical Professionals are
also in the process of conducting a review of recent treatment recommendations
("cross-gender hormone treatment"), addressing my gender issues, made by both
"Fenway Community Health" and a "Dr. Maria Warth," an endocrinologist with the
Lemuel Shattuck Hospital in Jamaica Plan, Mass., "to determine the 'appropriate-
ness' and 'necessity'" of the treatment plan at issue.

Here, what I don't understand is that, which I'm quite sure that your well
aware of by now, is that, in August of 2004, I was seen by two gender specialist
from Fenway Community Health, on retainer by UMCHP, contracted by the DOC, for
the specific purpose of conducting an evaluation and an appropriate treatment
plan to address my persistent gender dysphoria. In accordance with those treat-
ment recommendations, the DOC arranged for me to be seen by a specialist in en-
docrinology. The examining physician, Dr. Maria Warth recommended an appropriate
treatment regimen to address Fenway's treatment plan. 1/ Which according to Ms.-
Martin is now under review by UMCHP Medical Professionals, who originally retained
Fenway to perform this function, due to UMCHP's lack of experienced trained spec-
ialists. With all due respects here Dr. Brewer, it makes little or no sense at
all to retain specialist to perform a function, due to a lack of trained exper-
ienced medical professional in gender disorders, then conduct a review of those
treatment professionals recommendations. Though I am not a licensed attorney, to
me this sounds border-line on medical malpractice. In fact, if such turns out to
be the case, please make note that I intend on pursuing this matter with the Board
of Registration in Medicine, as well as a Complaint with the appropriate judicial
forum alleging such accusations.

Aside from the above, what you may not be aware of, there is a distinction
between my current custody and that of those who are in custody criminally.
Whereas, as my custody is "civil" in nature, I am not confined for any form of
"punishment, retaliation, or deterrent." Persons like myself who have been "civ-
illy" committed, are committed for "treatment and rehabilitation." 2/ As part of
my treatment process, I have been seen by numerous specialist in treating sex

To re: Sandy J. Battista, #M-15930                                    Page-2

offenders, contracted by the DOC, to evaluate, recommend, and provide specific therapeutic treatment addressing all necessary components of my sexual offending behaviors. Here, what I'm quite sure that the DOC has [not] made you aware of, is that, my clinical file contains numerous notations, inferring that: (1) my gender issues may have played a role in my past sexual offending behaviors; and (2) instructed me to seek treatment via UMass to address my gender issues. 3/ As such, my gender issues have previously been determined by several treating clinicians to be "a necessary component of my sex offender treatment plan." Therefore, the treatment at issue is twofold: (1) it will help resolve my persistent gender dysphoria; and (2) it will help lower my risk of re-offending. Here, the right to treatment is not just a matter of my health and well-being. 4/ But rather, the question must also be focused on, "whether the treatment regimen is statutorily mandated and necessary in order to satisfy [substantive due process]." 5/

      In closing, respectfully Dr. Brewer, from the enclosed, you can see that there is additional facts and circumstances which I'm sure that the DOC has not made you aware of upon conducting your review. As such, please include this additional information in your decision-making process, and/or, referred the enclosed to the appropriate medical professionals conducting the review at issue.

      Lastly, if needed, I am open to signing the necessary papers authorizing you and any other medical professionals to view and copy any parts of my clinical file. Please advise and I'll endeavor to comply.


      Thank you for your consideration and attention in the enclosed matter.


Sincerely,


Sandy J. Battista, #M-15930


cc: S.J.B.(FILE)


---
FOOTNOTES:

[1] Aside from having years of experience in treating patients medically who suffer from gender disorders, Dr. Wartl has treated my Congenital Disorder for the last 20+ years. As such, is extremely familiar with my body's physiology.

[2] See Commonwealth vs. Bruno, 432 Mass. 489, 500-01 (Mass. 2000)(citing M.G.L. ch.123A, 82). G.L. ch.123A not only authorizes, but "obligates" the DOC "to do all that can be done to 'treat' and 'rehabilitate' the civilly committed." See Commonwealth vs. Barboza, 387 Mass. 105, 438 N.E.2d 1064, 1069 (1982)(citing Commonwealth vs. Rodriquez, 376 Mass. 632, 646 (1978)). See Youngberg vs. Romeo, 457 U.S. 307, 322 (1982)(holding that, persons who are civilly committed are constitutionally entitled to "far greater treatment

In re: Sandy J. Battista, #M-15930                           Page--3

========================================================

FOOTNOTES CONTINUED:

and conditions of confinement, than criminals whose conditions of confine-
ment are designed to punish"). As such, affording state prisoners "more favor-
able treatment," which I am informed that UMCHP has recommended certain state
prisoners, for the treatment at issue, would have obvious implications on this
constitutional mandate.

[3] See Report of State Qualified Examiner, Dr. Katrin (Rouse) Weir (dated:
4/1/02), at page 14("There may be some biological basis as well as his psy-
chological dysphoria (discomfort) he experiences related to his gender identity.
It appears that he has a longstanding pattern beginning in childhood of cross
dressing and other related experiences associated with his transsexualism. He
clearly has a complex network of issues related to this, which he needs to work
through"); see Memo from Nicholas Petron, Ph.D., Clinical Director of Forensic
Health Services (dated: 11/13/03)("Regarding treatment for Gender Identity Dis-
order, I would advise you to seek services via the UMass mental health program);
and see Community Access Board Annual Review Report, (dated: 4/21/04), at page
15("Finally, we are uncertain of the relations of his Gender Identity issues
on his sexual offense risk and encourage him to explore this relationship in
treatment"). Here, these are just but a few specific comments inferring that
the question of my gender issues may be more than what meets the eye. My re-
cords contain numerous other notations by several other treating therapist over
the span of the last three years while committed.

[4] Here, just as well as in other areas, I am also quite sure that the DOC
has not made you aware of the impact this ordeal has over my emotions lately.
Learning that I might finally receive the treatment I've longed for all of my
life and fought for administratively and legally since 1996, then just as sudd-
enly informed me that such matters are currently under review has overwhelmed
me to the point that I had an emotional breakdown and had to be placed on anti-
depressants and placed on administrative watch. Here, I assure you Doctor,
though irrational, if left with no other alternative, I will castrate myself
in an attempt to seek this treatment. Facing the rest of my life being civilly
committed is hard enough to bare. But facing the rest of my life civilly comm-
itted while cruelly trapped in this distorted body is to devastating for me to
bare.

[5] See, e.g., Leaner vs. Farmer, 288 F.3d 532, 546-47 (3d Cir. 2002).



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Health Services Division*
*P.O. Box 426*
*Bridgewater, MA 02324*
*Phone: (508) 279-8612*
*Fax: (508) 279-8654*
*www.mass.gov/doc*



Mitt Romney
*Governor*

Kerry Healey
*Lieutenant Governor*

Edward A. Flynn
*Secretary*

Kathleen M. Dennehy
*Commissioner*

James R. Bender
*Deputy Commissioner*

May 27, 2005

Sandy Jo Battista, M15930
Massachusetts Treatment Center
Bridgewater, MA

Dear Sandy Jo Battista:

Your April 27, 2005 letter to Commissioner Dennehy was referred to me as the Director of Health Services for the Massachusetts Department of Correction. You expressed concern about the status of your treatment for Gender Identity Disorder. Superintendent Murphy will be responding directly to your regarding the concerns you addressed to him.

The Fenway Clinic recommendations are currently being reviewed by medical and security personnel to determine their medical necessity and appropriateness in the context of prison environment. Upon completion of the review you will be notified of the results.

In the meantime, I encourage you to continue working closely with your primary care clinician and other mental health staff at the Treatment Center. As you are aware, it is also important that you remain compliant with their treatment recommendations.

I hope that this letter provides you with the clarification that you are seeking.

Sincerely,

Susan J. Martin, Director

CC:    Kathleen M. Dennehy, Commissioner

♻ PRINTED ON RECYCLED PAPER



Sandy J. Battista, #M-15930
Mass. Treatment Center
30 Administration Rd.
Bridgewater, Mass. 02324-3230

Dated: June 2, 2005.

Susan J. Martin, Director
Health Services Division
Department of Correction
P.O. Box 426
Bridgewater, Mass. 02324-3230

Dear Director Martin:

    I am in receipt of your most recent correspondence dated May 27th. And
yes thank you your letter does provide some "clarification" on some of my
previous questions and concerns regarding the treatment recommendations at
issue. However, your letter now opens up additional questions and concerns
that I'd like to bring to your attention as well.

    First, in your letter you state that "The Fenway Clinic treatment re-
commendations are currently being reviewed by medical and security personnel
to determine the medical necessity and appropriateness in the context of a
prison environment." Here, what I don't understand is why? Specifically, you
are aware, aren't you not, that I am "civilly' committed to a Treatment
Facility. Which according to the state's highest court is comparable to a
"mental health facility." Unless, it is the DOC's position that the "envir-
onment" at the Treatment Center is comparable to a "prison environment." Is
this the case? And if so, may I quote you at my up-coming court hearing on
review of my civil commitment? Nevertheless, please make note that I will be
providing a copy of your letter in issue to my attorney for his review of
this recent position on the DOC's part.

    Second, you also state that "the treatment 'recommendations' are curr-
ently being reviewed." However, you are aware that the only portions of the
treatment recommendations being reviewed is those recommending "cross-gender
hormone treatment." At present, I am being provided with counseling by a
person qualified and/or trained to counseling person with gender disorders.
Also a part of the "treatment recommendations." Yet you allege that "all" of
the treatment recommendations are being reviewed. Here, it would seem that
only those portions of the treatment recommendations that do not agree with
DOC personnel are under review. Why else would one component of the treat-
ment recommendations be provided, while the other is pending review?

    Third, and most puzzling, is the fact that, originally, UMass had sub-
contracted with Fenway to retain the services of medical personnel who were
qualified and trained to evaluate and recommend treatment plans for persons
suffering from gender disorders in the custody of the DOC, due to their lack
of same. And, now from what you state, are conducting a review of their own
specialists treatment recommendations. Here, to me this sounds like border-

lining on "Medical Malpractice." Though just mere speculation on my part, should this "review" reveal that any medical personnel involved are in fact not qualified to "second-guess" Fenway Clinic's expert's recommendations, please make note that I will bring this matter up before the Board of Registration in Medicine.

Fourth, UMass, the DOC, as well as Treatment Center medical personnel were in possession of Fenway Clinic's report and treatment recommednations back in November of 2004. Yet, for some reason or another all concerned and involved waited some five months thereafter before conducting this so-called review. Even going as far as to have me seen by an specialist in endocrinology at the Lemueal Shattuck Hospital. Specifically for the sole purpose of an appropriate medical prescription regimen to address cross-gender hormonal treatment. Then as well, having me seen by the Treatment Center's in-house physician, Dr. Friedman. Who actually submitted the appropriate paper work to process the prescription. It was not until this time that the treatment recommendations were put on 'hold' pending this so-called review. Here, to me it just a little cruel to go through this whole process before conducting the review in issue. It makes little or no sense at all why this review wasn't conducted, and/or initiated upon possession of the Fenway Report back in November of 2004. In so doing, through me into an "emotional breakdown." Whereas, Treatment Center mental health personnel felt it necessary to have me placed on "antidepressants." As such, please make additional note that, if legal recourse is necessary in this matter, I intend on also pursuing a claim of "reckless and/or negligent infliction of emotional distress" for allowing this process to take it's course, as outlined above.

Fifth and lastly, what the DOC has so-conveniently failed to bring to UMass Medical Professional's awareness during this review, is the fact that, there are numerous notations contained within my treatment records implying that my "gender issues" may have played a role in my original civil commitment. As a matter of record, both the Community Access Board and Dr. Nicholas Petrou, Forensic Health Services current Clinical Director, contracted by the DOC to provide residents housed at the Treatment Center with sex offender specific services, have, in writing, instructed me to "seek treatment for my gender issues via UMass Corr. Health Program." Therefore, any review being conducted is not only a matter of my health and well-being. But rather, must also be focused on whether or not the treatment recommendations "are statutorily mandated and is necessary in order for my condition to improve. And thus, advance towards release."

In closing, I ask that you not only "clarify" the enclosed questions and concerns, but also bring these enclosed matters to the individual medical professionals attention currently conducting the "review" in issue. Without such, they will be deprived of important aspects and facts to take into account during their review process. Please also take note that, along with the enclosed matters, I hereby give my NOTICE OF INTENT to seek a "Temporary Restraining Order" with the Federal District Court, should this matter not be resolved no later than July 1st, as well as a Petition for Habeas Relief for failure to provide me with access to treatment deemed a necessary component of my civil commitment.

Thank you for your consideration and attention in the enclosed. I await your reply and further clarification.

-3-.

Sincerely,

Sandy J. Battista, #M-15930


cc: S.J.B.(FILE)
    Kathleen M. Dennehy, Commissioner
    Dr. A. Brewer, UMCHP
    Paul J. Machado, Esq.



Sandy J. Battista, #M-15930
Mass. Treatment Center
30 Administration Rd.
Bridgewater, Mass. 02324-3230

----------------------------------------------------------------

Dated: June 2, 2005.

Kathleen M. Dennehy, Commissioner
Department of Corrections
50 Maple Street, Suite 3
Milford, Mass. 01757-3698

     RE: On-Going Medical and Security Review of Previously Approved
         Cross-Gender Hormone Treatment.

Dear Commissioner Dennehy:

    I am writing in regards to a current on-going medical and security
review being conducted by UMass Correctional Health Program Medical Pro-
fessionals and DOC Administrators to determine the appropriateness and
necessity of a previously approved treatment plan addressing my gender issues
that included "cross-gender hormone treatment." Specifically, there has
been certain facts brought to my attention that are not being considered and
arbitrarily being interpreted in this review process. Enclosed you will
find a copy of such matters that I've recently brought to Director Susan
Martin's attention for clarification and consideration that I'd also like
for you to review, as originally directed towards your attention as well.

    Thank you for your consideration and attention in the enclosed.

Sincerely,

Sandy J. Battista, #M-15930

cc: S.J.B.(FILE)
    Paul J. Machado, Esq.

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

SANDY J. BATTISTA,                              )
    Plaintiff,                              )
                                            )
vs.                                             )    C.A.NO.
                                            )
KATHLEEN M. DENNEHY, Commissioner, et al.,      )
    Defendant's.                            )

## PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER, AND/OR IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION

Plaintiff Sandy J. Battista, acting pro-se in the above cap-
tioned matter, respectfully applies to this Court, pursuant to
Rule 65(a), FRCP, for a Temporary Restraining Order, and/or in
the Alternative, for a Preliminary Injunction, enjoining the
defendant's in the above captioned matter, from withholding a
course of treatment medically prescribed and determined medically
necessary and appropriate by several medical professional, per-
taining to her "gender issues."

In support thereof, plaintiff has attached her Memorandum
of Law in Support. (A proposed Order to Show Cause and Temporary
Restraining Order is also attached herewith).

Dated: 7/6/05 .               Respectfully submitted,

                        Sandy J. Battista, #M-15930
                        Plaintiff/Pro-se
                        Mass. Treatment Center
                        30 Administration Rd.
                        Bridgewater, Mass. 02324-3230