UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDY J. BATTISTA, )
    Plaintiff, )
                                            )
vs.                                         )   C.A.NO.
                                            )
KATHLEEN M. DENNEHY, Commissioner et al., )  05-11456 DPW
    Defendant's. )

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER, AND/OR IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION

### STATEMENT OF THE CASE:

This is a Civil Rights Action brought under 42 U.S.C. §1983 by a civilly committed patient whose commitment was based in part on her "gender issues," and who is presently being denied appropriate medical treatment, despite numerous medical professionals determination of the medical necessity and appropriateness. The plaintiff seeks a temporary restraining order and a preliminary injunction to ensure that she receives her previously prescribed treatment.

### STATEMENT OF RELEVANT FACTS:

As stated in the plaintiff's Verified Complaint, during her original civil commitment proceedings, one of the Commonwealth's expert witnesses, opined that plaintiff "clearly has a complex network of issues related around her 'gender issues,'" and determined that she "needs to work through them." Complaint ¶¶19-25. Subsequent to that determination, plaintiff was civilly committed, Complaint, ¶26, and further instructed while committed to seek treat-

ment for her "gender issues." Complaint, ¶¶28 & 30. In accordance with those treatment instructions, plaintiff was seen by two separate independent gender specialists, Complaint, ¶34, who both determined that plaintiff met all of the diagnostic criteria for "Gender Identity Disorder(NOS)," and determined it clinically and medically necessary and appropriate for plaintiff to be provided "cross-gender hormone therapy," as well as individual psychotherapy to support the adjustment the hormones will bring. Complaint, ¶35. In accordance with this treatment plan, defendant's made arrangements for plaintiff to be seen by an outside specialist in Endocrinology for the development of a medical prescription to address hormone administration, Complaint, ¶¶36-37; the prescription filled, Complaint, ¶38; and then arbitrarily placed an administrative "hold" on plaintiff's access to said prescription, pending some so-called medical and security review of the "medical necessity and appropriateness in the context of a 'prison environment.'" Complaint, ¶¶39, 44 & 49. The plaintiff is experiencing continued anxiety and depression, which is effecting her eating and sleeping habits, has contributed to a significant loss of weight, as well as her ability to function in normal daily routines, as well as productively participate in treatment for those sexual behaviors which she was originally committed under. Complaint, ¶¶40, 43, 47, & 58.

The defendant's against whom relief is sought are, respectively, the Commissioner of the Department of Corrections and Superintendent of the Massachusetts Treatment Center, who are responsible for maintaining a treatment program for the "care, custody, treat-

-3-

ment, and rehabilitation" of persons, like the plaintiff, who have been civilly committed. And for carrying out medical orders with-out question, as to the needs of the civilly committed.

## ARGUMENT

I. Standard for Issuing a TRO:

A party seeking an ex parte TRO must allege, in an affidavit or verified complaint, that his injury or loss is "immediate and irreparable" and will occur before the adverse party or that party's attorney can be heard in opposition to the motion. Fed.R.Civ.P. 65(b). The applicant must also certify the efforts, if any, which have been made to give that notice and the reasons supporting the claim that notice should not be required. Id.

A party seeking a TRO also must demonstrate: (1) a likelihood of success on the merits; (2) a potential for irreparable harm; (3) that the balance of the relevant equities favors him; and (4) the public interest would not be adversely affected by an injunction. Levesque vs. State of Maine, 587 F.2d 78, 80 (1st Cir. 1976); see also Butler vs. Maine Sup.Jud.Ct., 758 F.Supp. 37, 38 (D.Me. 1991) (applying criteria). See Planned Parenthood League of Mass. vs. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981). "Of these four factors, the probability-of-success component...has been regarded by this circuit as critical...." Lancor vs. Lebanon Housing Authy., 760 F.2d 361, 362 (1st Cir. 1995); accord B.P.G. Autoland Jeep-Eagle, Inc. vs. Chrysler Credit Corp., 785 F.Supp. 222, 227 (D.-Mass. 1991)("Most critical" component). Each of these four factors favors the grant of this application.

-4-

## II. THE PLAINTIFF IS ENTITLED TO A TRO, AND/OR PRELIMINARY INJUNCTION.

(A) <u>Plaintiff's Effort's To Notify Defendant's of her Intent to Seek Such Relief if Treatment is Not Provided.</u>

As set forth in the Verified Complaint in this case, plaintiff has repeatedly attempted to request upon the defendant's to "expedite" any alleged pending "Medical" and "security review" of her prescribed treatment, due to the deterioration she is experiencing on a 'daily' basis in her mental health and well-being, as well as injecting her "notice of intent" to seek such relief if not responded to in an appropriate and timely manner. [1]/ Complaint, ¶¶39,41-42, 45-46, & 50-51. See <u>Thompson vs. Ramirez</u>, 597 F.Supp. 726, 726 (D.P.R.1984)(holding that certification to court in writing of the efforts, if any, of notification to adverse parties, is a requirement of minimum due process).

(B) <u>Plaintiff's Likelihood of Success on the Merits</u>.

The records in this case, without dispute, reveals the following specific verified facts: (1) plaintiff was the subject of a petition for civil commitment(Complaint, ¶19); (2) plaintiff's subsequent civil commitment was presmised in part on her "gender issues"(Complaint, ¶¶23-26); (3) while civilly committed, several of plaintiff's treating therapists instructed her to seek treatment services via the treatment center's UMass mental health program for her "gender issues"(Complaint, ¶¶28 & 30); (4) in accordance with those

---

[1] Though not required, plaintiff even went as far as to write the defendant's legal department, requesting that he intervene on her behalf. And that, if no other alternative was available, she would be left to seek such relief. See attached letter to Attorney Richard C. McFarland(dated May 24, 2005).

-5-

treatment instructions, defendant's arranged for plaintiff to be seen by two independent outside specialists for the development of an appropriate treatment plan(Complaint, ¶¶33-34); (5) an appropriate plan was developed and deemed clinically and medically necessary and appropriate(Complaint, ¶35); (6) in accordance with that treatment plan, defendant's then arranged for plaintiff to be seen by an outside specialist ir Endocrinology for the development of a medical prescription to address hormonal therapy(Complaint, ¶37); (7) filled said prescription(Complaint, ¶38); and (8) then arbitrarily placed an administrative "hold" on plaintiff's access to such medically prescribed treatment, pending some so-called medical and security review "to determine the medical necessity and appropriateness in the context of a [prison environment]"(Complaint, ¶¶39,44 & 49). 2/

---

[2] Even more telling here, is that, in a prior action filed by plaintiff while she was "temporarily" civilly committed, awaiting trial on the Commonwealth's Petition to commit, defendant Hughes submitted a sworn affidavit before this court, declaring that such a treatment plan would be developed and provided plaintiff in the future. (Complaint, ¶¶16-17). The very same treatment plan defendant's now are withholding. In Kosilek vs. Maloney, 221 F.Supp.2d 156 (D.Mass. 2002), defendant Dennehy's predecessor, Michael T. Maloney(former Commissioner), under oath, stated that: "[i]f the doctors from the University of Massachusetts who are engaged to provide mental health care to inmates decided to bring in a specialist to treat Kosilek, he would not interfere. Indeed, Maloney sincerely believes that he has never in his career interfered with a doctor's order for treatment and has no intention of doing so in the future, with regard to Kosilek or anyone else." Id. at 176.

-6-

What the defendant's have done— "intentionally interfering with [medical] treatment once prescribed"— was specifically singled out by the United States Supreme Court as an example of unconstitutional "deliberate indifference" to prisoners' medical needs. Estelle vs. Gamble, 429 U.S. 97, 105 (1976). Many other courts have held that the failure to carry out physicians' orders is unconstitutional. See, e.g., Aswegan vs. Bruhl, 965 F.2d 676, 677-78 (8th Cir. 1992)(repeated failures to provide medications timely); Hill vs. Marshall, 962 F.2d 1209, 1213-14 (6th Cir. 1992)(failure to provide tuberculosis medication), cert. denied, ___ U.S. ___ (1993); Dace vs. Solem, 858 F.2d 385, 387-88 (8th Cir. 1988)(failure of prison doctors to carry out surgery scheduled before plaintiff's incarceration); Washington vs. Dugger, 860 F.2d 1018, 1021 (11th Cir. 1988)(failure to return patient to VA hospital for treatment of Agent Orange exposure); LaFaut vs. Smith, 834 F.2d 389, 393-94 (4th Cir. 1987)(failure to provide rehabilitation therapy recommended by orthopedic specialist). This is precisely what is going on in the case at hand.

In addition, it is well-established that, persons like the plaintiff, who are civilly committed, are constitutionally entitled "to more considerate treatment and conditions of confinement than criminals whose conditions are designed to punish." 3/

___

[3] What is most noteworthy here, is that, defendant's are currently affording state prisoner's housed in the general population of an all male adult state prison with medically prescribed hormonal therapy, as well as the right to retain, at their own expense, female clothing and make-up. All with no apparent security concerns. (Complaint, ¶¶ 29 & 65). See Kosliek, 221 F.Supp.2d at 168.

-7-

See Youngberg vs. Romeo, 457 U.S. 307, 322 (1982). As the Supreme Judicial Court has made abundantly clear, the "primary objective of c.123A...is to care for, treat, and, it is hoped, rehabilitate the sexually dangerous person, while...protecting the public." See Sheridan, petitioner, 412 Mass. 599, 604 (1992); Comm'r of Corr. vs. McCabe, 410 Mass. 847, 852-53 (1991). See Commonwealth vs. Barboza, 387 Mass. 104, 438 N.E.2d 1064, 1069 (1982)(..."[T]he Statute was enacted with the dual aims of protecting the public against future antisocial behavior by the offender, and of 'doing all that can be done to rehabiliatate him') (citing Commonwealth vs. Rodriguez, 376 Mass. 632, 646 (1982)(same))." Thus, the right to treatment here was/is not just a matter of plaintiff's health and well-being. Rather, the indifference analysis must also be focused on the challenged abuse of power by officials in denying plaintiff the treatment regimen that was statutorily mandated and was necessary in order for her condition to improve. And thus, for her to advance towards eventual release. See, e.g., Leamer vs. Fauver, 288 F.3d 532, 546-47 (3d Cir. 2002). 4/

---

[4] If the present operation of the treatment center is unable to meet the plaintiff's mental health needs, as Commissioner, defendant Dennehy, has a statutory responsibility under G.L. c.124, §1(c), to formulate and implement a policy which will. Id. See also, e.g., Commonwealth vs. Major, 354 Mass. 666, 668 (1968)("[I]ndeed, implicit in the statute and its purpose is the obligation to provide an environment conductive to a cure or an alleviation of the dangerous trait"); see also, e.g., Leamer, 288 F.3d at 539 & n.5, citing Lair vs. Fauver, 595 F.2d 911, 913-14 (3d Cir. 1979).

-8-

(C) <u>Plaintiff is Threatened with Irreparable Harm.</u>

The party seeking an injunction bears the burden of establishing a cognizable threat of irreparable harm as an essential prerequisite to the issuance of injunctive relief. <u>Vieques Conservation and Historical Trust vs. Bush</u>, 140 F.Supp.2d 127, 134 (D.P.R.2001)(citations omitted). The failure to demonstrate irreparable harm adequately is grounds in and of itself for denial of the motion. <u>Thompson</u>, 597 F.Supp. at 726.

The plaintiff has alleged sufficient verified facts, along with sufficient documentation that, she has been arbitrarily blocked by prison officials and administrators to medically prescribed treatment, deemed clinically and medically necessary and appropriate for a serious medical need. [5] Contrary to several of her treating therapists' and physicians' instructions. (Complaint, ¶¶28,30, & 34-38). Such conduct by prison officials is a clear violation of the Eighth Amendment. <u>Estelle</u>, 429 U.S. at 105(noting that "intentionally interfering with the treatment once prescribed" is a form of unlawful deliberate indifference); see <u>Cameron vs. Tomes</u>, 783 F.Supp. 1511, 1522 (D.Mass. 1992)(citing <u>Clarke vs. Cohen</u>, 613 F.Supp. 684, 704 (E.D.Pa.1985)(holding that to be entitled to deference the treatment "decision has to

---

[5] Circuit Court's have consistently considered "transsexualism," also known as "gender dysphoria," as a "serious medical need" for the purpose of the <u>Estelle</u> standard. See, e.g., <u>Cuoco vs. Moritsugu</u>, 222 F.3d 99, 106 (2d Cir. 2000); <u>Meriwether vs. Faulkner</u>, 821 F.2d 408, 413 (7th Cir. 1987); <u>White vs. Farrier</u>, 849 F.2d 322, 325 (8th Cir. 1988).

be based on medical or psychological criteria and not on exigency, administrative convenience, or other non-medical criteria"), aff'd, 794 F.2d 79 (3d Cir. 1986)).

As a matter of law, the continuing deprivation of constitutional rights constitutes "irreparable harm." Elrod vs. Burns, 427 U.S. 347, 373 (1976). This principle has been applied in prison litigation generally, Newsom vs. Norris, 888 F.2d 371, 378 (6th Cir. 1989); Mitchell vs. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984); Albro vs. County of Onondaga, N.Y., 627 F.Supp. 1280, 1287 (N.D. N.Y 1986); Williams vs. Lane, 646 F.Supp. 1379, 1409 (N.D.Ill. 1986), aff'd, 851 F.2d 867 (1989), and specifically in prison medical care cases. Phillips vs. Michigan Dept. of Corr., 731 F.Supp. 792, 801 (W.D.Mich.1990), aff'd, 932 F.2d 969 (6th Cir. 1991).

In addition, plaintiff is threatened with irreparable harm because of the nature of her custody. Without access to treatment recommended by her treatment providers, plaintiff will be deprived of an opportunity to address a necessary component surrounding the basis of her original commitment. Because release from the treatment center requires a determination that the patient is no longer sexually dangerous, successful clinical treatment is viewed by some as the only way a patient can realistically hope for reintegration into society, Pearson vs. Fair, No.81-3219-MA, 1989 U.S. Dist. Lexis 10988 (D.Mass. Aug. 28, 1989)(at page-19), denying plaintiff treatment would constitute irreparable harm. Id. at page-18. Such harm and the potential impact on plaintiff's continued deprivation of liberty is neither compensable or speculative. Id. (Complaint, ¶58).

(D) <u>The Balance of Hardships Favor the Plaintiff.</u>

In deciding whether to grant TRO's and preliminary injunctions, courts ask whether the suffering of the moving party if the motion is denied will outweigh the suffering of the non-moving party if the motion is granted. See, e.g., <u>Mitchell</u>, 749 F.2d at 808(holding that dangers posed by prison crowding outweighed states financial and administrative concerns); <u>Duran vs. Anaya</u>, 642 F.-Supp. 510, 527 (D.N.M.1986)(holding that prisoners' interest in **safety** and medical care outweighed states' interest in saving money by cutting staff).

In the case at hand, the present suffering of the plaintiff (Complaint, ¶¶40,43,47, & 50), and the potential impact on her continued liberty if she is not provided access to a necessary component surrounding the basis of her original commitment, are "enormous." The "suffering" the defendant's will experience if the court grants the order will consist of nothing more than allowing treatment center medical personnel to treat plaintiff as previously prescribed—something that the defendant's do, and are obligated to do, for the inmate and patient population of the treatment center on a daily basis. The defendant's hardship amounts to no more than "business as usual."

(E) <u>The Relief Sought Will Serve the Public Interest.</u>

In this case, the grant of relief will serve the public interest because it is always in the public interest for prison officials to obey the law. <u>Duran</u>, 642 F.Supp. at 527("Respect for law, particularly by officials responsible for the administration of the state's correctional system, is in itself a matter of the

-11-

highest public interest"); see also Llewelyn vs. Oakland County Prosecutor's Office, 402 F.Supp. 1379, 1393 (E.D.Mich. 1975) ("the Constitution is the ultimate expression of the public interest").

In addition, and moreimporatntly, it is always in the public interest that, persons like the plaintiff, who have been civilly committed specifically for "treatment, rehabilitation, and protection of the public," are afforded every opportunity to receive treatment based upon professional medical judgment. See, e.g., Youngberg, 457 U.S. at 322(civilly-committed persons are entitled to the exercise of professional judgment as to needs of residents). This interest would be manifestly disregarded were this court to ignore the plain intent of the state's interest in ensuring that civilly-committed patients are afforded every opportunity to receive treatment which may very well reduce their risk of reoffending sexually. See, e.g., Prentky, R.A. (1997) Arousal Reduction in Sexual Offenders: A Review of Antiandrogen Interventions. Sexual Abuse: A Journal of Research and Treatment 9, 335-349.

### III. The Plaintiff Should Not be Required to Post Security.

Usually a litigant who obtains interim injunctive relief is asked to post security. Rule 65(c), FRCP. However, the plaintiff is an indigent patient unable to post security. This court has discretion to excuse an impoverished litigant from posting security. Orantes-Hernandez vs. Smith, 541 F.Supp. 351, 385 n.30 (C.D.Cal.1982); J.L. vs. Parham, 412 F.Supp. 112, 140 (D.Ga. 1976), rev'd on other grounds, 442 U.S. 584 (1979). In view of the serious medical danger confronting the plaintiff, this court

-12-

should grant the relief requested without the posting of security.

CONCLSION

For the foregoing reasons, the court should GRANT the plaintiff's application in its entirety.

Dated: 7/6/05 .                 Respectfully submitted,

                                /s/ Sandy J. Battista
                                Sandy J. Battista, #M-15930
                                Plaintiff/Pro-se
                                Mass. Treatment Center
                                30 Administration Rd.
                                Bridgewater, Mass. 02324-3230

Sandy J. Battista, #M-15930
Mass. Treatment Center
30 Administration Rd.
Bridgewater, Mass. 02324-3230

---

Dated: May 24, 2005.

Richard C. McFarland, Esq.
Legal Division
Department of Correction
70 Franklin Street, Suite 600
Boston, Mass. 02110-1300

      RE: Administrative "Security Review" of Previously Approved Medical
          Treatment. ("Cross-Gender Hormone Treatment").

Dear Counsel:

    Being most familiar with my past pro-se attempts to seek treatment addressing my "gender issues," as well as representing counsel in the Kosilek [1] decision, I find myself once again writing to request that you speak with your clients on the implications in blocking my access to medical treatment previously determined by medical professionals as "medically necessary." A matter not only of my "health and well-being," but arguable also "statutorily mandated." In speaking with your clients, for your attention, please note the following:

    On 3/29/04 and 4/27/04, I wrote the Commissioner, Kathleen M. Dennehy, complaining that I was being treated "differently" from state prisoners, who are currently being afforded treatment while housed in the general population, while I am being denied. Moreimportantly, I also brought to the Commissioner's attention that, while temporarily civilly committed, during a previous pro-se Complaint that I filed with the Federal District Court, [2] you counsel, procured the sworn statement from a Gregory J. Hughes, LICSW, the Regional Administrator for the DOC Health Services Division. Which declared, in relevant part that, upon contracting with UMass Medical, a mental health professionalwithh experience in gender disorders would be retained. At which time I would "undergo a comprehensive medical and psychological evaluation regarding [my] claimed gender disorder and a treatment plan will be developed to address medical and mental health issues." [3] I further complained and alleged that, despite the action in issue being dismissed on other grounds, the [statement] was a sworn binding declaration, and that failing to honor those declarations was a form of "perjury."

    On 5/25/04, I received a letter from a Susan J. Martin, the Director of Health Services Division for the DOC. Director Martin informed me that the Commissioner had appointed her to investigate and reply to my previous letters above. Director Martin then instructed me to request upon my Health Services Unit to be seen by a gender specialist for an evaluation and recommednation for the development of a treatment plan. [4]

    In August of 2004, I finally was seen by two specialist in gender disorders. On retainor by UMass Correctional Health Program, contracted by the

In re: Sandy J. Battista, #M-15930                                            Page-2

DOC.

    In November of 2004, the above gender specialist submitted their report and recommendations for an appropriate medical/mental health treatment plan. Which included in part that, I be allowed "cross-gender hormone treatment."

    On 4/12/05, in accordance with the above treatment recommendations, I was seen by an endocrinologist at the Lemuel Shattuck Hospital. The examining physician, Dr. Maria Warth, who not only treats patients medical for cross-gender hormone treatment, but has also treated my Congenital Adrenal Disorder for the last 20-years while in custody, recommended a treatment regimen to address the medical component of the above treatment recommendations.

    On 4/14/05, I was seen by the Treatment Center's in-house physician, Dr. Friedman, who submitted an order for the medication recommended by Dr. Warth above.

    On 4/25/05, during a consultation with the Treatment Center's Medical Administrator, Maryanne Percuoco, I was informed that my treatment was put on "hold" by the DOC, pending some so-called security review by DOC administrators.

    On 4/27/05, I then submitted a letter to the Superintendent, Mr. Robert Murphy, requesting that he "expedite" this so-called security review. (A copy of this letter was directed to the Commissioner's attention as well). 5/

    On 5/9/05, I received a letter from Director Martin informing me that the treatment recommended by Dr. Warth above was currently under review by UMass. Correctional Health Program Medical Professionals "to determine it's appropriateness and necessity," as well as by DOC Administrators "to determine any potential security contraindications."

    On 5/12/05, in an internal DOC Grievance (No.10269) I submitted, the Superintendent, Mr. Murphy upon appeal held that, "No action is pending by the Superintendent. The grievant is advised to discuss his concerns with the Medical Director."

    On 5/23/05, as instructed by Superintendent Murphy, I then submitted a letter to Director Martin's attention, requesting that she provide me with the DOC Administrator(s) name/address who is allegedly conducting this so-called "security review," so that I may address my questions/concerns to the appropriate personnel. (As of date I've yet to receive any reply).

    In closing, please take note counsel, along with the enclosed, I hereby give my NOTICE OF INTENT to seek a TRO, as well as a Criminal Complaint against your clients for "perjury;" a Civil Complaint; and State Habeas Relief for blocking my access to treatment deemed a "necessary component of my sex offender treatment plan," should your clients not provide me with access to the treatment at issue no later than July 1, 2005. 6/

    Thank you for your consideration and attention in this matter. I await your, and/or your clients reply before procedding further on this matter.

Sincerely,

---

Sandy J. Battista, #M-15930                                              cc: S.J.B.(FILE)

In re: Sandy J. Battista, #M-15930                                        Page-3

---

FOOTNOTES:

[1] See <u>Michelle Kosilek vs. Michael T. Maloney, Commissioner,</u> U.S.Dist.Ct.-C.A.No.92-12820-MLW.

[2] See <u>Sandy J. Battista vs. Robert Murphy, Superintendent, et al.,</u> U.S. Dist.-Ct.C.A.No.02-10137-MEL.

[3] A copy of this Affidavit is attached herewith for your convenience and reference.

[4] It is noted here that, despite recently being provided with the relief declared in the <u>Hughes Affidavit</u> above, it was not until I filed a Complaint with the Commissioner, some two (2) years after the <u>Hughes Affidavit</u> was filed in <u>Battista vs. Murphy, Superintendent, et al.,</u> supra, that I was finally allowed access to such. If left with no other alternative but to once again seek the Court's review of the enclosed, I do not think this discrepancy will be looked at lightly. Submitting a sworn Affidavit before the Federal District Court then failing to honor the declarations is "perjury" counsel. Any way you get around it, any future Affidavit's will be disputed as not being "credible." Here, it is not my attention to threaten or seek any additional Complaints against your clients counsel. I only wish to be provided with the treatment, and may I point out, "recommended by your clients own medical professionals."

[5] It is noted here, that, in this correspondence, I pointed out to the Superintendent's attention that, as my custody is "civil" and not "punitive," I am constitutionally guaranteed to "greater treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." See <u>Youngberg vs. Romeo,</u> 457 U.S. 307, 322 (1982). And that, as <u>Kosilek,</u> and other state prisoners are currently being afforded this treatment while housed in the general population of an all male prison, denying me the treatment recommended by medical professionals would not only violate this constitutional mandate, but also question the remedial aspect of my current detention. See <u>Commonwealth vs. Barboza,</u> 438 N.E.2d 1064, 1069 (1982)(holding that the DOC is required to do "all that can be done to treat and rehabilitate the civilly committed"); see also, e.g., <u>Leamer vs. Fauver,</u> 288 F.3d 532, 546-47 (3d Cir. 2002)(holding that "the right to treatment here was not a matter of the plaintiff's health and well-being. Rather, the indifference analysis must focus on the challeneged abuse of power by officials in denying the plaintiff the treatment regimen that was statutorily mandated and was necessary in order for his condition to improve, and thus for him to advance towards release"). The Court in <u>Leamer</u> further held that, "If the present operation at the [MTC] is unable to meet plaintiff's needs, the Commissioner has a responsibility to formulate and implement a policy which will." Id. at 939-44n.5; see also, e.g., <u>Lair vs. Fauver,</u> 595 F.2d 911, 913-14 (3d Cir. 1979). See <u>Commonwealth vs. Page,</u> 339 Mass. 313, 317-18 (1959)(holding that "confinement in a prison which is undifferentiated from the incarceration of convicted criminals is not remedial so as to escape constitutional requirements of due process").

[6] Here, it is not intended counsel to make any idle threats of litigation. I only desire what your clients medical professionals recommended. Respectfully counsel, what is most confusing here, is that, for years you advocated on your clients behalf that because I was "self-diagnosed" I could not prevail at trial that I suffered from any recognized "serious medical disorder" that would necessitate treatment. However, here, it was [your clients medical professionals] that diagnosed and recommended an appropriate treatment plan. Now

In re: Sandy J. Battista, #M-15930                                              Page -4

---

FOOTNOTES CONTINUED:

your clients are now attempting to override their own medical professionals treatment recommendations by conducting a second "determination as to the appropriateness and necessity" of the treatment recommended, as well as a so-called "security review." What next counsel? It is conceded in part that, the Court in Kosilek provided your clients the discretion to conduct a security review of any medical treatment. However, the Court in Kosilek clearly instructed your clients that in making any security determinations that certain factors must be considered. For example, that:

> "[K]osilek is already living largely as a woman in a medium security male prison. This has not presented a security problem. The policy adopted by Maloney contemplates continuing female hormones for transsexuals for whom they have been prescribed prior to incarceration. Maloney expects that he would keep such inmates in the general population of a male prison. This has, evidently, been done so safely in several states, in the United States Bureau of Prisons Systems, and in Canada."

As such, any determination in my individual case must also consider these facts, as well as the obvious, my custody is "civil" and not "punitive." Despite the Treatment Center's design, there would be a far greater risk of any physical or sexual assault while in the custody of an adult male state prison than while at the Treatment Center, if any exist at all. A majority of the population here are old and feeble. I have lived my life here for the last three years largely as a woman. The resident population, as well as the administration and correctional officers are all extremely familiar with my desire to live my life as a female. For all purposes I am referred to as a female (Sandy). All with no security problems.