### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

**SANDY JO BATTISTA,**

>   **Plaintiff,**

>   **v.**                                                    C. A. No.  05-11456-DPW

**KATHLEEN M. DENNEHY, et al.,**

>   **Defendants.**

---

### MEMORANDUM OF LAW IN SUPPORT OF THE OPPOSITION OF DEFENDANTS KATHLEEN M. DENNEHY, ROBERT MURPHY, SUSAN MARTIN, STEVEN FAIRLY AND GREGORY HUGHES TO PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION

Defendants, Kathleen M. Dennehy, Robert Murphy, Susan Martin, Steven Fairly and Gregory Hughes, through counsel, hereby submit this memorandum of law in support of their opposition to plaintiff's request for a preliminary injunction.

### INTRODUCTION

Plaintiff, Sandy Jo Battista  ("Battista"), an individual presently under civil commitment to the Massachusetts Treatment Center for Sexually Dangerous Persons ("Treatment Center") as a sexually dangerous person, pursuant to M.G.L. c. 123A, has brought this action alleging a denial of treatment for his gender identity disorder ("GID").  Battista's complaint raises five (5) claims under 42 U.S.C. § 1983: 1) violation of substantive due process right to medical treatment (Complaint ¶ 68); 2) denial of equal protection (Complaint ¶ 70); 3) discriminatory practices in providing medical treatment (Complaint ¶ 72); 4) deprivation of due process (Complaint ¶ 74); and 5) intentional infliction of emotional distress (Complaint ¶ 76).   Named as defendants are: Kathleen M. Dennehy, the Commissioner of the Massachusetts Department of Correction ("DOC"); Robert Murphy, Treatment

Center Superintendent; Steven Fairly, Treatment Center Director of Security; Susan Martin, formerly DOC Director of Health Services; Gregory Hughes, formerly DOC Mental Health Regional Administrator (collectively "DOC defendants"); and University of Massachusetts Correctional Health Program ("UMCHP").

## FACTUAL BACKGROUND

On January 27, 1983, Battista was found guilty of Rape of a Child, Kidnapping, and Robbery and sentenced to 12 to 20 years in prison. On May 24, 2001, the district attorney petitioned for Battista's commitment as a sexually dangerous person ("SDP") to the Treatment Center. M.G.L. c. 123A, § 12(b). On December 19, 2001, a justice of the Superior Court found probable cause to believe that Battista was an SDP, and ordered him temporarily committed to the Treatment Center for examination and diagnosis by two qualified examiners. On April 10, 2002, based on the findings of the qualified examiners, who concluded that Battista is an SDP, the district attorney filed a petition for trial under M.G.L. c. 123A, § 14. On May 15, 2003, a unanimous jury determined beyond a reasonable doubt that Battista is sexually dangerous as that term is defined in M.G.L. c. 123A, § 1 and committed Battista to the Treatment Center. Complaint, ¶ 26. M.G.L. c. 123A, § 14(d). In July, 2003, Battista filed a petition for his discharge from his civil commitment in the Superior Court, pursuant to M.G.L. c. 123A, § 9. A hearing date has not been scheduled for the § 9 petition. Affidavit of Lawrence Weiner, ¶ 11, attached as Exhibit 1.

## ARGUMENT

In order to succeed on a request for injunctive relief, a plaintiff must show: 1) a probability of success on the merits of his claims; 2) that he will suffer irreparable harm without injunctive relief; 3) that the harm he will suffer if injunctive relief is not granted outweighs the harm to the defendants; and 4) that granting injunctive relief is in the public interest. See Jackson v. Fair, 846 F.2d 811, 814

3

(1st Cir. 1988); <u>Planned Parenthood League v. Bellotti</u>, 641 F.2d 1006, 1009 (1st Cir. 1981). The purpose of a preliminary injunction is to preserve the status quo. <u>Itek v. First National Bank of Boston</u>, 566 F. Supp. 1210 (D. Mass. 1983), <u>aff'd</u>, 730 F.2d 19 (1st Cir. 1983).

However, where a party seeks an injunction which alters the status quo by mandating some positive act by the non-moving party, the moving party must meet a higher standard. A party seeking a mandatory injunction must show that the factors supporting injunctive relief "weigh heavily and compellingly in the movant's favor." <u>SCFC ILC, Inc. v. Visa USA</u>, 936 F.2d 1096, 1098-99 (10th Cir. 1991); <u>Mass. Coalition of Citizens with Disabilities v. Civil Defense Agency and Office of Emerg. Preparedness</u>, 649 F.2d. 71, 76 n.7 (1st Cir. 1981) ("Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of situation demand such relief."); <u>Lewis v. General Electric Company</u>, 37 F. Supp. 2d 55, 62-63 (D. Mass. 1999) (the judiciary's disfavor of mandatory injunctions is reflected by the higher standard required for granting mandatory injunctive relief). The heightened standard is particularly important where the injunctive relief would provide the moving party with largely all the relief sought and where the relief could not be undone even if the non-moving party subsequently prevails at trial. <u>Phillip v. Fairfield University</u>, 118 F.3d 131, 133 (2nd Cir. 1997).

## I.    PLAINTIFF WILL NOT SUCCEED ON THE MERITS OF HIS CLAIMS.

### A.    Plaintiff's Claims Are Barred Under Doctrine of Res Judicata

Previously, Battista raised issues relative to his desire to obtain treatment for his GID in this Court in the case of <u>Battista v. Murphy, et al.</u>, U.S.D.C. No. 02-cv-10137-MEL. The complaint in that action alleged that Battista had been diagnosed by a gender identity expert as suffering from GID and that Treatment Center Superintendent, Robert Murphy, and other administrative and clinical staff,

4

had refused to provide Battista with treatment for his GID, including female hormones, castration, and female clothing and make-up. The DOC defendants moved to dismiss the complaint on the grounds of res judicata, citing to an earlier state court decision, <u>Battista v. Commonwealth of Massachusetts, et al.</u>, No. 97-03487 (Suffolk Superior Court) (1998) in which Battista had similarly sought treatment for his GID and the state court had entered a decision in favor of the DOC officials. On November 4, 2002, the Court (Lasker, J.) entered a Memorandum and Order granting defendants' motion to dismiss pursuant to the doctrine of res judicata. Battista filed a timely appeal with the United States Court of Appeals for the First Circuit, <u>Battista v. Murphy, et al.</u>, No. 02-2619. On October 3, 2003, the Court of Appeals entered judgment in favor of the DOC defendants, upholding the dismissal of the complaint by the District Court. In its decision, the Court of Appeals stated:

> Even if we assume <u>arguendo</u> that Battista's claims are not barred by res judicata, we nonetheless affirm the dismissal of all claims for failure to state a claim for which relief can be granted.
>
> As to the claim that Treatment Center officials have been deliberately indifferent to medical needs, Battista does not claim that he has been deprived of all care but that the psychological care which he has been offered is inadequate to treat his condition. Even if this were so, a point on which we hazard no opinion, Battista still has not alleged sufficient facts to show that Treatment Center officials were aware that the treatment offered Battista was inadequate. As such, Battista alleges no more than that he has not received the treatment of his choice. This is insufficient by law to establish a constitutional violation. <u>See</u>, <u>e.g.</u>, <u>Watson v. Caton</u>, 984 F.2d 537, 540 (1st Cir. 1993) (mere difference of medical opinion as to the need to pursue one course of treatment over another does not rise to the level of a constitutional violation).
>
> Battista also alleges that Treatment Center officials are violating his constitutional right to wear clothing of his choice. However, we are aware of no such constitutional right pertaining to patients "[i]n an institution like the Treatment Center [where], as in an ordinary prison, security and administrative concerns may clash with the welfare and comfort of individuals." <u>Cameron v. Tomes</u>, 990 F.2d 14, 20 (1st Cir. 1993). Similarly, we know of no constitutional right infringed by the failure of Treatment Center officials to place Battista in a single cell or with another patient who "shares the same

5

feminine characteristics."

The dismissal is <u>affirmed</u>.

<u>Battista v. Murphy, et al.</u>, No. 02-2619 (Judgment, Oct. 3, 2003).

In the case at bar, it is clear that Battista's complaint meets the prerequisites of the doctrine of <u>res judicata</u> and he is precluded him from re-litigating issues that have been adjudicated in prior state and federal litigation. <u>See</u> <u>FDIC v. Shearson-American Express, Inc.</u>, 996 F.2d 493, 497 (1st Cir. 1993); <u>Gloucester Marine Railways Corp. v. Parsi, Inc.</u>, 36 Mass. App. Ct. 386, 391 (1994).

**B.      Plaintiff Will Not Succeed On His Constitutional Claims.**

**1.      Plaintiff Has Failed To State A Claim Under 42 U.S.C. § 1983.**

The complaint alleges that the failure to treat Battista's GID with female hormones violates his right to treatment under the United States Constitution. Battista alleges that defendants have failed to comply with DOC policies, 103 DOC 630.00 <u>et seq.</u> (Medical Services) and 103 DOC 650.00 <u>et seq.</u> (Mental Health Services) and state statute, M.G.L. c. 123A, § 2. Complaint,¶ 68.

As an initial matter, to state a civil rights claim under 42 U.S.C. § 1983, a plaintiff must allege that defendants, acting under color of state law, committed some conduct which deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988); <u>Johnson v. Summers</u>, 411 Mass. 82, 86 (1991). This statute, 42 U.S.C. § 1983, in and of itself does not offer plaintiff any substantive ground for relief. It is well established that § 1983 is not a source of substantive rights, but merely provides a method for vindicating <u>federal</u> rights conferred under the United States Constitution or federal law. <u>Chapman v. Houston Welfare Rights, Org.</u>, 441 U.S. 600, 615-618 (1978). Rights that arise only from state law are not enforceable by § 1983. Since § 1983 requires violation of a federal constitutional or statutory

6

right, the mere failure to properly follow state law or regulations cannot provide the basis for a §

1983 claim.  See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 106 (1984); Coyne v.

City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992) ("It is bedrock law in this circuit, . . . that

violations of state law -- even where arbitrary, capricious, or undertaken in bad faith -- do not,

without more, give rise to a denial of substantive due process under the U.S. Constitution");

Martinez v. Colon, 54 F.3d 980, 989 (1st Cir. 1995) ("It is established beyond peradventure that a

state actor's failure to observe a duty imposed by state law, standing alone, is not a sufficient

foundation on which to erect a section 1983 claim.").  Where plaintiff's claims arise under state law,

he is unable to state a claim under § 1983.[1]

**2.      Plaintiff Is Unable To State A Claim For Inadequate Medical Treatment.**

The deliberate indifference standard utilized for Eighth Amendment claims has been held to be

an appropriate minimum guideline for the review of claims brought under the Fourteenth Amendment

by involuntarily committed persons alleging inadequate treatment and training.  See Cameron v.

Tomes, 783 F. Supp. 1511, 1515-16 (D. Mass. 1992), modified, Cameron v. Tomes, 990 F.2d 14 (1st

Cir. 1993); Youngberg v. Romeo, 457 U.S. 307, 315-16 (1982).  The District Court in Cameron,

supra., held that, "[A] state's decisions about the treatment of an involuntarily committed patient

cannot be constitutionally sufficient if in making them the state has shown deliberate indifference to

the patient's mental health needs." Id. at 1515-16.

---

1   Nor is Battista able to obtain equitable relief for alleged violations of DOC policies under state law.  The enabling
statute, M.G.L. c. 124, §§ 1(q) and 1(s), is without reference to the possibility of a private action in equity, much less a
private damages action, therefore, the regulations do not create a private right of action which would confer standing to seek
declaratory, injunctive or monetary relief. Loffredo v. Center for Addictive Behaviors, 426 Mass. 541, 546-47 (1998) (no
private cause of action under regulation in absence of clear legislative intent to create a private cause of action for person
injured by a regulation violation).  Massachusetts courts, have consistently found it improbable that the Legislature, in
granting a state agency the authority to promulgate regulations, was also empowering the agency to create possible civil
liability.  Martino v. Hogan, 37 Mass. App. Ct.  710, 720-21 (1994).

7

The Eighth Amendment protects prisoners from punishments which "involve unnecessary and wanton infliction of pain... totally without penological justification." Gregg v. Georgia, 428 U.S. 153, 173 (1976). In Estelle v. Gamble, 429 U.S. 97 (1976), the Court held that deliberate indifference to a serious medical condition constitutes cruel and unusual punishment in violation of the Eighth Amendment. The standard applied under the Eighth Amendment in this Circuit is that inmates should receive adequate medical care based on the exercise of professional judgment. United States v. DeCologero, 821 F.2d 39, 44 (1st Cir. 1987). Allegations which reflect disagreement as to the appropriate course of treatment do not state a constitutional violation, even if they present a claim of negligence. DesRosiers v. Moran, 949 F.2d 15, 20 (1st Cir. 1991); Watson v. Caton, 984 F.2d at 540 ("The courts have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment..."); Layne v. Vinzant, 657 F.2d 468, 474 (1st Cir. 1981) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments..."); Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987).

In order to succeed on a claim of cruel and unusual punishment, a plaintiff must satisfy both an objective and a subjective component. First, in order to demonstrate that the medical care violated constitutional mandates, a prisoner must show that his medical treatment "shocks the conscience" or "offends evolving standards of decency." Estelle v. Gamble, 429 U.S. at 106. Second, plaintiff must show that defendants acted with a sufficiently culpable state of mind, that is, with deliberate indifference to a serious medical need. See Farmer v. Brennan, 511 U.S. 825, 837 (1994); Whitley v. Albers, 475 . 312, 319-21 (1986); DesRosiers v. Moran, 949 F.2d at 18-19. To obtain injunctive

8

relief on a claim of deliberate indifference to medical treatment, an inmate must "prove that: 1) he has a serious medical need; 2) which has not been adequately treated; 3) because of [defendants'] deliberate indifference; and 4) that deliberate indifference is likely to continue in the future." Kosilek v. Maloney, 221 F. Supp. 2d 156, 161 (D. Mass. 2002).

    With regard to medical treatment for transsexual inmates, the federal courts have generally held that GID is a psychiatric condition which constitutes a serious medical need entitling the inmate to some form of medical treatment for the disorder, but that there is no constitutional right to a particular kind of treatment. See Supre v. Ricketts, 792 F.2d 958, 963 (10th Cir. 1986) (transsexual inmate entitled to some form of medical treatment, but failure to treat with female hormones does not constitute deliberate indifference); Lamb v. Maschner, 633 F. Supp. 351, 353 (D. Kan. 1986) (no deliberate indifferent where transsexual inmate provided with "some type of mental treatment" despite inmate's desire for hormones and sexual reassignment surgery); Meriwether v. Faulkner, 821 F.2d 408, 413-14 (7th Cir. 1987) (transsexualism constitutes a serious medical condition "entitled to some type of medical treatment," but hormone therapy is not constitutionally mandated); Brown v. Zavaras, 63 F.3d 967, 970 (10th Cir. 1995) (transsexual not entitled to receive hormones but is entitled to receive some type of  treatment); Long v. Nix, 877 F. Supp. 1358, 1365 (S.D. Iowa 1995) (transsexual inmates have no constitutional right to any particular treatment), aff'd 86 F.3d 761, 764 (8th Cir. 1996).  However, several federal court have held that an inmate must demonstrate more than a diagnosis of GID to mandate treatment under the Constitution. See Farmer v. Moritsugu, 163 F.3d 610 (D.C. Cir. 1998) (mere diagnosis of transsexualism, without more, does not necessarily mandate providing a transsexual prisoner with medical or psychological treatment); Maggert v. Hanks, 131 F.3d 670, 671-72 (7th Cir. 1997)  ("except in special circumstances ... the Eighth Amendment does

not entitle a prison inmate to curative treatment for his gender dysphoria"). In <u>Kosilek v. Maloney</u>,

<u>supra</u>, the court held:

> A gender disorder is not, however, necessarily a serious medical need for which
> the Eighth Amendment requires treatment. As with other mental illnesses,
> gender identity disorders have differing degrees of severity. As the Standards
> of Care explain, some individuals with gender identity disorders manage to find
> their own comfortable, effective ways of living that do not require
> psychotherapy, hormone therapy, a real life experience, or sex reassignment
> surgery. (Citing to <u>Farmer v. Moritsugu</u>, 163 F.3d at 615).

 <u>Kosilek v. Maloney</u>, 221 F. Supp.2d at 184.

In the instant case, the DOC defendants maintain that the gravamen of Battista's complaint is

a dispute over the proper course of his treatment. The dispute is based on the opinions of mental

health professionals who have examined Battista and are in disagreement over whether Battista's

reported desire to become a female is the result of a valid gender identity disorder or the result of

severe psychological traumas he suffered as a child, including an intersex disorder that resulted in his

rejection by his mother, the murder of his mother by his father, alleged physical, mental and sexual

abuse as a child, and inadequate sexual experiences as a young adult and his sexual deviancy. Weiner

Aff., ¶¶ 6, 7. For example, the report of Dr. Ronald Ebert, a forensic psychologist hired by

Battista's counsel in his civil commitment proceedings to conduct a psychological evaluation of

Battista relative to his sexual dangerousness, raised concerns regarding the validity of a GID

diagnosis and cautioned against the irreversible medical treatment desired by Battista:

> From a clinical point of view it is no small matter that he has taken on his
> mother's name as well as her sexuality. His wish to become a woman through
> surgery appears to be an attempt upon his part to regain the mother who
> rejected him and who was killed for her rejection. It may also be an attempt to
> reject his father and his father's anger towards women, or it might serve to
> psychologically redeem his father by bringing his mother back to life. In any
> case this is an incomplete psychological attempt to resolve his terrible childhood
> in a dramatic and permanent fashion. <u>It is to be hoped that any ethical</u>

> professional he sees to support his wish to change his sex will agree that many
> years of further treatment and therapy are required before such a decision
> can be made.

Psychological Evaluation of Sandy Jo Battista by Ronald Ebert, Ph.D., October 19, 2001, at p. 8

("Ebert Assessment") (Emphasis added) (Attachment 1 to Weiner Aff.). Further, Dr. Ebert states

that Battista's intersex condition, Congentital Adrenal Hyperplasia, ("CAH"), an infantile

adrenogenital syndrome, may play an important role in his self-reported gender confusion. Ebert

Assessment at p. 8. In addition, several other psychological evaluations conducted of Battista have

raised concerns regarding the reasons underlying his fixated desire to become a female. In an

October, 1998, a psychological assessment of Battista was conducted by David Campopiano, M.A.

and Robert Prenky, Ph.D. of the Justice Resource Center ("JRI"), a contract clinical program for the

treatment of sexually dangerous men at the Treatment Center. See I.D.P. Intake & Assessment

Report of Sandy J. Battista by David Campopiano, October, 1998 ("JRI Assessment") (Attachment 2

to Weiner Aff.). The JRI Assessment, which included psychological testing of Battista, found that he

had serious problems in the control of his anger and a high degree of psychopathy. Battista admitted

to being a "good liar," and acknowledged that he had engaged in highly manipulative behavior

including using threats of suicide and feigned "enemy problems" in order to change his housing

assignments in prison. JRI Assessment at pp. 5-6. As to his self-reported GID, the report stated:

> In regards to his gender identity issue, it is unclear to what extent his genetic
> disorder influenced his identity as a female. However, his early exposure to
> pornography, his brief relationship with his mother and her violent death, clearly
> had an impact on his self-perception and sexual development. Although these
> influences clearly influenced his attraction to young girls; it is unclear if it
> effected his gender identity. If we take into consideration his strong
> psychopathic tendencies, his gender identity issue may simply be manipulative.

JRI Assessment at p. 7. (Emphasis added). Battista's description of his childhood in the JRI

Assessment does not reference any cross-gender identification behaviors. JRI Assessment at p. 3.

11

Another psychological assessment was conducted at MCI-Norfolk in 1997 for purposes of evaluating

Battista's request for sex reassignment surgery.  See Psychological Assessment Report of Sandy J.

Battista by J. Taylor Carpenter, Ph.D., October, 4, 1997 ("Carpenter Assessment") (Attachment 3 to

Weiner Aff.).  Battista acknowledged that prior to 1995 he had not felt a desire to live as a female:

> Mr. Battista presented the following history of the present illness: He states that
> as far back as he can remember he has felt odd and different, but not necessarily
> female.  In the mid-1995 he decided to change his name to a female name and at
> that time he further decided, 'I wanted to live my life as a female.'

Carpenter Assessment at p. 1.

Dr. Carpenter also noted that Battista's "presentation was remarkable for the complete absence of

feminine characteristics of speech or posture, save for his hair being pulled back in a neat ponytail."

Carpenter Assessment at p. 4.  Nor did Battista report engaging in any cross-gender identification,

including cross-dressing behaviors, as a child. Carpenter Assessment at p. 2.  Based on his interviews

with Battista and extensive psychological testing, Dr. Carpenter found Battista to be very conflicted

and motivated by severe psychological disturbances:

> Mr. Battista's primary conflicts appear to center primarily around a great deal
> of rage and distrust of authority, and poorly differentiated sexual and aggressive
> drives.  His rage at authority has its roots in his images and experiences of his
> father's explosiveness and anger (e.g., reportedly shooting in the house and
> fatally beating his mother, physically abusing Mr. Battista's stepmother, and his
> use of painful corporal punishment), as well as the pervasive anti-authority
> attitude which is prevalent in the prison culture.  His sexual conflicts are equally
> severe and entwined with his rage, as well as anomalous in their behavioral
> expression.  His mother was repulsed by, and ridiculed the effects of his early
> genital development, leaving him alienated from his primary caregiver and his
> own sexual anatomy.  It is clear that this shame over his genitals persisted well
> into his young adulthood, and appears to be intermingled with an unconscious
> fantasy of using his genitals in a rageful way against women.  The relatively late
> onset of his desire to become a woman through sex reassignment surgery,
> appears to, in part, be a function of his alienation from others, deep conflict
> over his sexual being, precipitated by an acceptance by other inmates, in an
> environment which by nature must place controls on sexual expression, of his

12

> experiments with cross dressing.  In other words, as a lonely and angry individual who was deeply uncomfortable about his sexual being, cross dressing helped him deny the painful and complex conflicts, while at the same time providing stimulation, a less aggressive identity, and the deeply desired attention.  Even the painful ritual of surgery would appear to be both a concrete and masochistic transformation of that which has come to be associated with shame and pain, as well as some rite of passage whereby he finally has achieved an identity he believes that he can live with.

Carpenter Assessment at pp. 9-10.

In March, 1997, Dr Victoria Russell, a psychiatric consultant to the DOC with experience in treating gender disorders, offered an opinion regarding Battista's request for sex reassignment surgery after reviewing his medical records.  Similar to the opinions of Dr. Ebert, Dr. Carpenter and Mr. Campopiano, Dr. Russell reached the conclusion that Battista's recently reported gender confusion stems from his poor psychosocial adaptation at an early age caused by his medical condition, CAH, and his rejection by and ultimate loss of his mother, finding that "[t]here is no possible way for this individual to have felt comfortable with his sexual apparatus as a result of this brutality."  See Psychological Assessment of Sandy J. Battista by Victoria Russell, M.D., October, 4, 1997 at p. 2 ("Russell Assessment") (Attachment 4 to Weiner Aff.).  Dr. Russell further stated:

> Taken in the context of his past experience and behavior, this inmate's name change and requests for a sex change are bizarre at best and psychotic at worst. As previously discussed, when dealing with highly charged emotional issues such as sexual preference and behaviors, it is most important to stick to diagnostic facts and not be swayed by semi legalistic arguments for mutilating surgery or abnormal hormonal interventions.  The facts are that this inmate is dangerous to females.  He has suddenly decided that he 'always' wanted to be female, despite his history of hurting females.  It takes no experience in any mental health field to realize that this does not make sense.  No reasonably experienced therapist would consider recommending an individual with his history for a sex change operation without extensive testing and therapy.  This inmate has had neither.  In my opinion, this inmate would never be a reasonable candidate for sex-change surgery.

Russell Assessment at p. 2. (Emphasis added).

13

In sharp contrast to these psychological evaluations, evaluations conducted by Diane Ellaborn, L.I.C.S.W., in October, 2001 and Randi Kaufman, Ph.D. and Kevin Kapila, M.D., of the Fenway Clinic, in November, 2004, have found that Battista meets the criteria of GID and recommended medical treatment. Weiner Aff., ¶ 4. The conflicting psychological evaluations raise considerable doubt as to whether Battista's demand for surgical castration and hormone therapy is the result of a valid gender identity disorder or the result of the severe psychological trauma he suffered as a child or possibly his intersex adrenal condition (CAH). Weiner Aff., ¶¶ 6, 7. These divergent psychological evaluations have resulted in the DOC's decision to seek further review of Battista's GID diagnosis and treatment recommendations, while Battista, as expressed in his complaint, prefers immediate and irreversible treatment in the form of female hormones and castration. Battista's own expert, Dr. Ebert, strongly recommends that he undergo lengthy psychotherapy prior to a consideration of irreversible medical treatment. From defendants' perspective, it would be irresponsible to embark on a course of irreversible medical treatment in the face of substantial medical opinion to the contrary. The further review of Battista's GID diagnosis and the Fenway Clinic treatment recommendations is necessary in order to assess the serious concerns expressed in numerous clinical evaluations questioning the legitimacy of Battista's self-reports of gender dysphoria. Weiner Aff. ¶¶ 6-8. Accordingly, where the constitutional claim raised by Battista regarding his medical treatment concerns a disagreement as to which course of treatment is preferable, it is clear that Battista has failed to state a § 1983 claim. Watson v. Caton, supra at 540.

The same result is reached if Battista's treatment dispute is reviewed under a substantive due process analysis under the Fourteenth Amendment. In Amsden v. Moran, 904 F.2d 748, 753-54 (1st

14

Cir. 1990), cert. denied, 498 U.S. 1041 (1990), the First Circuit held that in order to demonstrate a violation of substantive due process rights, the "state action must in and of itself be egregiously unacceptable, outrageous, or conscience-shocking." Id. at 754 (emphasis in original). "It is only when some basic and fundamental principle has been transgressed that the 'constitutional line has been crossed.'" Id. at 754, quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir. 1972), cert. denied, 414 U.S. 1033 (1973). In the context of challenges to conditions of confinement of civilly committed individuals at the Treatment Center, the First Circuit held that substantive due process under the Fourteenth Amendment "requir[es] conditions that do not fall below the minimum standards of civilized decency." Cameron v. Tomes, 990 F.2d 14, 19 (1st Cir. 1993), citing to Rochin v. California, 342 U.S. 165 (1952). The Cameron Court further stated:

> It is settled that those who are confined by the state, for whatever reason, are entitled under the Constitution to food, clothing, medical care, and reasonable efforts to secure physical safety. Beyond such obvious essentials, however, guidance from the Supreme Court is largely confined to one cautiously phrased decision.

Cameron v. Tomes, 990 F.2d at 19. In discussing the Supreme Court's decision in Youngberg v. Romeo, 457 U.S. 307 (1982), the Cameron Court questioned whether Youngberg actually established a constitutional right to treatment and declined to apply the Youngberg decision to the case arising out of the Treatment Center, citing to its earlier decision in Langton v. Johnson, 928 F.2d 1206, 1217 (1st Cir. 1991). However, the Cameron Court did provide guidance regarding meeting the treatment needs of those confined to the Treatment Center:

> Thus when it comes to appraising the judgments of the administrators, it does not follow that they are bound to do what the doctors say is best for Cameron even if the doctors are unanimous. The administrators are responsible to the state and to the public for making professional judgments of their own, encompassing institutional concerns as well as individual welfare. Nothing in the Constitution mechanically gives controlling weight to one set of professional judgments. Indeed, when it comes to constitutional rights, none of

15

> the professionals has the last word.  Professional judgment, as the Supreme
> Court has explained, creates only a 'presumption' of correctness; welcome or
> not, the final responsibility belongs to the courts. See Youngberg, supra at 323.

> Cameron v. Tomes, 990 F.2d at 20-22.

Here, Battista is unable to demonstrate a violation of this substantive due process rights based on his dispute over the course of treatment available to him. It cannot be said that the decision to further review Battista's disputed diagnosis of GID before opting for irreversible medical treatment "shocks the conscience."   Accordingly, Battista will not succeed on this claim under either theory.

### C.      Plaintiff Will Not Succeed On His Equal Protection Claim.

Battista's claim that his rights under the Equal Protection guarantees of the Federal Constitution have been violated is without merit.  A plaintiff alleging an equal protection violation must allege not only that he was treated differently than others similarly situated, but also that "such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of  constitutional rights, or malicious or bad faith intent to injure a person." Rubinovitz v. Rogato, 60 F.3d 906, 909-910 (1st Cir. 1995); Walker v. Exeter Region Coop. School Dist., 284 F.3d 42, 45 n. 4 (1st Cir. 2002).  A plaintiff must show that a discriminatory purpose was the motivating factor in the unequal treatment.   See Washington v. Davis, 426 U.S. 229 (1976); Smith v. Stratus Computer, Inc., 40 F.3d 11, 16-17 (1st Cir. 1994), cert. denied, 514 U.S. 1108 (1995);  Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 545-46 (1995) (to prove equal protection violation, plaintiff must demonstrate that action was taken with discriminatory intent). Moreover, in the context of the Treatment Center, the state's interest in maintaining safety and security justifies interference with an inmate's fundamental rights as long as the interference reasonably furthers this goal.  See Washington v. Harper, 494 U.S. 210, 233 (1990).

Here, Battista alleges, in conclusory fashion, that he has been treated differently from

transsexual inmates who have been provided with hormone therapy, female clothing and make-up.

Complaint, ¶ 65.  Setting aside the fact that Battista is unable to show that he has been singled out

for selective and unequal treatment among transsexuals, it is clear that Battista is unable to

demonstrate that the alleged differences in treatment among inmates with GID is based on a

discriminatory animus on the part of the defendants against those civilly committed to the Treatment

Center.  Nor is Battista able to show that the reason he has not received treatment with female

hormones is due to his membership in a suspect group, his exercise of a "fundamental right," or

because defendants are motivated by bad faith or a malicious intent to injure him.  See Rubinovitz,

supra at 909.  To the contrary, as set out in the affidavit of Larry Weiner,  the fact that Battista has

not been treated with hormones is due to concerns as to the quality of the Fenway Clinic report

diagnosing him as suffering from GID and the existence of numerous clinical evaluations of Battista

which have questioned the appropriateness of a GID diagnosis and treatment for Battista.  Weiner

Aff., ¶¶ 6-8.  In the absence of any facts showing selective unequal treatment and that the treatment

presently available to Battista falls below constitutional standards and is based on a discriminatory

animus or a bad faith or a malicious intent to injure him, Battista will not succeed on this claim.

### D.    Plaintiff Will Not Succeed On His Discrimination Claim.

Count III of the complaint alleges, in conclusory fashion, that the failure to provide Battista

with female hormone treatment constitutes discrimination based on sex, disability and freedom of

expression.  However, it is clear that Battista's claim of  discrimination is without merit.  First,

Battista's claim will not succeed where he has failed to cite to any Federal or State law barring

discrimination which defendants have violated.  Assuming that Battista's complaint alleges that the

failure to provide him with hormones violates the Americans with Disabilities Act ("ADA"), this claim

fails where the ADA specifically excludes transsexuals from its jurisdiction.  See 42 U.S.C. §

12211(b)(1) (1990).   Second, Battista fails to provide any facts in support of his claimed discrimination based on his sex, disability or freedom of expression.   To the extent that Battista's complaint allege that restrictions on his ability to wear female clothing and make-up at the Treatment Center violate his "right to freedom of expression, this claim is meritless.   As the First Circuit stated in Battista v. Murphy, et al., No.02-2619 (Judgment  Oct. 3, 2003), there is no constitutional right requiring that Treatment Center administrators allow Battista to wear the clothing of his choice. Battista will not succeed on his claim that the actions of the defendants are discriminatory.

### E.    Plaintiff Will Not Succeed On His Claim Based On His Civil Commitment

Count IV of the complaint alleges that the failure to provide Battista with the medical treatment he desires will result in a lengthening of his civil commitment under M.G.L. c. 123A. However, Battista has failed to provide any facts in support of his conclusory allegation that the lack of GID treatment will extend his civil commitment.   First, the fact that Battista has been found to be a sexually dangerous person means that he has been deemed, beyond a reasonable doubt, to suffer from a "mental abnormality" or a "personality disorder" that makes him "likely to engage in sexual offenses if not confined to a secure facility."   M.G.L. c. 123A, § 1(i)   A "mental abnormality" is defined as a "congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons."   M.G.L. c. 123A, § 1.   A "personality disorder" is defined as "a congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses."   M.G.L. c. 123A, § 1.   Significantly, Battista has not demonstrated that a direct connection exists between the treatment he seeks for GID and the length of his civil commitment as a sexually dangerousness person.   Battista has not offered any evidence establishing that female hormone therapy and sex reassignment surgery will eliminate the

18

"mental abnormality" or a "personality disorder" that makes him "likely to engage in sexual offenses if not confined to a secure facility." G.L. c. 123A, § 1(i)

Second, state statute provides a mechanism though which Battista may petition the court for his release from civil commitment as a sexually dangerous person. M.G.L. c. 123A, § 9. Under § 9 the burden is on the Commonwealth to prove beyond a reasonable doubt that Battista remains a sexually dangerous person as defined under the statute. Battista has filed a petition for discharge under M.G.L. c. 123A, § 9 with the Superior Court which is awaiting the scheduling of a hearing on his petition. Weiner Aff., ¶ 11. Treatment for Battista's sexual deviancy is available at the Treatment Center, but Battista has voluntarily discontinued treatment that addresses his sexual deviancy and may hasten his discharge from his civil commitment. Id. at ¶ 11. In the absence of facts establishing that the failure to provide him with hormone therapy or sex reassignment surgery will lengthened his civil commitment, it is clear that Battista will not succeed on this claim.

**F.    Plaintiff Will Not Succeed On Intentional Infliction Of Emotional Distress Claim**

Count V of the complaint alleges that the defendants' failure to provided him with the treatment he desires constitutes an intentional or negligent infliction of emotional distress.

First, to the extent Battista seeks to bring a negligence claim under the Massachusetts Tort Claims Act ("MTCA"), M.G.L. c. 258, et seq., this claim is barred. The Eleventh Amendment bars suit against a state by its own citizens unless the state has waived its sovereign immunity. Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989); Edelman v. Jordan, 415 U.S. 651, 662-63 (1974) (the Supreme Court has consistently held that the Eleventh Amendment precludes such suits in the absence of the state's consent to suit). The MTCA provides a limited waiver of the Commonwealth's sovereign immunity. See M.G.L. c. 258, §2. Through language in the MTCA, the Commonwealth expressly consents to suit only in its own courts:

19

> All civil actions brought against a public employer on a claim for damages cognizable under this chapter <u>shall</u> be brought in the county where the claimant resides or in the county where such public employer is situated except that in the case of the Commonwealth such civil actions shall be brought in the county where the claimant resides or in Suffolk county. The superior court <u>shall</u> have jurisdiction of all civil actions brought against a public employer.

M.G.L. c. 258, §3 (emphasis added). The Supreme Judicial Court has expressly held that the MTCA does not waive the Commonwealth's Eleventh Amendment immunity from suit in federal court. <u>See</u> <u>Irwin v. Commissioner of the Dept. of Youth Services</u>, 388 Mass. 810, 819-21 (1983). <u>See</u> <u>Rivera v. Commonwealth of Massachusetts</u>, 16 F. Supp.2d 84, 87 (D. Mass. 1998) (federal courts lack jurisdiction over MTCA claim where the Commonwealth has not waived sovereign immunity); <u>Marsolais v. Commonwealth</u>, 2002 WL 373305 (D. Mass. Mar. 7, 2002) (slip op.). Therefore, the MTCA claim is barred in federal district court.

To the extent Battista seeks to bring a claim of intentional infliction of emotional distress under Massachusetts law, he must demonstrate 1) that the actor must have intended or should have known that the harm was likely to result; 2) that the conduct was "extreme and outrageous" and "was beyond all possible bounds of decency" and was "utterly intolerable in a civilized community;" 3) that the actions of the defendant must have cause plaintiff's emotional distress; and 4) the emotional distress suffered by plaintiff was "severe" and of a nature "that no reasonable man could be expected to endure it." <u>Agis v. Howard Johnson Co.</u>, 371 Mass. 140, 145 (1976): <u>Tetrault v. Mahoney, Hawkes & Goldings</u>, 425 Mass. 456, 466 (1997). The Supreme Judicial Court has set the bar high for establishing a claim of intentional infliction of emotional distress:

> We warned in <u>Agis</u>, however, that 'the door to recovery [for a claim of intentional infliction of emotional distress] should be opened but narrowly and with due caution.' A principal bulwark against excessively broad recovery is the requirement that the defendant must have engaged in 'extreme and outrageous' conduct. Thus, liability cannot be predicted upon 'mere insults, indignities, threats annoyances, petty oppressions, or other trivialities,' nor even is it enough 'that the defendant

20

> has acted with an intent which is torturous or even criminal, or that he intended to inflict emotional distress or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort; rather, '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987) (citations omitted).

In the case at bar, it is clear that the Battista will not succeed on his claim for the tort of intentional infliction of emotional distress against defendants Dennehy, Murphy, Fairly, Martin and Hughes where he fails to set out any facts or circumstances regarding these defendants in support of this claim. Certainly, a dispute regarding a choice between available medical treatments does not rise to the level of conduct that was "extreme and outrageous" and "beyond all bounds of decency" and "utterly intolerable in a civilized society." Agis, supra. Nor has Battista shown that the emotional distress he allegedly suffered was "severe" and of a nature "that no reasonable man could be expected to endure." Agis, supra. Battista's will not succeed on his claim.

## II.     INJUNCTIVE RELIEF IS NOT WARRANTED WHERE PLAINTIFF DOES NOT FACE AN IMMEDIATE AND IRREPARABLE HARM.

In order to pursue a claim for injunctive relief, a plaintiff must show that he faces a "real and immediate threat" of ongoing or future irreparable harm. City of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983); Smith v. Boyd, 945 F.2d 1041 (8th Cir. 1991).

In the case at bar, Battista has not demonstrated that he is faced with a "real and immediate threat" of irreparable harm resulting from the present dispute over his diagnosis and treatment for GID. The only threat that exists with regard to Battista would be by his own making, i.e. attempting to harm himself, and recent mental health records indicate that Battista is not presently suicidal. Weiner Aff., ¶ 10. Moreover, the mental health staff at the Treatment Center are well aware of

21

Battista's issues with GID treatment and are equipped to provide the necessary treatment to address any future concerns for his safety. In the absence of a showing that he faces an immediate irreparable threat of harm, Battista's request for injunctive relief should be denied.

### III.   DEFENDANTS WILL SUFFER THE GREATER HARM IF INJUNCTIVE RELIEF IS GRANTED.

Injunctive relief is not warranted in this action and the DOC will suffer the greater harm should the requested injunctive relief be allowed. Battista's request for injunctive relief, in effect, seeks to have the court step in and resolve a disagreement over the proper course of treatment for Battista. Such decisions should be left in the hands of qualified medical and mental health staff and prison administrators. In light of the fact that treatment has been made available to Battista, but he seeks a different course treatment, defendants would suffer the greater harm should the requested injunctive relief be granted. See Weiner Aff. While Battista can point to psychological evaluations that support his preferred course of treatment, this alone, is insufficient to override the reasonable treatment presently offered him or the decision to further review his treatment. It is well established that prison administrators should be accorded the latitude in making decisions which ensure that an inmate is provided with appropriate treatment which does not create an unnecessary threat to the internal order and running of the correctional facility. See Cameron v. Tomes, 990 F.2d at 19; Watson v. Caton, 984 F.2d at 540. In order to provide for the safety of the public as well as the safety of staff and inmates within its institutions, it is imperative that prison administrators have the ability to work with competent medical staff to provide appropriate medical and mental health treatment. Defendants will suffer the greater harm if injunctive relief is granted.

### IV.   GRANTING THE REQUESTED RELIEF IS NOT IN THE PUBLIC'S INTEREST.

It is in the public's interest that the defendants, working with medical and mental health professionals, be provided the flexibility to respond to medical and mental health issues which may

22

also raise safety and security concerns.  Such issues should remain in the hands of those with the expertise and experience to handle them.  The management of the Treatment Center is an extremely difficult task and it is in the public's interest that qualified administrators be permitted to make decisions and establish procedures which provide for the safety and security of staff and residents. The public benefits from having secure facilities that are safe and well maintained.

## **CONCLUSION**

For the foregoing reasons, defendants, Kathleen M. Dennehy, Robert Murphy, Steven Fairly, Susan Martin and Gregory Hughes, request that injunctive relief be denied.

Dated: July 22, 2005                                  Respectfully submitted,

NANCY ANKERS WHITE
Special Assistant Attorney General


/s/  Richard C. McFarland
Richard C. McFarland  (BBO# 542278)
Legal Division
Department of Correction
70 Franklin Street, Suite 600
Boston, MA   02202
(617) 727-3300   ext. 132

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SANDY JO BATTISTA,

    Plaintiff,

    v.                                C. A. No.  00-12456-MLW

MASSACHUSETTS DEPARTMENT OF CORRECTION, et al.,

    Defendants.

### AFFIDAVIT OF LAWRENCE M. WEINER, L.I.C.S.W.

I, Lawrence M. Weiner, do hereby depose and say that:

1.    I am an employee of the Massachusetts Department of Correction ("DOC") and I presently serve as the Regional Administrator for Mental Health Services for the DOC's Health Services Division.  I am a licensed social worker and my primary responsibility as a Regional Administrator is to monitor the mental health care provided to the inmates within DOC facilities. The information provided herein is based upon my personal knowledge.

2.    I am familiar with Sandy Jo Battista ("Battista"), an individual under civil commitment to the Massachusetts Treatment Center for the period of one day to life, having been adjudicated a sexually dangerous person on May 15, 2003, pursuant to G.L. c. 123A, § 14(d).  I have reviewed Battista's medical records including his mental health records.

3.    The DOC contracts with a private vendor to provide medical, dental and mental health services to inmates within the Department's custody.  As of January 1, 2003, the University of Massachusetts Medical School, is under contract to provide medical, dental and mental health services to inmates through its Correctional Health Program ("UMCHP").  Dr. Arthur Brewer is the medical director of the UMMS program and Dr. Kenneth Appelbaum, a psychiatrist, directs the

2

inmate mental health program.

4.    In 2004, UMCHP retained a psychiatrist and psychologist with experience and training in gender disorders affiliated with the Fenway Community Health Clinic ("Fenway Clinic") of Boston, Massachusetts, Randi Kaufman, Ph.D. and Kevin Kapila, M.D., to conduct an evaluations of inmates seeking treatment for gender identity disorders ("GID"), including Battista. The Fenway Clinic's November 16, 2004 evaluation of Battista determined that he met the criteria for a diagnosis of GID and recommended that Battista receive treatment with female hormones and psychotherapy.

5.    On April 12, 2005, Battista was evaluated by an endocrinologist at the Shattuck Hospital who prescribed female hormones for Battista. On April 14, 2005, a Treatment Center physician approved the prescription for female hormones.

6.    The Fenway Clinic's recommendation that Battista receive hormone therapy has not been implemented for several reasons. First, the DOC's Health Services Division has raised concerns regarding the competence of the Fenway Clinic's November 16, 2004 evaluation of Battista. The basis for this concerns stems, in part, from a peer review conducted of the Fenway Clinic evaluation of another DOC inmate seeking treatment for GID that raised concerns regarding the quality of the Fenway Clinic evaluations of inmates seeking treatment for GID. When a recent Fenway Clinic evaluation of a GID inmate recommending sex reassignment surgery appeared on its face to be vague and incomplete, the DOC retained a nationally recognized gender identity expert, Cynthia Osborne, to conduct a peer review of the evaluation. Cynthia Osborne's review of the Fenway Clinic evaluation raised concerns regarding the thoroughness of the Fenway Clinic evaluation, including the failure to consider the significance of suicidality as a contraindication to surgery, the exclusive reliance on the inmate's self-reports in making treatment recommendations, the failure to address the complexities as to what is medically necessary in GID, the complete lack of

3

prison staff interviews to detect inconsistencies in the inmate's self-reports, the lack of corroborating evidence, the failure to consider sex of attraction themes, the failure to consider other possible treatment options, and the effects of isolation on psychopathology, among others. The Osborne peer review highlighted substantial defficenices in the quality of the evaluations conducted by the Fenway Clinic, and the DOC has requested that its medical services provider, UMCHP, provide the DOC with a comprehensive review of the reports and recommendations made by the Fenway Clinic regarding inmates diagnosed with GID, including Battista, as well as UMCHP's own recommendations as to the appropriateness of the medical treatment recommended by the Fenway Clinic for each inmate evaluated. The DOC is presently awaiting UMCHP's review of the Fenway Clinic evaluation of Battista and UMCHP's own recommendation as to the appropriateness of the Fenway Clinic recommendation that Battista receive hormone treatments.

7.      In addition, concerns have been raised regarding the failure of the Fenway Clinic to fully address Battista's intersex condition, Congenital Adrenal Hyperplasia, and its possible effect upon the GID diagnosis. The Fenway Clinic report on Battista also fails to address the prior clinical evaluations of Battista, made available to the Fenway Clinic, which have expressed strong reservations regarding Battista's appropriateness for a diagnosis of GID. For example, the October 19, 2001 sexual dangerousness evaluation conducted by Ronald Ebert, Ph. D., at the request of Battista's attorney, raises significant concerns regarding the validity of a diagnosis of GID and strongly cautions against a headlong leap into the irreversible medical treatment desired by Battista. The Ebert report on Battista states:

> From a clinical point of view it is no small matter that he has taken on his mother's name as well as her sexuality. His wish to become a woman through surgery appears to be an attempt upon his part to regain the mother who rejected him and who was killed for her rejection. It may also be an attempt to reject his father and his father's anger towards women, or it might serve to psychologically redeem his father by

4

> bringing his mother back to life. In any case this is an incomplete psychological
> attempt to resolve his terrible childhood in a dramatic and permanent fashion. It is to
> be hoped that any ethical professional he sees to support his wish to change his sex
> will agree that many years of further treatment and therapy are required before such a
> decision can be made.

Psychological Evaluation of Sandy Jo Battista by Ronald Ebert, Ph.D., October 19, 2001, at p. 8

("Ebert Assessment") (Emphasis added) (Attachment 1). Further, Dr. Ebert acknowledges that the

plaintiff's intersex condition, Congenital Adrenal Hyperplasia, ("CAH"), an infantile adrenogenital

syndrome, may play an important role in the plaintiff's self-reported gender confusion. Ebert

Assessment at 8. Other psychological evaluations conducted of Battista have expressed concerns

regarding the reasons underlying Battista's fixated desire to change to a female, including suggesting

that his gender confusion is the result of his CAH. In October, 1998 a psychological assessment of

Battista was conducted by David Campopiano, M.A. and Robert Prenky, Ph.D. of the Justice

Resource Center ("JRI"), a contract clinical program for the treatment of sexually dangerous men at

the Treatment Center. I.D.P. Intake & Assessment Report of Sandy J. Battista by David

Campopiano, November 18, 1998 ("JRI Assessment") (Attachment 2). The JRI Assessment, which

included psychological testing of Battista, found that he had serious problems in the control of his

anger and a high degree of psychopathy. Battista admitted to being a "good liar," and acknowledged

that he had engaged in highly manipulative behavior including using threats of suicide and feigned

"enemy problems" in order to change his housing assignments in prison. JRI Assessment at 5-6.

Concerning Battista's self-reported GID, the JRI Assessment stated:

> In regards to his gender identity issue, it is unclear to what extent his genetic disorder
> influenced his identity as a female. However, his early exposure to pornography, his
> brief relationship with his mother and her violent death, clearly had an impact on his
> self-perception and sexual development. Although these influences clearly
> influenced his attraction to young girls; it is unclear if it effected his gender identity.
> If we take into consideration his strong psychopathic tendencies, his gender identity
> issue may simply be manipulative.

5

JRI Assessment at p. 7. (Emphasis added). Battista's description of his childhood did not reference any cross-gender identification behaviors. JRI Assessment at p.3. Another psychological assessment of Battista was conducted at MCI-Norfolk in 1997 for purposes of evaluating his request for sex reassignment surgery. See Psychological Assessment Report of Sandy J. Battista by J. Taylor Carpenter, Ph.D., October, 4, 1997 ("Carpenter Assessment") (Attachment 3). Of significance, Battista reported that prior to 1995 he had not felt a desire to live as a female:

> Mr. Battista presented the following history of the present illness: He states that as far back as he can remember he has felt odd and different, but not necessarily female. In the mid-1995 he decided to change his name to a female name and at that time he further decided, 'I wanted to live my life as a female.'

Carpenter Assessment at p. 1. Nor did Battista state that he had engaged in any cross-gender identification, including cross-dressing behaviors, as a child. Carpenter Assessment at p. 2. Finally, the March 17, 1997 report by psychiatrist Victoria Russell found that Battista's history of suffering from precocious puberty, child abuse, experiencing the death of his mother at age four, and early identification as a sexual predator, called into question the legitimacy of his claim that he suffered from GID. (Attachment 4).

       8.     While awaiting UMCHP's review of the Fenway Clinic evaluation and recommendations for Battista by UMCHP and UMCHP's own recommendation as to the appropriateness of the Fenway Clinic treatment recommendations for Battista, the DOC has contacted Cynthia Osborne and requested that she conduct a peer review of the Fenway Clinic's November 16, 2004 evaluation of Battista.

       9.     If it is determined that Battista is an appropriate candidate for GID treatment in the form of female hormones, it is my understanding that such treatment will need to be reviewed by the Superintendent of the Treatment Center regarding concerns for Battista's safety that may arise due to

6

the treatment, including the fact that the hormone treatment will result in the development of Battista's breasts and other feminine traits.

10.    Based on my review of Battista's mental health records, it appears that between 1997 and April, 2000, Battista was engaged in mental health treatment. During that time period, treatment records indicate that Battista was resistant to focusing on his identified psychological issues, such as his personality disorder and depression, preferring to focus on gender identity issues. In January, 2005 Battista resumed mental health treatment and presently meets regularly with a mental health clinician at the Treatment Center to discuss his mental health and gender disorder issues. Battista also meets regularly with a psychiatrist who has prescribed medication to treat his depression. Presently, Battista's mental health records indicate that he is not suicidal and a recent letter from Battista to staff stated that he did not intend to attempt to harm himself regarding the dispute over his medical treatment.

11.    My review of Battista's treatment records indicated that in May, 2005 Battista advised Treatment Center staff the he no longer wished to engage in the treatment for his sexual dangerousness available at the Treatment Center, but had decided to focus his energy on obtaining treatment for GID. According to Treatment Center records, Battista filed a petition for discharge from his day to life civil commitment as a sexually dangerous person, pursuant to G.L. c. 123A, § 9 in July, 2003. According to available records, the Superior Court has not set a date for a hearing on Battista's § 9 petition.

Signed under the pains and penalties of perjury this 22nd day of July, 2005.

Lawrence M. Weiner, L.I.C.S.W.

/21/2001  09:56    17818433111                PSYCHOLOGICAL SERVIC              PAGE  02



EXHIBIT

5

**PSI**
**Psychological Services, Inc.**

John Daignault, Psy.D.

Ronald S. Ebert, Ph.D.

**CONFIDENTIAL**

**Psychological Evaluation**

October 19, 2001

RE: <u>Sandy Jo Batista aka David Megarry</u>

**Identifying Data:**

Attorney Christopher P. LoConto has retained this forensic psychologist to conduct a
psychological evaluation of his client Sandy Jo Batista who is awaiting a probable cause
hearing to determine whether he currently meets the criteria for a sexually dangerous
person as defined by MGL c. 123A, sec.1. Sandy Jo Batista completed a twelve to twenty
year sentence for Rape of a child on May 29, 2001. The sentence was originally imposed
in the Worcester Superior Court January 27, 1983. Concurrent sentences of nine to ten
years for Kidnapping and Robbery were imposed at the same time. Mr. Batista was also
found guilty of Assault and Battery on a Correctional Officer on July 24, 1996.

**Structure of the Evaluation:**

Sandy Jo Batista's six part Department of Correction file was reviewed in its entirety and
relevant copies made.  Material reviewed included, but was not limited to his CORI
records, the defendant's plea on 2/28/83, his 12/9/82 statement to the police, the victim's
statement, reports from Bridgewater Sate Hospital by Dr. Kobrin  02/23/83. A report by
Dr. Whaley, records from the Medfield State Hospital concerning their treatment of the
then fifteen year old David Megarry, d reports, letters from treaters, legal documents
prepared by the defendant including a motion to reconsider and a report prepared 5/23/01
by Dr. Carol Feldman were reviewed. Additionally, a "brief summary" of a
comprehensive relapse prevention plan dated May 2001 was reviewed.  Sandy Jo Batista
was interviewed 7/9/01 and 9/25/01 for a total of 3 hours at the Treatment Center.
Telephone contact has been held with Diane Aliborn who is assessing the issue of gender
identity disorder.

**Standard for Being Found a Sexually Dangerous Person:**

MGL 123 A, 1 defines a sexually dangerous person as "any person who has been
convicted of, or adjudicated as a youthful offender by reason of a sexual offense, and
who suffers from a mental abnormality or personality disorder which makes the person
likely to engage in sexual offenses if not confined to a secure facility". A mental

222 Forbes Road, Suite 105, Braintree, MA 02184
Telephone (781) 843-8100 ■ Facsimile (781) 843-3111

ATTACHMENT   1

**PSI**
ological Services, Inc.

abnormality is defined as "a congenital or acquired condition of a person that affects the
emotional or volitional capacity of the person in a manner that predisposes that person to
the commission of criminal sexual acts to a degree that makes the person a menace to the
health and safety of other persons". Personality disorder is further defined as a
"congenital or acquired physical or mental condition that results in a general lack of
power to control sexual impulses".

**Informed Consent for Evaluation:**

Prior to my interviews I explained to Mr. Batista that I am a licensed forensic
psychologist retained by his attorney to conduct an assessment of his sexual
dangerousness. I explained that the information that I collected would not be held
confidential but rather would be included in my discussions with his attorney and perhaps
put into the form of a report that would be submitted to the Court. I explained I might be
asked to testify at trial. Given these factors, I explained that the lack of confidentiality
meant that he was not required to cooperate with the interviews if he didn't wish to. If he
chose to cooperate I explained he was not required to answer specific questions. Sandy
Jo Batista listened carefully to the above warning, stated "OK" and when asked if he
understood the warnings stated "yes, completely". He appeared to understand the limits
of confidentiality, agreed to be interviewed and was very cooperative with the interviews.

**Current Mental Status Evaluation:**

Sandy Jo Batista is a 39 year old, thin and carefully groomed man. He is quite clear in
explaining that he believes that he has a gender identity disorder and he states to this
examiner "I am in conflict on whether I am male or female. I desire greatly to be a
female, but there's no counseling for this". He explains in some detail that he would
prefer to dress as a woman and that he wishes to have a sex change operation. He
explains that he has attempted to persuade the Department of Correction to allow
counseling and such an operation, but that he has been unsuccessful. During the
discussion he addresses himself using feminine pronouns, says that in all correspondence
he uses feminine pronouns and becomes upset if people refer to him in the masculine.
Thus, he says that when he has been called a "laundry man" he asks to be called a
"laundry person". The record describes how he binds his genitals in order to appear more
feminine. He confirms this and further explains that he shaves his body hair and plucks
his eyebrows and says he has done this for the past six years.

His mood is appropriate to the interview, he is logical and clear in his thinking and he
denies all signs of a mental illness. There is no evidence in this interview of either a
thought disorder or a mood disorder. He is fully oriented and does not appear organically
impaired in any significant way. He denies that he is currently receiving medication or
treatment for mental illness. He does report the he was born with a medical condition
called Addisons Disease (Congenital Adrenal Hyper-plasia) and he says that he must take

2



**PSI**
logical Services, Inc.

medication daily for this condition.  He describes this as a hormonal imbalance, but he does not indicate that it has any current effect upon his behavior or his personality. He appears of at least normal intelligence, can express himself well and appears willing to engage in the interview.

**Relevant History:**

Sandy Jo Batista reports that he was born 12/30/61 in western Massachusetts and when asked to describe his childhood he says "I had a very traumatic upbringing, I couldn't say any part of my childhood was positive". He then goes on to say "my mother died when I was five or six years old, I didn't see her death.  I was told my father had some small part in it.  He did receive a sentence for involuntary manslaughter".  When it is pointed out to him that the record indicates that he actually witnessed his mother's death, he pauses and then says "if I actually witnessed it I wouldn't have any problem admitting it, maybe I did, but I just can't remember."

He says that after his mother's death he went to live with his maternal grandmother, "but her and her sons were somewhat physically and psychologically abusive to us, me and my brother and sister, so my paternal grandmother got us out of that situation".  Asked if he can recall the specifics of the abuse he says "I remember being folded up in this bed, and we were in the bathroom and there were water guns aimed at us, that's all I really remember".  Once again, his recall minimizes the actual events described in the record.

He says that when he was transferred to his paternal grandmother: "it was healthy, she is still supportive".  Asked how long he stayed there, he says "till they were unable to physically and financially care for us.  I was put in foster homes and children's homes. Then I was put back with my father when I was twelve years old, I remember being in Kentucky with my father, he had a second marriage.  My father tried to do the best he could, he really did.  I don't like to badmouth him-he was an alcoholic, had a bit of a temper-didn't have much patience.  He was abusive to my stepmother, but not to us kids".

It is striking than that his recall of many of these critical issues in his childhood is sanitized and minimized by Sandy Jo Batista. The available record indicates that his mother rejected him as an infant because of his medical condition, refusing even to change his diapers. His father beat his mother to death in his presence and  when he was placed with his maternal grandmother he was subjected to sexual abuse as well as significant physical and psychological abuse  (including throwing firecrackers into the locked bathroom at the terrified children).  In addition, when he returned to live with his father, on at least one occasion the police were called because his father shot a gun off in the house. Mr. Batista, in turn was described as "out of control" as a juvenile and was placed in foster care at both his grandmother's and his father's requests. Thus it is not surprising that a clinical note from his treatment as a juvenile at the Medfield State Hospital describes his history as "shocking in its violence and tumult". This appears to be a much more accurate representation of his history than that that he is currently able to

3

**PSI**
hological Services, Inc.

provide. This suggests that to the present, he has not been able to deal with the remarkable brutality and violence that characterized the family in which he developed.

Asked to describe whether his biological condition played a role in his development he agrees that it did. He says "from what I understand and to this date, I don't quite comprehend my medical problem, I started growing body hair when I was eighteen months old on my penis, under my arms. They gave me medication to slow it down. I was the average height and my features looked the same as a little boy. I was also told my mother refused to change my diaper and referred to me as a freak. I do remember being locked in a closet when my siblings got cookies and being told that 'if you weren't a freak you would get some too'. I guess that's why I was picked on by my maternal grandmother. I was also born pigeon toed. That added to my distortion of my body. The majority of my life, my adolescence, kids used to make fun of me. I was excused from physical education the majority of the time. My body- it was a rough time being in the showers. I was treated as a freak by boys and girls." He says that he eventually did grow to look like his peers, but" I was mixed up psychologically. I always had a deep complex about my body, something wrong with me, no girl would like me, fear of rejection, shame, that I might not be able to perform sexually".

He is asked to describe his sexual assault history and he says that when he was fifteen "I accosted a young girl at a bus stop, a neighbor intervened and I got scared and ran away". He says that he was then charged with Assault and Battery and committed to the Department of Youth Services and placed in a program at the Medfield State Hospital. He remained at that program for three years until he was eighteen and then moved to Ohio to live with his father for one year. He returned to Massachusetts at nineteen and soon entered the Army Reserves where he was found unable to adapt and given a General Discharge. Asked to describe his behavior in the military he says: "hard for me to take orders, hard to get along with my peers, got in fights and they caught me sleeping on the job. I was immature".

He says he then went to live with his father's ex girlfriend and "here is the present crime. It was an unhealthy atmosphere I was living in, but I didn't see it at the time. She lived alone and had an eleven year old daughter and son. The mother was promiscuous, not with me, but she would leave me in charge. I was left in charge the majority of the time and this girl had a crush on me and her friends did too. I had a nice car and they called me the 'fox'. They treated me like somebody special but she was only eleven (he denies any sexual activity with this girl). I had an eighteen year old girlfriend at this time and we would kiss and pet but when she wanted to go further I would back off, I would make excuses, I was ashamed of myself. In 83 I was incarcerated, I received twelve to twenty for the Rape and I got Kidnapping and the Robbery concurrent".

4



**PSI**
chological Services, Inc.

### Official Account of the Sex Offense:

In the plea hearing on February 28, 1983, James Reagan, Assistant District Attorney indicated that the victim was selling fudge, went to a house and heard a man say "they aren't home". He asked what she was selling and she explained and he said that he would later purchase some fudge from her. He left and she stopped at more houses, when she saw the man next to his car. He grabbed at her, put his hand around her mouth and carried her into his car. She struggled and he placed her inside the car and shut the door. She noted that the passenger's door handle and the window handle were missing. He drove to a clearing, forced a cloth into her mouth and removed her clothing. He then forced her legs open and began pushing his penis into her vagina while she struggled. He then put his penis into her mouth. He next placed her hand on his penis and moved it up and down. When he was finished, he told her " you can leave if you want to". She gathered her clothes and then she asked if she could have her fudge and her money back. He said no, and then he drove off.

### Mr. Batista's Account of the Sex Offense:

"I was living in the house with my father's ex girlfriend and an unhealthy atmosphere. That day I was out of work, I had too much free time. I used to drive around a lot. I would drink a lot. I wasn't drunk but I was drinking that day. I was drinking in the morning. I saw the individual going house to house selling something. I parked on a side street and approached her. My thought was to sexually assault her. She was petite, young, blonde, innocent and alone. I tricked her into going to the street where my car was parked. I went up to her, grabbed her, put my arm around her mouth and put her in the car .I drove with her screaming in fear. It was uncomfortable so I turned the radio up loud. She was panicking. She kept saying 'please don't hurt me', she was afraid for her life. That moment was when I didn't think and just reacted. I just drove and I saw an area that seemed to be secluded and parked my car behind some bushes and I sexually assaulted her."

Asked why he did this he answers: "at the time I wouldn't have been able to explain it". Asked his current understanding he says, "if I look at it now, the only reason I can give, I had such deep unconscious feelings about my body, shame of my genitals, fear of rejection, women, my image. I was frustrated sexually. I was unable to agree to go ahead with the sex act. I was scared to death what she (girlfriend) would think. I thought she would laugh at me the way my mom did…At the time I didn't care about anybody. I didn't care about myself, I didn't care that I was hurting her. I looked at it in a distanced way, as long as I didn't hurt her, didn't stab her. I was trying to minimize it".

He continues "those desires and fears was why I acted out against her. I can't change what I did, but I understand now she was a person, not an object. The fear on her face. It was me. I never ever will forget. I know I'll never hurt anybody again. It's not that I'm

5



**PSI**
chological Services, Inc.

sexually attracted to children, I have had sexual relations with females, it's just that children were vulnerable".

### Treatment and Incarceration History:

Asked to describe his numerous disciplinary reports during his 20 years of incarceration he says: "I have had 62, but not one of a sexual nature, 30 or 40 were for insolence. I had a habit of shooting off my mouth to Correctional Officers, telling them where to go. I didn't take responsibility for my actions. Then I was so bitter. I blamed the world for this hate, this violence. People in here prey on the weak-and now there is less violence. I don't have too many d reports now, the majority were in the 80's and the 90's".

Asked to explain charges that he had two assaults on Correctional Officers he says "I was horse playing in Old Colony December 12, 1989 and they thought we were fighting so we were sent to segregation. They wanted me to strip and I refused and six or eight of them physically restrained me and I punched one of the officers. It was my fault, but the contents of the d report were not correct. And there was one when they say I threatened an outside consultant but it was expunged by the commissioner." He goes on to explain that four or five years after the charges of assaulting a Correctional Officer occurred he filed a legal motion to withdraw his guilty plea. He says that he was not able to do so and the institutional record indicates that he pled guilty to the same charge a second time. He then says" I'm not trying to minimize the incident. At that time I just didn't care, it was a known fact that no matter how many d reports you had you were still coming here".

Asked to describe his treatment history he says that three years after entering prison he began counseling. He says "I have to be honest, I was informed that to go to a minimum and prerelease I had to address my issues, so it was an ulterior motive. I started counseling, from 86 to 92 I was in counseling. When they initiated this program, sometime in 94 I was in Shirley. I was in specialty groups- they ran anywhere from 30 days to four months. I joined a victim group because it was something to do with my time. I wasn't a victim. I then joined fellowship. I got my GED. I have studied the law for fifteen years, I have the equivalent of an Associates Degree in Law, I'm basically into Civil Rights. I filed suit too and I lost the case (he shows a newspaper clipping discussing his request for gender identity treatment). The Judge said that I didn't have the right to specific treatment as long as they provided some treatment. When they did away with the Department of Mental Health treatment and started in this new JRI program, everyone who was on 1 to 1 counseling was told they could participate in this group or have no counseling at all. They called us into the office and asked us to sign to get on the list for treatment and of course I signed. I was placed on a list and I was brought up here shortly after it opened up and I started treatment in 1999. I completed phase one and was placed on phase two but because of disciplinary reasons I was transferred from here October of '99 to Gardner. I entered treatment there and they made me do phase one over, so I did it twice and then I started phase two but I didn't complete it". He explains that he felt that the officers in Gardner were not treating him fairly and" I didn't look at

6



**PSI**
Psychological Services, Inc.

the big picture, I should have, but I quit.  I shouldn't have acted out, I should have taken the ticket. So that was 2000 and it's been about a year that I've been out of counseling". To support his description of "10 to 12" years of counseling, he prides letters and certificates from his many treatments. These communications do describe him as "motivated towards personal growth" and as an "active participant" in treatment, although it should be noted that as was the standard in the previous treatment program, no records or notes of treatment are available for review.

Asked to describe what he says was ten to twelve years of individual counseling he says "the individuals were highly qualified, I accept who I am and I accept my medical problems.  I don't see myself as defective." In fact, he speaks with pride of his current appearance and says that he now feels complete and comfortable with himself. He reports that it is his intention to continue counseling when he leaves the prison system with the goal of better understanding his gender issues and then be able to arrive at a determination about whether or not it would be appropriate for him to change his gender through surgery.

Asked to describe the reason for his name change he explains that he chose a "neutral" name that can be either male or female. He also explains that he took his mother's maiden name in order to honor her. It is interesting to note that in November 1995 the record indicates that his explanation for the name change was additionally that his family " disowned me ".

**Additional Clinical Data:**

A report by Dr. Tyler Carpenter in November 1997 is a thorough analysis of Sandy Jo Batista's treatment to that date as well as a review of his medical condition.  He notes that this is a "physical inter-sex condition" and might contribute to his emotionality.  He sees this man's wish for sex re-assignment surgery as "reflecting unrealistic fantasy and magical thinking". He notes that at that time (1997) he had rejected treatment and lacked a sense of guilt or remorse, feeling that "twelve should be the age of consent". When challenged on this point during these current interviews, Mr. Batista becomes irritated and states that he previously had many incorrect and inappropriate thoughts, but that he no longer has such an idea. In fact, he says, he feels that eighteen should be the age for consent because "choosing to have sex is certainly as important as being able to vote or drive a car".

A "brief summary" of a comprehensive relapse prevention plan dated May 2001 is an attempt to demonstrate this man's understanding of some of the basic concepts  of treatment for sexual dangerousness.  He appears to understand his risk factors and the necessary interventions.  He has developed plans for the short term and for the long term, although it is important to note that these plans focus heavily upon his wish to transform his gender.

7



**PSI**
Psychological Services, Inc.

In discussion with Sandy Jo Batista he does demonstrate appropriate remorse for his behavior and he demonstrates an understanding of the impact of his behavior upon his victim. Thus he appears to have made significant progress from that described by Dr. Carpenter in 1997. He continues to hold the belief that sex reassignment surgery will resolve his problems and help him to find his "soul mate".

**Discussion:**

This is a complex and difficult case for determination of continued sexual dangerousness. To begin with, Sandy Jo Batista (aka David Megarry) was born with a medical problem that predictably resulted in shame of his body and gender identity issues. He reports cross-dressing in his sister's clothing after their mother's death, for example. Less predictable was the resulting rejection and even abuse by his mother and this may have come to be directly linked to the manslaughter of his mother by his father. His childhood was a disastrous trail of sexual and physical abuse by various family members, leading predictably to an angry, confused and acting out adolescent. He began to act out sexually at age fifteen, received intensive treatment until age eighteen and then returned to the world of his family where violence, alcoholism and sexuality continued to influence his development. His index crime occurred when he was 20 and appears to have been rooted the context of his sense of self-hatred, his anger towards women and his alcoholism.

A review of his history of incarceration shows many years of continued anger, irritability and struggles with authority- initially through acting out and later through the legal system. In recent years there have been a number of interesting and hopeful shifts in his presentation. He has begun to focus upon education as a means of moving beyond his angry immaturity and he has changed both his name and his physical appearance to begin to take on a feminine guise. From a clinical perspective it is no small matter that he has taken on his mother's maiden name as well as her sexuality. His wish to become a woman through surgery appears to be an attempt upon his part to regain the mother who rejected him and who was killed for her rejection. It may also be an attempt to reject his father and his father's anger towards women, or it might serve to psychologically redeem his father by bringing mother back to life. In any case this is an incomplete psychological attempt to resolve his terrible childhood in a dramatic and permanent fashion. It is to be hoped that any ethical professional he sees to support his wish to change his sex will agree that many years of further treatment and therapy are required before such a decision can be made.

However unrealistic his psychological goals, they do appear to significantly reduce the likelihood of repeating his sexual aggression in the foreseeable future. His sexual interest has shifted to adults and his preoccupation with his gender identity issues together with his legal training have given him a new and more complex and appropriately adult focus. Although he has not completed the full sexual offender treatment, he does demonstrate a basic understanding of the major issues and he is able to recognize his personal risks as well as the necessary interventions. He has developed remorse for his acts and has an

8



**PSI**
Psychological Services, Inc.

appropriate understanding of the suffering his victim underwent at his hands. His guilt appears appropriate and genuine.

It is my clinical opinion that Sandy Jo Batista no longer represents a significant risk of re-offending and is thus no longer a sexually dangerous person.

Respectfully submitted,

Ronald S. Ebert, Ph.D.
Diplomate in Forensic Psychology, American
Board of Professional Psychology
Director, Psychological Services Inc.
Senior Forensic Psychologist, McLean Hospital
Instructor, Harvard Medical School

RSE/sc

9

### Justice Resource Institute
# Rehabilitation and Treatment Program

JOHN F. CUSACK, Ph.D.
*Program Director*

**EXHIBIT**

1

### I.D.P. Intake & Assessment Report

**Inmate's Name:** Sandy J. Battista
aka: David E. Megarry

**Dates of Assessment:** 10/19 & 23/98

**DOC ID:** W39562

**Housing Assignment:** N1

## A) Psychological Testing

The test protocol consisted of an Intake Interview, Davis' Interpersonal Reactivity Index [IRI], Spielberger's State-Trait Anger Expression Inventory [STAXI], the Psychopathy Checklist: Screening Version [PCL:SV], a structured psychopathy interview, Child Identity Scale (CIS), the Hostility Toward Women Scale [HTW], Marshal's Social Desirability Scale (MC), Trauma Survey Inventory (TSI), the Negative Evaluation Scale, and the Test of Self Conscious-Affect (TOSCA). The STAXI will be used as a pretreatment measure for the control and management of anger.

A neuropsychological test battery was also administered that included the Hooper Visual Organization Test, Cancellation Test, Trails Making Test [A & B], Parietal Lobe Battery, Rey-Osterrieth Complex Figure Test, WRAT-Wide Range Achievement Test (reading), Word Generation Test, and Wechsler Memory Scale-Revised [Logical Memory, I & II, Visual Reproduction, I & II].

In addition, the Institutional Risk Assessment and Prognosis for Treatment forms were completed. David Campopiano completed the assessment on 10/23/98. Ms. Battista appeared cooperative with the assessment, but expressed frustration with correctional officers (e.g., he stated that the correctional officers got on his nerves).

## B) Brief Review of Results

Mr. Battista reported no history of a formal thought disorder (psychosis), and no history of a serious head injury. Although he said he never used alcohol or mind-altering substances, his records indicate experience with marijuana, alcohol, and amphetamines. He indicated a history of clinical depression, onset of which was in the late 1980s early 1990s (incarcerated in 1982). He was prescribed Prozac and Doxepin, but currently takes no medication. Mr. Battista also noted that he used the threat of suicide as a manipulative tool while in prison (malingered). His records indicated an observation stay at Bridgewater State Hospital for 60 days in 1982. Although he mentioned a family history of alcohol abuse, including his father and mother, there was no information to suggest a family history of mental illness. He indicated that he was placed in a DYS

1

secured facility for sex offenders at Medfield State Hospital, as a teenager and remained there until the age of 18 (1977 to 1979). He also was treated at Metropolitan State Hospital in 1975 for a sexual offense and University Hospital in 1979 for congenital disorder (see Medical History). During his commitment at the DYS facility, he underwent counseling. During his state incarceration, he stated that he requested to be placed on Depo Provera in order to increase the likelihood of parole; however, this never came to fruition. Lastly, his records indicate an escape attempt on 3/30/88 from prison (see Criminal History). He does not request assistance from Mental Health Services.

The profile of scores obtained by Mr. Battista on the neuropsychological screening battery suggests an individual of low average to average (estimated) level of general intelligence with no clear evidence to suggest an organic component to his clinical profile. His performance on the Word Generation Test was quite low. His performance on Logical Memory I, and Visual Memory I was similarly low. However, his performance on Visual Memory II was better then his performance on Logical Memory II. Although the difference was not significant, these results, along with the Word Generation test, suggest deficits in verbal abilities. An assumption can be made that these verbal deficits are related to his lack of education. However, his low performance time and low copy score on the Rey Osterrieth, and two errors on Trails B suggest that impulsivity and poor attention may have contributed to the noted deficits. In order to discern the nature of these deficits, additional testing would be needed.

Mr. Battista's responses on the I.R.I. suggested deficits in his ability to be empathic. His score on Perspective Taking, a cognitive measure of the ability to appreciate other people's point of view, was low. His score on Empathic Concern, an affective measure of the ability to feel compassion for others, was within the normal range. His score on the Personal Distress scale, a measure of self-oriented feelings of personal anxiety and unease in tense interpersonal settings, was on the low end of the normal range.

Mr. Battista's profile on the TOSCA indicated that he explains his problems in behavioral terms. All five scale scores on the TOSCA were within normal range. His profile reflected elevations on the Guilt Scale and Externalization Scale. This profile reflects a tendency to address personal problems as fixable and not as an extension of himself.

Mr. Battista's score on the CIS was relatively low (33% of the total possible), indicating that he does not have a strong identification with children. His score on the HTW Scale was relatively high (60% of the total possible), indicating the presence of noteworthy hostility toward women. Mr. Battista's score on the Negative Evaluation Scale suggested no serious problems with his self-esteem. His score on the MC was low (45% of the total possible), indicating that he did not answer the questions in a socially acceptable manner.

Mr. Battista's responses on the STAXI suggested serious problems in the control and management of anger. Two (AX/IN and AX/EX) of the eight scale scores were elevated (80th percentile and 90th percentile) compared with other male inmates. This profile suggests that Mr. Battista frequently experiences intense angry feelings but suppresses these feelings. This analysis

2

also takes into account his scores on AX/OUT and AX/CON.  The AX/OUT scale was at the 2nd percentile suggesting that he never acts on his anger.  The AX/CON was also at the 2nd percentile, suggesting that he has virtually no control over his anger.  The STAXI profile suggests a tendency for Mr. Battista to suppress his anger, however his personal history reflects a stronger tendency to act on his angry feelings.

Mr. Battista's TSI was a valid profile.  There were no endorsements of critical items.  All clinical scales were below the suggested cutoffs for reporting.  However, the TSI profile reflected Mr. Battista's reported history of feelings of anger, anxiety, and bouts of depression.

Mr. Battista's overall score on the Hare PCL:SV [18] was at the cutoff for psychopathy. His score on Factor I, which is correlated with the clinical ratings of psychopathy, was {7} moderate.  His Factor II score, which is correlated with DSM-IV Axis II APD diagnosis, was {11} high.  His overall score on the JJPI PCL-R Interview [24] was one point below the general cutoff for psychopathy.  Based on these scores, psychopathy should be regarded as an issue in the management and treatment of Mr. Battista.

## C) Psychosocial History

Mr. Battista was born with Congenital Adrenal 21 Hyperplasia, which results in an increased secretion from the adrenal gland of cortisol steroids and androgens.  The effect this genetic defect played in Mr. Battista's physical development was evident by his accelerated growth and virilization as a child.  However, the effects on his psychosexual development are unclear.  He reported that his mother was "disgusted" by his appearance as an infant and toddler because of hirsutism (hair growth all over body).  He recalled that his maternal grandmother had to care for his hygiene needs, because his mother refused to look at him with his clothes off.  His rejection by his mother ended when his father reportedly killed her.  The records indicated that Mr. Battista's father killed his wife (inmate's mother), because she was unfaithful.  When Mr. Battista described the homicide, he remarked that the death was an accident and his father did not mean to kill her.  However, he remembered that his father was very abusive to his mother and frequently "shut up the house" with a gun.  The records indicate several different ages when the murder occurred, ranging from 4 years to 6 years old.  Mr. Battista reported that the murder occurred when he was 6 or 8 years of age.  He stated that he was unable to recall many events as a child, especially those involving his parents.  He was able to remember, however, getting tobasco sauce poured in his mouth by his parents as a form of punishment.  Mr. Battista indicated that he was unable to recall sexual or physical abuse by his parents or other caregivers.

He reported that he was the middle of three children.  He has a sister and a brother, and also a half brother.  He said that his relationships with his siblings were not meaningful.  He explained that he was a loner, and associated very little with his siblings.  As a child, Mr. Battista noted no history of enuresis, no violence towards animals, and no fire setting behavior.  However, his records indicate fire setting behavior while living at the Alpha House (residential group home). He noted a few instances of breaking and entering for which he never got caught.  He did not mention several sexual molestation charges for which he was hospitalized on two occasions (Metropolitan State Hospital in 1975 and Medfield State Hospital, a DYS facility for sex

3

offenders, from 1977 to 1979). The records indicate that he molested his younger stepsister. He never mentioned having a stepsister in this interview. The records included a statement by Mr. Battista which read," I was fooling around with my younger step sister." According to the records, Mr. Battista molested several family members. Based on available information, Mr. Battista was never charged with these offenses.

After his mother's murder, Mr. Battista was placed with his maternal grandparents. According to his records, Mr. Battista was exposed to pornographic material by his grandparents. Records further indicated that the children slept on a sofa in the basement, were deprived of adequate food, and exposed to the sexual activities of their grandmother and her friends. On occasions they were locked in the bathroom while firecrackers were thrown in at random moments. Because of the neglect and abuse caused by the maternal grandparents, he was placed with his paternal grandparents. During this time, he recalled that his father and grandparents hit him as a means of punishment. Soon after, his father delivered him to the court as a stubborn child, relinquishing custody. Mr. Battista was placed in several foster homes. His time spent in foster care and his experiences were unclear. However, his records indicated a few Breaking and Entering charges during his middle teen years. Also in 1977, he was found molesting a young girl (age unclear), which resulted in a commitment to Medfield State Hospital. Although Mr. Battista reported no history of fire setting, his records from Medfield State indicated otherwise. Similarly, Mr. Battista reported no history of alcohol abuse, but alcohol abuse was mentioned in a psychiatric evaluation written by Dr. Daniel M. Weiss.

Mr. Battista's academic history was poor. Following the murder of his mother, Mr. Battista moved several times, so he never stayed in one school for very long. He recalled that his grades were mainly Cs and Ds. He remembered that he was in mainstream classes, and claimed that he was never rebellious during school. He said he started smoking at age 10 while at school. He left school in the eighth grade and reported that he completed his GED while in DYS custody. He noted that he had a limited amount of friends during school. In fact, he described himself as a loner at school.

After being discharged from Medfield State, Mr. Battista stated joined the Army (no documentation to support his claim). He further stated that he was given a general discharge after 8 months. Mr. Battista stated that his discharge from the army was due to an altercation he had with another soldier. However, he said this incident was instigated by his sergeant who had it out for him because of an earlier incident. According to Mr. Battista, he took nude pictures of himself dressed only in his military boots and cap, and sent the pictures to Hustler in order to win $100.00. His sergeant noticed the address on the envelope and opened his mail, which resulted in the sergeant ordering him to tear up his pictures. Mr. Battista said that his sergeant wanted him out of the service. An altercation ensued, instigated by his sergeant, causing him to threw a pipe at someone, hitting that person in the head. No aspect of this story is documented anywhere in his records. Following his reported discharge from the Army, he stated that he took several unskilled jobs. However, his stay in society was short lived, because he was arrested for his current offense at age 20 and incarcerated at age 21. Mr. Battista remembered one positive aspect of his Army career, and that was his father's desire to "show him off" after graduating boot-camp.

Mr. Battista's reported that his sexual history consisted of three sexual partners, including his current victim. The other two partners were men who he had relations with while incarcerated

4

as an adult. He claimed that his first true sexual experience was at the age of 34 with one of the males. However, his records indicate that he reported having one sexual experience with a woman. He noted that no one ever discussed sex or taught him about sex in his family. Although he stated that he learned about sex while incarcerated at the age of 21, he also stated, as noted, that his first sexual experience was not until age 34. It is noteworthy that he included his current victim as a sexual partner, but not the many other sexual victims that are recorded in his records. Also, he said that he is not sexually attracted to men, but he reported that his mother's treatment of him made him ashamed of his body, making him fear women. He stated that he does not need to have sex or to masturbate. His experience with men was experimental, so he reports. Lastly, he claimed that he never viewed pornography as a child or as an adult. Indeed, he said that his first time being exposed to pornography was at the Mass Treatment Center. His report, again, contraindicates the records.

In describing Mr. Battista's character, several statements he made relating to his goals and ideas are poignant. First, Mr. Battista's immediate goal is to attend night school for paralegal studies. He will live with a transsexual friend who will assist him in obtaining information on a sex-change operation. His friend will also help him obtain SSI so his college and the sex-change operation will be paid for. Although he understands that it is highly unlikely that he will be hired by a prestigious law firm, he reported that he would not have any problems obtaining work as a paralegal. He stated that he will also make good on his plan to obtain a sex-change operation.

He was asked if he was a good liar, and his response, " I am not a pro, but I am good." He also noted that the majority of people were easily manipulated. Lastly, he noted that his most depressed episode in his life was his "life."

## D. Medical History

As documented several times in this evaluation, Mr. Battista was diagnosed with Congenital Adrenal Hyperplasia ( an infantile adrenogenital syndrome, which developed into hyperplasia of arenal cortices). According to reports there is a 21-hydroxylase deficiency. The net effect of this disorder is an increased secretion from the adrenal gland of cortisol precursors and androgens. After birth these children grow at an accelerated rate, but show advanced skeletal maturation. The advanced maturation in the skeleton causes premature closing of the bones resulting in their ultimate height to be below average. Also, boys' experience an enlarged phallus, but the testes and prostate remain small at puberty because of suppression of lutenizing hormones and follicle stimulating hormone.

The effects this disorder has on the psycho-sexual development are inconclusive. The research is not clear whether this disorder effects a person's decision to pursue a sex change, or if it effects a person's belief they are a different sex. However, research by Eicher et. al. (1979) examined the white blood cells of a small group of transsexuals looking for the presence or absence of H-Y antigentypically, the H-Y antigen is present on the cell surface of males and absent in females. Eicher et. al. Found that the experience or "felt" gender corresponded with the absence or presence of the H-Y antigen rather than with the person's body phenotype (in male transsexuals the H-Y antigen was absent).

5

## E. Mental Status

Although Mr. Battista presented as cooperative, he voiced several comments regarding correctional officers (e.g., "I can not stand ____; he is always watching TV"). He was dressed in jeans and T-shirt, with no apparent attempt at feminization. He had a beauty mark tattooed below his nose, as well as numerous tattoos up and down his arms and on the back of his neck. He noted that this was done in order to fit in with a biker gang on the outside. In previous records, he stated he was trying to fit in with the prison crowd. He also noted that in the same report he began lifting weights to fit in with the prison crowd. He was oriented X3 ( person, place, and time). Although cooperative, he came across as direct and assertive, making it clear if he did not want to answer a question. Moreover, his presentation appeared tense and frustrated at times. He evidenced no signs of a formal thought disorder and no delusions were noted. He denied any thoughts of suicide or homicide. However, a psychological report written by Dr. Tyler Carpenter indicated that Mr. Battista endorsed an item on the MCMI III indicating that he had tried to commit suicide in the past.

## F. Criminal and Institutional History

Mr. Battista's criminal history consists of 3 arraignments as a juvenile (involving 2 victims {i.e. Assault and Battery w/ Dangerous Weapon} and 1 property), and 18 arraignments as an adult (three of which were sexual). As noted earlier, Mr. Battista has been in the system since he was 15 years, when he was placed in a DYS secure facility for sexual offenders. Although this was his first documented charge of a sexual offense, which included all three arraignments, his psychiatric records indicate several sexual assaults on young girls (mostly family members). He has had one county incarceration for robbery and his current state incarceration.

The records indicate that his adjustment over the past 15 years has been poor as evidenced by 16 institutional failures, a DSU placement, one escape attempt, and over 60 disciplinary reports. He also incurred 4 reclassifications to higher security. He has been transferred numerous times due to several Protective Custody issues (he now admits that many of these were manipulative in nature). The most serious issues include: 3/88 attempted escape from Hampshire House of Corrections by cutting the cell windows with a hacksaw blade; he also made an operational key with a comb; 1988-1989 he assaulted two correctional officers; 1996 possession of a SAP weapon; 3/1997 he threatened an outside agency using the Associate Commissioners name; 8/1997 he punched an observation window, threatened staff, and refused to be cuffed. During 10/1997, he was transferred to OCCC and received 8 disciplinary reports for a myriad of infractions, including fighting, lying to staff, disruptive conduct, and abusive language to staff. Many of his issues revolved around his appearance (cross-dressing), which prompted his request to be transferred to Mass Treatment Center.

6

### G. Official Version of Current Offense

A 10-year old girl was selling fudge door to door, when Mr. Battista asked to buy some. He asked her to come with him to his car to get his wallet. When they arrived at his car, he grabbed her and shoved her in the car. He drove to a wooded area where he put a purple cloth in the victim's mouth and tied a nylon cloth around it. He took her clothes off and then his. Once finished undressing, he put his fingers in the victim's vagina and then forced her to perform fellatio on him. She reported that he ejaculated on her face and hair. Also, the report indicated that she stated he urinated on her. When Mr. Battista was finished, he let the victim go. She ran to nearest house and the police were called.

In a psychiatric report completed by Dr. Marc Whaley, Mr. Battista reported that he was smoking marijuana prior to his crime. He reported that he experienced sexual feelings that day, and "I did not know what to do with them (sexual feelings).... I could not have sex with girls my own age, because I am embarrassed." He went on to explain how he was driving in his car when he saw a ten year old girl walking alone. When he saw her, he recalled having the thought about grabbing her and having sex with her right then, even though "I knew I would get into trouble... I knew it was wrong...I just felt the pressure to act." In this report, Mr. Battista appears to endorse the police report. There is no mention in this psychiatric report, however, of ejaculating on the victim or urinating on her, so it is unclear what he agreed to.

### H. Summary and Treatment Issues

Mr. Battista has a long history of physical and sexual abuse perpetrated by caregivers, and a highly troubled and unstable childhood, resulting in a severe malattachment disorder and major problems developing normal relationships with peers. His development also influenced his manner of coping with society, especially due to his early introduction to secured environments (DYS, hospitals, and prisons). His need to survive at home, in foster care, in psychiatric hospitals, in DYS secured facilities, and in state prison has shaped his personality so he could adapt to, and survive in, a penal environment. For example, while incarcerated, Mr. Battista has used the threat of suicide to change his housing, and he has feigned "enemy problems" in order to change his placement. Along with his escape attempt, impersonation of the Associate Commissioner, and pathological lying, it is clear that Mr. Battista harbors many traits associated with psychopathy.

In regards to his gender identity issue, it is unclear to what extent his genetic disorder influenced his identity as a female. However, his early exposure to pornography, his brief relationship with his mother and her violent death, clearly had an impact on his self-perception and sexual development. Although these influences clearly influenced his attraction to young girls, it is unclear if it effected his gender identity. If we take into consideration his strong psychopathic tendencies, his gender identity issue may simply be manipulative.

Based on Mr. Battista's clinical data, personal history, and criminal record, the treatment issues include:
1) A diagnosis of psychopathy.
2) A long history of antisocial behavior.
3) An early and long history of emotional, physical, and sexual abuse.

7

4) An apparent lack of empathy and remorse, which is evidenced by his report of his crime and on clinical tests.

5) A history of inappropriate methods of anger management, evidenced by behavioral history.

6) Cognitive distortions around sexuality and women's roles, again evidenced by personal history and on clinical tests.

7) Although he denies not needing to masturbate or have sex, he acknowledged in his records a high sexual drive and strong sexual urges, which he directed towards young girls, because he feared women his age.

9) Evidence to suggest possible cognitive deficits.

8) A history of poly-substance abuse, and

10) Possible Gender Identity Disorder (malingering should be ruled out).

## F) Treatment Recommendations

1) A phallometric assessment to assess sexual deviant arousal toward prepubescent girls. If sexual deviant arousal is confirmed, then assess for appropriate behavioral interventions.

2) Participation in psycho-educational classes, including (a) anger management, (b) victim empathy, (c) cognitive restructuring, (d) sexuality education, and (e) social skills training.

4) Participation in relapse prevention.

5) Participation in group therapy to address denial and minimization.

6) Participation in victims survivors group.

7) Individual therapy, through CMS, to monitor depression, work on abuse history, and gender identity issues.

8) Assess for mood stabilizers through CMS.

9) A psychological evaluation to address the gender identity issue.

10) Participation in NA.

11) Physiological tests to asses for psychopathy.

12) Prior to parole or wrap date, an assessment for an aftercare program is warranted in order to provide structure and intensive supervision in the community.

13) Possible test for elevation of urinary 17-ketosteroids, and

14) Examine presence of H-Y antigen complex on surface of white blood cells. H-Y antigen, a protein on the Y chromosome, tends to be absent in male transsexuals.

## G) Prognosis for Treatment

According to the prognosis for treatment scale, Mr. Battista falls in the guarded range. Mr. Battista showed little remorse toward his victim, accepted little responsibility for his crime and candidly reported many distortions. This was evident by his lack of affect during the description of his crime. He explained that the daughter of his father's girlfriend flirted with him, causing him to get an "urge" that he acted on. Finally, Mr. Battista has a life long record of impulsive, aggressive acting out, highly manipulative, behavior, chronic lying and many other traits that are associated with psychopathy. Despite these obstacles, treatment is important for Mr. Battista, if there is any hope of reducing the likelihood of reoffense.

8

**H) Institutional Risk Assessment**

      Mr. Battista's overall score on the Institutional Risk Assessment form [ 23 ] was in the high moderate range.  Accordingly, he should be considered a moderate risk for assaulting persons within the institution.

**I) Inmates Classification:**        CM3: 2/3

**Report completed by:**  David Campopiano, MA.
**On Date:**  11/18/98

_____
**Signature**

**David Campopiano, MA.**

_____
**Signature**

**Robert Prentky, Ph.D.**

9

# CONFIDENTIAL

The Commonwealth of Massachusetts
Department of Corrections
Massachusetts Correctional Institution - Norfolk
Norfolk, MA 02056

PSYCHOLOGICAL ASSESSMENT REPORT

CONFIDENTIAL

Name: Sandy J. Battista          Identification #: W39562
  a.k.a. David Edward Megarry, Jr.
DOB/Age: 12/30/61; 35 yo          Occupation: Unemployed Inmate
Marital Status: Never married   Education: 8th Grade (GED 1982)
Dates Seen: 5/20, 6/9,17, 8/13/97
Medication: None                       Referred By: DOC/CMS
Examiner: J. Tyler Carpenter, Ph.D., ABPP

Reason for Referral: Mr. Battista was referred by the Department of
Corrections and Correctional Medical Services for a psychological
assessment for the purposes of assisting in the psychodiagnostic
evaluation of the inmate. The formal request had been made by
Victoria Russell, M.D., Consultant in Psychiatry, who wished to
obtain the results to assist the therapist in "... designing
appropriate therapy goals and interpretations" and because such
tests, "... are also given to people considering sex reassignment
surgery". The inmate is seeking specialized medical and
psychological treatment to assist him in his ultimate goal of
receiving a sex change operation. Mr. Battista is hoping to
initiate this treatment at the current time in preparation for his
operation after he is released from prison.

Limits of Confidentiality and Protection of Patient's Rights: The
examiner explained the Limits of Confidentiality and possible uses
of the evaluation by DOC and CMS to Mr. Battista, who clearly
understood both the limits and possible ramifications, signed a
detailed document listing the limitations, and agreed to the
evaluation. Inmate was informed that background information would
be reviewed and releases where appropriate were obtained.

Background Information: (The sources of information include the
following: QA Report on Transgender Issues of Inmates, 1/21/97, and
a Consultative Medical Evaluation, 3/17/97, by Victoria Russell,
M.D.; Probation Officer's Report by Paul G. Bernard; Sexually
Dangerous Person Examination by Daniel M. Weiss, M.D., 3/9/84;
Pretrial Intake Report; an Offical Version and Criminal History; a
psychodiagnostic interview, and a review of his medical chart).

    Mr. Battista presented the following history of the present
illness: He stated that as far back as he can remember he has felt
odd and different, but not necessarily female. In mid-1995 he
decided to change his name to a female name and at that time he
further decided,"I wanted to live my life as a female". He stated
that he gone through puberty as an infant and had been ridiculed by
others because of his large nose. He hid his feelings about these

ATTACHMENT  3

Battista, S.J.                    2                    5-8/97

instances until 1995, when he felt that he that he had gotten over
them. He stated that the precipitating event was an interaction he
had with an aggressive, outspoken inmate who questioned him about
some incongruous behaviors, e.g., having his name on his bath
slippers, his red bath robe, his shaved legs, etc.. Mr. Battista
stated as he 'came out' (in his new identity) the feared ridicule
and ostracism didn't occur.

Mr. Battista reported the following history of psychiatric
treatment: Mr. Battista reported that in 1974 he was hospitalized
at the Metropolitan State Hospital for "fooling around with my
younger step sister". Mr. Battista stated that from 1975 until
1979, he was hospitalized at the Medfield State Hospital at the
Steven J. Ott Center for an attempted sexual offense. Mr. Battista
stated that he escaped two or three times and was not admitted as
a psychiatric case. In 1982, Mr. Battista stated that he was
hospitalized at Bridgewater State Hospital for a criminal
competency trial. Mr. Battista denied any history of outpatient
treatment.

Mr. Battista reported the following family history of medical
conditions: Mr. Battista stated that his father suffered from
alcoholism. It is reported that his mother died when the inmate was
four years old. The inmate thinks that her death was related to a
beating by her husband (his father). Mr. Battista and some of the
records state that his father beat his mother for promiscuous
behavior.

Mr. Battista stated that when he was five or six years old,
after his mother died, he went to live with his maternal
grandmother. He stated that he was subsequently removed for neglect
and sent to his paternal grandmother and then he was moved in and
out of that home, and between his father and paternal grandmother
and foster homes. Mr. Battista stated that his father physically
abused his stepmother and shot up the house. The inmate reports
that he was the middle of three children and had an older sister
and a younger brother and a younger half brother.

Mr. Battista stated that he couldn't remember if he was
sexually or physically abused when he was young, but he does
remember being removed from the home. He stated that he received
very physical corporal punishment. He stated that he was locked in
the closet and called a 'freak' by his mother until his grandmother
took care of him.

Mr. Battista does not have any knowledge of his birth or
milestones except that he said that he knows that his milestones
were not delayed. He describes himself as being of a shy
temperament. Mr. Battista stated that he stayed back in first grade
and was a below average student, but was never placed in special
education classes. He stated that his life was that of a loner.

Mr. Battista stated that he was never able to take his clothes
off in front of someone and that he had sex with a women on one
occasion. He reported that no one ever explained sex to him and
that he could not pinpoint the age at which he began to understand
what sex was about. He felt that he learned the most about sex
beginning with his incarceration at 21 years old. He reported that

Battista, S.J.                    3                    5-8/97

he was locked in a locked DYS maximum security residential program
between the ages of 15 and 18 years old. He stated that he had
between one and two regular friends.

Mr. Battista reported the following occupational history: He
stated that he worked as a laborer and serving fast food. He stated
that these jobs that he described were generally unskilled. He
stated that the longest he held a job was between one and one and
a half years. He states that he has held between four and five
different jobs and always worked. He said that he was only out of
prison between 18 and 21. He stated that between 1/82 and 11/82 he
was in the military service and given a discharge that was
"uncharacterized". Mr. Battista stated that while he was in the
service, he got in a lot of fights, was unable to take orders, and
was frequently drunk and disorderly.  He denied ever doing any time
in the brig.

Mr. Battista stated that he was never married.

When asked about his medical history, Mr. Battista stated, "I
can take pain, I don't care, in fights if its inflicted by others",
but if he inflicts it on himself he stated that he cannot handle
it.  He stated that he doesn't experience physical discomfort as
others do and that he accepts it as part of prison life. Mr.
Battista stated that he wanted to go on a liquid diet so that he
would stop gaining weight.

Mr. Battista stated that between 10 and 13 years old that his
right eyeball was lacerated by blanks. He stated that he had was
born with congenital 21 hyperplasia which is an adrenal problem.
He stated that he takes medication to suppress adrenal function to
within normal limits. He stated that he received corrective surgery
between the ages of 6 and 7 for "pigeon toes". Mr. Battista denies
ever having any seizures or loss of consciousness.

Mr. Battista described his criminal and legal history as
follows: As a juvenile he was referred to the Department of Youth
services for an attempted sexual assault on a girl. He stated that
as an adult he was charged with breaking and entering an abandoned
warehouse. He stated that his current charge is the rape of a
child, kidnapping, and robbery. He stated that he had served
fourteen and a half years at the time of the testing.

Mr. Battista denied any attempt to kill himself (contradicted
by a contrary endorsement on question # 154 and 171 on the MCMI-
III), but stated that he had suicidal ideation approximately twelve
times over the previous year. Mr. Battista denied any history of
psychotic symptoms.

Mr. Battista reported abusing marijuana and alcohol between 18
and 20 years old. He stated that his use was primarily on Friday
and Saturday nights and at those times he would engage in drinking
and smoking pot to "oblivion".

<u>Assessment Procedures:</u> Bender Visual Motor Gestalt Test (Copy, IR),
Rorschach (RIAP-3), TAT, MCMI-III, MMPI-2 (Basic, Supplemental,
Content, and Harris & Lingoes Scales), an evaluation for
psychopathic personality traits, MASA Inventory - Booklet 5, Wilson
Sex Fantasy Questionnaire, Trails A & B, Digit Span, Mini-Mental

Battista, S.J.                4                    5-8/97

State Exam, and Psychodiagnostic Interview.

Validity: This is a generally reliable and valid assessment of both the nomothetic and idiographic traits and personality functioning of this inmate. It is both internally and diagnostically consistent.

* The MCMI-III produced a valid profile.
* The Rorschach was an interpretively useful protocol.
* The MMPI-2 produced a varied picture: Taken as an aggregate, the validity indicators are consistent with the inmate's self and diagnostic presentations.
* Assessments of his sexual functioning showed a mild defensive set.
* The remaining tests and interviews were reliable and valid assessments of the inmate's current level of functioning.

Physical Characteristics and Mental Status Examination: Inmate presented himself as a 35 year old single white male inmate. He was examined on four occasions under different correctional security/medical status, e.g., on occasion in disciplinary seclusion and at other times while housed in the medical unit. He was dressed in a jumpsuit, handcuffed on occasion (but not during those occasions when performing the Bender Gestalt or other tests involving writing), and clean, groomed, and neat in appearance. His facial expressions were initially limited in number and harsh, but softened over time and showed greater range and depth of emotional expression as he came to engage in the assessment process and become more trusting of the examiner. He had a direct and forceful manner of speaking and presenting himself, which became marginally more moderate over the number of interviews. His presentation appeared as not so much an attempt to dominate the interviewer, as it was to be aggressive enough to avoid being dominated or controlled by the interviewer. He has attractive, aquiline features. His presentation was remarkable for the complete absence of feminine characteristics of speech or posture, save for his hair being pulled back in a neat ponytail. His gender presentation was within normal limits, neither androgenous nor macho. He did not appear to lie or dissimulate. When he did not wish to answer certain questions, e.g., sexual history and current fantasy life, he stated that because the examiner was not a certified expert in transsexual problems, it was too personal and specialized an area for him to reveal. Mr. Battista was of average build and apparently good physical condition, but stated that he wanted to go on a liquid diet to avoid gaining weight and to prevent the return of bulk to his arms, legs, and chest (he reported body building in the past in order to hang out with a biker group and avoid being identified and victimized as a child molester). His physical appearance was remarkable for over 40 tatoos (by his report) which he had done in prison to strengthen his image as a tough, heterosexual convict. His motor behavior was remarkable for his unusual capacity to sit remarkably still for hours and work under

Battista, S.J.                    5                    5-8/97

occasionally uncomfortable conditions without showing restlessness
or pain. He said that this came of spending years in isolation and
segregation. Mr. Battista's relationship to the examiner was
generally frank, cooperative, and on occasion mutual. He appeared
hungry for an empathic human audience.

Mr. Battista saw himself as suffering from a legitimate
medical condition, e.g., transsexualism, for which specialized
medical treatment was indicated and which he was being
unconstitutionally and illegally deprived of. He felt that although
it was legitimate for DOC/CMS to refuse him sex reassignment
surgery, he felt that it was within his legal rights for him to
receive the specialized hormonal and psychotherapeutic treatment
that would precede such an operation on the outside. He was unable
to entertain alternate formulations of his condition or to
reasonably consider currently available treatment techniques to
address his symptomatic complaints of sexual identity dysphoria,
alienation, poor self-esteem, and depression with intermittent
despair and suicidality.

Mr. Battista was alert, oriented 4X, and without reported or
gross discernable perceptual anomalies. He stated on numerous
occasions that he was not "crazy". His immediate and long term
memory appeared to be WNL, as did his capacity to learn new
information. However, he reported that he was unable to remember
significant aspects of his early childhood, including whether or
not he had been sexually abused. He appeared to have a low average
fund of general information, except where information pertaining to
his legal status and medical condition was involved (in these
respects he sounded unusually well informed and resourceful). His
IQ is estimated to be in the average range, limited by his relative
inability to utilize abstract concepts, especially when discussing
his medical complaints. Mr. Battista was generally able to attend
and concentrate on the examiner and the tasks quite well, except
when the topic was his ideas about his right to address his gender
identity problem. His judgement was impaired by strong emotions
(e.g., anger and mistrust) and his use of defenses of splitting and
projective identification. His understanding of the dynamics of the
prison milieu is grossly intact. Mr. Battista's understanding of
his condition is concrete and somewhat superficial. He realizes
that his problems are due to something unusual about his self
image. He believes that the solution to his problem is to
concretely change his anatomy to fit his fantasied identity. He has
little apparent knowledge of the underpinnings of his perceptions
or the full impact of these dynamics on himself and others.

Mr. Battista generally appeared and acted rationally during
the interviews and testing. It was his inability to reflect on
alternate ways of understanding his condition and ways to deal with
it, that took on an irrational life of its own. At times he
demonstrated some press of speech. The association of his thinking
was remarkable for perseveration around his sense of being
persecuted and deprived with respect to his obsession with
dramatically altering his sexual appearance. His thinking is
distorted by intermittent concreteness and his current

Battista, S.J.                6                    5-8/97

preoccupation with sex reassignment surgery as a solution to all his problems reflects unrealistic fantasy and magical thinking.

Mr. Battista's mood was generally one of varying degrees of dysphoria. However, he was almost capable of euthymia at those times when he felt understood and optimistic about the evaluation process. His mood states were anything but shallow and in fact were remarkable for their duration and constancy. Although he was capable of almost a full range of affects, modulation of his affects was more dependent on external circumstances and the examiner's reactions, than on internal controls. He was capable of expressing strong emotion, but his affects lacked complexity and were driven at times by unconscious reactions to experienced shame and vulnerability. At times the inmate could be quite labile and almost explosive in his expressions of feeling. There was an impulsive quality to his thought, emotion, and behavior.

<u>Neuropsychological Screening:</u>

Mini-Mental State Exam - 26/30 - This score is not indicative of gross neuropsychological impairment. Errors consisted of a near miss on the season and some impairment in concentration.

Digit Span - 2 sequences of 5 digits forward and 2 sequences of 4 digits backwards is within normal limits (WNL) for this patient.

Trails A - 22" (62nd percentile) is within normal limits (WNL).

Trails B - 1'11" with 1 error (estimated to be in the 37th percentile if completed correctly) is within mildly impaired range for this patient.

Bender Visual Motor Gestalt Test - Copy: Errors consisted of 4 mild decrease of angulation errors, 2 moderate - 45 degree rotations, and a near collision (score of approximately 4-5).

Bender Visual Motor Gestalt Test - Immediate Recall: 6/9 gestalts recalled is WNL. Errors consisted of 1 moderate rotation, 2 angulation, 1 perseveration, and 2 overlapping difficulties (score of approximately 5-6).

Taken as a whole, the results of the neuropsychogical screen are unremarkable for gross impairment, save for suggestive characteristics of his performance on the Bender. Although he shows some mild problems with concentration, the only convergent evidence for such problems is found in his rigid, perseverative, and emotional interactions around his discussion of his understanding of his sexual identity problems. Such strong emotion and distortion is consistent with severe character pathology and engaging such patients around areas of great conflict.

The results on the Bender, however, appear quite anomalous. Hutt and Briskin's scoring system (as adapted by Brilliant &

Battista, S.J.                    7                    5-8/97

Gynther) yielded the following: An irregular sequence, a Copy score of approximately 4-5 and an Immediate Recall score of approximately 5-6. These scores are at the threshold of being "organic".

Although there is no compelling evidence of malingering, dissimulation, unreliability, psychosis, or organicity, Mr. Battista's Bender protocol contains clear evidence of rotation errors which are typically associated with either psychosis or organicity. The drawings were carefully executed, and the other errors would not be seen as a atypical for a person of his educational background and degree of psychopathology. However, in the absence of other evidence of dementia (e.g., memory deficits, poor concentration, decline in IQ and functioning, history of head trauma or neurological disease (aside from his endocrine disorder), advancing age, etc.) or psychosis, rotations are difficult to explain.

<u>Results of Personality Testing:</u>
MMPI-2:
     Validity Scales - L= 56   F= 85   K= 42

     Clinical Scales - Hs= 63   D= 86   Hy= 64   Pd= 83   Mf= 63

                      Pa= 85   Pt= 70   Sc= 84   Ma= 43   Si= 77

     2-Point Code= 2-6/6-2

MCMI-III:

Personality Code= 1 2A** 8A 2B*6A+8B 7 5"6B 3 4''//-**S*//

     Modifying Indices (BR Scores) - X= 64   Y= 47   Z= 71

     Clinical Personality Patterns - 1= 106   A= 99   2B= 77

        3= 30   4= 9   5= 42   6A= 73   6B= 34   7= 46   8A= 81

        8B= 59

     Severe Personality Pathology - S= 79   C= 69   P= 68

     Clinical Syndromes - A= 40   H= 66   N= 48   D= 80   B= 88   T= 60

        R= 65

     Severe Syndromes - SS= 60   CC= 71   PP= 63

Theoretical Orientation: Biopsychosocial environmental and eclectic.

Suicidality: Mr. Battista's score on the Exner Suicidality Constellation was 6, two points below the required critical score of 8 (which would indicate current critical concern about self-

Battista, S.J.                    8                    5-8/97

destructive potential). On the MCMI-III, he endorsed an item saying
he had tried to commit suicide in the past. During the interview he
stated that he had had suicidal ideation 12 times in the preceding
year. Although Mr. Battista's projectives show evidence of
underlying hopefulness, it should be noted that much of this hope
may be bound up in achieving his treatment which he hopes will
precede an eventual sex change operation and that discouragement
and depression could push this vulnerable individual into a
suicidal crisis.

Emotional Functioning: Mr. Battista is often seen as a hostile,
depressed, aggressive (psychologically), and suspicious individual.
He has fewer resources available to form and implement decisions
than should be the case. He is lacking in maturity and his
emotional functioning is frequently labile and dramatic in
presentation. These dysphoric affects reflect the mediation of his
anxious and retiring nature (linked to his choice of female objects
that are young and too immature to be regarded as threatening),
with his difficulties in coping with his ego deficits in the tough
and aberrant milieu and life of an inmate. These factors create a
vulnerability to being overwhelmed by the requirements of daily
living. Due to the nature of his personality development, as well
as his placement in a correctional setting, he has few outlets for
expressing himself or his restrained resentment. The lawsuit and
his cross dressing fulfill these needs, as well as reflecting his
psychodynamics and conditioning history. Mr. Battista's emotions do
not affect his thought processes in a consistent manner - sometimes
his emotions influence his thinking and at other times they don't.
This inconsistency leaves him vulnerable to being overwhelmed by
his emotions at times. He is attracted and reinforced by emotional
stimulation, but not moderate in his emotional expression. It
should be added, that much of his rage and disappointment at times,
comes as a result of having a core of hope and fanciful, but
conventional optimism that he can overcome the tragedies and
obstacles that have been such a formative part of his life up to
this time, and have a happy and satisfying outcome to his efforts.
It should be noted that although reportedly under medical control,
his congenital adrenal hyperplasia may be a contributing factor to
his emotionality.

Intrapsychic Functioning:

    a. Ego Defenses and Underlying Affect - Predominant underlying
       affects are <u>fear</u> (of rejection and ridicule of his basic
       sexual identity), <u>shame</u> (regarding his penis and nose,
       e.g., both their actual form and symbol phallic meaning),
       and <u>anger</u> (at anyone who opposes his understanding of
       himself or thwarts his attempts to realize his fantasied
       solutions to his psychic pain). These affects have their
       origin in classical conditioning by his mother and peers,
       sub-cultural conditioning in the prison environment, and
       psychodynamic and family systems dynamics. Predominant ego

Battista, S.J.                    9                    5-8/97

defenses are the following:

High adaptive level:
* self-assertion (logical carrying forward of his lawsuit and
  plea for help)

Mental inhibitions:
* repression (of early experience and ego-alien thoughts and
  emotions)

Minor image-distorting level:
* devaluation (probably in part related to the prison
  subculture).
* idealization (of females)

Disavowal level:
* denial (of aggressive and libidinal drives)
* rationalization

Major image-distorting level:
* autistic fantasy (substitute for realistic
  goals/relationships)
* projective identification (of aggressive, "selfish", and
  hostile impulses onto correctional and administrative
  authority, as well as all of his peers in the correctional
  environment)
* splitting of self-image or image of others

Action level:
* acting out (avoids awareness of his cognitive operations and
  precipitates his removal from what is for him an intolerable
  environment devoid of any sources of realistic
  satisfactions)
* help-rejecting complaining (to accept help would deprive him
  of his current strategy and place him initially in what he
  perceives to be psychological vulnerability and danger)

b. Conflicts - Mr. Battista's primary conflicts appear to
   center primarily around great rage and distrust of
   authority, and poorly differentiated sexual and aggressive
   drives. His rage at authority has it's roots in his images
   and experiences of his father's explosiveness and anger
   (e.g., reportedly shooting in the house and fatally beating
   his mother, physically abusing Mr. Battista's stepmother,
   and his use of painful corporal punishment), as well as the
   pervasive anti-authority attitude which is prevalent in the
   prison culture. His sexual conflicts are equally severe and
   entwined with his rage, as well as anomalous in their
   behavioral expression. His mother was repulsed by, and
   ridiculed the effects of his early genital development,
   leaving him alienated from his primary caregiver and his
   own sexual anatomy. It is clear that this shame over his

Battista, S.J.                    10                    5-8/97

genitals persisted well into his young adulthood, and
appears to be intermingled with an unconscious fantasy of
using his genitals in a rageful way against women. The
relatively late onset of his desire to become a women
through sex reassignment surgery, appears to in part be a
function of his alienation from others, deep conflict over
his sexual being, precipitated by an acceptance by other
inmates, in an environment which by nature must place
controls on sexual expression, of his experiments with
cross dressing. In other words, as a lonely and angry
individual who was deeply uncomfortable about his sexual
being, cross dressing helped him deny the painful and
complex conflicts, while at the same time providing
stimulation, a less aggressive identity, and the deeply
desired attention. Even the painful ritual of surgery would
appear to be both a concrete and masochistic transformation
of that which has come to be associated with shame and
pain, as well as some rite of passage whereby by he finally
has achieved an identity he believes that he can live with.

c.  Overt Manifestations of Intrapsychic Issues - He has, in
the past, used children as a way of bolstering his sense of
himself as weak and defective. His goal of undergoing sex
reassignment surgery as a solution to both his perceived
and apparent psychic pain and interpersonal problems,
reflects a synthesis (in fantasy) of
intrapsychic/interpersonal/environmental presses with a
vulnerable response style, defective reality testing, and
clear secondary gain within the correctional setting. The
lawsuit is deeply satisfying because it is overdetermined.
It is driven on one hand by his strong and valid desire for
relief from his deep personal suffering. While on the other
hand, it reflects a passive-aggressive rejection of
available sources of treatment (e.g., psychotherapy for his
character problems, psychopharmacotherapy for his
depression, a psychodiagnostic reformulation of his issues,
and sex offender treatment for his problematic pedophiliac
tendencies toward young girls), an active attack on
conventional authority, and a peculiarly quixotic solution
to dealing with the problems of his past, present, and
future.

d.  Intrapsychic Self-perception and Identity - Mr. Battista's
projectives, together with his objective test results and
problematic behaviors, indicate defective psychic
structures and an absence of adequate internal cohesion.
His basic response style reflects a perseverative tendency
to reduce complex and ambiguous stimuli to excessively
narrow and simplified gestalts. This style, together with
his underlying shame, anger, and suspicion (mediated by the
difficult prison environment), neglects critical variables
and leaves him prone to produce a high frequency of

Battista, S.J.                    11                    5-8/97

socially aberrant responses. At his best he is brutally concise and to the point. His underlying issues are chronic and pervasive to the point that they promote perceptual inaccuracy and produce serious problems in reality testing. He sees himself as damaged and defective, and inadequate in comparison to others. Such perceptions frequently precede feelings of futility and depression.

   e. Insight - Mr. Battista's insight is limited to his hypothesis that his nose, penis, male identity, and being in prison are the apparent source of dysphoric affects. He has no tolerance at this time for alternative constructions to his concrete and magical solution to his difficulties.

Interpersonal:

   a. Interpersonally Passive-Active and Hostile-Dependent - Mr. Battista has no clear preference for activity vs. passivity in his interpersonal relationships. His hostile-dependent attitude is due in large part to his status as an inmate (dependent by virtue of being incarcerated and controlled) and his characterologically angry way of dealing with the frustration he experiences at not getting what he wants.

   b. Issues of Autonomy (Independence) - Mr. Battista's unusually strong preoccupation with autonomy at this time reflects his despair at not receiving the type of help he believes is indicated, his stage of psychosexual development, and his fear of close interpersonal relations. Some of this fear is based on his anticipation of how some inmates will react to him in a female role, realistic caution in the prison, and previous negative experience as a child and an adult. In other words, he distances himself and insists on his autonomy because he feels rebuffed, is realistically cautious, and is vulnerable to be coming overwhelmed and hurt and/or hurtful in close interpersonal relationships.

   c. Social Functioning and Dynamics - He is quite sensitive to rejection and criticism; he frequently attributes malevolent intent to benign situations (a tendency which is potentiated by the frequently aggressively challenging nature of prison life). His interpersonal relationships are generally poor and based on dissimulation and subterfuge (some of which is adaptive for the average inmate). His interpersonal failures are due in part to the open expression of hostility and anger. Having said this, it is important to note that Mr. Battista has both a need for and an interest in achieving closeness with others. He tends to be conservative (i.e., slow to approach others, rather than conventional in his presentation of self) and cautious about tactile exchanges. This reflects both the nature of

Battista, S.J.                    12                    5-8/97

his likely contacts and the prison milieu, as well as his
past exposure to physical trauma. He is quite concerned
with personal space, as well as extremely cautious about
building and maintaining close emotional ties with others.
His interest is unlike that of your average adult; and,
therefore most of his contacts tend to be rather
superficial to date. Due to his underlying insecurity about
his personal integrity, he tends to be overly authoritarian
and argumentative when interpersonal situations pose
challenges to his sense of self (this personality trait is
augmented by social learning with his inmate peers and the
paramilitary subculture of prison milieus). He hopes for,
but does not expect routine positive interactions with
others.

d. Social Skills - Extremely limited. He tends to remain on
   the periphery of group interactions and spends much time in
   segregation.

e. Social Learning Style, Manipulation, and Secondary Gain -
   Mr. Battista is adaptive and a student, in his way, of
   social interaction. Paradoxically, in many ways (except for
   his continuing belief that 12+ year old girls are old
   enough to make sexual decisions for themselves) he has
   learned to eschew antisocial traits. He dislikes
   aggression and narcissistic/instrumental misuse of other
   people. He is quite sex role oriented and relies on the
   power of social roles to achieve through a superficial
   identification (e.g., tatoos camouflage his crime and help
   his association with tough and predatory inmates; becoming
   a woman will eliminate the need for aggressive assertion
   and provide him with the positive attention and support he
   craves), what he is unable to achieve through a less
   extreme and more mutual give and take with others. Mr.
   Battista manipulates to preserve his integrity, achieve
   gratification in the prison milieu, and regulate
   interpersonal closeness. He is aware of the secondary gain
   which might accrue to his behavior and choices, but the
   anticipated social gain is not the primary motivation for
   his behavior.

f. Sexual Feelings and Behaviors - Repressed, denied,
   misdirected, at times unconsciously fused with aggression,
   and immature (see other portions of this section for more
   information about the genesis and expression of his
   sexuality).

**Results of Sexual Functioning Assessments:** Responses on the LIE
index of the MASA and the qualitative analysis of the Wilson Sex
Fantasy Questionnaire acknowledged responses in the "safe range"
and therefore it is concluded that these instruments showed
evidence of a mildly defensive response set.

Battista, S.J.                    13                    5-8/97

MASA Inventory - Booklet 5: CHM of 15 (acknowledges a significant
level of interest in children); CMSadism of 0 (does not
acknowledge any sadism towards children); SIN of 27 (is in the
moderately high range and indicates feelings of sexual
inadequacy); EAG of 11 (low, but 3 items are noteworthy). The
noteworthy items concern past frequent thoughts about
threatening or frightening females, feeling angered by
females, and agreeing that in the past he has sometimes become
aggressive because he has been mistreated by a female. All
these results show convergent validity with similar traits
revealed in other parts of the assessment process. NOTE: This
inventory assesses behavior prevalent at the time of his crime
(14.5 years prior to this assessment).

Wilson Sex Fantasy Questionnaire - Qualitative analysis is
generally uninformative.

Psychopathic Traits: An evaluation of Mr. Battista's interview
results and records for traits associated with psychopathy (based
on the Hare PCL-R) yielded the following: A need for unusual
stimulation (preconscious and based on impact of feminine dress on
self image and reaction of others to him); some attempt to
manipulate (e.g., special sex reassignment surgery and adjunctive
treatments); lacks a sense of guilt or remorse around behavior
associated with his deviant beliefs (e.g., "dating", petting and
fondling much younger adolescent females is OK because "12 should
be the age of consent"); has limited history of stable self-
support; poor behavioral controls; coercive sexual behavior (e.g.,
his crimes); lack of realistic long-term goals (e.g., unrealistic
focus and role of sex surgery in his life plans, refusal to
participate in programs); juvenile delinquency; some criminal
versatility. Analysis of the number and strength of these traits as
an aggregate indicate that: Mr. Battista is in the 9th percentile
rank of prison inmates on his total score, the 5.4 percentile rank
on Factor 1 (selfish, callous, and remorseless use of others), and
the 33.6 percentile rank on Factor 2 (chronically unstable,
antisocial, and socially deviant lifestyle). These scores show that
the inmate is well below the diagnostic cutoff for psychopathy.

Diagnostic Summary and Recommendations:

Axis I: 302.6 Gender Identity Disorder NOS
        311.00 Depressive Disorder NOS
        R/O 294.9 Cognitive Disorder NOS
        R/O 302.3 Transvestic Fetishism with Gender Dysphoria
        R/O 302.2 Pedophilia (attracted to females)
        R/O 300.7 Body Dysmorphic Disorder
        307.50 Eating Disorder NOS
        305.20 Cannabis Abuse - in remission in a controlled
               environment
        305.00 Alcohol Abuse - in remission in a controlled
               environment

Battista, S.J.                    14                    5-8/97

Axis II: 301.7 Antisocial Personality Disorder
         301.83 Borderline Personality Disorder
              * with Avoidant, Passive-Aggressive (Negativistic), and
                Schizotypal Traits

Axis III: Congenital Adrenal Hyperplasia (CAH)
          (a concurrent congenital physical intersex condition)

Axis IV: Problems with primary support group, with the social
         environment, and with housing.

Axis V: 42

Recommendations:

1. Although not currently suicidal, Mr. Battista should be
considered a vulnerable individual by virtue of his clinical
history and testing results, and treated accordingly. On the MCMI-
III, he endorsed an item saying that he had tried to commit suicide
in the past, but provided no elaboration in the interviews.

2. A penile plethismograph would be useful in assessing Mr.
Battista's sexual arousal and establishing reliably and validly the
presence and nature of his arousal to sadistic themes or deviant
arousal to children in comparison with normative arousal to
appropriate adult stimuli. Statements could then be made with
respect to his potential to act on such impulses, which in turn
have implications for differential diagnosis and treatment. Given
his charges and his current attitude regarding the age of consent
for female children, he should be encouraged to take sex offender
treatment.

3. With focus and extra effort devoted to strengthening the
therapeutic alliance, therapeutic efficacy could proceed beyond
maintaining adjustment and avoiding self-destructive acting out,
toward meaningful characterological change. A high tolerance for
dealing with hostility, as well as skill in dealing with splitting
and negative transference, is critical to successful therapy with
Mr. Battista.

4. A psychopharmacological consult is warranted due to the presence
of significant depression and the recent increased frequency of
suicidal ideation.

J. Tyler Carpenter, Ph.D., ABPP
Consulting Staff Psychologist
Correctional Medical Services

10|4|97
Date of the Report



Victoria Russell, M.D.

To:    Kathleen Dennehy, Associate Commissioner, DOC
From:  Victoria Russell, M.D., Consultant in Psychiatry
Date:  17 March 1997
Re:    Sandy-Jo Battista/David Megarry        W39562

The above-named 35 year old Inmate has been incarcerated since 1986, eleven years ago; and apparently will be serving for another five years, until 2002. Because it is relevant for further discussion, the reason for his incarceration involved a violent assault on a young girl. In December of 1996, three months ago, without any previous discussion with caregivers, either in mental or physical health, the Inmate changed his name to that of a female, and notified staff of his wish to undergo a sex change operation. He later modified his request to being able to take female hormones and wear women's underwear. Although his requests were turned down, it is worthwhile to examine this Inmate's background in some detail in order to gain some insight into his recent behavior.

Medical Background:

The reason the Inmate needs cortisone on a daily basis is due to his unusual medical condition called Congenital Adrenal Hyperplasia (CAH), a disorder of cortisol metabolism caused by enzyme deficiencies within the adrenal gland. Medical notes within his file seem to indicate one or another of the known types of enzyme deficiencies, but in fact there is no actual documentation of what specific type of enzyme deficiency this Inmate has. This is highly relevant because people with some forms of CAH are actually girls (chromosomal structure XX) but are born with the appearance of being boys (chromosome structure XY) with somewhat malformed genitalia. A review of his medical file reveals that he apparently was a normally formed little boy who underwent precocious puberty starting at 18 months of age. This quickly led to the diagnosis of CAH; and proper treatment with cortisol stopped the precocious puberty. Apparently, secondary sexual characteristics then reappeared normally during the Inmate's adolescence. The Inmate has written for medical records from University Hospital where the diagnosis of CAH was originally made, but this information does not seem to be in his medical file.

Psychiatric Background:

Tragically for the Inmate, undergoing precocious puberty meant that he was treated as a freak. It also meant that he was separated from his family of origin because they could not pay for his

ATTACHMENT  4

( 2 )

diagnosis and treatment. He was locked in closets, taunted, abused. When he was 4, his mother died. There is no possible way for this individual to have felt comfortable with his sexual apparatus as a result of this brutality.

The Inmate's later psychosocial adaptation was poor and he was identified early on as a sexual predator. He spent three years of his adolescence in a State Hospital because of sexual assaults on a girl, then soon after his release repeated his offence which resulted in his present incarceration. He was not cooperative with treatment interventions when he was an adolescent. He has not been interested in treatment for his criminal sexual behavior during this incarceration. This Inmate's behavior indicates sexual dangerousness of very long standing.

Taken in the context of his past experience and behavior, this Inmate's name change and requests for a sex change are bizarre at best, and psychotic at worst. As previously discussed, when dealing with highly charged emotional issues such as sexual preference and behaviors, it is most important to stick to diagnostic facts and not be swayed by semi legalistic arguments for mutilating surgery or abnormal hormonal interventions. The facts are that this Inmate is dangerous to females. He has suddenly decided that he "always" wanted to be female, despite his history of hurting females. It takes no experience in any mental health field to realize this does not make sense. No reasonably experienced therapist would consider recommending an individual with this history for a sex change operation without extensive testing and therapy. The Inmate has had neither. On my opinion, this Inmate would never be a reasonable candidate for sex-change surgery.

Nonetheless, the Inmate has made his request. Although his request for surgery should of course be denied, several things can be done which might help with management:

1. Medical records should be obtained and this Inmate's Karyotype should be assured (XX or XY). Enzyme studies from the 1979 UH admission should be located to find out the exact nature of his original adrenal hormone/enzyme deficiency.

2. His current adrenal status should be identified. This syndrome is unusual, and there are cases where certain deficiencies can be life-threatening. Appropriate blood tests should be done. The Inmate should be evaluated by an Endocrinologist who specializes in the Adrenal Gland, NOT a urologist.

3. This Inmate certainly is mentally disturbed, although the Axis I diagnosis is probably not simply a Transgender Issue. What will help with any psychological discussion with this Inmate is adequate diagnosis. Therefore, he should have extensive diagnostic testing including MMPI and any projective testing which would reveal conflicts around sexuality.

4. If the Inmate complies, he should be offered therapy to explore his obvious ambivalence regarding his own sexual appearance, behavior and physical characteristics. However, it is essential to understand that his conflicts are virtually life-long, and therefore not likely to be amenable to treatment