UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDY J. BATTISTA,
    Plaintiff,

vs.

KATHLEEN M. DENNEHY, Comm'r., et al.,
    Defendant's.

)
)
)
)
)
)
)
)

C.A.No.05-11456-DPW.

PLAINTIFF'S REPLY TO OPPOSITION OF DEFENDANTS
KATHLEEN M. DENNEHY, ROBERT MURPHY, SUSAN MARTIN,
STEVEN FAIRLY AND GREGORY HUGHES TO PLAINTIFF'S REQUEST
FOR A PRELIMINARY INJUNCTION

Plaintiff, Sandy J. Battista("Battista"), acting pro-se in
the above captioned matter, hereby briefly responds [1] to the Opp-
osition of Defendants Kathleen M. Dennehy, Robert Murphy, Susan
Martin, Steven Fairly and Gregory Hughes(collectively "Defendants"),
to her pending Application for a TRO, and/or in the Alternative,
for a Preliminary Injunction.

In their Opposition, Defendants attempt to avoid the contro-
lling authority of the Supreme Court case in Estelle vs. Gamble, [2]
by arguing that: (1) Battista's current action is barred under the
Doctrine of Res Judicata; (2) the "gravament" of Battista's Comp-
laint amounts to a "dispute over the proper course of treatment,"
and therefore, cannot prevail on the likelihood of her claims; and

---

[1] A Motion Requesting this Court's leave to file the within REPLY
was timely filed with this Court on July 27, 2005.
[2] 429 U.S. 97 (1976).

-4-

App.Ct. 153, 163 ('1979)(citations omitted).

In the most recent decision of the Massachusetts Appeals Court, Justice Spina sets for the requirements in Massachusetts for Res Judicata:

> The term "res judicata" includes both claim pre-clusion and issue preclusion. Heacock vs. Heacock, 402 Mass. 211, 23 n.2 (1988). "The doctrine of claim preclusion makes valid, final judgments conclusive on the parties and their privies, and bars further litigation of all matters that were or should have been adjudicated in the action....The doctrine is a ramification of the policy considerations that underlie the rule against splitting a cause of action, and is 'based on the idea that the party to be precluded has had the incentive and opport-unity to litigate the matter fully in the first action.'" Id at 23-24(citation omitted.
>
> The doctrine of issue preclusion "prevents reliti-igation of an issue determined in an earlier action where the same issue arises in a later action, based on a different claim, between the same parties or their privies." Id. at 23 n.2. It requires proof that "(1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom estoppel is asserted was a party ( or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication is identical to the issue in the current adjudication. Additionally, the issue decided in the prior ad-judication must have been essential to the earlier judgment." Commissioner of the Dept. of Employ-ment and Training vs. Dugan, 428 Mass. 138, 142 (1988)(citation omitted). Issue preclusion can be used only to prevent relitigation of issues act-ually litigated in the prior action, Fidelity Mgmt. & Research Co. vs. Ostrander, 40 Mass.App.Ct. 195, 199 (1996), and thus we look to the record to see what was actually litigated. See Gleason vs. Hard-ware Mut. Co., 324 Mass. 695, 699 (1949). As the defendant's in this case are the parties asserting both claim and issue preclusion, they bear the burden of proof on the elements. See Fabrizio vs. U.S. Susuki Motor Corp., 362 Mass. 873, 873-74 (1974); McSorley vs. Hancock, 11 Mass. App.Ct. 563, 565 (1981).

---

1241 (11th Cir, 1988).

-5-

Sarvis vs. Boston Safe and Trust Co., 47 Mass.App.Ct. 86,
98-99 (1999).

Applying the above principles to the record at hand, re-
veals the weakness of the Defendants argument. Here, it is con-
ceded that the decision in Battista's prior state court action,
Battista vs. Commonwealth & others, No.97-03487-A(Suffolk Super-
ior Court)(1998) 6/, resulted in (a) a final judgment on the
merits; and (b) was by a court of competent jurisdiction. And
in a similar action filed with this court, Battista vs. Murphy,
Superintendent, et al., No.02-CV-10137-MEL 7/, on November 4,
2002, this Court (Lasker, J.) entered a MEMORANDUM AND ORDER
granting the defendants' motion to dismiss pursuant to the doct-
rine of res judicata. However, Battista vigorously disputes that
her current claims involve (c) the same cause of action; and (d)
the same parties or their privies, for the following reasons:

---

[6] In 1997, while incarcerated, Battista filed an action pro-se with
the Suffolk County Superior Court, alleging that the defendants', var-
ious Department of Correction Officials, Administrators, and Health
Services Personnel, were being "deliberately indifferent" to her (then)
[self-diagnosed] gender disorder by refusing to provide her with female
hormones, sex reassignment surgery, as well as the right to wear female
clothing. The Court (Burnes, J.) in treating defendants' motion as one
for summary judgment, held in relevant part that, "In consideration, the
Court has found that it is Battista who has diagnosed herself as a trans-
sexual. She has failed to proffer reliable evidence, such as a medical
diagnosis rendered by a physician, confirming her assertion....Thus, the
Court seriously doubts whether Battista will be able to put forth any
evidence of a 'serious medical need' at trial." Id. at page-11(attached
herewith and marked as Attachment-1 for this courts convenience).

[7] Complaint, ¶¶16-18 & Exhibit-2.

-6-

First, unlike the facts in Battista's prior state court action,
here, in accordance with this courts recent decision in Kosilek
vs. Maloney, 8/ Defendants arranged for Battista to be seen by
two independently retained gender experts for the specific pur-
poses of an evaluation and diagnosis as to Battista's proclaimed
gender issues, as well as an appropriate treatment plan to address
such gender issues. 9/ The examiners, in their report diagnosed
Battista as meeting all of the clinical criteria for "Gender Id-
entity Disorder(NOS)," and recommended that she be provided female
hormones and individual counseling by either an experience person
or person trained to counsel persons with gender issues, to supp-
ort the adjustment the hormones will bring. 10/ Subsequently, in
accordance with those treatment recommendations, Defendants then
arranged for Battista to be seen by an outside specialist in end-
ocrinology for a battery of medical test and the development of
an appropriate medical prescription to address hormonal administ-
ration, as well as instructed the Treatment Center's in-house med-
ical physician to fill said prescription. 11/ These facts clearly
indicate that Battista's current claims, though at first glance
may involve her gender issues, may involve an "operative nucleus

---

[8] 221 F.Supp.2d 156 (D.Mass. 2002).

[9] Complaint, ¶34.

[10] Complaint, ¶35.

[11] Complaint, ¶¶36-38.

-7-

of fact" different from the facts in her prior state and federal
court actions. <u>Thomas,</u> 880 F.2d at 1240-41. Additionally, prag-
matically speaking, the facts involved in Battista's current
claims are distinct and unrelated in time, space, origin, and in
motivation. <u>Murphy,</u> 877 F.2d at 685. <u>12/</u>

Finally, simply because the Department of Correction retains
jurisdiction over the states prison, as well as the Treatment
Center, does not by itself, enable the Defendants to invoke the
claim preclusive effect of judgments in actions to which the DOC's
**employees were parties in.** See generally, 18 Wright, Miller &
Cooper, Federal Practice and Procedure, §4460 at 533-36 (1981);
see also <u>Roche vs. Roche,</u> 22 Mass.App.Ct. 306, 493 N.E.2d 523,
525 (1986)("Since [defendant] played no role directly or vicar-
iously in the [prior litigation], we are of the opinion that he
is not entitled to claim a benefit from the judgment in that
case"). Defendants have, moreover, made no conclusive showing
that the defendant's in Battista's prior state court action were
representing **their** interest, nor have they shown that as a matter
of law, Battista's current claims under G.L. c.123A, are in all
instances derivative of the claims raised in her prior state

---

[12] The record at issue also indicates that, upon filing her prior
state and federal actions, a determination as to Battista's (then)
alleged "sexual dangerousness" under G.L.c.123A, had yet to be adjud-
icated. As such, this court should infer from that basis a separate
claim under c.123A. Where "formal barriers" to asserting a claim existed
in the first forum it would be "unfair to preclude [the plaintiff] from
a second action in which he can present those phases of the claim which
he was disabled from presenting in the first." <u>Davidson vs. Capuane,</u> 792
F.2d 275, 278 (2nd Cir.1986)(citing Restatement (Second) of Judgments
§26(1)(c) comment c (1982)). See <u>Burges vs. Hopkins,</u> 14 F.3d 787, 790
(2nd Cir. 1994)(the bar does not apply where "the initial forum did not
have the power to award the full measure of relief sought in the later action").

-8-

court action. Thus, on the present record, Defendants are un-
able to claim the benefit of the judgment in Battista's prior
state court action. See Hermes Automation Technology vs. Hyundai
Elec. Ind., 915 F.2d 739, 751 (1st Cir. 1990)(citing Roche, 493
N.E.2d at 525)). Since claim preclusion is grounded upon consid-
erations of fairness and efficient judicial administration, the
doctrine is not applied rigidly where such interests would not
be served. Gloucester Marine Railways Corp. vs. Parsi, Inc., 36
Mass.App.Ct. 386, 391-92 (1994). See Restatement (Second) of
Judgments §28(2)(b)("a new determination is warranted in order to
make account of an intervening change in the applicable legal con-
text or otherwise to avoid inequitable administration of laws").
Therefore, the question of what treatment Defendants are constit-
utionally and statutorily are obligated to provide Battista with,
in the context of G.L. c.123A, was not **heard** or decided in Batt-
ista's state court action, nor could it of had been raised. And
thus, there has been no judgment on the merits, with regards to
Battista's constitutional and statutory claims under G.L. c.123A.
Res judicata therefore does not apply.

    II. In REPLY to Defendants Contention That the "Gravamen"
       of Battista's Complaint Amounts to a Dispute Over the
       Proper Course of Treatment. And Therefore, Cannot Pre-
       vail on the Likelihood of Her Claims.

    Here, Defendants attempt to categorize Battista's current
claims as one amounting to a "dispute over the proper course of
treatment," is not only "arbitrary," but is also without "found-
ation in fact and law." For example, in support of it's argument,
Defendants have attached along with the Affidavit of a Lawrence
M. Weiner("Weiner Aff."), a Licensed Clinical Social Worker and

-9-

Regional Administrator with the Department of Corrections Health Services Division, 13/ the (1) report of a Dr. Ronald Ebert(Attachment 1 to Weiner Aff.); (2) an Intake Assessment Report conducted by a David Campopiano(Attachment 2 to Weiner Aff.); (3) Psychological Assessment Report of a Dr. J. Tyler Carpenter(Attachment 3 to Weiner Aff.); and (4) Psychological Assessment of Battista's (then) medical records by a Dr. Victoria Russell(Attachment 4 to Weiner Aff.). Which, according to Defendants position, constitutes the legal basis pertaining to "conflicting opinions over the proper course of treatment," with regards to Battista's gender issues. To the contrary, the "opinions" the Defendants rely upon are nothing more than reports from medical professionals who lack any formal training, education, or experience in evaluating or treating persons with gender issues, nor have Defendants provided this court with any evidence to the contrary. Therefore, these "reports" cannot form the legal basis for the Defendants position. See, e.g., Kosilek, 221 F.Supp.2d at 193.

In Kosilek, this Court (Wolf, J.), in ruling in a factually similar situation, held that:

> ,..."[d]ecisions as to whether psychotherapy,
> hormones, and/or sex reassignment surgery are
> necessary to treat Kosilek adequately must be
> based on an 'individualized medical evaluation'
> of Kosilek rather than as 'a result of a blanket
> rule.' Those decisions must be made by qualified
> professionals. Such professionals must exercise
> sound medical judgment, based upon prudent pro-
> fessional standards particularly the Standards
> of Care." 14/

---

[13] Here, Battista request that the court take judicial notice of the fact that, Defendants have a history of procuring affidavits from employees of it's Health Services Divisions, then failing to honor those declarations. See, e.g., Complaint, ¶17 & Exhibit-1.

-10-

Id. Moreover, Defendants seem to be "selectively choosing" what documents and information to bring to the court's attention. Though ignore the fact and fail to mention that, in November of 2004 upon receiving the Fenway Clinic's clinical diagnosis and treatment recommendations, concerning Battista's gender issues (Attachment 2), not only was reviewed and approved by the Treatment Center's whole medical and mental health personnel(Attachment 3), but Defendants themselves made arrangements to put those treatment recommendations into effect, by arranging for the development of an appropriate medical prescription to address hormonal therapy, as well as arranging for one of the Treatment Center's mental health clinician's to be trained by the Fenway Clinic to provide Battista with individualized counseling. (Attachment 4). This is a far cry from the Defendants position that Battista's current claims amount to "a dispute over the proper course of treatment." Here, if in fact a "dispute" does exist, it is with the Defendants and this court's prior decision in Kosilek. (See, e.g., Attachment 5). These undisputed facts,[15]/ clearly constitutes

_____

[14] Here, it is noted that, for some unknown reason Defendants have interpreted Battista's current claims as one also pertaining to both ⌈surgical castration and sex reassignment surgery⌉. However, no where in Battista's pleadings has she made reference to such. Moreover, Battista has not been evaluated or recommended for such medical procedures. Nevertheless, the ⌈Standards of Care⌉ explain that: "hormone therapy alone may provide sufficient symptomatic relief to obviate the need for cross-living or surgery." Kosilek, 221 F.Supp.2d at 194-95.

[15] It is noted here that, Defendants own pleadings adhere to these facts. See Weiner Aff. at ¶5("On April 12, 2005, Battista was evaluated by an endocrinologist at the Shattuck Hospital who prescribed hormones for Battista. On April 14, 2005, a Treatment Center physician approved the prescription for female hormones")(emphasis in original).

-11-

Battista's position of "an arbitrary interference with treatment once prescribed" by administrative officials. See Estelle, 429 U.S. at 105(noting that "intentionally interfering with the treatment once prescribed" is a form of unlawful deliberate indifference).

Additionally, relying on this court's decision in Cameron vs. Tomes, 16/ Defendants maintain that "the same result is reached under a substantive due process analysis under the Fourteenth Amendment." This argument, like the above, has obvious shortcomings. First, Defendants reliance on Cameron is misplaced. The decision in Cameron was very narrow in scope, the court stating that it "preferred to plow a furrow no wider than the case demanded." Id. at 19. The court noted that Cameron's claims were not really "right to treatment" claims, but rather claims regarding standards for the treatment he was already receiving. Id.

The court in Cameron, in dicta, cited Youngberg vs. Romeo, 457 U.S. 307 (1982), as the only guidance available from the Supreme Court on a constitutional right to treatment, and asserted that Youngberg had held that there was a constitutional entitlement only to freedom "from any but necessary restraints" and to "basic self-care training to secure safety and mobility." Id. at 18. The Cameron court did not note that, because of his severe retardation, the respondent was seeking basic self-care training as his only treatment. Youngberg, 457 U.S. at 317-19. Indeed, the Supreme Court in Youngberg concluded that due process required the state to provide the "minimally adequate or reasonable" treatment sought by the respondent. Id. at 319. Thus, while the Supreme

_____

[16] 990 F.2d 14 (1st Cir. 1993).

-12-

Court has not articulated any "broad constitutional 'right to treatment,'" Cameron, 990 F.2d at 18, it has been recognized that, persons like Battista who have been civilly-committed, are guaranteed greater protection than those required by the constit-utionl minima. See Langton vs. Johnston, 928 F.2d 1206, 1207 (1st Cir.1991). See Martel vs. Fridovich, 14 F.3d 1, 3 (1st Cir. 1993)(citing Langton);see also King vs. Greenblatt, 53 F.Supp.2d 117, 138 n.44 (1st Cir.1999)(citing to cases under G.L. c.123A).

In the case at hand, Defendants have simply provided no evidence whatsoever. Not even so much as an attempt to dispute the facts that, aside from Battista's original commitment being based in part around her gender issues, 17/ Defendants own prior and current treatment providers, contracted to provide sex off-ender specific services, have in numerous reports made Battista's gender issues "a necessary component of her sex offender treat-ment." 18/ See, e.g., Cameron vs. Tomes, 783 F.Supp. 1511, 1522 (D.Mass.1992)(,..."Dr. Jurgela have stated that anger management is a necessary component of Cameron's treatment plan")(citing Clark vs. Cohen, 613 F.Supp. 684, 704 (E.D.Pa.1985)(holding that

---

[17] Complaint, ¶¶19-25.

[18] Complaint, ¶¶28 & 30. Here, contrary to Defendants implication, Cognitive Behavioral Modification Therapy, the clinical methodology employed by Defendants prior and current treatment providers, encom-passes several components. To which "gender identity treatment" is in-cluded. See generally, Rehabilitation & Treatment Program for the Mass-achusetts Treatment Center. Justice Resource Institute Data Sheet(Att-achment 6). Note sections pertaining to PSYCHOLOGICAL SERVICES("A29 gender identity counseling"); and MEDICAL SERVICES("E6 evaluation for sex hormone treatment"). Moreover, in a recent Annual Review of Battista's treatment progress, in preparation for the court's review of her "current" sexual dangerousness under G.L. c.123A, §9, Defendants current treatment providers, have also determined her gender issues to be both "necessary" as well as "therapeutic." (Attachment 7). Note page-2(2004-2005 Community

-13-

to be entitled to deference the treatment "decision has to be based on medical or psychological criteria and not on exigency, administrative convenience, or other non-medical criteria"), aff'd 794 F.2d 79 (3d Cir.1986)). It is beyond "conscience shocking," and inconceivable to even entertain the notion of detaining a person for treatment and rehabilitation, then arbitrarily withhold treatment once prescribed. See, e.g., Ceamer vs. Fauver, 288 F.3d 532, 546-47 (3d Cir.2002).

III. In REPLY to Defendants Contention that Battista's Treatment Has Not Been Implemented "Because the Department of Correction's Health Services Division Has Raised Concerns Regarding the Competence of the Fenway Community Health Clinic's Evaluation of Battista"

Here, Defendants argue that, Battista's treatment has not been implemented because "the Department of Correction's Health Services Division has raised concerns regarding the competence of the Fenway Community Health Clinic's evaluation of Battista." Defendants seem to have based these concerns, in part, on an alleged "medical peer review" conducted by a Cynthia Osborne of the Fenway Clinic's evaluation of another prisoner 19/ who was evaluated and approved(recommended) for ⌐sex reassignment surgery⌐. (Weiner Aff., at ¶6). And based upon the findings in that peer review, have decided to conduct similar peer reviews of not only

---

Access Board Goal Recommendations); page-3(Other Therapeutic Activities); page-5(Status); and page-8(Clinical Formulation).

[19] Here, Battista speculates that the ⌐other inmate⌐ referred to in Cefendants pleadings, recently evaluated and recommended for sex reassignment surgery by the Fenway Clinic, is the plaintiff in the Kosilek decision, supra.

-14-

Battista's evaluation, [but all] inmates previously evaluated by the Fenway Clinic. (Weiner Aff., ¶6). Talk about "ethics," one should question the ethics of a proclaimed expert that would even consider questioning the competence of three of her peers, simply based on the above, as well as reports that are stale and well over five years old.

With all respect to the court, Battista prays that the court is not "blind" here to the Defendants agenda. Because it is quite obvious to this Plaintiff that Defendants went out "doctor shopping" to "purchase an opinion" to go along with it's argument.[20] For example, the alleged "peer review" being conducted by Defendants recently retained expert, Cynthia Osborne, is anything but a "medical peer review" for several reasons. First, the statute pertaining to [medical peer reviews], [21] G.L. c.111, §1, does not apply to medical services provided by the Department of Correction, as the Department of Correction is <u>not</u> a licensed hospital. Second, Defendants are <u>not</u> required by law to establish a "medical

---

[20] It is this very type of behavior why a prominent Boston Psychiatrist, L. Vernon Briggs, who, in 1921, was impelled to draft and sponsor the legislation, what was originally referred to as "The Briggs Law," because of what he characterized as the "almost inconceivable futile, cruel and wasteful" methods employed at the time to determine the mental responsibility of a defendant. Dr. Briggs felt that "purchased opinions" were giving the profession of psychiatry a bad reputation and that "battles of experts so confused the jury and the court that medical evidence was disregarded." See Flowers, The Psychiatric Examination of Offenders in Massachusetts, in Hoch Zubin, Psychiatry and the Law 97, 101 (1955).

[21] The objective of a "medical peer review" is rigorous and candid evaluation of a professionals performance by a providers peers. See <u>Beth Israel Hosp. Assn. vs. Bd. of Reg. in Med.</u>, 401 Mass. 172, 182-83 (1987); see also <u>Fowles vs. Lingos</u>, 30 Mass.App.Ct. 435, 441 & n.8 (1991).

-15-

peer review committee." 22/ The purpose of a medical peer review
committee is _not_ to recommend treatment for patients, but is to
evaluate the services provided and determine if the health care
providers should be disciplined. See Swatch vs. Treat, 41 Mass.-
App.Ct. 559, 563 (1996)(quoting Beth Israel Hosp. Assn., 401
Mass. at 182-83)). Here, Defendants have not provided this court
with any evidence that the Fenway Clinic was treating Battista.
And therefore, cannot substantiate it's position that Battista's
evaluation by the Fenway Clinic is undergoing "peer review." How-
ever, to the extent that Defendants attempt to question the com-
petence of the Fenway Clinic's evaluations, there exist a proper
mechanism for making such complaints. 23/ See, also, e.g., Swatch,
41 Mass.App.Ct. at 560.

Finally, an administrative agency's decision must be supported
by substantial evidence, defined as "such evidence as a reasonable
mind might accept as adequate to support a conclusion." Pyfrom
vs. Commissioner of Public Welfare, 39 Mass.App.Ct. 621 624 (1996)
(quoting G.L. c.30, §1)). "In order to determine if an agency's
decision is supported by substantial evidence, one must examine
the entire administrative record and take into account whatever

---

[22] A "medical peer review committee" is defined in part, as a "committee
of a state or local professional society of health care providers...which
...has as its function the evaluation or improvement of the quality of
health care rendered by providers of health care services, the determin-
ation whether health care services were performed in compliance with app-
licable standards of care...." G.L. c.111, §1, as appearing in St.1987,
c.579, §1.

[23] The procedures for lodging such complaints in Massachusetts can be
seen at: http://www.state.ma.us/reg/boards/py/cmr/?5101.htm or at:
www.state.ma.us/ethics.

-16-

detracts from its weight." Id. at 624-25, citing New Boston
Garden Corp. vs. Assessors of Boston, 383 Mass. 456, 466, (1981).
If the evidence points to an overwhelming probability to the
contrary, the agency's decision may be set aside. Pyfrom, 39
Mass.App.Ct. at 625, quoting New Boston Garden Corp., 383 Mass.
at 466. Therefore, Battista has established the likelihood of
success on the merits of her claim that the Defendants, administ-
rative officials, are unlawfully interfering with her [prescribed
treatment].


Dated: 8/5/05 .          Respectfully submitted,

                         _____
                         Sandy J. Battista, #M-15930
                         Plaintiff/Pro-se
                         Mass. Treatment Center
                         30 Administration Rd.
                         Bridgewater, Mass. 02324-3230


CERTIFICATE OF SERVICE

    I, Sandy J. Battista, plaintiff, acting pro-se in the enclosed
matter, on oath, hereby certify's that I have today mailed a true
and accurate copy of the within documents on each counsel of record
for the Defendants, separately, via first class mail postage prepaid,
by hand/mail.



Dated: 8/5/05 .          _____
                         Sandy J. Battista, #M-15930
                         Plaintiff/Pro-se



ATTACHMENT 1



COMMONWEALTH OF MASSACHUSETTS

4/2

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 97-3487A

SANDY-JO BATTISTA

4 1998

vs.

COMMONWEALTH OF MASSACHUSETTS & others[1]

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Before this Court is the defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment.[2] The pro se plaintiff, Sandy-Jo Battista ("Battista"), an inmate in the custody of the Massachusetts Department of Correction (the "Department"), alleges violations of the United States and Massachusetts Constitutions, as well as violations of 42 U.S.C. § 1983 and § 1988, the Massachusetts Civil Rights Act, and other state laws.[3] The foregoing causes of action arise from what

---

[1]Larry DuBois, Paul L. DiPaolo, Kathleen M. Dennehy, Maureen Banks, Lorene Melvin, Dr. Arthur Brewer and Correctional Medical Services. Dr. Victoria Russell was released from this action on December 8, 1997 due to improper service. Dr. Russell's Motion for Separate and Final Judgment was granted on January 1, 1998. The defendants in this footnote are sued in their official and individual capacities.

[2]Throughout this opinion, the phrase "the defendants" refers only to those defendants who have filed this joint motion: The Commonwealth of Massachusetts, Larry DuBois, Paul L. DiPaolo and Kathleen M. Dennehy.

[3]Alleged violations of 42 U.S.C. § 1981, § 1985, § 1986, Article 12 of the Massachusetts Declaration of Rights, and common law negligence, medical malpractice and retaliatory punishment claims were voluntarily dismissed on December 8, 1997. Dismissal of the negligence claims includes claims asserted under the Massachusetts Tort Claims Act (G. L. c. 258, § 2 (1988 ed.)).

Battista claims was inadequate medical treatment for an alleged gender identity disorder and a vascular condition. In support of their motion, the defendants assert that Battista's claims lack merit because they are deficient with respect to various required elements. Moreover, the defendants, who are public officials, assert that even if the record contains enough evidence to defeat their motion, the defendants are immune from suit. This Court will resolve this matter applying summary judgment standards. For the reasons set forth below, the defendants' Motion for Summary Judgment is **ALLOWED**.

## I.  BACKGROUND

Because this Court treats the defendants' motion as one for summary judgment, the facts are gathered from Battista's verified complaint and the parties' affidavits and exhibits in support of their memoranda.

On February 28, 1983, Battista began serving a 12-20 year sentence for rape of a child under 16 and concurrent sentences for armed robbery and kidnaping at the Plymouth House of Correction. Battista was transferred to MCI-Norfolk, a prison in Norfolk County, Massachusetts, on October 4, 1995. Shortly thereafter, on November 20, 1995, the Norfolk Probate Court approved Battista's request to change his name from "David Edward Megarry, Jr." to "Sandy-Jo Battista."[4]

The Department maintains Health Services Units ("HSU") at its prisons to provide medical care to inmates. The HSU is

---

[4]To avoid confusion, the Court will refer to Battista using feminine pronouns.

staffed by privately employed medical personnel from Correctional
Medical Services ("CMS").  CMS is responsible for all aspects of
medical care provided at the prisons.

As early as October 24, 1995, shortly after his transfer to
MCI-Norfolk, Battista sought treatment for a gender identity
disorder, specifically known as transsexualism, from the prison's
mental health staff.  At that time, Battista did not appear to
suffer from any psychological difficulties.  He was told to
contact the prison mental health staff as necessary.

In December 1996, and again in January 1997, Battista
requested that he be evaluated as a transsexual and be provided
with treatment for the alleged disorder.  On approximately
January 3, 1997, Kathleen M. Dennehy ("Dennehy"), then the
Associate Commissioner for Classification, Programs and Health
Services, received a letter from Battista in which she asked
Dennehy to intervene because Battista had not been given the
treatment she requested.  Dennehy received a second letter on
approximately January 20, 1997 requesting a prison transfer to
one of several states which allegedly provided treatment for
transsexuals.  Battista further requested that she be provided
with hormone treatment and that she wanted to have her testicles
removed, but that she was not asking the department to fund a sex
change operation.  Battista sent several additional letters to
Dennehy over the succeeding weeks stating similar requests.

In response to the letters, on February 11, 1997, Dennehy
requested that the Department's senior psychiatric consultant,
Dr. Victoria Russell ("Russell"), conduct a peer review of

Battista's medical treatment at MCI-Norfolk.  Furthermore,
Dennehy requested that a psychiatrist review Battista's medical
records.  Russell completed her peer review of Battista's medical
records on March 17, 1997.  In her report, Russell suggested that
Battista be examined by an endocrinologist, that she undergo
psychological testing, and that she be offered counseling.
Dennehy shared Russell's evaluation with the medical director of
CMS.

Pursuant to Russell's suggestions, Battista was examined by
an endocrinologist, Dr. Maria R. Warth ("Warth"); at the Lemuel
Shattuck Hospital on April 15, 1997.  On the basis of the
examination, Dr. Warth recommended that Battista be evaluated by
a gender change counselor for her alleged transsexualism.
Battista had a follow-up visit with Warth on May 13, 1997.  Warth
again recommended that Battista receive counseling for her
alleged gender identity disorder.

On May 15, 1997, as a result of Russell's and Warth's
recommendations, the Director of Mental Health notified Battista
that she would be scheduled to undergo a battery of psychological
tests and that she would receive counseling on an ongoing basis.
In response, Battista stated that she would only accept
counseling if a specialist in gender identity issues provided or
supervised the treatment.  Battista also said that she would
refrain from talking with the prison's mental health staff
because they had recently placed her on suicide watch.  She
further threatened to castrate herself if her issues were
ignored.  Battista did, however, submit to a series of

psychological tests over a two week period between May 20, 1997 and June 17, 1997.

On June 18, 1997, medical, mental health and health services administration staff met for a case conference regarding Battista.  The purpose of the conference was to develop a comprehensive response to Battista's condition in light of her refusal to meet with the mental health staff.  At the conference, it was decided that a senior psychiatrist would consult with the mental health staff regarding Battista's treatment.  A treatment plan was developed by MCI-Norfolk's Director of Mental Health Services and presented to Battista on June 18, 1997.  Battista reiterated that she was not interested in receiving therapy from the prison's mental health staff.  Battista has since met with the mental health director twice: July 18, 1997 and July 22,1997. She has never been diagnosed by a medical professional as a transsexual.

In addition to the alleged gender identity disorder, Battista suffers from varicose veins.  She was diagnosed with the condition in 1993, while incarcerated at the Plymouth House of Correction.  She was examined by CMS doctors on multiple occasions.  During one visit, on January 27, 1993, Battista acknowledged that she did wear therapeutic stockings for a "few days but had no relief."  Battista was referred to the Lemuel Shattuck Hospital, and was told to go to the hospital's brace clinic to be fitted for a pair of calf high stockings.

On February 7, 1996, CMS ordered stockings for Battista.

5

She received one pair of stockings on April 17, 1996.  On April 26, 1996, Battista received two more pairs.  By December 18, 1996, the stockings issued to Battista were "worn out" and "lost through the institutional laundry."  On December 20, 1996, Melvin indicated to Battista that new stockings would be ordered and that a doctor would review her request to be treated at the Lemuel Shattuck Hospital.  To this point, Battista had not been measured to insure proper fit of the stockings. Melvin confirmed her actions in a memo to Battista dated January 2, 1997.  In accordance with her request, Battista was seen by a CMS doctor on January 7, 1997.  Melvin again, on January 14, 1997, advised Battista that stockings had been ordered for her.

On January 20, 1997, Battista requested she be seen at the Lemuel Shattuck Hospital's vascular/surgical clinic (the "Clinic").  She was seen by doctors from the Clinic on February 3, 1997.  During the visit, she was given a prescription for thigh-high stockings.  In a letter dated March 11, 1997, Battista acknowledged having one pair of properly fitted stockings.  In the letter she requested an additional pair.

On April 28, 1997, during another examination at the Clinic, Battista was measured for support stockings.  She was prescribed thigh-high support stockings to alleviate the discomfort associated with her vascular condition.  In addition, Battista was advised that surgery to correct the condition was not necessary.  In an undated letter Battista received between April 28, 1997 and May 1, 1997, medical personnel at the Clinic

acknowledged Battista's receipt of thigh-high stockings.

## II.  DISCUSSION

### A.  Standard for Summary Judgment.

This court grants summary judgment when there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass. R. Civ. P. 56(c).  A court will grant summary judgment to the party entitled to judgment as a matter of law where "there is no real dispute [concerning] the salient facts," or where the issues at hand involve questions of law.  Cassesso, 390 Mass. at 422.  The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue.  Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).  A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party's case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial.  Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).  Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Pederson, 404 Mass. at 17.  The nonmoving party cannot defeat

7

summary judgment by resting on his or her pleadings and mere assertions of disputed facts to defeat the motion.  LaLonde v. Eissner, 405 Mass. 207, 209 (1989).

B.  The Claims.

1.  42 U.S.C. § 1983.

Battista alleges that his civil rights were violated by the state and various other defendants.  Specifically, Battista brings Section 1983 claims for violations of the First, Eighth and Fourteenth Amendments of the United States Constitution. Battista seeks both monetary and equitable relief.

a.  Action against the Commonwealth of Massachusetts.

The United States Supreme Court, in Will v. Michigan Dept. of State Police, held unequivocally that a State is not a "person" subject to suit under Section 1983.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989).  Given the foregoing rule, the Commonwealth is entitled to judgment as a matter of law on all Section 1983 claims.

b.  Action against the defendants, other than the Commonwealth, in their official capacities.

1.  Monetary relief.

State officials acting in their official capacities are not "persons" subject to suit for monetary damages under Section 1983.  Will, 491 U.S. at 71.  Although "state officials literally are persons," a suit against a state officer in his or her

8

official capacity "is not a suit against the official but rather
is a suit against the official's office.  As such it is no
different from a suit against the State itself."  <u>Id</u>.  A person
cannot recover monetary damages against the state under Section
1983.  The defendants, other than the Commonwealth, insofar as
they are sued in their official capacities, are entitled to
judgment as a matter of law on Battista's claims for money
damages under Section 1983.

### 2.   Prospective equitable relief.

A state official in his or her official capacity, when sued
for prospective equitable relief, is a "person" under Section
1983 because "official-capacity actions for prospective relief
are not treated as actions against the State."  <u>Id</u>.  Defenses of
immunity available to state officials sued personally are not
available when they are sued in their official capacity.
<u>Kentucky</u> v. <u>Graham</u>, 473 U.S. 159, 167 (1985).

### a.   First Amendment rights.

Given the voluminous and ambiguous filings in this case,
this Court has been assigned the arduous task of discerning the
rights Battista is asserting.  In her opposition brief, she seems
to attempt to support the allegation that the defendants' refusal
to place her in a facility that treats transsexuals amounts to a
violation of the First Amendment.  That claim has no legal basis,
and is thus without merit.  Furthermore, there is no question

that a prison inmate does not have the constitutional right to
cross-dress as a woman, even in a "limited" manner.  See <u>Star</u> v.
<u>Gramley</u>, 815 F. Supp. 276, 278 (N.D. Ill. 1993).  Summary
judgment must be granted here.

### b.  Eighth Amendment rights.

"Deliberate indifference" to the "serious medical needs" of
a prisoner constitutes cruel and unusual punishment, in violation
of the Eighth Amendment.  <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. 97, 102-103
(1976).  "A prison official exhibits deliberate indifference when
the official actually 'knows of and disregards' a prisoner's
serious medical needs."  <u>Long</u> v. <u>Nix</u>, 86 F.3d 761, 765 (8th Cir.
1996), <u>quoting</u> <u>Farmer</u> v. <u>Brennan</u>, 511 U.S. 825, 837 (1994).  The
official must be aware of facts from which the inference could be
drawn that a substantial risk of serious harm exists, and he must
also draw the inference.  <u>Farmer</u>, 511 U.S. at 837.  Thus, the
failure to treat a medical condition does not constitute
punishment within the meaning of the Eighth Amendment unless
prison officials knew that the condition created a risk to the
inmate's health and then failed to act on that knowledge.  <u>Long</u>,
86 F.3d at 765.  Moreover, nothing in the Eighth Amendment
proscribes prison doctors from exercising their independent
medical judgment.  <u>Id</u>.  Prisoners do not have the right to a
particular type of treatment.  <u>Id</u>.  Prison officials do not
violate the Eighth Amendment when, in the exercise of their
professional judgment, they refuse to implement a prisoner's

10

requested course of treatment.  Id.

The Court has considered whether Battista suffers from transsexualism and whether transsexualism presents a "serious medical need."  In this consideration, the Court has found that it is Battista who has diagnosed herself as a transsexual.  She has failed to proffer reliable evidence, such as a medical diagnosis rendered by a physician, confirming her assertion.[5] In fact, the record reveals numerous instances in which Battista admits that she has not been officially diagnosed as a transsexual.  Self-diagnosis of a "medical problem" is a far cry from one in which treatment has been mandated by a physician. Thus, this Court seriously doubts whether Battista will be able to put forth any evidence of a "serious medical need" at trial. See Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1991) (a "serious medical need" is one which has been diagnosed by a physician as mandating treatment); Laaman v. Helgemoe, 437 F. Supp. 269 (D.C. N.H. 1977) ("serious medical need" is one which has been diagnosed by a physician or one which is so obvious that even a lay person would easily recognize the necessity for a doctor's attention).

Even assuming, however, that Battista is indeed a transsexual, and that transsexualism presents a "serious medical

---

[5]Note that even if Battista provided reliable evidence of her alleged condition, at least one court which previously held that transsexualism was a "serious medical need" has questioned that holding in light of the United States Supreme Court's decision in Farmer, 511 U.S. at 825, and subsequent cases.  See Long, 86 F.3d at 765 n.3.

11

need," summary judgment must still be granted. The record indicates that the defendants were aware of Battista's apparent psychological problems. The record, however, fails to show any "deliberate indifference" on the part of the defendants. In fact, the record is replete with uncontested evidence of the attempts of the prison medical staff to evaluate Battista's psychological problems and her refusal to cooperate.

In an attempt to defeat summary judgment, Battista directs this Court to an endocrine consultation report completed by Dr. Warth. In the report, Warth indicated that Battista should be "evaluated" by a "gender change counselor." In a report made approximately one month later, Warth again indicated that Battista should receive "counseling" for her "gender issues." Battista claims that because prison officials failed to comply with Warth's recommendation, the defendant's acted with "deliberate indifference." Those facts, however, are not enough to defeat summary judgment. The argument put forth by Battista mirrors an argument made by the plaintiff in Long v. Nix. In Long, the plaintiff, who claimed to be a transsexual, brought a claim of "deliberate indifference" against a prison doctor for not prescribing tranquilizers. Long, 86 F.3d at 766. Another doctor, who specialized in the diagnosis and treatment of gender identity disorders, prescribed tranquilizers, among other treatments, for the plaintiff after a psychiatric examination. Id. at 764. Recognizing that a dispute over medical treatment does not rise to a level of "deliberate indifference," the Long

Court held that the prison doctor's failure to provide the plaintiff with tranquilizers did not constitute an Eighth Amendment violation. Id. at 766.

Here, as in Long, there is a dispute over a course of treatment. Dr. Warth recommended that Battista be "evaluated" by a "gender identity counselor." The defendants, on the other hand, have offered Battista counseling, though not by a specialist in gender identity disorders. Given the holding in Long, the dispute over the treatment offered to Battista in no way rises to a level of "deliberate indifference." See also, Meriwether v. Faulkner, 821 F.2d 408, 413-414 (7th Cir. 1987) (a decision regarding the treatment to be given to an alleged transsexual should be determined by reliance on professional judgment). The defendants have satisfied their burden of showing that Battista has no reasonable expectation of proving "deliberate indifference" at trial. As the nonmoving party, Battista has failed her burden of producing evidence that would create an issue of material fact, thereby defeating summary judgment on this count of the complaint. Summary judgment must, therefore, be granted here.

A similar conclusion is warranted regarding the prison medical staff's treatment of Battista's vascular condition.[6] Given the record provided to the Court in this case, no reasonable fact-finder could find that the defendants' actions,

---

[6]It is clear that Battista's vascular condition presents a "serious medical need." Battista was diagnosed with varicose veins by a qualified physician as early as 1993.

13

or lack thereof, amounted to "deliberate indifference." The record reveals that on multiple occasions, the defendant Dennehy ordered Battista's prescribed support stockings. Further, the record indicates that Battista was in possession of stockings for lengthy periods. Her assertion that the defendants were "deliberately indifferent" to her needs because she was at times limited to one pair of stockings, and thus could not comply with her instructions to wear them daily, results from an undue expansion of the phrase "deliberate indifference." The record shows unequivocally that the defendants did not fail to act on the knowledge that Battista had a legitimate medical condition that required therapeutic stockings. Lastly, as for Battista's repeated claims that the defendants consistently ordered stockings without taking proper measurements to insure proper fit, nothing in the record indicates that the defendants, who were not doctors, knew that measurements were required.

### c.   Fourteenth Amendment rights.

This Court assumes that Battista asserts a Fourteenth Amendment claim, not as an independent cause of action, but to properly assert her other claims for deprivations by state officials of specific protections defined in the Bill of Rights (First and Eighth Amendments).

If Battista does, however, assert a separate Fourteenth Amendment violation, it is not clear from Battista's complaint whether she is claiming deprivation of her procedural or

14

substantive due process rights.  Given the context of the suit, gleaned from the record, this Court assumes she is alleging violation of the latter.

In <u>Graham</u> v. <u>Conner</u>, the United States Supreme Court held that it is improper in a Section 1983 action to rely on a substantive due process claim when there is a specific constitutional standard that governs a plaintiff's claimed right. <u>Graham</u> v. <u>Conner</u>, 490 U. S. 386 (1989).  Applying the <u>Graham</u> rule, a Federal District Court held that a plaintiff who has brought a Section 1983 claim for an alleged violation of the Eighth Amendment, which provides explicit constitutional protection to prisoners against cruel and unusual punishment, cannot bring a separate, independent claim under Section 1983 for the same behavior based on substantive due process.  <u>Warren</u> v. <u>State of Missouri</u>, 754 F. Supp. 150, 153-154 (W.D. Mo. 1990), <u>affirmed</u> 995 F.2d 130 (8th Cir. 1993).  Like the plaintiff in <u>Warren</u>, Battista is barred from asserting separate claims under the Eighth and Fourteenth amendments for the same alleged behavior.  Similarly, it follows logically from <u>Graham</u> and <u>Warren</u> that Battista cannot assert First and Fourteenth Amendment claims for the same behavior based on substantive due process.  In light of the <u>Graham</u> and <u>Warren</u> decisions, summary judgment must be entered for the defendants on any independent Fourteenth Amendment claim, as a matter of law.

15

c.  Action against the defendants, other than the
    Commonwealth, in their personal capacities for monetary
    damages and prospective equitable relief.

State officials sued for money damages in their official
capacity are not "persons" for purposes of suit under Section
1983 because they assume the identity of the government that
employs them.  Hafer v. Melo, 502 U.S. 21, 27 (1991).  Officials
sued in their personal capacities, however, come to court as
individuals, and are, thus, "persons" under Section 1983.  Hafer,
502 U.S. at 27.

Recovery, however, may be barred by the officials' qualified
immunity.  Kentucky, 473 U.S. at 166-167; O'Malley v. Sheriff of
Worcester County, 415 Mass. 132, 142 (1993).  When government
officials who are performing discretionary functions are sued
individually, they have qualified immunity from suits for damage
liability if "their conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person
would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818
(1982).  The standard is objective, and its application to the
defendants' conduct is a question of law.  Hunter v. Bryant, 112
S. Ct. 534, 537 (1991).  The plaintiff's rights must be clearly
established so that a "reasonable official" would understand that
his or her actions violate those rights.  Rizzo v. Goode, 423
U.S. 362, 371 (1976).  The official "is not expected to determine
the manner in which the law's grey areas will be clarified and
defined."  Borucki v. Ryan, 827 F.2d 836, 839 (1st Cir. 1987).
If a right is clearly established, an inquiring court can presume

16

that the defendant knew, or should have known, that his conduct was beyond the pale. See <u>Harlow</u>, 457 U.S. at 818-819.

### 1.   First Amendment rights.

Summary judgment must be granted here given the analysis of Battista's First Amendment claim against the defendants in their official capacities for prospective equitable relief.   There is no evidence that the defendants have violated a "clearly established" right protected by the First Amendment.   See <u>Star</u>, 815 F. Supp. at 279 (court held that plaintiff had no "clearly established" right to cross-dress).

### 2.   Eighth Amendment rights.

Again, this Court is called upon to discern what actions Battista is alleging violated her constitutional rights. Regarding her alleged transsexualism, it seems that Battista is claiming that she has a right to be examined by a qualified gender specialist, and that the defendants' refusal to comply with her request amounted to "deliberate indifference" to a "serious medical need."   See <u>Singer</u> v. <u>State of Maine</u>, 49 F.3d 837, 845 (1st Cir. 1995) (the inquiry into whether the right at issue was "clearly established" properly focuses "not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged.").  That claimed right, however, is contrary to well-settled law.   As this Court recognized above, prisoners do not have the right to a

17

particular type of treatment.  Long, 86 F.3d at 765.  Moreover, prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment.  Id.

The dispositive fact here is that Battista was offered treatment for her perceived psychological maladies.  Battista does not dispute this.  As stated previously, the record indicates that the defendants were aware of Battista's apparent psychological problems, and that appropriate treatments were offered.  Furthermore, it is clear that the defendants recognized that there may be a connection between Battista's psychological problems and her congenital adrenal/endocrine condition. Battista has failed to point this Court to any precedent that supports the proposition that inmates are entitled to the medical treatment of their choice, and that refusal to provide the requested treatment amounts to "deliberate indifference."  See Quintero de Quintero v. Aponte-Roque, 947 F.2d 226, 228 (1st Cir. 1992) (when a defendant moves for summary judgment on the basis of qualified immunity, it is the plaintiff's burden to demonstrate the defendant's infringement of a "clearly established" right).

Lastly, Battista fails to cite precedent, properly interpreted, which creates liability for prison officials under the Eighth Amendment for relying on judgments of medical personnel regarding the appropriate level of medical care for her.  On the contrary, a variety of courts have held just the

18

opposite.  See, e.g., <u>Rosen</u> v. <u>Chang</u>, 811 F. Supp. 754 (D. R.I.
1993) (granting qualified immunity to prison administrator who
relied on physician's judgment regarding the appropriate level of
medical care to be given to an inmate); <u>Miltier</u> v. <u>Boern</u>, 896
F.2d 848 (4th Cir. 1990) (wardens not liable for alleged
deliberate indifference to inmate's serious medical needs where
wardens insured that inmate received medical treatment and there
was no suggestion why they should not have been entitled to rely
on their health care providers' expertise).

Moreover, as this Court recognized above, the defendants
have shown that Battista will not be able to produce evidence at
trial that would support a claim of "deliberate indifference"
regarding her vascular condition.  Battista has again failed to
satisfy her burden of putting forth evidence of "deliberate
indifference."  As to the counts against the defendants in their
personal capacities, qualified immunity applies and summary
judgment must be granted as a matter of law.


3.  Fourteenth Amendment rights.

Summary judgment must be granted here given the analysis of
Battista's independent Fourteenth Amendment claim, if any,
against the defendants in their official capacities for
prospective equitable relief.  There is no evidence that the
defendants have violated a "clearly established" right protected
by the Fourteenth Amendment.

## 2.  42 U.S.C. § 1988.

Regarding Battista's Section 1988 claim, it is well established that Section 1988 does not create an independent cause of action.  <u>North Carolina Dep't of Transp.</u> v. <u>Crest Street Community Council, Inc.</u>, 479 U.S. 6, 14 (1986); <u>Schroder</u> v. <u>Volcker</u>, 864 F.2d 97, 99 (10th Cir. 1988).  Rather, the statute "defines procedures under which remedies may be sought in civil rights actions." <u>Schroder</u>, 864 F.2d at 99.  Therefore, the defendants are entitled to judgment as a matter of law on the Section 1988 claim.

## 3.  The Massachusetts Civil Rights Act ("MCRA") (G. L. c. 12, §§ 11H and 11I).

### a.  Claim against the Commonwealth.

In <u>Commonwealth</u> v. <u>ELM Medical Laboratories, Inc.</u>, the Massachusetts Appeals Court held that the Commonwealth is not a "person" for the purposes of the MCRA.  <u>Commonwealth</u> v. <u>ELM Medical Laboratories, Inc.</u>, 33 Mass. App. Ct. 71, 76 (1992).  Thus, summary judgment is granted for the Commonwealth as a matter of law.

### b.  Claims against the defendants other than the Commonwealth.

The Supreme Judicial Court has stated that it is "consistent with the intent of the Legislature in enacting the Civil Rights Act to adopt thereunder the standard of immunity for public officials developed under § 1983." <u>Duarte</u> v. <u>Healy</u>, 405 Mass.

20

43, 47 (1989). Accordingly, officials are not liable under the MCRA for their discretionary acts, unless they have violated a right under Federal or State constitutional or statutory law that has "clearly established" at the time. <u>Duarte</u>, 405 Mass. at 47.

This Court has already determined that the defendants are immune from suit as a matter of law on her federal claims. Thus, the defendants also enjoy immunity from suit under the MCRA for alleged deprivations based on federal law.

As to Battista's claims under the MCRA for alleged deprivations based on state law, the state act and Section 1983 differ in one significant respect; to establish a state civil rights violation, plaintiff must prove that the defendants interfered with or attempted to interfere with constitutional or statutory rights by use of "threats, intimidation or coercion." <u>Freeman</u> v. <u>Planning Bd. Of West Boylston</u>, 419 Mass. 548, 564 (1995). The defendants have shown that evidence of this required element is not likely to be forthcoming at trial. Further, Battista has failed to point to specific evidence in the record that rebuts the defendants' charge that evidence of "threats, intimidation or coercion" does not exist. Summary judgment is therefore warranted here.

### 4.  G. L. c. 30A, § 7 and G. L. c. 231A.

Unless an exclusive mode of review is provided by law, judicial review of agency regulations is to be gained through a petition for declaratory relief. G. L. c. 30A, § 7 (1992 ed.).

There being no exclusive mode provided by G. L. c. 124, § 1 (1991 ed.), the statute giving the Commissioner of Correction the power to promulgate rules and regulations, or elsewhere, an action under G. L. c. 231A is the appropriate procedure to challenge the commissioner's regulations. Claims filed pursuant to c. 30A, § 7 challenge the general substantive validity of a regulation and not the way it was specifically applied to the individual plaintiff. Rate Setting Commission v. Baystate Medical Center, 422 Mass. 744, 747 (1996).

The issue on review is not whether the regulation has supported by substantial evidence in the record before the agency. Borden, Inc. v. Commissioner of Public Health, 388 Mass. 707, 721 (1983). Rather, the person challenging the regulation must prove in the judicial proceeding that the regulation is illegal, arbitrary or capricious. Borden, 388 Mass. at 722. A plaintiff must prove "the absence of any conceivable ground upon which [the rule] may be upheld." Id.

Battista brings this substantive challenge to 103 CMR 932 et. seq. (medical and mental health policies), arguing that its promulgation was illegal, arbitrary and capricious.[7] The record

---

[7]In her complaint, Battista identifies the challenged regulations as 103 CMR 630.00 et. seq. (medical policies), 103 CMR 650.00 et. seq. (mental health policies), and 103 CMR 400.00 et. seq. (inmate management policies). The indicated regulations do not exist. Construing the complaint with a liberal eye, the Court has identified 103 CMR 761 et. seq. as the regulations relevant to medical and mental health policies. See Estelle, 429 U.S. at 97 (inmate's pro se complaint should be liberally construed). Regarding the regulations governing "inmate management policies," this Court views almost every Department of Correction regulation as falling under the rubric of "inmate

is devoid of evidence that would show an "absence of any conceivable ground" to justify the existence of the regulation at issue.  Thus, summary judgment must be granted here.

5.  Article 26 of the Massachusetts Declaration of Rights.

Article 26 of the Declaration of Rights prohibits the infliction of cruel or unusual punishments.  The Supreme Judicial Court has read Article 26 to be at least as broad as the Eighth Amendment to the Federal Constitution.  Good v. Commissioner of Correction, 417 Mass. 329, 335 (1994).  Furthermore, the Court has not decided whether Article 26 affords a plaintiff greater rights than those protected by the Eighth Amendment.  See Libby v. Commissioner of Correction, 385 Mass. 421, 435 (1982); Cepulonis v. Commonwealth, 384 Mass. 495, 496-497 n.2 (1981).

As stated, "deliberate indifference" to "serious medical needs" of inmates violates the Eighth Amendment.  Estelle, 429 U.S. at 104.

Even if Battista's gender identity disorder, if properly diagnosed, evidences a "serious medical need," this Court has determined that there is no evidence that the defendants acted with "deliberate indifference."  Moreover, as to Battista's vascular condition, this Court concluded that the record contains no evidence of "deliberate indifference."

---

management."  As such, the Court doubts that Battista meant to challenge every regulation relating to "inmate management," and focuses its analysis on the regulations dictating medical and mental health policies.

This is not the case to consider extending Article 26 rights beyond those protected by its federal counterpart.  Given this Court's analysis regarding Battista's Eighth Amendment claims, summary judgment must be granted on the Article 26 claims.

## ORDER

For the foregoing reasons, as to the defendants the
Commonwealth of Massachusetts, Larry DuBois, Paul L. DiPaolo and
Kathleen M. Dennehy, their joint Motion for Summary Judgment is
**ALLOWED**.

Nonnie S. Burnes
Justice of the Superior Court

DATED:   June 1, 1998

25



ATTACHMENT 2

 University of
Massachusetts
**UMASS**. Medical School

UMass Correctional Health
One Research Drive, Suite 120C
Westborough, MA 01581

November 30, 2004

Sandy J. Battista
M-15930
Massachusetts Treatment Center
30 Administration Rd.
Bridgewater, MA 02324-3230

Dear Mr. Battista:

I am writing in response to your letter dated November 18, 2004. We have just received
the report of your assessment conducted by clinical staff from the Fenway Community
Health Center. Your mental health treatment providers at the Massachusetts Treatment
Center can review the recommendations with you.

Sincerely,

Kenneth L. Appelbaum, MD
Mental Health Program Director

Cc: Diane McLaughlin, MTC mental health director

**A Program of Commonwealth Medicine**

A T T A C H M E N T   3



University of
Massachusetts
**UMASS.** Medical School

UMass Correctional Health
Massachusetts Treatment Center/HSU
30 Administration Road
Bridgewater, MA 02324 USA
508.279.8100 (office)   508.279.3338 (fax)

*A Program of Commonwealth Medicine*

4/4/05

**Mr. Battista:**

I spoke with you  on Thursday, 3/31, and received your written grievance on Friday,
4/1, relating to the delay in receiving your hormone therapy.  Although I can
understand your frustration in having to wait so long, you must understand that
this involves a process that must be followed explicitly for it to be effective and
beneficial to you.

Dr. Warth prescribed  the Decadron for a certain period of time, to be followed by
blood work a few weeks later which has been completed, and then a follow-up visit
with her in 4-6 weeks.  You will be seeing her very soon to evaluate your levels, and
hopefully prescribe  the accurate dose of the hormone to meet your present needs.
All of this takes time so that we can offer you the best care under the direct
supervision by Dr. Worth, and Dr. Friedman, and reviewed by the regional Medical
Director, Dr. Brewer.

I would  think that you would appreciate the time that has gone into the planning
stages of one of the most important events of  your life.  You have patiently waited
this long, and now it is just a couple of weeks away before you will be on your
journey of  something you waited a very long time  for approval.

I hope now you can understand that there is in fact 'legitimate reason' for this
lengthy process, and can somewhat relate to all the reasons I listed above.

I will be following up with you after your visit with Dr. Warth.


Sincerely,

*Maryanne Percuoco HSA*

**Maryanne Percuoco**
**Health Services Administrator**

ATTACHMENT 4



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Health Services Division*



**Mitt Romney**
*Governor*

**Kerry Healey**
*Lieutenant Governor*

**Edward A. Flynn**
*Secretary*

*P.O. Box 426*
*Bridgewater, M.A. 02324*
*Phone: (508) 279-8612*
*Fax: (508) 279-8654*
*www.mass.gov/doc*

Kathleen M. Dennehy
*Commissioner*

James R. Bender
*Acting Deputy Commissioner*

December 13, 2004

Sandy Jo Battista, M15930
Massachusetts Treatment Center
30 Administration Road
Bridgewater, MA 02324

Dear Sandy Jo Battista:

Commissioner Dennehy has referred your letter of November 29, 2004 concerning the delay in receiving the results of your evaluation for Gender Identity Disorder to me for reply. I am also in receipt of your letters to me dated November 30, 2004 and December 3, 2004 and trust the following information will address the concerns you have raised.

The results of the evaluation have been received from Fenway Community Health and I have been advised that the contractual mental health provider met with you on December 2, 2004 to review the report and discuss the findings and recommendations. In accordance with these recommendations, a consultation request for the endocrinology clinic at Lemeul Shattuck Hospital has been submitted. Also in accordance with the recommendations, the contractual mental health provider at the Treatment Center has assigned a primary care clinician to meet with you on a monthly basis to provide support and help you cope with any issues that may arise.

In closing, I urge you to work cooperatively with both the medical and mental health providers who will be affording you the appropriate clinical treatment.

Sincerely,

Susan J. Martin
Director, Health Services Division

cc:     Diane McLaughlin, Mental Health Director, UMCH

**A T T A C H M E N T   5**

Please do not link to printable views of stories. The full story can be accessed using the link below. Thank you.
http://cbs4boston.com/iteam/local_story_145210838.html



# CBS4 | cbs4boston.com

## Sex Changes Behind Bars

May 25, 2005 9:06 pm US/Eastern

Hard core criminals in our state prisons. You pay for their food, clothing and general medical care. Now, you may end up paying for their sex change surgery. I-Team reporter Joe Bergantino investigates what critics are calling a massive waste of taxpayer dollars.

Kenneth Catheena Hunt, serving a life sentence for first degree murder.

Sandy Jo Battista, child rapist, behind bars twenty-one years.

Michelle Kosilek, in prison for life for strangling his wife.

All three are violent criminals.

All three believe they are women trapped in men's bodies.

And all three want you to pay for their sex change operations.

The I-Team has learned there are twelve prisoners in our correction system who have either been diagnosed with or are being diagnosed for gender identity disorder. Four prisoners are receiving hormone treatments. So far, their medical care and lawsuits have cost you tens of thousands of dollars. Sex changes for all of them would cost you at least a quarter of a million dollars.

Taxpayer advocate Barbara Anderson.

Barbara Anderson, Citizens for Limited Taxation: "What bothers me about that? What doesn't bother me about that? I can't even imagine seriously considering this. Never mind doing this. Never mind paying for it."

So why is state funding for prisoner sex changes-something insurance companies won't pay for even a possibility?

Blame it on the federal court. That's where Michelle, once Robert, Kosilek took her case.

Before Kosilek sued, the state's policy was this: Individuals receiving hormone treatment before imprisonment could continue it behind bars but no sex change operations allowed.

But two years ago, Judge Mark Wolf handed down this decision saying Kosilek has a "rare, medically recognized, major mental illness" and that the state must follow doctors prescribed treatment.

Correction Commissioner Kathleen Dennehy.

Kathleen Dennehy, DOC Commissioner: "The courts are telling us that medical professionals make medical recommendations and correctional administrators assess the safety and security concerns."

Now, a doctor hired by the state is recommending that Kosilek, who has twice attempted suicide, undergo a sex change operation as treatment for her disorder.

If the state refuses to do it, Kosilek will ask the federal court to order the surgery, at your expense.

Senator Scott Brown: "I think it's unconscionable that the Commonwealth of Massachusetts and the citizens of the Commonwealth would have to pay for any type of elective sex change operations for any prisoners."

But is sex change surgery elective?

Most doctors and psychotherapists, include Diane Ellaborn, say in some cases it's medically necessary.

Joe Bergantino: "What are the consequences for these men if the state says forget about it, you're on your own, live with it, get over it?"

Diane Ellaborn: "I think the psychological consequences are severe. I think people have severe depression, severe anxiety. These could be highly suicidal prisoners usually and also prisoners that are at very high risk for self mutilation."

Denise Leclair, who once was a man, heads up the International Foundation for Gender Education.

Denise Leclair: "We should rely on what doctors say the proper course of treatment is, not subject people's medical treatment to popular vote. That seems grossly unfair."

Because of our investigation, Senator Scott Brown has filed legislation prohibiting the state from paying for prisoner sex changes.

Senator Scott Brown: "When you go to prison, you lose some rights. You also lose your rights to get a sex change operation."

Later this week, the state will tell the federal court that sex surgery for Michelle Kosilek would result in a security nightmare. When that happens, expect Kosilek to pursue her lawsuit. Then a federal judge will eventually decide whether you will pay the bill for Kosilek's operation and beyond that, sex surgeries for other convicts serving times for horrendous crimes.

Joe Bergantino

© MMV, CBS Broadcasting Inc., All Rights Reserved.

A T T A C H M E N T   6

# Rehabilitation & Treatment Program at the Massachusetts Treatment Center
## JUSTICE RESOURCE INSTITUTE

*DATE:* February 20, 1993

*TO:* Barbara Schwartz

*FROM:* Jim Maddock

*RE:* <u>Individual Data Sheets for Distribution to Residents</u>

Attached are the 227 data sheets you requested for distribution, one to each resident. Each sheet includes:

1. Resident's Name

2. Treatment Team

3. Current Housing

4. Parole and Transition Program Eligibility Status

5. Prison Wrap Up Time Data

6. Treatment Coordinator

7. Date of Last RIRB Treatment Plan

8. Current Treatment Plan

Translation keys from the back of the ISMR Yellow Book also are attached.

I suggest you call me at 727-5500 Ext.358 this week so I can answer any questions regarding the data and keys.

cc: Greg Canfield

*Unit Directors,*
*Please attach this note to each data sheet & make one copy of packet per resident and one for the record.*
*B.*

JRI - Massachusetts Treatment Center - Information Systems

## *Column 25 - Treatment Plan*

Each resident's RIRB recommended Treatment Plan is listed as a series of letters and numbers. Read them as follows.
Letters/Numbers before ¦ are current assignments that should be continued. Letters/Numbers following ¦ and preceded by - are recommendations that need to be implemented.  * at the end of a recommendation means additional recommendations would not fit in this publication but are available upon request.


### RIRB Recommendation Key

A  -  PSYCHOLOGICAL SERVICES

        A1  - primary group
        A2  - victim empathy group
        A3  - child abuse victim survivor group
        A4  - couples therapy
        A5  - family therapy
        A6  - Vietnam veterans group
        A7  - individual therapy
        A8  - substance abuse treatment
        A9  - ACOA
        A10 - AA/NA
        A11 - day treatment unit
        A12 - administrative caseworker
        A13 - gestalt therapy
        A14 - medications group
        A15 - guardian ad litem
        A16 - incest perpetrators' group
        A17 - psychiatric day treatment
        A18 - sex/love addiction group
        A19 - self esteem group
        A20 - Minimum Privilege Unit - detox program
        A21 - AWOL (A Way of Life) group
        A22 - Black Awareness group
        A23 - youthful offenders group
        A24 - gay identity group
        A26 - expressive therapy
        A27 - psychiatric clinic follow-up
        A28 - satellite for socialization
        **A29 - gender identity counseling**
        A30 - art therapy
        A31 - music therapy
        A32 - creative writing
        A33 - drama therapy
        A34 - childhood trauma survivors' group
        A35 - lifers' group

B  -   ASSESSMENT SERVICES

        B1  - general educational assessment
        B2  - cognitive/intelligence testing
        B3  - personality testing
        B4  - neuropsychological screening
        B5  - full neuropsychological testing
        B6  - plethysmographic assessment
        B7  - impulse control assessment
        B8  - depression assessment
        B9  - sexual functioning assessment
        B10 - family/home assessment
        B11 - couples assessment
        B12 - substance abuse assessment
        B13 - speech therapy assessment
        B14 - SSI/SSDI assessment
        B15 - general behavioral therapy evaluation
        B16 - general needs evaluation
        B17 - competency evaluation for conservatorship/guardianship
        B18 - assessment by clinician
        B19 - assessment for learning disabilities
        B20 - case conference
        B21 - assessment by consultant psychologist

C  -   BEHAVIORAL TREATMENT SERVICES

        C1  - self control management
        C2  - anger management
        C3  - depression management
        C4  - relaxation training
        C5  - assertiveness training
        C6  - social skills training
        C7  - anxiety/relaxation therapy
        C8  - stress management
        C9  - relapse prevention
        C10 - orgasmic reconditioning
        C11 - covert conditioning
        C12 - systematic desensitization
        C13 - cognitive restructuring
        C14 - thought stopping
        C15 - contract group
        C16 - olfactory aversion
        C17 - fantasy group
        C18 - rational emotive therapy
        C19 - psych-physiological treatment
        C20 - individual behavioral contract
        C21 - adult heterosexual skills group
        C22 - masturbatory satiation

D  -  REHAB SERVICES - LEARNING CENTER/WORK

      D1  - vocational testing
      D2  - job survival skills course
      D3  - life management skills course
      D4  - sex education course (sexual knowledge)
      D5  - human sexuality course (sexual attitudes)
      D6  - heterosexual skills course
      D7  - individual tutoring
      D8  - GED/PreGED
      D9  - special needs
      D10 - college courses leading to AA/BA degree(s)
      D11 - computer courses
      D12 - PIC training
      D13 - work program
      D14 - religious
      D15 - pre-college courses
      D16 - vocational training
      D17 - volunteer services

E  -  MEDICAL SERVICES

      E1  - speech therapy
      E2  - dental treatment
      E3  - neurological/radiological testing
      E4  - psychopharmacological consult
      E5  - optometric/ophthalmologic services
      E6  - evaluation for sex hormone treatment
      E7  - medical exam
      E8  - other
      E9  - referral for "Rogers" court-ordered medication
      E10 - update medical records
      E11 - ongoing psychopharmacological treatment
      E12 - HIV antibodies testing
      E13 - blood/urine screening for drugs
      E14 - HIV counseling
      E15 - hearing exam
      E16 - on-going medical treatment
      E17 - weight control program
      E18 - medical education
      E19 - physical rehab program

F  -  REHAB SERVICES - RECREATION

      F3  - specified structured activities
      F4  - music program
      F5  - open recreation
      F6  - arts and crafts

G  -  RELEASE SERVICES

      G1   - authorized absence
      G2   - sheltered workshop
      G3   - Release House relapse prevention group
      G4   - Release House group
      G5   - psychophysiological assessment and/or treatment
      G6   - case manager group
      G7   - behavioral treatment
      G8   - placement in Release House
      G9   - Release House role play group
      G10  - Release House social skills group
      G11  - Release House day treatment

H  -  REHAB SERVICES - VOCATIONAL/OTHER

      H1   - electronics
      H2   - mechanical
      H3   - graphic arts
      H4   - general
      H5   - Avo / O.T.

J  -  PLACEMENT

      J1   - placement in "...branch thereof..." of TC
      J2   - favorable parole recommendation
      J3   - unfavorable parole recommendation
      J4   - placement in outside MR facility
      J5   - placement in TC Release House
      J6   - placement in Health Services Unit
      J7   - placement in outside MR secure facility

K  -  PSYCHO-EDUCATIONAL CLASSES

      K1   - Anger Management
      K2   - Stress Management
      K3   - Relapse Prevention
      K4   - Human Sexuality
      K5   - Understanding Sexual Assault
      K6   - Grief and Loss
      K7   - Intimacy and Relationships
      K8   - Family Dynamics
      K9   - Communication Skills
      K10  - Dynamics of Addiction
      K11  - Clear Thinking
      K12  - Human Development
      K13  - Sexual Addiction
      K14  - Social Skills
      K15  - Self Esteem and Self Awareness
      K16  - Art and Anger
      K17  - Choices

## _Column 26 - Date of Last RIRB Treatment Plan_

The date of each resident's most recent treatment plan by the Restrictive Integration Review Board/Pre-Release Review Board is listed.

- "x" following the date indicates that the resident did not attend the review.
- "t" following the date indicates that the review included an annual review of treatment.
- "c" following the date indicates that the review included a community access/Authorized Absence application.
- "s" following the date indicates that the review was to make only a recommendation of SDP status for a Section 9 hearing.
-------------------------------------------------------------

*Column 19 - Date of Parole and Transition Program Eligibility*

- Each resident's parole eligibility and Transition Program eligibility status is listed.

- PE = indicates that a resident already is parole eligible on his criminal sentence.

- civil = indicates that a resident is committed to the Treatment Center only through a civil commitment.  The parole process does not apply.

- A yyyy-mm-dd date = indicates the date on which a resident will be parole eligible on a criminal sentence.

- none = indicates that a resident is serving a first degree life sentence and will not be eligible for parole.

- wrap = indicates that a resident has completed prison sentence.

- TPE = indicates a resident is eligible for participation in the Treatment Center Transitional Program.

- PTC = indicates that a resident has been paroled from his governing prison sentence to the Treatment Center by the Parole Board.  He also remains at the Treatment Center under his Ch123A SDP one-day-to-life civil commitment.  He is eligible for participation in the Treatment Center Transitional Program.

------------------------------------------------------------------

*Column 20 - Date of Completion of any Prison Sentence*

- Each resident's status regarding completion of any criminal sentence is listed.
- A yyyy/mm/dd date = indicates the date on which a resident will complete any criminal sentence.
- A four digit year = indicates the year in which a resident completed any criminal sentence.
- civil = indicates that a resident is committed to the Treatment Center only through a civil commitment.  No criminal sentence was applied.
- Life-2nd = indicates that a resident is serving a second degree life sentence and has no definite date of completion of the sentence.
- Life-1st = indicates that a resident is serving a first degree life sentence and has no date for completion of the sentence.
------------------------------------------------------------------



## Column 24 - Treatment Coordinator

Each resident's Treatment Coordinator is listed.

## Staff Initial Codes

```
Beckwith, Paul      - PB
Cusack, John        - JC
Diamond, Deborah    - DD
Dion, George        - GD
DiZio, Nancy        - ND
Duffy, Amanda       - AD
Eells, Susan        - SE
English, William    - WE
Graves, Pamela      - PM
Higgins, Lonna      - LH
Hulnick, Midg       - MH
Price, Stephen      - SP
Schwartz, Barbara   - BS
Sinn, Timothy       - TS
Weeden, James       - JW
Zella, William      - WZ
```

---------------------------------------------------------------

ATTACHMENT 7



Forensic
Health
Services
Incorporated

# ANNUAL TREATMENT REVIEW

| | |
|---|---|
| **RESIDENT:** | Sandy Jo Battista     # M15930 |
| **DATE OF BIRTH:** | December 30th, 1961 |
| **REVIEW DATE:** | March 8th, 2005 |
| **REPORT DATE:** | March 14th, 2005 |
| **DATE OF LAST REVIEW:** | April 21st, 2004 |
| **TREATMENT TEAM:** | Brent Thibault, MA, LMHC |
| | Anne Boutin-Gammon, MA, LMHC |
| | Christina Orf, MA |
| | Henry Brady, MS |

**Identifying Information:**
Mr. Battista is a 43-year-old, single Caucasian male who was Temporarily Committed to the Massachusetts Treatment Center on May 24th, 2001. He was found to be a Sexually Dangerous Person on May 15th, 2003.

Mr. Battista's governing offense includes being charged and convicted for Rape of a Child by Force, for which he received a 12-20 year sentence, Unarmed Robbery for which he received a concurrent 12-20 year sentence, and a 9-10 year sentence for Kidnapping. These convictions stem from a December 5th, 1982 incident in which Mr. Battista kidnapped and raped a 10-year-old girl. Mr. Battista also had one prior conviction for Indecent Assault and Battery.

**Circumstances of the Annual Treatment Review**
This Review is being conducted as a part of the treatment review process mandated by Massachusetts General Laws Chapter 123A. This report is being prepared for presentation to the Community Access Board (C.A.B.). In preparing this report, this resident's progress in treatment has been assessed through a review of his Admission and/or Intake Summary, all available official versions of documented sexual offenses, R.I.R.B./C.A.B. Reviews, Qualified Examiner reports, Section Nine decisions, previous

1

Annual Treatment Reviews, Achievement Matrices, Treatment Plans, Treatment Review Panel Reports, relevant psychological testing and group, class and treatment progress notes. Mr. Battista chose to participate in his Annual Treatment Review.

## Limits of Confidentiality Warning

Mr. Battista was informed that the review meeting was not confidential, and that he could choose whether or not to answer any question(s) during the course of the meeting. Mr. Battista was further informed that a report would be submitted to the C.A.B. and that anything he said may be written in the report which would be placed in his record where it may be reviewed by the various boards at the Treatment Center, by a Qualified Examiner, or by any court. Mr. Battista indicated that he understood the above, and the Review proceeded on this basis. Mr. Battista indicated that he contacted his lawyer by telephone to receive guidance regarding whether or not to participate in his C.A.B. but they have not spoken as of yet. Mr. Battista indicated that he planned to attend his C.A.B. meeting.

## 2004-2005 Community Access Board Goal Recommendations

In referencing the Community Access Board Annual Review of April 21st, 2004, written by Frank DiCataldo, Ph.D., the following recommendations were made, in addition to the treatment teams' recommendations:

- Mr. Battista should continue to create his deviant cycle, clearly identifying all the existing deviant sexual desires at work in his governing offense and in his prior sexual offense.

- Mr. Battista should more directly address victim empathy issues and begin to move away from his victim stancing and replace it with the true victims of his offense and potential future victims.

- Mr. Battista should re-examine and talk more about his refusal to participate in the PPG.

- Mr. Battista should explore the relationship between his Gender Identity issues and his sexual offense risk.

## Review of Treatment/Progress

1. **Primary Group Assignment, Percentage of Attendance and Participation Level:**
   Mr. Battista was originally assigned to and attended the B-2-B Primary Group which was previously co-facilitated by Shawn Thomas, M.Ed, and Anne Boutin-Gammon, MA, LMHC, then Anne Boutin-Gammon, MA, LMHC and Christina Orf, MA.  In July 2004 Mr. Battista was transferred to and attended the B-1-B Primary Group, which was previously co-facilitated by William English, MA, LMHC and Christina Orf, MA, and presently co-facilitated by Christina Orf, MA and Brent Thibault, MA, LMHC.  In February 2005, Mr. Battista transferred to the C-2-A Primary Group co-

2

facilitated by Stephen Corrigan, MA, LMHC and Janna Douglas, MA. He currently has a 92% attendance rate. Mr. Battista is generally active in Primary Group and appears, at times, forthcoming about his thoughts and feelings. However, of concern is the fact that Mr. Battista requested and then subsequently moved to two different Primary Groups in one year. These requested moves on his part may indicate (1) a continued difficulty concerning receiving and/or accepting feedback from others and/or (2) "jealousy" if he had to work with two female therapists. It is apparent, that Mr. Battista should give strong consideration to exploring why he felt the need to switch Primary Groups twice in one year as it may be impacting his ability to fully engage in the treatment process.

2. **Psycho-educational Classes:**
   Mr. Battista completed the following Psycho-educational classes during this review period: Cognitive Distortions II and Victim Empathy II.

   Evaluation comments for Mr. Battista's completed psycho-educational classes were not available at the time this ATR was being written.

3. **Specialty Group:**
   Mr. Battista did not participate in any specialty groups during this review period.

4. **Unit Community Meeting:**
   Mr. Battista attends approximately 50% of the unit community meetings and chaired one unit meeting in November 2004.

5. **Other Therapeutic Activities:**
   Mr. Battista reports that he presently speaks with the clinical staff in HSU on a monthly basis to discuss his gender identity related issues as he continues receiving medical treatment for gender reassignment.

6. **Progress on 2004-2005 Community Access Board Goal Recommendations:**
   - Mr. Battista should continue to create his deviant cycle, clearly identifying all the existing deviant sexual desires at work in his governing offense and in his prior sexual offense.
     **Status:** Mr. Battista finished presenting his deviant cycle in group, received feedback from the group, and then submitted the cycle to the Treatment Team with the incorporation of group feedback for staff review. The Treatment Team has a couple of concerns regarding Mr. Battista's presentation of his Deviant Cycle, which will be highlighted by excerpts from two progress notes. On 11/24/04, "...Mr. Battista presented as somewhat guarded in response to questions about his deviant cycle, as though he did not want to provide any more information than what he wrote down for the assignment." On 11/05/04, "...Mr. Battista appeared somewhat frustrated at times, when challenged by his peers and/or the therapists, but was able to express himself appropriately."

3

Presently, Mr. Battista's deviant cycle is under review by the Treatment Team and there are some concerns. First, Mr. Battista's LRS (Low Risk Situations) appear to contain maladaptive behaviors and thus warrant revision. Secondly, Mr. Battista has alluded to a belief that the written treatment work is simply comprised of exercises that people will do because they are required to do so in order to leave. Further, Mr. Battista does not appear to endorse the treatment related work as an avenue to make meaningful changes in his life leaving considerable question as to what his integration level is. The Treatment Team strongly recommends that Mr. Battista explore his concerns with the Treatment Team. It is the Treatment Team's hope that this will result in a reduction in any cognitive distortion that may impede Mr. Battista's ability for self-growth and treatment advancement.

- Mr. Battista should more directly address victim empathy issues and begin to move away from his victim stancing and replace it with the true victims of his offense and potential future victims.
  **Status:** Mr. Battista enrolled in and passed Victim Empathy II. However, the class evaluation was not available at the time this report was written. In Primary Group dated 08/18/04, Mr. Battista stated, "…how his (Mr. Battista's) anger and frustration is interfering with his capacity to develop victim empathy. He expressed recognition that he has focused on his own pain and the harm he has experienced in life, which has impeded a full understanding of the impact his offense had on his victim. He stated that he enrolled in Anger Management, but quit because 'I got more angry and frustrated.' When asked why he thinks he presents as so angry and frustrated, Mr. Battista stated 'because I don't agree with this law and I will never accept this.' He further stated that he feels that the civil commitment process is based upon 'public outrage' and 'media hysteria.' He also expressed frustration at having to live life as a man stating that the institution 'forces me to cross-dress.' It was communicated to Mr. Battista that his anger and frustration may stem from a sense of loss of control. He was receptive to feedback from the group and stated, 'maybe I'm scared to get rid of anger because then I'll have to deal with underlying feelings."

  In terms of progress, Mr. Battista appears to have just scratched the surface concerning this recommendation and is encouraged to explore all of the intricate components in much greater detail in future Primary Groups.

- Mr. Battista should re-examine and talk more about his refusal to participate in the PPG.
  **Status:** Mr. Battista remains adamant that he will not participate in the PPG, citing that it is humiliating and not appropriate for anyone to have to endure. The Treatment Team encourages Mr. Battista to fully explore his concerns about taking the PPG with his Treatment Team.

4

- • Mr. Battista should explore the relationship between his Gender Identity issues
  and his sexual offense risk.
  **Status:** Mr. Battista has made references to his Gender Identity issues but has not
  directly correlated any type of relationship between his Gender Identity issues and
  his sexual offense risk since the beginning of 2004. The Treatment Team
  encourages Mr. Battista to continue to be open and honest about exploring the
  possibility of a connection in future Primary Groups.

7. **Review of Rehabilitation Progress:**
   Please refer to attached Rehabilitation Report.

8. **Review of Health Issues:**
   Mr. Battista stated that he would sign a release of information to allow his Treatment
   Team to have contact with HSU to discuss specific issues as they take place.
   However, at the time of this report, this information was not yet available.

**<u>Summary of Progress in Major Areas of Clinical Focus/Treatment Plan:</u>**

1. **Cognitive Restructuring**
   **Status:** The Treatment Team recommended that Mr. Battista continue to openly
   and honestly discuss his own cognitive distortions and then begin to test their
   validity. In terms of progress, Mr. Battista appears rather open about his
   thoughts, including his distortions (such as blaming others, intellectualizing and
   justification). However, he continues to struggle with interrupting his distortions
   "in the moment" resulting in unnecessary and avoidable interpersonal conflicts
   with others.

2. **Identification of Sexual Assault Cycle**
   **Status:** The Treatment Team recommended that Mr. Battista present his deviant
   cycle to his Primary Group and to his treatment team. As noted in earlier, Mr.
   Battista finished presenting his Deviant Cycle in group, received feedback from
   the group, and then submitted the cycle to the Treatment Team with the
   incorporation of group feedback for staff review. The Treatment Team has
   concerns regarding Mr. Battista's presentation of his Deviant Cycle, which is
   highlighted by excerpts from two progress notes. First, on 11/24/04,
   "…Mr. Battista presented as somewhat guarded in response to questions about his
   deviant cycle, as though he did not want to provide any more information than
   what he wrote down for the assignment." Secondly, on 11/05/04, "…Mr. Battista
   appeared somewhat frustrated at times, when challenged by his peers and/or the
   therapists, but was able to express himself appropriately." Presently, Mr.
   Battista's deviant cycle is under review by the Treatment Team and there is
   concern that Mr. Battista's LRS' (Low Risk Behaviors) appear to contain
   maladaptive behaviors and thus warrant revision. Presently, it appears as though
   Mr. Battista's Deviant Cycle has a good foundation but will likely require more in
   depth exploration and processing to make all of the necessary connections.

5

3. **Identification and Modification of Deviant Sexual Arousal**
   **Status:** The Treatment Team recommended that Mr. Battista define arousal, undergo a Phallometric Assessment and participate in any treatment recommended, and discuss his current and past deviant sexual thoughts and fantasies. Mr. Battista continues to refuse to undergo a Phallometric Assessment and has not discussed any current or past deviant sexual thoughts and fantasies other than discussing information pertaining to his governing offense. It is the Treatment Team's recommendation that Mr. Battista further explore his deviant sexual arousal, as he appears to have only scratched the surface with regards to exploring this component of his treatment.

4. **Relapse Prevention**
   **Status:** Mr. Battista has completed the coursework for Relapse Prevention I, II, and III. However, an oversight enabled him to take II and III without having his Deviant Cycle completed and signed off by staff. Subsequently, it is difficult to adequately address treatment-related issues in Relapse Prevention without having a thorough understanding of the deviancy involved. Mr. Battista is still working on identifying, acknowledging, and accepting all of his various levels of deviancy. Thus, the Treatment Team strongly recommends that he re-visit the concept of "Relapse Prevention" and everything that it entails as more in depth integration is necessary in light of the work he is doing related to deviancy.

5. **Accountability and Accepting Responsibility**
   **Status:** The Treatment Team recommended that Mr. Battista admit to committing all aspects of his governing offense according to the police reports to his Primary Group and disclose more details than are noted in his police reports. During this review period, Mr. Battista referenced this recommendation in Primary Group on 11/12/04 which stated: "…Mr. Battista then raised a H&N issue regarding the Accountability and Accepting Responsibility section of his treatment plan. He stated that this section of his treatment plan asks him to admit to all sex offenses on his record, which he says he has done. It was communicated to him that unless this information is clearly documented in a group note, this goal would continue to be recommended. Mr. Battista then stated, 'I admit to all sex offenses on my record,' but provided no detailed description of each offense during today's session." In terms of the assessment section as well as the Treatment Team's present position on this matter, "Mr. Battista presented as somewhat sarcastic when discussing the recommendation that he admit to all sex offenses on his record. He appears to lack a complete understanding that what is expected of him for this recommendation includes more then a statement of guilt to his primary group." Subsequently, it is the Treatment Team's recommendation that Mr. Battista more fully explore this treatment recommendation.

6

6. **Drug and Alcohol Abuse Treatment**
   **Status:** The Treatment Team recommended that Mr. Battista address how substances played a role in his life. Mr. Battista has not addressed this recommendation during this review period other than in Primary Group on 03/26/04 where he "…discussed his history of substance abuse and asked group members for their opinion regarding if he needs to explore his use in more depth, and if so how should he go about doing so.' '…He asked what he should participate in regarding addressing his substance abuse history.' 'Mr. Battista received feedback that he should explore his substance abuse history in more depth as it appears to be significant. Group members reviewed the available treatment options that are offered regarding substance abuse, such as AA, a psycho-educational class, and a substance abuse specialty group." The assessment section indicated that "Mr. Battista appeared more receptive to his fellow group members when they suggested that his substance abuse history is significant, as compared to when the Treatment Team has made similar recommendations." Presently, the Treatment Team strongly encourages Mr. Battista to explore how substances played a role in his crime via any one or combination of therapeutic outlets provided to him at the Treatment Center to do so.

7. **Anger Management and Stress Management**
   **Status:** The Treatment Team recommended that Mr. Battista discuss the role that anger and stress played in his life and during his sex offenses, and that he attend the Anger and Stress Management psycho-educational class. Mr. Battista has, from time to time, discussed the role he perceives anger to play. However, he has yet to enroll in the Anger and Stress Management psycho-educational class. During his Annual Treatment Review, Mr. Battista acknowledged that he, at times, is irritable and frustrated. He went on to state that it was, in part, due to the DOC having him live a life that was not him. He went on to state that he has dropped all of his lawsuits as well as his Section 9 petition. Mr. Battista stated that he enrolled in the Conflict Resolution psycho-educational class for next quarter. It is the Treatment Team's recommendation that he more fully explore this component of his treatment as he has yet to do so.

8. **Victim Empathy**
   **Status:** The Treatment Team recommended that Mr. Battista discuss what victim empathy is and how it can be helpful in his treatment, and that he attend the Victim Empathy Psycho-educational class. As noted previously, Mr. Battista completed the Victim Empathy II psycho-educational class. He also continues to acknowledge that he needs to work on developing victim empathy.

9. **Understanding Human Sexuality**
   **Status:** The Treatment Team recommended that Mr. Battista complete the Understanding Human Sexuality Psycho-educational class. Mr. Battista did not complete this recommendation over the past year.

7

10. **Social Skills Training**
    **Status:** The Treatment Team recommended that Mr. Battista attend 90% of all
    Community Meetings and attends the Social Skills psycho-educational class. Mr.
    Battista's attendance at Community Meetings over the past year was
    approximately 50% and he has not enrolled in a Social Skills class as was
    recommended. In addition, since the last Annual Treatment Review, Mr. Battista
    has transferred Primary Groups twice and went from B Unit to the C Unit in
    February 2005 citing interpersonal conflicts with both residents and CO's. Since
    Mr. Battista has not addressed these goals over the past year in conjunction with
    his interpersonal difficulties, the Treatment Team will continue to recommend
    them.

11. **Adult Life Skills Training**
    **Status:** The Treatment Team recommended that Mr. Battista maintain a job in the
    Institution. Mr. Battista maintained a job when he resided on the B Unit, but has
    not had a job since moving to the C Unit. Mr. Battista has been active in attaining
    a job since transitioning to the C Unit.

12. **Release Planning and Transition Into the Community**
    **Status:** The Treatment Team has not recommended any goals in this area at this
    time.

**Disciplinary Action:**
Mr. Battista received no Observation of Behavior Reports during this review period.

**Recommended Treatment Plan Goals:**
Please refer to the attached Treatment Plan.

**Clinical Formulation:**
Mr. Battista is a 43-year-old, single Caucasian male who was Temporarily Committed to
the Massachusetts Treatment Center on May 24th, 2001. He was found to be a Sexually
Dangerous Person on May 15th, 2003.

Mr. Battista's governing offense includes being charged and convicted for Rape of a
Child by Force, for which he received a 12-20 year sentence, Unarmed Robbery for
which he received a concurrent 12-20 year sentence, and a 9-10 year sentence for
Kidnapping. These convictions stem from a December 5th, 1982 incident in which Mr.
Battista kidnapped and raped a 10-year-old girl. Mr. Battista also had one prior
conviction for Indecent Assault and Battery.

Over the past year, some progress has been noted. Mr. Battista is generally active in
Primary Group and appears to be forthcoming about his beliefs. Mr. Battista reports that
he presently speaks with the clinical staff in HSU on a monthly basis to discuss his
gender identity related issues as he continues receiving medical treatment for gender

8

reassignment. In February 2005, Mr. Battista transferred to the C Unit from the B Unit. The Treatment Team is concerned that he has requested and then moved Primary Groups twice and Units once in one year, citing interpersonal conflicts with both residents and CO's and not be able to work with two female therapists. This may indicate difficulty with receiving and/or accepting unpleasant feedback from others. Along with this, Mr. Battista has alluded to a belief that the written treatment work is simply comprised of exercises that people will do because they are required to do so in order to leave. Further, Mr. Battista does not appear to endorse the treatment related work as an avenue to make meaningful changes in his life, leaving considerable question as to what his true level of integration is. The Treatment Team strongly recommends that Mr. Battista explore his concerns with the Treatment Team and make a genuine effort to take risk in treatment in order to facilitate personal growth.

Brent Thibault, MA, LMHC
Report Writer/Treatment Unit Coordinator, B Unit


Attachments:
      Rehabilitation Report
      Treatment Plan
      Achievement Matrix

xc:    F.H.S. Clinical File
      C.A.B. Members
      F.H.S. Clinical Director
      D.O.C. Deputy Superintendent of Treatment/Classification
      Treatment Coordinator
      D.O.C. File
      Resident

9