UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**SANDY JO BATTISTA,**

    **Plaintiff,**

    v.                                                  C. A. No. 05-11456-DPW

**KATHLEEN M. DENNEHY, et al.,**

    **Defendants.**

**RESPONSE OF DEFENDANTS KATHLEEN M. DENNEHY, ROBERT MURPHY, SUSAN MARTIN, STEVEN FAIRLY, AND GREGORY HUGHES TO PLAINTIFF'S OCTOBER 17, 2005 AFFIDAVIT**

    Defendants, Kathleen M. Dennehy, Robert Murphy, Susan Martin, Steven Fairly, and Gregory Hughes, through counsel, hereby submit their response to the affidavit submitted by plaintiff in support of his Motion for Leave to Supplement Plaintiff's Pending Application for a Preliminary Injunction by Sworn Affidavit. In response to plaintiff's affidavit, defendants submit the Second Affidavit of Lawrence M. Weiner, L.I.C/S.W. and attached report.

Dated: October 26, 2005                Respectfully submitted,

                                                NANCY ANKERS WHITE
                                                Special Assistant Attorney General

                                                /s/ Richard C. McFarland
                                                Richard C. McFarland  (BBO# 542278)
                                                Legal Division
                                                Department of Correction
                                                70 Franklin Street, Suite 600
                                                Boston, MA  02110-1300
                                                (617) 727-3300, Ext. 132

2

CERTIFICATE OF SERVICE

    I, Richard C. McFarland, counsel for Defendants, hereby certify that I served a copy of the Response of Defendants Kathleen M. Dennehy, Robert Murphy, Susan Martin, Steven Fairly, and Gregory Hughes to Plaintiff's October 17, 2005 Affidavit upon *pro se* plaintiff, Sandy Jo Battista, by first class mail, postage prepaid, to his address: Massachusetts Treatment Center, 30 Administration Rd., Bridgewater, MA 02324.

Dated:  October 26, 2005                                            /s/ Richard C. McFarland
                                                                                                      Richard C. McFarland

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDY JO BATTISTA,

    Plaintiff,

v.                                          C. A. No. 05-11456-DPW

MASSACHUSETTS DEPARTMENT OF CORRECTION, et al.,

    Defendants.

### SECOND AFFIDAVIT OF LAWRENCE M. WEINER, L.I.C.S.W.

I, Lawrence M. Weiner, do hereby depose and say that:

1. I am an employee of the Massachusetts Department of Correction ("DOC") and I presently serve as the Regional Administrator for Mental Health Services for the DOC's Health Services Division. I am a licensed social worker and my primary responsibility as a Regional Administrator is to monitor the mental health care provided to the inmates within DOC facilities. The information provided herein is based upon my personal knowledge.

2. The DOC contracts with a private vendor to provide medical, dental and mental health services to inmates within the Department's custody. As of January 1, 2003, the University of Massachusetts Medical School, is under contract to provide medical, dental and mental health services to inmates through its Correctional Health Program ("UMCHP"). Dr. Arthur Brewer is the program medical director and Dr. Kenneth Appelbaum, directs the inmate mental health program.

3. I am familiar with Sandy Jo Battista ("Battista"), an individual under civil commitment to the Massachusetts Treatment Center for the period of one day to life, having been adjudicated a sexually dangerous person on May 15, 2003, pursuant to G.L. c. 123A, § 14(d). Battista's confinement to the Treatment Center began on May 24, 2001, pursuant to a court order for

2

Battista's confinement to the Treatment Center began on May 24, 2001, pursuant to a court order for temporary civil commitment for evaluation. I have reviewed Battista's mental health records.

4. Battista has been engaged in psychotherapy with Tyler Carpenter, Ph. D. on a regular basis since January, 2005, focusing on mental health and gender identity disorder issues. Battista also meets with the Treatment Center's psychiatrist on a regular basis.

5. On October 8, 2005, Battista made a one inch cut on his scrotum with a razor blade in what he has described as an attempt at self-castration. Battista has reported that when the cut began to bleed he used a needle and thread to sew up the cut. Initially, Battista refused medical treatment for the cut, but on October 10, 2005, Battista allowed Treatment Center medical staff to examine the cut and was later treated at a local hospital. Upon returning to the Treatment Center, Battista was placed on a 15 minute mental health watch. On October 11, 2005 Battista was released from the mental health watch and returned to the general population a few days later based on assurances made to mental health staff that he would not engage in self-injurious behavior.

6. On October 19, 2005, Dr. Carpenter and Diane McLaughlin, L.I.C.S.W., the Mental Health Director for the Treatment Center, met with Battista to assess his mental status. According to mental health records, the clinicians determined that Battista did not appear to be at risk of self-injury at that time and could remain in general population.

7. On October 20, 2005, Diane McLaughlin received a copy of the October 17, 2005 affidavit in which Battista makes threats of self harm if not provided with hormone therapy. In response to the threats of self-harm contained in the affidavit, Battista was placed under constant staff observation, known as an "eyeball watch." On October 21, 2005, Battista's observation by staff was reduced to a 15 minute mental health watch. Battista remained on the mental health watch over the weekend. On Monday, October 24, 2005 Battista was evaluated by Diane McLaughlin as to

3

whether a risk of self-harm was still present. Based on the evaluation, Ms. McLaughlin determined that Battista did not pose a present risk of self-harm and was taken off the mental health watch and returned him to general population. However, the Treatment Center mental health staff will continue to closely monitor Battista's mental health and potential for self-injurious behavior. Battista is scheduled to meet again with Ms. McLaughlin on October 26, 2005."

8. In July, 2005, the Department of Correction requested that Cynthia Osborne, L.I.C.S.W., an expert in gender identity disorders ("GID"), conduct a review of the Fenway Clinic's August 10, 2004 evaluation of Battista regarding the adequacy of its diagnosis and treatment recommendations concerning GID. Cynthia Osborne's October 10, 2005 review of the Fenway Clinic evaluation raises concerns regarding the thoroughness of the Fenway Clinic evaluation, including the failure to consider the significance of suicidality as a contraindication to GID treatment, the lack of a comprehensive diagnostic formulation regarding co-morbid conditions, the exclusive reliance on the inmate's self-reports in making treatment recommendations, the failure to address Battista's sexual dangerousness, the lack of corroborating evidence, the lack of psychometric assessment to supplement clinical impressions, the failure to consider sex of attraction themes, and the effects of isolation on psychopathology, among others. The Osborne report highlights substantial defficenices in the quality of the evaluation of Battista conducted by the Fenway Clinic and concludes that "to provide primary treatment of GID, with the focus on feminization, within a context of a patient's severe, chronic psychiatric and psychosexual instability would be unethical, clinically unwise, and a breach of community standards." I have attached a copy of the October 10, 2005 report from Cynthia Osborne to this affidavit.

Signed under the pains and penalties of perjury this 26th day of October, 2005.

Lawrence M. Weiner, L.I.C.S.W.

**CYNTHIA S. OSBORNE, MSW**
Forensic Consultant
Assistant Professor, Department of Psychiatry & Behavioral Sciences
Johns Hopkins University School of Medicine

Inmate Name:         Sandy Jo Battista (DOC ID# M15930)
Nature of Report:    Peer report review
Reviewing Clinician: Cynthia S. Osborne, M.S.W.
Date of Report:      October 10, 2005

IDENTIFICATION:
Sandy Jo Battista is a single 43 y.o. Caucasian biological male, whose former legal name was David Megarry, Jr., with a stated preferred female identity. Mr. Battista has completed his sentence for conviction of rape, kidnapping, and robbery of a 10 y.o. female in 1982. He is currently held at the Massachusetts Treatment Center in Bridgewater, MA, following temporary civil commitment in May 2001 and formal civil commitment in May, 2003, secondary to being determined to be sexually dangerous. He has filed several legal suits against the Commonwealth of Massachusetts, most recently for allegedly failing to provide hormonal treatment of Gender Identity Disorder, as recommended by clinicians at Fenway Community Health in August, 2004, and subsequently prescribed by Dr. Wirth, MD of the Lemuel Shettuck Hospital, in the spring of 2005.

I was contacted by Larry Weiner, Mental Health Administrator, in July, 2005, and asked to provide a review of the clinical evaluation conducted by clinicians at Fenway Community Health in Boston. The Fenway evaluation culminated in a written report dated August 10, 2004, and is based on a clinical interview of 90 minutes duration and a review of the inmate's chart. It did not apparently include the administering of any formal psychological tests. I agreed to review the report and provide opinion about its adequacy.

My review process included a review of the following documents:
- Physician's Order dated August 3, 2005 by Robert Friedman, MD
- Physician's Order dated July 14, 2005 by Martin Bauermeister, MD
- Progress Note dated July 14, 2005 by Martin Bauermeister, MD
- Core Treatment Transfer Assessment Report date April 12, 2005, by Sharon Kelley, Psy.D. and Ruth Khowais, Psy.D., Forensic Health Services, Inc., Bridgewater, MA
- Forensic Health Services Treatment Plan dated March, 2005, Forensic Health Services
- Annual Treatment Review Report dated March 14, 2005, Brent Thibault, MA, for the B Unit Treatment Team, MA Treatment Center, Bridgewater, MA
- Report dated August 10, 2004, by Kevin Kapila, MD and Randi Kaufman, PsyD, of Fenway Community Health, Boston, MA
- Community Access Board Annual Review Report dated April 21, 2004, by DiCataldo, Ph.D., for the Community Access Board, MA Treatment Center, Bridgewater, MA
- Intake Assessment dated June 19, 2003, by Katherine Gotch, MA, and Anne E. Johnson, Ph.D., Forensic Health Services, MA Treatment Services, Bridgewater, MA

ATTACHMENT                                                                     1

- Report of Qualified Examiner to the Court dated April 1, 2002, by Katrin Rouse, Ed.D., Forensic Health Services, Inc., Boston, MA
- Sexual Dangerousness Assessment Report dated March 30, 2002, by Robert H. Joss, Ph.D., Consultant Psychologist, Forensic Health Services, Allston, MA
- Report dated October 19, 2001, by Ronald S. Ebert, Ph.D., Director, Psychological Services, Inc, Braintree, MA
- Report dated October 17, 2001, by Diane Ellaborn, LICSW, Framingham, MA
- Report dated November 18, 1998, by David Campopiano, MA and Robert Prentky, Ph.D., Justice Resource Institute, Rehabilitation and Treatment Program, Bridgewater, MA
- Report dated October 4, 1997 by J. Tyler Carpenter, Ph.D., Correctional Medical Services, MA DOC
- Report dated March 17, 1997, by Victoria Russell, MD, Consultant in Psychiatry
- Endocrine consult note dated August 8, 1983, by Brian Berelowitz, MD and George T. Griffing, MD., Evans Medical Group
- Discharge Summary dated October 24, 1979, by James C. Melby, MD

This report is based solely on a review of the documents, noted above, provided me. I have not conducted a clinical evaluation of Mr. Battista and, therefore, it is not within the scope of my present role to diagnose him. Accordingly, my report is based on the assumed accuracy of the inmate's existing diagnosis of Gender Identity Disorder, about which all reports appear to agree.

**PEER REVIEW RESPONSE:**

I.    *Lack of comprehensive diagnostic formulation:*

*In my opinion, the Fenway report fails to address critical questions regarding the presence, absence or possible contraindicative significance of Axis I and Axis II co-morbidity, including sociopathy and/or psychopathy, suicidality and/or self-harming tendencies, and pedophilia.*

Mr. Battista has, based on the Fenway and other reports, a complex history. It includes childhood abuse and neglect, a violent father, a rejecting mother, an abusive, neglectful custodial grandparent, multiple changes in residence and custodial care during childhood and adolescence, apparent conduct disorder by early adolescence, a serious, chronic medical illness with onset in infancy, early exposure to pornography, substance abuse problems, psychosexual conflict – including reports of pedophilic attraction to prepubescent females – manifesting in severe sexual aggression beginning in adolescence, adult incarceration characterized by chronic conduct problems, a determination of sexual dangerousness, and recent descriptions, including in the Fenway report, of self-starvation, manipulative behavior, limited insight, poor judgment, and superficiality. Given this presentation, the absence of any consideration of co-morbid Axis I and Axis II conditions, and their potentially complicating impact on diagnosis, treatment and prognosis, reflects an incomplete evaluation. The Fenway report itself references possible Axis II traits, but does not name them as such, and does not discuss their potential significance. *In my opinion, clarity regarding the presence, absence, nature and severity of co-morbid conditions is critical in the effort to determine with any degree of certainty Mr. Battista's motivation for self-harming or suicidal threats or behaviors, or his demands for particular treatments, as well as to weigh the potential benefits and risks of any particular treatment. To make treatment*

2

*decisions in the absence of a full diagnostic picture is clinically unsound.*

*Psychopathy*
Earlier reports reference high levels of sociopathy and psychopathy. Indicators of psychopathy include superficial attempts to display one's self in good light; deceitfulness, inconsistent explanations that change when one is challenged with facts; an inflated view of one's self and one's status; the view of one's self as a victim of others and of the system; lack of regret for one's crimes or remorse or empathy for one's victims; denial of responsibility for one's actions or indifference regarding their significance in impact on others, such as claims of blackouts for events surrounding one's offenses; lacking realistic long term goals; and impulsivity. Psychopathy is a significant predictor of criminal recidivism, violence and disruptive behavior during incarceration, and poor treatment outcomes. It follows logically that it is important to consider the level of psychopathy when formulating the diagnostic picture and treatment recommendations for inmates with GID. Doing so is consistent with good practice and with the Harry Benjamin Foundation's recommended Standards of Care. *Interventions based on diagnostic formulations that fail to consider personality instability, when it is present, may cater to and fuel that instability. Worsening one psychiatric illness with the treatment for another is clinically unjustified. More specifically, in cases involving potentially high levels of psychopathy, GID treatment strategies that iatrogenically worsen symptoms of entitlement and manipulativeness may lead to increased risk of threats and gestures of self harm. Such an outcome is not in the best interest of the inmate nor the Commonwealth of Massachusetts.*

*Suicidality and self harm*
There is evidence of high psychiatric co-morbidity with GID. A recent study (Hepp, Kraemer, Schnyder, Miller & Delsignore, 2005) found that 42% of the individuals diagnosed with GID also met criteria for one or more personality disorders. This is consistent with other studies, with the DSM-IV, and with the descriptive data from many gender clinics. However, there is no evidence that GID is the cause of that co-morbidity. Because there is, on the other hand, considerable evidence that personality disorders, and history of severe abuse, do motivate self-harming and are associated with higher than average rates of suicide, they should not be dismissed as insignificant in formulating the diagnostic picture of a case.

The Fenway report does not explicitly state that Mr. Battista is at risk of self-harm and suicide, but implies so in references (page 6) to ideation regarding "taking pills if she did decide to kill herself," and in the description (page 5) of threats of self-castration "…if things become 'drastic.'" Self-harm and/or suicidal gestures sometimes reflect severe gender dysphoria, but may also reflect underlying personality psychopathology. It is well documented that individuals with Borderline Personality Disorder engage in self-harm in a maladaptive pursuit of affective relief. It is also known that some individuals with Antisocial Personality Disorder engage in self-harm, or threats of the same, in order to manipulate others into meeting their demands. The evidence base about the correlation between self-harm and personality disorders is considerable. The same is not true for any assumed causal correlation between GID and self-harm. The evidence base is poor – based largely on anecdotal case reports – and insufficient as a basis for claims of certainty. I also know of no evidence that inmates with GID engage in more self-harm and suicide gestures than other inmates. Obvious indicators of personality psychopathology should not be ignored or minimized in the effort to understand patients presenting with complex

3

histories.

Similarly, the Fenway report emphasizes Mr. Battista's early history of trauma. Yet, there is no discussion of any possible associations between that history and the inmate's considerable psychiatric difficulties, including reported substance abuse, criminality, suicidality, self-starvation and attempts at genital self-mutilation.

Gestures of self-harm or suicidality, as well as both overt and masked threats, reflect serious mental illness, apart from GID, that requires treatment in and of itself. They are clear contraindications for hormonal or surgical intervention in most community settings. *Significant comorbidity – on both Axis I and II – complicates a GID diagnosis, and renders it difficult to say with certainty that GID, even if clearly present, is the "cause" of suicidal or self-harming behaviors. While it may be tempting to hypothesize that untreated GID causes these problems, there s no evidence for such claims. A positive outcome from hormonal treatment and/or surgery in such cases is far from inevitable.*

II.     CAH and GID

*While Mr. Battista may have suffered psychologically secondary to a reportedly chaotic, abusive childhood, a violent father, and a mother who was unable to cope with her son's medical condition, he does not suffer from a somatic intersex condition per se, and there is no evidence to support a hypothesis that he is at increased risk of GID as a result of his having CAH.*

Mr. Battista was reportedly diagnosed in infancy with Congenital Adrenal Hyperplasia. The specific variant of CAH – e.g. whether or not he suffered salt wasting or repeated electrolyte crises – and how it was treated early in Mr. Battista's life – e.g. whether he was treated consistently and effectively throughout his history – is not clear from the records. The Fenway report states "…Congenital Adrenal Hyperplasia has some correlation with male to female transsexuals." It further states that CAH "…is considered to be an intersex condition." It is important to clarify that CAH in males is quite a different matter than CAH in females. In some cases of CAH in females, prenatal exposure to high levels of androgens results in ambiguous external genitalia. However, males with CAH do *not* have somatic intersexuality – they are normal genetic males, have normal internal reproductive structures (except for possible medical problems with fertility), and have normal – albeit prematurely developing – male external genitalia. Males with CAH have not been identified as a psychologically vulnerable group -- they tend to do reasonably well psychologically, as far as we know via scientific evidence. There is no supportive evidence that CAH in males is associated with increased risk of cross gender identity or GID. The most recent and relevant study (2004, Hines, Brook and Conway) was consistent with most earlier studies, in that it showed that male children with CAH engage in male-typical play behavior, with no differences between them and non-CAH males. *Of greatest relevance, this study showed no affect of CAH on either gender identity or sexual orientation in males.*

Given the lack of evidence to the contrary, it should be assumed that the reasons for Mr. Battista's GID are not primarily hormonal. Further, the significant dynamic factors in Mr.

4

Battista's early life, as described in some detail in the Fenway report, and including his mother's reported rejection of him secondary to his early masculinization, are far more etiologically compelling, relative to Mr. Battista's life problems, than any evidence of an "intersex" condition per se. *While the Fenway report does not explicitly say so, by naming Mr. Battista's medical condition as an "intersex" condition associated with GID it implies the possible medical justification for sex reassignment in order to correct that intersex condition. It is important to be clear that Mr. Battista has no somatic intersexuality, and that there is no supportive evidence for using CAH as justification for hormonal or surgical reassignment.*

III.   *Sexual dangerousness*

*The Fenway report fails to address the critically important question of whether Pedophilia and/or sexual dangerousness, co-occurring with GID, present contraindications for hormonal or surgical reassignment.*

In reports dated 4/1/02, by Katrin Rouse, Ed.D., and 3/30/02, by Robert Joss, Ph.D., Mr. Battista was determined to be sexually dangerous. The Joss report emphasizes the predatory and impulsive nature of Mr. Battista's sexual offenses, the presence of deviant arousal patterns, his minimal participation in treatment efforts during incarceration, his failure to address the substance abuse issues in his history, and a psychiatric history that includes being assessed as carrying traits of both Borderline Personality Disorder and Antisocial Personality Disorder. The report concludes that the risks of reoffending would be high in an unconfining setting. Similarly, the Rouse report emphasizes the presence of both Pedophilia and Antisocial Personality Disorder, a pattern of inconsistent self-reporting, and minimal insight, remorse and acceptance of responsibility for his crimes. The Rouse report concludes that Mr. Battista presents with an overall pattern of antisocial behavior and meets criteria as a sexually dangerous person.

The Fenway report offers no response to the concerns raised in these reports. It does state (page 5) that Mr. Battista "…has attempted to have herself castrated surgically, as this would ostensibly lower the chance that she would re-offend sexually." It further states (page 4) that the inmate stated that "being around young girls is risky for her, and that she should avoid such situations," and that he made obscene phone calls to young girls while incarcerated. The report also then describes (page 5) Mr. Battista's continuing efforts to achieve surgical castration, although implying that these efforts are motivated not by the desire to curb pedophilic urges, but by the desire for sex reassignment. The report fails to address the serious implications of these factors or the described contradictions in Mr. Battista's motivation for castration. In one moment his motive is reportedly to curb pedophilic urges, but in another it is described as manipulative – to get the DOC to provide partial surgical reassignment.

The literature on the paraphilias – described as chronic conditions that are manageable through intensive treatment, but not curable – does not offer much reason to believe, if Mr. Battista's pedophilic urges were compelling enough to motivate several sexual assaults against children, and obscene phone calls to girls even after incarceration, that those urges have spontaneously disappeared, or transferred to adult women. And there is no evidence in the Fenway report or any of the earlier report that Mr. Battista has participated in a level of psychosexual therapy consistent with such an implied "cure." There is no way to say with certainty, even if Mr.

5

Battista's level of therapeutic engagement had been high (which it has not), that a claim of attraction to adult women, as it has evolved in the context of incarceration, in which he has had no access to prepubescent females, would "hold" in a real world context should he be released, and thereby be exposed to females of all ages. It is clinically irresponsible to recommend hormonal reassignment without considering these possible implications.

*The Fenway report states (page 6) that Mr. Battista's history is "common for someone with GID..." To the contrary, co-occurring Pedophilia and GID are far from common.* Pedophilia has been documented as co-occurring with some cases of Transvestic Fetishism, but there is a virtual absence of literature regarding the co-occurrence of Pedophilia and Gender Identity Disorder. The Fenway report neither endorses nor disputes the diagnosis of Pedophilia in Mr. Battista, failing, in fact, to address the question in any way. It provides, and fails to reconcile, two contradicting details about Mr. Battista's age of attraction – first (page 4), noting the inmate's self-description, during interview, of being at risk around young girls (suggesting ongoing, current pedophilic attraction), and, second (page 5), stating that he "finds herself attracted to women."

The Fenway report minimizes (page 4) the 2002 reports documenting that the inmate was found to be sexually dangerous, saying that this determination was made "as she had committed more than one incident." More accurately, the reasons given in the 2002 reports are numerous and compelling. *I cannot imagine a more explicit contraindication for sex reassignment than Mr. Battista's clinical presentation. It is anything but common as a presentation of GID. The Fenway report wholly fails to address the themes of sexual dangerousness and Pedophilia.*

**IV.    The Harry Benjamin International Gender Dysphoria Association Standards of Care**

*The Fenway report fails to accurately represent the SOC as flexible treatment guidelines rather than as a declaration of any one treatment as "the" recommended, appropriate or medically necessary treatment for all individuals diagnosed with GID. Further, the SOC were developed for non-incarcerated individuals, contain inherent contradictions related to incarcerated individuals, offer little relevant guidance to decision-making regarding incarcerated individuals who were not already in treatment for GID prior to incarceration, and do not represent consensus of the psychiatric community regarding what constitutes proper treatment for GID.*

The Fenway report states (page 6) that the purpose of the Harry Benjamin Standards of Care is to "articulate ...professional consensus about the psychiatric, psychological, medical, and surgical management of gender identity disorders." More completely, that statement in the Standards reads "...articulate this *international organization's* professional consensus..." While the Harry Benjamin Foundation has made unquestionable contribution to the quality of care of gender identity disordered individuals, it is a collegial organization, not a regulatory body with any formal authority. It has developed recommended guidelines, not enforceable "requirements," and its guidelines reflect the consensus of the organization's members, not the entire psychiatric community. To the contrary, there is considerable collegial disagreement about what constitutes appropriate treatment of GID. *There is currently no universal professional consensus regarding what constitutes medical necessity in GID, and regarding which treatments are medically necessary for which patients. There is no empirical basis for claims otherwise.*

6

Further, the Fenway report describes (page 6) the SOC as "...an internationally accepted treatment protocol..." More specifically with regard to Mr. Battista, the Fenway report states (page 7) that "...given that this inmate qualifies for the diagnosis of Gender Identity Disorder, she should be afforded the clinical treatment outlined by the Standards of Care." The report then states "It is therefore the clinical recommendation of these evaluators that Sandy Jo have her Gender Identity Disorder addressed through hormone administration..." These statements imply that the SOC recommend a particular "protocol" for anyone diagnosed with GID. That position does not accurately reflect the reality of clinical practice in the community, nor, as I understand it, the intent of the SOC. The Introductory Concepts section of the SOC state "The SOC is intended to provide flexible directions for the treatment of persons with gender identity disorders." It further states that clinicians may modify the "requirements" for a number of reasons, and that there are many and varied options for helping gender identity disordered individuals achieve improved functioning. Neither full triadic therapy, nor hormonal treatment alone, nor any other protocol, comprises *the single correct or recommended* treatment for all patients diagnosed with GID. In fact, while the SOC state that hormones and/or surgery are medically necessary in some cases ("transsexualism or profound GID"), nowhere do the SOC define what constitutes "profound." Further, the Standards note a number of possible therapeutic directions, saying "the diagnosis of GID invites the consideration of a variety of therapeutic options, only one of which is the complete therapeutic triad." There is considerable variation in application of the Standards in the psychiatric community. Some clinicians and clinics lean toward a more liberal and others toward a more conservative application. No where has it been empirically demonstrated that one is better than the other.

In the last several years the SOC have been revised to include a few brief clauses regarding GID in incarcerated individuals. However, there are inherent contradictions in efforts to adapt standards developed for community treatment to a prison environment, in which there are undeniably higher safety risks. The Readiness criteria for both hormones and surgery include "The patient has made *some progress* in *mastering* other identified problems leading to improving or continuing stable mental health (this implies *satisfactory control* of problems such as sociopathy, substance abuse, psychosis and suicidality;" "Some progress" and "mastering" constitute an oxymoron, as well as a diagnostic conundrum regarding how a clinician determines how much "progress" constitutes "some," and how much "mastery" justifies a recommendation for hormones. Similarly, "satisfactory control" is undefined, leaving important questions unanswered, such as "In a criminal context, is anything less than full control satisfactory?" and "What constitutes satisfactory control of suicidality?" and "How does a clinician judge, with a reliable degree of certainty, that an incarcerated individual has gained control of his sociopathy when he is in a confined environment that is fundamentally structured to externally control individuals who are deemed incapable of doing so for themselves?" Criminality and sociopathy are, without exception, contraindications for hormones or surgery, in reputable gender clinics throughout the world. Incarceration presents an inherent and irresolvable contradiction to this standard, and to the notion of personal mastery over one's sociopathic leanings. And the Harry Benjamin SOC do not at this time address these questions to a degree that warrants use of the Standards as justification for any treatment of GID – other than emphasizing the importance of continuance of treatments initiated prior to incarceration – in incarcerated individuals.

Mr. Battista's suicidal and self-harming threats and gestures represent an explicit failure regarding this criterion. The position that hormones or surgery are contraindicated in individuals who are incapable of or unwilling to prevent self-harm is wholly consistent with the SOC. In my opinion, prescribing hormones to incarcerated individuals reflects, rather than compliance with the existing SOC, an explicit violation. While exceptions may at times be clinically justified, and while hormonal treatment might in some cases of incarcerated individuals be helpful to both inmates and departments of correction, in terms of improving the manageability of inmates, exceptions should be made only following thorough debate of all potential implications and consequences – both clinical and institutional – and only following a thoroughly formulated diagnostic picture that considers not just GID but all Axis I and Axis II co-morbidity. The Fenway does not represent such a debate, nor a thorough diagnostic formulation. And the Harry Benjamin SOC do not at this time provide any guidance in this area.

V.    *Lack of corroborating reports*

*There is no evidence that the Fenway report considered any sources of information other than the inmate's self-reports and existing records.*

There is contradicting information in the various reports, some indicating that Mr. Battista is in close contact with his sister, and some describing no contact. If his sister, or other relatives are available, collateral interviews may be helpful in validating the inmate's self-reports, in clarifying some aspects of his history and, therefore, in reaching diagnostic clarity. The Fenway report describes the inmate as unable to "remember her thoughts about her gender while growing up," but also states that the inmate has suffered lifelong gender dysphoria and that he began cross dressing in female undergarments as an adolescent. The presence of childhood GID is not required for a diagnosis of GID in adulthood. However, it is known that some individuals falsify, exaggerate or minimize aspects of their history – such as transvestic arousal and cross dressing – in their efforts to qualify for reassignment. Collateral interviews can validate or invalidate self-reported history, and can help identify clinical variants or subtypes of GID. This, in turn, may influence treatment decisions. When evaluating incarcerated individuals, because of the particularly high risk of self-reports being influenced by sociopathy and psychopathy, it is particularly important to try to determine to what extent inconsistent or deceptive self-reporting reflects a pervasive pattern of deception, manipulation and/or entitlement indicative of significant chronic personality pathology. Since individuals with high levels of sociopathy or psychopathy are often unreliable historians, treatment decisions in cases of incarcerated individuals should not, in my opinion, rely solely on self-reports. As noted in previous sections of my report, such decisions may cater to and exacerbate, rather than diminish, significant psychiatric symptoms.

V.    *Lack of psychometric assessment*

*The Fenway report apparently relied on no formal psychometric assessment to supplement clinical impressions, and no mention is made of previous assessments, referenced in the institutional records, that suggest severe psychopathology.*

Conclusions in the Fenway report were apparently based solely on the 90-minute clinical interview and chart review. While self-report psychometric measures have limited value in

8

forensic assessments due to the tendency of the subject to engage in image management – responding to items in such a way as to present himself in the best light – the same limitation applies to the clinical interview. Psychometrics, while imperfect, provide additional information to compare with clinical impressions. Discrepancies between current and prior results of psychometric assessment and clinical impressions may highlight areas that warrant further inquiry. The assessment of complex cases warrants the gathering of data from as many sources as possible. To not do so leaves a serious gap, in particular in cases of such serious consequence as Mr. Battista's.

### VI. *Sexuality themes*

Based on the Fenway report, the course of development of GID in Mr. Battista is not clear. The report contradicts itself regarding the inmate's reported history of sexual dysfunction – saying (page 3) that the dysfunction was due to fear of rejection, but later (page 6) linking it causally to discomfort with his male anatomy. The report also states (page 3) that Mr. Battista reported being discharged from the army as a result of emotional instability after being discovered wearing women's undergarments, but then notes a previous evaluation that described the discharge as being due to fighting and drinking. The report makes no effort to explain these inconsistencies or their possible relevance to the diagnostic formulation.

Further, the Fenway report does not indicate whether or not a differential diagnosis between GID and Transvestic Fetishism was conducted. While gender dysphoria does develop in some cases of Transvestic Fetishism, and while some of those individuals in the real world community seek reassignment, it is important to differentiate the two conditions, and to develop a specifically applicable treatment plan. An earlier report (Elleborn) states that "No sexual arousal is reported in these early crossdressing experiences." However, as noted earlier, patients seeking reassignment often deny fetishistic arousal, and there is no evidence of collateral reports validating Mr. Battista's self-reports.

Further, the Fenway report describes (page 6) Mr. Battista as having had "a strong, persistent cross-sex identification as female since early childhood." However, the report offers little in the way of details documenting that supposed history, other than to say (page 3) that he began wearing female undergarments at age 14 or 15, that he (page 2) "was always jealous of women," and "played house and with dolls with her sister." Those few descriptors hardly prove a "strong, persistent" cross-sex identity. In fact, they raise the question of whether a diagnosis of Transvestic Fetishism (fetishistic arousal related to cross-dressing) with associated autogynephilic preoccupation (admiration of self in the image of a woman), either currently or in the past, has been adequately considered.

The DSM-IV describes autogynephilic males with GID as sometimes "…more fluctuating in the degree of cross-gender identification, more ambivalent about sex-reassignment surgery, more likely to be attracted to women, and less likely to be satisfied after sex-reassignment surgery." While Mr. Battista is not requesting surgery at this time, he has reportedly made it clear that it his goal. A cautious approach toward treatment, that carefully assesses for transvestic fetishism and autogynephilic traits, and that considers the increased risks of the autogynephilic subtype, is advised before initiating hormonal treatment. The Fenway report does not take such a stance.

9

Based on my reading of the Fenway and other reports, Mr. Battista's sexual identity may still be evolving and unstable, or may have been distorted as a result of his isolation in a prison environment.

**VII.** *The effects of isolation on psychopathology*

*The Fenway report fails to address this theme of isolation as a possible contributing factor in the intensification of Mr. Battista's cross gender preoccupation during incarceration.*

Incarcerated individuals do not have the same resources and role models available to them as non-incarcerated individuals do for resolving gender identity conflict. In real-world communities today, individuals with cross gender identity can participate in treatment groups, community support groups, and online support groups. These groups are often comprised of individuals making varied choices, and with whom each can reality test their own feelings and assumptions. They also have varied choices for sex partners. Some choose reassignment surgery but many do not. Some enter treatment with one idea about what they need and change their minds after exposure to alternatives. Some would prefer full reassignment but are unable to because of financial or other life constraints. Some choose hormonal treatment, while others do not.

Incarcerated individuals, by virtue of their isolation, do not have the resources described above. Their isolation, especially when accompanied by Antisocial, Borderline or Narcissistic personality traits, may intensify an inclination toward a cross gender identity as the only possible solution for internal psychosexual conflict, and rigidify the false assumption that particular interventions are the only viable choices. As long as an individual remains confined, there is no way to determine with certainty whether his cross-gender identity would be as profound if he were living in a real world context, with real life challenges, opportunities and more varied choices. It is unlikely that inmates, because of their isolation, are aware of the extent to which real world individuals choose adjustment over reassignment strategies. Appropriate treatment provides inmates with education about these themes, psychotherapeutic opportunities to explore them fully, and assistance in learning to embrace an attitude of responsible, contextually appropriate choices rather than angry entitlement. The lack of exposure to alternatives has isolated Mr. Battista in such a way that, in my opinion, it is impossible to predict with certainty his sex of attraction, age of attraction, or his core gender identity, in the real world. With such uncertainty, a cautious treatment plan is a responsible one.

Many individuals in the real world never access their desired feminizing options. Indeed, there are many individuals who have severe GID but who cannot access the supposed medically necessary treatment in such cases – hormones and surgery. The real world imposes constraints on people's choices. Many cannot afford the cost of such interventions; most third party payers won't cover them; often individuals themselves recognize that their preferred interventions would complicate life in ways that they're not willing to risk; many settle for choose imperfect options that lead to a better life adjustment without imposing significant disruption; many choose to live "between" the traditional sexes as true he/shes; some make peace by defining themselves as being a "third gender," neither fully male nor fully female, but integrating aspects of both. Demands by inmates that prison life provide *no* constraints or obstacles to cross gender preferences are unreasonable, unrealistic, and outsides the bounds of good clinical practice to try

10

to meet. And, as I have emphasized throughout this report, the risks are high that catering to these demands deepens the same underlying psychiatric pathology that landed Mr. Battista in prison and that motivated his poor adjustment to prison. The Fenway report fails to address these risks in any way.

**VIII.** *Summary*
*To provide primary treatment of GID, with the focus on feminization, within a context of a patient's severe, chronic psychiatric and psychosexual instability would be unethical, clinically unwise, and a breach of community standards.*

It is clinically unwise to make treatment for gender identity disorder – via hormones or other interventions – primary over treatment of severe co-morbid conditions for which there is no evidence that they have been sufficiently addressed. In cases involving sociopathy or psychopathy, and in Mr. Battista's case, apparently Pedophilia, this concern is especially grave. Mr. Battista has committed several sex crimes in his past. He admits to current risk of being around young females. He has a history, reportedly, of severe childhood emotional and physical abuse. He has demonstrated serious maladaptations consequent to that problematic early history – including possible substance abuse, lack of impulse control, and interpersonal difficulties. He has been determined to be sexually dangerous. He has attempted and threatened genital self-harm, self-starvation, and suicide. He has shown low motivation to complete a sex offender treatment program.

The fact that Mr. Battista wants and demands a particular treatment do not obligate the DOC to meet those demands and should not be the defining criteria for clinical decisions. Interpretations of the SOC vary from clinic to clinic in the real world. While one clinic, for example, might interpret an individual's adequate psychosexual functioning on hormones as indicating the appropriateness of proceeding to surgery, another clinic might interpret it as indicating that hormones have been successful and that surgery is unnecessary or unwise. In some clinics, full triadic therapy is common; in others, it is rare. *Conservative management of GID, in which attending to comorbid Axis I and Axis II problems is emphasized, is a valid approach. It is utilized in real world gender clinics with patients who present with far less psychiatric vulnerability than Mr. Battista appears to. It is certainly valid in the context of correctional systems.*

The Fenway report fails to even raise the question of other possible treatment options, to provide a clinical rationale for the recommendation of hormones over other options, or to address the question of the possible consequences and implications of hormonal treatment of incarcerated individuals in general, or Mr. Battista in particular. For example, the Fenway report explicitly states (page 5) that Mr. Battista's goals go beyond hormonal treatment. He apparently sees hormones as just the first step, and hopes to also have surgical reassignment. While hormonal treatment of incarcerated individuals may sometimes be helpful – by improving affective stability – it should not be undertaken lightly. It should be preceded with a process of clear informed consent, in which future additional feminizing treatment options and limitations are made thoroughly transparent. It should be preceded with a systematic process of psychotherapy in which clear treatment goals and the criteria for "personal mastery" of serious problems are clearly defined, met and sustained. And it should be preceded by thorough planning for possible

11

consequent security risks – of, for example, having an increasingly feminized individual in an all male institution – will be managed. To administer hormones in the absence of such planning caters to inmates unrealistic expectations and could lead to continuing or worsening conduct problems rather than resolution to psychiatric vulnerabilities.

The goal of the treatment of GID is not feminization per se. It is improved affective and psychosocial functioning and the amelioration of dysphoria. There are a variety of treatment paths to that end. Mr. Battista's expectations reflect an unrealistic overvaluing of physical feminization as the only possible solution to his discomfort. Based on my impressions of the inmate as described in the Fenway report, it is possible, if not likely, that both GID and underlying personality pathologies fuel this entitlement. Further, and of considerable significance, Mr. Battista apparently suffers not just from GID but from severe Pedophilia – as evidenced by multiple sexual assaults on female children (both familial and non-familial victims), an egosyntonic attitude about his attraction to young girls, continued sexual acting out via obscene phone calls even after incarceration, and lack of motivation to complete sex offender treatment. These symptoms clearly suggest that Mr. Battista needs psychiatric treatment, but in no way would qualify him for hormonal or surgical reassignment in any reputable clinic in the real world.

Cynthia S. Osborne, M.S.W.
Forensic Consultant
Assistant Professor
Department of Psychiatry and Behavioral Sciences
Johns Hopkins University School of Medicine

12

October 14, 2005

Addendum:
After completion of the attached report, I was informed on October 12, 2005 that on October 8, 2005 Mr. Battista engaged in genital self-mutilation. Mr. Battista reportedly stated that it was an expression of frustration over delays in hormonal treatment. Having never met nor evaluated the inmate myself, I cannot say with any certainty what this gesture means. However, it appears consistent with my warnings all through this report that there is a high risk of iatrogenic effects of an improper treatment plan. By offering Mr. Battista a simplistic solution of hormones, with full knowledge that he expects surgery to follow, and without considering the risks associated with his significant co-morbidity, one may fuel angry entitlement, and exacerbate maladaptive, manipulative, self-harming coping patterns. In my opinion, the DOC was responsible in its decision to delay hormonal treatment. A more thorough assessment is warranted.