UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**IN RE: SANDY J. BATTISTA, Plaintiff**

CIVIL ACTION
NO.05-11456-DPW.

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE REPORT OF CYNTHIA S. OSBORNE, MSW, AND/OR IN THE ALTERNATIVE, MOTION TO STRIKE

## FACTS:

On July 22, 2005, in response to plaintiff's pending Application for Preliminary Relief, Department of Correction defendant's, annexed to it's Opposition, the Affidavit of a Lawrence M. Weiner, LICSW("Weiner Affidavit")(on file). According to the Weiner Affidavit, defendant's have not provided plaintiff with the prescribed treatment at issue in plaintiff's pending Application for Preliminary Relief, because: (a) the Department of Corrections Health Services Division raised concerns regarding the competence of their own retained gender experts (Fenway Community Health Clinic)("Fenway Clinic"), November 16, 2004 evaluation of the plaintiff; and (b) has since retained another gender expert, Cynthia S. Osborne, MSW, to conduct a "medical peer review" of the Fenway Clinic's evaluation of the plaintiff. See Weiner Affidavit, at ¶6, annexed to the Memorandum of Law in Support of the Opposition of Defendants Kathleen M. Dennehy, Robert Murphy, Susan J. Martin, Steven Fairly, and Gregory Hughes to Plaintiff's Request for a Preliminary Injunction("Defendant's Opposition")(on file).

On October 26, 2005, in response to plaintiff's October 17, 2005 Affidavit, defendant's annexed to the Second Affidavit of

Lawrence M. Weiner, LICSW("Second Weiner Affidavit"), the "Medical Peer Review Report" of Cynthia S. Osborne, MSW("Osborne Report")(on file).

## ARGUMENT:

I. The "Osborne Report" Does Not Meet The Standard For Admission Of Opinion Testimony Established By The Supreme Court In Daubert vs. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). And Therefore, Should Be Excluded And/Or Stricken From The Record.

Traditionally, the standard for admission of scientific data was whether the underlying premise was generally accepted within the branch of the scientific community which devotes itself to research and analysis of the relevant issues. **Frye vs. United States,** 293 Fed. 1013, 1014 (D.C.Cir.1923); adopted in Massachusetts, **Commonwealth vs. Fatalo,** 346 Mass. 266 (1963). The legal theory was that if there was general acceptance within the relevant scientific community then the scientific theory was likely reliable.

Subsequently, the theory of admissibility was expanded to allow the proponent to establish admissibility by means other than general acceptance. **Daubert,** supra; adopted in Massachusetts, **Commonwealth vs. Lanigan,** 419 Mass. 15 (1994); see also, **Commonwealth vs. Sands,** 424 Mass. 184 (1997). However, the Court has cautioned that general acceptance remains significant and is "often the only issue." $\underline{1/}$ **Lanigan,** 419 Mass. at 26.

_____

[1] Apparently, the situation in which a test other than general acceptance will be applied is in those rare cases where a "... method of theory could be so novel that it has not yet had time to appear in the scientific literature. And thus, have gained general acceptance in the relevant scientific community but could nonetheless be sufficiently reliable to be the basis of admissible expert testimony." See **Case of Canavan,** 432 Mass. 304, 315 (2000).

In **Lanigan,** supra, the Supreme Judicial Court considered whether the Commonwealth would revise its rules for the admissibility of expert scientific opinions. Prior to **Lanigan,** a proponent of expert testimony had to show that the "community of scientists involved generally accepts the theory or process." Id. 419 Mass. at 24, citing **Frye,** supra. In **Lanigan,** the court recognized that, in our scientific and technical era., there could be some science that was ahead of its time - valid but not generally accepted. The court, in adopting certain parts of **Daubert,** supra, recognized that "[t]he ultimate test...is the reliability of the theory or process underlying the expert's testimony." **Lanigan,** 419 Mass. at 24.

In **Canavan's Case,** supra, the Supreme Judicial Court considered the question that it had expressly reserved in **Vassallo vs. Baxter Healthcare Corp.,** 428 Mass. 1, 15 and n.15 (1998) - "whether expert testimony based on, inter alia, personal observations and clinical experience would be admissible without application of the **Lanigan** analysis." **Canavan's Case,** 432 Mass. at 313. The court concluded that "[t]here is no logical reason why conclusions based on personal observations or clinical experience should not be subject to the **Lanigan** analysis." Id. "Observation informed by experience is but one scientific technique that is no

---

Footnote [1] Continued:

In the **Canavan Case,** the Supreme Judicial Court held that "...determining whether novel scientific testimony is reliable will hinge on presentations of the parties..." and concluded that "...a trial judge is required to assess the credibility of various expert witnesses in determining whether proposed scientific testimony is reliable." Id. 432 Mass. at 316. The Supreme Judicial Court further concluded that this required determination is "fact-intensive." Id.

-4-

less susceptible to **Lanigan** analysis than other types of
scientific methodology." Id. Personal observation may be a
reliable method, so long as the "method of personal observation
is either generally accepted by the relevant scientific community
or otherwise reliable to support a scientific conclusion relevant
to the case...." Id. 419 Mass. at 313-14. In making this deter-
mination, the trial judge must, of necessity, make some judgment
about the credibility of the expert. Id. at 312. That someone is
an expert does not automatically mean that his/her opinion is
reliable. See, e.g., **Boston Gass Co. vs. Assessors of Boston,**
334 Mass. 549, 579 (1957)("That a person qualifies as an expert
does not endow his testimony with magic qualities"). If the
opinion is not based on a reliable methodology, it is not admiss-
ible. **Lanigan,** 419 Mass. at 26; **Canavan's Case,** 432 Mass. at 315.

In the case at hand, the Osborne Report falls short of
meeting the above established criteria for admissibility of
scientific opinion testimony for several reasons. First, the
Osborne Report offers no credentials in the form of the experts
curriculum vitae or otherwise demonstrates any experience in
this specialized area of conducting medical peer reviews of a
peers performance. Her "claimed experience" is meaningless if
she cannot demonstrate that her methods and techniques for per-
forming medical peer reviews are valid and generally accepted
within the relevant scientific community. Id.

Second, the Osborne Report offers no empirical support for
the experts self-described methodology of determining the comp-
etence of the Fenway Clinic's evaluation of the plaintiff. The

-5-

explanations given makes clear that it is pure personal obser-

vation wherein the expert can make findings and attach signif-

icance to her findings only on her personal "say-so." For exam-

ple, the Osborne Report provided no empirical support for the

experts opinion that a prior determination of "sexual dangerous-

ness" or diagnosis of "pedophilia" has been validated or gener-

ally accepted to preclude hormonal therapy. To the contrary,

the Standards of Care do not preclude hormonal therapy as a

result of any co-morbid psychiatric condition. Rather, the

Standards of Care require the mental health professional "to

accurately diagnose any co-morbid psychiatric conditions and

see to their appropriate treatment," as well as "to ascertain

eligibility and rediness for hormone and surgical therapy."

Exactly what the Fenway Clinic has done. See ATTCHMENT-A (Stand-

ards of Care, at page-6 §IV "The Mental Health Professional").

Here, much of the Osborne Report has the same flavor — personal,

speculative, and unsupported by any reference to scientific

knowledge that the experts findings have been validated or gen-

erally accepted within the relevant scientific community. More-

over, the Osborne Report acknowledges that the expert has not

conducted "a clinical evaluation of [the plaintiff] and, there-

fore, it is not within the scope of [the experts] present role

to diagnose [the plaintiff]." However, the expert makes clinical

references to diagnosis' of "Sociopathy," "Psychopathy," "Border-

line Personality Disorder," "Transvestic Fetishism," and "Nar-

cissistic Personality" when referencing the appropriateness of

of hormonal treatment, despite the fact that the plaintiff has

not been competently diagnosed with either of these mental dis-

orders. No where does the expert mention that she even attempted to contact the Fenway Clinic or any of plaintiff's treating therapists to verify any of the areas highlighted in the Osborne Report. Simply because the Fenway Clinic chose not to make reference to those areas in their report, does not automatically support the finding that they did not consider those areas in their clinical evaluations of the plaintiff. $\frac{2}{}$ This opinion, like the experts opinion regarding the plaintiff's prior determination of "sexual dangerousness" and diagnosis of "pedophilia," is so incredible that no reasonable factfinder could accept it. Personal observation and hypothectical speculation is not expertise. Expertise is knowledge, informed by testable, peer-reviewed, accuracy in the conclusions of the theory, technique or methodology underlying the recitation of the knowledge.

Third, a common theme throughout the Osborne Report makes findings and the appropriateness of hormonal therapy while "incarcerated." Here, the Osborne Report suffers from an obvious flaw. Persons like the plaintiff, who have been "civilly-committed," are committed to "a secure mental health facility," **Commonwealth vs. Knapp,** 441 Mass. 157, 168-69 (Mass.2004) ("Those confined are held in the treatment center [a secure mental health facility], not a correctional facility"), for "treatment" and "rehabilitation," **Commonwealth vs. Bruno,** 432

---

[2] It is further noted here that, the Osborne Report provides no evidence that the Fenway Clinic's "report" (attached to the Complaint as Exhibit-10), is not in conventional format with that of other relevant mental health professionals. Compare, e.g., the "report" of Diane Ellaborn, LICSW, dated Osctober 17, 2001, annexed herewith as ATTACHMENT-B.

Mass. 489, 500-01 (2000)(citing M.G.L. c.123A, §2) and, there-
fore, are statutorily and constitutionally entitled "to more
considerate treatment and conditions of confinement than pris-
oners whose conditions of confinement are designed to punish."
**Youngberg vs. Romeo,** 457 U.S. 307, 322 (1982).

Fourth and lastly, the Osborne Report suffers from another
blatant (and fatal) flaw. The expert makes no reference relevant
to the necessity and appropriateness of treating plaintiff's
gender issues and the impact on her commitment if not provided
access to the prescribed treatment at issue. For example, records
at the experts disposal clearly reveal that, aside from plaint-
iff's original commitment being premised in part around her
gender issues, several of her treating therapist have deemed
her gender issues "a necessary component of her sex offender
treatment plan," and have instructed her to seek treatment to
address her gender issues. Thus, the necessity and appropriate-
ness of the right to treatment is not just a matter of plain-
tiff's health and well-being, but whether treatment is statut-
orily and constitutionally mandated. See, e.g., **Leamer vs.**
**Fauver,** 288 F.3d 532, 546-47 (3d Cir.2002).

The plaintiff concludes by arguing that the Court is amply
warranted in finding that the Osborne Report is not credible;
and does not meet the standard for admissibility of scientific
opinion testimony. The foundation for the admissibility of
opinion testimony is that the evidence must come from someone
with demonstrated expertise on the issue in controversy. Which
the Osborne Report has not done. All of the experts testimony

-8-

contained in the Osborne Report is little more than hypoth-
ectical speculation, ungrounded in any scientific discipline,
empirical studies or research. The expert only gave "lip service"
to the expression "research," but nothing of substance or con-
tent.

### CONCLUSION

Based upon the foregoing reasons, it is respectfully
suggested that this Court ALLOWS this Motion and issues an
Order excluding and/or striking from the record the Osborne
Report.

Dated: November 3, 2005        Respectfully submitted,

Sandy J. Battista, #M-15930
Plaintiff/Pro-se
Mass. Treatment Center
30 Administration Rd.
Bridgewater, Mass. 02324-3230

**ATTACHMENT A**

# The Harry Benjamin International Gender Dysphoria Association's

# Standards of Care for Gender Identity Disorders, Sixth Version

## February, 2001

Committee Members: Walter Meyer III M.D. (Chairperson), Walter O. Bockting Ph.D., Peggy Cohen-Kettenis Ph.D., Eli Coleman Ph.D., Domenico DiCeglie M.D., Holly Devor Ph.D., Louis Gooren M.D., Ph.D., J. Joris Hage M.D., Sheila Kirk M.D., Bram Kuiper Ph.D., Donald Laub M.D., Anne Lawrence M.D., Yvon Menard M.D., Jude Patton PA-C, Leah Schaefer Ed.D., Alice Webb D.H.S., Connie Christine Wheeler Ph.D.

This is the sixth version of the Standards of Care since the original 1979 document. Previous revisions were in 1980, 1981, 1990, and 1998.

## Table of Contents:

I.     Introductory Concepts
II.    Epidemiological Considerations
III.   Diagnostic Nomenclature
IV.    The Mental Health Professional
V.     Assessment and Treatment of Children and Adolescents
VI.    Psychotherapy with Adults
VII.   Requirements for Hormone Therapy for Adults
VIII.  Effects of Hormone Therapy in Adults
IX.    The Real-Life Experience
X.     Surgery
XI.    Breast Surgery
XII.   Genital Surgery
XIII.  Post-Transition Follow-Up

## I. Introductory Concepts

**The Purpose of the Standards of Care**. The major purpose of the Standards of Care (SOC) is to articulate this international organization's professional consensus about the psychiatric, psychological, medical, and surgical management of gender identity disorders. Professionals may use this document to understand the parameters within which they may offer assistance to those with these conditions. Persons with gender identity disorders, their families, and social institutions may use the SOC to understand the current thinking of professionals. All readers should be aware of the limitations of knowledge in this area and of the hope that some of the clinical uncertainties will be resolved in the future through scientific investigation.

**The Overarching Treatment Goal.** The general goal of psychotherapeutic, endocrine,

or surgical therapy for persons with gender identity disorders is lasting personal comfort with the gendered self in order to maximize overall psychological well-being and self-fulfillment.

**The Standards of Care Are Clinical Guidelines.** The SOC are intended to provide flexible directions for the treatment of persons with gender identity disorders. When eligibility requirements are stated they are meant to be minimum requirements. Individual professionals and organized programs may modify them. Clinical departures from these guidelines may come about because of a patient's unique anatomic, social, or psychological situation, an experienced professional's evolving method of handling a common situation, or a research protocol. These departures should be recognized as such, explained to the patient, and documented both for legal protection and so that the short and long term results can be retrieved to help the field to evolve.

**The Clinical Threshold.** A clinical threshold is passed when concerns, uncertainties, and questions about gender identity persist during a person's development, become so intense as to seem to be the most important aspect of a person's life, or prevent the establishment of a relatively unconflicted gender identity. The person's struggles are then variously informally referred to as a gender identity problem, gender dysphoria, a gender problem, a gender concern, gender distress, gender conflict, or transsexualism. Such struggles are known to occur from the preschool years to old age and have many alternate forms. These reflect various degrees of personal dissatisfaction with sexual identity, sex and gender demarcating body characteristics, gender roles, gender identity, and the perceptions of others. When dissatisfied individuals meet specified criteria in one of two official nomenclatures--the International Classification of Diseases-10 (ICD-10) or the Diagnostic and Statistical Manual of Mental Disorders--Fourth Edition (DSM-IV)--they are formally designated as suffering from a gender identity disorder (GID). Some persons with GID exceed another threshold--they persistently possess a wish for surgical transformation of their bodies.

**Two Primary Populations with GID Exist -- Biological Males and Biological Females.** The sex of a patient always is a significant factor in the management of GID. Clinicians need to separately consider the biologic, social, psychological, and economic dilemmas of each sex. All patients, however, should follow the SOC.

(back to top)

## II. Epidemiological Considerations

**Prevalence.** When the gender identity disorders first came to professional attention, clinical perspectives were largely focused on how to identify candidates for sex reassignment surgery. As the field matured, professionals recognized that some persons with bona fide gender identity disorders neither desired nor were candidates for sex reassignment surgery. The earliest estimates of prevalence for transsexualism in adults were 1 in 37,000 males and 1 in 107,000 females. The most recent prevalence information from the Netherlands for the transsexual end of the gender identity disorder spectrum is 1 in 11,900 males and 1 in 30,400 females. Four observations, not yet firmly supported by systematic study, increase the likelihood of an even higher prevalence: 1) unrecognized gender problems are occasionally diagnosed when patients are seen with anxiety,

depression, bipolar disorder, conduct disorder, substance abuse, dissociative identity disorders, borderline personality disorder, other sexual disorders and intersexed conditions; 2) some nonpatient male transvestites, female impersonators, transgender people, and male and female homosexuals may have a form of gender identity disorder; 3) the intensity of some persons' gender identity disorders fluctuates below and above a clinical threshold; 4) gender variance among female-bodied individuals tends to be relatively invisible to the culture, particularly to mental health professionals and scientists.

**Natural History of Gender Identity Disorders.** Ideally, prospective data about the natural history of gender identity struggles would inform all treatment decisions. These are lacking, except for the demonstration that, without therapy, most boys and girls with gender identity disorders outgrow their wish to change sex and gender. After the diagnosis of GID is made the therapeutic approach usually includes three elements or phases (sometimes labeled triadic therapy): a real-life experience in the desired role, hormones of the desired gender, and surgery to change the genitalia and other sex characteristics. Five less firmly scientifically established observations prevent clinicians from prescribing the triadic therapy based on diagnosis alone: 1) some carefully diagnosed persons spontaneously change their aspirations; 2) others make more comfortable accommodations to their gender identities without medical interventions; 3) others give up their wish to follow the triadic sequence during psychotherapy; 4) some gender identity clinics have an unexplained high drop out rate; and 5) the percentage of persons who are not benefited from the triadic therapy varies significantly from study to study. Many persons with GID will desire all three elements of triadic therapy. Typically, triadic therapy takes place in the order of hormones ==> real-life experience ==> surgery, or sometimes: real-life experience ==> hormones ==> surgery. For some biologic females, the preferred sequence may be hormones ==> breast surgery ==> real-life experience. However, the diagnosis of GID invites the consideration of a variety of therapeutic options, only one of which is the complete therapeutic triad. Clinicians have increasingly become aware that not all persons with gender identity disorders need or want all three elements of triadic therapy.

**Cultural Differences in Gender Identity Variance throughout the World.** Even if epidemiological studies established that a similar base rate of gender identity disorders existed all over the world, it is likely that cultural differences from one country to another would alter the behavioral expressions of these conditions. Moreover, access to treatment, cost of treatment, the therapies offered and the social attitudes towards gender variant people and the professionals who deliver care differ broadly from place to place. While in most countries, crossing gender boundaries usually generates moral censure rather than compassion, there are striking examples in certain cultures of cross- gendered behaviors (e.g., in spiritual leaders) that are not stigmatized.

(back to top)

## III. Diagnostic Nomenclature

**The Five Elements of Clinical Work.** Professional involvement with patients with gender identity disorders involves any of the following: diagnostic assessment, psychotherapy, real-life experience, hormone therapy, and surgical therapy. This section provides a background on diagnostic assessment.

**The Development of a Nomenclature**. The term *transexxual* emerged into professional and public usage in the 1950s as a means of designating a person who aspired to or actually lived in the anatomically contrary gender role, whether or not hormones had been administered or surgery had been performed. During the 1960s and 1970s, clinicians used the term *true transsexual*. The true transsexual was thought to be a person with a characteristic path of atypical gender identity development that predicted an improved life from a treatment sequence that culminated in genital surgery. True transsexuals were thought to have: 1) cross-gender identifications that were consistently expressed behaviorally in childhood, adolescence, and adulthood; 2) minimal or no sexual arousal to cross-dressing; and 3) no heterosexual interest, relative to their anatomic sex. True transsexuals could be of either sex. True transsexual males were distinguished from males who arrived at the desire to change sex and gender via a reasonably masculine behavioral developmental pathway. Belief in the true transsexual concept for males dissipated when it was realized that such patients were rarely encountered, and that some of the original true transsexuals had falsified their histories to make their stories match the earliest theories about the disorder. The concept of true transsexual females never created diagnostic uncertainties, largely because patient histories were relatively consistent and gender variant behaviors such as female cross-dressing remained unseen by clinicians. The term "gender dysphoria syndrome" was later adopted to designate the presence of a gender problem in either sex until psychiatry developed an official nomenclature.

The diagnosis of Transsexualism was introduced in the DSM-III in 1980 for gender dysphoric individuals who demonstrated at least two years of continuous interest in transforming the sex of their bodies and their social gender status. Others with gender dysphoria could be diagnosed as Gender Identity Disorder of Adolescence or Adulthood, Nontranssexual Type; or Gender Identity Disorder Not Otherwise Specified (GIDNOS). These diagnostic terms were usually ignored by the media, which used the term transsexual for any person who wanted to change his/her sex and gender.

**The DSM-IV**. In 1994, the DSM-IV committee replaced the diagnosis of Transsexualism with Gender Identity Disorder. Depending on their age, those with a strong and persistent cross-gender identification and a persistent discomfort with their sex or a sense of inappropriateness in the gender role of that sex were to be diagnosed as Gender Identity Disorder of Childhood (302.6), Adolescence, or Adulthood (302.85). For persons who did not meet these criteria, Gender Identity Disorder Not Otherwise Specified (GIDNOS) (302.6) was to be used. This category included a variety of individuals, including those who desired only castration or penectomy without a desire to develop breasts, those who wished hormone therapy and mastectomy without genital reconstruction, those with a congenital intersex condition, those with transient stress-related cross-dressing, and those with considerable ambivalence about giving up their gender status. Patients diagnosed with GID and GIDNOS were to be subclassified according to the sexual orientation: attracted to males; attracted to females; attracted to both; or attracted to neither. This subclassification was intended to assist in determining, over time, whether individuals of one sexual orientation or another experienced better outcomes using particular therapeutic approaches; it was **not** intended to guide treatment decisions.

Between the publication of DSM-III and DSM-IV, the term "transgender" began to be used in various ways. Some employed it to refer to those with unusual gender identities in

a value-free manner -- that is, without a connotation of psychopathology. Some people informally used the term to refer to any person with any type of gender identity issues. Transgender is not a formal diagnosis, but many professionals and members of the public found it easier to use informally than GIDNOS, which is a formal diagnosis.

**The ICD-10.** The ICD-10 now provides five diagnoses for the gender identity disorders (F64):

**Transsexualism** (F64.0) has three criteria:
1. The desire to live and be accepted as a member of the opposite sex, usually accompanied by the wish to make his or her body as congruent as possible with the preferred sex through surgery and hormone treatment;
2. The transsexual identity has been present persistently for at least two years;
3. The disorder is not a symptom of another mental disorder or a chromosomal abnormality.

**Dual-role Transvestism** (F64.1) has three criteria:
1. The individual wears clothes of the opposite sex in order to experience temporary membership in the opposite sex;
2. There is no sexual motivation for the cross-dressing;
3. The individual has no desire for a permanent change to the opposite sex.

**Gender Identity Disorder of Childhood** (64.2) has separate criteria for girls and for boys.
For girls:
1. The individual shows persistent and intense distress about being a girl, and has a stated desire to be a boy (not merely a desire for any perceived cultural advantages to being a boy) or insists that she is a boy;
2. Either of the following must be present:
   a. Persistent marked aversion to normative feminine clothing and insistence on wearing stereotypical masculine clothing;
   b. Persistent repudiation of female anatomical structures, as evidenced by at least one of the following:
      1. An assertion that she has, or will grow, a penis;
      2. Rejection of urination in a sitting position;
      3. Assertion that she does not want to grow breasts or menstruate.
3. The girl has not yet reached puberty;
4. The disorder must have been present for at least 6 months.
For boys:
1. The individual shows persistent and intense distress about being a boy, and has a desire to be a girl, or, more rarely, insists that he is a girl.
2. Either of the following must be present:
   a. Preoccupation with stereotypic female activities, as shown by a preference for either cross-dressing or simulating female attire, or by an intense desire to participate in the games and pastimes of girls and rejection of stereotypical male toys, games, and activities;
   b. Persistent repudiation of male anatomical structures, as evidenced by at least one of the following repeated assertions:
      1. That he will grow up to become a woman (not merely in the

role);
2. That his penis or testes are disgusting or will disappear;
3. That it would be better not to have a penis or testes.
3. The boy has not yet reached puberty;
4. The disorder must have been present for at least 6 months.

**Other Gender Identity Disorders** (F64.8) has no specific criteria.

**Gender Identity Disorder, Unspecified** has no specific criteria.

Either of the previous two diagnoses could be used for those with an intersexed condition.

The purpose of the DSM-IV and ICD-10 is to guide treatment and research. Different professional groups created these nomenclatures through consensus processes at different times. There is an expectation that the differences between the systems will be eliminated in the future. At this point, the specific diagnoses are based more on clinical reasoning than on scientific investigation.

**Are Gender Identity Disorders Mental Disorders?** To qualify as a mental disorder, a behavioral pattern must result in a significant adaptive disadvantage to the person or cause personal mental suffering. The DSM-IV and ICD-10 have defined hundreds of mental disorders which vary in onset, duration, pathogenesis, functional disability, and treatability. The designation of gender identity disorders as mental disorders is not a license for stigmatization, or for the deprivation of gender patients' civil rights. The use of a formal diagnosis is often important in offering relief, providing health insurance coverage, and guiding research to provide more effective future treatments.

(back to top)

## IV. The Mental Health Professional

**The Ten Tasks of the Mental Health Professional.** Mental health professionals (MHPs) who work with individuals with gender identity disorders may be regularly called upon to carry out many of these responsibilities:
1. To accurately diagnose the individual's gender disorder;
2. To accurately diagnose any co-morbid psychiatric conditions and see to their appropriate treatment;
3. To counsel the individual about the range of treatment options and their implications;
4. To engage in psychotherapy;
5. To ascertain eligibility and readiness for hormone and surgical therapy;
6. To make formal recommendations to medical and surgical colleagues;
7. To document their patient's relevant history in a letter of recommendation;
8. To be a colleague on a team of professionals with an interest in the gender identity disorders;
9. To educate family members, employers, and institutions about gender identity disorders;
10. To be available for follow-up of previously seen gender patients.

**The Adult-Specialist.** The education of the mental health professional who specializes in adult gender identity disorders rests upon basic general clinical competence in diagnosis and treatment of mental or emotional disorders. Clinical training may occur within any formally credentialing discipline -- for example, psychology, psychiatry, social work, counseling, or nursing. The following are the recommended minimal credentials for special competence with the gender identity disorders:

1. A master's degree or its equivalent in a clinical behavioral science field. This or a more advanced degree should be granted by an institution accredited by a recognized national or regional accrediting board. The mental health professional should have documented credentials from a proper training facility and a licensing board.
2. Specialized training and competence in the assessment of the DSM-IV/ICD-10 Sexual Disorders (not simply gender identity disorders).
3. Documented supervised training and competence in psychotherapy.
4. Continuing education in the treatment of gender identity disorders, which may include attendance at professional meetings, workshops, or seminars or participating in research related to gender identity issues.

**The Child-Specialist.** The professional who evaluates and offers therapy for a child or early adolescent with GID should have been trained in childhood and adolescent developmental psychopathology. The professional should be competent in diagnosing and treating the ordinary problems of children and adolescents. These requirements are in addition to the adult-specialist requirement.

**The Differences between Eligibility and Readiness.** The SOC provide recommendations for eligibility requirements for hormones and surgery. Without first meeting these recommended eligibility requirements, the patient and the therapist should not request hormones or surgery. An example of an eligibility requirement is: a person must live full time in the preferred gender for twelve months prior to genital surgery. To meet this criterion, the professional needs to document that the real-life experience has occurred for this duration. Meeting readiness criteria -- further consolidation of the evolving gender identity or improving mental health in the new or confirmed gender role -- is more complicated, because it rests upon the clinician's and the patient's judgment.

**The Mental Health Professional's Relationship to the Prescribing Physician and Surgeon.** Mental health professionals who recommend hormonal and surgical therapy share the legal and ethical responsibility for that decision with the physician who undertakes the treatment. Hormonal treatment can often alleviate anxiety and depression in people without the use of additional psychotropic medications. Some individuals, however, need psychotropic medication prior to, or concurrent with, taking hormones or having surgery. The mental health professional is expected to make this assessment, and see that the appropriate psychotropic medications are offered to the patient. The presence of psychiatric co-morbidities does not necessarily preclude hormonal or surgical treatment, but some diagnoses pose difficult treatment dilemmas and may delay or preclude the use of either treatment.

**The Mental Health Professional's Documentation Letter for Hormone Therapy or Surgery Should Succinctly Specify:**

1. The patient's general identifying characteristics;
2. The initial and evolving gender, sexual, and other psychiatric diagnoses;
3. The duration of their professional relationship including the type of psychotherapy or evaluation that the patient underwent;
4. The eligibility criteria that have been met and the mental health professional's rationale for hormone therapy or surgery;
5. The degree to which the patient has followed the Standards of Care to date and the likelihood of future compliance;
6. Whether the author of the report is part of a gender team;
7. That the sender welcomes a phone call to verify the fact that the mental health professional actually wrote the letter as described in this document.

The organization and completeness of these letters provide the hormone- prescribing physician and the surgeon an important degree of assurance that mental health professional is knowledgeable and competent concerning gender identity disorders.

**One Letter is Required for Instituting Hormone Therapy, or for Breast Surgery.** One letter from a mental health professional, including the above seven points, written to the physician who will be responsible for the patient's medical treatment, is sufficient for instituting hormone therapy or for a referral for breast surgery (e.g., mastectomy, chest reconstruction, or augmentation mammoplasty).

**Two Letters are Generally Required for Genital Surgery.** Genital surgery for biologic males may include orchiectomy, penectomy, clitoroplasty, labiaplasty or creation of a neovagina; for biologic females it may include hysterectomy, salpingo-oophorectomy, vaginectomy, metoidioplasty, scrotoplasty, urethroplasty, placement of testicular prostheses, or creation of a neophallus.

It is ideal if mental health professionals conduct their tasks and periodically report on these processes as part of a team of other mental health professionals and nonpsychiatric physicians. One letter to the physician performing genital surgery will generally suffice as long as two mental health professionals sign it.

More commonly, however, letters of recommendation are from mental health professionals who work alone without colleagues experienced with gender identity disorders. Because professionals working independently may not have the benefit of ongoing professional consultation on gender cases, two letters of recommendation are required prior to initiating genital surgery. If the first letter is from a person with a master's degree, the second letter should be from a psychiatrist or a Ph.D. clinical psychologist, who can be expected to adequately evaluate co-morbid psychiatric conditions. If the first letter is from the patient's psychotherapist, the second letter should be from a person who has only played an evaluative role for the patient. Each letter, however, is expected to cover the same topics. At least one of the letters should be an extensive report. The second letter writer, having read the first letter, may choose to offer a briefer summary and an agreement with the recommendation.

(back to top)

## V. Assessment and Treatment of Children and Adolescents

**Phenomenology.** Gender identity disorders in children and adolescents are different from those seen in adults, in that a rapid and dramatic developmental process (physical, psychological and sexual) is involved. Gender identity disorders in children and adolescents are complex conditions. The young person may experience his or her phenotype sex as inconsistent with his or her own sense of gender identity. Intense distress is often experienced, particularly in adolescence, and there are frequently associated emotional and behavioral difficulties. There is greater fluidity and variability in outcomes, especially in pre-pubertal children. Only a few gender variant youths become transsexual, although many eventually develop a homosexual orientation.

Commonly seen features of gender identity conflicts in children and adolescents include a stated desire to be the other sex; cross dressing; play with games and toys usually associated with the gender with which the child identifies; avoidance of the clothing, demeanor and play normally associated with the child's sex and gender of assignment; preference for playmates or friends of the sex and gender with which the child identifies; and dislike of bodily sex characteristics and functions. Gender identity disorders are more often diagnosed in boys.

Phenomenologically, there is a qualitative difference between the way children and adolescents present their sex and gender predicaments, from and the presentation of delusions or other psychotic symptoms. Delusional beliefs about their body or gender can occur in psychotic conditions but they can be distinguished from the phenomenon of a gender identity disorder. Gender identity disorders in childhood are not equivalent to those in adulthood and the former do not inevitably lead to the latter. The younger the child the less certain and perhaps more malleable the outcome.

**Psychological and Social Interventions.** The task of the child-specialist mental health professional is to provide assessment and treatment that broadly conforms to the following guidelines:
1. The professional should recognize and accept the gender identity problem. Acceptance and removal of secrecy can bring considerable relief.
2. The assessment should explore the nature and characteristics of the child's or adolescent's gender identity. A complete psychodiagnostic and psychiatric assessment should be performed. A complete assessment should include a family evaluation, because other emotional and behavioral problems are very common, and unresolved issues in the child's environment are often present.
3. Therapy should focus on ameliorating any comorbid problems in the child's life, and on reducing distress the child experiences from his or her gender identity problem and other difficulties. The child and family should be supported in making difficult decisions regarding the extent to which to allow the child to assume a gender role consistent with his or her gender identity. This includes issues of whether to inform others of the child's situation, and how others in the child's life should respond; for example, whether the child should attend school using a name and clothing opposite to his or her sex of assignment. They should also be supported in tolerating uncertainty and anxiety in relation to the child's gender expression and how best to manage it. Professional network meetings can be very useful in finding appropriate solutions to these problems.

**Physical Interventions**. Before any physical intervention is considered, extensive exploration of psychological, family and social issues should be undertaken. Physical interventions should be addressed in the context of adolescent development. Adolescents' gender identity development can rapidly and unexpectedly evolve. An adolescent shift toward gender conformity can occur primarily to please the family, and may not persist or reflect a permanent change in gender identity. Identity beliefs in adolescents may become firmly held and strongly expressed, giving a false impression of irreversibility; more fluidity may return at a later stage. For these reasons, irreversible physical interventions should be delayed as long as is clinically appropriate. Pressure for physical interventions because of an adolescent's level of distress can be great and in such circumstances a referral to a child and adolescent multi- disciplinary specialty service should be considered, in locations where these exist.

Physical interventions fall into three categories or stages:
1. Fully reversible interventions. These involve the use of LHRH agonists or medroxyprogesterone to suppress estrogen or testosterone production, and consequently to delay the physical changes of puberty.
2. Partially reversible interventions. These include hormonal interventions that masculinize or feminize the body, such as administration of testosterone to biologic females and estrogen to biologic males. Reversal may involve surgical intervention.
3. Irreversible interventions. These are surgical procedures.

A staged process is recommended to keep options open through the first two stages. Moving from one state to another should not occur until there has been adequate time for the young person and his/her family to assimilate fully the effects of earlier interventions.

**Fully Reversible Interventions.** Adolescents may be eligible for puberty-delaying hormones as soon as pubertal changes have begun. In order for the adolescent and his or her parents to make an informed decision about pubertal delay, it is recommended that the adolescent experience the onset of puberty in his or her biologic sex, at least to Tanner Stage Two. If for clinical reasons it is thought to be in the patient's interest to intervene earlier, this must be managed with pediatric endocrinological advice and more than one psychiatric opinion.

Two goals justify this intervention: a) to gain time to further explore the gender identity and other developmental issues in psychotherapy; and b) to make passing easier if the adolescent continues to pursue sex and gender change. In order to provide puberty delaying hormones to an adolescent, the following criteria must be met:
1. throughout childhood the adolescent has demonstrated an intense pattern of cross-sex and cross-gender identity and aversion to expected gender role behaviors;
2. sex and gender discomfort has significantly increased with the onset of puberty;
3. the family consents and participates in the therapy.

Biologic males should be treated with LHRH agonists (which stop LH secretion and therefore testosterone secretion), or with progestins or antiandrogens (which block testosterone secretion or neutralize testosterone action). Biologic females should be treated with LHRH agonists or with sufficient progestins (which stop the production of estrogens and progesterone) to stop menstruation.

**Partially Reversible Interventions**. Adolescents may be eligible to begin masculinizing or feminizing hormone therapy, as early as age 16, preferably with parental consent. In many countries 16-year olds are legal adults for medical decision making, and do not require parental consent.

Mental health professional involvement is an eligibility requirement for triadic therapy during adolescence. For the implementation of the real-life experience or hormone therapy, the mental health professional should be involved with the patient and family for a minimum of six months. While the number of sessions during this six-month period rests upon the clinician's judgment, the intent is that hormones and the real-life experience be thoughtfully and recurrently considered over time. In those patients who have already begun the real-life experience prior to being seen, the professional should work closely with them and their families with the thoughtful recurrent consideration of what is happening over time.

**Irreversible Interventions**. Any surgical intervention should not be carried out prior to adulthood, or prior to a real-life experience of at least two years in the gender role of the sex with which the adolescent identifies. The threshold of 18 should be seen as an eligibility criterion and not an indication in itself for active intervention.

(back to top)

## VI. Psychotherapy with Adults

**A Basic Observation.** Many adults with gender identity disorder find comfortable, effective ways of living that do not involve all the components of the triadic treatment sequence. While some individuals manage to do this on their own, psychotherapy can be very helpful in bringing about the discovery and maturational processes that enable self-comfort.

**Psychotherapy is Not an Absolute Requirement for Triadic Therapy.** Not every adult gender patient requires psychotherapy in order to proceed with hormone therapy, the real-life experience, hormones, or surgery. Individual programs vary to the extent that they perceive a need for psychotherapy. When the mental health professional's initial assessment leads to a recommendation for psychotherapy, the clinician should specify the goals of treatment, and estimate its frequency and duration. There is no required minimum number of psychotherapy sessions prior to hormone therapy, the real-life experience, or surgery, for three reasons: 1) patients differ widely in their abilities to attain similar goals in a specified time; 2) a minimum number of sessions tends to be construed as a hurdle, which discourages the genuine opportunity for personal growth; 3) the mental health professional can be an important support to the patient throughout all phases of gender transition. Individual programs may set eligibility criteria to some minimum number of sessions or months of psychotherapy.

The mental health professional who conducts the initial evaluation need not be the psychotherapist. If members of a gender team do not do psychotherapy, the psychotherapist should be informed that a letter describing the patient's therapy might be requested so the patient can proceed with the next phase of treatment.

**Goals of Psychotherapy.** Psychotherapy often provides education about a range of options not previously seriously considered by the patient. It emphasizes the need to set realistic life goals for work and relationships, and it seeks to define and alleviate the patient's conflicts that may have undermined a stable lifestyle.

**The Therapeutic Relationship.** The establishment of a reliable trusting relationship with the patient is the first step toward successful work as a mental health professional. This is usually accomplished by competent nonjudgmental exploration of the gender issues with the patient during the initial diagnostic evaluation. Other issues may be better dealt with later, after the person feels that the clinician is interested in and understands their gender identity concerns. Ideally, the clinician's work is with the whole of the person's complexity. The goals of therapy are to help the person to live more comfortably within a gender identity and to deal effectively with non-gender issues. The clinician often attempts to facilitate the capacity to work and to establish or maintain supportive relationships. Even when these initial goals are attained, mental health professionals should discuss the likelihood that no educational, psychotherapeutic, medical, or surgical therapy can permanently eradicate all vestiges of the person's original sex assignment and previous gendered experience.

**Processes of Psychotherapy.** Psychotherapy is a series of interactive communications between a therapist who is knowledgeable about how people suffer emotionally and how this may be alleviated, and a patient who is experiencing distress. Typically, psychotherapy consists of regularly held 50 minute sessions. The psychotherapy sessions initiate a developmental process. They enable the patient's history to be appreciated current dilemmas to be understood, and unrealistic ideas and maladaptive behaviors to be identified. Psychotherapy is not intended to cure the gender identity disorder. Its usual goal is a long-term stable life style with realistic chances for success in relationships, education, work, and gender identity expression. Gender distress often intensifies relationship, work, and educational dilemmas.

The therapist should make clear that it is the patient's right to choose among many options. The patient can experiment over time with alternative approaches. Ideally, psychotherapy is a collaborative effort. The therapist must be certain that the patient understands the concepts of eligibility and readiness, because the therapist and patient must cooperate in defining the patient's problems, and in assessing progress in dealing with them. Collaboration can prevent a stalemate between a therapist who seems needlessly withholding of a recommendation, and a patient who seems too profoundly distrusting to freely share thoughts, feelings, events, and relationships.

Patients may benefit from psychotherapy at every stage of gender evolution. This includes the post-surgical period, when the anatomic obstacles to gender comfort have been removed, but the person may continue to feel a lack of genuine comfort and skill in living in the new gender role.

**Options for Gender Adaptation.** The activities and processes that are listed below have, in various combinations, helped people to find more personal comfort. These adaptations may evolve spontaneously and during psychotherapy. Finding new gender adaptations does not mean that the person may not in the future elect to pursue hormone therapy, the

real-life experience, or genital surgery.

Activities:

Biological Males:

1. Cross-dressing: unobtrusively with undergarments; unisexually; or in a feminine fashion;
2. Changing the body through: hair removal through electrolysis or body waxing; minor plastic cosmetic surgical procedures;
3. Increasing grooming, wardrobe, and vocal expression skills.

Biological Females:

1. Cross-dressing: unobtrusively with undergarments, unisexually, or in a masculine fashion;
2. Changing the body through breast binding, weight lifting, applying theatrical facial hair;
3. Padding underpants or wearing a penile prosthesis.

Both Genders:

1. Learning about transgender phenomena from: support groups and gender networks, communication with peers via the Internet, studying these Standards of Care, relevant lay and professional literatures about legal rights pertaining to work, relationships, and public cross-dressing;
2. Involvement in recreational activities of the desired gender;
3. Episodic cross-gender living.

Processes:

1. Acceptance of personal homosexual or bisexual fantasies and behaviors (orientation) as distinct from gender identity and gender role aspirations;
2. Acceptance of the need to maintain a job, provide for the emotional needs of children, honor a spousal commitment, or not to distress a family member as currently having a higher priority than the personal wish for constant cross-gender expression;
3. Integration of male and female gender awareness into daily living;
4. Identification of the triggers for increased cross-gender yearnings and effectively attending to them; for instance, developing better self-protective, self-assertive, and vocational skills to advance at work and resolve interpersonal struggles to strengthen key relationships.

(back to top)

## VII. Requirements for Hormone Therapy for Adults

**Reasons for Hormone Therapy.** Cross-sex hormonal treatments play an important role in the anatomical and psychological gender transition process for properly selected adults with gender identity disorders. Hormones are often medically necessary for successful living in the new gender. They improve the quality of life and limit psychiatric co-morbidity, which often accompanies lack of treatment. When physicians administer androgens to biologic females and estrogens, progesterone, and testosterone-blocking agents to biologic males, patients feel and appear more like members of their preferred gender.

**Eligibility Criteria.** The administration of hormones is not to be lightly undertaken

because of their medical and social risks. Three criteria exist.

1. Age 18 years;
2. Demonstrable knowledge of what hormones medically can and cannot do and their social benefits and risks;
3. Either:
   a. a documented real-life experience of at least three months prior to the administration of hormones; or
   b. a period of psychotherapy of a duration specified by the mental health professional after the initial evaluation (usually a minimum of three months).

In selected circumstances, it can be acceptable to provide hormones to patients who have not fulfilled criterion 3 - for example, to facilitate the provision of monitored therapy using hormones of known quality, as an alternative to black-market or unsupervised hormone use.

**Readiness Criteria.** Three criteria exist:

1. The patient has had further consolidation of gender identity during the real-life experience or psychotherapy;
2. The patient has made some progress in mastering other identified problems leading to improving or continuing stable mental health (this implies satisfactory control of problems such as sociopathy, substance abuse, psychosis and suicidality;
3. The patient is likely to take hormones in a responsible manner.

**Can Hormones Be Given To Those Who Do Not Want Surgery or a Real-life Experience?** Yes, but after diagnosis and psychotherapy with a qualified mental health professional following minimal standards listed above. Hormone therapy can provide significant comfort to gender patients who do not wish to cross live or undergo surgery, or who are unable to do so. In some patients, hormone therapy alone may provide sufficient symptomatic relief to obviate the need for cross living or surgery.

**Hormone Therapy and Medical Care for Incarcerated Persons.** Persons who are receiving treatment for gender identity disorders should continue to receive appropriate treatment following these Standards of Care after incarceration. For example, those who are receiving psychotherapy and/or cross-sex hormonal treatments should be allowed to continue this medically necessary treatment to prevent or limit emotional lability, undesired regression of hormonally-induced physical effects and the sense of desperation that may lead to depression, anxiety and suicidality. Prisoners who are subject to rapid withdrawal of cross- sex hormones are particularly at risk for psychiatric symptoms and self- injurious behaviors. Medical monitoring of hormonal treatment as described in these Standards should also be provided. Housing for transgendered prisoners should take into account their transition status and their personal safety.

(back to top)

## VIII. Effects of Hormone Therapy in Adults

The maximum physical effects of hormones may not be evident until two years of continuous treatment. Heredity limits the tissue response to hormones and this cannot be overcome by increasing dosage. The degree of effects actually attained varies from patient

to patient.

**Desired Effects of Hormones.** Biologic males treated with estrogens can realistically expect treatment to result in: breast growth, some redistribution of body fat to approximate a female body habitus, decreased upper body strength, softening of skin, decrease in body hair, slowing or stopping the loss of scalp hair, decreased fertility and testicular size, and less frequent, less firm erections. Most of these changes are reversible, although breast enlargement will not completely reverse after discontinuation of treatment.

Biologic females treated with testosterone can expect the following permanent changes: a deepening of the voice, clitoral enlargement, mild breast atrophy, increased facial and body hair and male pattern baldness. Reversible changes include increased upper body strength, weight gain, increased social and sexual interest and arousability, and decreased hip fat.

**Potential Negative Medical Side Effects.** Patients with medical problems or otherwise at risk for cardiovascular disease may be more likely to experience serious or fatal consequences of cross-sex hormonal treatments. For example, cigarette smoking, obesity, advanced age, heart disease, hypertension, clotting abnormalities, malignancy, and some endocrine abnormalities may increase side effects and risks for hormonal treatment. Therefore, some patients may not be able to tolerate cross-sex hormones. However, hormones can provide health benefits as well as risks. Risk-benefit ratios should be considered collaboratively by the patient and prescribing physician.

Side effects in biologic males treated with estrogens and progestins may include increased propensity to blood clotting (venous thrombosis with a risk of fatal pulmonary embolism), development of benign pituitary prolactinomas, infertility, weight gain, emotional lability, liver disease, gallstone formation, somnolence, hypertension, and diabetes mellitus.

Side effects in biologic females treated with testosterone may include infertility, acne, emotional lability, increases in sexual desire, shift of lipid profiles to male patterns which increase the risk of cardiovascular disease, and the potential to develop benign and malignant liver tumors and hepatic dysfunction.

**The Prescribing Physician's Responsibilities.** Hormones are to be prescribed by a physician, and should not be administered without adequate psychological and medical assessment before and during treatment. Patients who do not understand the eligibility and readiness requirements and who are unaware of the SOC should be informed of them. This may be a good indication for a referral to a mental health professional experienced with gender identity disorders.

The physician providing hormonal treatment and medical monitoring need not be a specialist in endocrinology, but should become well-versed in the relevant medical and psychological aspects of treating persons with gender identity disorders.

After a thorough medical history, physical examination, and laboratory examination, the physician should again review the likely effects and side effects of hormone treatment, including the potential for serious, life-threatening consequences. The patient must have

the capacity to appreciate the risks and benefits of treatment, have his/her questions answered, and agree to medical monitoring of treatment. The medical record must contain a written informed consent document reflecting a discussion of the risks and benefits of hormone therapy.

Physicians have a wide latitude in what hormone preparations they may prescribe and what routes of administration they may select for individual patients. Viable options include oral, injectable, and transdermal delivery systems. The use of transdermal estrogen patches should be considered for males over 40 years of age or those with clotting abnormalities or a history of venous thrombosis. Transdermal testosterone is useful in females who do not want to take injections. In the absence of any other medical, surgical, or psychiatric conditions, basic medical monitoring should include: serial physical examinations relevant to treatment effects and side effects, vital sign measurements before and during treatment, weight measurements, and laboratory assessment. Gender patients, whether on hormones or not, should be screened for pelvic malignancies as are other persons.

For those receiving estrogens, the minimum laboratory assessment should consist of a pretreatment free testosterone level, fasting glucose, liver function tests, and complete blood count with reassessment at 6 and 12 months and annually thereafter. A pretreatment prolactin level should be obtained and repeated at 1, 2, and 3 years. If hyperprolactemia does not occur during this time, no further measurements are necessary. Biologic males undergoing estrogen treatment should be monitored for breast cancer and encouraged to engage in routine self-examination. As they age, they should be monitored for prostatic cancer.

For those receiving androgens, the minimum laboratory assessment should consist of pretreatment liver function tests and complete blood count with reassessment at 6 months, 12 months, and yearly thereafter. Yearly palpation of the liver should be considered. Females who have undergone mastectomies and who have a family history of breast cancer should be monitored for this disease.

Physicians may provide their patients with a brief written statement indicating that the person is under medical supervision, which includes cross- sex hormone therapy. During the early phases of hormone treatment, the patient may be encouraged to carry this statement at all times to help prevent difficulties with the police and other authorities.

**Reductions in Hormone Doses After Gonadectomy.** Estrogen doses in post-orchiectomy patients can often be reduced by 1/3 to 1/2 and still maintain feminization. Reductions in testosterone doses post-oophorectomy should be considered, taking into account the risks of osteoporosis. Lifelong maintenance treatment is usually required in all gender patients.

**The Misuse of Hormones.** Some individuals obtain hormones without prescription from friends, family members, and pharmacies in other countries. Medically unmonitored hormone use can expose the person to greater medical risk. Persons taking medically monitored hormones have been known to take additional doses of illicitly obtained hormones without their physician's knowledge. Mental health professionals and prescribing physicians should make an effort to encourage compliance with recommended

dosages, in order to limit morbidity. It is ethical for physicians to discontinue treatment of patients who do not comply with prescribed treatment regimens.

**Other Potential Benefits of Hormones.** Hormonal treatment, when medically tolerated, should precede any genital surgical interventions. Satisfaction with the hormone's effects consolidates the person's identity as a member of the preferred sex and gender and further adds to the conviction to proceed. Dissatisfaction with hormonal effects may signal ambivalence about proceeding to surgical interventions. In biologic males, hormones alone often generate adequate breast development, precluding the need for augmentation mammaplasty. Some patients who receive hormonal treatment will not desire genital or other surgical interventions.

**The Use of Antiandrogens and Sequential Therapy.** Antiandrogens can be used as adjunctive treatments in biologic males receiving estrogens, though they are not always necessary to achieve feminization. In some patients, antiandrogens may more profoundly suppress the production of testosterone, enabling a lower dose of estrogen to be used when adverse estrogen side effects are anticipated.

Feminization does not require sequential therapy. Attempts to mimic the menstrual cycle by prescribing interrupted estrogen therapy or substituting progesterone for estrogen during part of the month are not necessary to achieve feminization.

**Informed Consent.** Hormonal treatment should be provided only to those who are legally able to provide informed consent. This includes persons who have been declared by a court to be emancipated minors and incarcerated persons who are considered competent to participate in their medical decisions. For adolescents, informed consent needs to include the minor patient's assent and the written informed consent of a parent or legal guardian.

**Reproductive Options.** Informed consent implies that the patient understands that hormone administration limits fertility and that the removal of sexual organs prevents the capacity to reproduce. Cases are known of persons who have received hormone therapy and sex reassignment surgery who later regretted their inability to parent genetically related children. The mental health professional recommending hormone therapy, and the physician prescribing such therapy, should discuss reproductive options with the patient prior to starting hormone therapy. Biologic males, especially those who have not already reproduced, should be informed about sperm preservation options, and encouraged to consider banking sperm prior to hormone therapy. Biologic females do not presently have readily available options for gamete preservation, other than cryopreservation of fertilized embryos. However, they should be informed about reproductive issues, including this option. As other options become available, these should be presented.

(back to top)

## IX. The Real-Life Experience

The act of fully adopting a new or evolving gender role or gender presentation in everyday life is known as the real-life experience. The real-life experience is essential to the transition to the gender role that is congruent with the patient's gender identity. Since

changing one's gender presentation has immediate profound personal and social consequences, the decision to do so should be preceded by an awareness of what the familial, vocational, interpersonal, educational, economic, and legal consequences are likely to be. Professionals have a responsibility to discuss these predictable consequences with their patients. Change of gender role and presentation can be an important factor in employment discrimination, divorce, marital problems, and the restriction or loss of visitation rights with children. These represent external reality issues that must be confronted for success in the new gender presentation. These consequences may be quite different from what the patient imagined prior to undertaking the real-life experiences. However, not all changes are negative.

**Parameters of the Real-Life Experience.** When clinicians assess the quality of a person's real-life experience in the desired gender, the following abilities are reviewed:
1. To maintain full or part-time employment;
2. To function as a student;
3. To function in community-based volunteer activity;
4. To undertake some combination of items 1-3;
5. To acquire a (legal) gender-identity-appropriate first name;
6. To provide documentation that persons other than the therapist know that the patient functions in the desired gender role.

**Real-Life Experience versus Real-Life Test.** Although professionals may recommend living in the desired gender, the decision as to when and how to begin the real-life experience remains the person's responsibility. Some begin the real-life experience and decide that this often imagined life direction is not in their best interest. Professionals sometimes construe the real-life experience as the real-life test of the ultimate diagnosis. If patients prosper in the preferred gender, they are confirmed as "transsexual," but if they decided against continuing, they "must not have been." This reasoning is a confusion of the forces that enable successful adaptation with the presence of a gender identity disorder. The real-life experience tests the person's resolve, the capacity to function in the preferred gender, and the adequacy of social, economic, and psychological supports. It assists both the patient and the mental health professional in their judgments about how to proceed. Diagnosis, although always open for reconsideration, precedes a recommendation for patients to embark on the real-life experience. When the patient is successful in the real-life experience, both the mental health professional and the patient gain confidence about undertaking further steps.

**Removal of Beard and other Unwanted Hair for the Male to Female Patient.** Beard density is not significantly slowed by cross-sex hormone administration. Facial hair removal via electrolysis is a generally safe, time- consuming process that often facilitates the real-life experience for biologic males. Side effects include discomfort during and immediately after the procedure and less frequently hypo- or hyper-pigmentation, scarring, and folliculitis. Formal medical approval for hair removal is not necessary; electrolysis may be begun whenever the patient deems it prudent. It is usually recommended prior to commencing the real-life experience, because the beard must grow out to visible lengths to be removed. Many patients will require two years of regular treatments to effectively eradicate their facial hair. Hair removal by laser is a new alternative approach, but experience with it is limited.

(back to top)

## X. Surgery

**Sex Reassignment is Effective and Medically Indicated in Severe GID.** In persons diagnosed with transsexualism or profound GID, sex reassignment surgery, along with hormone therapy and real-life experience, is a treatment that has proven to be effective. Such a therapeutic regimen, when prescribed or recommended by qualified practitioners, is medically indicated and medically necessary. Sex reassignment is not "experimental," "investigational," "elective," "cosmetic," or optional in any meaningful sense. It constitutes very effective and appropriate treatment for transsexualism or profound GID.

**How to Deal with Ethical Questions Concerning Sex Reassignment Surgery.** Many persons, including some medical professionals, object on ethical grounds to surgery for GID. In ordinary surgical practice, pathological tissues are removed in order to restore disturbed functions, or alterations are made to body features to improve the patient's self image. Among those who object to sex reassignment surgery, these conditions are not thought to present when surgery is performed for persons with gender identity disorders. It is important that professionals dealing with patients with gender identity disorders feel comfortable about altering anatomically normal structures. In order to understand how surgery can alleviate the psychological discomfort of patients diagnosed with gender identity disorders, professionals need to listen to these patients discuss their life histories, and dilemmas. The resistance against performing surgery on the ethical basis of "above all do no harm" should be respected, discussed, and met with the opportunity to learn from patients themselves about the psychological distress of having profound gender identity disorder.

It is unethical to deny availability or eligibility for sex reassignment surgeries or hormone therapy solely on the basis of blood seropositivity for blood-borne infections such as HIV, or hepatitis B or C, etc.

**The Surgeon's Relationship with the Physician Prescribing Hormones and the Mental Health Professional.** The surgeon is not merely a technician hired to perform a procedure. The surgeon is part of the team of clinicians participating in a long-term treatment process. The patient often feels an immense positive regard for the surgeon, which ideally will enable long-term follow-up care. Because of his or her responsibility to the patient, the surgeon must understand the diagnosis that has led to the recommendation for genital surgery. Surgeons should have a chance to speak at length with their patients to satisfy themselves that the patient is likely to benefit from the procedures. Ideally, the surgeon should have a close working relationship with the other professionals who have been actively involved in the patient's psychological and medical care. This is best accomplished by belonging to an interdisciplinary team of professionals who specialize in gender identity disorders. Such gender teams do not exist everywhere, however. At the very least, the surgeon needs to be assured that the mental health professional and physician prescribing hormones are reputable professionals with specialized experience with gender identity disorders. This is often reflected in the quality of the documentation letters. Since fictitious and falsified letters have occasionally been presented, surgeons should personally communicate with at least one of the mental health

professionals to verify the authenticity of their letters.

Prior to performing any surgical procedures, the surgeon should have all medical conditions appropriately monitored and the effects of the hormonal treatment upon the liver and other organ systems investigated. This can be done alone or in conjunction with medical colleagues. Since pre-existing conditions may complicate genital reconstructive surgeries, surgeons must also be competent in urological diagnosis. The medical record should contain written informed consent for the particular surgery to be performed.

(back to top)

## XI. Breast Surgery

Breast augmentation and removal are common operations, easily obtainable by the general public for a variety of indications. Reasons for these operations range from cosmetic indications to cancer. Although breast appearance is definitely important as a secondary sex characteristic, breast size or presence are not involved in the legal definitions of sex and gender and are not important for reproduction. The performance of breast operations should be considered with the same reservations as beginning hormonal therapy. Both produce relatively irreversible changes to the body.

The approach for male-to-female patients is different than for female-to-male patients. For female-to-male patients, a mastectomy procedure is usually the first surgery performed for success in gender presentation as a man; and for some patients it is the only surgery undertaken. When the amount of breast tissue removed requires skin removal, a scar will result and the patient should be so informed. Female-to-male patients might may have surgery at the same time they begin hormones. For male-to-female patients, augmentation mammoplasty may be performed if the physician prescribing hormones and the surgeon have documented that breast enlargement after undergoing hormone treatment for 18 months is not sufficient for comfort in the social gender role.

(back to top)

## XII. Genital Surgery

**Eligibility Criteria.** These minimum eligibility criteria for various genital surgeries equally apply to biologic males and females seeking genital surgery. They are:
1. Legal age of majority in the patient's nation;
2. Usually 12 months of continuous hormonal therapy for those without a medical contraindication (see below, "Can Surgery Be Performed Without Hormones and the Real-life Experience");
3. 12 months of successful continuous full time real-life experience. Periods of returning to the original gender may indicate ambivalence about proceeding and generally should not be used to fulfill this criterion;
4. If required by the mental health professional, regular responsible participation in psychotherapy throughout the real-life experience at a frequency determined jointly by the patient and the mental health professional. Psychotherapy per se is not an absolute eligibility criterion for surgery;
5. Demonstrable knowledge of the cost, required lengths of hospitalizations, likely

complications, and post surgical rehabilitation requirements of various surgical approaches;

6. Awareness of different competent surgeons.

**Readiness Criteria.** The readiness criteria include:

1. Demonstrable progress in consolidating one's gender identity;
2. Demonstrable progress in dealing with work, family, and interpersonal issues resulting in a significantly better state of mental health (this implies satisfactory control of problems such as sociopathy, substance abuse, psychosis, suicidality, for instance).

**Can Surgery Be Provided Without Hormones and the Real-Life Experience?**
Individuals cannot receive genital surgery without meeting the eligibility criteria. Genital surgery is a treatment for a diagnosed gender identity disorder, and should undertaken only after careful evaluation. Genital surgery is not a right that must be granted upon request. The SOC provide for an individual approach for every patient; but this does not mean that the general guidelines, which specify treatment consisting of diagnostic evaluation, possible psychotherapy, hormones, and real-life experience, can be ignored. However, if a person has lived convincingly as a member of the preferred gender for a long period of time and is assessed to be a psychologically healthy after a requisite period of psychotherapy, there is no inherent reason that he or she must take hormones prior to genital surgery.

**Conditions under which Surgery May Occur.** Genital surgical treatments for persons with a diagnosis of gender identity disorder are not merely another set of elective procedures. Typical elective procedures only involve a private mutually consenting contract between a patient and a surgeon. Genital surgeries for individuals diagnosed as having GID are to be undertaken only after a comprehensive evaluation by a qualified mental health professional. Genital surgery may be performed once written documentation that a comprehensive evaluation has occurred and that the person has met the eligibility and readiness criteria. By following this procedure, the mental health professional, the surgeon and the patient share responsibility of the decision to make irreversible changes to the body.

**Requirements for the Surgeon Performing Genital Reconstruction.** The surgeon should be a urologist, gynecologist, plastic surgeon or general surgeon, and Board-Certified as such by a nationally known and reputable association. The surgeon should have specialized competence in genital reconstructive techniques as indicated by documented supervised training with a more experienced surgeon. Even experienced surgeons in this field must be willing to have their therapeutic skills reviewed by their peers. Surgeons should attend professional meetings where new techniques are presented.

Ideally, the surgeon should be knowledgeable about more than one of the surgical techniques for genital reconstruction so that he or she, in consultation with the patient, will be able to choose the ideal technique for the individual patient. When surgeons are skilled in a single technique, they should so inform their patients and refer those who do not want or are unsuitable for this procedure to another surgeon.

**Genital Surgery for the Male-to-Female Patient.** Genital surgical procedures may

include orchiectomy, penectomy, vaginoplasty, clitoroplasty, and labiaplasty. These procedures require skilled surgery and postoperative care. Techniques include penile skin inversion, pedicled rectosigmoid transplant, or free skin graft to line the neovagina. Sexual sensation is an important objective in vaginoplasty, along with creation of a functional vagina and acceptable cosmesis.

**Other Surgery for the Male-to-Female Patient.** Other surgeries that may be performed to assist feminization include reduction thyroid chondroplasty, suction-assisted lipoplasty of the waist, rhinoplasty, facial bone reduction, face-lift, and blepharoplasty. These do not require letters of recommendation from mental health professionals.

There are concerns about the safety and effectiveness of voice modification surgery and more follow-up research should be done prior to widespread use of this procedure. In order to protect their vocal cords, patients who elect this procedure should do so after all other surgeries requiring general anesthesia with intubation are completed.

**Genital Surgery for the Female-to-Male Patient.** Genital surgical procedures may include hysterectomy, salpingo-oophorectomy, vaginectomy, metoidioplasty, scrotoplasty, urethroplasty, placement of testicular prostheses, and phalloplasty. Current operative techniques for phalloplasty are varied. The choice of techniques may be restricted by anatomical or surgical considerations. If the objectives of phalloplasty are a neophallus of good appearance, standing micturition, sexual sensation, and/or coital ability, the patient should be clearly informed that there are several separate stages of surgery and frequent technical difficulties which may require additional operations. Even metoidioplasty, which in theory is a one-stage procedure for construction of a microphallus, often requires more than one surgery. The plethora of techniques for penis construction indicates that further technical development is necessary.

**Other Surgery for the Female-to-Male Patient.** Other surgeries that may be performed to assist masculinization include liposuction to reduce fat in hips, thighs and buttocks.

(back to top)

## XIII. Post-Transition Follow-up

Long-term postoperative follow-up is encouraged in that it is one of the factors associated with a good psychosocial outcome. Follow-up is important to the patient's subsequent anatomic and medical health and to the surgeon's knowledge about the benefits and limitations of surgery.

Long-term follow-up with the surgeon is recommended in all patients to ensure an optimal surgical outcome. Surgeons who operate on patients who are coming from long distances should include personal follow-up in their care plan and attempt to ensure affordable, local, long-term aftercare in the patient's geographic region. Postoperative patients may also sometimes exclude themselves from follow-up with the physician prescribing hormones, not recognizing that these physicians are best able to prevent, diagnose and treat possible long term medical conditions that are unique to hormonally and surgically treated patients. Postoperative patients should undergo regular medical screening according to recommended guidelines for their age. The need for follow-up

extends to the mental health professional, who having spent a longer period of time with the patient than any other professional, is in an excellent position to assist in any post-operative adjustment difficulties.

(back to top)

**ATTACHMENT B**

# DIANE ELLABORN, LICSW

152 Edmands Road
Framingham, MA 01701

Phone 508-788-5406
Fax    508-788-7761

### Gender Evaluation

October 17, 2001

Re:    Sandy J. Battista aka David Megarry

Attorney Christopher P. LoConto has requested this gender specialist evaluate whether Sandy Jo Battista has a Gender Identity Disorder, if he does, to clarify the nature and treatment of this condition and the possible implications for him if he undergoes treatment.

By way of introduction, I am a licensed clinical social worker in full time private practice. I have practiced for 22 years after obtaining my Masters in Social Work degree. I am a NASW Diplomate in Clinical Social Work. I have completed specialized training to become a Gender Specialist and primarily evaluate and treat patients with gender conditions. I am a member of the Harry Benjamin International Gender Dysphoria Association as well as an appointed member to the association's Ethics Committee. I am an elected board member and clinical consultant to the International Foundation of Gender Education. I have lectured internationally on the subject of gender conditions and trained professionals about the evaluation and treatment of gender dysphoria. I follow the Harry Benjamin International Gender Dysphoria Association's Standards of Care for the diagnosis and treatment of persons with gender dysphoria.

This association outlines the task of a Gender Specialists as:

> Mental health professionals (MHP) who work with individuals with gender
> identity disorders may be regularly called upon to carry out many
> of these responsibilities:

1.    to accurately  diagnose the individual's gender disorder;
2.    to accurately diagnose any co-morbid psychiatric conditions
      and see to their appropriate treatment;
3.    to counsel the individual about the range of treatment options
      and their implications;
4.    to engage in psychotherapy;
5.    to ascertain eligibility and readiness for hormone and
      surgical therapy;
6.    to make formal recommendations to medical and surgical
      colleagues;

7.     to document their patient's relevant history in a letter of recommendation;
8.     to be a colleague on a team of professionals with interest in the gender identity disorders;
9.     to educate family members, employers, and institutions about gender identity disorders;
10.    to be available for follow-up of previously seen gender patients.

During this evaluation I have reviewed Sandy Jo Battista's record for 12 hours, interviewed and evaluated Sandy Jo Battista in person for 4 hours and administered two diagnostic tests, interviewed on telephone, Deborah Johnson, Sandy Jo Battista's sister, contacted by telephone his endocrinologist Dr. Maria Warth and consulted with a pediatric endocrinologist about the medical/genetic condition he was born with: Congenital Adrenal 12 Hyperplasia which is considered an intersex condition.

The following is an overview of psychosocial history. I will not outline this history in detail since it is well documented in the record and by previous evaluations. I will, however, focus on Sandy Jo Battista's gender history, which is pertinent to this evaluation.

Sandy Jo Battista was born the middle of three children. He was born with a genetic disorder Congenital Adrenal 12 Hyperplasia , which results in an increased secretion from the adrenal gland of cortisol steroids and androgens. It is reported that Sandy's mother was rejecting toward him due to this condition and therefore his maternal grandmother cared for him as a baby. The home environment was described as physically violent which eventually culminated in the accidental death of his mother. It is unclear how old Sandy was at the time of this event but estimated between the age of 4-8. Abusive punishment was also described in this home environment. After the death of Sandy's mother, his father was incarcerated for involuntary manslaughter and Sandy was placed in care with his maternal grandparents who were allegedly physically and possible sexually abusive and neglectful. His placement was subsequently changed to his paternal grandparents. His father was also in this environment after he was released from prison. The record suggests this environment may also have been physically abusive. Sandy's father relinquished his custody and he was placed in a series of foster homes. Sandy has a history of breaking and entering charges and molestation of females.

He was placed at age 15 in a DYS secure facility. Previous placements include Metropolitan State Hospital and Medfield State Hospital. He is currently at Bridgewater Treatment Center. He has completed a twelve to twenty year sentence for rape of a child on May 29, 2001. Sandy Jo Battista is awaiting a probably cause hearing to determine whether he currently meets the criteria for a sexually dangerous person.

Sandy Jo Battista has a long history of cross gender identification and expression dating back to early latency ages 5-7 years old. Crossdressing is reported in his sister's

clothing, sleeping in her pajamas, wearing his sister's underwear under male clothing. No sexual arousal is reported in these early crossdressing experiences. It also is reported that Sandy Jo exhibited crossgender play as evidenced by playing with his sister's dolls and toys. He preferred playing with his sister or alone rather than with his same sex sibling or peers.

It is apparent from Sandy's history that this persistent gender condition continued to be expressed throughout his incarceration and has been longstanding. Examples of adult crossgender identification include:  history of name change to a female name (1995), crossdressing throughout his incarceration in female underpants (until this practice was disallowed), wearing of neutral or androgynous women's outer garments, use of pens and art pastels as eye makeup, attempts to harm testicles through tying testicles with rubber bands, freezing testicles with cups of ice and sticking sewing needles in testicles. It also is reported that he once offered a roommate money if he cut off his testicles (this did not occur). Sandy also reported a long history of the use of female hygiene products, shaving legs, chest, arms and underarms, plucking eyebrows and sitting while urinating. As mentioned I also administered two diagnostic tests to verify Sandy's diagnosis. Although there is no definitive psychological or medical test to verify Gender Identity Disorder, there are two tests that this evaluator uses as part of a gender evaluation. The results of the first test  "A Cross-Gender Questionnaire" by Richard E. Docter, Ph.D. and James S. Fleming, Ph.D., reflects a transsexual rather than transvestite identity and no arousal linked with this identity.  The second test "The Cogiati" by Jennifer Reitz, results reflect Sandy falls into the category of four, "probable transsexual" described as "your score places you among the majority of those diagnosed transsexuals, the "late onset" transsexual."

This early history of childhood crossdressing without sexual arousal, crossgender play and crossgender preference, along with adult evidence of gender condition, coupled with body dysphoria is evidence that Sandy Jo Battista meets the criteria for Gender Identity Disorder formerly called Transsexualism. The criteria for this diagnosis includes:

A.     A strong and persistent cross-gender, identification (not merely a desire for any perceived cultural advantages of being the other sex).

       In children, the disturbance is manifested by four (or more) of the following:

(1)    repeatedly stated desire to be, or insistence that he or she is, the other sex

(2)    in boys, preference for crossdressing or simulating female attire, in girls, insistence on wearing only stereotypical masculine clothing

(3)    strong and persistent preferences for cross-sex roles in make-believe play or persistent fantasies of being the other sex

(4)    intense desire to participate in the stereotypical games
       and pastimes of the other sex
(5)    strong preference for playmates of the other sex

In adolescents and adults, the disturbance is manifested by symptoms
such as a stated desire to be the other sex, frequent passing as the
other sex, desire to live or be treated as the other sex, or the conviction
that he or she has the typical feelings and reactions of the other sex.

Persistent discomfort with his or her sex or sense of inappropriateness
In the gender role of that sex.

In children, the disturbance is manifested by any of the following: in
boys, assertion that his penis or testes are disgusting or will disappear
or assertion that it would be better not to have a penis, or aversion
toward rough-and-tumble play and rejection of make stereotypical
toys, games, and activities; in girls, rejection of urinating in a sitting
position, assertion that she has or will grow a penis, or assertion
that she does not want to grow breasts or menstruate, or marked
aversion toward normative female clothing.

In adolescents and adults, the disturbance is manifested by symptoms
such as preoccupation with getting rid of primary and secondary sex
characteristics (e.g. request for hormones, surgery, or other procedures
to physically alter sexual characteristics to simulate the other sex) or
belief that he or she was born the wrong sex.

The disturbance is not concurrent with a physical intersex condition.

The disturbance causes clinically significant distress or impairment
In social, occupational, or other important areas of functioning.


Sandy Jo Battista is more accurately diagnosed with Gender Identity Disorder Not
Otherwise Specified (NOS) codified in DSM IV as 302.6. This reflects he meets the
criteria for Gender Identity Disorder and also has an intersex condition as noted in DSM
IV, Congenital Adrenal 12 Hyperplasia and accompanying gender dysphoria.

It is my professional opinion that Sandy Jo Battista meets the criteria for Gender Identity
Disorder NOS. In terms of differential diagnosis he does not meet criteria for
Transvestic Fetishism since historically and currently there is no sexual arousal linked
with his crossgender identification or expression and there is significant body dysphoria
along with the expressed desire to take progressive steps to become fully female. He
also does not meet criteria for malingering since crossgender identification and behavior
date back to early childhood and did not begin during incarceration.

Gender Identity is the internal understanding and psychological expression of being male or female. In most people this internal sense of self and outward expression match ones anatomy. When a person has a gender identity disorder they are opposite. Gender identity and sexual identity including sexual attraction, orientation, arousal and/or expression are separate identities. In Sandy Jo Battista's case her history of sexual offending appears to have nothing to do with her gender identity. People with gender identity disorder do not generally have deviant sexual arousal and/or expression and if they do it is rarely linked to their gender identity. In this case there is no sexual arousal linked to Sandy Jo Battista's gender identity and expression.

Gender Identity Disorder NOS is a recognized disorder codified in DSM IV as 302.6 with well recognized treatment involving psychotherapy, endocrinology and surgery. There is increasing persuasive evidence that this is a medical condition and is biological as reflected in recent brain research. Furthermore, Sandy has an intersex condition that can exacerbate gender dysphoria.

Sandy was diagnosed after birth with Congenital Adrenal Hyperplasia. According to reports there is a 21-hydroxylase deficiency. Normally the H-Y antigen is present on the cell surface of males and absent in females. In a research study by Eicher, et. al. (1979), they found a H-Y antigen deficiency in male to female transsexuals they studied. This implies there is a biological origin to Sandy's internal sense of being female that relates to his genetic intersex condition.

As noted, adult treatment of Gender Identity Disorder NOS includes psychotherapy, endocrinology and surgery. As mentioned previously The Harry Benjamin International Gender Dysphoria Association has established Standards of Care for this treatment. It is highly recommended that Sandy Jo Battista be treated psychologically by a gender specialist. He requested this treatment in 1996. Without this treatment it is this professional's opinion that she would be at high risk for depression, anxiety, suicide and self-abuse.

Also in 1996 he requested approval for crossgender hormone therapy administered by an endocrinologist. The recommended treatment is estrogen therapy and antiandrogen therapy to suppress testosterone and begin the feminization process. The secondary benefit of this treatment relevant to Sandy Jo Battista's case is that this treatment suppresses male sex drive, suppresses arousal, lowers aggressiveness and atrophies the genital area so it becomes first difficult then eventually impossible to attain and/or maintain an erection of his penis.

Sandy Jo Battista has also recently requested approval for surgery, notably elective castration (orchiectomy). This surgery is part of the sex reassignment process. In regards to his specific case the secondary benefit will be that his testosterone production will be dramatically lowered to 80% thus lowering aggression, sex drive, sexual arousal and eliminating the ability to attain and/or maintain an erection of his penis. In the motion recently filed to request elective castration it is noted that "empirical studies on the effects of castration of the sex offender, whether chemical or surgical,

have proven reasonably effective in suppressing re-offending sexual behavior including deviant sexual behaviors." These two treatments both crossgender hormone treatment and surgery are highly recommended as medical treatment for his Gender Identify Disorder.

In conclusion, Sandy Jo Battista clearly meets the criteria for Gender Identity Disorder, NOS. This condition is considered both psychological and medical in nature. This condition also appears related to his intersex condition Congenital Adrenal 12 Hyperplasia. While incarcerated he has been treated medically for his intersex condition and likewise should be allowed treatment psychologically and medically for his gender condition. The benefit of such treatment is two-fold, it will help resolve Sandy Jo Battista's persistent gender dysphoria and lower his risk of reoffending.

Diane Ellaborn, LICSW
NASW Diplomate in Clinical Social Work

# DIANE ELLABORN, LICSW

NASW Diplomate in Clinical Social Work          152 Edmonds Road ✕ Framingham, MA 01701 ✕ (508) 788-5406

| | |
|---|---|
| **PRIVATE** | **PRIVATE PSYCHOTHERAPY PRACTICE** |
| **PRACTICE** | • Individual, couple and family therapy |
| | • Specialty in the evaluation and treatment of adults and youths with |
| 1985 to Present | gender issues and their families |
| | • Conduct therapy groups for transgendered individuals |
| | • Divorce and family mediation |
| | **CONSULTATION SERVICES** |
| | • Supervise and train therapists about gender issues |
| | • Consult on cases involving transgendered clients |
| | • Conduct in-service training in conflict resolution skills for couples, schools and human services programs |

## EMPLOYMENT

1994 to 1996

**BRANDON START**, Natick, MA
Hospital diversion program for boys (7 - 17)
Title: Clinician (part-time)
• Provided short-term, intensive individual and family counseling
• Performed diagnostic assessments
• Evaluated and treated gender-varient residents, including cross-dressing and transsexual adolescents
• Case management

1989 to 1994

**ADOPTIONS WITH LOVE, INC.**, Newton, MA
**Title: Clinical Social Worker**
• Provided grief counseling to birthmothers contemplating an adoption plan
• Coordinated housing program for birthmothers and led a support and therapeutic group for in-state birthmothers
• Acted as liaison with prospective adoptive couples, their social workers, attorneys and outside social service agencies
• Coordinated the agency's continuing education and in-service program
• Coordinated prenatal and postnatal care with maternity staff
• Performed surrenders and facilitated meetings between birthparents and adoptive couples

1985 to 1989

**BEAVERBROOK GUIDANCE CLINIC**, Waltham, MA
**Title: Coordinator of Day Services**
• Coordinator of Adolescent Day Activities Program (see below)
• Developed and coordinated new day services
• Member of Executive Director's Advisory Board

(Continued on next page)

**Title: Coordinator of Adolescent Day Activities Program**
Hospital diversion program for disturbed adolescents who are at-risk
or have been psychiatrically hospitalized
- Administer therapeutic after-school program in Met Beaverbrook
  Area, including proposal writing, budget planning, and staff
  supervision
- Conduct therapy groups in Belmont High School for Focus and
  Resource Programs; and consult with teachers
- Conduct therapy group for dual-diagnosis (MR/ED) students in
  community setting and therapy groups in temporary adolescent shelter
- Provide individual/family counseling and case management
  for ADAP clients

**Title: Adolescent Case Manager**
- Perform major casework for 15-20 adolescents and young adults
  (ages 12-22) who have been hospitalized in psychiatric facilities or
  are at risk of psychiatric hospitalization
- Provide individual and family therapy and/or referral to outside
  practitioners
- Act as liaison to school, court system, Dept. of Social Services
  and other community service agencies
- Assess adolescents and refer to appropriate DMH services,
  including day treatment, residential programs and after-school groups
- Crisis intervention for regular caseload and on a rotating basis for
  clinic patients at large

1981 to 1985     **ROBERT F. KENNEDY ACTION CORPS, Lancaster, MA**
**Title: Family Social Worker**
- Major case and family work for 16 adolescent boys (ages 12-18)
- Performed short-term diagnostic family assessments
- Group leader for adolescent boys' therapy group
- Supervised and trained MSW candidates and group counselors
- Individual and family counseling
- Developed treatment and discharge plans
- Acted as liaison to schools, court system, and community agencies

1979 to 1980     **CATHOLIC HOME BUREAU, New York, NY**
**Title: Senior Case Worker**
- Major casework responsibility for inner-city, minority, adolescent
  girls (ages 12-21) in residential group home setting
- Individual, group and family counseling
- Supervised and trained child care staff

**COMMUNITY**     **CHILDREN'S HEARINGS PROJECT, Cambridge, MA**
**VOLUNTEER**     **Title: Community Mediator, since 1981**
**WORK**     Mediate family/child disputes
Work with program staff to train new mediators
Member of Advisory Council

**EDUCATION**       School of Social Welfare
                    State University of Stony Brook, Stony Brook, NY
                    Degree: MSW 1979

                    State University College at Old Westbury, NY
                    Degree: BS in Women's Studies 1976

                    International Foundation for Gender Education, Waltham, MA
                    Special training to work with individuals with gender issues (1990)

**CERTIFICATION**   NASW Diplomate in Clinical Social Work   (1992)
                    NASW Register of Clinical Social Workers (1990)
                    LICSW (Massachusetts: 1983)
                    CSW   (New York: 1980)

**ASSOCIATIONS**    Clinical Consultant, International Foundation
                    for Gender Education (1997)

                    Harry Benjamin International Gender Dysphoria Association, Member

                    National Association of Social Workers, Member

**PUBLICATIONS**    "The Age of Manhood: The FtM Development in
                    Adolescence." Chapter in yet untitled anthology by
                    Dean Kotula.

                    Know Your Legal Rights as an Adult Home Resident
                    North Shore Unitarian Veatch Foundation: New York 1980

**REFERENCES**      Furnished upon request