UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDY J. BATTISTA, )
    Plaintiff, )
     )
vs. ) C.A.No.05-11456-DPW.
     )
KATHLEEN M. DENNEHY, Comm'r., et al., )
    Defendants' )

## PLAINTIFF'S CROSS-MOTION FOR SANCTIONS AGAINST DEPARTMENT OF CORRECTION DEFENDANTS' ATTORNEY FOR ABUSIVE MOTION PRACTICE

    Plaintiff, Sandy J. Battista("Battista"), acting pro-se in the above captioned matter, hereby submits this cross-motion requesting sanctions be issued against Department of Correction Defendants' Attorney for his abusive motion practice. By way of sanctions, Battista seeks: (1) an Order denying the Motion of Department of Correction Defendants' for Sanctions Against Plaintiff for Improper Communications with Defendants' Expert Witness; and (2) a fine in the amount of $2,500.00, assessed directly against defense counsel, and not his clients. In support thereof, Battista states as follows:

    1) Battista herein recites and incorporates the facts set forth in her Verified Complaint, her Memorandum of Law in Support of Plaintiff's pending Application for Preliminary Relief, and her Reply to the Opposition of Department of Correction Defendants' to Plaintiff's pending Application for Preliminary Relief, dated August 5, 2005. The additional facts either occurred after the Complaint was filed, or were alleged by the parties' within pleadings filed thereafter.

-2-

2) Battista is an individual presently under civil commitment to the Massachusetts Treatment Center as a "Sexually Dangerous Person," pursuant to M.G.L. c.123A, §14(d), as amended by St.1999, c.74, who has also been diagnosed by three separate gender specialists as meeting all of the diagnostic clinical criteria for Gender Identity Disorder(NOS), and prescribed female hormone therapy.

3) Battista has written numerous letters to any and all Department of Correction("DOC") and UMass Correctional Health Program("UMCHP") [1] employees and officials she believed might be of assistance in explaining why her prescribed treatment is being withheld.

4) In July of 2005, the DOC defendants' filed their Opposition to Battista's pending Application for Preliminary Relief. The Opposition included the Affidavit of a Lawrence M. Weiner, LICSW, who stated that Battista's prescribed treatment was being withheld because the DOC's health services division was retaining the services of a nationally recognized gender specialist, Cynthia S. Osborne, MSW("Ms. Osborne"), to review various evaluations and make recommendations to the DOC regarding the competence of the Fenway Community Health Clinic's("Fenway Clinic") [2] November 2004 evaluations and treatment recommendations

---

[1] "UMCHP" is the medical contractor, contracted by the DOC to provide persons like Battista in the care and custody of the DOC with "medical, dental, and mental health services."

[2] The "Fenway Clinic" is the medical contractor, sub-contracted by UMCHP to "evaluate, diagnose, and recommend treatment plans" for persons like Battista who suffer from gender disorders.

-3-

concerning Battista's gender issues.

    5) Shortly thereafter, Battista wrote her independent gender specialist, Diane Ellaborn, LICSW("Ms. Ellaborn") [3]/ to inform her of this recent development in her treatment issues and to inquire of her as to whether she was familiar with Ms. Osborne.

    6) On August 6, 2005, Ms. Ellaborn informed Battista that she did not know Ms. Osborne, though conducted a search engine on the internet and learned that Ms. Osborne was an employee of the John Hopkins University. See ATTACHMENT-A.

    7) Battista then used this information to acquire the address of John Hopkins University via a book in her institutional law library. (Profiles of American Colleges[24th ed. 2001]).

    8) On August 17, 2005, Battista wrote Ms. Osborne. The letter [4]/ is neatly typed in proper business format. Battista's full name and address appear at the top of the page. In the letter, Battista briefly provides Ms. Osborne with a summary of her past pro-se efforts attempting to get the DOC to treat her gender issues, the effects the delay is having on her

---

[3] Battista originally retained Ms. Ellaborn's services to conduct an evaluation, pertaining to her (then) self-diagnosed gender disorder and to provide testimony during her civil commitment proceedings. However, Battista and Ms. Ellaborn have corresponded for years now and have established a professional relationship. Whereas, Ms. Ellaborn is sincerely interested in Battista's treatment issues and well-being.

[4] Here, it would appear from the record that for some reason or another Ms. Osborne did not receive Battista's August 17th letter. Therefore, Battista attaches same for this Court's convenience. See ATTACHMENT-B.

emotional well-being, and her personal speculations pertaining to the DOC's agenda in retaining Ms. Osborne's services. Battista closes the letter by requesting Ms. Osborne contact one of the DOC's former employees, Dr. Barbara K. Schwartz, to confirm her personal speculations of the DOC's agenda. Battista then thanks Ms. Osborne for her time and consideration to the matter. Nothing about the tone or format of the letter suggests anything but respect for Ms. Osborne and a sincere request in Battista's treatment issues.

9) On October 21, 2005, not receiving any reply to her August 17th letter, Battista again wrote Ms. Osborne.[5] Like her August 17th letter, Battista October 21st letter is also neatly typed and in proper business format. Battista's full name and address appear at the top of the page. The letter begins by noting Battista's previous August 17th letter, which Battista has received no reply. Additionally, Battista asks Ms. Osborne to review a copy of a recent letter she wrote to the Acting-Director of Health Services for the DOC. Battista closes the letter by explaining to Ms. Osborne that her treatment issues are currently the subject of a federal action and would have no other alternative if her findings (report) is delayed any longer but to supplement her pleadings to add a claim for violations of her rights to due process, as well as a complaint with the Ethics Commission. Battista then thanks

---

[5] A copy of Battista's October 21st letter to Ms. Osborne is attached to the Motion of DOC Defendants' for Sanctions Against Plaintiff for Improper Communications with Defendants' Expert Witness. (On file).

Ms. Osborne for her attention in the matter. Nothing about the tone or format of the letter suggests anything but respect for Ms. Osborne and a sincere request in Battista's treatment issues.

10) Battista argues, first, that sending a letter to a gender specialist who had been retained by DOC officials for consultation regarding Battista's medical diagnosis and treatment does not constitute the Court's sanction. Prisoners retain those constitutional rights that are consistent with legitimate penological objectives. Pell vs. Procunier, 417 U.S. 817 (1974). These retained rights include the First Amendment right to send correspondence to the outside world without censorship. Procunier vs. Martinez, 416 U.S. 396 (1974), rev'd in part, Thornburgh vs. Abbott, 490 U.S. 401 (1989). As Justice Marshall stated:

> [T]he mails are one of few vehicles prisoners
> have for informing the community about their
> existence.... To sustain a policy which chills
> the communication necessary to inform the public
> on this is at odds with the most basic tenets
> of the guarantee of freedom of speech.

Id., 416 U.S. at 427(Marshall, J., concurring). Letters from prisoners complaining of inappropriate behaviors by prison staff are protected. Brooks vs. Andolina, 826 F.2d 1266 (3rd Cir. 1987). Courts have further held that prisoners may not be punished for letters to persons outside the prison that are disrespectful or insulting to prison staff. McNamara vs. Moody, 606 F.2d 621, 624 (5th Cir.1979). Applying the same analysis to Battista's letters, it is beyond dispute that Battista was simply exercising her First Amendment right to communicate with

-6-

a medical specialist to seek information related to her treatment issues. Contrary to DOC defendants' counsel's characterization of Battista's letter, in fact it contained a respectful request for information about the recipient's role in conducting reviews of her peers performance. It is the type of inquiry that any free citizen might write were she informed that an outside doctor had reviewed her medical files and was participating in evaluation, diagnosis, and treatment decisions. "Implicit in the right to self-representation, is the obligation on part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." Traguth vs. Zuck, 710 F.2d 90, 95 (2nd Cir.1983).

11) With vague statements, DOC defendants' counsel seeks to characterize Battista's letter as that of an "undisguished attempt to intimidate, threaten, and exert undue influence over the DOC's expert, Ms. Osborne," requesting that the Court sanction Battista in the form of "dismissal of her action with prejudice."

12) DOC defendants' counsel has failed to cite a single case that would support the imposition of such a harsh and severe sanction for the content of Battista's outgoing mail. Except, as to boldy assert that Battista's actions in writing Ms. Osborne "may also constitute a violation of the 'Victim and Witness Protection Act' of 1982, 18 U.S.C. §1512(a)(1)."

13) There can be no dispute that Ms. Osborne is not a "witness" within the meaning of either §1503 or §1512 because there was no pending grand jury proceeding at the time Battista

wrote Ms. Osborne. See, e.g., United States vs. Risken, 788 F.2d 1361, 1365-69 (8th Cir.1986).

14) Rule 11 of the Federal Rules of Civil Procedure provides for sanctions (penalties) against attorneys or parties who file papers that have no basis in fact or law or are filed for no other purposes such as harassment, delay or increased cost. Id.

15) It is difficult to conceive how DOC defendant's counsel could substantiate in fact or law, that to the best of his knowledge, information and belief the purpose of Battista's letter to Ms. Osborne "was to intimidate the expert, in hope that she would change her opinion regarding his need for GID treatment for several reasons. First, no where in Battista's October 21st letter does she state that "she expects Ms. Osborne to agree to change her report regarding her need for treatment or would take steps to retaliate against Ms. Osbonre. For example, in paragraph 5 of DOC defendants' counsel's Motion at hand, counsel states in relevant part that:

> In particular, in the fourth paragraph of the first page of Battista's letter "he states that he expects Ms. Osborne to agree to change her report regarding his need for GID treatment, or he will take the following action."

Second, here, it is conceded in part, that Ms. Osborne's "report" was completed and dated October 10th and Battista's letter at issue was mailed and dated October 21st. However, counsel was well aware that Battista was not made aware of Ms. Osborne's report until being served with a copy on October 26th. [6] As such,

---

[6] See Response of Defendants Kathleen M. Dennehy, Robert Murphy, Susan J. Martin, Steven Fairly and Gregory Hughes to Plaintiff's October 17, 2005 Affidavit. (On file).

-8-

counsel could not have legitimately interpreted Battista's letter at issue as an attempt to change Ms. Osborne's opinion, as Battista was not even made aware of Ms. Osborne's opinion until well after mailing her letter at issue. Third and lastly, DOC defendants' counsel is extremely familiar with the tone and format of Battista's letters and pleadings, as counsel has been assigned to several of Battista's pro-se actions over the last 6-8 years. For example, in 1997, while incarcerated at MCI-Norfolk, upon Battista's initial pursuit at seeking evaluation and treatment for her gender issues, DOC officials retained the services of a similar consultant, Dr. Victoria Russell, to review various medical records and form an opinion as to Battista's (then) self-diagnosed gender disorder. Battista then acquired the address of Dr. Russell and wrote the consultant to request information on her credentials, as well as informing the consultant if she didn't respond in a timely fashion Battista would have no other alternative but to file suit. Because the consultant was not made aware that Battista would have access to her report, the consultant mistakenly submitted her report with her home address and received Battista's letter at her residence. Battista was then subjected administratively to disciplinary proceedings for attempting to extort information and threatening an outside consultant. Battista then obtained the services of an attorney with Massachusetts Correctional Legal Services("MCLS"), who filed suit on Battista's behalf. At which time the DOC assigned the DOC defendants' counsel at issue to represent their interest in Battista's previous action. See Sandy J. Battista vs. Paul L. DiPaolo, Superintendent, et al., Suff.Sup.Ct.C.A.

No.97-3712-C(dismissed upon the DOC's expungement of Battista's administrative disciplinary proceedings). Additionally, the Court can plainly see from Battista's letters to several DOC and UMCHP employees and officials attached to the Complaint as Exhibits 6,8,11-13,15 & 17, the tone and format to be much of the same as her October 21st letter to Ms. Osborne.

16) Upon information and belief, DOC defendants' counsel's Motion at hand is not grounded in either fact or law and was filed for no other purposes but to harass, delay or increase costs.

## C O N C L U S I O N

For the foregoing reasons, Battista hereby requests that, in light of DOC defendants' counsel's improper and abusive filing, the only appropriate sanctions for such unprofessional conduct is to deny the Motion of DOC Defendants' for Sanctions Against Plaintiff for Improper Communications with Defendants' Expert Witness, and fine counsel in the amount of $2,500.00, to be assessed directly against counsel, not his clients, and paid to the court for the waste of judicial resources in revewing, researching and drafting a Memorandum on this matter, in hope that it will deter such conduct from recurring. See, e.g., Knop vs. Johnson, 667 F.Supp. 512, 522 (W.D.Mich.1987); Robinson vs. Moses, 644 F.Supp. 975, 982-83 (W.D.Ind.1986).

Dated: December 2, 2005.        Respectfully submitted,

/s/ Sandy J. Battista
Sandy J. Battista, #M-15930
Plaintiff/Pro-se
Mass. Treatment Center
30 Administration Rd.
Bridgewater, Mass. 02324-3230

-10-

**CERTIFICATE OF SERVICE**

    I, Sandy J. Battista, plaintiff in the enclosed matter, acting pro-se, hereby certify's that I have today mailed a true and accurate copy of the within pleading on counsel of record for the DOC Defendants', by hand/mail.

Dated: December 2, 2005.　　　　_____
　　　　　　　　　　　　　　　　Sandy J. Battista, #M-15930
　　　　　　　　　　　　　　　　Plaintiff/Pro-se

ATTACHMENT A

Case 1:05-cv-11456-DPW     Document 37     Filed 12/05/2005     Page 11 of 19

**Diane Ellaborn, LICSW**
GENDER SPECIALIST
152 Edmands Rd., Framingham, MA 01701
(508) 788-5406
Ellaborn@aol.com  www.genderspecialist.com

① 8/4/05

Sandy-

I received your letter and was upset for you that they are questioning the credentials of independent reviewers they selected. Cynthia Osborne is not a member of my professional organization HBIGDA. I do not know her. A peer reviewer consists of a "neutral" person reading records and deciding whether the actions or report are clinically sound. I looked up the name Cynthia Osborne on Google (a search engine on the Internet). A Gender Specialist at at John Hopkins University was listed. I e-mailed her to see if she was reviewing your reports.

**Diane Ellaborn, LICSW**
GENDER SPECIALIST
152 Edmands Rd., Framingham, MA 01701
(508) 788-5406
Ellaborn@aol.com  www.genderspecialist.com

-2-

I'll let you know if she e-mails me back. She's in Baltimore MD and is the only person in the field that I could find with their name.

Take care,

Diane Ellaborn

ATTACHMENT B

Sandy J. Battista, #M-15930
Mass. Treatment Center
30 Administration Rd.
Bridgewater, Mass. 02324-3230

---

Dated: August 17, 2005.


Cynthia Osborne
C/O John Hopkins University
104 E. Biddle Street
Baltimore, Md. 21202

ATTN: Gender Clinic


Dear Ms. Osborne:

   Hi, my name is Sandy J. Battista. I am currently civilly-committed to the above addressed treatment facility. Which is subjected to the jurisdiction of the Massachusetts Department of Correction("DOC"). I am writing in regards to some recent news that has been brought to my attention that may involve you. As such, I kindly ask that you give me the time to at least review the enclosed.

   Briefly, ever since the year 1995, I have repeatedly attempted to get the DOC to treat my (then) self-diagnosed gender identity disorder. However, because the DOC arbitrarily maintains that this disorder is "elective," they are therefore not required by law to provide any form of treatment recognized by the relevant community of medical professionals. Additionally, because of my limited access to legal resources, my pro-se attempts have also proved unsuccessful. It was not until some time in 2001, when I received a small inheritance from my fathers passing, that I was finally able to retain the services of a gender expert. Ms. Diane Ellabern, LICSW. Who diagnosed me as meeting the clinical criteria for [Gender Identity Disorder(NOS)] and recommended that I be [surgically castrated and placed on female hormones].(See attached report). However, because Ms. Ellabern wasn't a DOC employee, the DOC maintained they weren't required by law to adhere to her treatment recommendations. It was not until the year 2002, when another DOC prisoner filed suit and won the right to be seen and treated by an expert in gender disorders that I finally had hope again. In accordance with that ruling, I requested to be seen and evaluated by the DOC's retained gender experts. Both the experts agreed that I also met the diagnostic criteria for [Gender Identity Disorder(NOS)] and recommended that I be provided [individualized counseling and female hormones]. (See attached report). Needless to say that this gave me high hopes of finally being in a position to be normal. I mean, these were the DOC's own retained gender experts. How could they deny me treatment now. In accordance with those treatment recommendations, the DOC then arranged for me to be seen by an endocrinologist for the development of an appropriate medical prescription to address hormonal therapy. And in turn, had the Treatment Center's in-house physician fill that prescription. It wasn't until the even of this prescription being disbursed that I learned that the DOC had retained your services to dispute the competence of their own retained experts. My god, how cruel can they get. To say the least, this news through me into an emotional breakdown. Currently I am on antidepressants and cannot even

-2-

concentrate enough to focus on any thing but my gender issues, because I am so overwhelmed with anxiety.

In closing, I also understand that the DOC originally sought your services to conduct a review of another inmate (Michelle L. Kosilek), who was recently recommended for sex ressignment surgery by the Fenway Community Health Clinic. And based on that review, requested of you to conduct similar reviews, not only of my evaluation, but [all] inmates previously evaluated by the Fenway Clinic. Respectfully, can't you see a hidden agenda here? Don't you think it unusual for the DOC to seek the services of such a highly recognized University? As you can see for yourself from the attached printed transcripts of a recent segment that aired on CBS 4, the DOC has always went on public record as maintaining that they feel this disorder is only "elective." And therefore, should not be required to provide inmates suffering from this disorder with any recognized treatment in the relevant field. And now are attempting to implicate such a reputable university in their agenda. For example, in a similar such situation, the DOC sought the services of a nationally recognized expert in treating sex offenders to testify on it's behalf in court, to support it's position of being able to run the Treatment Center comparable to a mental health facility. Who now recants her testimony and has gone on record as stating that she, Dr. Barbara K. Schwartz, was "naive to the DOC's agenda" in testifying on it's behalf.(See generally, attached letter from Dr. Barbara K. Schwartz to resident Steve Remeika, dated: June 21, 2002).

Lastly, I understand that I have committed some horrible crimes, and as such, do not have such a good reputation. And what I'm asking or implying here, (i.e.,) believing that the DOC retained your services with a hidden agenda, that being, to prevent me and all others from ever receiving treatment, would be questionable to any professional. However, in the interest of protecting your own reputation and that of the University, I ask that you at least contact Dr. Schwarz (her phone number is listed on the attached letter), and inquire of her as to her professional opinion of the DOC's honesty and agenda's. You will find every thing I've mentioned enclosed is true, and a lot more. PLEASE, I BEG OF YOU NOT TO TAKE MY HOPES AND DREAMS FROM ME. Because by taking the DOC's position, that is actually what you will be doing. Condemning me to a life cruelly trapped in this body that I should not been born with. Three (3) separate experts in your own field, one who lectures around the country and sits on the association's Ethics Committee, can't be all wrong, now can they?

Thank you for your time and consideration in the enclosed matter. I am sure you will use your professional consideration in the enclosed.

Sincerely,

[signature]
Sandy J. Battista, #M-15930

cc: S.J.B.(FILE)

Please do not link to printable views of stories. The full story can be accessed using the link below. Thank you.
http://cbs4boston.com/iteam/local_story_145210838.html



**CBS4 | cbs4boston.com**

## Sex Changes Behind Bars

May 25, 2005 9:06 pm US/Eastern

Hard core criminals in our state prisons. You pay for their food, clothing and general medical care. Now, you may end up paying for their sex change surgery. I-Team reporter Joe Bergantino investigates what critics are calling a massive waste of taxpayer dollars.

Kenneth Catheena Hunt, serving a life sentence for first degree murder.

Sandy Jo Battista, child rapist, behind bars twenty-one years.

Michelle Kosilek, in prison for life for strangling his wife.

All three are violent criminals.

All three believe they are women trapped in men's bodies.

And all three want you to pay for their sex change operations.

The I-Team has learned there are twelve prisoners in our correction system who have either been diagnosed with or are being diagnosed for gender identity disorder. Four prisoners are receiving hormone treatments. So far, their medical care and lawsuits have cost you tens of thousands of dollars. Sex changes for all of them would cost you at least a quarter of a million dollars.

Taxpayer advocate Barbara Anderson.

Barbara Anderson, Citizens for Limited Taxation: "What bothers me about that? What doesn't bother me about that? I can't even imagine seriously considering this. Never mind doing this. Never mind paying for it."

So why is state funding for prisoner sex changes-something insurance companies won't pay for even a possibility?

Blame it on the federal court. That's where Michelle, once Robert, Kosilek took her case.

Before Kosilek sued, the state's policy was this: Individuals receiving hormone treatment before imprisonment could continue it behind bars but no sex change operations allowed.

But two years ago, Judge Mark Wolf handed down this decision saying Kosilek has a "rare, medically recognized, major mental illness" and that the state must follow doctors prescribed treatment.

Correction Commissioner Kathleen Dennehy.

Kathleen Dennehy, DOC Commissioner: "The courts are telling us that medical professionals make medical recommendations and correctional administrators assess the safety and security concerns."

Now, a doctor hired by the state is recommending that Kosilek, who has twice attempted suicide, undergo a sex change operation as treatment for her disorder.

If the state refuses to do it, Kosilek will ask the federal court to order the surgery, at your expense.

Senator Scott Brown: "I think it's unconscionable that the Commonwealth of Massachusetts and the citizens of the Commonwealth would have to pay for any type of elective sex change operations for any prisoners."

But is sex change surgery elective?

Most doctors and psychotherapists, include Diane Ellaborn, say in some cases it's medically necessary.

Joe Bergantino: "What are the consequences for these men if the state says forget about it, you're on your own, live with it, get over it?"

Diane Ellaborn: "I think the psychological consequences are severe. I think people have severe depression, severe anxiety. These could be highly suicidal prisoners usually and also prisoners that are at very high risk for self mutilation."

Denise Leclair, who once was a man, heads up the International Foundation for Gender Education.

Denise Leclair: "We should rely on what doctors say the proper course of treatment is, not subject people's medical treatment to popular vote. That seems grossly unfair."

Because of our investigation, Senator Scott Brown has filed legislation prohibiting the state from paying for prisoner sex changes.

Senator Scott Brown: "When you go to prison, you lose some rights. You also lose your rights to get a sex change operation."

Later this week, the state will tell the federal court that sex surgery for Michelle Kosilek would result in a security nightmare. When that happens, expect Kosilek to pursue her lawsuit. Then a federal judge will eventually decide whether you will pay the bill for Kosilek's operation and beyond that, sex surgeries for other convicts serving times for horrendous crimes.

Joe Bergantino

© MMV, CBS Broadcasting Inc., All Rights Reserved.

#  Justice Resource Institute
# Rehabilitation and Treatment Program



**Mark P. Sperre**
*Program Director*

To: Steve Remeika
From: Barbara K Schwartz, Ph.D.
Re: Your Letter of June 14, 2002
Date: June 21, 2002

In response to your questions 1.) "Has the place improved in the recent undergone changes in the program under J.R.I?" I am a bit confused by your question and terms such as "recent". If you mean has the treatment program improved since the JRI treatment has been instituted, I think one need only look at the recidivism rates under the old program and the JRI program. We do not know of any civils who have been convicted of new violent crimes or sex crimes who have been released in the past nine years. This is in contrast to much higher rates for the DMH program including at least 4 murders that were committed by men released in the three years preceding our arrival here. However, I do not think that the "place" has improved. Obviously conditions of confinement have deteriorated markedly. JRI believed that it was working productively with the DOC to provide a treatment program that would lead to the release of civils. I had no idea that the agenda for Corrections would be to fight any program that had the above goal.

I believe that the above answers your second question. Your third question is "In your opinion has the C.A.B., J.R.I. and D.O.C. abided by and fulfilled their part of the agreement outlined in the "Master Plan" submitted to and ordered by the Courts?" I do not know what the court ordered the CAB to do but they have cleared several men lately which is unusual. JRI was ordered to continue offering the program described to the court and to maintain control of the treatment program. We have been unable to do that due to interference from the Department of Corrections who have consistently undermined the program and requested that staff engage in unethical conduct that has threatened our professional licenses. When we have resisted efforts to maintain professional integrity, we have been openly referred to as "a f—— pain".

Consequently I submitted my resignation in November prior to notification that the contract would be rebid. I was convinced to stay until the issue was resolved so that a temporary Clinical Director would not be terminated if the contract was not renewed which we knew it would not be.

I have loved working at the Treatment Center but feel that I was naïve in testifying for the DOC. However, at that time the treatment was overseen by two wonderful people, Tim App and Patty Spatero, whom I believe truly believe cared about the integrity of this program

However, current law suites in the field of treatment of civilly committed sex offenders have used a set of standards established since the transfer of the TC which would have made evaluation of this program much easier and can still be used in the future to assess whether treatment programs are constitutionally adequate. According to Janice Marques, Ph.D., Consent Monitor in the Washington suit:

> The Court's guidance was that adequate treatment "must offer residents a reasonable opportunity to improve the conditions for which they are confined." What does this mean for individuals who have been determined to be high-risk, predatory sexual offenders and who have been involuntarily committed for treatment? In answering this question, I developed a number of specific requirement that must be met before

*Massachusetts Treatment Center*
*30 Administration Road, Bridgewater, MA 02324*
*(508) 279-8100    Fax: (508) 279-1892*

>the injunction is dissolved. The first and most basic of
>these is that program must clearly operate as a mental health
>facility, not a prison. Second, the program needs to meet
>current professional standards; it must provide individualized
>treatment planning and a full range of interventions delivered
>by a competent staff. Finally it must demonstrate that release is
>possible, that those who successfully complete the inpatient
>phase of treatment can be moved into the community for ongoing
>supervision and treatment.

Obviously the Treatment Center does not meet a number of these criteria. This is the standard by which it should be judged.

I believe that I will be in a better position to advocate for the men at the Treatment Center, both civils and inmates, when I am a free agent. In the future I can be reached at

>New England Forensic Associates
>22 Mill Street
>Arlington, Massachusetts
>02476-4744
>(781) 643 0610