UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


SANDY JO BATTISTA,                )
        Plaintiff,                )
                                  )
                                  )        CIVIL ACTION NO.
        v.                        )        05-11456-DPW
                                  )
KATHLEEN M. DENNEHY,              )
Commissioner, ROBERT MURPHY,      )
Superintendent; STEVEN FAIRLY,    )
Director of Security;             )
SUSAN J. MARTIN, Director of      )
Health Services; GREGORY J.       )
HUGHES, LICSW; and UMASS          )
CORRECTIONAL HEALTH PROGRAM,      )
sued in the individual and        )
official capacities,              )
        Defendants.               )



MEMORANDUM AND ORDER
March 22, 2006


        Sandy J. Battista was civilly committed as a sexually

dangerous person, pursuant to Mass. Gen. L. ch. 123A,  and is

currently housed at the Massachusetts Treatment Center for

Sexually Dangerous Persons ("MTC").  Battista has been diagnosed

with Gender Identity Disorder ("GID"), and in April 2005, a

doctor prescribed female hormones to treat the condition.[1]  This

treatment was put on administrative hold pending further review.

        Battista, acting pro se, brings this action under 42 U.S.C.

_____

        [1] Although anatomically male, Plaintiff considers herself to
be transgendered and uses female pronouns in referring to
herself.  In this Memorandum, I acknowledge her preference, and
address her as a female.

§1983 alleging that Defendants' failure to provide her with
hormone therapy and their refusal to allow her to wear women's
clothing, use feminine hygiene products and makeup, deprived her
of constitutional rights to equal protection and substantive due
process.[2]  She also alleges violation of state civil commitment
statutes and Department of Correction ("DOC") regulations and
raises a claim of Intentional Infliction of Emotional Distress.

    Plaintiff has moved for a temporary restraining order and a
preliminary injunction requiring Defendants to provide her with
hormone therapy forthwith.  For the reasons discussed below, I
will deny interlocutory relief and dismiss the case as against
Defendant University of Massachusetts Correctional Health Program
but will grant her recent motion for the appointment of counsel
to pursue her claims on the merits.

## I. BACKGROUND

    In 1983, Plaintiff was convicted of rape of a child,
kidnapping, and robbery; she was sentenced to 12 to 20 years in
prison.  Days before her scheduled release in 2001, the district
attorney petitioned for her commitment as a sexually dangerous
person pursuant to Mass. Gen. L. ch. 123A.  In May 2003, a jury

---

[2] Count III states that Defendants "violated Battista's
constitutional rights to be free from discrimination based on
sex, disability, gender identity, and expression."  Complaint at
¶ 72.  No provision of the constitution explicitly guarantees
those rights in the way Plaintiff asserts them here.  I assume
that Plaintiff intended to assert discrimination claims under the
Fourteenth Amendment, and thus, in this Memorandum, the concerns
of Count III will be addressed as properly asserted under Count
II (equal protection) and Count IV (due process).

agreed that she was sexually dangerous and committed her to the
MTC, where she remains today.[3]

As part of the civil commitment proceedings, Plaintiff
underwent psychological evaluations by state examiners.  One of
those examiners, Dr. Katrin Rouse Weir, opined that Plaintiff has
a "complex network of issues related to [gender identity], which
he needs to work through."  Complaint, Ex. 3 at 14.  Plaintiff
offered to be surgically castrated, but Dr. Weir expressed
reservations about the effectiveness of this treatment in
Battista's case.[4]  Id.

During an annual review of Plaintiff's status in April 2004,
the MTC's Community Access Board ("CAB") determined that she
remained a sexually dangerous person.  Complaint, Ex. 7 at 15.
The CAB offered no opinion as to how Plaintiff's gender issues
related to her risk of criminal activity, but suggested that she
explore the connection further during her treatment for sexual
deviancy.[5]  Id.

─────────────────────

[3] In July 2003, Plaintiff filed a petition in the Superior
Court for her discharge from civil commitment pursuant to Mass.
Gen. L. c.123A § 9.  See Battista v. Commonwealth, C.A. No. 03-
10744 (Suffolk Superior Court).  This court has not advised that
a hearing date has been set for the § 9 petition.  Weiner
Affidavit at ¶ 11.

[4] Dr. Weir's reservations stemmed from Battista's history of
sexual offense, apparent confusion regarding sexual preference,
pedophilia and antisocial personality disorder, and demonstrated
aggression and impulsivity.  Complaint, Ex. 3 at 14-15.

[5] Battista's 2005 annual review noted that she meets
regularly with clinical staff to discuss gender identity issues
and is receiving treatment for gender reassignment, but she has
not made a "genuine effort" to participate effectively in her

In March and April 2004, Plaintiff submitted written complaints to Commissioner Dennehy, claiming that Dennehy was violating her equal protection rights by denying her hormone therapy and surgical castration while providing it to other prisoners. Complaint Ex. 6. Dennehy referred Plaintiff's complaints to Susan Martin, the Director of Health Services for the Massachusetts Department of Correction. Martin suggested that Plaintiff submit a request for an evaluation with a mental health provider to determine the appropriate treatment for GID. Complaint, Ex. 9.

Upon Plaintiff's request, arrangements were made for her to be seen by two separate, independent gender specialists from the Fenway Clinic in August 2004. Complaint at ¶ 34. The specialists diagnosed Plaintiff with GID, and recommended hormone therapy and psychotherapy ("Fenway Report"). Complaint, Ex. 10 at 6. In accordance with this recommendation, Plaintiff was provided with psychotherapy by a therapist trained to counsel individuals who are undergoing hormone treatment. Complaint at ¶ 36. She was also seen by an endocrinologist. Id. at ¶ 38. Shortly thereafter, MTC's in-house physician, Dr. Friedman, submitted an order to fill Plaintiff's prescription for hormones.[6]

---

therapy sessions. Plaintiff's Reply Memo, Ex. 7 at 8-9.

[6] In September 2001, at her own expense, Plaintiff had engaged Diana Ellaborn, a private licensed clinical social worker who specialized in gender disorders. Letter to K. Dennehy, Complaint Ex. 6 (March 29, 2004). Ms. Ellaborn diagnosed

By April 2005, Plaintiff had not yet received the hormone treatment. After receiving numerous letters of inquiry from Plaintiff, MTC Health Administrator Maryanne Percuoco informed her that Dennehy, Martin, Murphy and Fairly had put the prescription on hold pending "security review." Id. at ¶ 39; Plaintiff's Reply Memo, Ex. 3.

On April 26, 2005, allegedly as a result of the delay in receiving hormone treatment, Plaintiff suffered an emotional breakdown; she was administered antidepressants and put under the care of a psychiatrist. Id. at ¶ 40. She repeatedly wrote to Murphy and Fairly, carbon copying Dennehy, requesting that the security review be expedited. Id. at ¶¶ 41, 42. Martin explained to Plaintiff that the prescription was still being reviewed to determine its "appropriateness and necessity" and any potential security issues. Id. at ¶ 44. After another breakdown on May 9, 2005, Plaintiff was placed on administrative watch. Id. at ¶ 42.

Plaintiff continued to write Defendants about her concerns regarding the delay in hormone therapy, and in June 2005, she threatened legal action. Id. at ¶¶ 45-46, 50-51. In July 2005, she filed this suit seeking declaratory and injunctive relief and damages for Defendants' alleged failure to provide her with adequate medical care.

Plaintiff has already brought two actions similar to this

---

Plaintiff with GID and recommended hormone therapy and surgical castration. Id.

one.  In 1998, the Suffolk Superior Court held that Defendants
were not liable for refusing to treat her for GID.  <u>Battista v.</u>
<u>Commonwealth</u>, No. 97-03487 (Suffolk Superior Court) (1998)
(Plaintiff's Reply Memo, Ex. 1).  At that time, she had not yet
been professionally diagnosed with GID, and the court found that
she had refused to cooperate with prison medical staff's attempts
at psychological evaluation.  Four years later, Judge Lasker
dismissed on res judicata grounds a nearly identical case brought
by Plaintiff in federal court.  <u>Battista v. Murphy</u>, No. 02-CV-
10137-MEL (Nov. 4, 2002).[7]

_____

[7]  It bears noting that the Plaintiff has been a
particularly active litigant in this court.  In addition to the
instant action and that referenced above before Judge Lasker, the
Plaintiff has engaged in the following litigation in this court:
<u>Battista v. Murphy</u>, 05-12383-DPW (filed Nov. 21, 2005) (a §1983
action alleging that defendants unconstitutionally prohibited
plaintiff from communicating with other inmates); <u>Battista v.</u>
<u>DeCataldo et. al.</u>, 05-10743-RWZ (July 8, 2005) (dismissing a
§1983 action in which Plaintiff challenged the constitutionality
of her designation as a sexually dangerous person); <u>Battista v.</u>
<u>MacEachern, et. al.</u>, 04-10779-DPW (Nov. 12, 2004) (denying motion
to proceed in forma pauperis on action challenging the alleged
censorship of a magazine for nudity) <u>aff'd</u> No. 04-1676, 04-1708
(1st Cir. Oct. 13, 2004); <u>Battista v. Percuoco</u>, et. al., 04-
10890-MEL (Nov. 3, 2004) (denying motion to proceed in forma
pauperis on §1983 action challenging the alleged censorship of a
magazine for nudity) <u>aff'd</u> No. 04-1740 (1st Cir. Oct. 13, 2004);
<u>Cote et. al. v. Murphy, et. al.</u>, 03-10716-DPW (Sept. 27, 2004)
(dismissing action challenging the constitutionality of "double-
bunking" at the Massachusetts Treatment Center, and consequently,
denying as moot Plaintiff's motion to intervene) <u>aff'd</u>, No. 04-
2538 (1st Cir. Oct. 21, 2005); <u>Battista v. Murphy, et. al.</u>, 04-
10226-MEL (Aug. 24, 2004) (denying motion to proceed in forma
pauperis on equal protection challenge to Massachusetts Treatment
Center's policies allowing inmates to retain personal
possessions) <u>aff'd</u> No. 04-1783, 04-1979 (1st Cir. Oct. 13, 2004);
<u>Battista v. Murphy et. al.</u>, 03-12643-MEL (Aug. 24, 2004) (denying
motion to proceed in forma pauperis on §1983 action alleging that
failure to provide plaintiff with surgical castration violated

## II. DISCUSSION

In deciding whether to issue interlocutory injunctive relief, a district court must weigh four factors:

(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Wine and Spirits Retailers, Inc., v. Rhode Island, 418 F.3d 36, 46 (1st Cir. 2005). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." Id. (quoting New Comm Wireless Servs., Inc., v. SprintCom, Inc., 287

---

her due process rights) aff'd No. 04-1782, 04-1978 (1st Cir. Oct. 13, 2004); Battista v. Massachusetts, 04-10378-RGS (May 10, 2004) (dismissing complaint challenging the retroactive application of Massachusetts' civil commitment statute for sexually dangerous persons); Battista v. Forensic Health Services, 03-11161-NG (Jan. 12, 2004) (denying for failure to exhaust state remedies a petition for writ of habeas corpus based on allegations that defendant's policy for evaluating sexual dangerousness is unconstitutional); Battista v. Conte, et. al., 02-40181-NMG (July 24, 2003) (dismissing a §1983 suit alleging that defendants unconstitutionally impaired plaintiff's plea agreement and intentionally caused emotional distress); Battista v. Murphy, et. al., 02-12384-WGY (Dec. 31, 2002)(denying for failure to exhaust state remedies a petition for writ of habeas corpus challenging plaintiff's adjudication as a sexually dangerous person); Battista v. Murphy, et. al., 98-12310-NG (Dec. 27, 1999) (denying petition for writ of habeas corpus on the grounds that Plaintiff's claims of ineffective assistance of counsel were wholly unsupported); Battista et. al. v. DuBois, et. al., 94-12043-DPW (Apr. 29, 1996) (granting summary judgment in favor of defendants on §1983 action alleging deprivation of personal hygiene supplies in violation of the Eighth Amendment and on challenge to state's policy of determining inmate indigency).

F.3d 1, 9 (1st Cir. 2002)).  Accordingly, I begin with a
discussion of the likelihood of Plaintiff's success on the
merits.

**A.    Success on the merits**

<u>1.</u>    <u>UMass Correctional Health Program</u>

Defendant UMass Correctional Health Program ("UMCHP") has
moved to dismiss Plaintiff's complaint pursuant to Fed. R. Civ.
P. 12(b)(6), on the grounds that (1) as a state agency, any
claims for injunctive or monetary relief against it in federal
court are barred by the Eleventh Amendment to the United States
Constitution, and (2) the complaint fails to allege any action on
the part of UMCHP that can be enjoined.

A court may not grant a motion to dismiss "unless it appears
beyond doubt that the plaintiff can prove no set of facts in
support of [her] claim which would entitle [her] to relief."
<u>McLaughlin v. Boston Harbor Cruise Lines, Inc.</u>, 419 F.3d 47, 50
(1st Cir. 2005).  Assuming, as I must, that all well-pled
allegations in the complaint are true and indulging all
reasonable inferences in Plaintiff's favor, <u>id.</u>, I nevertheless
find that her claims against UMCHP cannot stand.

In the absence of consent, the Eleventh Amendment bars suits
brought by a citizen against her own state or state agency.
<u>Pennhurst State Sch. & Hospital v. Halderman</u>, 465 U.S. 89, 100
(1984).  Whether a state university is a state agency for

8

purposes of sovereign immunity is a "vexing" question, whose resolution generally involves consideration of a number of factors, including the university's mission, governance, and financial relationship to the state.  Neo Gen Screening, Inc., v. New England Newborn Screening Program, 187 F.3d 24, 27 (1st Cir. 1999).

Several courts have granted the University of Massachusetts sovereign immunity.  See, e.g., id. (upholding Judge O'Toole's holding that U Mass and its newborn screening program were state agencies); Daniel v. American Board of Emergency Medicine, 988 F. Supp. 127, 178-81 (W.D.N.Y. 1997) (finding the U Mass Medical Center to be a state agency).  These decision were fact-dependent, turning on the nature of the university department in question.  Here, UMCHP has presented no evidence as to its relationship to U Mass or to the state, beyond the fact that its name contains the words "University of Massachusetts".  Consequently, I do not rest dismissal of the case against UMCHP on sovereign immunity grounds.

However, Plaintiff has failed to allege facts that support a claim against UMCHP.  In her complaint, the reference to UMCHP alleges that Martin informed Battista that UMCHP was reviewing her prescription for hormones to determine its "appropriateness and necessity."  Complaint at ¶ 44.  Plaintiff also wrote a letter to Arthur Brewer, MD, the medical director of UMCHP, explaining her concerns about her GID treatment.  Complaint at ¶¶

9

45-46; Ex. 17.  Plaintiff's letter and her complaint, do not explain what, if any, role that UMCHP or any employee of UMCHP had in the alleged violation of her civil rights.  From Battista's letter, it appears that UMCHP professionals were reviewing her case, but the authority to provide the treatment Battista seeks resides with the Department of Corrections. Complaint Ex. 17.  Thus, because the complaint fails to allege facts sufficient to support a claim against UMCHP, I will grant UMCHP's motion to dismiss.  The remainder of this Memorandum applies only to the remaining defendants.

2.  Res Judicata

     Pointing to the two previous lawsuits that Plaintiff brought regarding the sufficiency of her treatment for GID, Defendants contend that the doctrine of res judicata, or claim preclusion, bars the current action.

     Res judicata prevents parties from "relitigating issues which were raised or could have been raised in a previous action, once a court has entered a final judgment on the merits in the previous action."  FDIC v. Shearson-American Express, Inc., 996 F.2d 493, 497 (1st Cir. 1993).  In order to trigger res judicata, three requirements must be met:

(1) a final judgment on the merits in an earlier action; (2) an identity of parties or privies in the two suits; and (3) an identity of the cause of action in both the earlier and later suits.

Id.

Plaintiff concedes that the judgment of the state court in
Battista v. Commonwealth, No. 97-03487-A (Suffolk Superior Court)
(1998), and Judge Lasker's decision in Battista v. Murphy, No.
02-CV-10137-MEL (Nov. 4, 2002), constitute final judgments on the
merits for purposes of claim preclusion.  The dispute centers
around elements (2) and (3).

With respect to the second element, the basic premise is
that parties to a prior action are bound by the judgment and non-
parties are not bound.  A. Wright & A. Miller, 18A Fed. Prac. &
Proc. Juris. 2d §4449.  A present party may invoke claim
preclusion if she was also a named party in the prior action, so
long as the party was acting in the same legal capacity in each
suit.  Id.  The more difficult situation arises when a non-party
to the first action seeks to use claim preclusion.  Under federal
law, "nonmutual claim preclusion may be invoked by defendants who
were not parties to the original action, if the new defendants
have a close and significant relationship with the original
defendants." Hermes Automation Technology, Inc. v. Hyundai
Electronics Industries Co., 915 F.2d 739, 751 (1st Cir.
1990)(internal quotations omitted).  Massachusetts law is
narrower in that it allows the new defendant to invoke claim
preclusion "only if that person's interest was represented by a
party to the prior action."[8]  Id.

---

[8] The governing claim preclusion law depends on the court in
which the final judgment on the merits was rendered.  Hermes

11

Only two of the named defendants in the present suit were defendants in earlier suits: Kathleen Dennehy was named in the state court action, and Robert Murphy was named in the federal court action.  Although the parties have not directly addressed this point, it appears that Dennehy and Murphy were acting in the same legal capacities in the prior suits as they are in the current one.  As for the remaining defendants, the only evidence of privity is an oblique suggestion in Defendants' brief that they, and the prior defendants, are all Department of Corrections officials.  Without more, this is insufficient to allow Defendants to invoke claim preclusion under either the federal or Massachusetts standard.

Nevertheless, even if privity of identity were established here, I find the third element of res judicata -- identity of cause of action -- is not satisfied.  Consistent with the "broad purpose of res judicata to eliminate needless repetitive litigation," Kilgoar v. Colbert County Bd. of Educ., 578 F.2d 1033, 1035 (5th Cir. 1978), a second suit will be barred if its claims and those asserted in the earlier action "derive from a common nucleus of operative facts."  Breneman v. Federal Aviation Administration, 381 F.3d 33, 38 (1st Cir. 2004).  However,

Automation Technology, Inc. v. Hyundai Electronics Industries Co., 915 F.2d 739, 750 (1st Cir. 1990).  Here, there were two previous final judgments, one from a Massachusetts court and one from a federal court.  Consequently, the law of either jurisdiction could apply.

12

"[s]ubsequent conduct, [that,] even if it is of the same nature as the conduct complained of in a prior lawsuit, may give rise to an entirely separate cause of action." Gonzalez-Pina v. Rodriquez, 407 F.3d 425, 430 (1st Cir. 2005) (quoting Kilgoar, 578 F.2d at 1035).

It is true that in this suit and the previous two, Plaintiff alleged that he received inadequate treatment for GID.  However, the facts that gave rise to the current suit differ significantly from the first two.[9]  The first suit centered around the defendants' failure to provide Battista with a therapist who specialized in gender identity disorders.  In holding that no constitutional violation had occurred, Justice Burnes of the Superior Court relied in part on the fact that Plaintiff's GID was self-diagnosed.  Battista, No. 97-3487-A at 11.  Central to Justice Burnes' holding was the fact that Battista herself refused to cooperate with prison officials' attempts at psychological evaluation.

_____

[9] I note that the claims in this suit are not identical to those raised in the first two.  Battista's state court suit was a §1983 action alleging violation of the First, Eighth, and Fourteenth Amendments, 42 U.S.C. §1988, the Massachusetts Civil Rights Act, and other state laws.  Her first federal suit only claimed violations of the First, Eighth, and Fourteenth Amendments under §1983.  The current action contains a §1983 claim based on the Fourteenth Amendment, a claim alleging violation of Mass. Gen. L. c. 123A, §2, and a claim of Intentional Infliction of Emotional Distress.  Nevertheless, res judicata could still apply in the form of claim preclusion, if the new claims arose from the same transaction or occurrence, or in the form of issue preclusion, if the same issues were previously litigated.

In contrast, by the time the current suit was filed, Plaintiff had been professionally diagnosed with GID and had received counseling by a gender specialist.  Her suit is now driven by a different set of facts: she was prescribed hormone therapy by a licensed professional, the prescription was approved by an MTC physician, and Defendants withheld that treatment. Thus, the issue for resolution here is not whether failing to provide Plaintiff with a specialized psychotherapist violates the constitution, but whether the withholding of professionally prescribed hormone therapy is a constitutional violation.

The previous federal court action presents a closer case regarding res judicata.  By November 2002, when Judge Lasker handed down his decision, a professional had diagnosed Plaintiff with GID, and had recommended hormone therapy and surgical sex reassignment as possible treatments.[10]  In that previous suit, Plaintiff sought, as she does here, an injunction requiring prison officials to provide her with that treatment.  Again, what distinguishes this case is that Battista had been prescribed medication to treat her condition, and that medication was withheld.

In sum, res judicata does not preclude this suit.  Although there is some identity of parties and the legal principles are

---

[10] A private gender specialist, Diane Ellaborn, diagnosed Battista with GID in October 2001.  Dr. Katrin Rouse Weir's report, dated April 1, 2002, acknowledged Ms. Ellaborn's findings.

14

similar, the cause of action arises from new conduct that
occurred after the previous judgments were rendered.

3.    State law and DOC policies

    Count I alleges that by withholding Plaintiff's prescribed
treatment, Defendants violated Mass. Gen. L. ch. 123A, §2 and
Department of Correction ("DOC") policies 103 DOC 630 and 650.
These claims have no likelihood of success because neither
federal nor state law offer grounds for relief.

    To state a claim under § 1983, a plaintiff must allege that
the defendant, acting under color of state law, deprived her of a
right secured by the Constitution or laws of the United States.
West v. Atkins, 487 U.S. 42, 48 (1988).  Since Plaintiff's claims
in Count I are based solely on state law, §1983 does not apply.
See Martinez v. Colon, 54 F.3d 980, 989 (1st Cir. 1995) ("It is
established beyond peradventure that a state actor's failure to
observe a duty imposed by state law, standing alone, is not a
sufficient foundation on which to erect a section 1983 claim.").

    State law, however, is no more helpful to the Plaintiff.  As
Defendants correctly point out, neither Mass. Gen. L. ch. 123A
nor the DOC policies at issue confer a private right of action.
Massachusetts courts are "reluctant to infer a private cause of
action from a statute in the absence of some indication from the
Legislature supporting such an inference."  Loffredo v. Center
for Addictive Behaviors, 426 Mass. 541, 544 (1998).  There is no
suggestion in the enabling statute, Mass. Gen. L. ch. 124, §1,

15

that the legislature intended to allow private actions.

Without an enabling statute to support it, a private cause
of action cannot be inferred solely from an agency regulation.
Id. at 546; see Martino v. Hogan, 37 Mass. App. Ct. 710, 720
(1994) ("It is implausible to imagine that the Legislature, in
granting the department authority to promulgate regulations, was
empowering the department to create possible civil liability
against the officials.") (internal citations omitted).  Thus,
Plaintiff's claims based upon Mass. Gen. L. ch. 123A, §2 and
policies 103 HOC 610 and 650 cannot stand.


4.   Equal Protection

Plaintiff alleges that in withholding her hormone therapy,
but providing it to other inmates who suffer from GID, Defendants
denied her constitutional right to equal protection.

To establish an equal protection violation, a plaintiff must
show that (1) she was selectively treated, compared with others
similarly situated; and (2) "that such selective treatment was
based on impermissible considerations such as race, religion,
intent to inhibit or punish the exercise of constitutional
rights, or malicious or bad faith intent to injure a person."
Rubinovitz v. Rogato, 60 F.3d 906, 909-910 (1st Cir. 1995).  "The
underlying equal protection inquiry, ... is whether different
treatment of two separately classified groups is at least

16

marginally *reasonable*."  Walker v. Exeter Region Cooperative
School Dist. , 284 F.3d 42, 44 (1st Cir. 2002) (emphasis in
original).

Plaintiff has failed to meet these requirements.  In support
of her claim of selective treatment, she asserts that
transgendered inmates housed with the general population of an
all-male state prison have been allowed hormone therapy, as well
as the right to retain, at their own expense, female clothing and
makeup, apparently without any security problems.[11]  Complaint at
¶ 65.  At most, these facts show that prison officials, and
possibly medical staff, made different decisions with respect to
Plaintiff than they did for other transgendered inmates.  These
facts alone do not establish that Plaintiff and the inmates were
similarly situated or that Defendants had no legitimate
justification for treating Plaintiff as they did.

Defendants assert that Plaintiff has not received hormone

---

[11] Although not mentioned in the body of the complaint,
Plaintiff appears to be referring to two transgendered prisoners,
Kenny Hunt, who is housed at MCI-Shirley Medium, and Michelle
Kosilek, housed at MCI-Norfolk.  Letter to K. Dennehy, Complaint
Ex. 6 at 2 (March 29, 2004).  While awaiting consultation with an
endocrinologist, Plaintiff learned from Hunt that Hunt and
Kosilek were receiving hormone therapy for their gender disorders
and were allowed to keep makeup.  Id.  Neither Hunt nor Kosilek
were receiving this treatment prior to their incarceration.  Id.
Kosilek has filed an action against the Massachusetts
Department of Correction alleging that the defendants
unconstitutionally denied her medical treatment for GID.  Kosilek
v. Dept. of Corrections, Civil Action No. 00-12455-MLW (filed
Nov. 21, 2000).  The case is set for trial before Chief Judge
Wolf on April 6, 2006.

therapy because the Fenway Clinic's November 16, 2004, evaluation
of Battista was "vague and incomplete."  Weiner Affidavit at ¶ 6.
Defendants claim that they are awaiting further review of the
Fenway Report before they implement an irreversible course of
treatment.  Id. at ¶ 7.  Evaluations by a number of other medical
professionals dating as far back as 1995, indicate that
Plaintiff's psychological issues are serious and raise questions
about the severity of her GID and the proper course of treatment.
Id. at ¶¶ 7, 10, 11.  This evidence suggests that Defendants'
decision to await further review of Plaintiff's case easily
clears the hurdle of being "marginally reasonable."

        Thus, Plaintiff has failed to show that she is likely to
succeed on her equal protection claim.

5.    Due Process

        In Counts I and IV, Plaintiff claims that she has been
denied her substantive due process right to medical care.

        As an involuntarily committed person, Plaintiff has a
constitutional right to minimally adequate medical care.
Youngberg v. Romeo, 457 U.S. 307, 319 (1982); Cameron v. Tomes,
783 F. Supp. 1511, 1515 (D. Mass. 1992) (Keeton, J.), modified by
Cameron v. Tomes, 990 F.2d 14 (1st Cir. 1993).  Although this
right is grounded in the Fourteenth Amendment's Due Process
clause, courts have looked to Eighth Amendment jurisprudence for
guidance.  See Cameron, 783 F. Supp. at 1515; Garcia v. City of
Boston, 115 F. Supp.2d 74, 82 (D. Mass. 2000) (Lasker, J.).  The

18

Eighth Amendment represents a floor below which the level of
medical care afforded to such individuals cannot constitutionally
fall.  See Youngberg, 457 U.S. at 322 ("Persons who have been
involuntarily committed are entitled to more considerate
treatment and conditions of confinement than criminals whose
conditions of confinement are designed to punish.").

     The Eighth Amendment imposes a duty to attend to the
"serious medical needs of prisoners." Estelle v. Gamble, 429
U.S. 97, 104 (1976).  "Deliberate indifference" to those ends on
the part of government officials violates the Constitution.  Id.
In the First Circuit's words, "[d]eliberate indifference is
conduct that offends evolving standards of decency in a civilized
society." DesRosiers v. Moran, 949 F.2d 15, 18 (1st Cir. 1991).
It is more than mere negligence; it requires that officials had a
"culpable state of mind and intended to wantonly inflict pain."
Id.  Such indifference may be manifested by prison doctors in
response to the prisoner's needs or by [other prison officials]
in intentionally denying or delaying access to medical care or
intentionally interfering with the treatment once prescribed."
Estelle, 429 U.S. at 104-105.

     This does not mean that prisoners, or the civilly committed,
have a constitutional right to ideal medical treatment or to all
the medical treatment of their choice.  See Doe v. Gaughan, 808
F.2d 871, 886 (1986).  Rather, a state must provide "adequate
services: services at a level reasonably commensurate with modern

19

medical science and of a quality acceptable within prudent
professional standards." <u>U.S. v. DeCologero</u>, 821 F.2d 39, 43
(1st Cir. 1987).

It is sufficient, for constitutional purposes, for
professional judgment to have been exercised. <u>Youngberg</u>, 457
U.S. at 321. Once that judgment has been exercised, "[i]t is not
appropriate for the courts to specify which of several
professionally acceptable choices should have been made." <u>Id.</u> at
321-22. Decisions made by professionals enjoy a presumption of
validity; "liability may be imposed only when the decision by the
professional is such a substantial departure from accepted
professional judgment, practice or standards as to demonstrate
that the person responsible actually did not base the decision on
such a judgment." <u>Id.</u> at 323.

Finally, in determining whether the quality of medical care
in an institutional setting satisfies Due Process, a court must
weigh the civilly committed individual's liberty interest against
the State's asserted reasons for restraining that liberty.
<u>Youngberg</u>, 457 U.S. at 320. In undertaking this balancing, the
court must consider the "practical constraints facing prison
officials," such as security concerns. <u>DesRosiers</u>, 949 F.2d at
19.

With this legal framework in mind, I consider the facts of
this particular case in assessing the propriety of Defendants'
withholding of Plaintiff's prescription for hormones.

Plaintiff contends that Defendants have intentionally interfered with her medical treatment after it had been prescribed -- conduct singled out by the Supreme Court as an example of deliberate indifference. See Estelle, 429 U.S. at 105. Her argument is as follows. Defendant arranged for Plaintiff to be seen by gender specialists at Fenway Community Health. Those specialists developed a treatment plan that included hormone therapy accompanied by psychotherapy. An in-house physician approved the prescription for hormones, and although Defendants provided the psychotherapy and a consultation with an endocrinologist, they arbitrarily refused to follow through with the hormone treatment.

Defendants respond that medical professionals disagreed over the proper course of Plaintiff's treatment. They point to a number of reports by medical professionals discussing Plaintiff's gender disorder. These reports stated that Plaintiff was conflicted about her desire to be a woman and her gender issues were complicated by a traumatic childhood and severe psychological disturbances.[12] These reports recommended

---

[12] For example, in October 2001, Ronald Ebert, PhD., wrote:

[Plaintiff's] wish to become a woman through surgery appears to be an attempt upon his part to regain the mother who rejected him and was killed for her rejection. It may also be an attempt to reject his father and his father's anger towards women, or it might serve to psychologically redeem his father by bringing mother back to life. In any case this is an incomplete psychological attempt to resolve his terrible childhood in a dramatic and permanent fashion. It

psychotherapy and those that did not rule out physical sex change as a form of treatment, recommended extreme caution should that option be pursued.[13]  In contrast, the Fenway Report diagnosed Plaintiff with GID and recommended hormone therapy.  Faced with these competing recommendations, Defendants claim that they decided to withhold Plaintiffs hormone treatment until they could review her case further.

Although it is somewhat curious that Defendants would withhold treatment approved by an in-house physician, the range of psychological evaluations and treatment recommendations evidence Defendants' genuine attempts to diagnose and treat Plaintiff's numerous disorders.  At this stage, they undermine Plaintiff's efforts to show a likelihood of success on the merits

---

is to be hoped that any ethical professional he sees to support his wish to change his sex will agree that many years of further treatment and therapy are required before such a decision can be made.

Weiner Affidavit, Ex. 1 at 9.

[13]  Dr. Victoria Russell, a psychiatrist, wrote a memo to Kathleen Dennehy dated March 17, 1997, in which she said the following regarding Plaintiff's request for a sex change:

Taken in the context of his past experience and behavior, this Inmate's name change and requests for a sex change are bizarre at best, and psychotic at worst... No reasonably experienced therapist would consider recommending an individual with this history for a sex change operation without extensive testing and therapy.  The Inmate has had neither.  On my opinion, this Inmate would never be a reasonable candidate for sex-change surgery.

Weiner Affidavit, Ex. 4 at 2.

of her substantive due process claim.

The record contains nine comprehensive psychological evaluations of Plaintiff by medical or social work professionals dating back to 1997.[14]  These reports detail Plaintiff's tragic childhood, brutal crimes, psychoses, and cooperation, or lack thereof, in psychotherapy.  They each recognize Plaintiff's gender issues, but rely primarily on psychotherapy for treatment.

Only the Ellaborn Report and the Fenway Report explicitly recommend hormone therapy.  The Ellaborn Report, requested by Plaintiff's former attorney and privately funded, is the only one that strongly recommends hormones and surgery and dismisses any link between Plaintiff's GID, history of sexual offenses, and personality disorders.  The Fenway Report is more cautious, acknowledging that Plaintiff's incarceration might present complications with respect to her personal safety and "transition status."  Complaint, Ex. 10 at 7.  Given the strong reservations the great majority of health professionals expressed towards hormone treatment and surgical options, and the qualification in

---

[14] These reports are, beginning with the most recent: Brent Thibout, MA, LMHC, Plaintiff's Reply, Ex. 7 (March 14, 2005); Kevin Kapila, MD, and Randi Kaufman, PsyD ("Fenway Report"), Complaint, Ex. 10 (Aug. 10 2004); Frank DiCataldo, Ph.D., Complaint, Ex. 7 (Apr. 24, 2004); Katrin Rouse Weir, Ed. D., Complaint, Ex. 3 (Apr. 1, 2002); Ronald S. Ebert, Ph.D., Weiner Affidavit, Ex. 1 (Oct. 19, 2001); Diane Ellaborn, LICSW ("Ellaborn Report"), Plaintiff's Memo to Exclude Osborne Report, Attachment B (October 17, 2001); David Campopiano, MA and Robert Prentky, Ph.D., Weiner Affidavit, Ex. 2 (Nov. 18, 1998); J. Tyler Carpenter, PhD, Weiner Affidavit, Ex. 3 (Oct. 4, 1997); and Victoria Russell, MD, Weiner Affidavit at Ex. 4 (Mar. 17, 1997).

the Fenway Report, Defendant's hesitancy in providing Plaintiff

with hormone therapy cannot on this record be termed

unreasonable.[15]

---

[15] Defendants engaged Cynthia S. Osborne, MSW, to conduct a review of the Fenway Report ("Osborne Report"). See Second Affidavit Weiner, Ex. 1. Osborne offered a stinging critique of the Fenway Report's analysis and treatment recommendations. Plaintiff has moved to exclude this report, alleging that Osborne is not qualified as an expert under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Daubert requires that an expert's testimony "rests on a reliable foundation and is relevant to the task at hand." Id. at 597. Ms. Osborne is an expert in gender identity disorders, a licensed clinical social worker, holds a masters degree in social work, and is a Forensic Consultant and Assistant Professor in the Department of Psychiatry and Behavioral Sciences at Johns Hopkins University. Second Affidavit of Weiner at ¶ 8, Ex. 1 at 12. Her report comprehensively reviews Plaintiff's previous psychological evaluations dating back to 1979 and provides a detailed analysis of Plaintiff's previous diagnoses and treatment recommendations, incorporating the most recent relevant studies. Ms. Osborne discusses the Harry Benjamin Standards of Care and their application to Plaintiff, specifically addressing Plaintiff's status as an incarcerated individual.

The Osborne Report clearly satisfies Daubert's requirements of reliability and relevancy, and consequently, I deny Plaintiff's motion to exclude it. However, because Ms. Osborne never personally met or evaluated Plaintiff, I do not give the Osborne Report as much weight as the other reports in deciding whether Defendants' treatment of Plaintiff meets constitutional standards.

In a related motion, Defendants have requested that the case be dismissed as a sanction against Plaintiff for attempting to intimidate Ms. Osborne. Plaintiff filed a cross-motion for sanctions alleging abusive motion practice.

Plaintiff sent two letters to Ms. Osborne, dated August 17, 2005, and October 21, 2005. Plaintiff's Cross-Motion, Attachment B; Defendants' Motion for Sanction, Ex. 1. The October 21 letter states

> [I]f left with no alternative, I will without question
> supplement my pleadings to add a claim against you for
> violations of my due process rights. Additionally, as
> mentioned from my independent gender specialist, Ms. Diane
> Ellaborn, LICSW, who is an appointed member to the Harry
> Benjamin International Gender Dysphoria Association's Ethics

Moreover, there is no evidence that Defendants have neglected Plaintiff's medical needs, let alone exhibited the "wanton disregard" required to establish a constitutional violation.  See DesRosiers, 949 F.2d at 19.  To the contrary, Defendants have conducted a number of professional psychological evaluations of Plaintiff that addressed her gender issues, including at least one by gender specialists.  Defendants arranged for her to see an endocrinologist for a consultation on hormone therapy, and provided her with regular sessions with a counselor trained in gender issues.[16]  See Complaint, Ex. 17.

_____

Committee, your evaluative process will also be the subject of review.
Defendants' Motion for Sanction, Ex. 1.
    This passage suggests threats of legal action and ethics committee reporting designed to intimidate the witness.  Although improper, the threats do not warrant a sanction of dismissal, given that the Plaintiff is pro se and this is the only instance of improper behavior brought to my attention.  Plaintiff, however, should take note that her conduct was inappropriate and sanctions may be imposed for similar conduct in the future.  At this point, however, the cross-motions for sanctions will be denied.

[16] Plaintiff has also received treatment for her other psychological disorders.  She has participated in, among other things, a Relapse Prevention program, group therapy, individual therapy, and a class on victim empathy.  Plaintiff's Reply, Ex 7 at 5-8.  She has failed to take advantage of other treatment recommendations, such as an anger and stress management class, a social skills class, and community meetings.  Id.
    Plaintiff has submitted an affidavit that claims she is receiving "no form of medical treatment to alleviate the symptoms I am experiencing over my gender issues."  Battista Affidavit at ¶ 10.  This directly contradicts the Second Affidavit of Lawrence Weiner, which states that Plaintiff has been engaged in regular psychotherapy sessions with a gender specialist since January 2005, has regular sessions with a general psychiatrist, and is being closely monitored by the mental health staff.  Second

Plaintiff relies on Kosilek v. Maloney, 221 F. Supp. 2d 156 (D. Mass. 2002) (Wolf, J.), to support her claim that withholding hormone therapy is a constitutional violation. Kosilek is a prisoner serving a life sentence at MCI-Norfolk, a medium-security male prison. Id. at 158. She had a gender identity disorder, and believing that she was a female trapped in a male body, suffered constant mental anguish and attempted twice to commit suicide. Id. Michael Maloney, the Commissioner of the Department of Corrections, adopted a blanket policy prohibiting administration of female hormones to inmates who had not been taking them prior to incarceration. Id. at 159-160. Pursuant to this policy and against the recommendation of at least one medical professional, Maloney decided not to provide Kosilek with hormones or other treatment generally recommended for individuals with Kosilek's symptoms. Id. at 159.

Kosilek sued alleging that Maloney provided inadequate health care in violation the Eighth Amendment. Chief Judge Wolf held that because Maloney did not have the requisite state of mind, there was no constitutional violation. Id. at 190-91. However, he also found that Maloney had failed to provide Kosilek with adequate medical care. Maloney was not a medical professional, and did not consult with one when he denied Kosilek hormone therapy. Kosilek had a serious medical need and, more

---

Weiner Affidavit at ¶¶ 4, 7.

concerned about financial costs and political fallout than
Kosilek's well-being, Maloney "offered no real treatment at all."
Id. at 161, 191.

After reviewing the nature of GID, the standard treatments,
and holding a hearing during which an expert testified, Chief
Judge Wolf concluded that "at a minimum, Kosilek should receive
genuine psychotherapy from, or under the direction of, someone
qualified by training and experience to address a severe gender
identity disorder." Id. at 193. Chief Judge Wolf held further
that hormones, and even sex reassignment surgery should be
considered, if deemed medically necessary by a qualified
professional. Id. at 195.

Plaintiff appears to read Kosilek as requiring prison
officials to provide any treatment recommended by a medical
professional and in accordance with prudent professional
standards. I disagree. The central holding in Kosilek is that
the medical care of prisoners must be based on an individual
professional evaluation, not a blanket rule. Id. at 193.
Kosilek's medical care failed to meet the constitutional standard
because she was not provided with a specialist trained to treat
her disorder, and more importantly, decisions about her health
care were neither made by a medical professional nor based upon
medical considerations. Id. at 193.[17]

---

[17] Kosilek's case alleging inadequate treatment for GID is
scheduled for trial before Chief Judge Wolf on April 6, 2006.

27

In contrast, Plaintiff not only received numerous assessments by psychologists, psychiatrists, and social workers, she also received an evaluation by gender specialists.  Those specialists recommended a course of treatment that included specialized psychotherapy and hormones.  Several other medical professionals also recommended psychotherapy, and Plaintiff has been receiving that portion of the treatment.  Defendants claim that they are considering hormone therapy, but are reviewing it for its appropriateness "in the context of prison environment," Complaint, Ex. 16. -- the very situation that the Fenway Report flagged as being a potential complication.  Thus, Plaintiff has received the individualized, specialized medical care that Chief Judge Wolf found lacking in Kosilek's case.

Relying on Kosilek, Plaintiff argues that evaluations of medical professionals who are not gender specialists are irrelevant.  Kosilek is not so rigid.  Again, Kosilek focuses on the importance of individualized medical treatment by professionals exercising sound medical judgment.  While specialist opinions are valuable, this does not mean that the opinions of other qualified medical professionals should be disregarded.  The opinions of non-gender specialists are especially valuable in Plaintiff's case, where she suffers from a number of psychological disorders that potentially interact with

See Note 11, supra.

28

her GID.

Even if I disregard non-gender specialist evaluations, the Fenway Report raised the specter of potential problems with incarcerated individuals and candidly admitted that the widely accepted standard of care for GID did not address individuals who wished to begin hormone treatment after incarceration.[18] Complaint, Ex. 10 at 7.  It is not unreasonable on its face for Defendants to take time reviewing this issue before providing Plaintiff with hormone treatment.

I recognize that Plaintiff has spent years waiting for the hormone therapy that she believes will relieve her suffering. She has endured mental breakdowns, bouts of depression, thoughts of suicide and even attempted to mutilate herself.  However, Plaintiff has not demonstrated that the health care she has received falls short of constitutional standards.  On this record at this time, I cannot adopt the medical recommendations of two gender specialists, while discounting the numerous opinions of other qualified medical professionals.  See Youngberg, 457 U.S. at 321-22.

Due process analysis, moreover, requires weighing the interests of the state.  The interest of the state in exercising caution before embarking on hormone therapy in this case is

---

[18] The Fenway Report relied on the Harry Benjamin Standards of Care, an internationally accepted treatment protocol for gender identity disorders.  Complaint, Ex. 10 at 6.

significant.  After reviewing the record, I cannot say that it is clear that the treatment Plaintiff seeks will have its desired effect.[19]  Defendants' concerns about initiating hormone therapy while Plaintiff is incarcerated have a foundation in this record. At this stage, Plaintiff has not shown herself likely to prevail on her substantive due process claims.

6.    Intentional Infliction of Emotional Distress

Plaintiff has alleged that Defendant's withholding of hormone therapy constitutes intentional infliction of emotional distress ("IIED").

In order to establish a claim for IIED under Massachusetts law, a plaintiff must show

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was "extreme and outrageous," was "beyond all possible bounds of decency" and was "utterly intolerable in a civilized community"; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was "severe" and of a nature "that no reasonable man could be expected to endure it."

Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976)(internal citations omitted).

---

[19]  In this connection, Plaintiff has alleged in Count IV that denial of hormone therapy will violate her due process right to liberty by lengthening her incarceration.  Complaint at ¶ 74. As noted above, the relationship between Plaintiff's gender identity disorder, her offending behavior, and her other psychological disorders is unclear.  The impact of hormone therapy on Plaintiff's designation as a sexually dangerous person is also uncertain.  Thus, it does not appear that Plaintiff is likely to succeed on this claim.

"Mere insults, indignities, threats, annoyances, petty oppressions or other trivialities" are insufficient to establish liability for IIED.  Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987).  Nor is it enough "that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  Id.  Rather, a defendant will be subject to liability only when his conduct "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."  Id.

I cannot say on this record that Defendants' actions constitute conduct "atrocious and utterly intolerable in a civilized society."  Id.  As discussed above, Defendants withheld the hormone therapy that had been prescribed to Plaintiff because they concluded that, given the Plaintiff's medical and criminal history and the differing views of several medical professionals as to the appropriateness of hormone therapy, further review was necessary before administering hormones to Plaintiff.  See Weiner Affidavit at ¶¶ 6-9.

Although Plaintiff has suffered mental anguish as a result of the postponement of hormone therapy, Defendants' actions appear to have been based upon legitimate, if debatable grounds, and their decision does not appear unreasonable.  It appears

31

Defendants' conduct falls short of "extreme and outrageous," and Plaintiff's claim of IIED is unlikely to succeed on the merits.

**B. Harm to Plaintiff**

The second element that a court considers in deciding whether to grant a temporary restraining order or a preliminary injunction is potential for irreparable harm to the movant if injunctive relief is denied. <u>Wine and Spirits</u>, 418 F.3d at 46.

Plaintiff claims that she is threatened with irreparable harm in two ways. First, she contends that the continued deprivation of her constitutional right to adequate medical care constitutes irreparable harm. Second, she argues that so long as one of the conditions that resulted in her confinement goes untreated, she will be unable to gain release from the institution and reintegrate into society.

Neither of these claims has vitality. Because I have found that Defendants' conduct has not been shown likely to amount to a constitutional violation, Plaintiff cannot be said to suffer irreparable harm on that ground. With respect to Plaintiff's second argument-- that Plaintiff's condition is now going untreated -- I note she is receiving specialized and general psychotherapy, the treatment recommended by each professional report in the record. Moreover, as discussed above, medical professionals debate the impact that hormone therapy will have on Plaintiff's criminal proclivity and psychological disorders, and

32

consequently, her designation as a sexually dangerous person. Since her release depends on a finding that she is no longer sexually dangerous, see Mass. Gen. L. c. 123A §9, the effect that withholding hormone treatment has on Plaintiff's liberty is unclear.

## C. Harm to Defendant and Balance of Hardships

There is harm in requiring Defendants on an interlocutory basis to administer hormone therapy when qualified medical professionals have expressed divergent opinions as to its effectiveness. The admonition in Youngberg bears repeating: "It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Youngberg, 457 U.S. at 321. Tying the hands of competent medical professionals and prison officials on this record risks harming not only the autonomy of the state and the quality of its health care, but the Plaintiff's own well-being.

In short, the balance of hardships between Plaintiff and Defendants appears to favor Defendants.

## D. Public interest

Finally, I must consider the effect on the public interest of requiring Defendants to administer hormone therapy to Plaintiff.

Plaintiff contends that it is in the public interest in having public officials obey the law and having civilly committed

individuals receive treatment based upon professional medical judgment. I agree. As discussed above, Plaintiff has not shown that Defendants have not obeyed the law. It appears on this record that Plaintiff has received medical care based upon the judgment (albeit contested) of medical professionals, thus satisfying the public interest.

### III. CONCLUSION

Plaintiff has failed to show that she is likely to succeed on the merits of her claim; moreover, the balance of hardships and the potential effect on the public interest counsels against interlocutory injunctive relief.

For the reasons set forth more fully above, I DENY Plaintiff's motion for a temporary restraining order and preliminary injunction (No. 7) and ALLOW the Motion to Dismiss the defendant University of Massachusetts Correctional Medical Health Program (No. 19).

The decision to deny interlocutory relief is, of course, based upon a limited record in a setting where professional judgment will be determinative. I am of the view that, before the case moves on to final resolution, the pro se Plaintiff should have the benefit of counsel to permit professional prosecution of the case.

I note further that in a parallel action, <u>Battista v. Murphy</u>, Civil Action No. 05-12383-DPW (filed Nov. 21, 2005), Plaintiff seeks to challenge regulations limiting correspondence

34

in Massachusetts correctional facilities.  That case appears to
have been prompted by limitations imposed on Plaintiff's ability
to communicate with the plaintiff in <u>Kosilek</u>, a gender identity
case pending before Chief Judge Wolf.  <u>See</u> Note 11, <u>supra</u>.

Accordingly, I will ALLOW the Plaintiff's Motion to Appoint
Counsel in the instant case, and consolidate this case with Civil
Action No. 05-12383, for which the same counsel shall be
appointed to conduct the litigation.

/s/ Douglas P. Woodlock
_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE