UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE: SANDY J. BATTISTA, Plaintiff

FILED
IN CLERKS OFFICE

C.A.No.05-11456-DPW.
2007 JUL 10  P 12: 17

U.S. DISTRICT COURT
DISTRICT OF MASS.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO RENEWED MOTION OF DEFENDANTS KATHLEEN M. DENNEHY, ROBERT MURPHY, SUSAN MARTIN, STEVEN FAIRLY AND GREGORY HUGHES FOR AN ORDER COMPELLING PLAINTIFF TO SUBMIT TO MENTAL EXAMINATIONS

Plaintiff, Sandy J. Battista, acting pro-se in the above referenced mater, hereby submits the following Memorandum of Law in Support of her Opposition to Renewed Motion of Defendants Kathleen M. Dennehy, Robert Murphy, Susan Martin, Steven Fairly and Gregory Hughes for an order Compelling Plaintiff to Submit to Mental Examinations("Defendants Motion").

### A R G U M E N T

Rule 35 (a) of the Federal Rules of Civil Procedure provides that "when the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician or to produce for examination the person in his custody or legal control. The order may be made only on a motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made." Id.

Rule 35 requires the trial judge, who must decide, as an initial matter in every case, whether the party requesting a

physical or mental examination or examinations has adequately
demonstrated the existence of the Rule's requirement of "in
controversy" and "good cause." Schlagenauf vs. Holder, 379 U.S.
104, 118-19 (1964). The plaintiff's right to avoid the invasion
of a mental examination must be balanced against defendants right
to a fair trial. Curtis vs. Express, Inc., 868 F.Supp. 467, 468
(N.D.N.Y. 1994). However, the "in controversy" and "good cause"
requirements are not simple formalities and are not met by the
pleadings—nor by mere relevance to the case—but requires an
affirmative showing by the movant that each condition as to which
the examination is sought is really and genuinely in controversy
and that good cause exists for ordering each particular examination.
Id., citing Schlagenauf, 379 U.S. at 118.

It has been noted that "more than any other mode of discovery,
an examination [under Fed.R.Civ.P. 35] impinges directly upon the
privacy and personality of the party being examined." See J.W.
Smith & H.B. Zobel, Rules Practice §35.3, at 385 (1975). Such a
motion should therefore be as detailed as possible. Id. at 384.
The moving party "must produce sufficient information, by what-
ever means, so that the district judge can fulfill his function
mandated by the Rule." Schlagenauf, 379 U.S. at 119. The grant
or denial of a Rule 35 Motion "clearly...rests in the sound
discretion of the trial court." Real vs. Hogan, 828 F.2d 58, 63
(1st Cir. 1987).

## Defendants Have Not Adequately Demonstrated The Rule's Require-ment of "In Controversy" And "Good Cause."

As argued above, the court must first determine whether the
moving party has established the other party's physical or mental

-3-

condition is in controversy. Schlagenauf, 379 U.S. at 118-19; Sabree vs. United Bhd. of Crpenters & Joiners Of Am., Local No. 33, 126 F.R.D. 422, 426 (D.Mass. 1989). In the case at bar, it was the defendants, not the plaintiff, who placed her mental condition in controversy by raising concerns regarding the thoroughness of the Fenway Clinic's November 2004 evaluation of the plaintiff. See Affidavit of Lawrence M. Weiner, LICSW, attached to Defendants Kathleen M. Dennehy, Robert Murphy, Susan Martin, Steven Fairly and Gregory Hughes Opposition to Plaintiff's Request for a Preliminary Injunction(dated: July 22, 2005)(Paper Nos.10-11); see also Second Affidavit of Lawrence M. Weiner, LICSW, attached to the Response of Defendants Kathleen M. Dennehy, Robert Murphy, Susan Martin, Steven Fairly and Gregory Hughes to Plaintiff's October 17, 2005 Affidavi(dated: October 26, 2005) (Paper No.33). To the contrary, although some what inartfully drafted, the Complaint clearly alleges that the defendants violated plaintiff's statutory and constitutional rights "by arbitrarily withholding 'medically prescribed treatment,'" and contends as a result "has suffered physical and emotional injuries." Complaint, ¶¶34-40, 43, 47, 58 & 64. See also Plaintiff's Motion for Leave to Supplement Pending Application for Preliminary Relief & Affidavit(dated: October 17, 2005)(Paper Nos.31-32). Here, arguably, had plaintiff introduced evidence regarding the "substance" of the Fenway Clinic's November 2004 evaluation, rather than its "existence," defendants may have adequately demonstrated the "in controversy" requirements. See John Doe vs. Leo J. O'Neil, Worcester C.A.No.04-2513 (Mass.Super.Ct. Jan. 26, 2006)(Locke, J.)(2006 Mass.Super. LEXIS 80), citing Vanderbilt vs. Town of

-4-

Childmark, 174 F.R.D. 225, 230 (D.Mass. 1977). See Schlagenauf, 379 U.S. at 119-21. Likewise, Defendants Motion fails to adequately demonstrate the "good cause" requirement.

A finding of "good cause" must be based on a particular factual determination of potential harm, not on mere conclusory statements. See 8 C. Wright & A. Miller, Federal Practice and Procedure, §2035, at 264-65; see General Dynamics Corp. vs. Selb Manufacturing Co., 482 F.2d 1204, 1212 (8th Cir. 1973)(burden on movant to make specific demonstration of necessity for protective order), $\frac{1}{}$ cert. denied, 414 U.S. 1162 (1974). Cf. Schlagenauf, 379 U.S. at 118-19(good cause under Fed.R.Civ.P. 35(a) must be based on more than "conclusory statements").

Applying the principles above to the record at hand reveals the weakness of the defendants demonstration of good cause. First, what the defendants ignore and so conveniently omits reference to, is that, aside from the Fenway Clinic being subcontracted by UMass, defendants own primary medical providers, on July 6, 2006, Terre K. Marshall, Director of the Department of Corrections ("DOC") Health Services Division("Director Marshall"), wrote UMass to confirm the decisions from a meeting held between UMass and Director Marshall concerning plaintiff's treatment issues, and to request "clarification" so that "the Superintendent at the Treatment Center may begin a security review for [for plaintiff]." ATTACHMENT-A. And that, on October 17, 2006, UMass medical

[1] Rule 35 must be subjected to the provisions of Rule 26(c) which permits the court to make any other order which justice requires to protect the party from annonyance, embarassment, oppression, undue burden, or expense. Swift vs. Swift, 64 F.R.D. 440 (E.D.N.Y 1974).

professionals provided Director Marshall with her requested clarification, and further instructed that in the absence of security contraindications all of plaintiff's prescribed treatments and interventions should be provided "without further evaluation for necessity." $\frac{2}{}$ ATTACHMENT-B. Here, where defendants own medical providers have determined plaintiff's prescribed treatment should be provided "without further evaluation for necessity," id., defendants claims that good cause exists to order additionals evaluations falls short of the Rule's mandate. Schlagenauf, 379 U.S. at 118-19.

Second, it is immaterial that Director Marshall, an "administrative oficial," may still harbor concerns regarding the Fenway Clinic's thoroughness and the necessity of plaintiff's prescribed treatment. As Director of the DOC's Health Services Division, per policy, Director Marshall delegates those decisions to the DOC's primary medical provider. ATTACHMENT-D(at Section 103 DOC

---

[2] The DOC has promulgated regulations concerning medical services for inmates. Among other things, it is the DOC's policy that "[a]ccess to health care is an inmate's right and not a privilege" and that "[a]ll health care services shall be comparable to that available within the community." See Kosilek vs. Maloney, 221 F.Supp.2d 156, 167 (D.Mass. 2002)(citing to DOC regulations). Additionally, pursuant to policy, the private medical contractor "shall be solely responsible for making all decisions with respect to the type, timing, and level of services needed by inmates covered under the contractual agreement with the DOC. Id. See ATTACHMENT-C(at Section 103 DOC 610.01 & 610.01(2)). See Royce vs. Commissioner of Correction, 390 Mass. 425, 456 N.E.2d 1127, 1128 (1983) ("[O]nce an agency has seen fit to promulgate regulations, it must comply with those regulations"). A statute, rule or regulation creates a liberty interest (or "entitlement") if it limits the discretion of officials. Kentucky Dept. of Corr. vs. Thompson, 490 U.S. 454, 462 (1989); Meachum vs. Fano, 427 U.S. 215, 226-27 (1976). The word "shall," where substantive rights are involved, indicates that the action is mandatory. See, e.g., Commonwealth vs. Kennedy, 435 Mass. 527, 530 (2001). See also Hewitt vs. Helms, 459 U.S. 460, 471 (1983); accord Kentucky Dept. of Corr., 490 U.S at 462. An agency must conform its actions to the procedures that it has adopted. See Caldwell vs. Miller, 790 F.2d 589, 609-10 (7th Cir.1986) and cases cited. An inmate, too, has the right to expect prison officials to follow its policies and procedures. Id. at 610, citig anderson vs. Smith, 697 F.2d 239, 240 (8th Cir. 1983).

-6-

601.01(1)-(15)(defining the Director of the DOC's Health Services
Division primary role as oversight of administration). See, e.g.,
Casey vs. Lewis, 834 F.Supp. 1477, 1545 (D.Ariz. 1993)(security
staff's overruling of medical orders constitutes deliberate
indifference); Hamilton vs. Endell, 981 F.2d 1063, 1066-67 (9th
Cir.1992)(Prison officials may not...intentionally rely on a
medical opinion that is not without adequate basis). Even assuming
that DOC policy provides Director Marshall the discretion to
second-guess the DOC's primary medical providers exercise of
professional medical judgment, reliance on a "belief" that an
evaluation is required cannot form the basis of the Rule's require-
ment of "good cause." See Memorandum of Law in Support of Defendants
Motion, at page 3("...the DOC's Health Services Division has serious
concerns regarding the thoroughness of the Fenway Clinic's eval-
uation of the plaintiff and defendants 'belief' that a complete
evaluation of plaintiff is required before irreversible treatment
is authorized"). Parties may not "fish" for evidence on which to
base their complaint "in hopes of somehow finding soemthing helpful
to [their] case in the course of the discovery procedure." See
Charbonnier vs. Amico, 367 Mass. 146, 153 (1975); see also 4 Moore's
Practice, ¶26.56[1] at 26-95 n.3("discovery cannot be used as a
vehicle for discovering a right of action").

Third, while the Defendants Motion accurately points out
that the "initial" record in this case contains medical professionals
debate whether plaintiff is an appropriate candidate for hormone
therapy. As argued above, when all is said and done, review and
final determination of that evidence, per policy, is left to the
sole responsibility of the DOC's primary medical provider ("UMass"),

ATTACHMENT-C, supra, not Director Marshall. ATTACHMENT-D, supra.
See, e.g., Youngberg vs. Romeo, 457 U.S. 307, 324 (1983)(holding
that "[o]nly decisions that are made by the 'appropriate profess-
ionals' are entitled to a presumption of correctness"); see also,
e.g., Commonwealth vs. Poissant, 445 Mass. 558, 823 N.E.2d 350,
356 (2005)("The Commonwealth cannot seek successive examinations
by different experts until it obtains the opinion it desires").
See United States vs. Tierney, 760 F.2d 382, 388 (1st Cir.)("Having
one's cake and eating it, too, is not in fashion in this circuit"),
cert. denied, 474 U.S. 843 (1985).

Therefore, where Defendants Motion fails to adequately
demonstrate the Rule's requirements of "in controversy" and "good
cause," defendants requests to compel plaintiff to submit to
further evaluations should be denied.   $\frac{3}{}$

Dated: 7/4/07 .          Respectfully submitted,

                         Sandy J. Battista, #M-15930
                         Plaintiff/Pro-se
                         Mass. Treatment Center
                         30 Administration Rd.
                         Bridgewater, Mass. 02324

---

[3] Rule 35 authorizes a mental examination only by a licensed physician
or psychiatrist. See Acosta vs. Tennecol Oil Co., 913 F.2d 205, 109
(5th Cir. 1990) and cases cited. Defendants proposed examiner, Cynthia
S. Osborne, MSW, does not meet the Rule's requirement of a licensed
physician or psychiatrist. Id.



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Health Services Division*
*P.O. Box 426*
*Bridgewater, Mass 02324*
*Phone: (508) 279-8612*
*Fax: (508) 279-8651*
*www.mass.gov/doc*



**Mitt Romney**
*Governor*

**Kerry Healey**
*Lieutenant Governor*

**Robert C. Haas**
*Secretary*

Kathleen M. Dennehy
*Commissioner*

James R. Bender
*Deputy Commissioner*

July 6, 2006

Patti Onorato, Executive Director
University of Massachusetts Medical School
Health and Criminal Justice Program
One Research Drive, Suite 120C
Westborough, MA 01581

Dear Patti,

I am writing to confirm receipt on April 19, 2006, of your Gender Identity Disorder (GID) treatment recommendations for Mr. Sandy Jo Battista, M15930. As we discussed in our meeting on December 21, 2005, it is your responsibility as the contractual medical and mental health provider to review all outside consultant's evaluations and develop specific, detailed recommendations based upon your assessment of what proposed interventions are clinically appropriate and medically necessary. Neither the Superintendents of the institutions where these inmates diagnosed with GID reside, nor the Commissioner, are in a position to interpret the ambiguous and broad clinical recommendation set forth in the Fenway Clinic evaluations that each inmate diagnosed with GID be afforded the Harry Benjamin Standards of Care (SOC). The Department of Correction (DOC) is not in the position of *making* any GID treatment recommendations, but reviews the recommendations proposed for specific security related concerns. To this point, your clinical input regarding a more specific interpretation of the SOC, other than to say "any feminizing procedure short of sex reassignment surgery", has lacked the specificity necessary for a security review for contraindications due to the ambiguous nature of the SOC. For example, were we to assume that a "feminizing procedure" included prescribing hormones, a tracheal shave, breast augmentation, rhinoplasty, and female clothing? Also, how were we to determine who was requesting any particular treatment and for that matter, who was appropriate for any particular treatment.

While I appreciate your recent treatment proposal for Mr. Battista, which specifies counseling, hormones, facial and chest hair removal, and access to feminine clothing and canteen products, it does not reflect that in fact Mr. Battista is already receiving mental health counseling with a primary care clinician. Additionally, I still find significant information lacking, which makes it difficult to complete a thorough security review. For example, what hormones are you recommending be prescribed, and when and how are they to be administered? Where would you be scheduling his laser hair removal appointments and what type of pre or post procedure treatments might be necessary? Is there to be any specific progression or continuous review of these treatment recommendations to determine either their efficacy or whether they remain essential? For example, should he receive hormones first, determine if it impacts his hair growth

in such a way to render laser hair removal unnecessary? Also, it is still unclear to me, what, if any, female clothing and canteen items Mr. Battista is requesting, or what you are recommending. For example, a previous GID evaluator had specified that an inmate diagnosed with GID should have access to whatever clothing and products were available to the female inmate population at MCI-Framingham. Consequently, please find enclosed a canteen list from MCI-Framingham, which can be used as a guide to identify specific female products you wish to recommend.    We await more clarity in your response so that the Superintendent at the Massachusetts Treatment Center may begin a security review for Mr. Battista.

Thank you for your attention to this matter.

Terre K. Marshall
Director, Health Services Division

CC: Veronica Madden, Associate Commissioner, Reentry and Reintegration



**University of
Massachusetts
Medical School**

UMass Correctional Health
University of Massachusetts Medical School
One Research Drive, Suite 120C
Westborough, MA 01581-3922 USA
508.475.3220 (office)  508.475.3270 (fax)

*A Program of Commonwealth Medicine*

October 17, 2006

Terre Marshall, Director
DOC Health Services Division
P.O. Box 426
Bridgewater, MA  02324



DEPARTMENT OF CORRECTION

OCT 1 8 2006

*looped*

HEALTH SERVICES DIVISION

Dear Ms. Marshall:

I am writing in response to your July 6, 2006 letter requesting detailed Gender Identity Disorder (GID) treatment recommendations for Sandy Jo Battista, M15930.

Dr. Warth, endocrinologist from LSH, has recommended that Sandy Jo Battista be started on Lupron 1 mg subcutaneously daily and Estradiol 0.05mg daily via patch.

Laser hair removal would be performed at Boston University Dermatology located at 930 Commonwealth AvenueWest, in Boston. Lidocaine topical cream 2.5% will be applied to the area to be treated just prior to transport by medical staff. Post treatment requires the patient applies Hydrocortisone cream 2.5% twice a day to the treatment area until the next scheduled treatment. Most patients require ten treatments and the treatments occur every 6-8 weeks. Laser hair removal should not be initiated until the patient has been on hormones for a period of time.

Please note that, we have again reviewed the question of access to feminine clothing and canteen items with our GID consultants. They have unequivocally informed us that access to such items is an "essential" component of the management of GID. Feminine attire and make-up assist the patient in "feeling more feminine...[and] secure in their identity" and provide a "signal to other persons of the social transition." It is not, however, the standard of care for medical or mental health professionals to weigh the initial or ongoing need for any particular feminine product, or any other treatments with the exception of hormones and sex reassignment surgery (SRS). Only hormones and SRS require the support of the therapist. Access to feminine attire and make-up is "based on what the individual wants and needs to feel more feminine."

ATTACHMENT B

Thus, in accordance with the recommendations of our consultants, we again recommend that, in the absence of security-related concerns and restrictions, the inmate be allowed to choose on an ongoing basis from all female canteen items or other sources of feminine attire and products that are routinely available to female inmates.

At this point, the inmate has not made specific requests at this time, however, we repeat our previous recommendations that these items, and any other items that the inmate requests going forward, be provided if they do not pose an unacceptable security risk.

You have also asked whether the treatments and interventions that we have previously recommended, and are recommending again in this letter, should be provided in a "specific progression" or be subject to "continuous review…to determine either their efficacy or whether they remain essential." Based on the consistent recommendations of our consultants, which we have previously shared and endorsed, we are again recommending that in the absence of security contraindications all of the interventions and treatments described in this letter should be provided on an ongoing basis without further evaluation for necessity.

Sincerely,

Arthur Brewer, MD
Program Medical Director
UMASS Correctional Health

Kenneth Appelbaum, MD
Director, Mental Health
 UMASS Correctional Health

cc: Patti Onorato, Executive Director, UMASS Correctional Health



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Health Services Division*
*P.O. Box 426*
*Bridgewater, MA 02324*
*Phone: (508) 279-8612*
*Fax: (508) 279-8654*
*www.mass.gov/doc*



Mitt Romney
*Governor*

Kerry Healey
*Lieutenant Governor*

Robert C. Haas
*Secretary*

Kathleen M. Dennehy
*Commissioner*

James R. Bender
*Deputy Commissioner*

To:      Superintendents/Unit Directors

From:    Terre Marshall, Director of Health Services

Date:    May 24, 2006

Re:      **Annual Policy Review 103 DOC 610, Clinical Contract Personnel and the Role Of DOC Health Services**

---

Please be advised that 103 DOC 610, Clinical Contract Personnel and the Role of DOC Health Services has undergone an annual review for 2006 and has been found operationally sound. Please include a copy of this memorandum with your current policy as indication that an Annual Review has been completed.

ATTACHMENT-C

Printed on Recycled Paper

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION
HEALTH SERVICES DIVISION

103 DOC 610
CLINICAL CONTRACT PERSONNEL AND THE ROLE OF DOC HEALTH SERVICES

TABLE OF CONTENTS

610.01  General Policy...................................... 2
610.02  Contractual Clinical Personnel...................... 2
610.03  Role of the Division of Health Services............. 6
610.04  Health Training for Correctional Personnel.......... 7
610.05  Inmate Workers...................................... 8
610.06  Students and Interns................................ 9

| MASSACHUSETTS DEPARTMENT OF CORRECTION | DIVISION: HEALTH SERVICES |
|---|---|
| **TITLE: CLINICAL CONTRACT PERSONNEL AND THE ROLE OF DOC HEALTH SERVICES** | **NUMBER: 103 DOC 610** |

**PURPOSE:** To establish general Health Services standards for clinical staff contracted to provide medical, dental, mental health and forensic mental health services in Department facilities by defining qualifications and specific responsibilities of those personnel. This includes health related training and education of Department personnel and inmates, staffing, and quality assurance. In addition, this policy will clarify the role of the Division of Health Services as it relates to the contractual provider(s).

**REFERENCES:**    MGL C 124, § 1(c), (q).; 243 CMR 3.05; 103 CMR 485
ACA Standard: 3-4326, 3-4327, 3-4328, 3-4334, 3-4335, 3-4338, 3-4340, 3-4363, 3-4364, 3-4369. NCCHC Standard: P-03, P-04, P-05, P-06, P-09, P-18, P-19, P-20, P-21, P-22 P-23, P-24, P-25, P-52

**APPLICABILITY:** Staff/Inmates        **PUBLIC ACCESS:** Yes

**LOCATION**: DOC Central Policy File, Facility Policy File, Health Services Division Policy File

**RESPONSIBLE STAFF FOR IMPLEMENTATION AND MONITORING OF POLICY:** Director of Health Services, Superintendents, Contractual Medical Provider Program Director

**PROMULGATION DATE:** 06/14/2004      **EFFECTIVE DATE:** 07/14/2004

**CANCELLATION:** This policy cancels all previous Department policy statements, bulletins, directives, orders, notices, rules or regulations regarding Health Services standards for clinical contractual staff.

**SEVERABILITY CLAUSE:** If any article, section, subsection, sentence, clause or phrase of this policy is for any reason held to be unconstitutional, contrary to statute, in excess of authority of the Commissioner or otherwise inoperative, such decision shall not affect the validity of any other article, section, subsection, sentence, clause or phrase of this policy.

## 610.01    General Policy

In concert with the Division of Health Services, the contractual medical provider shall be solely responsible for making all decisions with respect to the type, timing and level of services needed by inmates covered under the contractual agreement with the Department of Correction. The Department of Correction Health Services Division shall ensure that all contractual medical, nursing, dental, mental health, forensic mental health and support staff shall have qualifications and experience consistent with those of their respective professions in the general community. The qualifications of contractual clinical staff shall be in compliance with all applicable requirements for licensure, certification, or registration in effect in the Commonwealth of Massachusetts.

1.    The Health Services Division shall ensure that the contractor provides each facility having on-site clinical personnel with written job descriptions that define the specific duties and responsibilities of these personnel. These job descriptions shall have approval of the Director of Health Services or designee and shall be reviewed at least annually.

2.    Matters of medical, mental health and dental judgment are the sole province of the responsible physicians, psychiatrists or dentists.

3.    The contractual medical provider will maintain a manual of written policies and defined procedures specifically developed for the individual facilities and approved by the Director of Health Services. All policies and procedures will be in compliance with the American Correctional Association (ACA), the National Commission of Correctional Health Care (NCCHC) Standards, and in the case of Bridgewater State Hospital with JACHO standards and shall be reviewed at least annually for necessary revisions. When there is a conflict between standards the more restrictive will be adhered to.

## 610.02    Contractual Clinical Personnel

The selection of contractual medical providers by the Department shall be achieved through a competitive selection process in accordance with 801 CMR 21.00. Physician coverage, as well as other clinical coverage in Department facilities will be defined

M.T.C. Law Library



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Health Services Division*
*P.O. Box 426*
*Bridgewater, MA 02324*
*Phone: (508) 279-8612*
*Fax: (508) 279-8654*
*www.mass.gov/doc*

**Mitt Romney**
*Governor*

**Kerry Healey**
*Lieutenant Governor*

**Edward A. Flynn**
*Secretary*

**Kathleen M. Dennehy**
*Commissioner*

**James R. Bender**
*Deputy Commissioner*

RECEIVED

JAN 25 2006

To:     Superintendents/Unit Directors

From:   Peter J. Heffernan, Acting Director of Health Services

Date:   November 29, 2005

Re:     **Annual Policy Review 103 DOC 601, Health Services Organization**

---

Please be advised that 103 DOC 601, Health Services Organization, has undergone an annual review for 2005. The policy is undergoing extensive revisions, however, it remains operationally sound at this time. Please include a copy of this memorandum with your current policy as indication that an Annual Review has been completed.

ATTACHMENT-D

Printed on Recycled Paper



COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION - HEALTH SERVICES DIVISION

DOC DIVISION OF HEALTH SERVICES - ORGANIZATION
103 DOC 601

TABLE OF CONTENTS

601.01   Responsible Health Authority ........................ 2
601.02   Relationship with Superintendents ................ 3
601.03   Organization of Division Management ................ 4
         Health Services Duty Officer ..................... 4
         Division Management Team ........................ 4
             Deputy Director ............................. 4
             Regional Administrator ...................... 5
             Mental Health Administrators ................ 8
             Special Projects Manager .................... 8
601.04   Contractual Medical Providers ..................... 9
         Senior Medical Consultant ....................... 9
         Senior Mental Health Consultant ................. 10
         Program Director ................................ 10
         Medical Director at Bridgewater State Hospital .. 11
601.05   Committee Structure ............................. 11
         Health Services Executive Committee ............. 11
         Quality Assurance Mortality Review Committee .... 12
         Quality Assurance Suicide Review Committee ...... 1
         Medical Records Committee ....................... 14
         Policies and Procedures Committee ............... 14
601.06   Administrative Meetings ......................... 16
         Lemuel Shattuck Hospital ........................ 16
         Quarterly Regional Meetings ..................... 16
         Case Conference Meetings ........................ 16
         Monthly Regional/Mental Health Administrator
             Meetings .................................... 17
601.07   Administrative Reports .......................... 17
601.08   Health Service Audits ........................... 17



| MASSACHUSETTS DEPARTMENT OF CORRECTION | DIVISION: Health Services |
|---|---|
| TITLE: Health Services Organization | NUMBER: 103 DOC 601 |

**PURPOSE:** The purpose of this policy is to establish the organization of the Massachusetts Department of Correction health services division

**REFERENCES:** MGL, Ch. 124, S 1 c q and S 18; MGL 125, S 14
ACA Standard: 3-4326, 3-4327, 3-4328, 3-4329, 3-4334
NCCHC Standard: P-02, P-03, P-04, P-05

**APPLICABILITY:** Health Service **PUBLIC ACCESS:** Yes
Division, Contractual Medical Provider

**LOCATION:** DOC Central Policy File Facility
Policy File
Health Services Division Policy File

**RESPONSIBLE STAFF FOR IMPLEMENTATION AND MONITORING OF POLICY:**
Director of Health Services
Superintendent

**PROMULGATION DATE:** 7-17-02 **EFFECTIVE DATE:** 8-17-02

**CANCELLATION:** This policy cancels all previous department policy statements, bulletins, directives, orders, notices, rules, and regulations regarding health services division organization which are inconsistent with this policy.

**SEVERABILITY CLAUSE:** If any part of this policy is for any reason held to be in excess of the authority of the Commissioner, such decision will not affect any other part of this policy.

601.01    Responsible Health Authority

The overall health authority for the Department of
Correction is the Director of Health Services. As
health authority, the Director of Health Services is
responsible for arranging and providing accessible
quality medical, dental and mental health care to all
inmates, according to the standards of the American
Correctional Association (ACA) and National Commission
on Correctional Health Care (NCCHC) and applicable
regulations. In carrying out that responsibility, the
Director of Health Services delegates the on-site
authority to each facility's health service
administrator who is a full time employee of the
contractual medical provider. As the facility health
authority, the health service administrator is
responsible for arranging all levels of health care
and forensic mental health services and for assuring
that all inmates have access to quality medical and
mental health care.

The Director of Health Services will provide oversight
of administration, organization and planning of
medical, mental health and dental services provided by
the contractual medical provider.

The Director of Health Services shall have the
responsibility to:

1.    Recommend to the Commissioner and Deputy
      Commissioner and contractual program director
      policies which relate to the delivery of health
      services to inmates in the care and custody of
      the Department;

2.    Perform contract development, negotiation, and
      supervision of the vendor selection process;

3.    Review and approve procedures that are developed
      by the contractual medical provider relating to
      health care delivery;

4.    Assist and advise superintendents in meeting the
      specific health care needs of their facility's
      population;

November 2005                                    601-2

5.  Prepare an annual budget for the delivery of health care services in the Department's facilities;

6.  Ensure that the contractual medical provider meets its responsibility for providing quality medical, dental, and mental health services for inmates/ detainees at each DOC facility and forensic mental health services for patients at Bridgewater State Hospital as required by the contractual agreement;

7.  Assist the contractual medical provider to determine the health care personnel staffing patterns for each facility;

8.  Oversee an external organizational process for reviewing, planning, monitoring, and managing the quality and appropriateness of care provided to inmates by the contractual medical provider;

9.  Ensure contract compliance by monitoring and evaluating the quality and efficiency of the contractual clinical services;

10.  Approve and ensure that the contractual medical provider participates in a quality assurance program;

11.  Oversee and ensure utilization review of all health services provided to inmates not covered under a contractual health care agreement;

12.  Approve all division of health service policies and procedures;

13.  Prepare budgets and provide financial management of division operations including payroll functions;

14.  Provide fiscal monitoring of contractual medical services; and

15.  Supervise accounting, purchasing and resource allocation functions of the division.