**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| SANDY JO BATTISTA, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action |
| v. | ) | No. 05-11456-DPW |
| | ) | |
| KATHLEEN DENNEHY, et al., | ) | |
| | ) | |
| Defendant. | ) | |

_____ )

**PLAINTIFF'S MOTION FOR LEAVE TO FILE**
**HER FIRST AMENDED COMPLAINT**

Plaintiff Sandy J. Battista hereby moves, pursuant to Federal Rule of Civil

Procedure 15(a) and this Court's Scheduling Order, for leave to file an amended

complaint in this action.  Plaintiff's proposed Amended Complaint is attached hereto at

Tab 1.  In support of this motion, Plaintiff states:

1.    On July 8, 2005, Ms. Battista brought this action seeking necessary

medical treatment for her diagnosed gender identity disorder ("GID") which was being

indefinitely withheld by the DOC.  At the time, Ms. Battista was not represented by

counsel and brought this action *pro se*.

2.    On November 11, 2007, this Court appointed undersigned counsel to

represent Ms. Battista on a *pro bono* basis.

3.    On the same date, this Court denied all pending motions in this action,

without prejudice, in light of the appointment of new *pro bono* counsel.

4.    The Court's December 10, 2007, scheduling order sets the timetable for

discovery and for the Plaintiff to amend her Complaint.

5.    As of the date of the scheduling order, no discovery had begun in this

case.  The scheduling order set the date for initial disclosures for January 4, 2008.

6.    Plaintiff's proposed Amended Complaint involves the same issues and operative facts that were raised in the original Complaint.

7.    Plaintiff's proposed Amended Complaint removes named parties from the original complaint who are not necessary parties to this action.

8.    Plaintiff's proposed Amended Complaint adds two new defendants, Harold W. Clarke, who became the Commissioner of the Department of Corrections ("DOC") after the date of the original complaint, and Terre K. Marshall, who became the Depart of Corrections ("DOC") director of Health Services after the date of the original complaint.  Both parties are responsible for the decision-making around Ms. Battista's care and are necessary parties for the requested relief.  As set forth in the Amended Complaint, Ms. Marshall was directly involved in the decision to withhold treatment and actively, and illegally, challenged the DOC's doctor's medical directives.

9.    Plaintiff's proposed Amended Complaint clarifies Plaintiff's original *pro se* causes of action and requests for injunctive relief and damages.  The causes of action include due process, equal protection and eighth amendment claims under the federal and Massachusetts constitutions, as well as tort claims for negligence, intentional infliction of emotional distress and negligent infliction of emotional distress.

10.    As no discovery has begun, no motions are pending, and the proposed Amended Complaint includes the same factual issues as the original *pro se* complaint, the Defendant will not suffer prejudice.

Dated:  January 8, 2008                          Respectfully submitted,

                                                 SANDY J. BATTISTA

                                                 by her attorneys,

                                                 /s/ Neal E. Minahan_____
                                                 Emily Smith–Lee (BBO# 634223)
                                                 Neal E. Minahan (BBO#661371)
                                                 Dana McSherry (BBO #664430)
                                                 Ada Sheng (BBO#664775)
                                                 McDermott Will & Emery LLP
                                                 28 State Street
                                                 Boston, MA 02109
                                                 tel: 617.535.4000
                                                 fax: 617.535.3800

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) on January 8, 2008.

                                                 /s/ Neal E. Minahan_____
                                                 Neal E. Minahan

BST99 1561791-1.009962.0255

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SANDY J. BATTISTA,<br><br>Plaintiff,<br><br>v.<br><br>HAROLD W. CLARKE,<br>KATHLEEN M. DENNEHY,<br>ROBERT MURPHY,<br>TERRE K. MARSHALL, and<br>SUSAN J. MARTIN, in their official and individual<br>capacities;<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No.<br>)  05-11456-DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## [PROPOSED] FIRST AMENDED COMPLAINT

Plaintiff Sandy J. Battista for her Complaint states as follows:

## INTRODUCTION

1.      Sandy J. Battista, a civilly committed person within the Massachusetts
Department of Corrections (the "DOC"), was first diagnosed with Gender Identity Disorder
("GID") in 2001. This diagnosis was later confirmed in 2004 by the DOC's own contracted
medical provider.  The DOC's doctors subsequently prescribed Ms. Battista with a GID
treatment plan that includes (i) psychotherapy, (ii) hormone therapy; (iii) laser hair removal; and
(iv) access to feminine clothing and products from the DOC's canteen.  In 2005, the prescription
for hormone therapy was filled by the DOC's pharmacist and sent to the Massachusetts
Treatment Center, where Ms. Battista is housed.  Before delivering the prescribed medication,
however, DOC officials —none of whom are medical professionals— unilaterally decided to
withhold her treatment indefinitely, despite the repeated and forceful objections of its own
doctors.  For over two years, the DOC, through the named Defendants, has refused to deliver the

treatment plan prescribed by DOC physicians. The DOC's sole rationale for withholding this treatment is a "security review" that has been ongoing for almost three years. This civil rights action seeks declaratory and injunctive relief to ensure that Ms. Battista receives her prescribed GID treatment plan. Ms. Battista also seeks damages for the years of extreme physical and emotional pain she has suffered as a result of the Defendants actions.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over all claims arising under federal law pursuant to 28 U.S.C. §§ 1331 and 1343 and over the request for declaratory relief pursuant to 28 U.S.C. §§ 1331, 2201 and 2202. This court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

3. Venue lies in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b). The events giving rise to this action occurred in this District and, on information and belief, the Defendants reside in this District.

## PARTIES

4. Plaintiff, Sandy J. Battista is, and was at all times relevant hereto, a civilly committed patient in the care and custody of the DOC housed at the Massachusetts Treatment Center ("MTC"), 30 Administration Road, Bridgewater, Massachusetts.

5. Defendant Harold W. Clarke is the Commissioner of the Department of Corrections in the Commonwealth of Massachusetts. Mr. Clarke is ultimately responsible for and controls the care and custody of the Plaintiff and the operation and actions of the DOC. He is being sued in both his official and individual capacity.

6. Defendant Kathleen Dennehy is the former Commissioner of the Department of Corrections in the Commonwealth of Massachusetts. As Commissioner, Ms. Dennehy was ultimately responsible for and controlled the care and custody of the Plaintiff and the operation

and actions of the DOC between early 2004 and April 2007. She is being sued in both her official and individual capacity.

7.    Defendant Susan J. Martin was at the time of certain allegations in this complaint the Director of the Health Services Division ("HSD") of the DOC. As Director of HSD, Ms. Martin was responsible for ensuring the proper administration of prescribed medical treatment and was ultimately responsible for the health of persons within the DOC. Ms. Martin is being sued in both her official and individual capacity.

8.    Defendant Terre K. Marshall is, and was at the time of certain allegations in this complaint, the Director of the Health Services Division ("HSD") of the DOC. As Director of HSD, Ms. Marshall is responsible for ensuring the proper administration of medical treatment and is ultimately responsible for the health of persons within the DOC. Ms. Marshall is being sued in both her official and individual capacity.

9.    Defendant Robert Murphy is, and was at all times relevant to this action, the Superintendent of the MTC. Mr. Murphy is a DOC employee responsible for all activity within the MTC, including the health and wellbeing of Ms. Battista and its other civilly committed inmates. Mr. Murphy is being sued in both his official and individual capacity.

10.    The DOC is a department of the Commonwealth of Massachusetts.

### STATEMENT OF FACT

#### *Plaintiff's Gender Identity Disorder*

11.    Gender Identity Disorder (GID) is defined by strong, persistent feelings of identification with the opposite gender and discomfort with one's own assigned sex. People with gender identity disorder may act and present themselves as members of the opposite sex and may express a desire to alter their bodies. People with GID desire to live as members of the opposite

sex and often dress and use mannerisms associated with the other gender. The disorder affects an individual's self-image and can impact the person's mannerisms, behavior and dress.

12.    The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM4") recognizes GID and states that it is identified by "[a] strong persistent cross-gender identification" and "[p]ersistent discomfort with his or her sex or sense of inappropriateness in the gender role of that sex."

13.    Professionals and experts on GID have developed written standards of care to guide the diagnosis and treatment of GID. These standards, known as the Harry Benjamin Standards of Care, are an internationally accepted treatment protocol meant to "articulate... professional consensus about the psychiatric, psychological, medical and surgical management of gender identity disorders."

14.    If not addressed, GID can cause a poor self-image, social isolation and extreme emotional distress. Left untreated, the disorder can cause severe depression and anxiety, and interfere with an individual's ability to function in the world, leading to further isolation, self-abuse and even suicide.

15.    Though still biologically male, Ms. Battista identifies as a female. Phrased simply in non-medical terminology, Ms. Battista is a female in a male body.

16.    Within the limiting conditions of civil confinement, Ms. Battista has attempted to alter her appearance, mannerisms and dress to conform to her gender identity. She prefers to be referred to by feminine pronouns and, in July 1995, legally changed her birth name to her current, more feminine one.

17.    Since 2001, three separate medical professionals and the DOC's own medical providers have diagnosed Ms. Battista with GID, each finding that Ms. Battista has met the

diagnostic criteria and each recommending that she be treated with appropriate psychotherapy and hormone therapy in accordance with recognized clinical guidelines.

### *UMCHP is Solely Responsible for the DOC's Medical Decisions*

18.    The DOC contracts with private vendors to provide medical, dental and mental health services to criminally and civilly committed inmates within the DOC's custody.

19.    Pursuant to DOC regulations, the DOC's private medical contractor has <u>full responsibility</u> for all decisions related to the type, timing and level of medical and mental health services provided to inmates.   The relevant DOC regulation states:

> In concert with the Division of Health Services, ***the contractual medical provider shall be solely responsible for making all decisions*** with respect to the type, timing and level of services needed by inmates covered under the contractual agreement with the Department of Correction… ***Matters of medical, mental health and dental judgment are the sole province of the responsible physicians, psychiatrists or dentists***

103 DOC 610.01 (emphasis added).

20.    At all times relevant to this action, the University of Massachusetts Correctional Health Program ("UMCHP") was under contract with the DOC to provide all inmate medical and mental health services, including those of Ms. Battista.  Under DOC regulations, UMCHP has sole authority to diagnose and set medical and mental health treatments for Ms. Battista.

21.    Repeatedly over the last three years, UMCHP has submitted its diagnosis and GID Treatment Plan for Ms. Battista to the DOC.  The most recent letter by UMCHP states that "all of the interventions and treatments described in this letter should be provided on an ongoing basis without further evaluation for necessity."  The letter unequivocally sets forth UMCHP's treatment plan, which includes (i) psychotherapy, (ii) hormones, (iii) facial and chest hair removal, and (iv) access to feminine clothing and canteen products.  A copy of the doctors' letter, dated October 17, 2006, is attached hereto as <u>Exhibit A</u>.

22.    Despite the repeated and consistent advice of its physicians, the DOC has refused to implement the recommended treatment plan and has indefinitely withheld treatment from Ms. Battista based on a still-ongoing "security review."

### Plaintiff's GID Diagnosis by the DOC's Own Doctors

23.    Between November 2003 and May 2004, Ms. Battista sent a series of separate correspondence to UMCHP and DOC officials, including Defendants Dennehy, Martin and Murphy, requesting an evaluation of her gender issues by UMCHP.

24.    UMCHP subsequently requested the expertise of Fenway Community Health ("Fenway") to assess the possible diagnosis of GID and to help UMCHP determine a proper treatment.

25.    On August 10, 2004, the DOC, UMCHP and Fenway arranged for two separate independent gender specialists —Dr. Kevin Kapila, MD, and Dr. Randi Kaufman, PsyD— to examine and evaluate Ms. Battista and to recommend a treatment plan to address her gender issues.

26.    On November 16, 2004, Dr. Kapila and Dr. Kaufman submitted their report and recommendation to UMCHP.

27.    The report applies the Harry Benjamin Standards of Care and diagnoses Ms. Battista with GID. The report states that "[t]he Benjamin Standards of Care call for the patient to be both eligible, and ready, to begin hormone treatment."

28.    In its conclusion, Dr. Kapila and Kaufman's report states:

> It is therefore the clinical recommendation of these evaluators that Sandy Jo have her Gender Identity Disorder addressed through hormone administration and ongoing psychotherapy to support the adjustment of the transition the hormones will bring. The psychotherapy should be with a clinician who is knowledgeable about gender identity issues....

29.   Fenway provided its report and recommendations to UMCHP, which later reviewed and accepted their diagnosis and recommendation.

30.   On April 12, 2005, UMCHP referred Ms. Battista to Dr. Maria Warth, an endocrinologist at Lemuel Shattuck Hospital ("LSH"), for a recommendation of an appropriate hormone prescription. LSH is the designated medical facility for all DOC inpatient admissions, pursuant to 103 DOC 604.02 and provides medical services to DOC facilities across the Commonwealth, including the MTC.

31.   Dr. Warth recommended to UMCHP a medically appropriate prescription for Ms. Battista's hormone therapy. UMCHP reviewed and accepted the recommendation.

32.   On April 14, 2005, Dr. Friedman —UMCHP's in-house physician at MTC— reviewed, approved and signed Ms. Battista's prescription for hormone therapy as recommended by Dr. Warth and Fenway.

33.   On information and belief, the prescription was filled by the state office of pharmacy services and returned to MTC for distribution to Ms. Battista.

34.   Sometime after the prescription was filled, the pharmacist and/or MTC Heath Services personnel were instructed not to distribute the hormones to Ms. Battista.  On information and belief, this instruction came from DOC officials who are not and were not medical professionals.

### The DOC's Refusal to Allow Treatment and the Painful Effect on Ms. Battista

35.   Starting on April 14, 2005, the day her hormone prescription was to be filled, Ms. Battista wrote numerous letters to the Defendants inquiring about the status of her prescription and other treatment.

36.    On April 25, 2005, the MTC's Health Services Administrator, Maryanne Percuoco, told Ms. Battista that Defendants Dennehy, Martin and Murphy had an administrative "hold" on her medical prescription pending a "security review."

37.    On April 26, 2005, after hearing that the DOC refused to fill her prescription, Ms. Battista became overwhelmed with anxiety and a sense of hopelessness and suffered an emotional breakdown.

38.    Ms. Battista was immediately placed under a psychiatrist's care.  She was prescribed Doxepin and Prozac for depression and was provided Benadryl to aide sleep.

39.    The antidepressants, however, treated only her anxiety and not the underlying cause of her emotional distress —namely, her GID.  Thus, Ms. Battista's mental health further deteriorated and her emotional anguish increased as time passed with no response from the DOC on the status of her treatment.

40.    On April 26, 2005, Ms. Battista notified Defendant Murphy to request that any pending administrative "security review" be expedited due to the continual deterioration of her health and well-being.

41.    On April 27, 2005, Ms. Battista wrote a letter to Defendant Dennehy explaining her waning mental health and asking that the DOC's "security review" be expedited.

42.    On May 5, 2005, after receiving no response, Ms. Battista again wrote Defendant Murphy to explain the extreme and profound effects on her from the delay in her prescribed treatment.

43.    On May 9, 2005, Ms. Battista experienced a second severe emotional breakdown from the constant stress and anxiety that resulted from the DOC's failure to provide her prescribed treatment and the general unresponsiveness of each Defendant.

44.    As a result of this emotional collapse, Ms. Battista was placed in a segregation unit in the MTC and placed on "crisis" watch. When on "crisis" watch, Ms. Battista was locked in a solitary room naked with only a mattress and security blanket. She was watched constantly for two to three straight days.

45.    In a letter dated May 9, 2005, Defendant Martin informed Ms. Battista that her medical prescription was currently being reviewed by UMCHP "to determine it's appropriateness and necessity" as well as by DOC administrators "to determine any potential security contraindications." As stated more fully above, however, UMCHP has steadfastly backed its GID diagnosis and its treatment plan, which includes its prescription of Ms. Battista's hormone therapy. Indeed, UMCHP explicitly states that its treatment plan should "be provided on an ongoing basis *without further evaluation for necessity*." Exhibit A (emphasis added).

46.    On May 11, 2005, the DOC denied Ms. Battista's Inmate Grievance Form seeking her prescribed GID treatment or, in the alternative, to expedite the security issue. Ms. Battista then appealed to the superintendent, Defendant Murphy, who promptly denied her grievance appeal stating that the "[m]atter is currently at the level of a medical and clinical decision" and advised Ms. Battista to "discuss [her] concerns with the Medical Director."

47.    On May 17, 2005, due to the continued deterioration in her mental health and well-being, Ms. Battista's treating psychiatrists felt it medically necessary to double the dosage of her anti-depressant medication. Once again, this treatment did not negate the ever-increasing strain from her failure to receive GID treatments.

48.    In a letter dated May 27, 2005, Defendant Martin reiterated to Ms. Battista that her prescribed treatment was still under review by "medical and security personnel."

49.    Over the next several months, Ms. Battista continued to write DOC officials about her health and her desperate need for GID treatments. As the DOC continued to withhold treatment, Ms. Battista's mental health disintegrated.

50.    In October 2005, Ms. Battista attempted to castrate herself with a razor blade in her cell. Ms. Battista was trying to rid herself of the testosterone produced in the male testes. Since Ms. Battista could not receive hormone therapy, she sought to rid herself of her testosterone in a self abusive way.

51.    Upon slicing her testicles with a razor blade, Ms. Battista became afraid at the amount of blood that issued forth from the opening and stopped her incision. Ms. Battista, while sitting in a pool of blood, stitched herself back up with a needle and thread.

52.    A day after the wound was sewn, the area around the incision became infected and swollen. Ms. Battista was in a great deal of pain for several days.

53.    After seeking medical treatment, Ms. Battista was prescribed antibiotics and again put on "crisis" watch for three to four days. She has permanent scarring from this attempted castration.

54.    Since April 2005, Ms. Battista's eating and sleeping habits have been continually and severely affected.

55.    Without the hormones, hair removal and feminine products, Ms. Battista often starves herself to get rid of muscle mass and appear more feminine. At times, Ms. Battista also binge eats from depression and anxiety before forcing herself to vomit.

56.    Since the DOC's initial denial of hormone treatment in April 2005, Ms. Battista has lost approximately 30-40 pounds and now weighs a mere 130 pounds.

57.    Moreover, since the denial of treatment, Ms. Battista's struggles to function in her normal daily routines and is unable to fully concentrate on her sex offender treatment.

58.    As of the date of this Complaint —almost three years after Ms. Battista's prescription for hormones was first written— the Defendants have yet to provide Ms. Battista with a decision on the "security issues" surrounding her treatment.

59.    As explained above, UMCHP has never deviated from its GID diagnoses of Ms. Battista nor her prescribed treatment of hormone therapy.

60.    In or around June 2005, a DOC mental health clinician informed Ms. Battista that all previous and current medical recommendations for "cross–gender hormone treatment" were put "on hold" by the DOC until further notice. He informed her that the DOC would not make a decision regarding her GID treatment plan any time in the near future.

### The DOC's Attempts to Obstruct and Undermine UMCHP's Medical Judgment

61.    On or about December 21, 2005, Defendant Marshall and other DOC officials met with UMCHP to discuss Ms. Battista's GID diagnosis and treatment.   At the meeting, as described in a July 6, 2006 letter from Defendant Marshall, DOC officials allegedly instructed UMCHP that "it is your responsibility as the contractual medical and mental health provider to review all outside consultant's evaluations… based on what proposed interventions are clinically appropriate and medically necessary."

62.    Despite this, and despite UMCHP's repeated assertions that Ms. Battista's prescribed treatment is in fact clinically appropriate and medically necessary, the DOC continued to delay and obstruct UMCHP's prescribed treatment for Ms. Battista.

63.    After the DOC delayed UMCHP's medical directives for over a year, UMCHP once again laid out Ms. Battista's GID Treatment Plan on April 19, 2006. In no uncertain terms,

the treatment plan directed the DOC to provide Ms. Battista with (i) psychotherapy, (ii) hormones, (iii) facial and chest hair removal, and (iv) access to feminine clothing and canteen products.

64.    On July 6, 2006, Defendant Marshall wrote a letter to Patti Onorato, the Executive Director of UMCHP. In the letter, Ms. Marshall states:

> Neither the Superintendents of the institutions where these inmates
> diagnosed with GID reside, nor the Commissioner, are in a
> position to interpret the ambiguous and broad clinical language set
> forth in the Fenway Clinic evaluations that each inmate diagnosed
> with GID be afforded the Harry Benjamin Standards of Care
> (SOC). The [DOC] is not in the position of making any GID
> treatment recommendations, but reviews the recommendations
> proposed for specific security related concerns.

65.    Despite her assertion that the DOC's only concern is security, Ms. Marshall directly challenges the reasoning behind UMCHP's treatment plan. Ms. Marshall states that "your treatment proposal for Mr. Battista, which specifies counseling, hormones, facial and chest hair removal, and access to feminine clothing and canteen products…does not reflect that in fact Mr. Battista is already receiving mental health counseling…." The letter further challenges each of UMCHP's treatment recommendations as "lacking" and "unclear."

66.    Finally, Defendant Marshall states that "[w]e await more clarity in your response so that [Defendant Murphy] may begin a security review for Mr. Battista." Thus, in July 6, 2006 —over a year after originally withholding Ms. Battista's prescription— the DOC had yet to even begin the security review that Defendant Martin stated was ongoing in May 2005.

### *UMCHP Stands By its Diagnosis and Treatment Plan*

67.    On October 17, 2006, Dr. Arthur Brewer, Program Medical Director of UMCHP, and Dr. Kenneth Appelbaum, Director of Mental Health for UMCHP wrote to Defendant Marshall to further stress the importance of their treatment plan for Ms. Battista.  See Exhibit A.

- 12 -

68.    In the letter, Drs. Appelbaum and Brewer further clarified UMCHP's original

diagnosis and recommendations for treatment, stating:

> Dr. Warth, endocrinologist from LSH, has recommended that
> Sandy Jo Battista started on Lupron 1 mg subcutaneously daily and
> Estradiol 0.05mg daily via patch.

Id.

69.    The letter goes on to state:

> Laser hair removal would be performed at Boston University
> Dermatology… Lidocaine topical cream 2.5% will be applied to
> the area to be treated just prior to transport by medical staff. Post
> treatment requires the patient apply Hydrocortizone cream 2.5%
> twice a day to the treatment area until the next scheduled
> treatment. Most patients require ten treatments and the treatments
> occur every 6–8 weeks.

Id.

70.    As for feminine dress, the UMCHP doctors reiterate that :

> [W]e have again reviewed the question of access to feminine
> clothing and canteen items with our GID consultants. They have
> <u>unequivocally</u> informed us that access to such items is an
> "essential" component of the management of GID.

Id. (emphasis added).

71.    UMCHP further stresses that "we again recommend that, in the absence of

security related concerns and restrictions, the inmate be allowed to choose on an ongoing basis

from all female canteen items…" Id.

72.    The letter ends:

> Based on the consistent recommendations of our consultants,
> which we have previously shared and endorsed, we are again
> recommending that… all of the interventions and treatments
> described in this letter ***should be provided on an ongoing basis
> without further evaluation for necessity***.

Id. (emphasis added).

- 13 -

73.    The only GID treatment the DOC does provide Ms. Battista is an individual counseling session with Diane McLaughlin, a mental health administrator with no prior GID experience. These sessions are not psychotherapy sessions, but merely consist of a brief "check in" once per month for less than five minutes per session.

74.    Over one year after the date of UMCHP's letter and three years after Ms. Battista's original diagnosis, the DOC has yet to institute UMCHP prescribed treatments.

### The DOC's Treatment of Other Inmates

75.    Upon information and belief, the DOC provides hormonal therapy and access to female canteen items to state criminal inmates who are similarly diagnosed with GID. The continued provision of these GID treatments to inmates under tighter security restrictions than Ms. Battista demonstrates that no genuine security issues exist with regards to Ms. Battista's treatment.

76.    Upon information and belief, female prisoners and civilly committed inmates have access to different products and clothing in the DOC canteen than male prisoners and civilly committed inmates. These products include, *inter alia*, makeup, female clothing, female deodorant and feminine hygiene products.

77.    Upon information and belief, the DOC does not unduly delay or otherwise withhold medical treatment for state criminal inmates or civilly committed individuals with any non-GID diagnosis.

78.    Unlike with criminally convicted prisoners, civil commitment is not punitive in nature and the DOC in running the MTC has a statutory obligation to provide adequate treatment to civilly committed residents.

79.    Upon information and belief, the DOC does not —and cannot under its own regulations— wholly reject the medical decisions of UMCHP or any other contracted medical or mental health provider for any non-GID diagnosis.

## COUNT I

### Violations of the Fourteenth Amendment to the United States Constitution
### *Due Process*
### (42 U.S.C. § 1983)

80.    Paragraphs 1 through 79 are incorporated by reference as if set forth fully herein.

81.    By withholding necessary medical treatment, Defendants, acting under color of state law, have deprived and continue to deprive Plaintiff of her life, liberty and property without due process of law, as guaranteed by the Fourteenth Amendment to the Constitution of the United States.

82.    Ms. Battista is a civilly committed person and, as such, is entitled to greater protections than a criminal inmate housed for punitive purposes.

83.    As a result of Defendants' actions, Plaintiff has suffered substantial injury.

## COUNT II

### Violations of the Eighth Amendment to the United States Constitution
### *Cruel & Unusual Punishment*
### (42 U.S.C. § 1983)

84.    Paragraphs 1 through 83 are incorporated by reference as if set forth fully herein.

85.    Plaintiff's has a serious medical need for GID treatment in accordance with the diagnosis of UMCHP, her treating physicians and medical personnel including the recommendations of consulting physicians experienced in the treatment of GID.

86.    Plaintiff's serious medical need has been withheld by Defendants and it goes untreated to this day.

87.    Defendants have been deliberately indifferent to Plaintiff's serious medical needs and have denied her treatment for reasons that are unrelated to her medical needs or legitimate security concerns. Defendants know that medical experts consider Plaintiff to be at risk for serious medical harm and have knowingly disregarded that risk.

88.    Defendants' denial of Plaintiff's medically necessary care is deliberately indifferent and constitutes cruel and unusual punishment in violation of Plaintiff's rights under 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution.

89.    As a result of Defendants' actions, Plaintiff faces a substantial and imminent risk of serious medical harm.

## COUNT III

**Violations of the Fourteenth Amendment to the United States Constitution**
***Equal Protection***
**(42 U.S.C. § 1983)**

90.    Paragraphs 1 through 89 are incorporated by reference as if set forth fully herein.

91.    Defendants, under color of state law, have deprived and continue to deprive Plaintiff of her right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, by withholding medically necessary treatments for GID patients while providing full access to medical care for non-GID patients. Thus, the Defendants have and continue to discriminate against Plaintiff on the basis of her gender identity.

92.    Defendants have deprived and continue to deprive Plaintiff of her right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, by withholding medical care from Plaintiff, a civilly committed person, while providing full access to GID treatments to state inmates serving criminal sentences.

93.     Defendants' disparate treatment of Plaintiff is based on Plaintiff's gender identity and civil commitment status and is motivated by discrimination.

94.     As a result of Defendants' discriminatory actions, as described above, the Plaintiff has suffered substantial injury.

## COUNT IV

### Violations of Article X and XII of the Massachusetts Declaration of Rights
### *Massachusetts Due Process*
### (M.G.L. ch. 12, §§ 11*H-I*)

95.     Paragraphs 1 through 94 are incorporated by reference as if set forth fully herein.

96.     By withholding necessary medical treatment, Defendants, acting under color of state law, have deprived and continue to deprive Plaintiff of her life, liberty and property without due process of law, as guaranteed by the Fourteenth Amendment to the Constitution of the United States.

97.     Ms. Battista is a civilly committed person and, as such, is entitled to greater protections than a criminal inmate housed for punitive purposes.

98.     As a result of Defendants' actions, Plaintiff has suffered substantial injury.

99.     The Defendants' interference with Plaintiff's rights secured by Article X and XII of the Massachusetts Declaration of Rights has been accomplished by threats, intimidation or coercion in violation of M.G.L. ch. 12, § 11*I*.

## COUNT V

### Violations of Article XXVI of the Massachusetts Declaration of Rights
### *Massachusetts Cruel & Unusual Punishment*
### (M.G.L. ch. 12, § 11*I*)

100.    Paragraphs 1 through 99 are incorporated by reference as if set forth fully herein.

101.    Plaintiff's has a serious medical need for GID treatment in accordance with the diagnosis of UMCHP, her treating physicians and medical personnel including the recommendations of consulting physicians experienced in the treatment of GID.

102.    Plaintiff's serious medical need has been withheld by Defendants and it goes untreated to this day.

103.    Defendants have been deliberately indifferent to Plaintiff's serious medical needs and have denied her treatment for reasons that are unrelated to her medical needs or legitimate security concerns. Defendants know that medical experts consider Plaintiff to be at risk for serious medical harm and have knowingly disregarded that risk.

104.    Defendants' denial of Plaintiff's medically necessary care is deliberately indifferent and constitutes cruel and unusual punishment in violation of Plaintiff's rights under M.G.L. ch. 12, § 11*I* and Article XXVI of the Massachusetts Declaration of Rights.

105.    As a result of Defendants' actions, Plaintiff faces a substantial and imminent risk of serious medical harm.

### COUNT VI

**Violations of Article I of the Massachusetts Declaration of Rights**
*Massachusetts Equal Protection*
**(M.G.L. ch. 12, § 11*I*)**

106.    Paragraphs 1 through 105 are incorporated by reference as if set forth fully herein.

107.    Defendants, under color of state law, have deprived and continue to deprive Plaintiff of her right to equal protection of the laws, as secured Article I of the Massachusetts Declaration of Rights and M.G.L. ch. 12, §11I, by withholding medically necessary treatments for GID patients while providing full access to medical care for non-GID patients. Thus, the

- 18 -

Defendants have and continue to discriminate against Plaintiff on the basis of her gender identity.

108.    Defendants have deprived and continue to deprive Plaintiff of her right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, by withholding medical care from Plaintiff, a civilly committed person, while providing full access to GID treatments to state inmates serving criminal sentences.

109.    Defendants' disparate treatment of Plaintiff is based on Plaintiff's gender identity and civil commitment status and is motivated by discrimination.

110.    The Defendants' interference with Plaintiff's rights secured by Article I of the Massachusetts Declaration of Rights has been accomplished by threats, intimidation or coercion in violation of M.G.L. ch. 12, § 11I.

111.    As a result of Defendants' discriminatory actions, as described above, the Plaintiff has suffered substantial injury.

## COUNT VII

### *Negligence*

112.    Paragraphs 1 through 111 are incorporated by reference as if set forth fully herein.

113.    Defendants have a duty not to unduly interfere with UMCHP's medical diagnosis and treatment plan for Ms. Battista. Defendants have a further duty to expedite any security review and not unduly delay a decision that would affect the Plaintiff's medical and mental health.

114.    By withholding UMCHP's treatment plan under the guise of a security review for a period of almost three years, as set forth more fully above, Defendants have breached their duty to Plaintiff.

115.    As a result of Defendants' actions, as described above, the Plaintiff has suffered substantial injury.

## COUNT VIII

### *Intentional Infliction of Emotional Distress*

116.    Paragraphs 1 through 115 are incorporated by reference as if set forth fully herein.

117.    Defendants' conduct in withholding Plaintiff's medical care against the express advice of the DOC's medical providers, as more fully above described above, was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable.

118.    Defendants intended to inflict —or knew or should have known that their conduct would likely result in— emotional distress to Plaintiff.

119.    The Defendants' actions were the proximate cause of Plaintiff's emotional distress and, as outlined above, Plaintiff's emotional distress was severe and of such a nature that no reasonable person could expect to endure it.

## COUNT IX

### *Negligent Infliction of Emotional Distress*

120.    Paragraphs 1 through 119 are incorporated by reference as if set forth fully herein.

121.    Defendants have a duty not to unduly interfere with UMCHP's medical diagnosis and treatment plan for Ms. Battista. Defendants have a further duty to expedite any security review and not unduly delay a decision that would affect the Plaintiff's medical and mental health.

- 20 -

122.  By disregarding their own regulations and by withholding UMCHP's treatment plan from Plaintiff for a period of almost three years, Defendants have breached their duty to Plaintiff.

123.  Defendants' actions, as described above, have caused the Plaintiff severe emotional distress and physical harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)  Enter judgment for the Plaintiff and against the Defendants on all counts of this Complaint;

(b)  Declare the practice of denying Plaintiff her GID treatment as prescribed by UMCHP unconstitutional and/or in violation of state and/or federal law;

(c)  Declare that Defendant's three year "security review" is impermissibly delayed and that no legitimate security concerns exist that justify denying Plaintiff's prescribed treatment plan;

(d)  Enter a permanent injunction against Defendants to prevent the DOC from interfering with the discretion of the medical and mental health professionals involved in Plaintiff's care;

(e)  Enter a permanent injunction ordering the Defendants to provide the Plaintiff with GID treatment consistent with the recommendations of UMCHP and Fenway;

(f)  Enter a permanent injunction ordering Defendants to provide Plaintiff with adequate psychotherapy in accordance with the recommendations of the DOC' contracted medical and mental health providers;

(g)  Enter a permanent injunction ordering Defendants to provide Plaintiff with her prescribed hormone treatment in accordance with the UMCHP GID treatment plan;

(h)  Enter a permanent injunction ordering Defendants to allow Plaintiff to access feminine canteen and other products in accordance with the UMCHP GID treatment plan;

(i)  Enter a permanent injunction ordering Defendants to provide Plaintiff with laser hair removal treatments in accordance with the UMCHP GID treatment plan;

(j)     Award Plaintiff compensatory damages for her physical and emotional pain and suffering resulting from each of the named Defendants' actions;

(k)     Award the Plaintiff reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

(l)     Grant such other relief as the Court deems just and proper.


Dated: January 8, 2008                    Respectfully submitted,

                                          SANDY J. BATTISTA

                                          by her attorneys,

                                          /s/ Neal E. Minahan
                                          Emily Smith–Lee (BBO# 634223)
                                          Neal E. Minahan (BBO#661371)
                                          Dana McSherry (BBO #664430)
                                          Ada Sheng (BBO#664775)
                                          McDermott Will & Emery LLP
                                          28 State Street
                                          Boston, MA 02109
                                          tel: 617.535.4000
                                          fax: 617.535.3800

BST99 1561729-1 009962 0255

# **EXHIBIT A**



**University of Massachusetts**
**UMASS. Medical School**

UMass Correctional Health
University of Massachusetts Medical School
One Research Drive, Suite 120C
Westborough, MA 01581-3922 USA
508 475.3220 (office)    508 475 3270 (fax)

*A Program of Commonwealth Medicine*

October 17, 2006

Terre Marshall, Director
DOC Health Services Division
P.O. Box 426
Bridgewater, MA  02324



Dear Ms  Marshall

I am writing in response to your July 6, 2006 letter requesting detailed Gender Identity Disorder (GID) treatment recommendations for Sandy Jo Battista, M15930

Dr. Warth, endocrinologist from LSH, has recommended that Sandy Jo Battista be started on Lupron 1 mg subcutaneously daily and Estradiol 0 05mg daily via patch

Laser hair removal would be performed at Boston University Dermatology located at 930 Commonwealth AvenueWest, in Boston. Lidocaine topical cream 2.5% will be applied to the area to be treated just prior to transport by medical staff  Post treatment requires the patient applies Hydrocortisone cream 2 5% twice a day to the treatment area until the next scheduled treatment. Most patients require ten treatments and the treatments occur every 6-8 weeks. Laser hair removal should not be initiated until the patient has been on hormones for a period of time

Please note that, we have again reviewed the question of access to feminine clothing and canteen items with our GID consultants.  They have unequivocally informed us that access to such items is an "essential" component of the management of GID. Feminine attire and make-up assist the patient in "feeling more feminine... [and] secure in their identity" and provide a "signal to other persons of the social transition." It is not, however, the standard of care for medical or mental health professionals to weigh the initial or ongoing need for any particular feminine product, or any other treatments with the exception of hormones and sex reassignment surgery (SRS)  Only hormones and SRS require the support of the therapist  Access to feminine attire and make-up is "based on what the individual wants and needs to feel more feminine"

ATTACHMENT  B

Thus, in accordance with the recommendations of our consultants, we again recommend that, in the absence of security-related concerns and restrictions, the inmate be allowed to choose on an ongoing basis from all female canteen items or other sources of feminine attire and products that are routinely available to female inmates.

At this point, the inmate has not made specific requests at this time, however, we repeat our previous recommendations that these items, and any other items that the inmate requests going forward, be provided if they do not pose an unacceptable security risk

You have also asked whether the treatments and interventions that we have previously recommended, and are recommending again in this letter, should be provided in a "specific progression" or be subject to "continuous review. to determine either their efficacy or whether they remain essential " Based on the consistent recommendations of our consultants, which we have previously shared and endorsed, we are again recommending that in the absence of security contraindications all of the interventions and treatments described in this letter should be provided on an ongoing basis without further evaluation for necessity

Sincerely,

Arthur Brewer, MD
Program Medical Director
UMASS Correctional Health

Kenneth Appelbaum, MD
Director, Mental Health
UMASS Correctional Health

cc: Patti Onorato, Executive Director, UMASS Correctional Health