**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SANDY J. BATTISTA, )<br>)<br>Plaintiff, )<br>v. )<br>HAROLD W. CLARKE, )<br>KATHLEEN M. DENNEHY, )<br>ROBERT MURPHY, )<br>TERRE K. MARSHALL, and )<br>SUSAN J. MARTIN, in their official and individual )<br>capacities; )<br>)<br>Defendants. )<br>) | Civil Action No.<br>05-11456-DPW |

## OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL DISMISSAL
## OF THE FIRST AMENDED COMPLAINT

Plaintiff Sandy J. Battista, through counsel, hereby submits this opposition to

Defendants' Motion for Partial Dismissal of the first Amended Complaint.

## SUMMARY

The gravamen of Ms. Battista's claims is simple: Defendants have, without authority or

justification, refused to deliver prescribed medical treatment that the Department of Corrections'

own contractual medical provider authorized three years ago, and callously ignored Ms.

Battista's resulting mental and physical suffering that persist to this day. The named Defendants

have each ignored unequivocal Department of Correction ("DOC") regulations, which require all

medical decisions to be made *solely* by the DOC's contractual medical provider which, in this

case, was the University of Massachusetts Correctional Health Program ("UMCHP"). The

regulations are clear that no DOC official, including each of the named Defendants, may second-

guess or otherwise obstruct a medical determination made by UMCHP. As alleged in the

Amended Complaint, UMCHP has been steadfast in its decision that (i) Ms. Battista was properly diagnosed with Gender Identity Disorder ("GID"), and (ii) Ms. Battista requires a necessary and appropriate medical treatment plan that includes hormone therapy. The Defendants, none of whom are medical professionals, cannot be allowed to reject UMCHP's prescribed treatment simply because they disagree politically with the diagnosis and believe that people with GID should be treated differently.

Defendants completely disregard the fact that DOC officials <u>must</u> abide by UMCHP's diagnoses. They instead create a faulty factual foundation that they hope the Court will accept without question. They allege that their decision to deny Ms. Battista's treatment is due to "serious concerns regarding the validity of the GID diagnosis" and that the delay is due to "the divergent opinions regarding the appropriateness of plaintiff's GID diagnosis and treatment." Def. Mtn. p.2. As a matter of law, however, Defendants have no authority to challenge the validity of Ms. Battista's GID diagnosis or any medical diagnosis. Even if Defendants had such authority, their motion to dismiss still fails in light of Ms. Battista's specific and well-founded allegation that no divergent medical opinions exist.[1]

Defendants attempt to confuse the issues further by conflating the claims linked to Defendants' official and personal capacities. Ms. Battista seeks injunctive relief – namely, that the DOC provide her with UMCHP's prescribed treatment plan – against Defendants in their official capacity only. She also seeks damages against each Defendant individually due to Defendants' blatant disregard for her right to medical care and the severity of the physical and mental harm she has suffered as a result. The damages claims are against the Defendants as

---

[1] Even if the Court were to find that DOC officials were authorized to challenge medical diagnoses, any divergent medical views would be the subject of expert discovery and appropriately reconciled at summary judgment or trial, and not upon a motion to dismiss. Defendants improperly seek to have the court take their factual assertions over Plaintiff's well-pleaded facts.

individuals and not as State actors, such that Defendants' various claims of immunity fail. As individuals, each of the Defendants acted in direct violation of the DOC's regulations and established procedure regarding the administration of medical care and, as such, acted outside the scope of his/her employment. Moreover, each Defendant made an individual decision to ignore DOC regulations and to either purposefully or negligently deny Ms. Battista's medical treatment despite UMCHP's repeated and forceful assertions that the prescribed treatment was necessary. As a result, Ms. Battista has experienced severe mental health issues, attempted self-castration, and struggled in her daily life with GID. Ms. Battista's truthful allegations highlight the egregiously harmful nature of the Defendants' actions and sufficiently supports each count in the Complaint against Defendants' motion to dismiss.

## FACTUAL BACKGROUND

### A.    DOC Regulations

The DOC contracts with private vendors to provide medical, dental and mental health services to criminally and civilly committed persons within DOC custody. Amend. Compl. ¶18. Pursuant to DOC regulations, the DOC's private medical contractor has full responsibility for all decisions related to the type, timing and level of medical and mental health services provided to persons within its care. Amend. Compl. ¶19. The relevant DOC regulation states:

> In concert with the Division of Health Services, the contractual medical provider shall be <u>solely</u> responsible for making <u>all decisions</u> with respect to the type, timing and level of services needed by inmates covered under the contractual agreement with the Department of Correction… <u>Matters of medical, mental health and dental judgment are the sole province of the responsible physicians, psychiatrists or dentists</u>.

103 DOC 610.1 (emphasis added). While health care providers are charged with ensuring that the delivery of health care is in accordance with the security requirements of the facility as determined by the superintendent, "[m]atters of clinical judgment are the <u>sole province</u> of the

licensed health care professionals." 103 DOC 601.02 (emphasis added); Amend. Compl. ¶19.
At all times relevant to this action, UMCHP was under contract with the DOC to provide all
medical and mental health services, including those of Ms. Battista. Amend. Compl. ¶20. Thus,
the DOC has no right to second guess the UMCHP's decisions except with regard to security.
*See* 103 DOC 610.1, 103 DOC 601.02; Amend. Compl. ¶20.

**B.      Ms. Battista's Medical History**

        Ms. Battista has been civilly committed at the Massachusetts Treatment Center in
Bridgewater since 2001. Amend. Compl. ¶4. Ms. Battista has been diagnosed with GID by two
separate experts, including the DOC's own contractual medical provider. Amend. Compl. ¶17.
In 2001, Ms. Battista retained an expert who diagnosed her with GID and recommended that she
be treated in accordance with the Harry Benjamin Standards of Care.[2] In 2004, DOC doctors at
UMCHP independently evaluated her through two outside GID specialists, who confirmed Ms.
Battista's GID diagnosis and prescribed a GID treatment plan that includes (i) psychotherapy, (ii)
hormone therapy, (iii) laser hair removal, and (iv) access to feminine clothing and products from
the DOC's canteen. Amend. Compl. ¶¶17, 21, 68-72. Ms. Battista's prescription for hormone
therapy was subsequently filled by a DOC pharmacist and sent to the Massachusetts Treatment
Center. Amend. Compl. ¶33. Nevertheless, in 2005, Defendants —none of whom are medical
professionals— unilaterally decided to withhold Ms. Battista's treatment and prescription
pending a "security review." Amend. Compl. ¶34. Almost three years later, this "security
review" still has not taken place. Amend. Compl. ¶¶66, 74.

**C.      Specific Actions by the Defendants**

---

[2] The Harry Benjamin Standards of Care articulate the professional consensus about the psychiatric, psychological, medical and surgical management of gender identity disorders, and are widely accepted by therapists all over the world.

Defendants have not only ignored the DOC regulations and policies regarding medical diagnoses, but they have also acted outside their authority to interfere with Ms. Battista's medical treatment. Defendants Kathleen Dennehy ("Dennehy"), former DOC Commissioner, Susan Martin ("Martin"), former DOC Director of Health Services, and Robert Murphy ("Murphy"), initially decided to withhold Ms. Battista's medical treatment in 2004. Amend. Compl. ¶¶6-7, 9, 34, 41-2, 45-6. At the time, Martin informed Ms. Battista that her prescription for hormone therapy was being withheld for a "security review." Amend. Compl. ¶45. According to DOC regulations, such security reviews are conducted by the superintendent of the facility, who in this case was Murphy. 103 DOC 601.02 ("all health care providers shall ensure that the delivery of health care is in accordance with the security requirements of the facility as determined by the superintendent."); Amend. Compl. ¶9.

Over the next year, Ms. Battista wrote numerous letters to Martin, Murphy, and Dennehy inquiring as to the status of the review and pleading with Defendants to expedite her security review in light of her deteriorating physical and mental health. Amend. Compl. ¶¶35, 40-42, 46, 49. These letters were met with inaction. Amend. Compl. ¶74.

After his appointment as commissioner in 2007, Harold Clarke ("Clarke") continued Dennehy's policy of withholding treatment. Amend. Compl. ¶5. Almost three years later, Defendants have not concluded any security review or made a decision regarding Ms. Battista's treatment. Amend. Compl. ¶22, 45, 60. As a result, Ms. Battista suffered two severe emotional breaks, was put on "crisis watch" and eventually attempted to castrate herself leading to severe bleeding and serious infection. Amend. Compl. ¶35-44, 49-57.

Martin and her successor Terre Marshall ("Marshall") have sustained a three-year campaign to obstruct and influence the doctors at UMCHP regarding their diagnosis of Ms.

Battista. Amend. Compl. ¶¶61-66.  In May 2005, Martin informed Ms. Battista for the first time that her GID treatment was being reviewed by UMCHP to "determine its appropriateness and necessity." Amend. Compl. ¶45.

In December 2005, Defendants Marshall and Dennehy forced a meeting with UMCHP to remind them of their "responsibility[ies] as the contractual medical provider," and to attempt to coerce them into changing their diagnosis of Ms. Battista. Amend. Compl. ¶61.  UMCHP doctors, however, did not waiver in their medical determination and unequivocally responded to Defendants' pressure by once again laying out their specific treatment plan for Ms. Battista. Amend. Compl. ¶62.  Defendants, however, did not leave it at that and once again attempted to confuse and delay Ms. Battista's diagnosis.  In July 2006, Marshall wrote a letter to the executive director of UMCHP stating that, while the DOC "is not in the position of making GID treatment recommendations" pursuant to its regulations, she still had questions concerning the validity of UMCHP's recommendations. Amend. Compl. ¶¶64-66.  Marshall stated, "We await more clarity in your response so that [Murphy] may begin a security review for Ms. Battista." Amend. Compl. ¶65.  Thus, in July 2006 – over a year after originally withholding Ms. Battista's prescription – the DOC had yet to begin the security review that Defendants claimed was ongoing as of May 2005. Amend. Compl. ¶66.

In response to these attempts to coerce and intimidate UMCHP doctors, UMCHP has steadfastly supported its original GID diagnosis and treatment plan.  In response to the inappropriate interference by Defendant Marshall, UMCHP doctors stated that "all of the interventions and treatments [prescribed to Ms. Battista] should be provided on an ongoing basis *without further evaluation for necessity*." Amend. Compl. ¶ 72.  Nevertheless, Defendants continue to withhold Ms. Battista's medical treatment to this day.

**LEGAL STANDARD**

In each of their arguments, Defendants fundamentally misconstrue the standards governing a motion to dismiss. In deciding a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court "construe[s] the Complaint liberally and treat[s] all well-pleaded facts as true, according the plaintiff the benefit of all reasonable inferences." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995). *See also*, *K.W. Thompson Tool Co. v. United States*, 836 F.2d 721, 726 (1st Cir. 1988). Ms. Battista is not obligated to prove her claims at this stage and the Court need only look to the allegations in the complaint and "if under any theory they are sufficient to state a cause of action in accordance with law, a motion to dismiss the complaint must be denied." *Knight v. Mills*, 836 F.2d 659, 664 (1st Cir. 1987)(citing *Melo-Tone Vending Inc. v. United States*, 666 F.2d 687, 688 (1st Cir. 1981)).

I.    **MS. BATTISTA'S EQUAL PROTECTION CLAIMS ARISE FROM HER TREATMENT IN COMPARISON TO OTHER SIMILARLY SITUATED BUT CLEARLY DISTINCT GROUPS (COUNTS III AND VI)**

Defendants contend that Ms. Battista's argument is based on her differential treatment from a comparator group consisting of "transsexuals, female inmates, and male criminally convicted inmates and civilly committed individuals not diagnosed with GID." Def. Mtn. p.5. This claim appears nowhere in the Amended Complaint.

The issue actually raised by the Amended Complaint is that the DOC cannot show that it is treating Ms. Battista in the same manner it treats other similarly situated, but clearly distinct, groups: (1) non-GID patients, Amend. Compl. ¶91; or (2) criminal inmates diagnosed with GID, Amend. Compl. ¶92. Defendants also demand that Ms. Battista prove her allegations according to the summary judgment standards of *Rubinovitz v. Rogato*, 60 F.3d 906 (1st Cir. 1995), but such a high level of proof does not apply in the pleadings stage. Taken as true, Ms. Battista's well-pleaded facts are sufficient to support a cause of action. Accordingly, Ms. Battista's equal

protection claims under 42 U.S.C. §1983 (Count III) and M.G.L. ch.12, §11*I* (Count VI) survive Defendants' motion to dismiss.

### A.    Ms. Battista Has Been Treated Differently in Comparison with Similarly Situated Persons Not Diagnosed with GID

Compared to non-GID patients, Ms. Battista has clearly been singled out for selective and unequal treatment and the difference in treatment is based on an impermissible consideration of her GID status. Amend. Compl. ¶¶77, 91.  *See Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005)("the Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'")(citation omitted).  The DOC's contractual medical provider has diagnosed Ms. Battista with GID and prescribed a treatment plan that it deems medically necessary. Amend. Compl. ¶¶23-32.  Yet unlike other non-GID patients who receive their prescribed medical treatments without difficulty, Ms. Battista has been prevented by the Defendants from receiving her prescribed medical treatment. Amend. Compl. ¶¶34-66.

Defendants allege that the delay is due to (i) potential security issues and (ii) its attempt to resolve differing medical diagnoses.  Defendants have never stated the basis for their security concerns, but instead, continue to focus on the validity of Ms. Battista's GID diagnosis. Defendants, however, do not have the right to question the medical diagnosis of the DOC's contractual medical provider. *See* 103 DOC 601.02 and 610.01.  The fact that the DOC is withholding Ms. Battista's prescribed medical treatment on illegitimate grounds when it does not withhold prescribed medical treatment from non-GID patients leads to Ms. Battista's allegations

that the underlying reason for the DOC's abnormal behavior is discriminatory animus based on her GID status.

**B.     Ms. Battista is Treated Differently in Comparison with Similarly Situated Criminal Inmates with GID Diagnoses**

Ms. Battista has been treated differently in comparison to criminal inmates diagnosed with GID despite the fact that she has the same diagnosis and requires the same type of hormone treatment.  As alleged in the Amended Complaint, the DOC permits criminal inmates who have been diagnosed with GID to receive prescribed hormone therapy as part of their treatment for GID. Amend. Compl. ¶¶75-76, 92.

Ms. Battista has been diagnosed with GID by the DOC's contractual medical provider, yet the DOC has put a hold on her hormone prescription absent any legitimate reason. Defendants are now attempting to justify their position by disputing Ms. Battista's factual allegations, stating that "prison officials *and medical staff* have made different decisions with respect to plaintiff." Def. Mtn. p.5 (emphasis added).  In fact, the medical staff has *not* made a different decision with respect to Ms. Battista. Amend. Compl. ¶¶67-72.  UMCHP diagnosed Ms. Battista with the same GID condition as the criminal inmates and prescribed similar treatment, but DOC officials, without any rational basis, have acted differently only with respect to Ms. Battista.

The sole difference between Ms. Battista and the criminal inmates, who have been similarly diagnosed with GID and receive hormone therapy, is the fact that Ms. Battista is civilly committed.  In light of *Kosilek v. Maloney*, 221 F. Supp.2d 156 (D. Mass. 2002), which requires individualized treatment assessments for inmates with GID, the DOC essentially has been forced to allow criminal inmates with GID to receive prescribed hormonal treatment.  Ms. Battista has received the individualized assessment by UMCHP as guaranteed by *Kosilek*, but the DOC has

stopped short of following through with her prescribed treatment.  While some criminal inmates have benefited in the short-term from the immediate effects of the *Kosilek* decision, discriminatory animus continues to pervade the DOC's approach to providing treatment for GID patients, especially as it relates to civilly committed persons.  Ms. Battista's status as a civilly committed person renders her an easy target for differential treatment because of her physical separation from criminal inmates diagnosed with GID.

## II.    DEFENDANTS ARE NOT IMMUNE FROM SUIT IN THEIR OFFICIAL CAPACITIES UNDER 42 U.S.C. §1983

Defendants are not immune from suit in their official capacities when the relief being sought is injunctive relief.  In the very same case which Defendants cite, *Will v. Michigan Department of State Police*, the Supreme Court held:

> Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under §1983 because "official-capacity actions for prospective relief are not treated as actions against the State."

491 U.S. 58, 71 n.10 (1989) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).  *See also Hafer v. Melo*, 502 U.S. 21, 27 (1991).  Defendants in their official capacities are "persons" under §1983 who can be sued for declaratory and injunctive relief.  Accordingly, Ms. Battista's §1983 claims for declaratory and injunctive relief against the Defendants in their official capacities survive, as do her claims for damages against the Defendants in their personal capacities.

## III.   MS. BATTISTA MEETS THE REQUIREMENTS FOR PLEADING CLAIMS UNDER THE MASSACHUSETTS CIVIL RIGHTS ACT, M.G.L. CH. 12, §11H-I, AND DEFENDANTS ARE NOT IMMUNE FROM SUIT IN THEIR OFFICIAL CAPACITIES  (COUNTS IV, V & VI)

First, Ms. Battista brings each of her Massachusetts constitutional claims under the Massachusetts Civil Rights Act ("MCRA"), M.G.L. ch. 12, §11H-I.  Defendants contend that

Ms. Battista has pleaded her claims directly under the State Constitution and therefore they cannot be accorded relief. The language in the Amended Complaint, however, unmistakably refutes Defendants' contention. In Counts IV-VI of her Amended Complaint, Ms. Battista clearly states that Defendants interfered with her rights "in violation of M.G.L. ch. 12, §11I." Amend. Compl. ¶¶99, 104, 110. Ms. Battista's MCRA claims are well-pleaded and allege a clear violation of her constitutional rights.

Second, Defendants' contention that Ms. Battista's MCRA claims do not allege the necessary evidence of interference involving the use of "threats, intimidation or coercion" must also fail because a person in Ms. Battista's situation, who relies on the DOC for all her medical care and who, because of Defendants' actions, is being forced to forego basic medical needs, clearly satisfies any definition of coercion. *See Gordon v. Pepe*, 2004 U.S. Dist. LEXIS 16807 at *14 (D. Mass. Aug. 24, 2004)(finding that a prisoner who was not provided with religiously acceptable meals was clearly being coerced on the basis that plaintiff was "behind bars and depends on the Commonwealth to provide him with nutritionally balanced meals."). As in *Gordon*, Defendants are in a coercive position with relation to Ms. Battista by virtue of her status as a civilly committed person who is completely dependent on the DOC for her medical care. *See Torres v. DuBois*, 1997 Mass. Super. LEXIS 539 at *34-35 (Mass. Sup. Ct. Feb. 10, 1997)("The medical care a prisoner receives is just as much a 'condition' of his confinement as the food he is fed, the clothes he is issued, . . . and the protection he is afforded against other inmates."). Ms. Battista's allegations that the DOC's refusal to provide Ms. Battista with medically necessary treatment thus involves evidence of "threats, intimidation or coercion" sufficient to support an MCRA claim.

Third, Defendants' claim that sovereign immunity shields them from liability in their official capacity under the MCRA is incorrect. To the extent Defendants in their official capacities are "persons" that can be sued under 42 U.S.C. §1983, they can also be sued in their official capacities under the MCRA. The Supreme Judicial Court has stated:

> The Legislature enacted G.L. c. 12, §§11H and 11I, to provide a State remedy for deprivations of civil rights. The statute extended beyond the limits of its Federal counterpart by incorporating private action within its bounds. We conclude that the Legislature intended to provide a remedy under G.L. c. 12, §11I, coextensive with 42 U.S.C. §1983, except that the Federal statute requires State action whereas its State counterpart does not.

*Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822-23 (1985)(emphasis added).

The MCRA is not only coextensive with 42 U.S.C. §1983, but it actually extends the reach of the MCRA beyond the limitations of §1983. The *ELM Medical Laboratories* case cited by Defendants simply finds that the MCRA does not waive sovereign immunity in the context of suits against the State for liability. It is not disputed that Ms. Battista cannot bring suit directly against the Commonwealth or its agencies, but she is permitted under both 42 U.S.C. §1983 and the MCRA to bring suit against the Defendants in their official capacities for declaratory and injunctive relief.

## IV.    DEFENDANTS ACTED OUTSIDE THE SCOPE OF THEIR OFFICE OR EMPLOYMENT AND ARE LIABLE IN THEIR PERSONAL CAPACITIES FOR NEGLIGENCE AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (COUNTS VII AND IX)

Defendants incorrectly presume that they are shielded under the limitations of the Massachusetts Tort Claims Act ("MTCA") and that their negligent or wrongful conduct was "within the scope of [their] office or employment." M.G.L. ch. 258 §2. The question of whether Defendants' actions fell within the "scope of office or employment" is to be determined with reference to the *respondeat superior* law of the state in which the alleged tort occurred – in this

case Massachusetts." *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 106 (D. Mass. 1997).

According to the laws of Massachusetts, Defendants acted outside the scope of their employment with the DOC. In Massachusetts, the conduct of an agent is within the scope of employment if (i) it is of the kind he is employed to perform; (ii) it occurs substantially within the authorized time and space limits of employment; and (iii) it is motivated by a purpose to serve the employer. *Kelly v. United States*, 924 F.2d 355, 357 (1st Cir. 1991)(citing *Wang Laboratories, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 859 (1986)).

First, Defendants' continued interference with Ms. Battista's medical treatment by conducting their own medical review of her diagnosis and treatment plan is contrary to the kind of conduct Defendants were employed to perform according. Defendants are not medical professionals, they are not hired to perform medical reviews of any sort, and all questions regarding medical appropriateness and necessity are within the sole discretion of UMCHP, the DOC's contractual medical provider. *See* 103 DOC 601.02 ("Matters of clinical judgment are the sole province of the *licensed health care professionals (ie physician, dentist)*….")(emphasis added); Amend. Compl. ¶¶18-20.

Second, Defendants contend that they have been withholding medical care pending a security review. Even assuming Defendants were able to articulate any security concerns – which they have never done – such conduct has clearly occurred outside any reasonable interpretation of the "authorized time and space limits" of their employment. The Defendants' withholding of Ms. Battista's prescribed medical treatment pending "security review" for almost three years is so inexcusably delayed that it must fall outside the scope of their employment. Amend. Compl. ¶¶35-66.

Finally, Defendants' denial of important medical treatment to a resident who possesses no other means of obtaining medical relief cannot be attributed to any rational motivation or "purpose to serve the employer." *See Nichols v. Land Transp. Corp.*, 223 F.3d 21, 24 (1st Cir. 2000)(finding that employee's assault on another driver was not "actuated by a purpose" to serve the employer and therefore the behavior was outside the scope of employment). The DOC has no interest in depriving any person under its charge of necessary medical care and no such action by a DOC employee could, or ever should, be defensible with an alleged motivation or purpose of serving the DOC.

Ms. Battista is not obligated to prove the substance of her claims at this stage and her Amended Complaint alleges sufficient facts and circumstances to support her claims. Accordingly, Ms. Battista's claims against Defendants in their personal capacities for negligence and negligent infliction of emotional distress (Counts VII and IX) survive Defendants' motion to dismiss.

**V.    DEFENDANTS' CONDUCT RISES TO LEVEL OF "EXTREME AND OUTRAGEOUS" REQUIRED FOR AN INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM (COUNT VIII)**

Ms. Battista's allegations regarding the Defendants' conduct satisfies the threshold requirement for a claim of intentional infliction of emotional distress. Again, Ms. Battista is not required at this stage to prove the veracity of her claims, but merely to allege sufficient facts and circumstances rising to the level of "extreme and outrageous" conduct in order to survive Defendants' motion to dismiss. This she has done.

First, Defendants have withheld prescribed medical treatment from Ms. Battista for almost three years. The Defendants' manufactured dispute regarding Ms. Battista's medical diagnosis is not authorized by DOC regulations and serves no purpose other than to delay

treatment. Such a prolonged hold on prescribed medical treatment is unimaginable in any

context other than as an intentional desire to withhold treatment which amounts to extreme and

outrageous conduct.

Second, taking into account Ms. Battista's complete dependence on Defendants for

access to medical care, Defendants' actions in delaying and refusing her medical treatment are

"utterly intolerable in a civilized community." *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145

(1976)(*citing* Restatement (Second) of Torts §46, comment d). A civilized society is judged on

how it treats its most vulnerable populations, and in this case, Ms. Battista, as a civilly

committed individual, is in a particularly vulnerable position given her complete dependence on

Defendants for her medical care. Defendants' behavior is all the more egregious given that they

are in such a unique position of power with respect to Ms. Battista and also possess intimate

knowledge of her medical and psychiatric condition.

Third, Ms. Battista's condition as a person diagnosed with GID presents an additional

layer of concern when considering Defendants' actions – denying life-altering medical treatment

to a person who is suffering from a severe and debilitating medical condition such as GID is not

only life-threatening, but torturous. Ms. Battista's multiple emotional breakdowns, continued

severe depression, and her attempt at self-castration in October 2005 are evidence enough of the

"extreme and outrageous" nature of Defendants' conduct. Amend. Compl. ¶¶35-57.

Finally, Defendants again try to mislead the Court with their contention that a dispute

exists among medical professionals, and that their delay due to such a dispute does not rise to the

level of "extreme and outrageous" conduct. Def. Mtn p.12. The chronology of events

demonstrates that Defendants' actions are not, in fact, a response to any dispute among mental

health professionals – the Defendants manufactured the dispute after Ms. Battista filed this suit

seeking injunctive relief in July 2005. *See* Def. Mtn. p.3 (citing the October 2005 review conducted by Cynthia Osborne). Defendants' attempt to create a dispute about a medical diagnosis is an intentional contravention of the DOC's regulations which grant the contractual medical provider sole medical discretion. *See* 103 DOC 601.02 and 610.01. These facts are further evidence of Defendants' intentional interference with Ms. Battista's medical treatment leading to her severe emotional distress.

Defendants have no justification for their extreme delay in providing Ms. Battista with her prescribed medical treatment and their continued withholding of her medical treatment constitutes "extreme and outrageous" conduct.

## VI. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE THEY VIOLATED MS. BATTISTA'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS

Initially, it is important to recognize that the doctrine of qualified immunity, when applicable, only shields government officials from civil monetary damages. *See Knight v. Mills*, 836 F.2d 659, 665 (1st Cir. 1987). Even if the Court finds that Defendants are entitled to qualified immunity, Ms. Battista's claims for declaratory and injunctive relief against Defendants survive. *See Hegarty v. Somerset County*, 25 F.3d 17, 18 n.2 (1st Cir. 1994).

Defendants claim they are entitled to a grant of qualified immunity because they have not violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, Ms. Battista's claims under both the Fourteenth and Eighth Amendments set forth: (1) that her right to medical care is clearly established; (2) that Defendants did in fact violate this clearly established right to medical care; and (3) that a reasonable official would not have understood Defendants' conduct

to be consistent with that right in light of DOC regulations and established procedure regarding the administration of medical care.

**A.     Ms. Battista's Clearly Established Rights Under the Fourteenth and Eighth Amendments**

Ms. Battista's status as a civilly committed person creates a dual layer of constitutional rights. As a person whose conditions of confinement do not reflect a punitive purpose, Ms. Battista's rights regarding medical care are most accurately considered under the ambit of the Fourteenth Amendment:

> Because there had been no formal adjudication of guilt against [the pre-trial detainee] at the time he required medical care, the Eighth Amendment has no application. <u>The Due Process Clause, however, does require the responsible government or governmental agency to provide medical care</u> to persons [such as a pre-trial detainee] who have been injured.

*Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983).[3]  Under the Fourteenth Amendment, Ms. Battista's rights are more expansive than under the Eighth Amendment. *See Youngberg v. Romeo*, 457 U.S. at 321-22 ("[P]ersons who have been involuntarily committed are entitled to <u>more considerate treatment and conditions of confinement </u>than criminals whose conditions of confinement are designed to punish.")(emphasis added).  Although the DOC routinely lumps civilly committed individuals together with criminal inmates when addressing constitutional claims, a prisoner's Eighth Amendment rights are merely the bare minimum standard for civilly committed persons.  *See Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244-45 (1983)("the due process rights of a person in [a pre-trial detainee's] situation are at

---

[3] Courts have treated involuntarily committed persons in the same manner as pre-trial detainees whose conditions of confinement must be reasonably related to the purpose of the detention. *See Youngberg v. Romeo*, 457 U.S. 307, 320-21 (1982) ("We agre[e] that the detainees…could not be punished.  But we upheld those restrictions on liberty that were reasonably related to legitimate government objectives and not tantamount to punishment….We have taken a similar approach in deciding procedural due process challenges to civil commitment proceedings.").

least as great as the Eighth Amendment protections available to a convicted prisoner.");

*Gerakaris v. Champagne*, 913 F. Supp. 646, 652 (D. Mass. 1996)("Fourteenth Amendment due

process right to adequate medical care is at least as great as the corresponding right of an inmate

under the Eighth Amendment.").

      Under both the Fourteenth and the Eighth Amendments, Ms. Battista's right to medical

care is clearly established. Due process under the Fourteenth Amendment encompasses a basic

right to medical care such that deprivation of medical care is a violation of the due process right:

> [O]ur most basic conception of due process mandate[s] that
> medical care be provided to one who is incarcerated and may be
> suffering from serious illness or injury….where the circumstances
> are clearly sufficient to indicate the need of medical attention for
> injury or illness, the denial of such aid constitutes the deprivation
> of constitutional due process."

*Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972). In addition, Ms. Battista possesses at a

minimum a clearly established right under the Eighth Amendment, which provides prisoners

with a right to medical treatment:

> Deliberate indifference to serious medical needs of prisoners
> constitutes the 'unnecessary and wanton infliction of pain'
> proscribed by the Eighth Amendment. This is true whether the
> indifference is manifested by prison doctors in their response to the
> prisoner's needs or by prison guards in intentionally denying or
> delaying access to medical care or intentionally interfering with the
> treatment once prescribed.

*Estelle v. Gamble*, 429 U.S. 97,104 (1976). *See also Farmer v. Brennan*, 511 U.S. 825, 832

(1994)("The [Eighth] Amendment also imposes duties on these officials, who must provide

humane conditions of confinement; prison officials must ensure that inmates receive adequate

food, clothing, shelter, and medical care."); *United States v. DeCologero*, 821 F.2d 39, 42 (1st

Cir. 1987)("[I]t is plain that an inmate deserves *adequate* medical care.")(emphasis in original).

**B.  Defendants' Denial of Ms. Battista's Prescribed Medical Treatment Violated Her Clearly Established Fourteenth and Eighth Amendment Rights**

Defendants' conduct – namely denying her prescribed medical treatment despite the DOC's usual practice of promptly administering prescribed treatment – is in violation of Ms. Battista's clearly established Fourteenth and Eighth Amendment rights to medical care.

Defendants are well aware of the *Kosilek* decision which defined adequate medical care as an individualized medical evaluation after which the DOC was expected to "<u>follow the DOC's usual policy and practice</u> of allowing medical professionals to assess what is necessary to treat [plaintiff]." *Kosilek v. Maloney*, 221 F.Supp.2d at 193 (emphasis added). In Ms. Battista's case, UMCHP unequivocally found that Ms. Battista's GID diagnosis and treatment are necessary and appropriate. After she received UMCHP's medical diagnosis and prescription, however, Defendants did not follow the DOC's "usual policy and practice." Amend. Compl. ¶¶35-66. Instead of administering the prescribed treatment for Ms. Battista's serious medical need, Defendants have "intentionally interfer[ed] with the treatment once prescribed." *Estelle*, 429 at 104. *See Kosilek*, 221 F.Supp.2d at 181 ("'Even if prison officials give inmates *access* to treatment, they may still be deliberately indifferent to inmates' needs if they *fail to provide prescribed treatment*.'")(citing *Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000))(emphasis added).

In failing to follow the DOC's own procedures and regulations by refusing to accept UMCHP's medical diagnosis and unilaterally denying Ms. Battista's  prescribed treatment, Defendants are in violation of Ms. Battista's clearly established Fourteenth and Eighth Amendment rights.

**C.  A Reasonable Official Would Not Have Understood Defendants' Conduct to be Consistent with the Fourteenth and Eighth Amendments**

Given the overwhelming evidence supporting Ms. Battista's Fourteenth and Eighth Amendment rights to medical care, Defendants' conduct cannot be said to conform to what a "reasonable official" would understand as consistent with those rights. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The relevant inquiry is "what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards," *Saucier v. Katz*, 533 U.S. 194, 208 (2001). Defendants cannot plead ignorance of their own regulations or the DOC's "usual policy and practice" regarding the provision of prescribed medical treatment. Absent security concerns, a reasonable official would understand that once UMCHP prescribed a course of treatment that they found medically necessary and appropriate, DOC officials must provide that treatment. The DOC's regulations and practices clearly establish that the contractual medical provider possesses sole medical judgment and the DOC's authority only reaches to security reviews.[4] *See* 103 DOC 601.02 and 610.01.

Given the limited role the DOC possesses with respect to withholding prescribed medical treatment, a reasonable official would conclude that Defendants have acted outside the clearly established standard for adequate medical care under the Fourteenth and Eighth Amendment. Defendants are thereby not eligible for qualified immunity.

## CONCLUSION

For the foregoing reasons, Ms. Battista requests that the Court deny Defendants' motion for partial dismissal of the first amended complaint.

---

[4] Defendants try to include the authority to medically evaluate a treatment plan within their purview by citing *Cameron v. Tomes*, 990 F.2d 14, 20-21 (1st Cir. 1993), but a close reading of *Cameron* only supports the contention that the DOC is entitled to consider security and administration concerns when evaluating a treatment plan affecting conditions of confinement. Ms. Battista does not refute that Defendants are entitled to consider security concerns related to her medical treatment, but nowhere are Defendants granted the authority to second-guess on a medical basis the contractual medical provider's medical diagnosis. Amend. Compl. ¶¶18-20.

Dated: February 15, 2008          Respectfully submitted,

SANDY J. BATTISTA

By her attorneys,

/s/ Ada Y. Sheng
Emily Smith-Lee (BBO#634223)
Dana McSherry (BBO#664430)
Neal E. Minahan (BBO#661371)
Ada Y. Sheng (BBO#664475)
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
Tel: (617) 535-4000
Fax: (617) 535-3800

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on February 15, 2008.

/s/ Ada Y. Sheng
Ada Y. Sheng