UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDY JO BATTISTA,

     Plaintiff,

     v.

                         C. A. No.  05-11456-DPW

KATHLEEN M. DENNEHY, et al.,

     Defendants.

**OPPOSITION OF DEFENDANTS HAROLD W. CLARKE,
KATHLEEN M. DENNEHY, ROBERT MURPHY, TERRE K.
MARSHALL, AND SUSAN J. MARTIN TO PLAINTIFF'S
MOTION FOR A PROTECTIVE ORDER**

Defendants, Harold W. Clarke, Kathleen M. Dennehy, Robert Murphy, Terre K. Marshall, and Susan J. Martin, through counsel, hereby submit their opposition to plaintiff Sandy Jo Battista's motion for a protective order.

## INTRODUCTION

Sandy Jo Battista  ("plaintiff"), an individual presently under civil commitment to the Massachusetts Treatment Center ("Treatment Center") as a sexually dangerous person, pursuant to M.G.L. c. 123A, has brought this action alleging a denial of treatment for an alleged gender identity disorder ("GID").   The gravamen of plaintiff's amended complaint is that the defendants' failure to provide GID treatment in the form of hormone therapy, laser hair removal, and access to feminine canteen products constitutes a violation of the constitutional right to minimally adequate medical care.   The amended complaint seeks a permanent injunction and damages.

# I.     DISPUTE REGARDING DEFENDANTS' REQUESTS FOR DISCOVERY.

## A.   Plaintiff's Refusal To Produce Documents Or Assist In Location Of Documents.

Defendants have propounded requests for production of documents, pursuant to Fed. R. Civ. P. 34, and interrogatories, pursuant to Fed. R. Civ. P. 33, upon plaintiff.   Among the documents requested by defendants were records relative to the mental health and medical treatment provided plaintiff pre-incarceration, as well as records of state agencies charged with plaintiff's custody pre-incarceration and any military records of plaintiff.   Plaintiff has refused to provide the requested records or to assist defendants in obtaining the requested records by providing defendants with specific releases.   Pursuant to Local Rule 37.1, the document requests and plaintiff's responses at issue are set out as follows:

**Document Request No. 8:**

Copies of any and all medical records and documents relating to treatment, evaluation, and/or testing of plaintiff by any provider of health care, including, but not limited to, physicians, psychiatrists, psychologists, social workers, mental health assistants, physician assistants, therapists, nurses, hospitals, or similar institutions, clinics, mental health facilities and which were created on or after December 30, 1961.   If plaintiff is not in possession, custody or control of said medical records, please identify the name and address of each institution, clinic, hospital, facility, office or individual in possession of said medical records.   Plaintiff shall provide defendants with a signed authorization for release of medical records form for each institution, clinic, hospital, facility, office or individual identified as having possession, custody or control of medical records pertaining to plaintiff.

**Plaintiff's Response:**

Plaintiff objects to Request No. 8 on the grounds that it is overbroad, not reasonably calculated to lead to the discovery of admissible evidence and is unduly invasive of her privacy. Plaintiff's medical records prior to Plaintiff's present period of custody with the DOC including incarceration and civil commitment are irrelevant, not in Plaintiff's possession, and therefore will not be produced.   The DOC already has in its possession all of Plaintiff's medical records from her present period of custody with the DOC including incarceration and civil commitment which span the last 25 years and include the period of time leading up to Plaintiff's initial complaints relating to GID.   Plaintiff further objects to the request to provide a blanket release of any medical records from any provider for her entire lifetime on the grounds that such a request is not authorized by the discovery rules, and is overbroad, not reasonably calculated to lead to the discovery of admissible evidence, and is unduly invasive of her privacy.

However, subject to and without waiving these objections and the General Objections set forth above, Plaintiff will produce all responsive, non-privileged medical records in her possession, custody or control relating to medical treatment during her present period of incarceration and civil commitment.

**Document Request No. 9:**

Copies of any and all mental health/psychiatric documents and records relating to treatment, evaluation, testing of plaintiff by any provider of mental health care, including, but not limited to, physicians, psychiatrists, psychologists, social workers, mental health assistants, mental health professional, therapists, nurses, hospitals, or similar institutions, clinics, office, mental health center, facility and which were created on or after January 1, 1966. If plaintiff is not in possession, custody or control of said mental health/psychiatric records, please identify the name and address of each hospital, or similar institution, clinic, office, mental health center, facility or individual in possession of said mental health/psychiatric records. Plaintiff shall provide defendants with a signed authorization for release of mental health/psychiatric records form for each hospital, or similar institution, clinic, office, mental health center, facility or individual identified as having possession, custody or control of mental health/psychiatric records pertaining to plaintiff.

**Plaintiff's Response:**

Plaintiff objects to Request No. 9 on the grounds that it is overbroad, not reasonably calculated to lead to the discovery of admissible evidence and is unduly invasive of her privacy. Plaintiff's documents and records prior to Plaintiff's present period of custody with the DOC including incarceration and civil commitment are irrelevant, not in Plaintiff's possession, and therefore will not be produced. The DOC already has in its possession all of Plaintiff's mental health/psychiatric documents and records from her present period of custody with the DOC including incarceration and civil commitment which span the last 25 years and include the period of time leading up to Plaintiff's initial complaints relating to GID. Plaintiff further objects to the request to provide a blanket release of any mental health/psychiatric documents and records from any provider for her entire lifetime on the grounds that such a request is not authorized by the discovery rules, and is overbroad, not reasonably calculated to lead to the discovery of admissible evidence, and is unduly invasive of her privacy.

However, subject to and without waiving these objections and the General Objections set forth above, Plaintiff will produce all responsive, non-privileged records in her possession, custody or control relating to mental health/psychiatric treatment during her present period of incarceration and civil commitment.

**Document Request No. 10:**

Copies of any and all documents and records relating to plaintiff's commitment to any facility of any State within the United States for the treatment of mentally ill individuals, including the Commonwealth of Massachusetts Department of Mental Health. Include within your response, copies of any and all records relating to confinement, custody, legal proceedings,

release, mental health or medical treatment, evaluation, and/or testing of plaintiff by any provider of health care, including, but not limited to, agency staff members, physicians, psychiatrists, psychologists, social workers, mental health assistants, mental health professionals, therapists, nurses, hospitals, or similar institutions, clinics, mental health facilities and which were created on or after January 1, 1966. If plaintiff is not in possession, custody or control of said records, please identify the name and address of each facility or individual in possession of said records. Plaintiff shall provide defendants with a signed authorization for release of records form for each facility or individual identified as having possession, custody or control of records pertaining to plaintiff.

**Plaintiff's Response**:

Plaintiff objects to Request No. 10 on the grounds that it is overbroad, not reasonably calculated to lead to the discovery of admissible evidence and is unduly invasive of her privacy. Information pertaining to Plaintiff's commitment to any facility for the treatment of mentally ill individuals prior to Plaintiff's present period of custody with the DOC including incarceration and civil commitment are irrelevant and will not be produced. Plaintiff further objects to the request for authorization for a blanket release of any records from any facility for the treatment of mentally ill individuals for her entire lifetime on the grounds that such a request is not authorized by the discovery rules, and is overbroad, not reasonably calculated to lead to the discovery of admissible evidence, and is unduly invasive of her privacy.

However, subject to and without waiving these objections and the General Objections set forth above, Plaintiff will produce all responsive, non-privileged records in her possession, custody or control relating to mental health/psychiatric treatment during her present period of incarceration and civil commitment.

**Document Request No. 11**:

Copies of any and all documents and records relating to plaintiff's commitment to any facility of any State for the custody and/or treatment of youthful offenders, including the Commonwealth of Massachusetts' Department Youth Services. Include within your response, copies of any and all records relating to confinement, custody, legal proceedings, release, mental health or medical treatment, evaluation, and/or testing of plaintiff by any provider of health care, including, but not limited to, agency staff members, physicians, psychiatrists, psychologists, social workers, mental health assistants, therapists, nurses, hospitals, or similar institutions, clinics, mental health facilities and which were created on or after January 1, 1974. If plaintiff is not in possession, custody or control of said records, please identify the name and address of each facility or individual in possession of said records. Plaintiff shall provide defendants with a signed authorization for release of records form for each facility or individual identified as having possession, custody or control of records pertaining to plaintiff.

**Plaintiff's Response:**

Plaintiff objects to Request No. 11 on the grounds that it is overbroad, not reasonably calculated to lead to the discovery of admissible evidence and is unduly invasive of her privacy.

Information pertaining to Plaintiff's commitment to any facility for the custody and/or treatment of youthful offenders is irrelevant and will not be produced. Plaintiff's juvenile records are confidential, and have no possible relevance to this action except to create unfair prejudice. Plaintiff further objects to the request for authorization for a blanket release of any DYS records on the grounds that such a request is not authorized by the discovery rules, and is overbroad, not reasonably calculated to lead to the discovery of admissible evidence, and is unduly invasive of her privacy.

**Document Request No. 13**:

Copies of any and all documents and records relating to plaintiff's involvement, participation, or enlistment with any United States armed forces services, including the Army, Navy, Marines, Coast Guard, National Guard, Reserves, or any military organization within the United States. If plaintiff is not in possession, custody or control of said records, please identify the name and address of each armed service, institution, facility or individual in possession of said records. Plaintiff shall provide defendants with a signed authorization for release of records form for each armed service, institution, facility or individual identified as having possession, custody or control of records pertaining to plaintiff.

**Plaintiff's Response:**

Plaintiff objects to Request No. 13 on the grounds that it is overbroad, not reasonably calculated to lead to the discovery of admissible evidence and is unduly invasive of her privacy. Plaintiff further objects to the request for authorization for a blanket release of her military records on the grounds that such a request is not authorized by the discovery rules, and is overbroad, not reasonably calculated to lead to the discovery of admissible evidence, and is unduly invasive of her privacy. Subject to and without waiving these objections and the General Objections set forth above, Plaintiff will produce the Certificate of Release/Discharge from active duty documenting Plaintiff's discharge from military service.

**Interrogatory Request No. 7.**

If, prior to your present period of custody with the Department of Correction you were ever committed or placed within the custody of the Massachusetts Department of Youth Services, please state for each period of custody, treatment or commitment to a facility of the Department of Youth Services:

        a.      the dates of your confinement/custody;
        b.      the name and address of the facility;
        c.      the circumstances resulting in your confinement/custody;
        d.      describe the nature of the confinement, including any treatment provided;
        e.      describe the circumstances of your release from confinement/custody.

**Plaintiff's Response:**

Plaintiff objects to this Interrogatory on the grounds that it is overbroad, not reasonably calculated to lead to the discovery of admissible evidence and is unduly invasive of her privacy. Plaintiff further objects that her juvenile records are confidential and have no possible relevance to this action except to create unfair prejudice.

Plaintiff has further indicated that he will refuse to respond to any attempt to solicit information regarding childhood experiences through a deposition or through questions raised by defendants' expert in an interview.

### B.      Defendants' Efforts To Narrow Discovery Disputes.

Pursuant to Local Rule 37.1, defendants' counsel contacted plaintiff's counsel in an attempt to resolve or narrow the dispute with regard to defendants' request for production of documents and interrogatories.   During the course of their discovery conferences, defendants dropped their request for plaintiff's educational records and records pertaining to plaintiff's custody in any local, County or State correctional facility or jail, or police lock-up.   Defendants also narrowed their request for documents described in request nos. 8, 9, 10, 11, and 13 limiting the requests to records relevant to any mental health issues or treatment, medical treatment for Addison's Disease ("CAH") and/or issues related to GID.  Defendants further offered to assist in obtaining the requested documents from various state agencies, the U.S. Army, and private and public medical and mental health care providers identified by plaintiff, relative to the issues raised in plaintiff's amended complaint.   Defendants also offered to have the available records sent directly to plaintiff's counsel or to the court for an *in camera* review regarding relevance. Defendants have offered to institute procedures to ensure the privacy of the requested documents, including signing a confidentially agreement limiting the dissemination of the records.   Defendants provided plaintiff with a draft of the affidavit of their expert, Dr. Chester W. Schmidt, Jr., M.D., which states records and documents relevant to plaintiff's medical and mental health treatment pre-incarceration would significantly assist him in evaluating plaintiff'

alleged GID and co-morbid mental disorders.  However, despite defendants attempts to narrow

the issues, reduce the minimal burdens the requested discovery may cause plaintiff, and to

diminish privacy concerns, plaintiff has refused to cooperate with regard to obtaining the

documents requested by defendants in request nos. 9, 10, 11, and 13.  *See* February 26, 2008

Letter of Plaintiff's Counsel and February 27, 2008 Letter of Defendants' Counsel, attached

hereto as Exhibit A.  Instead, plaintiff has sought a protective order pursuant to Fed. R. Civ. P.

26(c)(4) and has rendered the baseless charge that defendants' request for documents pertaining

to plaintiff's pre-incarceration mental health and medical treatment is a malicious attempt to

harass, intimidate and disparage Battista's character.  Defendants request that the motion for a

protective order be denied.

## ARGUMENT

### I.    PLAINTIFF'S REQUEST FOR A PROTECTIVE ORDER MUST BE DENIED IN THE ABSENCE OF GOOD CAUSE.

#### A.    Standard of Review

It is well settled that the Federal Rules of Civil Procedure are to be construed liberally in

favor of discovery.  *Hickman v. Taylor,* 329 U.S. 495, 507 (1947) ("[T]he deposition-discovery

rules are to be accorded a broad and liberal treatment"); *Ameristar Jet Charter, Inc. v. Signal*

*Composites, Inc.*, 244 F.3d 189, 192 (1st Cir. 2001) (citing *Hickman*); *SEC v. Sargent*, 229 F.3d

68, 80 (1st Cir. 2000) (quoting *Hickman*).  The general scope of discovery is set out in Fed. R.

Civ. P. 26(b)(1):

> In General. Parties may obtain discovery regarding any matter, not
> privileged, that is relevant to the claim or defense of any party, including
> the existence, description, nature, custody, condition, and location of any
> books, documents, or any other tangible things and the identity and location
> of persons having knowledge of any discoverable matter.  For good cause,
> the court may order discovery of any matter relevant to the subject matter
> involved in the action.  Relevant information need not be admissible at the

trail if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii).

"Relevancy is to be broadly construed at the discovery state of litigation and a request for discovery should be considered relevant if there is *any* possibility that the information sought may be relevant to the subject matter of the action." *Gagne v. Reddy*, 104 F.R.D. 454, 456 (D. Mass. 1984) (emphasis in original); *Microwave Research Corp. v. Sanders Associates,* 110 F.R.D. 669, 672 (D. Mass. 1986) (For purposes of Rule 26, relevant information includes any matter that is or may become an issue in the litigation.).

A party seeking a protective order bears the burden of proving "good cause" for the limitation on discovery.  *See* Fed. R. Civ. P. 26(c); *Anderson v. Cryovac,* 805 F.2d 1, 7 (1st Cir. 1986); *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 789 (1st Cir. 1988), *cert.* 488 U.S. 1030 (1989) (burden on moving party to show good cause).  "A finding of good cause must be based on a particular factual demonstration of potential harm, not conclusory statements." *Anderson,* 805 F.2d at 7 (citing 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2035 at 264-265 (1974)); *General Dynamics Corp. v. Selb Manufacturing Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973) (movant has burden to make a specific demonstration of necessity for protective order), *cert. denied*, 414 U.S. 1162 (1974).  "In assessing whether to issue a protective order, courts generally balance the harm to defendant against the relevance of and the necessity for the information." *Multi-Core v. Southern Water Treatment Co.,* 139 F.R.D. 262, 264 (D. Mass. 1991).  The court in *Multi-Core,* noting that courts have used a variety of procedures to strike a balance between the parties in order to permit discovery, ordered that the requested documents be disclosed solely to counsel seeking the documents and his experts and ordered counsel to sign a nondisclosure agreement. *Id.  See also, Ramirez v. Boehringer Ingelheim Pharmaceuticals,*

*Inc.*, 425 F.3d 67, 73-74 (1st Cir. 2005) (party seeking discovery invited by court to suggest alternative measures to conduct discovery while balancing concerns for privacy).

### B.    Plaintiff Has Failed To Demonstrate Good Cause To Enter Protective Order.

In support of the motion for a protective order, plaintiff argues that: 1) the requested documents are not relevant to the claims raised in the amended complaint; 2) the requested discovery is overly burdensome and constitutes an attempt to harass and embarrass plaintiff; and 3) discovery should not be available to defendants where they have failed to comply with a DOC policy regarding contract medical personnel. Plaintiff's motion should be denied in the absence of a demonstration of good cause for this court to limit discovery. Plaintiff has failed to show that the documents requested by defendants are not relevant to the claims raised, especially where defendants' expert has stated that the requested documents will assist him in rendering his expert opinion. Nor has plaintiff shown that the discovery requested is overly burdensome or intended to harass where he relies solely upon conclusory allegations. Finally, the argument that discovery should not be permitted where defendants lack "clean hands" because they have not followed a DOC policy lacks merit and does not constitute good cause to limit discovery.

### 1.    Requested Documents Are Relevant To Claims Raised By Plaintiff.

The documents and information requested by defendants, *i.e.* pre-incarceration medical, mental health, and military records, are relevant to the claims raised by plaintiff in the instant action. Information pertaining to plaintiff's childhood, adolescent, and young adult experiences has played a major role in the assessments by those mental health professionals that have found that plaintiff meets the criteria for a diagnosis of GID, as well as those mental health professionals who have diagnosed plaintiff with having other psychological disorders and questioned the appropriateness of the GID diagnosis.

Plaintiff's claim for injunctive relief and damages relies largely upon the November 16, 2004 report of Drs. Kevin Kapilla and Randi Kaufman of the Fenway Clinic which diagnosed plaintiff with GID and recommended treatment with psychotherapy and hormones. Amended Complaint, ¶¶ 25-28. The Fenway Clinic report describes at length plaintiff's developmental and gender history. *See* Exhibit B at 1-3. Specifically, Drs. Kapilla and Kaufman find support for their conclusion that plaintiff meets the criteria for a diagnosis of GID in plaintiff's description of childhood and adolescence experiences, stating that plaintiff "had a strong, persistent cross-sex identification as a female since early childhood, long before she was aware of this clinical diagnosis." In further support of the GID diagnosis, Drs. Kapilla and Kaufman point to plaintiff's claim to have worn women's underwear since the age of 14 or 15. They focus on plaintiff's detailed claim of being discharged from the Army after being discovered wearing women's undergarments and being seen by an Army therapist. Ex. B at 3.

Other psychological assessments of plaintiff have similarly focused on plaintiff's recounting of childhood, adolescence, and young adult experiences, including a 1974 hospitalization at the Metropolitan State Hospital, a facility of the Department of Mental Health and his placement in an adolescent unit at a Department of Mental Health facility run by the Department of Youth Services ("DYS") from 1975 until 1979. For example, in his October, 1997 report, Dr. Carpenter describes plaintiff's traumatic childhood and placement in DYS custody from ages 15 to 18. *See* Exhibit C at 1-3. Dr. Carpenter explains the significance of plaintiff's childhood and adolescence to present desire to become a woman as follows:

> Mr. Battista's primary conflicts appear to center primarily around great rage and distrust of authority, and poorly differentiated sexual and aggressive drives. His rage at authority has its roots in his images and experiences of his father's explosiveness and anger (e.g., reportedly shooting in the house and fatally beating his mother, physically abusing Mr. Battista's stepmother, and his use of painful corporal punishment), as well as the pervasive anti-authority

attitude which is prevalent in the prison culture. His sexual conflicts are equally severe and entwined with his rage, as well as anomalous in their behavioral expression. His mother was repulsed by, and ridiculed the effects of his early genital development, leaving him alienated from his primary caregiver and his own sexual anatomy. It is clear that this shame over his genitals persisted well into his young adulthood, and appears to be intermingled with an unconscious fantasy of using his genitals in a rageful way against women. The relatively late onset of his desire to become a woman through sex reassignment surgery, appears to in part be a function of his alienation from others, deep conflict over his sexual being, precipitated by an acceptance by other inmates, in an environment which by nature must place controls on sexual expression, of his experiments with cross dressing.

Exhibit C at 9-10.

In his October, 2001 report, Dr. Ebert describes plaintiff's traumatic childhood and placement in DYS custody as an adolescent as having played an important role in his psychological development. *See* Exhibit D at 3-4. Dr. Ebert strongly questioned the validity of a GID diagnosis and found a direct correlation between plaintiff's desire to become a woman and his traumatic childhood and adolescence. *Id.* at 8.

Also, in her October, 2005 review of the Fenway Clinic assessment, Cynthia Osborne, MSW, raises concerns regarding the Fenway Clinic's emphasis on plaintiff's early history of trauma and the absence of "any discussion of any possible associations between that history and the inmate's psychiatric difficulties…" *See* Exhibit E at 4.

Most importantly, defendants' expert, a psychiatrist with extensive experience in diagnosing and treating GID, Dr. Chester W. Schmidt, Jr., states that any records relative to plaintiff's childhood and adolescence, including medical records, mental health records, court records, records from youth services agencies, and other public or private service providers, could provide valuable insights into the nature of plaintiff's mental disorders and the appropriateness of the GID diagnosis. *See* Exhibit F, Affidavit of Chester W. Schmidt, Jr., M.D., ¶ 9. Dr. Schmidt states that where individuals diagnosed with GID often report experiencing the

symptoms of the disorder as a child or adolescent, historical records such as medical or mental health records may help to confirm the existence of such symptoms. Medical, mental health or other documents may confirm that plaintiff sought treatment for GID or displayed symptoms of GID as a child or adolescent or young adult. *Id*. at ¶ 6. It should be noted that plaintiff advised the Fenway Clinic evaluators of experiencing the symptoms of GID as a child and an adolescent. *See* Exhibit B.

Dr. Schmidt also states that where a diagnosis of GID can also be confounded by the presence of co-morbid psychological disorders such as personality disorders, depression or bi-polar disorders, any records probative of the psychological disorders suffered by plaintiff, including any mental health treatment provided pre-incarceration, is essential to developing a full understanding of plaintiff and provides context in the formulation of a diagnosis. *See* Ex. F at ¶ 7. Dr. Schmidt states that in order to provide a thorough assessment of plaintiff's alleged GID, it is extremely important for him to develop an understanding of the nature of the psychological traumas experienced by plaintiff as a child and the role such traumas may play in the late onset of plaintiff's desire to seek treatment for a gender disorder. Dr. Schmidt states that the goal of a thorough assessment and diagnosis of plaintiff regarding GID would be severely compromised if he or other mental health professionals were prevented from exploring plaintiff's early psychological development through a personal interview of plaintiff and review of any available medical records, mental health records, youth offender custodial records, records of public or private mental health agencies, etc. *Id.* at ¶ 9.

Dr. Schmidt further states that access to plaintiff's military records would be useful in conducting his assessment of plaintiff. *Id.* at ¶ 5. The Fenway Clinic evaluators point to plaintiff's discharge from the Army as a result of being caught wearing female underwear as

evidence of plaintiff's longstanding desire to be a woman. *See* Ex. B at p. 3. However, the Fenway Clinic evaluators failed to seek plaintiff's military records to attempt to confirm plaintiff's explanation of the circumstances surrounding the discharge. Plaintiff has provided different explanations for the Army discharge to other evaluators. For example, plaintiff informed one evaluator that the discharge from the Army was the result of getting drunk once too many times and getting into a fight (Weiss, 1984). Plaintiff told another evaluator that the discharge from the Army was the result of an altercation with a sergeant who intercepted photos of plaintiff dressed only in military boots and a cap sent by plaintiff to *Hustler* magazine (Campopiano, 1998). Plaintiff told Dr. Ebert that the discharge was due to getting into fights and being caught asleep on the job. (Ebert, 2001). A review of plaintiff's military records may help determine whether the story told by plaintiff of being caught wearing women's underwear and being referred to an Army therapist, in fact, occurred.

In addition, where plaintiff states that he has very little memory of his childhood and adolescence, the available records may be helpful fill-in the blanks of plaintiff's history. To the extent that plaintiff has provided previous evaluators with inconsistent historical information or has withheld important historical information, access to documents which provide information regarding plaintiff's childhood, adolescence, and early adulthood would be very helpful to Dr. Schmidt in rendering an accurate diagnosis. Ex. F at ¶ 9.

While it is possible that a diligent search for the pre-incarceration records relative to plaintiff's mental health, medical, and GID issues may not locate a large number of records, it is nevertheless clear that the documents sought by defendants should be considered relevant if there is a possibility that the information sought may be relevant to the issues raised in this action. *See Gagne v. Reddy*, *supra* at 456. Accordingly, where the information and records sought by

defendants are relevant to the claims raised by plaintiff in the instant action, plaintiff's motion should be denied.

>   **2.      Plaintiff Has Failed To Demonstrate That The Requested Discovery Is Unduly Burdensome and Harmful.**

Plaintiff's motion fails to establish good cause for this court to limit discovery by entering a protective order.  Instead of a demonstration of facts in support of the requested limitation on discovery, plaintiff relies on nothing more than conclsuory statements.

Plaintiff argues, in conclusory fashion, that the request for documents is merely an attempt to harass and intimidate plaintiff by "stirring up painful memories."  Plaintiff's Memorandum in Support of Motion for Protective Order at 11.  However, the clinical significance of plaintiff's childhood and adolescence experiences upon his GID diagnosis and psychological disorders is made clear in numerous psychological assessments, including the reports of Dr. Ebert and Dr. Carpenter who see a correlation between plaintiff's childhood experiences and the current desire to become a woman.  *See* Exs. C & D.  Virtually every mental health professional who has conducted a psychological assessment has inquired of and discussed the circumstances surrounding plaintiff's childhood and adolescence and their impact on plaintiff's present psychological disorders.  Despite the clear significance of this history to plaintiff's current psychological disorders, including the GID diagnosis, plaintiff now seeks to prevent defendants from exploring these areas because the experiences are too painful for plaintiff to discuss.  Plaintiff fails to explain why he has willingly discussed his childhood and adolescence experiences in numerous prior assessments, but now finds it an invasion of privacy and too painful to discuss in a deposition or in an interview with defendants' expert.  Certainly, if plaintiff now asserts a lack any present memory of many of the experiences of his childhood and adolescence, plaintiff is free to state so in response to the questions posed in a deposition or

expert interview.    However, plaintiff's possible lack of present memory does not warrant the extreme measure of ordering defendants not to even inquire into these matters.  Where plaintiff's complaint raises issues directly related his diagnosis of GID and other psychological disorders and plaintiff's childhood and adolescence experiences have been determined by numerous mental health professionals to be relevant to his present psychological disorders and desire to become a woman, plaintiff should not be permitted to thwart discovery into this area by claiming privacy and possible distress.  Plaintiff's conclusory allegations of experiencing distress if forced to discuss them do not satisfy the burden of demonstrating good cause to deny such discovery.

Nor does plaintiff's claim that the discovery sought is unduly burdensome withstand scrutiny.  First, sending letters to the relevant state agencies, the U.S. Army, and private medical and mental health agencies who have been identified as having provided mental health or medical treatment for plaintiff and inquiring as to whether they presently possess any records relevant to plaintiff is hardly burdensome.   Nor would providing defendants with specific releases and allowing defendants to seek the records on their own overly burden plaintiff. Defendants have offered to have the releases narrowly drawn and to forward any of plaintiff's pre-incarceration records located directly to plaintiff's counsel or the court to conduct an initial review the records regarding relevance.  *See* Exhibit A, February 28, 2008 Letter from Defendants' Counsel to Plaintiff's Counsel.  In order to protect plaintiff's privacy, defendants will also agree to sign a non-disclosure agreement with regard to plaintiff's available pre-incarceration records.  Certainly, where there are measures available to the court to balance defendants' discovery needs and plaintiff's privacy interests and minimize any potential burdens for plaintiff, the requested discovery should be permitted.

In the absence of a demonstration by plaintiff that the discovery request would cause unnecessary harm and that there are no procedures available to the court to balance the interests of the parties, plaintiff's motion for a protective order should be denied.

> **3.     Plaintiff's Claim That Defendants' Alleged Failure To Comply With A DOC Policy Regarding Medical Treatment Decisions Warrants Limiting Discovery Is Without Merit And Does Not Constitute Good Cause For A Protective Order.**

Plaintiff's motion further argues that defendants have waived the right to seek discovery where they allegedly have not followed a DOC policy that places the responsibility for medical decisions with the DOC's medical services provider.  Memorandum in Support of Plaintiff's Motion of Protective Order at 3, 9, citing 103 DOC 610.00, *et seq.* entitled Clinical Contract Personnel and the Role of DOC Health Services.  However, plaintiff's theory that discovery may be denied simply on the basis of an allegation that defendants have violated plaintiff's rights by acting contrary to their own policy, while novel, is nonetheless frivolous.

First, plaintiff's argument that defendants' actions are not in compliance with a DOC policy does not constitute good cause to enter a protective order.  As the cases establish, good cause in support of a protective order is based on a demonstration of potential harm balanced with the need for discovery, *not* whether a party may have legal theories in support of its claims or defenses.  *See Anderson, supra* at 7; *Public Citizen*, *supra* at 789; *Multi-Core, supra* at 264.

Second, plaintiff's assertion that the relief requested must be granted where the defendants have failed to comply with a DOC policy fails to state a claim under federal or state law.  Plaintiff is unable to raise this claim where the alleged failure of defendants to comply with a state agency policy does not state a claim under federal law.  *See Albright v. Oliver,* 510 U.s. 266, 271 (1994)*; Cruz-Erazo v. Rivera-Montanez*, 212 F.3d 617, 621 (1st Cir. 2000), citing *Pitsley v. Warish*, 927 F.2d 3, 6 (1st Cir. 1991), *cert. denied* 502 U.S. 879 (1991); *Baker v. Gray*,

57 Mass. App. Ct. 618, 624 (2003) (claim brought under 42 U.S.C. § 1983 dismissed where court held that § 1983 protects against the violation of Federal statutes and constitutional provisions, but it does not protect against the violation of State statutes);

Nor does plaintiff have standing under Massachusetts law to raise a claim for relief based on defendants alleged failure to comply with a DOC policy where it is well established that state agency policies, guidelines, or regulations do not create a private right of action. Massachusetts courts, in related contexts, have consistently found it improbable that the Legislature, in granting a state agency the authority to promulgate regulations was also empowering the agency to create possible civil liability. *See Martino v. Hogan*, 37 Mass. App. Ct. 710, 720-21 (1994), *rev. denied* 419 Mass. 1106 (1995) ("implausible" that Legislature intended to delegate to Department of Correction the authority to establish personal liability in event of breach of classification regulations); *Dinsky v. Framingham*, 386 Mass. 801, 804-810 (1982) (nothing in State Building Code evidenced legislative intent to create a private right of action for enforcement of building code). The reluctance of courts to view the violation of any administrative regulation as conferring a private remedy for damages is also based on a well-founded concern that such a policy would discourage agencies from promulgating any standards for fear of encountering endless litigation. *See Touche Ross & Co. v. Reddington*, 442 U.S. 581, 578 (1979). Such considerations are properly addressed to the legislature. *Id.* at 579.

Finally, the Attorney General, as the chief law enforcement officer of the Commonwealth, is the appropriate party to maintain a civil action to establish an official's duty to enforce DOC regulations. *Attorney General v. Sheriff of Worcester County*, 382 Mass. 57, 58-59 (1980) (Attorney General is the appropriate officer to seek clarification of Department of Public Health regulations through declaratory relief). Here, plaintiff lacks standing to raise a

claim against defendants under 103 DOC 610.01, a non-promulgated DOC policy. Accordingly, plaintiff's reliance upon defendants' alleged failure to comply with a DOC policy to establish good cause to enter a protective order is misplaced.

Therefore, it is clear that plaintiff is unable to demonstrate that good cause exists to enter a protective order denying defendants access to the requested relevant documents and information.

## CONCLUSION

For the foregoing reasons, defendants, Harold W. Clarke, Kathleen M. Dennehy, Robert Murphy, Terre K. Marshall, and Susan J. Martin, request that plaintiff's motion for a protective order be denied. Defendants further request that plaintiff be ordered to respond to defendants' discovery requests as described above.

## REQUEST FOR ORAL ARGUMENT

Defendants believe that oral argument will assist the court in deciding this matter and request that an oral argument be held.

Dated: March 6, 2008

Respectfully submitted,

NANCY ANKERS WHITE
Special Assistant Attorney General

/s/  Richard C. McFarland
Richard C. McFarland, BBO# 542278
Joan T. Kennedy, BBO #554935
Legal Division
Department of Correction
70 Franklin Street, Suite 600
Boston, MA   02202
(617) 727-3300   ext. 132

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on 03/6/08.

 /s/ Richard C. McFarland
Richard C. McFarland

# EXHIBIT A

# McDermott
# Will&Emery



Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C

Strategic alliance with MWE China Law Offices (Shanghai)

Dana M. McSherry

DEPARTMENT OF CORRECTION
LEGAL DEPARTMENT @mwe.com
617.535.4060

February 26, 2008

**BY HAND**

Richard C. McFarland
Department of Correction
70 Franklin Street
Suite 600
Boston, MA  02110

>          Re:    Sandy J. Battista v. Kathleen M. Dennehy, et al.
>                 CA No. 05-11456-DPW

Dear Richard:

Thank you for taking the time to speak with me and Neal Minahan yesterday regarding the scope of discovery in the above referenced matter.  I write to confirm my understanding of your position on the discovery issues we discussed.  Please let me know if any of the following is inaccurate.

- You have agreed to eliminate your request for Ms. Battista's report cards.

- You will not agree to refrain from asking Ms. Battista specific questions regarding her mother's death during her deposition.

- In response to our objections that Ms. Battista's military, DYS, DMH and DSS records are irrelevant and unduly prejudicial, you advocate a "look and see" approach.  You propose that we either undertake our own investigation well beyond our discovery obligations or authorize you to go on an unfettered fishing expedition in order to see whether any relevant information exists.  You have provided no substantive basis for the relevance of such hypothetical materials and in fact acknowledge that these records may not exist.

- You have narrowed your request for Ms. Battista's childhood medical records to documents relating to GID or Congenital Adrenal Hyperplasia   You refuse to narrow your request for Ms. Battista's childhood mental health records.

- Finally, in response to our position that Ms. Battista's childhood medical and mental health records are (a) not within Ms. Battista's possession, and (b) not reasonably obtainable, you again advocate a "look and see" approach.  Once more, you propose that we either undertake our own investigation well beyond our discovery obligations or

Richard C. McFarland
February 26, 2008
Page 2

authorize you to go on an unfettered fishing expedition in order to see whether any
relevant information turns up. You have provided no substantive basis for the relevance
of such materials and acknowledge that these records may no longer exist.

We plan to file our Motion for Protective Order tomorrow, Wednesday, February 27th. Please
let me know if I have misunderstood your positions in any way.

Sincerely,

Dana M. McSherry

DMM/jpp

cc:     Sandy Battista
        Emily Smith-Lee
        Neal Minahan
        Ada Sheng



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety and Security*
*Department of Correction*
*Legal Division*
*70 Franklin St., Suite 600*
*Boston, Massachusetts 02110-1300*
*Tel:(617-727-3300 Ext. 124)*
*www.mass.gov/doc*



**Deval L. Patrick**
Governor

**Timothy P. Murray**
Lieutenant Governor

**Kevin M. Burke**
Secretary

**Harold W. Clarke**
Commissioner

**James R. Bender**
**Ronald T. Duval**
**Veronica M. Madden**
Deputy Commissioners

**Nancy Ankers White**
General Counsel

BY FACSIMILE & FIRST CLASS MAIL

February 27, 2008

Dana M. McSherry, Esq.
McDermott, Will & Emery
28 State Street
Boston, MA 02109-1775

RE:     <u>Battista. v. Dennehy, et al.</u>
             USDC No. 05-11456-DPW

Dear Attorney McSherry:

        I am writing in response to your letter of February 26, 2008 regarding the dispute over defendants' discovery requests and our conversation of February 25, 2008. That conversation was a continuation of my discussions with attorney Neil Minahan of last week. My goal in contacting you and attorney Minahan was to resolve or, at least narrow, the areas of disagreement stemming from plaintiff's response to defendants' discovery requests. I feel it is necessary to respond to several of the points you raise in your February 26, 2008 letter.

        First, since it is undisputed that prior to his incarceration, Battista was in DYS custody for several years, received treatment in DMH facilities, was subject to several Child in Need of Services (CHINS) petitions through DSS, and served several months in the Army, I suggested that an effort be made to ascertain if any of the state agencies and the Army were in possession of records relevant to Battista. Certainly, if DYS, DMH, DSS or the Army have no records pertaining to Battista, the dispute over the relevance of the information would end there, avoiding involving the court in this particular discovery dispute. I indicated that in the absence of a release from your client, it was unlikely that the State agencies or the Army would attempt a search for the records on my behalf. However, you have refused to provide me with releases from your client so that I could ascertain whether the records exist, even though I offered to have any records located sent to you or to the court for an *in camera* inspection. Since I am unable to obtain the records on my own, I offered to assist you in pursuing the records. I envisioned that a simple letter from you indicating that you represent Battista and inquiring as to whether the three State agencies or the Army had any records pertaining to Battista would be enough to at least

2

determine if there are records available. Preparing and mailing such letters does not appear to me to be overly burdensome.

Similarly, to the extent your client or the available records can provide the identify of private mental health or medical providers that have provided treatment to your client pre-incarceration, a letter to the mental health or medical provider inquiring as to whether they presently possess records pertaining to your client does not appear to be overly burdensome.

Defendants also believe that the available records, in particular the numerous evaluations of your client, sufficiently establish the relevance of records pertaining to your client's pre-incarceration mental health, medical, military, and custodial records. First, several of the evaluations of Battista point to the likely connection between Battista's chaotic and traumatic childhood and adolescence and the desire to become a woman. In particular, Dr. Ebert's 2001 report states that Battista's desire to be a woman likely stems from his terrible childhood and his relationship with his mother. Drs. Kapilla and Kaufman state that Battista has demonstrated a persistent "cross-sex identification as a female since early childhood." Where numerous evaluators have pointed to the connection between Battista's childhood and adolescence and his personality disorders and the diagnosis of GID, documents and records relative to Battista's medical and mental health treatment are highly relevant. In addition, several evaluators have pointed to a connection between Battista's Congenital Adrenal Hyperphasia ("CAH") and GID, and medical records that discuss his medical treatment for CAH are also relevant.

As I advised attorney Minahan, my expert believes that where the diagnosis of GID largely relies upon the self-reports of the individual, historical records such as medical or mental health records would help to confirm the existence of symptoms of GID or co-morbid psychological disorders prior to incarceration. According to defendants' expert, information probative of psychological disorders suffered by an individual seeking treatment for GID is essential to developing a full understanding of the individual and provides context in the formulation of a diagnosis. Defendants' expert further believes that it is extremely important to develop an understanding of the nature of the psychological traumas experienced by plaintiff as a child and the role such traumas may play in the late onset of plaintiff's desire to become a woman. In particular, the assessments of two psychologists, Dr. Ebert and Dr. Carpenter, expressed concerns that plaintiff's desire to become a woman might not be the result of a genuine gender identity disorder, but the result of deep psychological conflicts based on the shame and pain plaintiff experienced as a child, including plaintiff's rejection by his mother due to the effects of CAH on his body. Defendants' expert believes that the goal of a thorough assessment and diagnosis of Battista regarding GID would be compromised if he or other mental health professionals were prevented from exploring plaintiff's early psychological development through a personal interview of Battista and review of any available medical records, mental health records, youth offender custodial records, and records of public or private mental health agencies. Defendants' expert has prepared an affidavit in support of the relevance of Battista's pre-incarceration medical, mental health, and custodial records and I can provide you with a copy if it will further our discussion of these discovery requests.

In addition, the military records, including the circumstances concerning Battista's discharge are relevant where Drs. Kapilla and Kaufman cite to Battista's claim that his discharge

3

was the result of being discovered wearing female clothing in support of their conclusion that Battista has had a long-standing desire to be a woman. However, Battista has provided very different explanations of his discharge from the Army, including: he was unable to take orders, frequently drunk & disorderly. (Carpenter, 97, Rouse 2002); being drunk and engaging in a fight. (Weiss, 84); and an officer discovered photos of Battista wearing only a hat and boots sent to magazine (Campopiano, 98). Certainly, Battista's military records would likely provide sufficient information to determine which story contains the truth.

In conclusion, defendants believe that the records sought are relevant to the claims raised by your client. The fact that defendants do not know for sure if the requested records exist does warrant a label of a fishing expedition since we have offered to assist in the search for the pre-incarceration medical and mental health records. Defendants have attempted to narrow the document requests and agreed to institute procedures to ensure the privacy of the records, but to no avail. Defendants remain willing to continue to discuss these issues in hopes of avoiding court involvement in these discovery issues.

Sincerely,

Richard C. McFarland

RCM/am
Encl.

# EXHIBIT B

FENWAY COMMUNITY HEALTH

Mental Health and Addictions
Department
7 Haviland Street
Boston, Massachusetts 02115-2683

Telephone 617 927-6200
Facsimile 617 267-3667

www.fenwayhealth.org

Fenway Community Health
7 Haviland Street
Boston, MA  02115

Re:  Sandy Jo Battista (formerly known as David Megarry)
DOB:  12/30/61
DOC Case #:  M-15930
Date of evaluation:  8/10/04

≡**Fenway**

BOARD OF DIRECTORS
2004-2005

Stewart B. Clifford, Jr.
President

Joanne T. Ayoub
Vice President

Allison Salke
Treasurer

Thea Damon, Esq.
Clerk

Terence M. Keane, PhD*
At-Large

Elisa Alonso
David J. Breen, Esq.
Richard Marshall, MD
Carl Nagy-Koechlin
Richard D. Olson, Jr.
Arnold E. Sapenter
Scott E. Squillace, Esq.*

* Past President

Stephen L. Boswell, MD
Executive Director

## Reason for Evaluation

This evaluation of Sandy Jo Battista was done at the request of University of Massachusetts Medical School, who provides mental health care for the Department of Corrections, to assess the possible diagnosis of Gender Identity Disorder, and to help determine treatment planning.  The inmate reported that she filed a lawsuit two years ago to be evaluated for Gender Identity Disorder.  She reported becoming severely depressed in May 2003, when she was civilly committed to this institution, secondary to being evaluated as a sexually dangerous person.  She stated that she is not too concerned about her freedom at this time; rather she is focusing on being able to transition from male to female.

This evaluation is based on a 90-minute interview with Kevin Kapila, MD and Randi Kaufman, PsyD, as well as reviewing the inmate's chart.

## Developmental and Gender History

Inmate is a 43-year-old biological male who identifies as female.  Hereafter female pronouns will be used.  Inmate reported that she was born in Oxford, MA, the middle child of three, with a sister one year older, and a brother two years younger. Inmate was born with a medical condition called Congenital Adrenal Hyperplasia, which caused early physical maturity, and is considered to be an intersex condition. Inmate reported that mother rejected her early, due to her atypical physical presentation from CAH.  Paternal grandmother was also rejecting, reportedly saying inmate should not be bathed.  Inmate reports that she took medication to slow the growth process, but her body did not "catch up" until she was 14 or 15.  Inmate reported that she was also born "pigeon-toed", but was not put into corrective braces.  At 6 or 7 she had surgery to correct this, including full casts on her legs.

Inmate reported that father was violent toward her, beating her often for playing with her sister's toys and dressing in her clothing.  Father is reported as frequently yelling at mother, and while inmate could not recall witnessing physical violence,

she states that father once beat mother so badly that she had a brain hemorrhage, which led to her death. Client was 8 at that time. Father was incarcerated for involuntary manslaughter, and maternal grandmother raised inmate for some time. Maternal grandmother reportedly did not like inmate, as she was "father's junior", the man who had killed her daughter. Inmate states she "heard" that grandmother was physically and emotionally abusive to her, but does not remember this. A previous evaluation, done by Katrin Rouse, Ed.D., indicates that inmate was subjected to pornographic material and sexual acting out by grandmother and her friends. Paternal grandmother reportedly learned that inmate was being mistreated and petitioned for, and received, legal guardianship. Inmate remained with her until father was released from prison, when inmate was 10.

Inmate stated that she could not remember her thoughts about her gender while growing up, but was always jealous of women. She thought about what it would be like to have a woman's body, and did not like her own body. Inmate stated that she thought this was "normal", and that all males thought this way. She hated sports, and played house and with dolls with her sister.

Inmate and siblings lived with father after he was released from prison. He remarried, and stepmother was reported as being "okay" toward inmate. Inmate stated that father changed while he was in prison, and no longer beat inmate. He reportedly spent much of his time drunk for the remainder of his life. Father moved the family to Homestead, Florida, where he joined a motorcycle gang called the Devil's Disciples". This brought a lifestyle of "parties, beer and girls", but inmate recalled that for the first time she felt she had a normal home. The family did things together like going on picnics and fishing. Father continued using drugs and drinking for some time, and inmate recalled that she did not like seeing father passed out. She attended school, and they ate together as a family, remaining in Florida until inmate was in the 8th grade. Inmate reported that she was a loner, without friends, but always got along with sister, who was "the only one who stuck by me". She used alcohol and marijuana in an effort to be accepted by peers. Inmate reports that she herself was violent and aggressive, getting into lots of fights, and that she lifted weights for years.

Inmate reported that she left school in the 8th grade. When she was 15 father took out a CHINS petition, as she was setting fires in garbage cans in the woods, running away, stealing from stores, and committing acts of vandalism. Previous reports indicate that inmate had sexual contact with female family members, and that this led to father seeking to place inmate outside the home. From age 15 through 18 inmate attended school in a DYS facility, and lived in two foster homes. She reported that the foster homes were "not bad", and she went on field trips and picnics.

A previous evaluation, by Katrin Rouse, Ed.D., forensic psychologist, reflects that inmate was also placed in Worcester State Hospital adolescent unit in July 1977, the Metropolitan State Hospital adolescent program in 1978 and 1979, and was housed in a DYS facility on the grounds of Medfield State Hospital in July 1979 for two years, and but this information was not discussed with these evaluators.

The family then moved to Mayville, Kentucky, until inmate was 18. She was unsure why they moved, but thought father might have done this to break ties with the motorcycle gang. A rival bike gang reportedly killed Father's brother. Father then became religious and the family participated in retreats. The family then moved to Ohio briefly, where father got a job as an assistant cop.

Inmate reported that she dated some women, and that they always wanted to go further with her sexually than she was able or willing to do. She stated that she was never able to have sex willingly, and recalls having sex with women twice, at the age of 18. She was not able to perform, as she was extremely fearful of rejection, recalling mother's early rejection of her, and needed to have the woman put inmate inside of her.

At inmate's age of 19 the family moved back to Massachusetts and lived in a trailer in Wilkinsonville. Inmate joined the army as "there was not much work", and was ejected after a few months for wearing women's undergarments. Inmate stated that she was unaware that the army did inspections, and had been wearing women's undergarments since the age of 14 or 15. The undergarments, which were believed to have been stolen from the women's barracks, were confiscated, despite inmate claiming ownership. Inmate was sent to the army therapist, who she told she wore women's undergarments, as she felt more comfortable, but did not say that she wished to be women. Inmate was ejected with an "uncharacterized discharge", with the understanding that inmate was emotionally unstable. However it should be noted that a previous evaluation done by Katrin Rouse, Ed.D., indicated that inmate was ejected from the military due to fighting and drinking.

Inmate then lived with father's ex-wife. In 1983 inmate was convicted and began serving a sentence of 12-20 years for the rape of a child, as well as armed robbery and kidnapping, for which she received 9-10 year sentences.

Father died in 2001. Inmate reports that sister, who lives in Ohio, is inmate's only "life-line" to the outside, and only relationship she maintains outside of prison. They talk approximately every two months. Sister has five children and little money, and inmate is afraid to come out to her about her gender dysphoria. When she changed her name legally in 1995 inmate took mother's maiden name (Battista), and although she wanted a girl's name, this made her anxious, and instead she chose an androgynous name (Sandy).

<u>Prison History:</u>

Inmate reported that she has been in prison since February 1983, following the rape of a child, kidnapping, and robbery, for which she received a sentence of 12-20 years, and 9-10 years respectively. Inmate and previous reports indicate that when she was 15, inmate grabbed a 10-year old girl at the bus stop, and brought her into the woods to rape her, but a neighbor intervened. The incident for which she was convicted involved a 10-year old girl selling fudge. Inmate pulled her into her car, brought her to a wooded area, and sexually molested her. Further details are contained in the report of a Sexually Dangerous Person, by Katrin Rouse, Ed.D. This report also details inmate's frequent misconduct throughout her prison history,

including escape, fighting, assault on a guard, and making obscene phone calls to young girls.

Inmate noted that she has never been able to have sex willingly, and that because of this she was sexually frustrated. She stated that she did not see anything wrong with being sexually abusive, as she herself was abused. She noted that due to her shame, she had to put a vest over the child's face in order to perform sexually. Inmate also noted that being around young girls is risky for her, and that she should avoid such situations.

Inmate reported that she first came out about her gender dysphoria in 1996, when she was at MCI Norfolk. She reported that most of the inmates accepted her, but that this acceptance was likely due to the fear they had of inmate, who was allegedly physically built at that time. Inmate began to shave her body, and "got away with it", as body builders shave. Around that time she was put into segregation for eight months, where she did not have access to weights, and she stopped lifting. She began to lose her strength and size rapidly, and continued to shave her body. Inmate told her mental health counselor of her overwhelming thoughts, her hatred of her body and desire to change her sex. She began to starve herself, wanted her genitals removed, and thought of suicide. Inmate began to take her anger out on others, verbally and physically, and often received punishment. She reported that she tied her testicles with rubber bands and tried to freeze them. She continued to starve herself for days at a time. She complained that the prison staff did not help her, and that putting her on Prozac and in a paper johnny did not address her issues.

Inmate reported that she needed to find something to occupy herself in the absence of weightlifting, and she began to go to the library. She began to file lawsuits, beginning in 1997. The first lawsuit was inmate's attempt to get treatment for Gender Identity Disorder, alleging that her civil rights were being violated. The case was reportedly dismissed because inmate had diagnosed herself. Inmate's second case was in Federal district court, and stated that this case was dismissed because there was a chance inmate could be released, and it was not "ripe for review".

Five days before she finished serving her sentence, in May 2001, inmate was evaluated for being a sexually dangerous person. She was found to be sexually dangerous, as she had committed more than one incident, and was then committed to the Mass Treatment Center for sexual offenders in May 2003. This is a civil commitment, where inmate is entitled to more treatment considerations, and can file for annual reviews. She will remain in the treatment center until she is deemed to be sufficiently rehabilitated to be released. Inmate reported that she became severely depressed after this commitment, due to the loss of hope that she would be freed, and cried for a week.

In 2002 inmate filed another lawsuit, which was also dismissed. This suit was based on an evaluation inmate had done by Diane Ellaborn, a gender therapist, to show she suffers from Gender Identity Disorder. Inmate used her own money, which she received from father's death, to pay for this evaluation. The evaluation was allegedly not considered by the court, as Ms. Ellaborn was retained independently, and not through the state.

4

Inmate reported that she has attempted to have herself castrated surgically, as this would ostensibly lower the chance that she would re-offend sexually. The media covered this story, and inmate's sister viewed it on TV. Inmate initially lied about her gender issued, but later came out to sister. Inmate stated that when her attempts to have herself castrated medically failed, she has tried to get herself castrated in prison. She sent for brochures on how to do this, and has asked inmates if they would be willing to do this, looking for someone she trusts. Inmate stated that she is not currently trying to castrate herself, but might try to do so if things became "drastic" and she had no hope. She noted that recently she has become a little more hopeful, as she has heard about two other inmates being started on hormone therapy.

Inmate has continued to come out to other inmates, and has both lost friends, and made new ones. She noted that in coming out as transgender other inmates think she wants sex, and that while she has never been forced or assaulted, inmates have tried to be sexual with her. Inmate admitted to sexual contact with two men, both of whom are reported to be more feminine than herself, but finds herself attracted to women. She noted that inmates have difficulty understanding that she both wishes to be a woman, and is attracted to women. She stated that she is only able to masturbate if she fantasizes that she is a woman.

Inmate stated that she is no longer a "trouble-maker" since coming out about her gender. She continues to starve herself, as she immediately puts on muscle if she eats. She reported that she isolates herself, cries, and has tried repeatedly to get treatment. Inmate stated that she has had cognitive-behavioral treatment by Sean Thomas, to help with past behaviors, but has been told that the mental health department in prison does not treat gender identity disorder.

Inmate talked about her belief that her gender dysphoria is related to her history of being a sexual offender, in that she is angry, frustrated, and has low self-esteem.

When asked what she hopes for inmate stated that she would like to be on hormones, to be castrated, and to have cosmetic surgery for her face. She had researched this, and knew the name of Dr. Ousterhaut, a well-known feminine facial surgeon. Eventually she hopes to have full sex reassignment surgery, and had also researched this.

Medically inmate reported that she has had two hernia surgeries, and is pigeon-toed. She was on Prozac a few years ago, and was also on Doxypin for sleep difficulty, which she stated made her feel like a "zombie". Inmate asserted that she is supposed to be taking Dexymethazone at the hour of sleep, but she is not allowed to hold it on her person, as it is an oral steroid, and she cannot obtain it later than 9PM. She was taken off of the medication, administered tests, and is waiting to hear if she should continue taking it, or take another medication.

**Mental Status:**

Sandy Jo is quite thin and petite, was dressed neatly, and had plucked eyebrows and light eye make-up, that she said she had improvised from other materials. She appeared to feel somewhat self-conscious or shy when this was inquired about. On the surface the inmate appeared to be cooperative, and she was clearly happy to be evaluated, with the hope that this would help her move into a gender transition. The history she provided contained some inconsistencies, but in general her overall story matched with previous evaluations. Her affect was flat, her answers somewhat superficial, and she appeared to want to downplay the impact of her family history.

The inmate was oriented to person, place and time. She impressed as average in intelligence. She denied hallucinations, delusions, ideas of reference, and homicidal or suicidal ideation. However, she admitted to having thought about taking pills if she did decide to kill herself. She asserted again that currently she has more hope than she has had in the past. Her speech was normal in rate and rhythm. She had no psychomotor changes, and there was no evidence of a thought disorder or cognitive impairment. Her insight was limited to poor, and her judgment appeared based on what she has learned in treatment. Inmate stated that she has learned to think more before she reacts.

**Diagnostic Impressions and Recommendations**

Sandy Jo appears to fit the diagnosis for Gender Identity Disorder, NOS. There appears to be some evidence that inmate's particular intersex condition, Congenital Adrenal Hyperplasia, has some correlation with male to female transsexuals. It is notable that the history Sandy Jo presents is common for someone with GID, in that her experiences illustrate her gender dysphoria, as well as attempts to relieve her distress (wanting to tie and cut off her testicles). She has had a strong, persistent cross-sex identification as female since early childhood, long before she was aware of this clinical diagnosis. Her identification with women is seen in her early cross-dressing, her discomfort with her male sexual organs to the point of being unable to be sexual in a willing manner, and her sexual fantasies of being a woman. Finally, the inmate's symptoms have caused significant impairment in her life, both prior to, and since her incarceration.

The Harry Benjamin Standards of Care, an internationally accepted treatment protocol, the purpose of which is to "articulate ... professional consensus about the psychiatric, psychological, medical, and surgical management of gender identity disorders", notes that that are various activities and processes that people often engage in to provide more personal comfort. These activities, which often include things such as cross-dressing, spending time with females partaking in activities common to women, removing facial and body hair through laser treatment or electrolysis, and cosmetic surgery, are not available to persons who are incarcerated.

The Benjamin Standards of Care call for the patient to be both eligible, and ready, to begin hormone treatment.

Eligibility requirements include:

1. that the person be 18 years of age or older
2. that he demonstrates knowledge of what hormones medically can and cannot do, as well as their social benefits and risks
3. either a real-life experience in the desired gender role for a minimum period of three months, or a period of psychotherapy specified by a mental health professional after the initial evaluation.

The Readiness Criteria include:

1. the patient has had further consolidation of gender identity during the real-life experience or psychotherapy;
2. The patient has made some progress in mastering other identified problems leading to improving or continuing stable mental health (this implies satisfactory control of problems such as sociopathy, substance abuse, psychosis and suicidality;
3. The patient is likely to take hormones in a responsible manner.

The Benjamin Standards of Care includes a short discussion about incarcerated people. It states that "Persons who are receiving treatment for gender identity disorders should continue to receive appropriate treatment following these Standards of Care after incarceration. For example, those who are receiving psychotherapy and/or cross-sex hormonal treatments should be allowed to continue this medically necessary treatment to prevent or limit emotional lability, undesired regression of hormonally-induced physical effects and the sense of desperation that may lead to depression, anxiety and suicidality ... Housing for transgendered prisoners should take into account their transition status and their personal safety". This inmate had not begun treatment prior to incarceration, as she had neither been aware of, nor diagnosed with Gender Identity Disorder. However, given that this inmate qualifies for the diagnosis of Gender Identity Disorder, she should be afforded the clinical treatment outlined by the Standards of Care.

It is therefore the clinical recommendation of these evaluators that Sandy Jo have her Gender Identity Disorder addressed through hormone administration and ongoing psychotherapy to support the adjustment of the transition the hormones will bring. The psychotherapy should be with a clinician who is knowledgeable about gender identity issues, and/or is being supervised by a clinician with expertise in this area.

Respectfully submitted by:

Kevin Kapila, MD                                    Randi Kaufman, PsyD

November 16, 2004

7

# EXHIBIT C

# CONFIDENTIAL

CONFIDENTIAL

The Commonwealth of Massachusetts
Department of Corrections
Massachusetts Correctional Institution - Norfolk
Norfolk, MA 02056

### PSYCHOLOGICAL ASSESSMENT REPORT

CONFIDENTIAL

Name: Sandy J. Battista          Identification #: W39562
 a.k.a. David Edward Megarry, Jr.
DOB/Age: 12/30/61; 35 yo          Occupation: Unemployed Inmate
Marital Status: Never married   Education: 8th Grade (GED 1982)
Dates Seen: 5/20, 6/9,17, 8/13/97
Medication: None                    Referred By: DOC/CMS
Examiner: J. Tyler Carpenter, Ph.D., ABPP

Reason for Referral: Mr. Battista was referred by the Department of
Corrections and Correctional Medical Services for a psychological
assessment for the purposes of assisting in the psychodiagnostic
evaluation of the inmate. The formal request had been made by
Victoria Russell, M.D., Consultant in Psychiatry, who wished to
obtain the results to assist the therapist in "... designing
appropriate therapy goals and interpretations" and because such
tests, "... are also given to people considering sex reassignment
surgery". The inmate is seeking specialized medical and
psychological treatment to assist him in his ultimate goal of
receiving a sex change operation. Mr. Battista is hoping to
initiate this treatment at the current time in preparation for his
operation after he is released from prison.

Limits of Confidentiality and Protection of Patient's Rights: The
examiner explained the Limits of Confidentiality and possible uses
of the evaluation by DOC and CMS to Mr. Battista, who clearly
understood both the limits and possible ramifications, signed a
detailed document listing the limitations, and agreed to the
evaluation. Inmate was informed that background information would
be reviewed and releases where appropriate were obtained.

Background Information: (The sources of information include the
following: QA Report on Transgender Issues of Inmates, 1/21/97, and
a Consultative Medical Evaluation, 3/17/97, by Victoria Russell,
M.D.; Probation Officer's Report by Paul G. Bernard; Sexually
Dangerous Person Examination by Daniel M. Weiss, M.D., 3/9/84;
Pretrial Intake Report; an Offical Version and Criminal History; a
psychodiagnostic interview, and a review of his medical chart).

Mr. Battista presented the following history of the present
illness: He stated that as far back as he can remember he has felt
odd and different, but not necessarily female. In mid-1995 he
decided to change his name to a female name and at that time he
further decided,"I wanted to live my life as a female". He stated
that he gone through puberty as an infant and had been ridiculed by
others because of his large nose. He hid his feelings about these

instances until 1995, when he felt that he that he had gotten over them. He stated that the precipitating event was an interaction he had with an aggressive, outspoken inmate who questioned him about some incongruous behaviors, e.g., having his name on his bath slippers, his red bath robe, his shaved legs, etc.. Mr. Battista stated as he 'came out' (in his new identity) the feared ridicule and ostracism didn't occur.

Mr. Battista reported the following history of psychiatric treatment: Mr. Battista reported that in 1974 he was hospitalized at the Metropolitan State Hospital for "fooling around with my younger step sister". Mr. Battista stated that from 1975 until 1979, he was hospitalized at the Medfield State Hospital at the Steven J. Ott Center for an attempted sexual offense. Mr. Battista stated that he escaped two or three times and was not admitted as a psychiatric case. In 1982, Mr. Battista stated that he was hospitalized at Bridgewater State Hospital for a criminal competency trial. Mr. Battista denied any history of outpatient treatment.

Mr. Battista reported the following family history of medical conditions: Mr. Battista stated that his father suffered from alcoholism. It is reported that his mother died when the inmate was four years old. The inmate thinks that her death was related to a beating by her husband (his father). Mr. Battista and some of the records state that his father beat his mother for promiscuous behavior.

Mr. Battista stated that when he was five or six years old, after his mother died, he went to live with his maternal grandmother. He stated that he was subsequently removed for neglect and sent to his paternal grandmother and then he was moved in and out of that home, and between his father and paternal grandmother and foster homes. Mr. Battista stated that his father physically abused his stepmother and shot up the house. The inmate reports that he was the middle of three children and had an older sister and a younger brother and a younger half brother.

Mr. Battista stated that he couldn't remember if he was sexually or physically abused when he was young, but he does remember being removed from the home. He stated that he received very physical corporal punishment. He stated that he was locked in the closet and called a 'freak' by his mother until his grandmother took care of him.

Mr. Battista does not have any knowledge of his birth or milestones except that he said that he knows that his milestones were not delayed. He describes himself as being a of a shy temperament. Mr. Battista stated that he stayed back in first grade and was a below average student, but was never placed in special education classes. He stated that his life was that of a loner.

Mr. Battista stated that he was never able to take his clothes off in front of someone and that he had sex with a women on one occasion. He reported that no one ever explained sex to him and that he could not pinpoint the age at which he began to understand what sex was about. He felt that he learned the most about sex beginning with his incarceration at 21 years old. He reported that

Battista, S.J.                           3                        5-8/97

he was locked in a locked DYS maximum security residential program
between the ages of 15 and 18 years old. He stated that he had
between one and two regular friends.

Mr. Battista reported the following occupational history: He
stated that he worked as a laborer and serving fast food. He stated
that these jobs that he described were generally unskilled. He
stated that the longest he held a job was between one and one and
a half years. He states that he has held between four and five
different jobs and always worked. He said that he was only out of
prison between 18 and 21. He stated that between 1/82 and 11/82 he
was in the military service and given a discharge that was
"uncharacterized". Mr. Battista stated that while he was in the
service, he got in a lot of fights, was unable to take orders, and
was frequently drunk and disorderly. He denied ever doing any time
in the brig.

Mr. Battista stated that he was never married.

When asked about his medical history, Mr. Battista stated, "I
can take pain, I don't care, in fights if its inflicted by others",
but if he inflicts it on himself he stated that he cannot handle
it.   He stated that he doesn't experience physical discomfort as
others do and that he accepts it as part of prison life. Mr.
Battista stated that he wanted to go on a liquid diet so that he
would stop gaining weight.

Mr. Battista stated that between 10 and 13 years old that his
right eyeball was lacerated by blanks. He stated that he had was
born with congenital 21 hyperplasia which is an adrenal problem.
He stated that he takes medication to suppress adrenal function to
within normal limits. He stated that he received corrective surgery
between the ages of 6 and 7 for "pigeon toes". Mr. Battista denies
ever having any seizures or loss of consciousness.

Mr. Battista described his criminal and legal history as
follows: As a juvenile he was referred to the Department of Youth
services for an attempted sexual assault on a girl. He stated that
as an adult he was charged with breaking and entering an abandoned
warehouse. He stated that his current charge is the rape of a
child, kidnapping, and robbery. He stated that he had served
fourteen and a half years at the time of the testing.

Mr. Battista denied any attempt to kill himself (contradicted
by a contrary endorsement on question # 154 and 171 on the MCMI-
III), but stated that he had suicidal ideation approximately twelve
times over the previous year. Mr. Battista denied any history of
psychotic symptoms.

Mr. Battista reported abusing marijuana and alcohol between 18
and 20 years old. He stated that his use was primarily on Friday
and Saturday nights and at those times he would engage in drinking
and smoking pot to "oblivion".

Assessment Procedures: Bender Visual Motor Gestalt Test (Copy, IR),
Rorschach (RIAP-3), TAT, MCMI-III, MMPI-2 (Basic, Supplemental,
Content, and Harris & Lingoes Scales), an evaluation for
psychopathic personality traits, MASA Inventory - Booklet 5, Wilson
Sex Fantasy Questionnaire, Trails A & B, Digit Span, Mini-Mental

Battista, S.J.                          4                          5-8/97

State Exam, and Psychodiagnostic Interview.

Validity: This is a generally reliable and valid assessment of both the nomothetic and idiographic traits and personality functioning of this inmate. It is both internally and diagnostically consistent.

* The MCMI-III produced a valid profile.
* The Rorschach was an interpretively useful protocol.
* The MMPI-2 produced a varied picture: Taken as an aggregate, the validity indicators are consistent with the inmate's self and diagnostic presentations.
* Assessments of his sexual functioning showed a mild defensive set.
* The remaining tests and interviews were reliable and valid assessments of the inmate's current level of functioning.

Physical Characteristics and Mental Status Examination: Inmate presented himself as a 35 year old single white male inmate. He was examined on four occasions under different correctional security/medical status, e.g., on occasion in disciplinary seclusion and at other times while housed in the medical unit. He was dressed in a jumpsuit, handcuffed on occasion (but not during those occasions when performing the Bender Gestalt or other tests involving writing), and clean, groomed, and neat in appearance. His facial expressions were initially limited in number and harsh, but softened over time and showed greater range and depth of emotional expression as he came to engage in the assessment process and become more trusting of the examiner. He had a direct and forceful manner of speaking and presenting himself, which became marginally more moderate over the number of interviews. His presentation appeared as not so much an attempt to dominate the interviewer, as it was to be aggressive enough to avoid being dominated or controlled by the interviewer. He has attractive, aquiline features. His presentation was remarkable for the complete absence of feminine characteristics of speech or posture, save for his hair being pulled back in a neat ponytail. His gender presentation was within normal limits, neither androgenous nor macho. He did not appear to lie or dissimulate. When he did not wish to answer certain questions, e.g., sexual history and current fantasy life, he stated that because the examiner was not a certified expert in transsexual problems, it was too personal and specialized an area for him to reveal. Mr. Battista was of average build and apparently good physical condition, but stated that he wanted to go on a liquid diet to avoid gaining weight and to prevent the return of bulk to his arms, legs, and chest (he reported body building in the past in order to hang out with a biker group and avoid being identified and victimized as a child molester). His physical appearance was remarkable for over 40 tatoos (by his report) which he had done in prison to strengthen his image as a tough, heterosexual convict. His motor behavior was remarkable for his unusual capacity to sit remarkably still for hours and work under

occasionally uncomfortable conditions without showing restlessness or pain. He said that this came of spending years in isolation and segregation. Mr. Battista's relationship to the examiner was generally frank, cooperative, and on occasion mutual. He appeared hungry for an empathic human audience.

Mr. Battista saw himself as suffering from a legitimate medical condition, e.g., transsexualism, for which specialized medical treatment was indicated and which he was being unconstitutionally and illegally deprived of. He felt that although it was legitimate for DOC/CMS to refuse him sex reassignment surgery, he felt that it was within his legal rights for him to receive the specialized hormonal and psychotherapeutic treatment that would precede such an operation on the outside. He was unable to entertain alternate formulations of his condition or to reasonably consider currently available treatment techniques to address his symptomatic complaints of sexual identity dysphoria, alienation, poor self-esteem, and depression with intermittent despair and suicidality.

Mr. Battista was alert, oriented 4X, and without reported or gross discernable perceptual anomalies. He stated on numerous occasions that he was not "crazy". His immediate and long term memory appeared to be WNL, as did his capacity to learn new information. However, he reported that he was unable to remember significant aspects of his early childhood, including whether or not he had been sexually abused. He appeared to have a low average fund of general information, except where information pertaining to his legal status and medical condition was involved (in these respects he sounded unusually well informed and resourceful). His IQ is estimated to be in the average range, limited by his relative inability to utilize abstract concepts, especially when discussing his medical complaints. Mr. Battista was generally able to attend and concentrate on the examiner and the tasks quite well, except when the topic was his ideas about his right to address his gender identity problem. His judgement was impaired by strong emotions (e.g., anger and mistrust) and his use of defenses of splitting and projective identification. His understanding of the dynamics of the prison milieu is grossly intact. Mr. Battista's understanding of his condition is concrete and somewhat superficial. He realizes that his problems are due to something unusual about his self image. He believes that the solution to his problem is to concretely change his anatomy to fit his fantasied identity. He has little apparent knowledge of the underpinnings of his perceptions or the full impact of these dynamics on himself and others.

Mr. Battista generally appeared and acted rationally during the interviews and testing. It was his inability to reflect on alternate ways of understanding his condition and ways to deal with it, that took on an irrational life of its own. At times he demonstrated some press of speech. The association of his thinking was remarkable for perseveration around his sense of being persecuted and deprived with respect to his obsession with dramatically altering his sexual appearance. His thinking is distorted by intermittent concreteness and his current

Battista, S.J.                        6                        5-8/97

preoccupation with sex reassignment surgery as a solution to all
his problems reflects unrealistic fantasy and magical thinking.
     Mr. Battista's mood was generally one of varying degrees of
dysphoria. However, he was almost capable of euthymia at those
times when he felt understood and optimistic about the evaluation
process. His mood states were anything but shallow and in fact were
remarkable for their duration and constancy. Although he was
capable of almost a full range of affects, modulation of his
affects was more dependent on external circumstances and the
examiner's reactions, than on internal controls. He was capable of
expressing strong emotion, but his affects lacked complexity and
were driven at times by unconscious reactions to experienced shame
and vulnerability. At times the inmate could be quite labile and
almost explosive in his expressions of feeling. There was an
impulsive quality to his thought, emotion, and behavior.

Neuropsychological Screening:

Mini-Mental State Exam - 26/30 - This score is not indicative of
     gross neuropsychological impairment. Errors consisted of a
     near miss on the season and some impairment in concentration.

Digit Span - 2 sequences of 5 digits forward and 2 sequences of 4
     digits backwards is within normal limits (WNL) for this
     patient.

Trails A - 22" (62nd percentile) is within normal limits (WNL).

Trails B - 1'11" with 1 error (estimated to be in the 37th
     percentile if completed correctly) is within mildly impaired
     range for this patient.

Bender Visual Motor Gestalt Test - Copy: Errors consisted of 4 mild
     decrease of angulation errors, 2 moderate - 45 degree
     rotations, and a near collision (score of approximately 4-5).

Bender Visual Motor Gestalt Test - Immediate Recall: 6/9 gestalts
     recalled is WNL. Errors consisted of 1 moderate rotation, 2
     angulation, 1 perseveration, and 2 overlapping difficulties
     (score of approximately 5-6).

     Taken as a whole, the results of the neuropsychogical screen
are unremarkable for gross impairment, save for suggestive
characteristics of his performance on the Bender. Although he shows
some mild problems with concentration, the only convergent evidence
for such problems is found in his rigid, perseverative, and
emotional interactions around his discussion of his understanding
of his sexual identity problems. Such strong emotion and distortion
is consistent with severe character pathology and engaging such
patients around areas of great conflict.
     The results on the Bender, however, appear quite anomalous.
Hutt and Briskin's scoring system (as adapted by Brilliant &

Battista, S.J.                    7                    5-8/97

Gynther) yielded the following: An irregular sequence, a Copy score
of approximately 4-5 and an Immediate Recall score of approximately
5-6. These scores are at the threshold of being "organic".
    Although there is no compelling evidence of malingering,
dissimulation, unreliability, psychosis, or organicity, Mr.
Battista's Bender protocol contains clear evidence of rotation
errors which are typically associated with either psychosis or
organicity. The drawings were carefully executed, and the other
errors would not be seen as a atypical for a person of his
educational background and degree of psychopathology. However, in
the absence of other evidence of dementia (e.g., memory deficits,
poor concentration, decline in IQ and functioning, history of head
trauma or neurological disease (aside from his endocrine disorder),
advancing age, etc.) or psychosis, rotations are difficult to
explain.

Results of Personality Testing:
MMPI-2:
    Validity Scales - L= 56  F= 85  K= 42

    Clinical Scales - Hs= 63  D= 86   Hy= 64   Pd= 83   Mf= 63

                      Pa= 85  Pt= 70  Sc= 84  Ma= 43  Si= 77

    2-Point Code= 2-6/6-2

MCMI-III:

Personality Code= 1 2A** 8A 2B*6A+8B 7 5"6B 3 4''//-**S*//

    Modifying Indices (BR Scores) - X= 64  Y= 47  Z= 71

    Clinical Personality Patterns - 1= 106  A= 99  2B= 77

        3= 30  4= 9  5= 42  6A= 73  6B= 34  7= 46  8A= 81

        8B= 59

    Severe Personality Pathology - S= 79  C= 69  P= 68

    Clinical Syndromes - A= 40  H= 66  N= 48  D= 80  B= 88  T= 60

        R= 65

    Severe Syndromes - SS= 60  CC= 71  PP= 63

Theoretical   Orientation:   Biopsychosocial   environmental   and
                        eclectic.

Suicidality: Mr. Battista's score on the Exner Suicidality
Constellation was 6, two points below the required critical score
of 8 (which would indicate current critical concern about self-

Battista, S.J.                          8                        5-8/97

destructive potential). On the MCMI-III, he endorsed an item saying
he had tried to commit suicide in the past. During the interview he
stated that he had had suicidal ideation 12 times in the preceding
year. Although Mr. Battista's projectives show evidence of
underlying hopefulness, it should be noted that much of this hope
may be bound up in achieving his treatment which he hopes will
precede an eventual sex change operation and that discouragement
and depression could push this vulnerable individual into a
suicidal crisis.

Emotional Functioning: Mr. Battista is often seen as a hostile,
depressed, aggressive (psychologically), and suspicious individual.
He has fewer resources available to form and implement decisions
than should be the case. He is lacking in maturity and his
emotional functioning is frequently labile and dramatic in
presentation. These dysphoric affects reflect the mediation of his
anxious and retiring nature (linked to his choice of female objects
that are young and too immature to be regarded as threatening),
with his difficulties in coping with his ego deficits in the tough
and aberrant milieu and life of an inmate. These factors create a
vulnerability to being overwhelmed by the requirements of daily
living. Due to the nature of his personality development, as well
as his placement in a correctional setting, he has few outlets for
expressing himself or his restrained resentment. The lawsuit and
his cross dressing fulfill these needs, as well as reflecting his
psychodynamics and conditioning history. Mr. Battista's emotions do
not affect his thought processes in a consistent manner - sometimes
his emotions influence his thinking and at other times they don't.
This inconsistency leaves him vulnerable to being overwhelmed by
his emotions at times. He is attracted and reinforced by emotional
stimulation, but not moderate in his emotional expression. It
should be added, that much of his rage and disappointment at times,
comes as a result of having a core of hope and fanciful, but
conventional optimism that he can overcome the tragedies and
obstacles that have been such a formative part of his life up to
this time, and have a happy and satisfying outcome to his efforts.
It should be noted that although reportedly under medical control,
his congenital adrenal hyperplasia may be a contributing factor to
his emotionality.

Intrapsychic Functioning:

    a. Ego Defenses and Underlying Affect - Predominant underlying
       affects are fear (of rejection and ridicule of his basic
       sexual identity), shame (regarding his penis and nose,
       e.g., both their actual form and symbol phallic meaning),
       and anger (at anyone who opposes his understanding of
       himself or thwarts his attempts to realize his fantasied
       solutions to his psychic pain). These affects have their
       origin in classical conditioning by his mother and peers,
       sub-cultural conditioning in the prison environment, and
       psychodynamic and family systems dynamics. Predominant ego

Battista, S.J.                           9                        5-8/97

defenses are the following:

High adaptive level:
* self-assertion (logical carrying forward of his lawsuit and
  plea for help)

Mental inhibitions:
* repression (of early experience and ego-alien thoughts and
  emotions)

Minor image-distorting level:
* devaluation (probably in part related to the prison
  subculture).
* idealization (of females)

Disavowal level:
* denial (of aggressive and libidinal drives)
* rationalization

Major image-distorting level:
* autistic fantasy (substitute for realistic
  goals/relationships)
* projective identification (of aggressive, "selfish", and
  hostile impulses onto correctional and administrative
  authority, as well as all of his peers in the correctional
  environment)
* splitting of self-image or image of others

Action level:
* acting out (avoids awareness of his cognitive operations and
  precipitates his removal from what is for him an intolerable
  environment devoid of any sources of realistic
  satisfactions)
* help-rejecting complaining (to accept help would deprive him
  of his current strategy and place him initially in what he
  perceives to be psychological vulnerability and danger)

b. Conflicts - Mr. Battista's primary conflicts appear to
   center primarily around great rage and distrust of
   authority, and poorly differentiated sexual and aggressive
   drives. His rage at authority has it's roots in his images
   and experiences of his father's explosiveness and anger
   (e.g., reportedly shooting in the house and fatally beating
   his mother, physically abusing Mr. Battista's stepmother,
   and his use of painful corporal punishment), as well as the
   pervasive anti-authority attitude which is prevalent in the
   prison culture. His sexual conflicts are equally severe and
   entwined with his rage, as well as anomalous in their
   behavioral expresssion. His mother was repulsed by, and
   ridiculed the effects of his early genital development,
   leaving him alienated from his primary caregiver and his
   own sexual anatomy. It is clear that this shame over his

Battista, S.J.                          10                          5-8/97

genitals persisted well into his young adulthood, and
appears to be intermingled with an unconscious fantasy of
using his genitals in a rageful way against women. The
relatively late onset of his desire to become a women
through sex reassignment surgery, appears to in part be a
function of his alienation from others, deep conflict over
his sexual being, precipitated by an acceptance by other
inmates, in an environment which by nature must place
controls on sexual expression, of his experiments with
cross dressing. In other words, as a lonely and angry
individual who was deeply uncomfortable about his sexual
being, cross dressing helped him deny the painful and
complex conflicts, while at the same time providing
stimulation, a less aggressive identity, and the deeply
desired attention. Even the painful ritual of surgery would
appear to be both a concrete and masochistic transformation
of that which has come to be associated with shame and
pain, as well as some rite of passage whereby by he finally
has achieved an identity he believes that he can live with.

c. Overt Manifestations of Intrapsychic Issues - He has, in
the past, used children as a way of bolstering his sense of
himself as weak and defective. His goal of undergoing sex
reassignment surgery as a solution to both his perceived
and apparent psychic pain and interpersonal problems,
reflects a synthesis (in fantasy) of
intrapsychic/interpersonal/environmental presses with a
vulnerable response style, defective reality testing, and
clear secondary gain within the correctional setting. The
lawsuit is deeply satisfying because it is overdetermined.
It is driven on one hand by his strong and valid desire for
relief from his deep personal suffering. While on the other
hand, it reflects a passive-aggressive rejection of
available sources of treatment (e.g., psychotherapy for his
character problems, psychopharmacotherapy for his
depression, a psychodiagnostic reformulation of his issues,
and sex offender treatment for his problematic pedophiliac
tendencies toward young girls), an active attack on
conventional authority, and a peculiarly quixotic solution
to dealing with the problems of his past, present, and
future.

d. Intrapsychic Self-perception and Identity - Mr. Battista's
projectives, together with his objective test results and
problematic behaviors, indicate defective psychic
structures and an absence of adequate internal cohesion.
His basic response style reflects a perseverative tendency
to reduce complex and ambiguous stimuli to excessively
narrow and simplified gestalts. This style, together with
his underlying shame, anger, and suspicion (mediated by the
difficult prison environment), neglects critical variables
and leaves him prone to produce a high frequency of

Battista, S.J.                           11                          5-8/97

socially aberrant responses. At his best he is brutally
concise and to the point. His underlying issues are chronic
and pervasive to the point that they promote perceptual
inaccuracy and produce serious problems in reality testing.
He sees himself as damaged and defective, and inadequate in
comparison to others. Such perceptions frequently precede
feelings of futility and depression.

   e. Insight - Mr. Battista's insight is limited to his
      hypothesis that his nose, penis, male identity, and being
      in prison are the apparent source of dysphoric affects. He
      has no tolerance at this time for alternative constructions
      to his concrete and magical solution to his difficulties.

Interpersonal:

   a. Interpersonally Passive-Active and Hostile-Dependent - Mr.
      Battista has no clear preference for activity vs. passivity
      in his interpersonal relationships. His hostile-dependent
      attitude is due in large part to his status as an inmate
      (dependent by virtue of being incarcerated and controlled)
      and his characterologically angry way of dealing with the
      frustration he experiences at not getting what he wants.

   b. Issues of Autonomy (Independence) - Mr. Battista's
      unusually strong preoccupation with autonomy at this time
      reflects his despair at not receiving the type of help he
      believes is indicated, his stage of psychosexual
      development, and his fear of close interpersonal relations.
      Some of this fear is based on his anticipation of how
      some inmates will react to him in a female role, realistic
      caution in the prison, and previous negative experience as
      a child and an adult. In other words, he distances himself
      and insists on his autonomy because he feels rebuffed, is
      realistically cautious, and is vulnerable to be coming
      overwhelmed and hurt and/or hurtful in close interpersonal
      relationships.

   c. Social Functioning and Dynamics - He is quite sensitive to
      rejection and criticism; he frequently attributes
      malevolent intent to benign situations (a tendency which is
      potentiated by the frequently aggressively challenging
      nature of prison life). His interpersonal relationships are
      generally poor and based on dissimulation and subterfuge
      (some of which is adaptive for the average inmate). His
      interpersonal failures are due in part to the open
      expression of hostility and anger. Having said this, it is
      important to note that Mr. Battista has both a need for and
      an interest in achieving closeness with others. He tends to
      be conservative (i.e., slow to approach others, rather than
      conventional in his presentation of self) and cautious
      about tactile exchanges. This reflects both the nature of

Battista, S.J.                    12                    5-8/97

his likely contacts and the prison milieu, as well as his
past exposure to physical trauma. He is quite concerned
with personal space, as well as extremely cautious about
building and maintaining close emotional ties with others.
His interest is unlike that of your average adult; and,
therefore most of his contacts tend to be rather
superficial to date. Due to his underlying insecurity about
his personal integrity, he tends to be overly authoritarian
and argumentative when interpersonal situations pose
challenges to his sense of self (this personality trait is
augmented by social learning with his inmate peers and the
paramilitary subculture of prison milieus). He hopes for,
but does not expect routine positive interactions with
others.

d.  Social Skills - Extremely limited. He tends to remain on
    the periphery of group interactions and spends much time in
    segregation.

e.  Social Learning Style, Manipulation, and Secondary Gain -
    Mr. Battista is adaptive and a student, in his way, of
    social interaction. Paradoxically, in many ways (except for
    his continuing belief that 12+ year old girls are old
    enough to make sexual decisions for themselves) he has
    learned to eschew antisocial traits. He dislikes
    aggression and narcissistic/instrumental misuse of other
    people. He is quite sex role oriented and relies on the
    power of social roles to achieve through a superficial
    identification (e.g., tatoos camouflage his crime and help
    his association with tough and predatory inmates; becoming
    a woman will eliminate the need for aggressive assertion
    and provide him with the positive attention and support he
    craves), what he is unable to achieve through a less
    extreme and more mutual give and take with others. Mr.
    Battista manipulates to preserve his integrity, achieve
    gratification in the prison milieu, and regulate
    interpersonal closeness. He is aware of the secondary gain
    which might accrue to his behavior and choices, but the
    anticipated social gain is not the primary motivation for
    his behavior.

f.  Sexual Feelings and Behaviors - Repressed, denied,
    misdirected, at times unconsciously fused with aggression,
    and immature (see other portions of this section for more
    information about the genesis and expression of his
    sexuality).

Results of Sexual Functioning Assessments: Responses on the LIE
index of the MASA and the qualitative analysis of the Wilson Sex
Fantasy Questionnaire acknowledged responses in the "safe range"
and therefore it is concluded that these instruments showed
evidence of a mildly defensive response set.

Battista, S.J.                    13                    5-8/97

MASA Inventory - Booklet 5: CHM of 15 (acknowledges a significant
    level of interest in children); CMSadism of 0 (does not
    acknowledge any sadism towards children); SIN of 27 (is in the
    moderately high range and indicates feelings of sexual
    inadequacy); EAG of 11 (low, but 3 items are noteworthy). The
    noteworthy items concern past frequent thoughts about
    threatening or frightening females, feeling angered by
    females, and agreeing that in the past he has sometimes become
    aggressive because he has been mistreated by a female. All
    these results show convergent validity with similar traits
    revealed in other parts of the assessment process. NOTE: This
    inventory assesses behavior prevalent at the time of his crime
    (14.5 years prior to this assessment).

Wilson Sex Fantasy Questionnaire - Qualitative analysis is
    generally uninformative.

Psychopathic Traits: An evaluation of Mr. Battista's interview
results and records for traits associated with psychopathy (based
on the Hare PCL-R) yielded the following: A need for unusual
stimulation (preconscious and based on impact of feminine dress on
self image and reaction of others to him); some attempt to
manipulate (e.g., special sex reassignment surgery and adjunctive
treatments); lacks a sense of guilt or remorse around behavior
associated with his deviant beliefs (e.g., "dating", petting and
fondling much younger adolescent females is OK because "12 should
be the age of consent"); has limited history of stable self-
support; poor behavioral controls; coercive sexual behavior (e.g.,
his crimes); lack of realistic long-term goals (e.g., unrealistic
focus and role of sex surgery in his life plans, refusal to
participate in programs); juvenile delinquency; some criminal
versatility. Analysis of the number and strength of these traits as
an aggregate indicate that: Mr. Battista is in the 9th percentile
rank of prison inmates on his total score, the 5.4 percentile rank
on Factor 1 (selfish, callous, and remorseless use of others), and
the 33.6 percentile rank on Factor 2 (chronically unstable,
antisocial, and socially deviant lifestyle). These scores show that
the inmate is well below the diagnostic cutoff for psychopathy.

Diagnostic Summary and Recommendations:

Axis I: 302.6 Gender Identity Disorder NOS
        311.00 Depressive Disorder NOS
        R/O 294.9 Cognitive Disorder NOS
        R/O 302.3 Transvestic Fetishism with Gender Dysphoria
        R/O 302.2 Pedophilia (attracted to females)
        R/O 300.7 Body Dysmorphic Disorder
        307.50 Eating Disorder NOS
        305.20 Cannabis Abuse - in remission in a controlled
               environment
        305.00 Alcohol Abuse - in remission in a controlled
               environment

Battista, S.J.                    14                    5-8/97

Axis II: 301.7 Antisocial Personality Disorder
         301.83 Borderline Personality Disorder
              * with Avoidant, Passive-Aggressive (Negativistic), and
                Schizotypal Traits

Axis III: Congenital Adrenal Hyperplasia (CAH)
          (a concurrent congenital physical intersex condition)

Axis IV: Problems with primary support group, with the social
         environment, and with housing.

Axis V: 42

Recommendations:

1. Although not currently suicidal, Mr. Battista should be
considered a vulnerable individual by virtue of his clinical
history and testing results, and treated accordingly. On the MCMI-
III, he endorsed an item saying that he had tried to commit suicide
in the past, but provided no elaboration in the interviews.

2. A penile plethismograph would be useful in assessing Mr.
Battista's sexual arousal and establishing reliably and validly the
presence and nature of his arousal to sadistic themes or deviant
arousal to children in comparison with normative arousal to
appropriate adult stimuli. Statements could then be made with
respect to his potential to act on such impulses, which in turn
have implications for differential diagnosis and treatment. Given
his charges and his current attitude regarding the age of consent
for female children, he should be encouraged to take sex offender
treatment.

3. With focus and extra effort devoted to strengthening the
therapeutic alliance, therapeutic efficacy could proceed beyond
maintaining adjustment and avoiding self-destructive acting out,
toward meaningful characterological change. A high tolerance for
dealing with hostility, as well as skill in dealing with splitting
and negative transference, is critical to successful therapy with
Mr. Battista.

4. A psychopharmacological consult is warranted due to the presence
of significant depression and the recent increased frequency of
suicidal ideation.

J. Tyler Carpenter, Ph.D., ABPP
Consulting Staff Psychologist
Correctional Medical Services

10|4|97
Date of the Report

# EXHIBIT D

EXHIBIT

5

# PSI

John Daiguault, Psy.D.

**Psychological Services, Inc.**

Ronald S. Ebert, Ph.D.

# CONFIDENTIAL

## Psychological Evaluation

October 19, 2001

RE: **Sandy Jo Batista aka David Megarry**

### Identifying Data:

Attorney Christopher P. LoConto has retained this forensic psychologist to conduct a psychological evaluation of his client Sandy Jo Batista who is awaiting a probable cause hearing to determine whether he currently meets the criteria for a sexually dangerous person as defined by MGL c. 123A, sec.1. Sandy Jo Batista completed a twelve to twenty year sentence for Rape of a child on May 29, 2001. The sentence was originally imposed in the Worcester Superior Court January 27, 1983. Concurrent sentences of nine to ten years for Kidnapping and Robbery were imposed at the same time. Mr. Batista was also found guilty of Assault and Battery on a Correctional Officer on July 24, 1996.

### Structure of the Evaluation:

Sandy Jo Batista's six part Department of Correction file was reviewed in its entirety and relevant copies made. Material reviewed included, but was not limited to his CORI records, the defendant's plea on 2/28/83, his 12/9/82 statement to the police, the victim's statement, reports from Bridgewater Sate Hospital by Dr. Kobrin 02/23/83. A report by Dr. Whaley, records from the Medfield State Hospital concerning their treatment of the then fifteen year old David Megarry, d reports, letters from treaters, legal documents prepared by the defendant including a motion to reconsider and a report prepared 5/23/01 by Dr. Carol Feldman were reviewed. Additionally, a "brief summary" of a comprehensive relapse prevention plan dated May 2001 was reviewed. Sandy Jo Batista was interviewed 7/9/01 and 9/25/01 for a total of 3 hours at the Treatment Center. Telephone contact has been held with Diane Aliborn who is assessing the issue of gender identity disorder.

### Standard for Being Found a Sexually Dangerous Person:

MGL 123 A, 1 defines a sexually dangerous person as "any person who has been convicted of, or adjudicated as a youthful offender by reason of a sexual offense, and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility". A mental

222 Forbes Road, Suite 105, Braintree, MA 02184
Telephone (781) 843-8100 ▪ Facsimile (781) 843-3111



PSI
ological Services, Inc.

abnormality is defined as "a congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons". Personality disorder is further defined as a "congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses".

## Informed Consent for Evaluation:

Prior to my interviews I explained to Mr. Batista that I am a licensed forensic psychologist retained by his attorney to conduct an assessment of his sexual dangerousness. I explained that the information that I collected would not be held confidential but rather would be included in my discussions with his attorney and perhaps put into the form of a report that would be submitted to the Court. I explained I might be asked to testify at trial. Given these factors, I explained that the lack of confidentiality meant that he was not required to cooperate with the interviews if he didn't wish to. If he chose to cooperate I explained he was not required to answer specific questions. Sandy Jo Batista listened carefully to the above warning, stated "OK" and when asked if he understood the warnings stated "yes, completely". He appeared to understand the limits of confidentiality, agreed to be interviewed and was very cooperative with the interviews.

## Current Mental Status Evaluation:

Sandy Jo Batista is a 39 year old, thin and carefully groomed man. He is quite clear in explaining that he believes that he has a gender identity disorder and he states to this examiner "I am in conflict on whether I am male or female. I desire greatly to be a female, but there's no counseling for this". He explains in some detail that he would prefer to dress as a woman and that he wishes to have a sex change operation. He explains that he has attempted to persuade the Department of Correction to allow counseling and such an operation, but that he has been unsuccessful. During the discussion he addresses himself using feminine pronouns, says that in all correspondence he uses feminine pronouns and becomes upset if people refer to him in the masculine. Thus, he says that when he has been called a "laundry man" he asks to be called a "laundry person". The record describes how he binds his genitals in order to appear more feminine. He confirms this and further explains that he shaves his body hair and plucks his eyebrows and says he has done this for the past six years.

His mood is appropriate to the interview, he is logical and clear in his thinking and he denies all signs of a mental illness. There is no evidence in this interview of either a thought disorder or a mood disorder. He is fully oriented and does not appear organically impaired in any significant way. He denies that he is currently receiving medication or treatment for mental illness. He does report the he was born with a medical condition called Addisons Disease (Congenital Adrenal Hyper-plasia) and he says that he must take

2



**PSI**
Jlogical Services, Inc.

medication daily for this condition. He describes this as a hormonal imbalance, but he does not indicate that it has any current effect upon his behavior or his personality. He appears of at least normal intelligence, can express himself well and appears willing to engage in the interview.

### Relevant History:

Sandy Jo Batista reports that he was born 12/30/61 in western Massachusetts and when asked to describe his childhood he says "I had a very traumatic upbringing, I couldn't say any part of my childhood was positive". He then goes on to say "my mother died when I was five or six years old, I didn't see her death. I was told my father had some small part in it. He did receive a sentence for involuntary manslaughter". When it is pointed out to him that the record indicates that he actually witnessed his mother's death, he pauses and then says "if I actually witnessed it I wouldn't have any problem admitting it, maybe I did, but I just can't remember."

He says that after his mother's death he went to live with his maternal grandmother, "but her and her sons were somewhat physically and psychologically abusive to us, me and my brother and sister, so my paternal grandmother got us out of that situation". Asked if he can recall the specifics of the abuse he says "I remember being folded up in this bed, and we were in the bathroom and there were water guns aimed at us, that's all I really remember". Once again, his recall minimizes the actual events described in the record.

He says that when he was transferred to his paternal grandmother: "it was healthy, she is still supportive". Asked how long he stayed there, he says "till they were unable to physically and financially care for us. I was put in foster homes and children's homes. Then I was put back with my father when I was twelve years old, I remember being in Kentucky with my father, he had a second marriage. My father tried to do the best he could, he really did. I don't like to badmouth him-he was an alcoholic, had a bit of a temper-didn't have much patience. He was abusive to my stepmother, but not to us kids".

It is striking than that his recall of many of these critical issues in his childhood is sanitized and minimized by Sandy Jo Batista. The available record indicates that his mother rejected him as an infant because of his medical condition, refusing even to change his diapers. His father beat his mother to death in his presence and when he was placed with his maternal grandmother he was subjected to sexual abuse as well as significant physical and psychological abuse (including throwing firecrackers into the locked bathroom at the terrified children). In addition, when he returned to live with his father, on at least one occasion the police were called because his father shot a gun off in the house. Mr. Batista, in turn was described as "out of control" as a juvenile and was placed in foster care at both his grandmother's and his father's requests. Thus it is not surprising that a clinical note from his treatment as a juvenile at the Medfield State Hospital describes his history as "shocking in its violence and tumult". This appears to be a much more accurate representation of his history than that that he is currently able to

3

**PSI**
ological Services, Inc.

provide. This suggests that to the present, he has not been able to deal with the remarkable brutality and violence that characterized the family in which he developed.

Asked to describe whether his biological condition played a role in his development he agrees that it did. He says "from what I understand and to this date, I don't quite comprehend my medical problem, I started growing body hair when I was eighteen months old on my penis, under my arms. They gave me medication to slow it down. I was the average height and my features looked the same as a little boy. I was also told my mother refused to change my diaper and referred to me as a freak. I do remember being locked in a closet when my siblings got cookies and being told that 'if you weren't a freak you would get some too'. I guess that's why I was picked on by my maternal grandmother. I was also born pigeon toed. That added to my distortion of my body. The majority of my life, my adolescence, kids used to make fun of me. I was excused from physical education the majority of the time. My body- it was a rough time being in the showers. I was treated as a freak by boys and girls." He says that he eventually did grow to look like his peers, but" I was mixed up psychologically. I always had a deep complex about my body, something wrong with me, no girl would like me, fear of rejection, shame, that I might not be able to perform sexually".

He is asked to describe his sexual assault history and he says that when he was fifteen "I accosted a young girl at a bus stop, a neighbor intervened and I got scared and ran away". He says that he was then charged with Assault and Battery and committed to the Department of Youth Services and placed in a program at the Medfield State Hospital. He remained at that program for three years until he was eighteen and then moved to Ohio to live with his father for one year. He returned to Massachusetts at nineteen and soon entered the Army Reserves where he was found unable to adapt and given a General Discharge. Asked to describe his behavior in the military he says: "hard for me to take orders, hard to get along with my peers, got in fights and they caught me sleeping on the job. I was immature".

He says he then went to live with his father's ex girlfriend and "here is the present crime. It was an unhealthy atmosphere I was living in, but I didn't see it at the time. She lived alone and had an eleven year old daughter and son. The mother was promiscuous, not with me, but she would leave me in charge. I was left in charge the majority of the time and this girl had a crush on me and her friends did too. I had a nice car and they called me the 'fox'. They treated me like somebody special but she was only eleven (he denies any sexual activity with this girl). I had an eighteen year old girlfriend at this time and we would kiss and pet but when she wanted to go further I would back off, I would make excuses, I was ashamed of myself. In 83 I was incarcerated, I received twelve to twenty for the Rape and I got Kidnapping and the Robbery concurrent".



**PSI**
ological Services, Inc.

## Official Account of the Sex Offense:

In the plea hearing on February 28, 1983, James Reagan, Assistant District Attorney indicated that the victim was selling fudge, went to a house and heard a man say "they aren't home". He asked what she was selling and she explained and he said that he would later purchase some fudge from her. He left and she stopped at more houses, when she saw the man next to his car. He grabbed at her, put his hand around her mouth and carried her into his car. She struggled and he placed her inside the car and shut the door. She noted that the passenger's door handle and the window handle were missing. He drove to a clearing, forced a cloth into her mouth and removed her clothing. He then forced her legs open and began pushing his penis into her vagina while she struggled. He then put his penis into her mouth. He next placed her hand on his penis and moved it up and down. When he was finished, he told her " you can leave if you want to". She gathered her clothes and then she asked if she could have her fudge and her money back. He said no, and then he drove off.

## Mr. Batista's Account of the Sex Offense:

"I was living in the house with my father's ex girlfriend and an unhealthy atmosphere. That day I was out of work, I had too much free time. I used to drive around a lot. I would drink a lot. I wasn't drunk but I was drinking that day. I was drinking in the morning. I saw the individual going house to house selling something. I parked on a side street and approached her. My thought was to sexually assault her. She was petite, young, blonde, innocent and alone. I tricked her into going to the street where my car was parked. I went up to her, grabbed her, put my arm around her mouth and put her in the car .I drove with her screaming in fear. It was uncomfortable so I turned the radio up loud. She was panicking. She kept saying 'please don't hurt me', she was afraid for her life. That moment was when I didn't think and just reacted. I just drove and I saw an area that seemed to be secluded and parked my car behind some bushes and I sexually assaulted her."

Asked why he did this he answers: "at the time I wouldn't have been able to explain it". Asked his current understanding he says, "if I look at it now, the only reason I can give, I had such deep unconscious feelings about my body, shame of my genitals, fear of rejection, women, my image. I was frustrated sexually. I was unable to agree to go ahead with the sex act. I was scared to death what she (girlfriend) would think. I thought she would laugh at me the way my mom did...At the time I didn't care about anybody. I didn't care about myself, I didn't care that I was hurting her. I looked at it in a distanced way, as long as I didn't hurt her, didn't stab her. I was trying to minimize it".

He continues "those desires and fears was why I acted out against her. I can't change what I did, but I understand now she was a person, not an object. The fear on her face. It was me. I never ever will forget. I know I'll never hurt anybody again. It's not that I'm

5



**PSI**
hological Services, Inc.

sexually attracted to children, I have had sexual relations with females, it's just that children were vulnerable".

## Treatment and Incarceration History:

Asked to describe his numerous disciplinary reports during his 20 years of incarceration he says: "I have had 62, but not one of a sexual nature, 30 or 40 were for insolence. I had a habit of shooting off my mouth to Correctional Officers, telling them where to go. I didn't take responsibility for my actions. Then I was so bitter. I blamed the world for this hate, this violence. People in here prey on the weak-and now there is less violence. I don't have too many d reports now, the majority were in the 80's and the 90's".

Asked to explain charges that he had two assaults on Correctional Officers he says "I was horse playing in Old Colony December 12, 1989 and they thought we were fighting so we were sent to segregation. They wanted me to strip and I refused and six or eight of them physically restrained me and I punched one of the officers. It was my fault, but the contents of the d report were not correct. And there was one when they say I threatened an outside consultant but it was expunged by the commissioner." He goes on to explain that four or five years after the charges of assaulting a Correctional Officer occurred he filed a legal motion to withdraw his guilty plea. He says that he was not able to do so and the institutional record indicates that he pled guilty to the same charge a second time. He then says" I'm not trying to minimize the incident. At that time I just didn't care, it was a known fact that no matter how many d reports you had you were still coming here".

Asked to describe his treatment history he says that three years after entering prison he began counseling. He says "I have to be honest, I was informed that to go to a minimum and prerelease I had to address my issues, so it was an ulterior motive. I started counseling, from 86 to 92 I was in counseling. When they initiated this program, sometime in 94 I was in Shirley. I was in specialty groups- they ran anywhere from 30 days to four months. I joined a victim group because it was something to do with my time. I wasn't a victim. I then joined fellowship. I got my GED. I have studied the law for fifteen years, I have the equivalent of an Associates Degree in Law, I'm basically into Civil Rights. I filed suit too and I lost the case (he shows a newspaper clipping discussing his request for gender identity treatment). The Judge said that I didn't have the right to specific treatment as long as they provided some treatment. When they did away with the Department of Mental Health treatment and started in this new JRI program, everyone who was on 1 to 1 counseling was told they could participate in this group or have no counseling at all. They called us into the office and asked us to sign to get on the list for treatment and of course I signed. I was placed on a list and I was brought up here shortly after it opened up and I started treatment in 1999. I completed phase one and was placed on phase two but because of disciplinary reasons I was transferred from here October of '99 to Gardner. I entered treatment there and they made me do phase one over, so I did it twice and then I started phase two but I didn't complete it". He explains that he felt that the officers in Gardner were not treating him fairly and" I didn't look at

8/22/2001  09:56  17818433111    PSYCHOLOGICAL SERVIC    PAGE  08

**PSI**
Psychological Services, Inc.

the big picture, I should have, but I quit. I shouldn't have acted out, I should have taken the ticket. So that was 2000 and it's been about a year that I've been out of counseling". To support his description of "10 to 12" years of counseling, he prides letters and certificates from his many treatments. These communications do describe him as "motivated towards personal growth" and as an "active participant" in treatment, although it should be noted that as was the standard in the previous treatment program, no records or notes of treatment are available for review.

Asked to describe what he says was ten to twelve years of individual counseling he says "the individuals were highly qualified, I accept who I am and I accept my medical problems. I don't see myself as defective." In fact, he speaks with pride of his current appearance and says that he now feels complete and comfortable with himself. He reports that it is his intention to continue counseling when he leaves the prison system with the goal of better understanding his gender issues and then be able to arrive at a determination about whether or not it would be appropriate for him to change his gender through surgery.

Asked to describe the reason for his name change he explains that he chose a "neutral" name that can be either male or female. He also explains that he took his mother's maiden name in order to honor her. It is interesting to note that in November 1995 the record indicates that his explanation for the name change was additionally that his family " disowned me ".

<u>Additional Clinical Data:</u>

A report by Dr. Tyler Carpenter in November 1997 is a thorough analysis of Sandy Jo Batista's treatment to that date as well as a review of his medical condition. He notes that this is a "physical inter-sex condition" and might contribute to his emotionality. He sees this man's wish for sex re-assignment surgery as "reflecting unrealistic fantasy and magical thinking". He notes that at that time (1997) he had rejected treatment and lacked a sense of guilt or remorse, feeling that "twelve should be the age of consent". When challenged on this point during these current interviews, Mr. Batista becomes irritated and states that he previously had many incorrect and inappropriate thoughts, but that he no longer has such an idea. In fact, he says, he feels that eighteen should be the age for consent because "choosing to have sex is certainly as important as being able to vote or drive a car".

A "brief summary" of a comprehensive relapse prevention plan dated May 2001 is an attempt to demonstrate this man's understanding of some of the basic concepts of treatment for sexual dangerousness. He appears to understand his risk factors and the necessary interventions. He has developed plans for the short term and for the long term, although it is important to note that these plans focus heavily upon his wish to transform his gender.



**PSI**
Psychological Services, Inc.

In discussion with Sandy Jo Batista he does demonstrate appropriate remorse for his behavior and he demonstrates an understanding of the impact of his behavior upon his victim. Thus he appears to have made significant progress from that described by Dr. Carpenter in 1997. He continues to hold the belief that sex reassignment surgery will resolve his problems and help him to find his "soul mate".

## Discussion:

This is a complex and difficult case for determination of continued sexual dangerousness. To begin with, Sandy Jo Batista (aka David Megarry) was born with a medical problem that predictably resulted in shame of his body and gender identity issues. He reports cross-dressing in his sister's clothing after their mother's death, for example. Less predictable was the resulting rejection and even abuse by his mother and this may have come to be directly linked to the manslaughter of his mother by his father. His childhood was a disastrous trail of sexual and physical abuse by various family members, leading predictably to an angry, confused and acting out adolescent. He began to act out sexually at age fifteen, received intensive treatment until age eighteen and then returned to the world of his family where violence, alcoholism and sexuality continued to influence his development. His index crime occurred when he was 20 and appears to have been rooted the context of his sense of self-hatred, his anger towards women and his alcoholism.

A review of his history of incarceration shows many years of continued anger, irritability and struggles with authority- initially through acting out and later through the legal system. In recent years there have been a number of interesting and hopeful shifts in his presentation. He has begun to focus upon education as a means of moving beyond his angry immaturity and he has changed both his name and his physical appearance to begin to take on a feminine guise. From a clinical perspective it is no small matter that he has taken on his mother's maiden name as well as her sexuality. His wish to become a woman through surgery appears to be an attempt upon his part to regain the mother who rejected him and who was killed for her rejection. It may also be an attempt to reject his father and his father's anger towards women, or it might serve to psychologically redeem his father by bringing mother back to life. In any case this is an incomplete psychological attempt to resolve his terrible childhood in a dramatic and permanent fashion. It is to be hoped that any ethical professional he sees to support his wish to change his sex will agree that many years of further treatment and therapy are required before such a decision can be made.

However unrealistic his psychological goals, they do appear to significantly reduce the likelihood of repeating his sexual aggression in the foreseeable future. His sexual interest has shifted to adults and his preoccupation with his gender identity issues together with his legal training have given him a new and more complex and appropriately adult focus. Although he has not completed the full sexual offender treatment, he does demonstrate a basic understanding of the major issues and he is able to recognize his personal risks as well as the necessary interventions. He has developed remorse for his acts and has an



**PSI**
rhological Services, Inc.

appropriate understanding of the suffering his victim underwent at his hands. His guilt appears appropriate and genuine.

It is my clinical opinion that Sandy Jo Batista no longer represents a significant risk of re-offending and is thus no longer a sexually dangerous person.

Respectfully submitted,

Ronald S. Ebert, Ph.D.
Diplomate in Forensic Psychology, American
Board of Professional Psychology
Director, Psychological Services Inc.
Senior Forensic Psychologist, McLean Hospital
Instructor, Harvard Medical School

RSE/sc

9

# EXHIBIT E

**CYNTHIA S. OSBORNE, MSW**
Forensic Consultant
Assistant Professor, Department of Psychiatry & Behavioral Sciences
Johns Hopkins University School of Medicine

Inmate Name:          Sandy Jo Battista (DOC ID# M15930)
Nature of Report:     Peer report review
Reviewing Clinician:  Cynthia S. Osborne, M.S.W.
Date of Report:       October 10, 2005

IDENTIFICATION:

Sandy Jo Battista is a single 43 y.o. Caucasian biological male, whose former legal name was David Megarry, Jr., with a stated preferred female identity. Mr. Battista has completed his sentence for conviction of rape, kidnapping, and robbery of a 10 y.o. female in 1982. He is currently held at the Massachusetts Treatment Center in Bridgewater, MA, following temporary civil commitment in May 2001 and formal civil commitment in May, 2003, secondary to being determined to be sexually dangerous. He has filed several legal suits against the Commonwealth of Massachusetts, most recently for allegedly failing to provide hormonal treatment of Gender Identity Disorder, as recommended by clinicians at Fenway Community Health in August, 2004, and subsequently prescribed by Dr. Wirth, MD of the Lemuel Shettuck Hospital, in the spring of 2005.

I was contacted by Larry Weiner, Mental Health Administrator, in July, 2005, and asked to provide a review of the clinical evaluation conducted by clinicians at Fenway Community Health in Boston. The Fenway evaluation culminated in a written report dated August 10, 2004, and is based on a clinical interview of 90 minutes duration and a review of the inmate's chart. It did not apparently include the administering of any formal psychological tests. I agreed to review the report and provide opinion about its adequacy.

My review process included a review of the following documents:
- Physician's Order dated August 3, 2005 by Robert Friedman, MD
- Physician's Order dated July 14, 2005 by Martin Bauermeister, MD
- Progress Note dated July 14, 2005 by Martin Bauermeister, MD
- Core Treatment Transfer Assessment Report date April 12, 2005, by Sharon Kelley, Psy.D. and Ruth Khowais, Psy.D., Forensic Health Services, Inc., Bridgewater, MA
- Forensic Health Services Treatment Plan dated March, 2005, Forensic Health Services
- Annual Treatment Review Report dated March 14, 2005, Brent Thibault, MA, for the B Unit Treatment Team, MA Treatment Center, Bridgewater, MA
- Report dated August 10, 2004, by Kevin Kapila, MD and Randi Kaufman, PsyD, of Fenway Community Health, Boston, MA
- Community Access Board Annual Review Report dated April 21, 2004, by DiCataldo, Ph.D., for the Community Access Board, MA Treatment Center, Bridgewater, MA
- Intake Assessment dated June 19, 2003, by Katherine Gotch, MA, and Anne E. Johnson, Ph.D., Forensic Health Services, MA Treatment Services, Bridgewater, MA

- Report of Qualified Examiner to the Court dated April 1, 2002, by Katrin Rouse, Ed.D., Forensic Health Services, Inc., Boston, MA
- Sexual Dangerousness Assessment Report dated March 30, 2002, by Robert H. Joss, Ph.D., Consultant Psychologist, Forensic Health Services, Allston, MA
- Report dated October 19, 2001, by Ronald S. Ebert, Ph.D., Director, Psychological Services, Inc, Braintree, MA
- Report dated October 17, 2001, by Diane Ellaborn, LICSW, Framingham, MA
- Report dated November 18, 1998, by David Campopiano, MA and Robert Prentky, Ph.D., Justice Resource Institute, Rehabilitation and Treatment Program, Bridgewater, MA
- Report dated October 4, 1997 by J. Tyler Carpenter, Ph.D., Correctional Medical Services, MA DOC
- Report dated March 17, 1997, by Victoria Russell, MD, Consultant in Psychiatry
- Endocrine consult note dated August 8, 1983, by Brian Berelowitz, MD and George T. Griffing, MD., Evans Medical Group
- Discharge Summary dated October 24, 1979, by James C. Melby, MD

This report is based solely on a review of the documents, noted above, provided me. I have not conducted a clinical evaluation of Mr. Battista and, therefore, it is not within the scope of my present role to diagnose him. Accordingly, my report is based on the assumed accuracy of the inmate's existing diagnosis of Gender Identity Disorder, about which all reports appear to agree.

## PEER REVIEW RESPONSE:

### I. *Lack of comprehensive diagnostic formulation:*

*In my opinion, the Fenway report fails to address critical questions regarding the presence, absence or possible contraindicative significance of Axis I and Axis II co-morbidity, including sociopathy and/or psychopathy, suicidality and/or self-harming tendencies, and pedophilia.*

Mr. Battista has, based on the Fenway and other reports, a complex history. It includes childhood abuse and neglect, a violent father, a rejecting mother, an abusive, neglectful custodial grandparent, multiple changes in residence and custodial care during childhood and adolescence, apparent conduct disorder by early adolescence, a serious, chronic medical illness with onset in infancy, early exposure to pornography, substance abuse problems, psychosexual conflict – including reports of pedophilic attraction to prepubescent females – manifesting in severe sexual aggression beginning in adolescence, adult incarceration characterized by chronic conduct problems, a determination of sexual dangerousness, and recent descriptions, including in the Fenway report, of self-starvation, manipulative behavior, limited insight, poor judgment, and superficiality. Given this presentation, the absence of any consideration of co-morbid Axis I and Axis II conditions, and their potentially complicating impact on diagnosis, treatment and prognosis, reflects an incomplete evaluation. The Fenway report itself references possible Axis II traits, but does not name them as such, and does not discuss their potential significance. *In my opinion, clarity regarding the presence, absence, nature and severity of co-morbid conditions is critical in the effort to determine with any degree of certainty Mr. Battista's motivation for self-harming or suicidal threats or behaviors, or his demands for particular treatments, as well as to weigh the potential benefits and risks of any particular treatment. To make treatment*

2

*decisions in the absence of a full diagnostic picture is clinically unsound.*

### Psychopathy

Earlier reports reference high levels of sociopathy and psychopathy. Indicators of psychopathy include superficial attempts to display one's self in good light; deceitfulness, inconsistent explanations that change when one is challenged with facts; an inflated view of one's self and one's status; the view of one's self as a victim of others and of the system; lack of regret for one's crimes or remorse or empathy for one's victims; denial of responsibility for one's actions or indifference regarding their significance in impact on others, such as claims of blackouts for events surrounding one's offenses; lacking realistic long term goals; and impulsivity. Psychopathy is a significant predictor of criminal recidivism, violence and disruptive behavior during incarceration, and poor treatment outcomes. It follows logically that it is important to consider the level of psychopathy when formulating the diagnostic picture and treatment recommendations for inmates with GID. Doing so is consistent with good practice and with the Harry Benjamin Foundation's recommended Standards of Care. *Interventions based on diagnostic formulations that fail to consider personality instability, when it is present, may cater to and fuel that instability. Worsening one psychiatric illness with the treatment for another is clinically unjustified. More specifically, in cases involving potentially high levels of psychopathy, GID treatment strategies that iatrogenically worsen symptoms of entitlement and manipulativeness may lead to increased risk of threats and gestures of self harm. Such an outcome is not in the best interest of the inmate nor the Commonwealth of Massachusetts.*

### Suicidality and self harm

There is evidence of high psychiatric co-morbidity with GID. A recent study (Hepp, Kraemer, Schnyder, Miller & Delsignore, 2005) found that 42% of the individuals diagnosed with GID also met criteria for one or more personality disorders. This is consistent with other studies, with the DSM-IV, and with the descriptive data from many gender clinics. However, there is no evidence that GID is the cause of that co-morbidity. Because there is, on the other hand, considerable evidence that personality disorders, and history of severe abuse, do motivate self-harming and are associated with higher than average rates of suicide, they should not be dismissed as insignificant in formulating the diagnostic picture of a case.

The Fenway report does not explicitly state that Mr. Battista is at risk of self-harm and suicide, but implies so in references (page 6) to ideation regarding "taking pills if she did decide to kill herself," and in the description (page 5) of threats of self-castration "…if things become 'drastic.'" Self-harm and/or suicidal gestures sometimes reflect severe gender dysphoria, but may also reflect underlying personality psychopathology. It is well documented that individuals with Borderline Personality Disorder engage in self-harm in a maladaptive pursuit of affective relief. It is also known that some individuals with Antisocial Personality Disorder engage in self-harm, or threats of the same, in order to manipulate others into meeting their demands. The evidence base about the correlation between self-harm and personality disorders is considerable. The same is not true for any assumed causal correlation between GID and self-harm. The evidence base is poor – based largely on anecdotal case reports – and insufficient as a basis for claims of certainty. I also know of no evidence that inmates with GID engage in more self-harm and suicide gestures than other inmates. Obvious indicators of personality psychopathology should not be ignored or minimized in the effort to understand patients presenting with complex

3

histories.

Similarly, the Fenway report emphasizes Mr. Battista's early history of trauma. Yet, there is no discussion of any possible associations between that history and the inmate's considerable psychiatric difficulties, including reported substance abuse, criminality, suicidality, self-starvation and attempts at genital self-mutilation.

Gestures of self-harm or suicidality, as well as both overt and masked threats, reflect serious mental illness, apart from GID, that requires treatment in and of itself. They are clear contraindications for hormonal or surgical intervention in most community settings. *Significant comorbidity – on both Axis I and II – complicates a GID diagnosis, and renders it difficult to say with certainty that GID, even if clearly present, is the "cause" of suicidal or self-harming behaviors. While it may be tempting to hypothesize that untreated GID causes these problems, there s no evidence for such claims. A positive outcome from hormonal treatment and/or surgery in such cases is far from inevitable.*

II.    *CAH and GID*

*While Mr. Battista may have suffered psychologically secondary to a reportedly chaotic, abusive childhood, a violent father, and a mother who was unable to cope with her son's medical condition, he does not suffer from a somatic intersex condition per se, and there is no evidence to support a hypothesis that he is at increased risk of GID as a result of his having CAH.*

Mr. Battista was reportedly diagnosed in infancy with Congenital Adrenal Hyperplasia. The specific variant of CAH -- e.g. whether or not he suffered salt wasting or repeated electrolyte crises – and how it was treated early in Mr. Battista's life – e.g. whether he was treated consistently and effectively throughout his history – is not clear from the records. The Fenway report states "…Congenital Adrenal Hyperplasia has some correlation with male to female transsexuals." It further states that CAH "…is considered to be an intersex condition." It is important to clarify that CAH in males is quite a different matter than CAH in females. In some cases of CAH in females, prenatal exposure to high levels of androgens results in ambiguous external genitalia. However, males with CAH do *not* have somatic intersexuality – they are normal genetic males, have normal internal reproductive structures (except for possible medical problems with fertility), and have normal – albeit prematurely developing – male external genitalia. Males with CAH have not been identified as a psychologically vulnerable group -- they tend to do reasonably well psychologically, as far as we know via scientific evidence. There is no supportive evidence that CAH in males is associated with increased risk of cross gender identity or GID. The most recent and relevant study (2004, Hines, Brook and Conway) was consistent with most earlier studies, in that it showed that male children with CAH engage in male-typical play behavior, with no differences between them and non-CAH males. *Of greatest relevance, this study showed no affect of CAH on either gender identity or sexual orientation in males.*

Given the lack of evidence to the contrary, it should be assumed that the reasons for Mr. Battista's GID are not primarily hormonal. Further, the significant dynamic factors in Mr.

4

RECEIVED

JUN 24 2003

Battista's early life, as described in some detail in the Fenway report, and including his mother's reported rejection of him secondary to his early masculinization, are far more etiologically compelling, relative to Mr. Battista's life problems, than any evidence of an "intersex" condition per se. *While the Fenway report does not explicitly say so, by naming Mr. Battista's medical condition as an "intersex" condition associated with GID it implies the possible medical justification for sex reassignment in order to correct that intersex condition. It is important to be clear that Mr. Battista has no somatic intersexuality, and that there is no supportive evidence for using CAH as justification for hormonal or surgical reassignment.*

**III.    Sexual dangerousness**

*The Fenway report fails to address the critically important question of whether Pedophilia and/or sexual dangerousness, co-occurring with GID, present contraindications for hormonal or surgical reassignment.*

In reports dated 4/1/02, by Katrin Rouse, Ed.D., and 3/30/02, by Robert Joss, Ph.D., Mr. Battista was determined to be sexually dangerous. The Joss report emphasizes the predatory and impulsive nature of Mr. Battista's sexual offenses, the presence of deviant arousal patterns, his minimal participation in treatment efforts during incarceration, his failure to address the substance abuse issues in his history, and a psychiatric history that includes being assessed as carrying traits of both Borderline Personality Disorder and Antisocial Personality Disorder. The report concludes that the risks of reoffending would be high in an unconfined setting. Similarly, the Rouse report emphasizes the presence of both Pedophilia and Antisocial Personality Disorder, a pattern of inconsistent self-reporting, and minimal insight, remorse and acceptance of responsibility for his crimes. The Rouse report concludes that Mr. Battista presents with an overall pattern of antisocial behavior and meets criteria as a sexually dangerous person.

The Fenway report offers no response to the concerns raised in these reports. It does state (page 5) that Mr. Battista "...has attempted to have herself castrated surgically, as this would ostensibly lower the chance that she would re-offend sexually." It further states (page 4) that the inmate stated that "being around young girls is risky for her, and that she should avoid such situations," and that he made obscene phone calls to young girls while incarcerated. The report also then describes (page 5) Mr. Battista's continuing efforts to achieve surgical castration, although implying that these efforts are motivated not by the desire to curb pedophilic urges, but by the desire for sex reassignment. The report fails to address the serious implications of these factors or the described contradictions in Mr. Battista's motivation for castration. In one moment his motive is reportedly to curb pedophilic urges, but in another it is described as manipulative – to get the DOC to provide partial surgical reassignment.

The literature on the paraphilias – described as chronic conditions that are manageable through intensive treatment, but not curable – does not offer much reason to believe, if Mr. Battista's pedophilic urges were compelling enough to motivate several sexual assaults against children, and obscene phone calls to girls even after incarceration, that those urges have spontaneously disappeared, or transferred to adult women. And there is no evidence in the Fenway report or any of the earlier report that Mr. Battista has participated in a level of psychosexual therapy consistent with such an implied "cure." There is no way to say with certainty, even if Mr.

Battista's level of therapeutic engagement had been high (which it has not), that a claim of attraction to adult women, as it has evolved in the context of incarceration, in which he has had no access to prepubescent females, would "hold" in a real world context should he be released, and thereby be exposed to females of all ages. It is clinically irresponsible to recommend hormonal reassignment without considering these possible implications.

*The Fenway report states (page 6) that Mr. Battista's history is "common for someone with GID..."* To the contrary, co-occurring Pedophilia and GID are far from common. Pedophilia has been documented as co-occurring with some cases of Transvestic Fetishism, but there is a virtual absence of literature regarding the co-occurrence of Pedophilia and Gender Identity Disorder. The Fenway report neither endorses nor disputes the diagnosis of Pedophilia in Mr. Battista, failing, in fact, to address the question in any way. It provides, and fails to reconcile, two contradicting details about Mr. Battista's age of attraction – first (page 4), noting the inmate's self-description, during interview, of being at risk around young girls (suggesting ongoing, current pedophilic attraction), and, second (page 5), stating that he "finds herself attracted to women."

The Fenway report minimizes (page 4) the 2002 reports documenting that the inmate was found to be sexually dangerous, saying that this determination was made "as she had committed more than one incident." More accurately, the reasons given in the 2002 reports are numerous and compelling. *I cannot imagine a more explicit contraindication for sex reassignment than Mr. Battista's clinical presentation. It is anything but common as a presentation of GID. The Fenway report wholly fails to address the themes of sexual dangerousness and Pedophilia.*

## IV.     *The Harry Benjamin International Gender Dysphoria Association Standards of Care*

*The Fenway report fails to accurately represent the SOC as flexible treatment guidelines rather than as a declaration of any one treatment as "the" recommended, appropriate or medically necessary treatment for all individuals diagnosed with GID. Further, the SOC were developed for non-incarcerated individuals, contain inherent contradictions related to incarcerated individuals, offer little relevant guidance to decision-making regarding incarcerated individuals who were not already in treatment for GID prior to incarceration, and do not represent consensus of the psychiatric community regarding what constitutes proper treatment for GID.*

The Fenway report states (page 6) that the purpose of the Harry Benjamin Standards of Care is to "articulate ...professional consensus about the psychiatric, psychological, medical, and surgical management of gender identity disorders." More completely, that statement in the Standards reads "...articulate this *international organization's* professional consensus..." While the Harry Benjamin Foundation has made unquestionable contribution to the quality of care of gender identity disordered individuals, it is a collegial organization, not a regulatory body with any formal authority. It has developed recommended guidelines, not enforceable "requirements," and its guidelines reflect the consensus of the organization's members, not the entire psychiatric community. To the contrary, there is considerable collegial disagreement about what constitutes appropriate treatment of GID. *There is currently no universal professional consensus regarding what constitutes medical necessity in GID, and regarding which treatments are medically necessary for which patients. There is no empirical basis for claims otherwise.*

Further, the Fenway report describes (page 6) the SOC as "...an internationally accepted treatment protocol..." More specifically with regard to Mr. Battista, the Fenway report states (page 7) that "...given that this inmate qualifies for the diagnosis of Gender Identity Disorder, she should be afforded the clinical treatment outlined by the Standards of Care." The report then states "It is therefore the clinical recommendation of these evaluators that Sandy Jo have her Gender Identity Disorder addressed through hormone administration..." These statements imply that the SOC recommend a particular "protocol" for anyone diagnosed with GID. That position does not accurately reflect the reality of clinical practice in the community, nor, as I understand it, the intent of the SOC. The Introductory Concepts section of the SOC state "The SOC is intended to provide flexible directions for the treatment of persons with gender identity disorders." It further states that clinicians may modify the "requirements" for a number of reasons, and that there are many and varied options for helping gender identity disordered individuals achieve improved functioning. Neither full triadic therapy, nor hormonal treatment alone, nor any other protocol, comprises *the single correct or recommended* treatment for all patients diagnosed with GID. In fact, while the SOC state that hormones and/or surgery are medically necessary in some cases ("transsexualism or profound GID"), nowhere do the SOC define what constitutes "profound." Further, the Standards note a number of possible therapeutic directions, saying "the diagnosis of GID invites the consideration of a variety of therapeutic options, only one of which is the complete therapeutic triad." There is considerable variation in application of the Standards in the psychiatric community. Some clinicians and clinics lean toward a more liberal and others toward a more conservative application. No where has it been empirically demonstrated that one is better than the other.

In the last several years the SOC have been revised to include a few brief clauses regarding GID in incarcerated individuals. However, there are inherent contradictions in efforts to adapt standards developed for community treatment to a prison environment, in which there are undeniably higher safety risks. The Readiness criteria for both hormones and surgery include "The patient has made *some progress* in *mastering* other identified problems leading to improving or continuing stable mental health (this implies *satisfactory control* of problems such as sociopathy, substance abuse, psychosis and suicidality;" "Some progress" and "mastering" constitute an oxymoron, as well as a diagnostic conundrum regarding how a clinician determines how much "progress" constitutes "some," and how much "mastery" justifies a recommendation for hormones. Similarly, "satisfactory control" is undefined, leaving important questions unanswered, such as "In a criminal context, is anything less than full control satisfactory?" and "What constitutes satisfactory control of suicidality?" and "How does a clinician judge, with a reliable degree of certainty, that an incarcerated individual has gained control of his sociopathy when he is in a confined environment that is fundamentally structured to externally control individuals who are deemed incapable of doing so for themselves?" Criminality and sociopathy are, without exception, contraindications for hormones or surgery, in reputable gender clinics throughout the world. Incarceration presents an inherent and irresolvable contradiction to this standard, and to the notion of personal mastery over one's sociopathic leanings. And the Harry Benjamin SOC do not at this time address these questions to a degree that warrants use of the Standards as justification for any treatment of GID – other than emphasizing the importance of continuance of treatments initiated prior to incarceration – in incarcerated individuals.

7

Mr. Battista's suicidal and self-harming threats and gestures represent an explicit failure regarding this criterion. The position that hormones or surgery are contraindicated in individuals who are incapable of or unwilling to prevent self-harm is wholly consistent with the SOC. In my opinion, prescribing hormones to incarcerated individuals reflects, rather than compliance with the existing SOC, an explicit violation. While exceptions may at times be clinically justified, and while hormonal treatment might in some cases of incarcerated individuals be helpful to both inmates and departments of correction, in terms of improving the manageability of inmates, exceptions should be made only following thorough debate of all potential implications and consequences – both clinical and institutional – and only following a thoroughly formulated diagnostic picture that considers not just GID but all Axis I and Axis II co-morbidity. The Fenway does not represent such a debate, nor a thorough diagnostic formulation. And the Harry Benjamin SOC do not at this time provide any guidance in this area.

V.    *Lack of corroborating reports*

*There is no evidence that the Fenway report considered any sources of information other than the inmate's self-reports and existing records.*

There is contradicting information in the various reports, some indicating that Mr. Battista is in close contact with his sister, and some describing no contact. If his sister, or other relatives are available, collateral interviews may be helpful in validating the inmate's self-reports, in clarifying some aspects of his history and, therefore, in reaching diagnostic clarity. The Fenway report describes the inmate as unable to "remember her thoughts about her gender while growing up," but also states that the inmate has suffered lifelong gender dysphoria and that he began cross dressing in female undergarments as an adolescent. The presence of childhood GID is not required for a diagnosis of GID in adulthood. However, it is known that some individuals falsify, exaggerate or minimize aspects of their history – such as transvestic arousal and cross dressing – in their efforts to qualify for reassignment. Collateral interviews can validate or invalidate self-reported history, and can help identify clinical variants or subtypes of GID. This, in turn, may influence treatment decisions. When evaluating incarcerated individuals, because of the particularly high risk of self-reports being influenced by sociopathy and psychopathy, it is particularly important to try to determine to what extent inconsistent or deceptive self-reporting reflects a pervasive pattern of deception, manipulation and/or entitlement indicative of significant chronic personality pathology. Since individuals with high levels of sociopathy or psychopathy are often unreliable historians, treatment decisions in cases of incarcerated individuals should not, in my opinion, rely solely on self-reports. As noted in previous sections of my report, such decisions may cater to and exacerbate, rather than diminish, significant psychiatric symptoms.

V.    *Lack of psychometric assessment*

*The Fenway report apparently relied on no formal psychometric assessment to supplement clinical impressions, and no mention is made of previous assessments, referenced in the institutional records, that suggest severe psychopathology.*

Conclusions in the Fenway report were apparently based solely on the 90-minute clinical interview and chart review. While self-report psychometric measures have limited value in

8

forensic assessments due to the tendency of the subject to engage in image management – responding to items in such a way as to present himself in the best light – the same limitation applies to the clinical interview. Psychometrics, while imperfect, provide additional information to compare with clinical impressions. Discrepancies between current and prior results of psychometric assessment and clinical impressions may highlight areas that warrant further inquiry. The assessment of complex cases warrants the gathering of data from as many sources as possible. To not do so leaves a serious gap, in particular in cases of such serious consequence as Mr. Battista's.

**VI.    Sexuality themes**

Based on the Fenway report, the course of development of GID in Mr. Battista is not clear. The report contradicts itself regarding the inmate's reported history of sexual dysfunction – saying (page 3) that the dysfunction was due to fear of rejection, but later (page 6) linking it causally to discomfort with his male anatomy. The report also states (page 3) that Mr. Battista reported being discharged from the army as a result of emotional instability after being discovered wearing women's undergarments, but then notes a previous evaluation that described the discharge as being due to fighting and drinking. The report makes no effort to explain these inconsistencies or their possible relevance to the diagnostic formulation.

Further, the Fenway report does not indicate whether or not a differential diagnosis between GID and Transvestic Fetishism was conducted. While gender dysphoria does develop in some cases of Transvestic Fetishism, and while some of those individuals in the real world community seek reassignment, it is important to differentiate the two conditions, and to develop a specifically applicable treatment plan. An earlier report (Elleborn) states that "No sexual arousal is reported in these early crossdressing experiences." However, as noted earlier, patients seeking reassignment often deny fetishistic arousal, and there is no evidence of collateral reports validating Mr. Battista's self-reports.

Further, the Fenway report describes (page 6) Mr. Battista as having had "a strong, persistent cross-sex identification as female since early childhood." However, the report offers little in the way of details documenting that supposed history, other than to say (page 3) that he began wearing female undergarments at age 14 or 15, that he (page 2) "was always jealous of women," and "played house and with dolls with her sister." Those few descriptors hardly prove a "strong, persistent" cross-sex identity. In fact, they raise the question of whether a diagnosis of Transvestic Fetishism (fetishistic arousal related to cross-dressing) with associated autogynephilic preoccupation (admiration of self in the image of a woman), either currently or in the past, has been adequately considered.

The DSM-IV describes autogynephilic males with GID as sometimes "…more fluctuating in the degree of cross-gender identification, more ambivalent about sex-reassignment surgery, more likely to be attracted to women, and less likely to be satisfied after sex-reassignment surgery." While Mr. Battista is not requesting surgery at this time, he has reportedly made it clear that it his goal. A cautious approach toward treatment, that carefully assesses for transvestic fetishism and autogynephilic traits, and that considers the increased risks of the autogynephilic subtype, is advised before initiating hormonal treatment. The Fenway report does not take such a stance.

9

Based on my reading of the Fenway and other reports, Mr. Battista's sexual identity may still be evolving and unstable, or may have been distorted as a result of his isolation in a prison environment.

## VII.    *The effects of isolation on psychopathology*

*The Fenway report fails to address this theme of isolation as a possible contributing factor in the intensification of Mr. Battista's cross gender preoccupation during incarceration.*

Incarcerated individuals do not have the same resources and role models available to them as non-incarcerated individuals do for resolving gender identity conflict. In real-world communities today, individuals with cross gender identity can participate in treatment groups, community support groups, and online support groups. These groups are often comprised of individuals making varied choices, and with whom each can reality test their own feelings and assumptions. They also have varied choices for sex partners. Some choose reassignment surgery but many do not. Some enter treatment with one idea about what they need and change their minds after exposure to alternatives. Some would prefer full reassignment but are unable to because of financial or other life constraints. Some choose hormonal treatment, while others do not.

Incarcerated individuals, by virtue of their isolation, do not have the resources described above. Their isolation, especially when accompanied by Antisocial, Borderline or Narcissistic personality traits, may intensify an inclination toward a cross gender identity as the only possible solution for internal psychosexual conflict, and rigidify the false assumption that particular interventions are the only viable choices. As long as an individual remains confined, there is no way to determine with certainty whether his cross-gender identity would be as profound if he were living in a real world context, with real life challenges, opportunities and more varied choices. It is unlikely that inmates, because of their isolation, are aware of the extent to which real world individuals choose adjustment over reassignment strategies. Appropriate treatment provides inmates with education about these themes, psychotherapeutic opportunities to explore them fully, and assistance in learning to embrace an attitude of responsible, contextually appropriate choices rather than angry entitlement. The lack of exposure to alternatives has isolated Mr. Battista in such a way that, in my opinion, it is impossible to predict with certainty his sex of attraction, age of attraction, or his core gender identity, in the real world. With such uncertainty, a cautious treatment plan is a responsible one.

Many individuals in the real world never access their desired feminizing options. Indeed, there are many individuals who have severe GID but who cannot access the supposed medically necessary treatment in such cases -- hormones and surgery. The real world imposes constraints on people's choices. Many cannot afford the cost of such interventions; most third party payers won't cover them; often individuals themselves recognize that their preferred interventions would complicate life in ways that they're not willing to risk; many settle for choose imperfect options that lead to a better life adjustment without imposing significant disruption; many choose to live "between" the traditional sexes as true he/shes; some make peace by defining themselves as being a "third gender," neither fully male nor fully female, but integrating aspects of both. Demands by inmates that prison life provide *no* constraints or obstacles to cross gender preferences are unreasonable, unrealistic, and outsides the bounds of good clinical practice to try

to meet. And, as I have emphasized throughout this report, the risks are high that catering to these demands deepens the same underlying psychiatric pathology that landed Mr. Battista in prison and that motivated his poor adjustment to prison. The Fenway report fails to address these risks in any way.

## VIII.  Summary

*To provide primary treatment of GID, with the focus on feminization, within a context of a patient's severe, chronic psychiatric and psychosexual instability would be unethical, clinically unwise, and a breach of community standards.*

It is clinically unwise to make treatment for gender identity disorder – via hormones or other interventions – primary over treatment of severe co-morbid conditions for which there is no evidence that they have been sufficiently addressed. In cases involving sociopathy or psychopathy, and in Mr. Battista's case, apparently Pedophilia, this concern is especially grave. Mr. Battista has committed several sex crimes in his past. He admits to current risk of being around young females. He has a history, reportedly, of severe childhood emotional and physical abuse. He has demonstrated serious maladaptations consequent to that problematic early history – including possible substance abuse, lack of impulse control, and interpersonal difficulties. He has been determined to be sexually dangerous. He has attempted and threatened genital self-harm, self-starvation, and suicide. He has shown low motivation to complete a sex offender treatment program.

The fact that Mr. Battista wants and demands a particular treatment do not obligate the DOC to meet those demands and should not be the defining criteria for clinical decisions. Interpretations of the SOC vary from clinic to clinic in the real world. While one clinic, for example, might interpret an individual's adequate psychosexual functioning on hormones as indicating the appropriateness of proceeding to surgery, another clinic might interpret it as indicating that hormones have been successful and that surgery is unnecessary or unwise. In some clinics, full triadic therapy is common; in others, it is rare. *Conservative management of GID, in which attending to comorbid Axis I and Axis II problems is emphasized, is a valid approach. It is utilized in real world gender clinics with patients who present with far less psychiatric vulnerability than Mr. Battista appears to. It is certainly valid in the context of correctional systems.*

The Fenway report fails to even raise the question of other possible treatment options, to provide a clinical rationale for the recommendation of hormones over other options, or to address the question of the possible consequences and implications of hormonal treatment of incarcerated individuals in general, or Mr. Battista in particular. For example, the Fenway report explicitly states (page 5) that Mr. Battista's goals go beyond hormonal treatment. He apparently sees hormones as just the first step, and hopes to also have surgical reassignment. While hormonal treatment of incarcerated individuals may sometimes be helpful – by improving affective stability – it should not be undertaken lightly. It should be preceded with a process of clear informed consent, in which future additional feminizing treatment options and limitations are made thoroughly transparent. It should be preceded with a systematic process of psychotherapy in which clear treatment goals and the criteria for "personal mastery" of serious problems are clearly defined, met and sustained. And it should be preceded by thorough planning for possible

11

RECEIVED
AUG 24 2015

consequent security risks – of, for example, having an increasingly feminized individual in an all male institution – will be managed. To administer hormones in the absence of such planning caters to inmates unrealistic expectations and could lead to continuing or worsening conduct problems rather than resolution to psychiatric vulnerabilities.

The goal of the treatment of GID is not feminization per se. It is improved affective and psychosocial functioning and the amelioration of dysphoria. There are a variety of treatment paths to that end. Mr. Battista's expectations reflect an unrealistic overvaluing of physical feminization as the only possible solution to his discomfort. Based on my impressions of the inmate as described in the Fenway report, it is possible, if not likely, that both GID and underlying personality pathologies fuel this entitlement. Further, and of considerable significance, Mr. Battista apparently suffers not just from GID but from severe Pedophilia – as evidenced by multiple sexual assaults on female children (both familial and non-familial victims), an egosyntonic attitude about his attraction to young girls, continued sexual acting out via obscene phone calls even after incarceration, and lack of motivation to complete sex offender treatment. These symptoms clearly suggest that Mr. Battista needs psychiatric treatment, but in no way would qualify him for hormonal or surgical reassignment in any reputable clinic in the real world.

Cynthia S. Osborne, M.S.W.
Forensic Consultant
Assistant Professor
Department of Psychiatry and Behavioral Sciences
Johns Hopkins University School of Medicine

October 14, 2005

Addendum:

After completion of the attached report, I was informed on October 12, 2005 that on October 8, 2005 Mr. Battista engaged in genital self-mutilation. Mr. Battista reportedly stated that it was an expression of frustration over delays in hormonal treatment. Having never met nor evaluated the inmate myself, I cannot say with any certainty what this gesture means. However, it appears consistent with my warnings all through this report that there is a high risk of iatrogenic effects of an improper treatment plan. By offering Mr. Battista a simplistic solution of hormones, with full knowledge that he expects surgery to follow, and without considering the risks associated with his significant co-morbidity, one may fuel angry entitlement, and exacerbate maladaptive, manipulative, self-harming coping patterns. In my opinion, the DOC was responsible in its decision to delay hormonal treatment. A more thorough assessment is warranted.

# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDY J. BATTISTA,

     Plaintiff,

     v.                            Civil Action No. 05-11456-DPW

HAROLD W. CLARKE, et al.,

     Defendants.

## AFFIDAVIT OF CHESTER SCHMIDT, JR., M.D.

I, Chester Schmidt, Jr., M.D., do hereby depose and say that:

1.     I am a medical doctor, a board-certified psychiatrist, and a Professor of Psychiatry at the Johns Hopkins University School of Medicine. I am currently Chief Medical Officer of Johns Hopkins Healthcare. I served as the Director of the Department of Psychiatry at the Johns Hopkins Bayview Medical Center until June, 2006. I am the co-founder and the associate director of the Sexual Behaviors Consultation Unit of the Johns Hopkins University School of Medicine.

2.     The Sexual Behaviors Consultation Unit of the Johns Hopkins University School of Medicine conducts evaluations and provides treatment for individuals with gender difficulties. The Sexual Behaviors Consultation Unit conducted the initial psychiatric evaluations and screenings of the candidates for sex reassignment surgery ("SRS") at the Johns Hopkins Medical School. A number of the gender identity disorder ("GID") patients evaluated by the Sexual Behaviors Consultation Unit underwent SRS at the Johns Hopkins School of Medicine.

3.     I have extensive experience in the diagnosis and treatment of individuals with gender disorders. I have participated in the evaluation of at least 300 individuals diagnosed with GID, beginning in 1971 and continuing to the present. I have been involved in the treatment of

transgendered individuals, including conducting psychotherapy, prescribing medications, including hormones, and monitoring medical treatment.

4.    Presently, there is no known biological or genetic cause for GID. Nor are there any psychological tests presently available to confirm a diagnosis of GID. As a result the diagnosis of GID largely relies upon the self-reports of the individual and the experience and skills of the mental health professional conducting the clinical evaluation. In my experience, it is not uncommon for individuals seeking treatment for GID to exaggerate their symptoms or to tell the evaluator what they think the evaluator wants to hear in order to receive a diagnosis of GID. As a result, I often look for documentation, such as medical or mental health records, to confirm an individual's statements regarding their gender disorder.

5.    For example, access to plaintiff's military records would be useful in assessing plaintiff's alleged GID. The Fenway Clinic evaluators point to plaintiff's discharge from the Army as a result of being caught wearing female underwear as evidence of plaintiff's longstanding desire to be a woman. However, plaintiff informed other evaluators that the discharge from the Army was the result of getting drunk once too many times and getting into a fight (Weiss, 1984). Plaintiff told another evaluator that the discharge from the Army was the result of an altercation with a sergeant who intercepted photos of plaintiff dressed only in military boots and a cap sent by plaintiff to *Hustler* magazine (Campopiano, 1998). While the Fenway clinic evaluators note that plaintiff told prior evaluators that the discharge from the Army was due to a fight, they made no attempt to confirm plaintiff's story. A review of plaintiff's military records may help determine whether the story told by plaintiff of being caught wearing women's underwear and being referred to an Army therapist is, in fact, the truth.

2

6.      In addition, where individuals diagnosed with GID often report experiencing the symptoms of the disorder as a child or adolescent, historical records such as medical or mental health records may help to confirm the existence of such symptoms. Medical, mental health or other documents may confirm that plaintiff sought treatment for GID or displayed symptoms of GID as a child or adolescent or young adult as described by a parent, guardian or custodian, etc.

7.      Based on my experience and the available scientific literature, the diagnosis of GID can also be confounded by the presence of co-morbid psychological disorders such as personality disorders, depression or bi-polar disorders. The existence of a co-morbid personality disorder, such as an anti-social personality disorder or a borderline personality disorder, can lead to a distortion of self-perception and identity, as well as social functioning. Any and all information probative of psychological disorders suffered by an individual seeking treatment for GID is essential to developing a full understanding of the individual and provides context in the formulation of a diagnosis.

8.      Based on my review of many of the psychological evaluations conducted of the plaintiff, it is my opinion that it is extremely important to develop an understanding of the nature of the psychological traumas experienced by plaintiff as a child and the role such traumas may play in the late onset of plaintiff's desire to seek treatment for a gender disorder. In particular, the psychological assessments of two psychologists, Dr. Ronald Ebert, Ph.D. and Dr. Tyler Carpenter, Ph.D., expressed concerns that plaintiff's desire to become a woman might not be the result of a genuine gender identity disorder, but the result of deep psychological conflicts based on the shame and pain plaintiff experienced as a child, including plaintiff's rejection by his mother due to the effects of Congenital Adrenal Hyperplasia on his genitals. In my opinion, the

3

goal of a thorough assessment and diagnosis of plaintiff regarding GID would be severely compromised if I or other mental health professionals were prevented from exploring plaintiff's early psychological development through a personal interview of plaintiff and review of any available medical records, mental health records, youth offender custodial records, records of public or private mental health agencies, etc.

9.    To the extent they may be available, any records relative to plaintiff's childhood and adolescence, including medical records, mental health records, court records, records from youth services agencies, and other public or private service providers, could provide valuable insights into the nature plaintiff's mental disorders and diagnosis of GID. To the extent that plaintiff has provided previous evaluators with inconsistent historical information or has withheld important historical information, access to documents which provide information regarding plaintiff's childhood, adolescence, and early adulthood would be very helpful in rendering an accurate diagnosis.

Signed under the pains and penalties of perjury this 27 day of February, 2008.


_____
Chester W. Schmidt, Jr., M.D.

4