**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SANDY J. BATTISTA,<br><br>　　　　Plaintiff,<br>v.<br>HAROLD W. CLARKE,<br>KATHLEEN M. DENNEHY,<br>ROBERT MURPHY,<br>TERRE K. MARSHALL, and<br>SUSAN J. MARTIN, in their official and individual capacities;<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No.<br>) 05-11456-DPW<br>)<br>) **Leave to File**<br>) **Granted on**<br>) **March 24, 2008**<br>)<br>)<br>)<br>) |

**REPLY TO DEFENDANTS' OPPOSITION TO**
**PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER**

　　Plaintiff Sandy J. Battista, through counsel, hereby submits her reply to Defendants' opposition to her motion for a protective order.

**INTRODUCTION**

　　In their effort to explain their requested dragnet into Ms. Battista's childhood medical, mental health, and disciplinary records, Defendants claim to need this information for a full assessment of her GID diagnosis. This is flawed on several levels.

　　First, this case is about whether the Defendants acted with deliberate indifference to Ms. Battista's medical needs, and in violation of her Constitutional and common law rights, by deciding not to follow the treatment plan prescribed by the DOC's contractual medical providers. It is not about whether an expert retained for litigation purposes might arrive at a different conclusion upon review of previously unavailable information. Defendants should not be allowed to use the discovery process to retroactively justify the challenged decision.

Second, though Defendants insists that their expert, Dr. Schmidt, must have access to the full panoply of Ms. Battista's entire life history in order to "evaluate" her diagnosis, Dr. Schmidt himself has previously testified that he neither requires nor relies on the kind of information Defendants now seek in the ordinary course of his clinical practice. Instead, Dr. Schmidt has testified that in the "typical" case he relies on the patient's self reports about his or her history, precisely the information that was available to Ms. Battista's medical providers and is currently available to the Defendants.

Third, even if Defendants were entitled to Ms. Battista' childhood medical records, they have provided absolutely no basis for interrogating Ms. Battista about the details of her abuse as a child and her mother's violent death. Interestingly, even Dr. Schmidt does not state in his affidavit that this rehash of traumatic childhood events is necessary for his analysis.[1] More importantly, even if the fact of these events were relevant, the Defendants and their expert are already in possession of all of the reports in which she has described these events to mental health professionals over the past 25 years, and have not identified a single additional fact it might learn from testing her current memory of these events.

Finally, the Defendants' insistence that its regulations do not provide a "private cause of action" misses the point. Ms. Battista alleges violations of her constitutional and common law rights on the basis that the Defendants unreasonably and in deliberate indifference to her medical condition interfered with treatment prescribed for her by their own contractual medical providers. The DOC has enacted regulations that set the standards for its own conduct, regulations which do not permit the Defendants to second guess medical decisions for reasons other than security concerns. Whether or not there is a "private right of action" under the

---

[1] Dr. Schmidt simply claims a need for a "personal interview" and access to records.

1

regulations, these regulations serve as the yardstick by which the Defendants' behavior is measured, and Defendants should not be allowed to use the discovery authority of this Court to go beyond what they are ordinarily entitled to do (i.e., to gather extensive new documentation in order to revisit the medical diagnosis) simply because a lawsuit has been filed.

**I.      Pre-Incarceration Medical, Mental Health, and Military Records Are Not Relevant**

The central issue in this case is the DOC's calculated decision to deny Ms. Battista's prescribed medical treatment, and whether that decision violated Ms. Battista's rights. Defendants must justify that decision, if they can at all, based on the information available to them and their contractual medical providers at the time. Indeed, the Defendants' insistence on this discovery only highlights what is really going on in this case: GID patients, unlike any other inmate or resident of the Massachusetts Treatment Center seeking medical or mental health care, must go through the additional hoop of filing a lawsuit and subjecting themselves to onerous discovery in order to obtain a simple prescription ordered by the DOC's own contractual medical provider.

At bottom, the Defendants are seeking to justify their decision by starting the process of Ms. Battista's medical review and diagnosis anew, with this Court as the ultimate arbiter of the validity of the medical decision. Courts uniformly decline to second-guess the medical decisions of clinicians on a plaintiff's challenge to a medical diagnosis. *See Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)("[F]ederal courts are generally reluctant to second guess medical judgments."); *Bowring v. Godwin*, 551 F.2d 44 (4th Cir. 1977)("[W]e disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment."). This is so because the Court's role is to evaluate the Defendants' conduct, not to serve as a medical decision maker.

2

Likewise, there is no justification for the Defendants to recreate the medical record in an effort to have this Court second-guess the medical decisions of their own clinicians.

Similarly, the Defendants' reliance on a collection of evaluative reports from throughout Ms. Battista's incarceration as justification for more expansive discovery is misplaced. If anything, the reports demonstrate the breadth of the information already available to the Defendants at the time they made their decision, including 25 years of medical and mental health records during the period of Ms. Battista's incarceration and residency at the Treatment Center.

In short, the Defendants made their decision to withhold treatment based on the information available at the time of the decision and they cannot be allowed to bolster and justify that decision by a search at a later time for potentially supportive information – information that was not available to the providers recommending the treatment and which was not requested by the DOC until after this litigation commenced.

**II.     Defendant's Expert Affidavit Does Not Justify Their Discovery Requests**

Even assuming relevance, the affidavit proffered by Defendants falls well short of demonstrating that the information sought is necessary to evaluating Ms. Battista's diagnosis and recommended treatment. In a nutshell, Defendants expert claims to need corroborating evidence of Ms. Battista's self reports of her history. There is no basis for this. In fact, Defendants' expert has described, under oath, the types of information on which he relies as a clinician in assessing GID patients:

> Q:   Doctor, would you agree that the diagnosis of an individual for a Gender Identity Disorder is done primarily through the self-reports of the individual?
> A:   Yes, as it, if you will, is filtered through the evaluation process done by a professional.
> …

3

> Q: Doctor, when you examined an individual for -- a treatment for the symptoms of gender dysphoria, were there certain things that you looked for in your evaluation?
> A. What we looked for -- yes, we look to their history for very specific things that help make the diagnosis.
> Q. And, on occasion, do you ever seek a third-party to confirm the statements of the individual?
> A. From time to time we've had the opportunity to have a -- family members, if you will, who can provide additional data and observations about the earlier history. ***But I would say the typical patient comes by himself and often they're the only source of the information***.

Exhibit 1 at 24-25 (Transcript from *Kosilek v. Dennehy*, June 7, 2006).

The medical professionals referenced by Defendants all relied on Ms. Battista's self-reporting in their evaluations, and Dr. Schmidt himself follows the same practice in assessing patients. Accordingly, even if Defendants were entitled to revisit the diagnosis with new evidence, years after the challenged decision was made, there is no basis for their apparent desire to have their retained expert apply an even more exacting standard to his review of Ms. Battista's diagnosis than he would use in his own clinical practice.

**III.    Ms. Battista's Traumatic Childhood Abuse and History Is Not Relevant**

Just as the DOC's discovery requests for written records are not relevant, so too is any interrogation of Ms. Battista as to the childhood abuse she suffered or her mother's death at the hands of her father. First, for all the reasons set forth above, the Defendants have no right to recreate the record underlying their challenged decision, and therefore the details of Ms. Battista's trauma and abuse have no place in this case.

Second, even assuming relevance, the operative facts of all of these events are well known to the Defendants, as they are in possession of Ms. Battista's records since her time of incarceration over twenty years ago. Defendants have made no showing that knowledge of

4

further details of these events, even if Ms. Battista were able to remember them, would accomplish anything other than burdening and humiliating Ms. Battista.

## CONCLUSION

For the foregoing reasons, Ms. Battista requests that the Court grant her motion for a protective order.

Dated: March 24, 2008                                    Respectfully submitted,

                                                         SANDY J. BATTISTA

                                                         By her attorneys,

                                                         /s/ Emily E. Smith-Lee
                                                         Emily Smith-Lee (BBO#634223)
                                                         Dana McSherry (BBO#664430)
                                                         Neal E. Minahan (BBO#661371)
                                                         Ada Y. Sheng (BBO#664475)
                                                         McDermott Will & Emery LLP
                                                         28 State Street
                                                         Boston, MA 02109
                                                         Tel: (617) 535-4000
                                                         Fax: (617) 535-3800

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 24, 2008.

                                                         /s/ Emily E. Smith-Lee_____
                                                         Emily Smith-Lee

EXHIBIT 1

CHESTER SCHMIDT, M D  6/7/2006  9:30:00 AM

```
 1      UNITED STATES DISTRICT COURT
 2        DISTRICT OF MASSACHUSETTS
 3           No 1:00-cv-12455-MLW
 4
 5
        MICHELLE KOSILEK
 6         Plaintiff
 7
        vs
 8
 9
        THE MASSACHUSETTS DEPARTMENT OF CORRECTION et al
10         Defendants
11
12              ********
13
14      For Trial Before:
          Chief Judge Mark L Wolf
15
16
17        United States District Court
            District of Massachusetts (Boston)
18          One Courthouse Way
            Boston, Massachusetts 02210
19          June 7 2006
20
                ********
21
22      REPORTER: RICHARD H ROMANOW RPR
             Official Court Reporter
23           United States District Court
        One Courthouse Way  Room 5200  Boston  MA 02210
24              (617) 737-0370
25
```

```
 1              APPEARANCES
 2
 3   FRANCES S COHEN ESQ
     JOSEPH L SULMAN ESQ
 4   Dechert, LLP
     Hancock Tower
 5   200 Clarendon Street
     Boston, Massachusetts 02116
 6   (617) 728-7173
     Email: Frances.cohen@dechert.com
 7   For Plaintiff
 8
     RICHARD C McFARLAND ESQ
 9   JOAN T KENNEDY ESQ
     Department of Correction
10   70 Franklin Street  Suite 600
     Boston, Massachusetts 02110
11   (617) 727-7403
     Email: Rcmcfarland@doc.state.ma.us
12   For the Defendant Department of Correction
```

```
 1                   I N D E X
 2
 3
 4  WITNESS         DIRECT CROSS REDIRECT RECROSS
 5
 6  CHESTER SCHMIDT M.D
 7    By Mr McFarland:  10           99
 8    By Ms Cohen:       42
 9
10  MARK BURROWES (Continued)
11    By Ms Cohen:  113
12    By Ms Kennedy:  121
13
14
15               E X H I B I T S
16
17  EXHIBIT 61                      30
18  EXHIBIT 62                      43
```

```
 1                PROCEEDINGS
 2      (Open court 9:30 a m)
 3      THE CLERK: Civil Action 00-12455 Michelle
 4  Kosilek versus Kathleen Dennehy, et al. The Court is in
 5  session. You may be seated
 6      THE COURT: Good morning. Would counsel
 7  please identify themselves for the record
 8      MS COHEN: Good morning, your Honor. Frances
 9  S Cohen and Joseph L Sulman for the plaintiff
10  Michelle Lynn Kosilek, and Miss Kosilek is seated with
11  us at counsel table
12      MR McFARLAND: Good morning, your Honor
13  Richard McFarland with co-counsel Joan Kennedy on behalf
14  of the Commissioner of Correction, Kathleen Dennehy
15      THE COURT: I apologize for coming in late,
16  but I received submissions from each of you since we
17  recessed yesterday and I needed to take a look at them
18      The plaintiff has 14 hours and 2 minutes left
19  The defendants have 19 hours and 25 minutes left
20      I have received the defendants' memo regarding
21  Rule 404(b) which I've looked at, but not that closely
22  yet. This morning I received -- and I think it was
23  filed about 11:00 last night, the plaintiff's memo
24  regarding collateral estoppel, which I have looked at
25  somewhat more closely because I think it relates to the
```

**21**

1  A. Well, we don't require anything. We don't set any
2  standards. Our position right from Day 1 in 1971 to
3  today is to maintain a neutral position with regard to
4  those decisions. We neither advocate for nor do we
5  speak against the decisions for the cross-gender
6  hormones or eventually for surgery. We believe that
7  those decisions are the province of the patients,
8  therefore we don't set standards. We don't, in a sense,
9  make recommendations. We leave the decision making in
10 the hands of the patients.
11 Q. Doctor, would you send a letter to a surgeon in,
12 say, Montreal suggesting that this person have Sex
13 Reassignment Surgery --
14    MS. COHEN: Objection.
15    THE COURT: I'm sorry. What's the next
16 question?
17    MS. COHEN: I have an objection.
18    THE COURT: Oh, I'm sorry. I'm reading
19 something. Excuse me.
20    MS. COHEN: My objection is to the vagueness
21 of the question. The witness has been asked "would
22 he." I don't know in what circumstances the question,
23 does he, has he, is it his practice?
24    MR. McFARLAND: I'll rephrase the question.
25    THE COURT: Thank you.

**22**

1  Q. Dr. Schmidt, if a client that you had been
2  evaluating asked you to send a letter to a surgeon
3  recommending that this individual receive the Sex
4  Reassignment Surgery, what would be your response to
5  that request?
6  A. It would be that we would not make recommendations
7  what we would do is we would -- with the permission of
8  the patient, we would release our file and also indicate
9  that there were no contraindications from our point of
10 view for the surgery if indeed that was the case.
11 Q. And Doctor, how often in your practice has that
12 happened, that you sent a letter to a surgeon providing
13 information to that surgeon about the patient's
14 treatment with your group?
15 A. Well, earlier on we probably did that fairly
16 frequently. In the last two decades, I would say that
17 the way the practice has evolved, since we referred the
18 patients for the psychotherapy if you will, during the
19 now real-life period where they're living and
20 functioning in the cross-gender role while on hormones
21 preparing themselves for surgery, we usually let the
22 individual -- not usually, we let the individual
23 psychotherapist if they're within our faculty do that
24 letter and, of course, if the patients come from
25 elsewhere, that responsibility would fall to the person

**23**

1  who's doing that management, not to us. So we've not
2  been in -- our practice is such that we're not asked to
3  nor do we send those letters very frequently.
4  Q. And, Doctor, are you familiar with the work of
5  Dr. George Brown in the diagnosis and treatment of
6  gender dysphoria?
7  A. Yes, I am.
8  Q. Would you agree with Dr. Brown's opinion that there
9  is no known biological cause of gender dysphoria?
10 A. Yes, I do.
11 Q. Would you also agree with Dr. Brown's opinion that
12 there is no known genetic cause for the disorder known
13 as GID?
14 A. Yes, I do.
15 Q. Would you agree with Dr. Brown's opinion that there
16 are no known psychological tests presently available to
17 confirm the diagnosis of a Gender Identity Disorder?
18 A. That is accurate.
19 Q. Would you also agree with Dr. Brown that often the
20 diagnosis for a GID individual is done primarily through
21 the self-reports of the individual?
22 A. Yes.
23    MS. COHEN: Objection to the characterization
24 of Dr. Brown.
25    THE COURT: Without the -- well, why don't you

**24**

1  ask without the preamble.
2  Q. Doctor, would you agree that the diagnosis of an
3  individual for a Gender Identity Disorder is done
4  primarily through the self-reports of the individual?
5  A. Yes, as it, if you will, is filtered through the
6  evaluation process done by a professional.
7  Q. And would you agree that it's not uncommon for
8  individuals seeking treatment for a Gender Identity
9  Disorder to provide or to rely on their self-reports or
10 to exaggerate their symptoms in hopes of getting
11 treatment?
12    MS. COHEN: Now I'm going to object, your
13 Honor, to the leading of this witness.
14    THE COURT: Sustained.
15 Q. Doctor, when you examined an individual for -- a
16 treatment for the symptoms of gender dysphoria, were
17 there certain things that you looked for in your
18 evaluation?
19 A. What we looked for -- yes, we look to their history
20 for very specific things that help make the diagnosis.
21 Q. And, on occasion, do you ever seek a third-party to
22 confirm the statements of the individual?
23 A. From time to time we've had the opportunity to have
24 a -- family members, if you will, who can provide
25 additional data and observations about the earlier

CHESTER SCHMIDT, M D  6/7/2006  9:30:00 AM

25

1  history  But I would say the typical patient comes by
2  himself and often they're the only source of the
3  information
4  Q  Doctor are you familiar with the term "dysphoria"
5  as used with regard to gender disorders?
6  A  Yes I am
7  Q  And where is that term defined, if you know, in any
8  of the manuals that discuss gender dysphoria?
9  A  Well it's a clinical term your Honor that is -- I
10  forget the person who coined the term  It's descriptive
11  of the -- if you will  the concerns, the frustrations
12  sometimes the depression, um  dissatisfaction, etc
13  associated with believing that the -- the patients
14  believe that they are really of the other sex and want
15  to live in the role of the other sex  That term is not
16  part of the diagnostic nomenclature within DSM-IV  the
17  DSM-IV being the diagnostic manual, and there's a
18  section in that manual that sets out the criteria for
19  diagnosing GID  Gender dysphoria is not a component of
20  those criteria
21  Q  And  Doctor  do you diagnose your patients with
22  differing degrees of gender dysphoria?
23  A  No
24  Q  You don't describe them as moderate, medium or
25  severe gender dysphoric?