## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SANDY J. BATTISTA, <br><br> Plaintiff, <br><br> v. <br><br> HAROLD W. CLARKE, <br> KATHLEEN M. DENNEHY, <br> ROBERT MURPHY, <br> TERRE K. MARSHALL, and <br> SUSAN J. MARTIN, in their official and individual <br> capacities; <br><br> Defendants. | Civil Action No. <br> 05-11456-DPW <br><br> **ORAL** <br> **ARGUMENT** <br> **REQUESTED** |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR PRELIMINARY INJUNCTION

### I.    INTRODUCTION

From the beginning, Defendants have insisted that their refusal to allow Ms. Battista to receive the treatment recommended by the DOC's own gender identity specialists, confirmed by its own mental health contractor, and prescribed by its own contracted endocrinologist, was due to "serious concerns" about the "legitimacy" of her gender identity disorder ("GID") diagnosis. Even assuming there had been disagreement among the treating professionals, the Department of Corrections has now received the report of its latest GID expert, who conducted his own evaluation of Ms. Battista and concluded that "of course" Ms. Battista suffers from GID. Ex. A.

Moreover, as more fully set forth below, there was in fact never disagreement among any of Ms. Battista's treating professionals about either the legitimacy of the diagnosis or the appropriateness of the recommended treatment. Instead, as discovery to date has confirmed, the underlying "disagreement" was between DOC officials and the medical experts, and all of the

evidence of medical disagreement previously cited to the Court was gathered or created to bolster the position of the DOC officials after the initiation of this lawsuit. This includes the report of an "expert" retained after the lawsuit was filed, as well as selective quotes from old reports by individuals conducting forensic evaluations who were never asked (and were not qualified) to assess her for GID.

The fact remains that every clinician involved in evaluating Ms. Battista's GID from 1997 to the present, now including Dr. Levine, has concurred with the diagnosis, and no such clinician has disagreed with the core treatment recommendations: appropriate psychotherapy and hormone administration. Accordingly, the central dispute-- whether Ms. Battista suffers from GID-- has been resolved. She has on record a detailed plan of treatment, recommended by recognized experts in GID, repeatedly confirmed by the entity who was then the DOC contractual medical provider, and cleared medically by the DOC endocrinologist who actually prescribed the hormones in April, 2005. There is no clinical or legal reason to further delay Ms. Battista's treatment.

Further, the Defendants have already demonstrated their willingness to delay Ms. Battista's treatment by whatever means or pretext they can conjure. Against this backdrop, any claim for a need for time (in addition to the 3-4 years they have already had) to review the security implications of the prescribed treatment should be viewed with extreme skepticism.

Finally, Ms. Battista has been forced to endure over three years of the symptoms associated with untreated GID, along with the uncertainty of having no treatment decision and the profound disappointment associated with periodically having her hopes raised then dashed. Indeed, her distress became so severe after learning that the DOC would not allow her the prescribed therapy in 2005 that she attempted to castrate herself. Currently, Ms. Battista

continues to experience depression and hopelessness, and remains at risk for further crisis. There is no way to adequately account for her continued emotional suffering, and allowing it to continue any longer than necessary amounts not only to irreparable harm but also simple cruelty.

For all of the reasons set forth herein, Ms. Battista respectfully renews her original motion for a preliminary injunction ordering the DOC to authorize the implementation of the treatment she was prescribed in April, 2005. In recognition of the fact that the prescription is three years out of date, as well as the possibility that the Treatment Center might need to do a certain amount of planning to minimize security risk, Ms. Battista requests that the order specify that the hormone therapy be commenced no later than September 30, 2008, and that the DOC and its contractual providers do whatever is necessary in the interim in terms of follow up consultation with the endocrinologist, assessment of the psychotherapy being provided to Ms. Battista to ensure it is considered appropriate by the current GID consultant, and implementation of any reasonable and appropriate steps to accommodate legitimate security concerns.

## II.    FACTUAL BACKGROUND

### A.    Ms. Battista's Medical History

In 1997, Ms. Battista requested that Kathleen Dennehy, then an Associate Commissioner with DOC, arrange for an evaluation by a gender specialist. Ms. Dennehy forwarded this request to a psychiatrist, Victoria Russell. Ex. B. Dr. Russell's first response revealed her generally negative and dismissive view of the need for any such treatment:

> It must also be remembered that elective procedures are just that: they are not necessary to save a life. What is the MEDICAL- not cosmetic- bottom line? If the DOC attends to the "quality of life" issues as a MEDICAL standard of care, as SJB wants us to do, would the DOC then be obliged to do tummy tucks and liposuction as also furthering "quality of life" issues for other (non-sexually) unhappy inmates?

Ex. C.

Dr. Russell's later report, submitted to this Court by the DOC as evidence of "conflicting medical opinion," was not prepared for the purpose of evaluating Ms. Battista for possible GID. Indeed, by Dr. Russell's own written admission, the decision to deny her request for such an evaluation had already been made. Ex. D. Importantly, Dr. Russell never evaluated or even met Ms. Battista, before or after this report.

Ms. Battista was then seen by Dr. Tyler Carpenter. Again, the purpose of this evaluation was not to determine if she was eligible for GID treatment—that decision had already been made—but rather to assess the ongoing management of her mental health. Despite the Defendants' use of isolated comments from his report to cast doubt on her diagnosis, Dr. Carpenter's Axis I diagnosis for Ms. Battista in 1997 was, in fact, GID. Ex. E.

From 1997 until mid-2004, the DOC performed no further assessment of Ms. Battista's reported gender disorder. Rather, all DOC-initiated psychological evaluations and interviews during this period were in the context of her civil commitment and continued forensic evaluation of sexual dangerousness. These evaluations are done under a separate contract and by different providers than the ongoing health services provided by UMass. Deposition of L. Weiner ("Weiner Dep") at 13-15, Ex. F.[1]  During the relevant time period, these reports were not commonly shared with clinical personnel, and in fact it appears that DOC personnel first went looking for these reports after the lawsuit was filed, in connection with the retention of Cynthia Osborne. Id. at 13-15, 111-15. None of these evaluators were asked, or attempted, to offer an opinion as to either the GID diagnosis or the treatment at issue. Two of these reports were

---

[1] All of the depositions have been taken recently, and only rough transcripts are available at the time of this filing. Citations are to the rough transcripts, which can be supplemented if the Court wishes once the final transcripts are received.

nonetheless cited to the Court in this litigation as examples of legitimate differences of opinions among treating clinicians on these very issues.

In 2001, Ms. Battista, at her own expense, retained a GID specialist, Diane Ellaborn. Ellaborn diagnosed Ms. Battista with GID and recommended that she be started on the triadic therapy set forth in the Harry Benjamin Standards of Care. Ms. Battista again requested that she be treated for GID, and was again denied. That denial prompted Ms. Battista to file a lawsuit in 2002.[2] In connection with that suit, the DOC submitted an affidavit reassuring the Court that it intended to provide Ms. Battista "a comprehensive medical and psychological evaluation regarding his claimed gender disorder," and to develop a treatment plan. Ex. G.

## B.    Diagnosis and Recommendations of the Treating Clinicians

In August, 2004, Ms. Battista was finally seen at the Fenway Clinic for a gender evaluation. The Fenway clinicians confirmed that she did suffer from gender identity disorder, and recommended that she receive hormone therapy, and psychotherapy with someone qualified to treat GID or under the supervision of a qualified GID clinician. Ex. H. Though the report did not issue until November, the DOC was told within a few weeks of the evaluation that Fenway had recommended hormone therapy. Deposition of S. Martin ("Martin Dep") at 123, Ex. I. Nobody told Ms. Battista this until the full report arrived, despite increasingly desperate letters to DOC officials from Ms. Battista asking about the status of her evaluation and potential treatment. Id. at 129-30; 134-38.

On April 12, 2005, Ms. Battista was seen by an endocrinologist, Dr. Maria Warth, who indicated that she should be started on Lupron and Estradiol. On April 14, 2005, the physician at the Treatment Center, Dr. Friedman, wrote an order for the hormones, and asked that it be faxed

---

[2] Judge Lasker ultimately dismissed that action, on the grounds that Ms. Battista's claims were barred by *res judicata* based on an earlier state court action.

to Dr. Brewer (at UMass) for his approval. Ex. K. The following day, Dr. Friedman wrote a

new order:

> Please DIC previous order for estradol and lupron. Please send
> copy of Dr. Warth's consult to *security* for *approval*.

Ex. L (emphasis in original).

Over the next several months, Ms. Battista made repeated inquiries to the DOC and

UMass about the status of her hormone prescription. By July 6, 2005, no action had been taken,

and no explanation had been provided, except a series of vague assurances from DOC officials

that her treatment was "under review." Accordingly, she filed her complaint in this Court.

### C.    Osborne's "Peer Review" and the DOC's Ongoing Efforts to Interfere with Treatment

Up until this point, DOC documents do not reflect a single clinician involved in Ms.

Battista's GID evaluation and treatment who questioned her diagnosis. After Ms. Battista filed

suit, the DOC took two parallel tracks. First, they asked Cynthia Osborne, already a retained

expert in connection with the ongoing Kosilek litigation, to review and comment on the Fenway

Clinic recommendations. Second, they began a letter-writing campaign designed to make it

appear that UMass was at fault for any delay in treatment. As more fully discussed below, based

on DOC documents and the admissions of its witnesses, this campaign was clearly pretextual.

With respect to the first prong of the strategy, though the DOC is careful to describe Ms.

Osborne's efforts as a medical "peer review," it is undisputed that the relationship she had with

the DOC prior to this request was as a testifying expert in the Kosilek case, and not as a member

of any clinical team. Deposition of V. Madden ("Madden Dep.") at 129-30, Ex. M. The timing

and circumstances of her retention in this case further demonstrate that it was done to develop an

opinion that could be used in litigation, not clinical management. First, the earliest reference in

any DOC documents to involving Ms. Osborne in Ms. Battista's case or questioning the

underlying diagnosis of GID, appears in an internal e-mail dated July 13, 2005, in which a DOC employee was discussing the recently-filed lawsuit. Ex. N.[3]  Second, among the documents Ms. Osborne reviewed were eight reports from the forensic providers, documents that are ordinarily not part of the clinical file and that were only retrieved by DOC personnel after the lawsuit was filed. Ex. O; Weiner Dep. at 111-15. Finally, after the Fenway provided a detailed response to her report, discussed more fully below, the DOC took no further steps for over two years to further assess or review the Fenway diagnosis. Weiner Dep. at 197-98.

On October 10, 2005, Ms. Osborne provided her "peer review," which the DOC promptly submitted to this Court as evidence of medical disagreement and ongoing review of the diagnosis. Ex. O. Importantly, Ms. Osborne did not even purport to challenge the diagnosis, and in fact she acknowledged the unanimity of opinion regarding that diagnosis:

> ...my report is based on the assumed accuracy of the inmate's existing diagnosis of Gender Identity Disorder, *about which all reports seem to agree.*

Id., p. 2 (emphasis added).

Nonetheless, Ms. Osborne proceeded to raise a number of criticisms of the Fenway Clinic's approach to the diagnosis, based on issues she felt they had not adequately considered. After receipt of this critique, the Fenway clinicians provided a detailed, 26 page response to the Osborne report on March 1, 2006. Ex. P. DOC witnesses acknowledge that this was a thorough and detailed review, of the kind that would ordinarily justify deference to the evaluating clinician's expertise. Madden Dep. at 76-77; Weiner Dep. at 194-95. Indeed, the Deputy

---

[3] The portion of the email that contains the reference to Ms. Osborne is the subject of a dispute between the parties as to the applicability of the attorney-client privilege, which is more fully briefed in Plaintiff's challenge to Defendants' invocation of the privilege, which Plaintiff anticipates filing shortly if the issue cannot be resolved with the DOC.

Commissioner with oversight over the Health Services Division, Veronica Madden, still cannot

explain why Ms. Battista's treatment had not been initiated after receipt of this report:

> Q. From a lay person's perspective does this 20 page, single
> spaced report with five and a half pages of literature references
> appear to be something that you would personally consider a
> thoughtful response to concerns that were raised?
>
> A. It's certainly a long response and a detailed response. If it
> addresses the specific issues that the clinicians had raised, I would
> defer to the clinicians to determine if the diagnostic references
> were what was generated by the Ebert report and the Osborne
> considerations.
>
> Q. Do you know then why Sandy wasn't started on her treatment
> plan after this response was received in March of '06?
>
> A. I don't have any personal knowledge of that.
>
> Q. Do you have any general knowledge?
>
> A. No.

Madden Dep. at 76-77.

After receiving the Fenway response, the DOC apparently took no action to further

review Ms. Battista's diagnosis for over two years, yet continued to represent to this Court that

there were unresolved differences of medical opinion.[4]

The letter writing strategy also began after the lawsuit was filed. Beginning in July, 2005

and continuing into the fall of 2006, DOC personnel required UMass to respond to numerous

missives asking them to confirm the treatment plan, and in some cases asking for "specificity"

that had been available to the DOC since the original doctor's order in April, 2005.

---

[4] Notably, the DOC received this report three weeks before this Court issued its March 22, 2006 order on Ms. Battista's first motion for a preliminary injunction, in which the DOC's stated need to "await further review" of the Fenway report was cited as one of the reasons their conduct was not unreasonable. The DOC never provided the report to the Court or to Ms. Battista, then a *pro se* litigant. The report in fact did not surface at all until 2008, after counsel was appointed for Ms. Battista and sought discovery from the Defendants.

The first letter, signed by Martin, was sent on July 14, 2005, and purportedly sought "clarification" that UMass believed that the treatment plan was "clinically appropriate and medically necessary." Ex. Q. UMass responded on September 1, 2005:

> *The recommendations we have received from Dr. Kapila and Dr. Kaufman with regard to each of these patients appear to be reasonable and appropriate and, in our view, there is no medical or mental health reason of which we are aware to warrant the delay of such treatment.* To the contrary, relying upon Dr. Kapila and Dr. Kaufman, we have endorsed each treatment plan and have forwarded all of them to you for your review and approval.

Ex. R (emphasis added).

Indeed, DOC personnel clearly understood at this point that UMass had endorsed the clinical appropriateness and medical necessity of the treatment plan:

> Q:.....even as of September 1st there was no doubt in your mind that UMass agreed to the clinical appropriateness and medical necessity. You simply disagreed with the basis for their conclusions?
>
> A. Yeah.

Weiner Dep. at 186.

Given that UMass' approval of the proposed treatment was never really in doubt, the focus of this strategy eventually shifted to requests for more "specificity" about the proposed treatment. The Fenway response was submitted to the DOC on March 1, 2006. Ex. P. On April 3, 2006, another letter was sent to UMass, this time asking for more specific recommendations. Ex. S. On April 14, UMass responded with a detailed set of recommendations, on the form provided by the DOC, entitled "GID Treatment Recommendation Request Form." Ex. T.

At least with respect to the recommendation for hormone therapy, there is no room for doubt that the requests for "specificity" were a pretext from the beginning. All DOC witnesses questioned on this point admit that they had sufficient specificity on this issue from the time the

original doctor's order was written in April, 2005. Martin Dep. at 171; Deposition of T. Marshall ("Marshall Dep.") at 196-97, Ex. U; Weiner Dep. at 60-61. In any event, even if there had ever been a legitimate question as to UMass' view of the recommendations and of the DOC's concerns or about the specificity of prescribed hormone treatment, those questions were answered no later than April, 2006.

By January, 2007, the DOC had still done nothing to implement or further review the prescribed treatment. Id. at 231-32. Perhaps the lens through which the DOC has viewed the matter of Ms. Battista's mental health care, and the real answer to what has been driving their treatment (or non-treatment) decisions all along, is best seen in a letter sent to Ms. Battista by DOC counsel in February, 2007:

> As you are well aware, the validity of your diagnosis for GID is the subject of the above-cited litigation.... *Presently, it appears that the status of your medical treatment for GID will have to be resolved through the litigation you initiated*."

Ex. V (emphasis added).

Asked whether this was an accurate description, and whether of what was really happening with Ms. Battista's care, Mr. Weiner recently testified: "It would seem that way." Weiner Dep. at 231-32.

## C.     Dr. Levine's Evaluation and the DOC's Lack of a Concrete Treatment Plan

In early 2008, the DOC finally retained a GID consultant, Dr. Levine, to replace Fenway. Dr. Levine met with Ms. Battista in early June, 2008 to conduct his own evaluation. He concluded that "of course" Ms. Battista suffers from GID, and that she needs treatment. Ex. A. His recommendations included psychotherapy, and creation of a "GID support group.". With respect to hormones, he did not disagree with the recommendation in the Fenway report to provide hormones, but simply cautioned that it should be done in conjunction with therapy, and

medically cleared for potential complications associated with Ms. Battista's life-long genetic

condition, congenital adrenal hyperplasia.[5]

It remains unclear exactly what the DOC intends to do with respect to Ms. Battista's

treatment. Asked recently at deposition about what the next steps were, Terre Marshall testified:

> We are going to- I guess it depends. We are going to put this
> recommendation in front of the committee we have yet to establish
> to initiate the treatment plan and the process of certainly intensive
> individual therapy in the very near future.

Marshall Dep. at 91.

Further, according to Ms. Marshall, the DOC anticipates deferring a decision on hormone

therapy until a period of six to twelve months of therapy, and that decision will be left up to yet

another clinician (the new vendor's chief psychiatrist, who is not a GID specialist). Thus, even

in the best case scenario, and even assuming the DOC does not attempt to influence the decisions

of its new providers as it appears to have attempted with UMass, Ms. Battista will be forced to

wait another six months to a year from whenever the yet-unformed committee is created and

implements a treatment plan.

### D.    Ms. Battista's Continued and Obvious Distress

In April and May of 2005, her increasing anxiety, depression, and distress were noted by

medical and mental health personnel. An April 26 psychiatry record notes Ms. Battista's

anxiety, depression and anger at the delay in receiving her treatment, and that she was started on

Doxepin. On May 17, her Doxepin was doubled, due to the fact that she was "increasingly

agitated, tearful and could not concentrate." Ex. W.

---

[5] According to the Defendants' statement in the Joint Status Report submitted to the Court this week, they may raise this as another reason to avoid the hormone recommendation. Importantly, however, Dr. Levine was apparently unaware that the endocrinologist who wrote the initial prescription is also the physician who has been treating her for CAH throughout her incarceration, therefore was well aware of the CAH when she issued the original order.

On numerous occasions during this period, Ms. Battista wrote to Commissioner Dennehey, Director of Health Services Susan Martin, and Superintendent Robert Murphy, describing in detail her depression, anxiety, weight loss, loss of motivation, thoughts of self-harm and general despair. In August, 2005, Ms. Battista was started on Prozac to alleviate some of her symptoms. On October 4, her psychiatrist discontinued the Prozac, noting that the medication "failed to make him feel better" and did not address the GID. Ex. X. On October 8, Ms. Battista tried to self-castrate, based on her belief that removing her testicles would lower her testosterone, thereby providing some relief. She was unable to complete the castration, and reported herself when the wound became infected.

Ms. Battista continues to suffer from anxiety, depression, eating disorders and an overall sense of helplessness and despair associated with her GID. The most acute periods of suffering for her have been when something happens to give her hope that she will get treated for her disorder, such as the doctor's order in April, 2005, and then that hope is extinguished. Even DOC personnel acknowledge that this could be a particularly vulnerable time for her, in light of the encouraging news that Dr. Levine has confirmed the diagnosis, if anything further is done to delay or challenge her treatment. Weiner Dep. at 229.

## III.    ARGUMENT

It is settled law that prisoners are entitled to adequate medical care, and that correctional officials are not constitutionally permitted to be deliberately indifferent to a serious medical need.. Ms. Battista has a serious medical need: she has been diagnosed by two qualified GID specialists as suffering from GID, and the minimal counseling the DOC has been providing for the past three years has failed to meaningfully address her disorder or alleviate her symptoms.

Further, it is abundantly clear that the DOC has consistently approached the clinical management of her GID as a legal, not a medical, problem, and that even the cited differences in medical opinion it relied on to avoid an injunction two years ago were manufactured as a litigation strategy. For years, the Defendants have ignored the recommendations of their contracted medical and mental health providers, the requirements of their own regulations, and Ms. Battista's obvious suffering. To call this conduct "deliberate indifference" might in fact be an understatement. Accordingly, she has established a likelihood of success on the merits.

The balance of harms also supports an injunction. The only "harm" to the Defendants is an order requiring them to implement a three year old treatment recommendation, when they have had years to address any legitimate concerns they might have. In contrast, each day of continued uncertainty, depression and hopelessness is a day of Ms. Battista's life that she will never get back. Finally, it cannot serve the public interest to condone the calculated and strategic neglect of a known medical condition. Public policy as well favors issuance of an injunction.

### A.    Ms. Battista is Likely to Succeed on the Merits of her Claim for Injunctive Relief

Ms. Battista's status as a civilly committed person creates a dual layer of constitutional rights. The Eighth Amendment prohibits prison officials from acting with deliberate indifference to a serious medical need, and from interfering with medical treatment once prescribed:

> Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in *intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.*

Estelle v. Gamble, 429 U.S. 97,104 (1976)(emphasis added);  see also Farmer v. Brennan, 511 U.S. 825, 832 (1994) (prison officials "must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care.").

Ms. Battista, moreover, is entitled to even greater protection as a person whose conditions of confinement do not reflect a punitive purpose. See Youngberg v. Romeo, 457 U.S. 307, at 321-22 (involuntarily committed individuals "are entitled to *more considerate treatment and conditions of confinement* than criminals whose conditions of confinement are designed to punish.") (emphasis added). Accordingly, a prisoner's Eighth Amendment rights are merely the bare minimum standard for civilly committed persons. See Revere v. Massachusetts General Hospital, 463 U.S. 239, 244-45 (1983) ("[T]he due process rights of a person in [a pre-trial detainee's] situation are at least as great as the Eighth Amendment protections available to a convicted prisoner."). Under either the Eighth Amendment or the Fourteenth, Ms. Battista has established a likelihood of success on her constitutional claims.

1.  Ms. Battista Has a Serious Medical Need That is Not Being Adequately Treated

GID has been recognized as a serious medical need where it is sufficiently severe to cause intense and enduring distress. See Kosilek v. Maloney, 221 F. Supp. 2d 156, 184 (D. Mass. 2002) ("Kosilek I"). Ms. Battista's GID has required frequent interaction with mental health staff, she has been placed on "watch" several times when in particularly intense distress and been on and off medication designed to help her cope with the depression and anxiety associated with her condition, and has gone so far as to attempt self-castration. There can be no doubt that this is a source of significant and persistent suffering for her.

Further, a "serious medical need" has been found to exist where a physician has ordered treatment, because that physician's judgment in concluding that treatment is warranted is

tantamount to a finding that the condition is real and is serious. <u>Estelle</u>, 429 U.S. at 104;

<u>Gaudreault v. Mun. of Salem</u>, 923 F.2d 203, 208 (1st Cir. 1990). Here, two qualified clinicians

retained indirectly by the DOC have diagnosed Ms. Battista with GID and recommended the

treatment she seeks, DOC's contractual mental health provider has repeatedly endorsed and

recommended the treatment, and a qualified endocrinologist has conducted a physical

examination and prescribed the actual medications to be administered.

There is similarly no question that the "treatment" she has received to date is minimal

and insufficient to meet her needs. The DOC has long insisted that it is providing "some"

treatment, by offering counseling. The fact remains, however, that three years of this counseling

have not substantially alleviated Ms. Battista's symptoms. In October, 2005, Ms. Battista's

psychiatrist essentially admitted the futility of treating her distress with psychiatric medications:

> After having failed to make him feel better on Rx and in view that I
> have never given him any diagnosis other than gender identity
> disorder, for which there is no medication indication in the first
> place, I shall discontinue his Rx, not because he 'refuses' Rx, but
> because I do not see any indication for it after failed trial to
> decrease his disappointment and anger.

<u>Ex</u>. X.

Ms. Battista later began seeing Diane McLaughlin, who is not a psychiatrist, and not a

specialist in GID, for brief monthly visits, in which the topic of discussion is generally Ms.

Battista's frustration over her lack of treatment. Even the DOC does not believe that this

minimal counseling is effective treatment for Ms. Battista. Weiner Dep. at 219-20. In short, the

DOC may be taking steps to help Ms. Battista cope with the emotions associated with the delay

in her treatment, but what she is receiving is ***not*** treatment for her GID. As the court in <u>Kosilek I</u>

noted when considering the adequacy of similar therapy:

> ...this would not constitute treatment for Kosilek's gender identity
> disorder. Nor would it be consistent with the DOC's practice with

> regard to other serious illnesses. As Hughes testified, if Kosilek
> had cancer, and was depressed and suicidal because of that disease,
> the DOC would discharge its duty to him under the Eighth
> Amendment by treating ***both*** his cancer and his depression.

221 F. Supp. 2d. at 188 (emphasis added)

Finally, where the GID specialists, the treating mental health clinicians, the physicians responsible for overseeing the delivery of health services for the DOC population, and the endocrinologist who would be responsible for hormone administration are unanimous in their view that the appropriate treatment for Ms. Battista's GID should include hormone therapy, it strains reason to believe that the decision of DOC prison officials to provide minimal monthly therapy that even they believe is inadequate satisfies their constitutional obligations.

2.    Deliberate Indifference

Interfering with a prescription or order actually written by a physician is almost by definition "deliberate indifference." See Estelle, 429 U.S. at 104-05; see also Miller v. Fisher, No. 92-CV-973, 1993 U.S. Dist. LEXIS 15192, at *7-*8 (N.D.N.Y. Oct. 25, 1993) (listing intentional interference with prescribed treatment as example of deliberate indifference). Here, there is no question that there was a written order, and unanimity among the treating professionals. Nonetheless, DOC personnel did nothing for three months after the order was written and, then launched a three year campaign, after the lawsuit was filed, to influence the medical providers to change their minds and to create the appearance of uncertainty around the diagnosis.

Moreover, any semblance of reasonableness that might otherwise have attached to the DOC's initial reluctance to administer the hormone therapy collapses in the face of the facts. Under the most generous interpretation, the DOC had confirmation of the judgment of its clinical team, after a full review of all concerns raised, no later than April, 2006. There is simply no

excuse for DOC's utter inaction and/or deliberate interference with the commencement of meaningful treatment for Ms. Battista's GID for four years after her diagnosis and three years after the prescription was ordered. See Malik v. UMass Correctional Health, No. 2006-00877, 2007 Mass. Super. LEXIS 361, at *13 (Mass. Superior Ct. at Worcester, Aug. 17, 2007) (noting that delay of over *one year* in providing treatment could constitute deliberate indifference). Indeed, even DOC's Weiner admits that the time DOC has taken to do "due diligence" on the treatment recommendations was not reasonable. Weiner Dep. at 224.

Finally, these very defendants have been on notice of what is expected of them under the Eighth Amendment since the decision by Judge Wolfe in Kosilek I. Judge Wolfe took then-Commissioner Maloney to task for treating an inmate's GID "primarily as presenting legal issues rather than medical questions," and clearly outlined the DOC's future obligations:

> The court expects that, educated by the trial record and this decision, Maloney and his colleagues will in the future attempt to discharge properly their constitutional duties to Kosilek.... *While concerns about security and public controversy have made him reluctant to do more for Kosilek than the law requires, the court does not expect that Maloney will be recalcitrant in the future.*
>
> ...Thus, the court expects that Maloney will follow the DOC's *usual policy and practice of allowing medical professionals to assess what is necessary* to treat Kosilek.

Id. at 193.

If there was any doubt prior to 2002 whether (i) GID could rise to the level of a serious medical condition; or (ii) the DOC was authorized to interfere with the clinical judgment of qualified medical providers on GID diagnoses and treatment plans, those doubts should have been amply dispelled by the Kosilek I decision.

Nonetheless, Defendants continued to undermine, question, and ultimately ignore the recommendations coming out of Ms. Battista's clinical evaluations. This is flatly inconsistent

with the DOC's own regulations, which provide that clinical decisions are the "sole province" of the provider, and with the Defendants' constitutional obligations as described in Kosilek I.

## B.     The Balance of Harms Favors an Injunction

Ms. Battista's allegation of a deprivation of constitutional rights alone creates a presumption of irreparable harm. See Wal-Mart Stores v. Rodriguez, 238 F. Supp. 2d 395, 421 (D.P.R. 2002) ("A presumption of irreparable harm flows from and is triggered by an alleged deprivation of constitutional rights."), vacated on other grounds, 322 F.3d 747; see also Phillips v. Michigan Dept. of Corrections, 731 F. Supp. 792, 801 (W.D. Mich. 1990) (no further showing of harm required when an alleged deprivation of a constitutional right is involved).

Though it is the allegation, not the demonstration, of a constitutional violation that triggers this presumption, in this case Ms. Battista has set forth a clear record of the Defendants' persistent and willful refusal to acknowledge the clinical judgment of their contractual medical providers, efforts to undermine and contradict that judgment, and apparent disregard for her suffering. Accordingly, Ms. Battista has not only alleged, but also demonstrated, a violation of her constitutional rights under the Eighth and Fourteenth Amendments.

Even in the absence of such a presumption, the harm to Ms. Battista is clear. Though not currently in a crisis state, she continues to suffer depression, anxiety, weight loss, and an overall sense of despair and hopelessness associated with her inability to physically express what she feels to be her true gender. Even DOC personnel acknowledge that this could be a particularly vulnerable time for her, in light of the encouraging news that Dr. Levine has confirmed the diagnosis, if anything further is done to delay or challenge her treatment. Weiner Dep. at 229.

In contrast, the harm to the Defendants is negligible. Any claim that administering hormone therapy to Ms. Battista will bring about any significant negative consequences to the

Defendants is belied by the fact that (i) the DOC already maintains inmates on hormones in other correctional facilities without undue incident; and (ii) the Defendants have done nothing for the past three or more years to assess or address any security risks associated with this treatment. Deposition of R. Murphy ("Murphy Dep.") at 187-92, 173, <u>Ex</u>. Y. Ms. Battista's request for relief provides ample time for the DOC to develop an implementation plan that addresses any legitimate security issues prior to the proposed deadline for commencing treatment.

**C.    Public Policy Favors an Injunction**

Allowing Ms. Battista to finally enjoy some relief will not in any way adversely affect the public interest, and in fact public policy considerations overwhelmingly favor such an injunction. Holding prison officials accountable for their constitutional obligations, and ensuring the protection of Eighth and Fourteenth Amendments in the prison system, serves the public interest. See <u>Phillips v. Michigan Dep't of Corrections</u>, 731 F. Supp. 792 (W.D. Mich. 1990)("the public interest will be served by safeguarding Eighth Amendment rights in the prisons in Michigan. As defendant acknowledged in oral argument, this Court is bound by law to keep a balance between efficient prison management and keeping prisons a humane place: in this case, there is a glaring need for the latter goal."). Public policy simply cannot favor allowing prison officials to continuously and systematically interfere with the medical judgment of trained professionals, or to treat the ongoing clinical management of an individual with an obvious need for treatment as a matter of litigation risk rather than therapeutic intervention.

IV.    **Conclusion**

For all of the reasons set forth herein, Ms. Battista respectfully requests that the Court

enter an injunction ordering the Defendants to (i) commence hormone therapy for her GID no

later than September 30, 2008; and (ii) take all reasonably necessary steps in the meantime to

update her prescription, implement appropriate psychotherapy, and develop a plan to address

whatever reasonable security concerns they might have.

Dated:  August 6, 2008                Respectfully submitted,

                                      SANDY J. BATTISTA

                                      by her attorneys,

                                      /s/ Emily E. Smith-Lee_____    _____
                                      Emily Smith–Lee (BBO# 634223)
                                      Neal E. Minahan (BBO#661371)
                                      Dana M. McSherry (BBO #664430)
                                      Ada Sheng (BBO#664775)
                                      McDermott Will & Emery LLP
                                      28 State Street
                                      Boston, MA 02109
                                      tel: 617.535.4000
                                      fax: 617.535.3800

## CERTIFICATE OF RULE 7.1 CONFERENCE

Pursuant to Local Rule 7.1, I hereby certify that, on August 6, 2008, I conferred by telephone with Defendants' counsel Richard McFarland in a good faith attempt to resolve or narrow the issues raised in the foregoing Motion.  The undersigned has been unable to narrow the issues.

                                      /s/Emily-Smith-Lee

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 6, 2008.

                                      /s/ Emily E. Smith-Lee_____
                                      Emily E. Smith-Lee

# EXHIBIT A

**Stephen B. Levine, MD**
Center for Marital and Sexual Health
23230 Chagrin Boulevard #350
Beachwood, Ohio 44122
216 831 2900
fax 216 831 4306

Wednesday, June 18, 2008

Aminadov Zakai, MD
MHM Services, Inc.
50 Commerce Way
Norton, Massachusetts, 02766-3313

Re: Sandy J. Battista formerly named David Megarry

Dear Dr Zakai,

Thank you for enabling the 1 hour 50 minute interview at the Treatment Center today with this 45 year old never married man who has served three sentences for robbery and kidnapping and rape of a ten year old girl. No longer serving a sentence for these crimes, Sandy is civilly committed as a registered sex offender until a panel decides that he is no longer a great risk to society. At this point, his civil commitment is for an indefinite duration—1 day to forever

Sandy is again in litigation trying to force the implementation of 2004 recommendations of the Fenway Clinic to begin hormones. He hopes to get hormones at his current institution and eventually be free man. He thinks about flying to Thailand to obtain sex reassignment surgery but he says he is not actually certain that he wants surgery, in part, because he thinks that the surgery is mutilating. Sandy describes himself as generally pessimistic about getting what he wants.

Sandy is a 5 feet 7 inch, 136 lb well groomed clean shaven frontally balding male with a slightly feminine handshake and wave. He says his waist is 28 inches. Sandy's long hair was carefully braided. His overall appearance reflected considerable care in clothing. Sandy sat still, conversed rationally, seemed to be forthcoming, and possessed an adequate vocabulary. Sandy's appearance did not show his anticipatory anxiety about this interview. He said that he had trouble sleeping and cried a lot with worry that I would not support the recommendations for hormones. He demonstrated no gross abnormalities of mental status—mood, cognition, or perception.

I see Sandy's gender problem in the light of six issues:

1            He has been cared for by foster families and various prison systems for almost 30 years. Prior to adolescent foster placements, he lived with his mother, maternal grandmother, paternal grand parents, and his father for varying lengths of time. His parents and grandparents are now deceased

11                                                                                                    1

and he is basically alone in the world except for a sister who lives in southern Ohio, where he does not wish to reside. She may not know about his GID.

2.  He has the most common form of male congenital hyperplasia (CAH) and is on prednisone. It is not the salt wasting variety. He claims that he feels the same on and off prednisone. Medically, without prednisone, he might experience adrenal insufficiency, however, which can be fatal if unrecognized. Although CAH is a form of intersex condition, in his case it resulted in precocious puberty in his second year of life not ambiguous genitalia. Sandy's genitalia were normal at birth and still are apparently. The influence on males with CAH is not well studied. The adolescent and adult sexual identities in girls with CAH have been scientifically carefully scrutinized. The general conclusion is that CAH does not lead to GID, at most, it leads to masculine gender role behaviors without an increase of lesbianism Although Sandy has CAH, I don't think it would be justified to say that his GID is due to an intersex condition. He does not have an intersex condition; his genitalia are not ambiguous by report and I presume by repeated physical examinations.

3.  He is a convicted pedophile who continues today to have transient awareness of the attractiveness of 9-11 year old girls—that is, those who are on the cusp of puberty. He has made considerable progress in developing victim empathy and effective avoidance techniques for not allowing himself to dwell on his pedophilic eroticism. He claims to think about with regret his crimes almost on a daily basis and now he feels badly for his victims.

4.  He has very poor recall of his childhood, does not remember anything about the "accidental" murder of his mother by his father in front of him. He denies being abused and only has good memories of his times with his grandparents and father. He has forgiven his mother so much so that in choosing a new gender-neutral name in 1995, he took his mother's maiden name to honor and to forgive her. He does not now recognize himself as abused and suggests that the recurrent references to these events may be an error in understanding. (Numerous evaluators have described him as being sexually abused.) He emphasized that his father was convicted of manslaughter, not murder, and that he accidently killed his mother. Sandy gave the impression of not wanting to recall. He claims not to have any intrusive disturbing memories of his youth, although he thinks his crime almost daily. This suggests to me that the fixation on the bodily discomfort and wish to have it relieved may play a major role in suppressing his memories of early life chaos and pain.

5   Sandy seems to have come a long way in prison from his impulsive aggressive molesting irresponsible uneducated youth that is recurrently described in the numerous reports about him that were provided to me Apparently, this maturation is real, he is calm, has not been a behavior

problem in recent years. He is motivated to get out of prison and to get hormones. It would be hard not to consider David Megarry in his early years in prison as poorly socialized irresponsible dangerous psychopathic man. Sandy never accomplished any vocational success outside of prison. He was separated from the US Army after 8 months of disciplinary problems which may have included drunkenness and wearing of female underpants. Today, he is proud of his accomplishments. He works in prison—he landed a prime position in Property on Dec 26, 2007 and has been working effectively there since. He has worked in other prison roles as well. He says he is now somewhat educated, takes personal responsibility for his crimes, is honest and compassionate, and is no longer violent. Generally, he is untrusting and pessimistic. He states that he wants a normal life, to be reconnected with his family (all dead but a sister), and make something of himself. He hopes to get into a two-year post prison program in Boston where he can get support, counseling, and work. St Andrews is the only place he knows that takes sexually dangerous offenders. It has a long waiting list, he claims.

6.    Having been rejected by his mother for his pigeon-toed deformity and his precocious puberty as a "freak", he remains sensitive to any form of rejection as a freak. He distinguishes himself from the sexual perverts in Bridgewater who masturbate in a closet when they see an attractive Corrections Officer or who have two or three way homosexual sex. His masturbation is irregular, perhaps averages monthly, and only involves his rectum. "I don't stimulate my penis." He rarely ejaculates. He is embarrassed by this revelation. I am not sure he has shared his masturbatory method with other evaluators. This sensitivity to being labeled a "freak" means to me that his self categorization as a Trans person removed Sandy from the category of freak and placed him in a new unstigmatized one. While corrections officers or prisoners may refer to Trans prisoners as freaks, Sandy is able to see this as a reflection of their ignorance. Out in the free world a man who appears dressed as a woman often encounters name calling and sometimes the threat of violence. It is important that Sandy work on this issue since Sandy values so highly the lack of recent personal violence.

Of course, Sandy is some form of gender identity disorder. While this initial reevaluation did not have the luxury of time to review the development and evolution of his gender identity, orientation, and intention as a child, adolescent, and adult, the subject deserves tracing as accurately as possible. Currently, he does not use his penis for masturbation, he sits to urinate, and likes to think of himself as a woman. When he is seen naked by others, he is embarrassed by having male genitalia. He said that when he tried to increase his masculine gender roles through beards, tattoos, or weight lifting, these activities eventually made him less comfortable. Once he realized this, he allowed his slender petite body to revert to its natural form. In the process of starving himself for days on end for this purpose, he lost 40 lbs. His quest is to gain access to female clothing and

31                                                                                          3

06/24/2008  16:03    5084223386              DEPUTY COMM MADDEN              PAGE  09/18

hormonal treatment in the immediate future. He denies any autogynephilia, in fact, he laughs uncomprehendingly that anyone would be turned on to the image of the self as a female. He is says that his dominant orientation is directed at women. But his interest in attractive women is not so much to their bodies as it is to their clothing and styling opportunities. He imagines loving and making love with a woman as a woman, a woman as petite as he now is. He is sexually attracted to men but not romantically. "I am bisexual." He has had four sexual experiences with men in prison, one with a woman prior to prison. But his description of orientation as bierotic is actually incomplete. Sandy acknowledges that he is still capable ("always will be!") of being attracted to prepubertal girls. Since 1995 when he announced and obtained a name change, he has expressed his femininity socially. This has caused him to lose and gain a few friends. It has enabled him to learn about his legal rights and to focus his life on his eventual becoming a woman. He claims never to have had sexual arousal to girl's or women's clothing. (that is, he denies a fetishistic transvestitic pattern) Sandy's sexual drive is not strong, never was, he claims. He does not like having a penis. His last sexual experience with a man was three years ago. He won't do this again because the few moments of pleasure of having an erection in him is not worth the consequences of being discovered to be a rule breaker who can't control himself. The benefit/risk ratio is terrible for him. He sees himself as a woman but not a transsexual woman—a woman! He seems a bit disinterested in exploring the relationship between his sexual identity mosaic and his inconstant, shifting, unsoothing parental attachments. If he had freedom to select an ideal sexual partner, it would be a small woman with his shape. He would then think of himself as a lesbian.

Apparently, Sandy tried to castrate himself in 2005 to lower his testosterone level and its unwanted masculinizing effects after he felt thwarted by the DOC's refusal to honor Fenway's recommendations for hormones for him. He did this in his cell with a razor blade and although he carefully studied the procedure in advance, he was surprised by the anatomy, the blood, and the pain. He sewed his incision up, packed himself with gauze, and went to bed. By the next day, he had an infection and sought help. He was put in the hole for this behavior. While he was cited for this disruptive behavior, he emphasized that it was considered carefully, researched, and planned; it was not impulsive. Sandy sees this as different from tickets for bad behavior that he got when he was younger. The castration attempt was the culmination of nervous breakdown he gradually had. He could not stop pacing in his cell and crying all the time. He would not eat or shower. His cell mate complained that he smelled. He was temporarily placed in the crisis unit. He is not interested in self surgery any longer.

Sandy claims that he has always been afraid of actual sex with a woman because she might not like his body. Children seem less dangerous and critical to him and are less likely to see him as a freak. This was his sense of why he attacked and molested little girls. He is very sensitive because of his mother's perception of him as a freak to any labeling of him now.

I have read/scanned the report of *lengthy* commentary of consultant Ms. Cynthia Osbourne, MSW and the *lengthier* rebuttal of Drs. Kapila and Kaufman, the original

evaluators at Fenway Clinic. While each has made some cogent points about the other party's views, my view of both written reports and the diagnosis and treatment of GID are fundamentally different. I don't really expect most readers to be able to find the time, interest, and concentration to read over 20 single spaced pages on most topics. The issue is that this prisoner has a form of GID, complicated by his horrendous early life history, his demonstration of his capacity to violently harm a child, and his imprisonment for an indefinite amount of time. The two reports represent a distinctly pro triadic therapy (real life experience, hormones, and SRS) and a distinctly con triadic therapy approach. Both are extreme. There is no reason to doubt that Sandy has a form of GID; Osbourne's major point is that the therapy approach should take into consideration many more factors than this diagnosis per se.

**Tentative Diagnoses:**
Axis I  "Sexual identity mosaicism" characterized at least by
        Gender Identity Disorder of Adulthood, attracted to women and men,
        AND
        Pedophilia
Axis II
        Psychopathic Personality Disorder, much improved in prison environment
Axis III
        Congenital Adrenal Hyperplasia, 21-hydroxylase deficiency (likely), relatively
        mild without genital malformation.
Axis IV
        Frustration over not getting the treatment that Fenway recommended
        Frustration over not knowing when he is to be released from Bridgewater (it is
        reasonable to speculate that he is also very frightened about leaving Bridgewater)
Axis V  very low prior to imprisonment
         Relatively high in recent several years considering the prison environment

**Recommendations for the management of GID**
    1       Draw AM testosterone level to see if he is actually hypogonadal (note
            the low sex drive)
    2       Assign someone to continue this evaluation with the aim of getting him
            positioned to be part of the DOC gender identity program
    3.      Hormone treatment is a possibility but it is preferable that it be done
            within the context of therapy where he can face his fears about their
            dangers and slowly come to grips with their limitations. We need to
            recognize that there probably is no medical experience with giving
            estrogens to someone with CAH so they must be given cautiously with
            careful monitoring. Sandy Je Battista is a strong argument for
            developing a GID program. It will likely help the prisoner considerably
            just being part of it.
    4.      I think he would make a very good core group member if there was a
            group for Trans prisoners.

51                                                                                      5

5.   Make every effort to value his continuing high level work in property and his ability to remain honest in that position, as this is evidence that his psychopathy is better controlled now

6.   Every effort should be made to praise his accomplishments in prison in the last few years and he can be given access to more feminine canteen materials once these are specifically defined and judged to be safe for the environment.

7    Since Sandy has such a horrendous early life history with masochistic underpinnings, he needs to understand that for some peers in prison, his feminine expressions may excite them into trying to attain domination of him, in a manner that is representative of his past abuse   The social risk of feminization for him must be balanced by his capacity to resist being treated intimately as a female only to be abused anew.

8    Staff should be mindful that by increasing his feminization through hormones and participating in a gender problem is not likely to permanently end his pedophilic attractions   While estrogen is likely to lessen the intensity of his sexual drives, it will not alter the direction of it (towards 9-11 year old girls).   If his testosterone levels are hypogonadal prior to estrogen administration, it may be that no attenuation of his sexual interest in girls will occur.   The medical staff might consider using Provera in the future as an inexpensive but effective antiandrogen.

Respectfully,


Stephen B  Levine, MD

61                                                                              6

# EXHIBIT B



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Health Services Division*
*45 Hospital Road, S Bldg., P.O. Box 317*
*Medfield, MA 02052-0317*

Larry E. DuBois
*Commissioner*

Michael T. Maloney
*Deputy Commissioner*

Kathleen M. Dennehy
*Associate Commissioner*

*Phone: (617) 727-8528*
*Fax: (617) 727-8569*

TO:    Victoria Russell, MD

FR:    Kathleen M. Dennehy, Associate Commissioner
       Classification, Programs & Health Services

DA:    February 11, 1997

RE:    Sandy-Jo Battista, W39562

The above named inmate has written to me requesting that DOC policy be revised to address transsexualism. Would you review his correspondence and advise me on the issues he raises. I've requested a copy of his medical record. Upon receipt, I will forward it to you for your review and comment.

KMD/pm

cc:    John D. Noonan, Director, Health Services
       File:inmissue\battista.sj3

P.S.    I've enclosed a copy of Illinois DOC's policy relative to the evaluation of inmates with gender identification problems.

DOC 000670

# EXHIBIT C

To:    Kathy Dennehy
From: Victoria

Response to "Help":  Off the top of my head comments re SJB
                    Exactly what are you looking for?
                    Hopefully, the start of a dialogue

1. For any named psychiatric condition, the first step is to make an adequate diagnosis. Regarding gender identity dysphoria, it is not enough to be unhappy in one's culturally defined role, etc. It is not enough to say, "I am a woman, make me one," as SJB is doing. Diagnosis not only involves naming the problem but also making a predictive statement about whether or not the individual could endure the stress/challenge of changing one's identified gender role/identity. Thus the need for projective testing (MMPI, TAT, Rorschach) and intensive diagnosis, made in this case by a doctoral level therapist.

2. The Standard of Care (FINE choice of words) is to dress in the gender appearance and role of choice IN THE CHOSEN ENVIRONMENT. It never happens in a vacuum. This is a complex task, and in the community it would involve a progression from changed gender dressing at home, with friends, in the neighborhood, at work, etc. Therapy would be ongoing, designed to support the individual in dealing with the inevitable difficulties this would involve. The DOC would have to consider whether its commitment to Inmates involves setting them up in their chosen community environments in which the cross dressing and/or hormonal treatments could take place—because that is actually The Standard of Care, not pushing hormones in an isolated prison environment—which is nobody's chosen environment. Consider: to start developing bosoms in prison population would be to invite physical assault, something no reasonably competent therapist would wish on any client. And on the other hand, the Inmate has committed a crime which by definition prevents his/her being located in a less hostile environment.

3. It must also be remembered that elective procedures are just that: they are not necessary to save a life. What is the Medical—not cosmetic—bottom line? If the DOC attends to the "quality of life" issues as a MEDICAL Standard of Care, as SJB wants us to do, would the DOC then be obliged to do tummy tucks and liposuctions as also furthering "quality of life" issues for other (non sexually) unhappy Inmates? What makes sexual unhappiness (that is what dysphoria means) more compelling than the many other types of agonies other Inmates have?

# EXHIBIT D

*Institution:*
*Norfolk*

*7 q" Boy*
*XX or XY*

Victoria Russell, M.D.

████████████

To:     Kathleen Dennehy, Associate Commissioner, DOC
From:   Victoria Russell, M.D., Consultant in Psychiatry
Date:   17 March 1997
Re:     Sandy-Jo Battista/David Megarry     W39562

The above-named 35 year old Inmate has been incarcerated since 1986, eleven years ago; and
apparently will be serving for another five years, until 2002. Because it is relevant for further
discussion, the reason for his incarceration involved a violent assault on a young girl. In
December of 1996, three months ago, without any previous discussion with caregivers, either in
mental or physical health, the Inmate changed his name to that of a female, and notified staff of his
wish to undergo a sex change operation. He later modified his request to being able to take
female hormones and wear women's underwear. Although his requests were turned down, it is
worthwhile to examine this Inmate's background in some detail in order to gain some insight into
his recent behavior.

Medical Background:

The reason the Inmate needs cortisone on a daily basis is due to his unusual medical condition
called Congenital Adrenal Hyperplasia (CAH), a disorder of cortisol metabolism caused by
enzyme deficiencies within the adrenal gland. Medical notes within his file seem to indicate one or
another of the known types of enzyme deficiencies, but in fact there is no actual documentation of
what specific type of enzyme deficiency this Inmate has. This is highly relevant because people
with some forms of CAH are actually girls (chromosomal structure XX) but are born with the
appearance of being boys (chromosome structure XY) with somewhat malformed genitalia. A
review of his medical file reveals that he apparently was a normally formed little boy who
underwent precocious puberty starting at 18 months of age. This quickly led to the diagnosis of
CAH; and proper treatment with cortisol stopped the precocious puberty. Apparently, secondary
sexual characteristics then reappeared normally during the Inmate's adolescence. The Inmate has
written for medical records from University Hospital where the diagnosis of CAH was originally
made, but this information does not seem to be in his medical file.

Psychiatric Background:

Tragically for the Inmate, undergoing precocious puberty meant that he was treated as a freak. It
also meant that he was separated from his family of origin because they could not pay for his

(2)

diagnosis and treatment. He was locked in closets, taunted, abused. When he was 4, his mother died. There is no possible way for this individual to have felt comfortable with his sexual apparatus as a result of this brutality.

The Inmate's later psychosocial adaptation was poor and he was identified early on as a sexual predator. He spent three years of his adolescence in a State Hospital because of sexual assaults on a girl, then soon after his release repeated his offence which resulted in his present incarceration. He was not cooperative with treatment interventions when he was an adolescent. He has not been interested in treatment for his criminal sexual behavior during this incarceration. This Inmate's behavior indicates sexual dangerousness of very long standing.

Taken in the context of his past experience and behavior, this Inmate's name change and requests for a sex change are bizarre at best, and psychotic at worst. As previously discussed, when dealing with highly charged emotional issues such as sexual preference and behaviors, it is most important to stick to diagnostic facts and not be swayed by semi-legalistic arguments for mutilating surgery or abnormal hormonal interventions. The facts are that this Inmate is dangerous to females. He has suddenly decided that he "always" wanted to be female, despite his history of hurting females. It takes no experience in any mental health field to realize this does not make sense. No reasonably experienced therapist would consider recommending an individual with this history for a sex change operation without extensive testing and therapy. The Inmate has had neither. On my opinion, this Inmate would never be a reasonable candidate for sex-change surgery.

Nonetheless, the Inmate has made his request. Although his request for surgery should of course be denied, several things can be done which might help with management:

1. Medical records should be obtained and this Inmate's Karyotype should be assured (XX or XY). Enzyme studies from the 1979 UH admission should be located to find out the exact nature of his original adrenal hormone/enzyme deficiency.

2. His current adrenal status should be identified. This syndrome is unusual, and there are cases where certain deficiencies can be life-threatening. Appropriate blood tests should be done. The Inmate should be evaluated by an Endocrinologist who specializes in the Adrenal Gland, NOT a urologist.

3. This Inmate certainly is mentally disturbed, although the Axis I diagnosis is probably not simply a Transgender Issue. What will help with any psychological discussion with this Inmate is adequate diagnosis. Therefore, he should have extensive diagnostic testing including MMPI and any projective testing which would reveal conflicts around sexuality.

4. If the Inmate complies, he should be offered therapy to explore his obvious ambivalence regarding his own sexual appearance, behavior and physical characteristics. However, it is essential to understand that his conflicts are virtually life-long, and therefore not likely to be amenable to treatment.

DOC 000633

# EXHIBIT E

CONFIDENTIAL
CONFIDENTIAL

The Commonwealth of Massachusetts
Department of Corrections
Massachusetts Correctional Institution - Norfolk
Norfolk, MA 02056

## PSYCHOLOGICAL ASSESSMENT REPORT

### CONFIDENTIAL

Name: Sandy J. Battista          Identification #: W39562
 a.k.a. David Edward Megarry, Jr.
DOB/Age: 12/30/61; 35 yo          Occupation: Unemployed Inmate
Marital Status: Never married   Education: 8th Grade (GED 1982)
Dates Seen: 5/20, 6/9,17, 8/13/97
Medication: None                 Referred By: DOC/CMS
Examiner: J. Tyler Carpenter, Ph.D., ABPP

Reason for Referral: Mr. Battista was referred by the Department of
Corrections and Correctional Medical Services for a psychological
assessment for the purposes of assisting in the psychodiagnostic
evaluation of the inmate. The formal request had been made by
Victoria Russell, M.D., Consultant in Psychiatry, who wished to
obtain the results to assist the therapist in "... designing
appropriate therapy goals and interpretations" and because such
tests, "... are also given to people considering sex reassignment
surgery". The inmate is seeking specialized medical and
psychological treatment to assist him in his ultimate goal of
receiving a sex change operation. Mr. Battista is hoping to
initiate this treatment at the current time in preparation for his
operation after he is released from prison.

Limits of Confidentiality and Protection of Patient's Rights: The
examiner explained the Limits of Confidentiality and possible uses
of the evaluation by DOC and CMS to Mr. Battista, who clearly
understood both the limits and possible ramifications, signed a
detailed document listing the limitations, and agreed to the
evaluation. Inmate was informed that background information would
be reviewed and releases where appropriate were obtained.

Background Information: (The sources of information include the
following: QA Report on Transgender Issues of Inmates, 1/21/97, and
a Consultative Medical Evaluation, 3/17/97, by Victoria Russell,
M.D.; Probation Officer's Report by Paul G. Bernard; Sexually
Dangerous Person Examination by Daniel M. Weiss, M.D., 3/9/84;
Pretrial Intake Report; an Offical Version and Criminal History; a
psychodiagnostic interview, and a review of his medical chart).

Mr. Battista presented the following history of the present
illness: He stated that as far back as he can remember he has felt
odd and different, but not necessarily female. In mid-1995 he
decided to change his name to a female name and at that time he
further decided,"I wanted to live my life as a female". He stated
that he gone through puberty as an infant and had been ridiculed by
others because of his large nose. He hid his feelings about these

DOC 000254

Battista, S.J.                           2                          5-8/97

instances until 1995, when he felt that he that he had gotten over them. He stated that the precipitating event was an interaction he had with an aggressive, outspoken inmate who questioned him about some incongruous behaviors, e.g., having his name on his bath slippers, his red bath robe, his shaved legs, etc.. Mr. Battista stated as he 'came out' (in his new identity) the feared ridicule and ostracism didn't occur.

Mr. Battista reported the following history of psychiatric treatment: Mr. Battista reported that in 1974 he was hospitalized at the Metropolitan State Hospital for "fooling around with my younger step sister". Mr. Battista stated that from 1975 until 1979, he was hospitalized at the Medfield State Hospital at the Steven J. Ott Center for an attempted sexual offense. Mr. Battista stated that he escaped two or three times and was not admitted as a psychiatric case. In 1982, Mr. Battista stated that he was hospitalized at Bridgewater State Hospital for a criminal competency trial. Mr. Battista denied any history of outpatient treatment.

Mr. Battista reported the following family history of medical conditions: Mr. Battista stated that his father suffered from alcoholism. It is reported that his mother died when the inmate was four years old. The inmate thinks that her death was related to a beating by her husband (his father). Mr. Battista and some of the records state that his father beat his mother for promiscuous behavior.

Mr. Battista stated that when he was five or six years old, after his mother died, he went to live with his maternal grandmother. He stated that he was subsequently removed for neglect and sent to his paternal grandmother and then he was moved in and out of that home, and between his father and paternal grandmother and foster homes. Mr. Battista stated that his father physically abused his stepmother and shot up the house. The inmate reports that he was the middle of three children and had an older sister and a younger brother and a younger half brother.

Mr. Battista stated that he couldn't remember if he was sexually or physically abused when he was young, but he does remember being removed from the home. He stated that he received very physical corporal punishment. He stated that he was locked in the closet and called a 'freak' by his mother until his grandmother took care of him.

Mr. Battista does not have any knowledge of his birth or milestones except that he said that he knows that his milestones were not delayed. He describes himself as being a of a shy temperament. Mr. Battista stated that he stayed back in first grade and was a below average student, but was never placed in special education classes. He stated that his life was that of a loner.

Mr. Battista stated that he was never able to take his clothes off in front of someone and that he had sex with a women on one occasion. He reported that no one ever explained sex to him and that he could not pinpoint the age at which he began to understand what sex was about. He felt that he learned the most about sex beginning with his incarceration at 21 years old. He reported that

DOC 000255

Battista, S.J.                    3                    5-8/97

he was locked in a locked DYS maximum security residential program
between the ages of 15 and 18 years old. He stated that he had
between one and two regular friends.

Mr. Battista reported the following occupational history: He
stated that he worked as a laborer and serving fast food. He stated
that these jobs that he described were generally unskilled. He
stated that the longest he held a job was between one and one and
a half years. He states that he has held between four and five
different jobs and always worked. He said that he was only out of
prison between 18 and 21. He stated that between 1/82 and 11/82 he
was in the military service and given a discharge that was
"uncharacterized". Mr. Battista stated that while he was in the
service, he got in a lot of fights, was unable to take orders, and
was frequently drunk and disorderly. He denied ever doing any time
in the brig.

Mr. Battista stated that he was never married.

When asked about his medical history, Mr. Battista stated, "I
can take pain, I don't care, in fights if its inflicted by others",
but if he inflicts it on himself he stated that he cannot handle
it. He stated that he doesn't experience physical discomfort as
others do and that he accepts it as part of prison life. Mr.
Battista stated that he wanted to go on a liquid diet so that he
would stop gaining weight.

Mr. Battista stated that between 10 and 13 years old that his
right eyeball was lacerated by blanks. He stated that he had was
born with congenital 21 hyperplasia which is an adrenal problem.
He stated that he takes medication to suppress adrenal function to
within normal limits. He stated that he received corrective surgery
between the ages of 6 and 7 for "pigeon toes". Mr. Battista denies
ever having any seizures or loss of consciousness.

Mr. Battista described his criminal and legal history as
follows: As a juvenile he was referred to the Department of Youth
services for an attempted sexual assault on a girl. He stated that
as an adult he was charged with breaking and entering an abandoned
warehouse. He stated that his current charge is the rape of a
child, kidnapping, and robbery. He stated that he had served
fourteen and a half years at the time of the testing.

Mr. Battista denied any attempt to kill himself (contradicted
by a contrary endorsement on question # 154 and 171 on the MCMI-
III), but stated that he had suicidal ideation approximately twelve
times over the previous year. Mr. Battista denied any history of
psychotic symptoms.

Mr. Battista reported abusing marijuana and alcohol between 18
and 20 years old. He stated that his use was primarily on Friday
and Saturday nights and at those times he would engage in drinking
and smoking pot to "oblivion".

Assessment Procedures: Bender Visual Motor Gestalt Test (Copy, IR),
Rorschach (RIAP-3), TAT, MCMI-III, MMPI-2 (Basic, Supplemental,
Content, and Harris & Lingoes Scales), an evaluation for
psychopathic personality traits, MASA Inventory - Booklet 5, Wilson
Sex Fantasy Questionnaire, Trails A & B, Digit Span, Mini-Mental

DOC 000256

Battista, S.J.                          4                    5-8/97

State Exam, and Psychodiagnostic Interview.

Validity: This is a generally reliable and valid assessment of both the nomothetic and idiographic traits and personality functioning of this inmate. It is both internally and diagnostically consistent.

* The MCMI-III produced a valid profile.
* The Rorschach was an interpretively useful protocol.
* The MMPI-2 produced a varied picture: Taken as an aggregate, the validity indicators are consistent with the inmate's self and diagnostic presentations.
* Assessments of his sexual functioning showed a mild defensive set.
* The remaining tests and interviews were reliable and valid assessments of the inmate's current level of functioning.

Physical Characteristics and Mental Status Examination: Inmate presented himself as a 35 year old single white male inmate. He was examined on four occasions under different correctional security/medical status, e.g., on occasion in disciplinary seclusion and at other times while housed in the medical unit. He was dressed in a jumpsuit, handcuffed on occasion (but not during those occasions when performing the Bender Gestalt or other tests involving writing), and clean, groomed, and neat in appearance. His facial expressions were initially limited in number and harsh, but softened over time and showed greater range and depth of emotional expression as he came to engage in the assessment process and become more trusting of the examiner. He had a direct and forceful manner of speaking and presenting himself, which became marginally more moderate over the number of interviews. His presentation appeared as not so much an attempt to dominate the interviewer, as it was to be aggressive enough to avoid being dominated or controlled by the interviewer. He has attractive, aquiline features. His presentation was remarkable for the complete absence of feminine characteristics of speech or posture, save for his hair being pulled back in a neat ponytail. His gender presentation was within normal limits, neither androgenous nor macho. He did not appear to lie or dissimulate. When he did not wish to answer certain questions, e.g., sexual history and current fantasy life, he stated that because the examiner was not a certified expert in transsexual problems, it was too personal and specialized an area for him to reveal. Mr. Battista was of average build and apparently good physical condition, but stated that he wanted to go on a liquid diet to avoid gaining weight and to prevent the return of bulk to his arms, legs, and chest (he reported body building in the past in order to hang out with a biker group and avoid being identified and victimized as a child molester). His physical appearance was remarkable for over 40 tatoos (by his report) which he had done in prison to strengthen his image as a tough, heterosexual convict. His motor behavior was remarkable for his unusual capacity to sit remarkably still for hours and work under

DOC 000257

Battista, S.J.                          5                          5-8/97

occasionally uncomfortable conditions without showing restlessness
or pain. He said that this came of spending years in isolation and
segregation. Mr. Battista's relationship to the examiner was
generally frank, cooperative, and on occasion mutual. He appeared
hungry for an empathic human audience.

Mr. Battista saw himself as suffering from a legitimate
medical condition, e.g., transsexualism, for which specialized
medical treatment was indicated and which he was being
unconstitutionally and illegally deprived of. He felt that although
it was legitimate for DOC/CMS to refuse him sex reassignment
surgery, he felt that it was within his legal rights for him to
receive the specialized hormonal and psychotherapeutic treatment
that would precede such an operation on the outside. He was unable
to entertain alternate formulations of his condition or to
reasonably consider currently available treatment techniques to
address his symptomatic complaints of sexual identity dysphoria,
alienation, poor self-esteem, and depression with intermittent
despair and suicidality.

Mr. Battista was alert, oriented 4X, and without reported or
gross discernable perceptual anomalies. He stated on numerous
occasions that he was not "crazy". His immediate and long term
memory appeared to be WNL, as did his capacity to learn new
information. However, he reported that he was unable to remember
significant aspects of his early childhood, including whether or
not he had been sexually abused. He appeared to have a low average
fund of general information, except where information pertaining to
his legal status and medical condition was involved (in these
respects he sounded unusually well informed and resourceful). His
IQ is estimated to be in the average range, limited by his relative
inability to utilize abstract concepts, especially when discussing
his medical complaints. Mr. Battista was generally able to attend
and concentrate on the examiner and the tasks quite well, except
when the topic was his ideas about his right to address his gender
identity problem. His judgement was impaired by strong emotions
(e.g., anger and mistrust) and his use of defenses of splitting and
projective identification. His understanding of the dynamics of the
prison milieu is grossly intact. Mr. Battista's understanding of
his condition is concrete and somewhat superficial. He realizes
that his problems are due to something unusual about his self
image. He believes that the solution to his problem is to
concretely change his anatomy to fit his fantasied identity. He has
little apparent knowledge of the underpinnings of his perceptions
or the full impact of these dynamics on himself and others.

Mr. Battista generally appeared and acted rationally during
the interviews and testing. It was his inability to reflect on
alternate ways of understanding his condition and ways to deal with
it, that took on an irrational life of its own. At times he
demonstrated some press of speech. The association of his thinking
was remarkable for perseveration around his sense of being
persecuted and deprived with respect to his obsession with
dramatically altering his sexual appearance. His thinking is
distorted by intermittent concreteness and his current

DOC 000258

Battista, S.J.                    6                    5-8/97

preoccupation with sex reassignment surgery as a solution to all
his problems reflects unrealistic fantasy and magical thinking.

   Mr. Battista's mood was generally one of varying degrees of
dysphoria. However, he was almost capable of euthymia at those
times when he felt understood and optimistic about the evaluation
process. His mood states were anything but shallow and in fact were
remarkable for their duration and constancy. Although he was
capable of almost a full range of affects, modulation of his
affects was more dependent on external circumstances and the
examiner's reactions, than on internal controls. He was capable of
expressing strong emotion, but his affects lacked complexity and
were driven at times by unconscious reactions to experienced shame
and vulnerability. At times the inmate could be quite labile and
almost explosive in his expressions of feeling. There was an
impulsive quality to his thought, emotion, and behavior.

Neuropsychological Screening:

Mini-Mental State Exam - 26/30 - This score is not indicative of
     gross neuropsychological impairment. Errors consisted of a
     near miss on the season and some impairment in concentration.

Digit Span - 2 sequences of 5 digits forward and 2 sequences of 4
     digits backwards is within normal limits (WNL) for this
     patient.

Trails A - 22" (62nd percentile) is within normal limits (WNL).

Trails B - 1'11" with 1 error (estimated to be in the 37th
     percentile if completed correctly) is within mildly impaired
     range for this patient.

Bender Visual Motor Gestalt Test - Copy: Errors consisted of 4 mild
     decrease of angulation errors, 2 moderate - 45 degree
     rotations, and a near collision (score of approximately 4-5).

Bender Visual Motor Gestalt Test - Immediate Recall: 6/9 gestalts
     recalled is WNL. Errors consisted of 1 moderate rotation, 2
     angulation, 1 perseveration, and 2 overlapping difficulties
     (score of approximately 5-6).

   Taken as a whole, the results of the neuropsychogical screen
are unremarkable for gross impairment, save for suggestive
characteristics of his performance on the Bender. Although he shows
some mild problems with concentration, the only convergent evidence
for such problems is found in his rigid, perseverative, and
emotional interactions around his discussion of his understanding
of his sexual identity problems. Such strong emotion and distortion
is consistent with severe character pathology and engaging such
patients around areas of great conflict.
   The results on the Bender, however, appear quite anomalous.
Hutt and Briskin's scoring system (as adapted by Brilliant &

DOC 000259

Battista, S.J.                    7                    5-8/97

Gynther) yielded the following: An irregular sequence, a Copy score of approximately 4-5 and an Immediate Recall score of approximately 5-6. These scores are at the threshold of being "organic".

        Although there is no compelling evidence of malingering, dissimulation, unreliability, psychosis, or organicity, Mr. Battista's Bender protocol contains clear evidence of rotation errors which are typically associated with either psychosis or organicity. The drawings were carefully executed, and the other errors would not be seen as a atypical for a person of his educational background and degree of psychopathology. However, in the absence of other evidence of dementia (e.g., memory deficits, poor concentration, decline in IQ and functioning, history of head trauma or neurological disease (aside from his endocrine disorder), advancing age, etc.) or psychosis, rotations are difficult to explain.

Results of Personality Testing:
MMPI-2:
        Validity Scales - L= 56  F= 85  K= 42

        Clinical Scales - Hs= 63  D= 86  Hy= 64  Pd= 83  Mf= 63

                          Pa= 85  Pt= 70  Sc= 84  Ma= 43  Si= 77

        2-Point Code= 2-6/6-2

MCMI-III:

Personality Code= 1 2A** 8A 2B*6A+8B 7 5"6B 3 4''//-**S*//

        Modifying Indices (BR Scores) - X= 64  Y= 47  Z= 71

        Clinical Personality Patterns - 1= 106  A= 99  2B= 77

            3= 30  4= 9  5= 42  6A= 73  6B= 34  7= 46  8A= 81

            8B= 59

        Severe Personality Pathology - S= 79  C= 69  P= 68

        Clinical Syndromes - A= 40  H= 66  N= 49  D= 80  B= 88  T= 60

            R= 65

        Severe Syndromes - SS= 60  CC= 71  PP= 63

    Theoretical  Orientation:  Biopsychosocial  environmental  and
                        eclectic.

Suicidality: Mr. Battista's  score  on  the  Exner  Suicidality Constellation was 6, two points below the required critical score of 8 (which would indicate current critical concern about self-

DOC 000260

Battista, S.J.                    8                    5-8/97

destructive potential). On the MCMI-III, he endorsed an item saying
he had tried to commit suicide in the past. During the interview he
stated that he had had suicidal ideation 12 times in the preceding
year. Although Mr. Battista's projectives show evidence of
underlying hopefulness, it should be noted that much of this hope
may be bound up in achieving his treatment which he hopes will
precede an eventual sex change operation and that discouragement
and depression could push this vulnerable individual into a
suicidal crisis.

Emotional Functioning: Mr. Battista is often seen as a hostile,
depressed, aggressive (psychologically), and suspicious individual.
He has fewer resources available to form and implement decisions
than should be the case. He is lacking in maturity and his
emotional functioning is frequently labile and dramatic in
presentation. These dysphoric affects reflect the mediation of his
anxious and retiring nature (linked to his choice of female objects
that are young and too immature to be regarded as threatening),
with his difficulties in coping with his ego deficits in the tough
and aberrant milieu and life of an inmate. These factors create a
vulnerability to being overwhelmed by the requirements of daily
living. Due to the nature of his personality development, as well
as his placement in a correctional setting, he has few outlets for
expressing himself or his restrained resentment. The lawsuit and
his cross dressing fulfill these needs, as well as reflecting his
psychodynamics and conditioning history. Mr. Battista's emotions do
not affect his thought processes in a consistent manner - sometimes
his emotions influence his thinking and at other times they don't.
This inconsistency leaves him vulnerable to being overwhelmed by
his emotions at times. He is attracted and reinforced by emotional
stimulation, but not moderate in his emotional expression. It
should be added, that much of his rage and disappointment at times,
comes as a result of having a core of hope and fanciful, but
conventional optimism that he can overcome the tragedies and
obstacles that have been such a formative part of his life up to
this time, and have a happy and satisfying outcome to his efforts.
It should be noted that although reportedly under medical control,
his congenital adrenal hyperplasia may be a contributing factor to
his emotionality.

Intrapsychic Functioning:

   a. Ego Defenses and Underlying Affect - Predominant underlying
      affects are <u>fear</u> (of rejection and ridicule of his basic
      sexual identity), <u>shame</u> (regarding his penis and nose,
      e.g., both their actual form and symbol phallic meaning),
      and <u>anger</u> (at anyone who opposes his understanding of
      himself or thwarts his attempts to realize his fantasied
      solutions to his psychic pain). These affects have their
      origin in classical conditioning by his mother and peers,
      sub-cultural conditioning in the prison environment, and
      psychodynamic and family systems dynamics. Predominant ego

DOC 000261

Battista, S.J.                          9                          5-8/97

    defenses are the following:

High adaptive level:
* self-assertion (logical carrying forward of his lawsuit and
  plea for help)

Mental inhibitions:
* repression (of early experience and ego-alien thoughts and
  emotions)

Minor image-distorting level:
* devaluation (probably in part related to the prison
  subculture).
* idealization (of females)

Disavowal level:
* denial (of aggressive and libidinal drives)
* rationalization

Major image-distorting level:
* autistic fantasy (substitute for realistic
  goals/relationships)
* projective identification (of aggressive, "selfish", and
  hostile impulses onto correctional and administrative
  authority, as well as all of his peers in the correctional
  environment)
* splitting of self-image or image of others

Action level:
* acting out (avoids awareness of his cognitive operations and
  precipitates his removal from what is for him an intolerable
  environment devoid of any sources of realistic
  satisfactions)
* help-rejecting complaining (to accept help would deprive him
  of his current strategy and place him initially in what he
  perceives to be psychological vulnerability and danger)

b. Conflicts - Mr. Battista's primary conflicts appear to
   center primarily around great rage and distrust of
   authority, and poorly differentiated sexual and aggressive
   drives. His rage at authority has it's roots in his images
   and experiences of his father's explosiveness and anger
   (e.g., reportedly shooting in the house and fatally beating
   his mother, physically abusing Mr. Battista's stepmother,
   and his use of painful corporal punishment), as well as the
   pervasive anti-authority attitude which is prevalent in the
   prison culture. His sexual conflicts are equally severe and
   entwined with his rage, as well as anomalous in their
   behavioral expresssion. His mother was repulsed by, and
   ridiculed the effects of his early genital development,
   leaving him alienated from his primary caregiver and his
   own sexual anatomy. It is clear that this shame over his

genitals persisted well into his young adulthood, and
appears to be intermingled with an unconscious fantasy of
using his genitals in a rageful way against women. The
relatively late onset of his desire to become a women
through sex reassignment surgery, appears to in part be a
function of his alienation from others, deep conflict over
his sexual being, precipitated by an acceptance by other
inmates, in an environment which by nature must place
controls on sexual expression, of his experiments with
cross dressing. In other words, as a lonely and angry
individual who was deeply uncomfortable about his sexual
being, cross dressing helped him deny the painful and
complex conflicts, while at the same time providing
stimulation, a less aggressive identity, and the deeply
desired attention. Even the painful ritual of surgery would
appear to be both a concrete and masochistic transformation
of that which has come to be associated with shame and
pain, as well as some rite of passage whereby by he finally
has achieved an identity he believes that he can live with.

c. Overt Manifestations of Intrapsychic Issues - He has, in
the past, used children as a way of bolstering his sense of
himself as weak and defective. His goal of undergoing sex
reassignment surgery as a solution to both his perceived
and apparent psychic pain and interpersonal problems,
reflects a synthesis (in fantasy) of
intrapsychic/interpersonal/environmental presses with a
vulnerable response style, defective reality testing, and
clear secondary gain within the correctional setting. The
lawsuit is deeply satisfying because it is overdetermined.
It is driven on one hand by his strong and valid desire for
relief from his deep personal suffering. While on the other
hand, it reflects a passive-aggressive rejection of
available sources of treatment (e.g., psychotherapy for his
character problems, psychopharmacotherapy for his
depression, a psychodiagnostic reformulation of his issues,
and sex offender treatment for his problematic pedophiliac
tendencies toward young girls), an active attack on
conventional authority, and a peculiarly quixotic solution
to dealing with the problems of his past, present, and
future.

d. Intrapsychic Self-perception and Identity - Mr. Battista's
projectives, together with his objective test results and
problematic behaviors, indicate defective psychic
structures and an absence of adequate internal cohesion.
His basic response style reflects a perseverative tendency
to reduce complex and ambiguous stimuli to excessively
narrow and simplified gestalts. This style, together with
his underlying shame, anger, and suspicion (mediated by the
difficult prison environment), neglects critical variables
and leaves him prone to produce a high frequency of

DOC 000263

Battista, S.J.                    11                    5-8/97

socially aberrant responses. At his best he is brutally
concise and to the point. His underlying issues are chronic
and pervasive to the point that they promote perceptual
inaccuracy and produce serious problems in reality testing.
He sees himself as damaged and defective, and inadequate in
comparison to others. Such perceptions frequently precede
feelings of futility and depression.

e. Insight - Mr. Battista's insight is limited to his
hypothesis that his nose, penis, male identity, and being
in prison are the apparent source of dysphoric affects. He
has no tolerance at this time for alternative constructions
to his concrete and magical solution to his difficulties.

Interpersonal:

a. Interpersonally Passive-Active and Hostile-Dependent - Mr.
Battista has no clear preference for activity vs. passivity
in his interpersonal relationships. His hostile-dependent
attitude is due in large part to his status as an inmate
(dependent by virtue of being incarcerated and controlled)
and his characterologically angry way of dealing with the
frustration he experiences at not getting what he wants.

b. Issues of Autonomy (Independence) - Mr. Battista's
unusually strong preoccupation with autonomy at this time
reflects his despair at not receiving the type of help he
believes is indicated, his stage of psychosexual
development, and his fear of close interpersonal relations.
Some of this fear is based on his anticipation of how
some inmates will react to him in a female role, realistic
caution in the prison, and previous negative experience as
a child and an adult. In other words, he distances himself
and insists on his autonomy because he feels rebuffed, is
realistically cautious, and is vulnerable to be coming
overwhelmed and hurt and/or hurtful in close interpersonal
relationships.

c. Social Functioning and Dynamics - He is quite sensitive to
rejection and criticism; he frequently attributes
malevolent intent to benign situations (a tendency which is
potentiated by the frequently aggressively challenging
nature of prison life). His interpersonal relationships are
generally poor and based on dissimulation and subterfuge
(some of which is adaptive for the average inmate). His
interpersonal failures are due in part to the open
expression of hostility and anger. Having said this, it is
important to note that Mr. Battista has both a need for and
an interest in achieving closeness with others. He tends to
be conservative (i.e., slow to approach others, rather than
conventional in his presentation of self) and cautious
about tactile exchanges. This reflects both the nature of

DOC 000264

Battista, S.J.                  12                    5-8/97

his likely contacts and the prison milieu, as well as his
past exposure to physical trauma. He is quite concerned
with personal space, as well as extremely cautious about
building and maintaining close emotional ties with others.
His interest is unlike that of your average adult; and,
therefore most of his contacts tend to be rather
superficial to date. Due to his underlying insecurity about
his personal integrity, he tends to be overly authoritarian
and argumentative when interpersonal situations pose
challenges to his sense of self (this personality trait is
augmented by social learning with his inmate peers and the
paramilitary subculture of prison milieus). He hopes for,
but does not expect routine positive interactions with
others.

d. Social Skills - Extremely limited. He tends to remain on
the periphery of group interactions and spends much time in
segregation.

e. Social Learning Style, Manipulation, and Secondary Gain -
Mr. Battista is adaptive and a student, in his way, of
social interaction. Paradoxically, in many ways (except for
his continuing belief that 12+ year old girls are old
enough to make sexual decisions for themselves) he has
learned to eschew antisocial traits. He dislikes
aggression and narcissistic/instrumental misuse of other
people. He is quite sex role oriented and relies on the
power of social roles to achieve through a superficial
identification (e.g., tatoos camouflage his crime and help
his association with tough and predatory inmates; becoming
a woman will eliminate the need for aggressive assertion
and provide him with the positive attention and support he
craves), what he is unable to achieve through a less
extreme and more mutual give and take with others. Mr.
Battista manipulates to preserve his integrity, achieve
gratification in the prison milieu, and regulate
interpersonal closeness. He is aware of the secondary gain
which might accrue to his behavior and choices, but the
anticipated social gain is not the primary motivation for
his behavior.

f. Sexual Feelings and Behaviors - Repressed, denied,
misdirected, at times unconsciously fused with aggression,
and immature (see other portions of this section for more
information about the genesis and expression of his
sexuality).

Results of Sexual Functioning Assessments: Responses on the LIE
index of the MASA and the qualitative analysis of the Wilson Sex
Fantasy Questionnaire acknowledged responses in the "safe range"
and therefore it is concluded that these instruments showed
evidence of a mildly defensive response set.

Battista, S.J.                    13                    5-8/97

MASA Inventory - Booklet 5: CHM of 15 (acknowledges a significant level of interest in children); CMSadism of 0 (does not acknowledge any sadism towards children); SIN of 27 (is in the moderately high range and indicates feelings of sexual inadequacy); EAG of 11 (low, but 3 items are noteworthy). The noteworthy items concern past frequent thoughts about threatening or frightening females, feeling angered by females, and agreeing that in the past he has sometimes become aggressive because he has been mistreated by a female. All these results show convergent validity with similar traits revealed in other parts of the assessment process. NOTE: This inventory assesses behavior prevalent at the time of his crime (14.5 years prior to this assessment).

Wilson Sex Fantasy Questionnaire - Qualitative analysis is generally uninformative.

Psychopathic Traits: An evaluation of Mr. Battista's interview results and records for traits associated with psychopathy (based on the Hare PCL-R) yielded the following: A need for unusual stimulation (preconscious and based on impact of feminine dress on self image and reaction of others to him); some attempt to manipulate (e.g., special sex reassignment surgery and adjunctive treatments); lacks a sense of guilt or remorse around behavior associated with his deviant beliefs (e.g., "dating", petting and fondling much younger adolescent females is OK because "12 should be the age of consent"); has limited history of stable self-support; poor behavioral controls; coercive sexual behavior (e.g., his crimes); lack of realistic long-term goals (e.g., unrealistic focus and role of sex surgery in his life plans, refusal to participate in programs); juvenile delinquency; some criminal versatility. Analysis of the number and strength of these traits as an aggregate indicate that: Mr. Battista is in the 9th percentile rank of prison inmates on his total score, the 5.4 percentile rank on Factor 1 (selfish, callous, and remorseless use of others), and the 33.6 percentile rank on Factor 2 (chronically unstable, antisocial, and socially deviant lifestyle). These scores show that the inmate is well below the diagnostic cutoff for psychopathy.

Diagnostic Summary and Recommendations:

Axis I: 302.6 Gender Identity Disorder NOS
        311.00 Depressive Disorder NOS
        R/O 294.9 Cognitive Disorder NOS
        R/O 302.3 Transvestic Fetishism with Gender Dysphoria
        R/O 302.2 Pedophilia (attracted to females)
        R/O 300.7 Body Dysmorphic Disorder
        307.50 Eating Disorder NOS
        305.20 Cannabis Abuse - in remission in a controlled environment
        305.00 Alcohol Abuse - in remission in a controlled environment

Battista, S.J.                    14                    5-8/97

Axis II: 301.7 Antisocial Personality Disorder
         301.83 Borderline Personality Disorder
            * with Avoidant, Passive-Aggressive (Negativistic), and
              Schizotypal Traits

Axis III: Congenital Adrenal Hyperplasia (CAH)
          (a concurrent congenital physical intersex condition)

Axis IV: Problems with primary support group, with the social
         environment, and with housing.

Axis V: 42

Recommendations:

1. Although not currently suicidal, Mr. Battista should be
considered a vulnerable individual by virtue of his clinical
history and testing results, and treated accordingly. On the MCMI-
III, he endorsed an item saying that he had tried to commit suicide
in the past, but provided no elaboration in the interviews.

2. A penile plethismograph would be useful in assessing Mr.
Battista's sexual arousal and establishing reliably and validly the
presence and nature of his arousal to sadistic themes or deviant
arousal to children in comparison with normative arousal to
appropriate adult stimuli. Statements could then be made with
respect to his potential to act on such impulses, which in turn
have implications for differential diagnosis and treatment. Given
his charges and his current attitude regarding the age of consent
for female children, he should be encouraged to take sex offender
treatment.

3. With focus and extra effort devoted to strengthening the
therapeutic alliance, therapeutic efficacy could proceed beyond
maintaining adjustment and avoiding self-destructive acting out,
toward meaningful characterological change. A high tolerance for
dealing with hostility, as well as skill in dealing with splitting
and negative transference, is critical to successful therapy with
Mr. Battista.

4. A psychopharmacological consult is warranted due to the presence
of significant depression and the recent increased frequency of
suicidal ideation.

J. Tyler Carpenter, Ph.D., ABPP
Consulting Staff Psychologist
Correctional Medical Services

10|4|97
Date of the Report

DOC 000267

# EXHIBIT F

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


SANDY BATTISTA

Plaintiff

v.                          C.A. No. 099620225

KATHLEEN DENNEHY, et al.

Defendants



- - - - - - - -

DEPOSITION OF LAWRENCE M. WEINER

Wednesday, July 30, 2008

10:10 a.m.

McDermott Will & Emery

28 State Street

Boston, Massachusetts

- - - - - - - -



Reporter:  Deborah Roth, RPR/CSR

## Page 10

| | | |
|---|---|---|
| 0:16:19 | 1 | and their response, in the process of hiring |
| 0:16:24 | 2 | MHM, or did you come into that position after |
| 0:16:26 | 3 | the contract was signed? |
| 0:16:27 | 4 | A. No. I was not part of the selection |
| 0:16:29 | 5 | committee that chose MHM, but I was involved |
| 0:16:32 | 6 | in the whole procurement process. |
| 0:16:35 | 7 | We had other vendors come in and do |
| 0:16:38 | 8 | presentations and give their proposals, but I |
| 0:16:42 | 9 | -- then there was a separate selection |
| 0:16:44 | 10 | committee that would review everything and |
| 0:16:46 | 11 | make the determination as to who should be |
| 0:16:48 | 12 | selected to be the vendor. |
| 0:16:49 | 13 | Q. Tell me the about the selection |
| 0:16:51 | 14 | committee and that process. Is that the same |
| 0:16:53 | 15 | for all of your vendors? |
| 0:16:57 | 16 | A. It's kind of beyond my scope. I never |
| 0:17:01 | 17 | had any involvement in it. |
| 0:17:02 | 18 | Q. In really general terms, do you know if |
| 0:17:06 | 19 | the selection committee is made up of DOC |
| 0:17:10 | 20 | personnel, or are they made up of personnel |
| 0:17:13 | 21 | from your overall medical vendor? |
| 0:17:17 | 22 | Categorically, who sits on that committee? |
| 0:17:20 | 23 | A. DOC people as well as -- I think that |
| 0:17:25 | 24 | there is a representative from the Department |

## Page 11

| | | |
|---|---|---|
| 10:17:28 | 1 | of Mental Health, uhm, a representative from |
| 10:17:29 | 2 | the Department of Public Health, uhm, but I'm |
| 10:17:31 | 3 | not sure who else might have been in there. |
| 10:17:34 | 4 | Probably about ten people. |
| 10:17:36 | 5 | Q. Who would know the answer to that? |
| 10:17:40 | 6 | A. Uhm, Terry Marshall I know was on |
| 10:17:42 | 7 | that -- she might have chaired the committee. |
| 10:17:43 | 8 | So she would -- and I would also guess there |
| 10:17:47 | 9 | would probably be a public document that would |
| 10:17:49 | 10 | talk about the selection. |
| 10:17:52 | 11 | Q. Okay. So currently how long have you |
| 10:17:56 | 12 | had your current position? |
| 10:17:57 | 13 | A. I think since June of '06. |
| 10:18:06 | 14 | Q. About two years? |
| 10:18:08 | 15 | A. Yeah. |
| 10:18:10 | 16 | Q. Prior to that, you were still an |
| 10:18:14 | 17 | employee of the DOC? |
| 10:18:17 | 18 | A. Yes. I was a regional administrator in |
| 10:18:21 | 19 | the health services division for mental |
| 10:18:22 | 20 | health. |
| 10:18:23 | 21 | Q. Describe for me what the |
| 10:18:25 | 22 | responsibilities of that job are. |
| 10:18:26 | 23 | A. Not so much different -- I mean, in the |
| 10:18:27 | 24 | broad scope of things, it's still to oversee, |

## Page 12

| | | |
|---|---|---|
| 0:18:30 | 1 | you know, the quality. |
| 0:18:30 | 2 | I would be assigned institutions I |
| 0:18:33 | 3 | would be more specifically responsible for |
| 0:18:35 | 4 | overseeing, and then I would report to the |
| 0:18:37 | 5 | person who was me before me. |
| 0:18:40 | 6 | Q. Okay. So in your prior job, you had |
| 0:18:44 | 7 | responsibility for specific -- |
| 0:18:47 | 8 | A. It was narrow, yeah. |
| 0:18:48 | 9 | Q. What institutions were you responsible |
| 0:18:50 | 10 | for in that position? |
| 0:18:52 | 11 | A. You know, I anticipated that question, |
| 0:18:54 | 12 | but I don't really know the total answer. |
| 0:18:57 | 13 | Q. Okay. |
| 0:18:57 | 14 | A. Uhm, I would say, I mean, most of them, |
| 0:19:03 | 15 | maximum and medium security prisons, but I |
| 0:19:08 | 16 | don't remember totally. There was another |
| 0:19:10 | 17 | regional administrator at the time who had |
| 0:19:13 | 18 | other responsibilities for other institutions, |
| 0:19:13 | 19 | and we split them. |
| 0:19:15 | 20 | Q. There were two people in your position. |
| 0:19:17 | 21 | So would it be fair to assume that the |
| 0:19:18 | 22 | institutions were split roughly in half |
| 0:19:21 | 23 | between the two of you? |
| 0:19:22 | 24 | A. Yeah. |

## Page 13

| | | |
|---|---|---|
| 0:19:23 | 1 | Q. Was the treatment center one of your |
| 0:19:25 | 2 | responsibilities? |
| 0:19:26 | 3 | A. No, it wasn't. |
| 0:19:29 | 4 | Q. Who was the regional mental |
| 0:19:33 | 5 | administrator who was responsible for the |
| 0:19:35 | 6 | treatment center? |
| 0:19:36 | 7 | A. Deborah Mendoza. |
| 0:19:39 | 8 | Q. But currently you have responsibility |
| 0:19:49 | 9 | for the treatment center because you have |
| 0:19:52 | 10 | responsibility for the whole system? |
| 0:19:53 | 11 | A. I would say so. |
| 0:19:54 | 12 | Q. And your role in overseeing the |
| 0:19:57 | 13 | contract with the vendor, that's specifically |
| 0:19:59 | 14 | the mental health vendor? |
| 0:20:01 | 15 | A. Correct. |
| 0:20:01 | 16 | Q. Do you have any role in overseeing or |
| 0:20:05 | 17 | managing the contract with any of the forensic |
| 0:20:08 | 18 | mental health vendors? |
| 0:20:09 | 19 | A. Such as? |
| 0:20:12 | 20 | Q. So, for example, I believe -- and don't |
| 0:20:16 | 21 | let me put words in your mouth -- it is my |
| 0:20:19 | 22 | understanding that at the treatment center |
| 0:20:20 | 23 | they have people who run their sex offender |
| 0:20:22 | 24 | program. |

Page 14

| | | |
|---|---|---|
| 0:20:23 | 1 | A. You are correct, and that is -- not to |
| 0:20:25 | 2 | confuse people -- but that's operated by |
| 0:20:27 | 3 | Forensic Health Services, which recently was |
| 0:20:30 | 4 | purchased by MHM, but they are separate |
| 0:20:33 | 5 | contracts, and the responsibility for that |
| 0:20:35 | 6 | falls under the program services division, not |
| 0:20:38 | 7 | under the health services division. |
| 0:20:39 | 8 | So I don't have anything to do with |
| 0:20:41 | 9 | them -- with the sex offender treatment |
| 0:20:44 | 10 | program contract. |
| 0:20:47 | 11 | Q. And do those two programs interact at |
| 0:20:50 | 12 | all, the sex offender treatment program run |
| 0:20:53 | 13 | under the first contract and the mental health |
| 0:20:55 | 14 | services run under the second? |
| 0:20:57 | 15 | A. Not as much. No, not too much. |
| 0:21:03 | 16 | I think that there is an effort |
| 0:21:05 | 17 | underway to create this committee called the |
| 0:21:07 | 18 | care coordination committee that would bring |
| 0:21:09 | 19 | all different sort of mental health and |
| 0:21:11 | 20 | medical vendors together, substance abuse |
| 0:21:13 | 21 | vendors, sex offenders, and talk about better |
| 0:21:16 | 22 | ways to share information. |
| 0:21:25 | 23 | Q. That's not currently in place? |
| 0:21:27 | 24 | A. No. |

Page 15

| | | |
|---|---|---|
| 0:21:27 | 1 | Q. So, for example, if you had somebody |
| 0:21:30 | 2 | under your area of responsibility, an inmate |
| 0:21:33 | 3 | or a resident -- let's say, a resident of the |
| 0:21:36 | 4 | treatment center -- who is in the sex offender |
| 0:21:39 | 5 | are program, but also has another issue, say, |
| 0:21:42 | 6 | substance abuse or depression or another |
| 0:21:47 | 7 | mental health issue. |
| 0:21:48 | 8 | As a matter of past practice, would |
| 0:21:50 | 9 | it be common for you or anyone working under |
| 0:21:52 | 10 | you to refer to any of the forensic work or |
| 0:21:56 | 11 | the sex offender treatment programs in |
| 0:21:58 | 12 | developing a treatment plan for the non-sex |
| 0:22:01 | 13 | offender issue? |
| 0:22:02 | 14 | A. I would say in past practice it wasn't |
| 0:22:05 | 15 | a common practice. I don't know that it ever |
| 0:22:09 | 16 | took place. |
| 0:22:09 | 17 | Q. And are those records -- if you know, |
| 0:22:13 | 18 | again -- are the records kept by the sex |
| 0:22:18 | 19 | offender treatment program, you know, the |
| 0:22:21 | 20 | progress notes, reports, whatever, are those |
| 0:22:25 | 21 | commonly ever shared with the people on the |
| 0:22:28 | 22 | mental health vendor side? |
| 0:22:30 | 23 | A. I don't think so. They are kept |
| 0:22:37 | 24 | separately. |

Page 16

| | | |
|---|---|---|
| 10:22:38 | 1 | Q. And separate administrative |
| 10:22:40 | 2 | responsibility in the chain of command at DOC? |
| 10:22:43 | 3 | A. Correct. |
| 10:22:43 | 4 | Q. I think you called that program |
| 10:22:44 | 5 | services? |
| 10:22:45 | 6 | A. Correct. |
| 10:22:45 | 7 | Q. Who is the person at your level on that |
| 10:22:49 | 8 | side of things at the DOC? |
| 10:22:50 | 9 | A. The director of program services is |
| 10:22:53 | 10 | above my level, more equivalent to a director |
| 10:22:56 | 11 | of health services. Chris Mitchell. |
| 10:23:04 | 12 | Q. When did you first start working for |
| 10:23:07 | 13 | the Department of Correction? |
| 10:23:14 | 14 | A. 2004, I believe, the summer, May or |
| 10:23:14 | 15 | June. |
| 10:23:19 | 16 | Q. Did you start in this regional |
| 10:23:22 | 17 | administrative position, or did you have a |
| 10:23:23 | 18 | different title? |
| 10:23:25 | 19 | A. No. I started as a regional |
| 10:23:27 | 20 | administrator. |
| 10:23:28 | 21 | Q. And what did you do professionally |
| 10:23:30 | 22 | before coming to the DOC? |
| 10:23:31 | 23 | A. Directly prior to that, I was actually |
| 10:23:34 | 24 | a mental health clinician at the treatment |

Page 17

| | | |
|---|---|---|
| 10:23:37 | 1 | center. I was there for about a year. I |
| 10:23:42 | 2 | think I started there in September of '03. |
| 10:23:47 | 3 | Prior to that, I was a mental health |
| 10:23:49 | 4 | clinician at MCI Cedar Junction. I was |
| 10:23:53 | 5 | employed by the vendor, which was CMS, and |
| 10:23:58 | 6 | then became UMass. |
| 10:24:01 | 7 | So I started in Walpole in '99 to |
| 10:24:06 | 8 | '03, and then I went treatment center for a |
| 10:24:08 | 9 | year. |
| 10:24:09 | 10 | Prior to the department, I worked at |
| 10:24:11 | 11 | the Middlesex County Sheriffs Department. I |
| 10:24:14 | 12 | worked at the Middlesex County jail as a |
| 10:24:16 | 13 | mental health clinician. |
| 10:24:18 | 14 | Prior to that, I worked at a place |
| 10:24:24 | 15 | called the Butler Center, which was DYS |
| 10:24:28 | 16 | program. I worked for JRI and I provided |
| 10:24:34 | 17 | mental health services, therapy to the kids |
| 10:24:39 | 18 | there. |
| 10:24:39 | 19 | Q. So in some form or another, you've been |
| 10:24:42 | 20 | involved in the correctional setting |
| 10:24:46 | 21 | throughout your career? |
| 10:24:47 | 22 | A. My career as a mental health |
| 10:24:51 | 23 | professional. |
| 10:24:51 | 24 | Q. Did you have another career before |

Page 58

| | | |
|---|---|---|
| 1:26:13 | 1 | A. Yeah. |
| 1:26:13 | 2 | Q. And at the time what was the regional |
| 1:26:15 | 3 | position? |
| 1:26:15 | 4 | A. Regional administrator. |
| 1:26:17 | 5 | Q. Got it. So the reason this was being |
| 1:26:20 | 6 | sent to you by both Peter Hefferan and |
| 1:26:23 | 7 | Veronica Madden is that those were the two |
| 1:26:26 | 8 | people in your reporting chain? |
| 1:26:28 | 9 | A. I would guess, yeah. |
| 1:26:30 | 10 | You know, I don't know if I was |
| 1:26:33 | 11 | responding to an e-mail that Veronica might |
| 1:26:37 | 12 | have sent me. |
| 1:26:37 | 13 | You know what I mean? |
| 1:26:38 | 14 | Q. Why don't you take a minute and read |
| 1:26:43 | 15 | this over to see if it is sparks any |
| 1:26:47 | 16 | recollection of the events surrounding it. |
| 1:26:50 | 17 | A. Okay. |
| 1:27:14 | 18 | Q. Having looked through it — by the way, |
| 1:27:18 | 19 | had you seen this document before today in |
| 1:27:20 | 20 | preparation for your deposition or in any |
| 1:27:22 | 21 | other — |
| 1:27:24 | 22 | A. Two minutes before we came in here, |
| 1:27:26 | 23 | when I was outside with Mr. McFarland, to |
| 1:27:29 | 24 | discuss whether or not he showed it to me. |

Page 59

| | | |
|---|---|---|
| 1:27:31 | 1 | Q. This was not one of the documents you |
| 1:27:33 | 2 | reviewed to prepare for today? |
| 1:27:35 | 3 | A. No. |
| 1:27:35 | 4 | Q. Having looked it over, do you now have |
| 1:27:38 | 5 | any recollection of the events surrounding |
| 1:27:40 | 6 | this e-mail? |
| 1:27:42 | 7 | A. Not specifically, no. |
| 1:27:46 | 8 | Q. And in this first full paragraph here, |
| 1:27:52 | 9 | you have a sentence that says, "Basically |
| 1:27:57 | 10 | where we are at with Sandy Jo," sort of |
| 1:27:57 | 11 | summarizing the status of her treatment? |
| 1:27:59 | 12 | A. Yes. |
| 1:28:00 | 13 | Q. This is not too long after you began to |
| 1:28:03 | 14 | be responsible for these things? |
| 1:28:04 | 15 | A. Yeah, probably not too long, no. |
| 1:28:07 | 16 | Q. This was written before you had any |
| 1:28:09 | 17 | interaction with Cynthia Osborne with respect |
| 1:28:12 | 18 | to Sandy? |
| 1:28:12 | 19 | A. Yes. |
| 1:28:13 | 20 | Q. You said, "The Fenway has recommended |
| 1:28:20 | 21 | hormone therapy, and we have drafted a letter |
| 1:28:22 | 22 | to UMass asking for their clarification as to |
| 1:28:26 | 23 | whether they agree that hormones therapy is |
| 1:28:28 | 24 | both clinically appropriate and medically |

Page 60

| | | |
|---|---|---|
| 11:28:31 | 1 | necessary." |
| 11:28:31 | 2 | Do you see that? |
| 11:28:31 | 3 | A. Yes. |
| 11:28:32 | 4 | Q. And earlier we were talking about the |
| 11:28:35 | 5 | areas of concern with the Fenway report? |
| 11:28:37 | 6 | A. Yes. |
| 11:28:37 | 7 | Q. One of them being specificity of the |
| 11:28:40 | 8 | recommendations and the other being sort of |
| 11:28:42 | 9 | your comfort level with UMass's endorsement of |
| 11:28:46 | 10 | the treatment plan; is that right? |
| 11:28:47 | 11 | A. Yes. |
| 11:28:47 | 12 | Q. So you're not asking at this point |
| 11:28:50 | 13 | about specificity? |
| 11:28:53 | 14 | A. Not in this e-mail, no. Just medical |
| 11:28:56 | 15 | necessity and clinical appropriateness. |
| 11:28:58 | 16 | Q. Am I correct as of July '05 the |
| 11:29:02 | 17 | department had available to it the doctor's |
| 11:29:06 | 18 | order that we were discussing and the specific |
| 11:29:09 | 19 | recommendation from the endocrinologist for |
| 11:29:10 | 20 | the hormone therapy? |
| 11:29:11 | 21 | A. Can you repeat? |
| 11:29:13 | 22 | Q. Before the break, we were talking about |
| 11:29:16 | 23 | Dr. Friedman's April '05 order that spelled |
| 11:29:20 | 24 | out the specific medications and doses? |

Page 61

| | | |
|---|---|---|
| 11:29:23 | 1 | A. Yes. |
| 11:29:25 | 2 | Q. Would you agree at this point, solely |
| 11:29:27 | 3 | with respect to the specificity question, the |
| 11:29:29 | 4 | department had available to it sufficient |
| 11:29:34 | 5 | information to know what was being ordered in |
| 11:29:36 | 6 | terms of hormone therapy? |
| 11:29:36 | 7 | A. Yes. |
| 11:29:37 | 8 | Q. So at this point you are not asking for |
| 11:29:40 | 9 | more specialty, you are asking them to weigh |
| 11:29:43 | 10 | in on clinical appropriateness and medical |
| 11:29:46 | 11 | necessity? |
| 11:29:46 | 12 | A. Related to the hormones. |
| 11:29:47 | 13 | Q. Do you know when the original Fenway |
| 11:29:57 | 14 | report was received by the department? |
| 11:30:00 | 15 | A. I don't. |
| 11:30:01 | 16 | Q. Feel free to look at Exhibit 1. |
| 11:30:06 | 17 | A. Uhm, no. I would say anecdotally that |
| 11:30:11 | 18 | the date of the evaluation is listed as |
| 11:30:15 | 19 | 8/10/04 and that might not have been sent to |
| 11:30:19 | 20 | health services until the winter. I just |
| 11:30:21 | 21 | don't know. |
| 11:30:22 | 22 | Q. If you flip to the last page, the |
| 11:30:25 | 23 | report itself is actually dated November 16, |
| 11:30:29 | 24 | 2004. |

Page 110

13:16:52   1      AFTERNOON SESSION
13:17:59   2
13:17:59   3         EXHIBIT NO 8 MARKED
13:18:30   4      BY MS  SMITH-LEE:
13:18:30   5      Q. So I have shown you what we have marked
13:18:35   6   as Weiner 8.
13:18:37   7         Let me know when you've had a
13:18:38   8   chance to look it over.
13:18:45   9      A. Okay.
13:19:00   10     Q. So Weiner 8 appears to be an e-mail
13:19:02   11  chain, the date at the very top is 7/20/05.
13:19:06   12        Do you see that?
13:19:07   13     A. Yes.
13:19:07   14     Q. Do you recognize this e-mail chain?
13:19:09   15     A. No. No.
13:19:11   16        I mean, yeah, I know it is me, but I
13:19:14   17  don't recognize having seen it before.  I
13:19:16   18  don't remember.
13:19:16   19     Q. You don't have any reason to doubt
13:19:20   20  that --
13:19:20   21     A. No.
13:19:21   22     Q. The bottom entry is "Lawrence Weiner,
13:19:26   23  7/19/2005." Do you see that?
13:19:28   24     A. (Nodding.)

Page 111

13:19:29   1      Q. Do you know, or can you deduce from
13:19:31   2   looking at this to whom your original e-mail
13:19:35   3   went?
13:19:35   4      A. I would deduce it went to Kathleen
13:19:43   5   Dennehy.
13:19:43   6      Q. Because she is the next --
13:19:45   7      A. She could have been a cc, you know.
13:19:48   8         Let me put it this way:  I might
13:19:49   9   have been on -- Greg probably left two weeks
13:19:52   10  before that.  I don't know that I would have
13:19:54   11  been bold enough to e-mail the Commissioner
13:19:58   12  directly on anything.
13:19:59   13     Q. In the end, the final e-mail at the top
13:20:02   14  is from you to Veronica Madden, and it cc'ed
13:20:06   15  to a variety of people, including Commissioner
13:20:10   16  Dennehy?
13:20:10   17     A. Correct.
13:20:11   18     Q. The first paragraph of your e-mail --
13:20:14   19  by "your e-mail," I'm talking about the one at
13:20:16   20  the bottom dated 7/19, the one that references
13:20:19   21  a conference with Cynthia Osborne and says, "I
13:20:22   22  will send her copies of the previous
13:20:23   23  evaluations done on Mr. Battista as well so
13:20:27   24  that she can gather background and see where

Page 112

13:20:30   1   previous evaluators have raised questions
13:20:35   2   regarding the validity of his GID diagnosis."
13:20:37   3         Do you see that?
13:20:37   4      A. Yes.
13:20:38   5      Q. Do you recall gathering and sending to
13:20:40   6   Ms. Osborne prior evaluations of Sandy?
13:20:44   7      A. I do.  I do.
13:20:45   8      Q. Did those evaluations include
13:20:50   9   evaluations done under the auspices of
13:20:53   10  Forensic Health Services?
13:20:55   11     A. I believe they did.
13:20:56   12     Q. Okay.  And those would be evaluations
13:21:01   13  that were in connection with the sex offender
13:21:05   14  treatment program or the determination of
13:21:07   15  sexual dangerousness?
13:21:08   16     A. Correct.
13:21:09   17     Q. And earlier we talked about the
13:21:11   18  different roles of Forensic Health Services
13:21:13   19  and the mental health provider.
13:21:15   20        Do you recall that?
13:21:16   21     A. Yes.
13:21:18   22     Q. And I believe your testimony was it
13:21:21   23  wouldn't be the ordinary course for the
13:21:22   24  clinical side of things to have access to the

Page 113

13:21:25   1   Forensic Health Services record and
13:21:27   2   conclusions?
13:21:29   3      A. Correct.
13:21:29   4      Q. Is that a fair statement?
13:21:31   5      A. Yes.
13:21:33   6      Q. How did it come about that on the
13:21:36   7   clinical side you were in the possession of
13:21:38   8   the Forensic Health Services reports?
13:21:41   9      A. How did I come into the possession of
13:21:44   10  them?
13:21:44   11     Q. Yes. How did that happen?
13:21:46   12        You are getting ready to send these
13:21:49   13  to Osborne, and they had to come from
13:21:50   14  somewhere.
13:21:51   15     A. I went to the treatment center, and I
13:21:52   16  copied them.
13:21:53   17     Q. Okay.  Were you looking for something
13:21:58   18  specific, or did you go to the treatment
13:21:59   19  center and say, "Let me see all of the
13:22:06   20  Forensic Health Services files on Sandy
13:22:06   21  Battista"?
13:22:06   22     A. Let me step back.
13:22:07   23        So, again, three years ago -- I
13:22:10   24  don't know that I was looking -- I don't know

Page 114

| | | |
|---|---|---|
| 13:22:13 | 1 | if I would have had Campopiano -- I don't know |
| 13:22:17 | 2 | if those were already in my possession or I |
| 13:22:20 | 3 | got those. |
| 13:22:21 | 4 | The specific -- like, community |
| 13:22:24 | 5 | access board evaluation, that is a Forensic |
| 13:22:28 | 6 | Health Services thing, or the yearly annual |
| 13:22:30 | 7 | treatment reviews, that was a Forensic Health |
| 13:22:32 | 8 | Services thing. Those were the things I would |
| 13:22:33 | 9 | have gotten out that record. |
| 13:22:35 | 10 | I don't know -- I don't know if I |
| 13:22:37 | 11 | got those other evaluations out of that |
| 13:22:39 | 12 | record. Perhaps Greg Hughes already had them. |
| 13:22:42 | 13 | I can't say I specifically got those from the |
| 13:22:44 | 14 | treatment center. |
| 13:22:45 | 15 | Q. Okay. |
| 13:22:46 | 16 | A. I can only think of the ones that would |
| 13:22:49 | 17 | have been in his sex offender treatment file |
| 13:22:53 | 18 | that was maintained by Forensic Health |
| 13:22:55 | 19 | Services, there were things in there that -- |
| 13:23:00 | 20 | that's what I would have gotten. |
| 13:23:01 | 21 | Q. Okay. And correct me if I am wrong, |
| 13:23:04 | 22 | but I thought your testimony this morning was |
| 13:23:07 | 23 | that it is not a usual or common thing to do |
| 13:23:10 | 24 | from clinical side, to go look at the Forensic |

Page 115

| | | |
|---|---|---|
| 13:23:15 | 1 | Health Services materials? |
| 13:23:15 | 2 | A. It wouldn't be usual for a -- at that |
| 13:23:20 | 3 | time a UMass mental health clinician working |
| 13:23:22 | 4 | at the clinic to go into the Forensic Health |
| 13:23:29 | 5 | Services area to go to a file to look at the |
| 13:23:32 | 6 | sex offender treatment, that wasn't common |
| 13:23:35 | 7 | occurrence. |
| 13:23:36 | 8 | Q. Was it a common occurrence for the DOC |
| 13:23:39 | 9 | mental health personnel to go looking for |
| 13:23:43 | 10 | information in the Forensic Health Services |
| 13:23:48 | 11 | files? |
| 13:23:49 | 12 | A. That was the first time I had done it. |
| 13:23:51 | 13 | Q. So what prompted you to do that? |
| 13:23:53 | 14 | A. I don't know. |
| 13:23:59 | 15 | Q. Did anybody suggest to you that there |
| 13:24:00 | 16 | were reports in the sex offender treatment |
| 13:24:03 | 17 | program that might be worth looking at? |
| 13:24:04 | 18 | A. I honestly don't -- I honestly don't |
| 13:24:08 | 19 | remember. |
| 13:24:10 | 20 | I don't know if it was something |
| 13:24:10 | 21 | that I came upon myself or something I was |
| 13:24:13 | 22 | instructed to do. I really doesn't remember. |
| 13:24:15 | 23 | Q. In the last paragraph there, you note |
| 13:24:35 | 24 | that procedurally you're unclear about some |

Page 116

| | | |
|---|---|---|
| 13:24:38 | 1 | next steps, specifically, "How we want to |
| 13:24:41 | 2 | inform UMass of this review and whether we can |
| 13:24:44 | 3 | put the whole approval process for Sandy Jo |
| 13:24:47 | 4 | hormones treatment on hold until we receive |
| 13:24:50 | 5 | the results of the peer review from Cynthia |
| 13:24:52 | 6 | Osborne and get a response from UMass and the |
| 13:24:55 | 7 | Fenway." |
| 13:24:55 | 8 | Do you see that? |
| 13:24:55 | 9 | A. Yes. |
| 13:24:56 | 10 | Q. Did you ever get an answer to that |
| 13:25:00 | 11 | question? |
| 13:25:00 | 12 | A. It looks like Kathleen Dennehy |
| 13:25:08 | 13 | responded. |
| 13:25:09 | 14 | Q. You took that answer to be, yes, we |
| 13:25:14 | 15 | will put the approval process on hold until we |
| 13:25:14 | 16 | get a response from UMass and Fenway? |
| 13:25:17 | 17 | A. I'm assuming there was an actual |
| 13:25:26 | 18 | conversation. |
| 13:25:26 | 19 | I can't -- let me put it this way: |
| 13:25:29 | 20 | Do I think I saw that e-mail and said it's |
| 13:25:31 | 21 | very clear now? We are going to put it on -- |
| 13:25:33 | 22 | no, I don't think that's what happened. |
| 13:25:34 | 23 | I think that there were |
| 13:25:35 | 24 | conversations that took place that I can't say |

Page 117

| | | |
|---|---|---|
| 13:25:38 | 1 | I remember necessarily, but that decision was |
| 13:25:42 | 2 | made, that that was how we were going to |
| 13:25:44 | 3 | proceed. |
| 13:25:44 | 4 | Q. Okay. So whatever the specific |
| 13:25:48 | 5 | conversation, you do recall having the |
| 13:25:50 | 6 | understanding at around this time that a |
| 13:25:52 | 7 | decision was made to put the approval process |
| 13:25:56 | 8 | on hold until the peer review was done by |
| 13:25:59 | 9 | Osborne and you got a response from UMass and |
| 13:26:01 | 10 | the Fenway? |
| 13:26:02 | 11 | A. I guess that's fair. |
| 13:26:03 | 12 | Q. Okay. And who would have been party to |
| 13:26:05 | 13 | those conversations? |
| 13:26:06 | 14 | A. You know, uhm, I would guess Sue |
| 13:26:12 | 15 | Martin. I am going to a -- I don't know when |
| 13:26:15 | 16 | she left. Uhm, she wasn't cc'ed and Peter |
| 13:26:19 | 17 | was. So maybe she was gone by that point. |
| 13:26:22 | 18 | Uhm, I mean, there's -- Commissioner |
| 13:26:27 | 19 | Dennehy and Associate Commissioner Madden were |
| 13:26:30 | 20 | involved. |
| 13:26:30 | 21 | Q. Who is Janet King? |
| 13:26:33 | 22 | A. Associate Commissioner Madden's |
| 13:26:37 | 23 | assistant. |
| 13:26:38 | 24 | Q. How did you inform UMass of the Osborne |

Page 142

| | | |
|---|---|---|
| 3:54:28 | 1 | "I hear you, Larry. Let me think |
| 3:54:30 | 2 | about it." |
| 3:54:31 | 3 | "In my judgment, I want to put him |
| 3:54:33 | 4 | on Prozac." |
| 3:54:34 | 5 | Is that the end of it? |
| 3:54:35 | 6 | A. I would expect more than "in my |
| 3:54:37 | 7 | judgment." I would want to know what his |
| 3:54:39 | 8 | judgment and him to explain his judgment. |
| 3:54:41 | 9 | For instance, if this inmate was |
| 3:54:42 | 10 | bipolar, perhaps the Prozac is going to |
| 3:54:48 | 11 | exacerbate the manic symptoms, and if he still |
| 3:54:48 | 12 | persisted on doing that -- you know what I |
| 3:54:50 | 13 | mean? -- I would want to know -- if I really |
| 3:54:52 | 14 | got concerned, I would go to Dr. Zakai, and |
| 3:54:56 | 15 | they said, "This is the way it is." You know, |
| 3:55:00 | 16 | I would accept it. |
| 3:55:01 | 17 | Q. If the physiatrist said, "I know he is |
| 3:55:03 | 18 | bipolar. There is a potential interaction. I |
| 3:55:06 | 19 | read this study about this method, and I think |
| 3:55:08 | 20 | this is the best way to go," is that enough |
| 3:55:11 | 21 | for you? |
| 3:55:11 | 22 | A. Sure. |
| 3:55:12 | 23 | Q. What is different about this? |
| 3:55:14 | 24 | A. Why don't I take it and accept it? |

Page 143

| | | |
|---|---|---|
| 3:55:20 | 1 | Aside from everything I said already? |
| 3:55:25 | 2 | Q. You had a report from Fenway. UMass |
| 3:55:30 | 3 | endorsed it. I believe you testified that |
| 3:55:35 | 4 | they said they thought it is clinically |
| 3:55:38 | 5 | appropriate. Some questions were raised, |
| 3:55:43 | 6 | which you've discussed in some detail, which |
| 3:55:50 | 7 | in the end didn't change UMass's |
| 3:55:52 | 8 | recommendation. I believe you got some for |
| 3:55:55 | 9 | information from Fenway as part of this |
| 3:55:56 | 10 | process; but in the end, the treating |
| 3:55:59 | 11 | physicians have come back and said, "Yes, we |
| 3:56:02 | 12 | still think this is the right thing." |
| 3:56:04 | 13 | Why is this different? |
| 3:56:05 | 14 | A. We didn't agree. Ultimately we |
| 3:56:08 | 15 | disagreed with what they came back with, for |
| 3:56:10 | 16 | all the reasons that -- you know, again, in |
| 3:56:14 | 17 | the face of a lot of evidence to suggest that |
| 3:56:15 | 18 | what Fenway was recommending was not |
| 3:56:18 | 19 | appropriate and was not responsible. You |
| 3:56:21 | 20 | know, it wasn't like we sat back, and so we're |
| 3:56:23 | 21 | not doing it, you know. |
| 3:56:24 | 22 | Q. Let me take that part. |
| 3:56:26 | 23 | You said in the end you disagreed. |
| 3:56:28 | 24 | You disagreed clinically? |

Page 144

| | | |
|---|---|---|
| 3:56:29 | 1 | A. Uhm, I think that with Sandy Jo we |
| 3:56:33 | 2 | disagreed about the diagnosis. We were |
| 3:56:36 | 3 | unclear about that. We were unclear about |
| 3:56:38 | 4 | whether or not they were recommending a |
| 3:56:42 | 5 | treatment plan that took into account a lot of |
| 3:56:45 | 6 | the factors we felt were concerning. |
| 3:56:51 | 7 | Q. Who is Victoria Russell? |
| 3:57:13 | 8 | A. I believe she was a psychiatrist. I |
| 3:57:17 | 9 | know Victoria Russell because she used to -- |
| 3:57:20 | 10 | we talked about the mortality reviews. She |
| 3:57:22 | 11 | was the independent psychiatric consultant |
| 3:57:25 | 12 | that chaired those mortality reviews, but I |
| 3:57:29 | 13 | did not know her in the context of GID. |
| 3:57:31 | 14 | Q. Does she still have any kind of |
| 3:57:34 | 15 | relationship with the department? |
| 3:57:34 | 16 | A. I don't think so. I actually think she |
| 3:57:37 | 17 | was employed by the department, but it |
| 3:57:44 | 18 | predates me. |
| 3:57:46 | 19 | Q. Do you know anything about her |
| 3:57:47 | 20 | qualifications, her specialties, area of |
| 3:57:49 | 21 | practice? |
| 3:57:50 | 22 | A. I believe she is a psychiatrist. |
| 3:57:53 | 23 | Q. Do you know whether she has any |
| 3:57:54 | 24 | experience or training in GID? |

Page 145

| | | |
|---|---|---|
| 13:57:56 | 1 | A. I do not know. |
| 13:57:57 | 2 | Q. Now, you have cited her report in your |
| 13:58:04 | 3 | affidavit as one of the pieces of that |
| 13:58:09 | 4 | evidence there was controversy about the |
| 13:58:10 | 5 | diagnosis; is that right? I am looking at the |
| 13:58:14 | 6 | end of Paragraph 7 on Page 5. |
| 13:58:16 | 7 | A. Thank you. |
| 13:58:17 | 8 | Q. Sure. |
| 13:58:22 | 9 | A. Yes. |
| 13:58:24 | 10 | Q. Do you know if she ever met with Sandy |
| 13:58:30 | 11 | Battista? |
| 13:58:30 | 12 | A. I don't believe that she did. |
| 13:58:32 | 13 | I believe that she recommended |
| 13:58:33 | 14 | further evaluation, is how I remember it, |
| 13:58:36 | 15 | which I think then took place by Tyler |
| 13:58:43 | 16 | Carpenter. |
| 13:58:47 | 17 | That's my recollection, that she |
| 13:58:49 | 18 | recommended more evaluation, and then Tyler, |
| 13:58:52 | 19 | who was employed by the vendor at the time, |
| 13:58:55 | 20 | did that evaluation. |
| 13:58:55 | 21 | Q. And is it your recollection -- I assume |
| 13:58:59 | 22 | you read the report before you cited it in you |
| 13:59:02 | 23 | are affidavit? |
| 13:59:02 | 24 | A. Yes. |

Page 186

| | | |
|---|---|---|
| 15:00:38 | 1 | September 1st, that September 1st letter, it's |
| 15:00:42 | 2 | more like a cut and paste. |
| 15:00:45 | 3 | Q. If I remembering your testimony about |
| 15:00:47 | 4 | the September 1st letter, even as of September |
| 15:00:50 | 5 | 1st there was no doubt in your mind that UMass |
| 15:00:54 | 6 | agreed to the clinical appropriateness and |
| 15:00:57 | 7 | medical necessity. You simply disagreed with |
| 15:01:02 | 8 | the basis for their conclusions? |
| 15:01:04 | 9 | A. Yeah. |
| 15:01:05 | 10 | Q. And you've said in — excuse me — in |
| 15:01:23 | 11 | the second-to-last paragraph of the April 3rd |
| 15:01:25 | 12 | letter, it reads, "The Superintendent Kathleen |
| 15:01:31 | 13 | Dennehy, et al., are in no position to make |
| 15:01:32 | 14 | medical decisions by interpreting the broad |
| 15:01:34 | 15 | recommendations set forth in the Fenway Clinic |
| 15:01:36 | 16 | evaluations that each inmate diagnosed with |
| 15:01:40 | 17 | GID should be afforded the Harry Benjamin |
| 15:01:43 | 18 | standards of care." |
| 15:01:43 | 19 | Do you see that? |
| 15:01:46 | 20 | A. Yes. |
| 15:01:47 | 21 | Q. Was that the recommendation in the |
| 15:01:49 | 22 | Fenway recommendations for Sandy, that she be |
| 15:01:54 | 23 | afforded the Harry Benjamin standards of care? |
| 15:02:00 | 24 | A. I have that right here. Can I look at |

Page 187

| | | |
|---|---|---|
| 15:02:02 | 1 | that? |
| 15:02:02 | 2 | Q. Sure. Look at whatever you want. |
| 15:02:38 | 3 | A. The recommendations were for hormones |
| 15:02:41 | 4 | and ongoing psychotherapy. |
| 15:02:44 | 5 | Q. You are reading from the report |
| 15:02:46 | 6 | November 04? |
| 15:02:47 | 7 | A. Yes. |
| 15:02:48 | 8 | Q. They go on to discuss in the following |
| 15:02:50 | 9 | sentence that the kind of clinician who should |
| 15:02:53 | 10 | be involved in the psychotherapy piece of |
| 15:02:55 | 11 | that. |
| 15:02:55 | 12 | A. Correct. |
| 15:02:55 | 13 | Q. And then some number of months after |
| 15:02:58 | 14 | this, the hormone recommendation is further |
| 15:03:01 | 15 | refined by the actual doctor's order from |
| 15:03:06 | 16 | Dr. Wirth and Dr. Friedman? |
| 15:03:07 | 17 | A. Yes. |
| 15:03:08 | 18 | Q. And in what way does the information |
| 15:03:16 | 19 | that was available to the department before |
| 15:03:20 | 20 | April 3rd, 2006 about the hormone |
| 15:03:25 | 21 | recommendation leave the department in the |
| 15:03:25 | 22 | position of interpreting a broad |
| 15:03:27 | 23 | recommendation that everybody should be |
| 15:03:28 | 24 | provided with the Harry Benjamin standards of |

Page 188

| | | |
|---|---|---|
| 15:03:32 | 1 | care? |
| 15:03:32 | 2 | What is left for you to interpret |
| 15:03:33 | 3 | about the hormone treatment recommendation? |
| 15:03:36 | 4 | A. I'm not sure that there is anything. |
| 15:03:43 | 5 | MR McFARLAND: What are you |
| 15:03:45 | 6 | quoting from? Which exhibit |
| 15:03:46 | 7 | MS SMITH-LEE: The broad |
| 15:03:47 | 8 | recommendations from the April 3rd letter |
| 15:03:49 | 9 | That's 15 |
| 15:03:50 | 10 | Q. And on April 14th or thereabouts, you |
| 15:04:08 | 11 | received this recommendation form in |
| 15:04:12 | 12 | substantially the same form you asked for? |
| 15:04:15 | 13 | A. Yes. |
| 15:04:44 | 14 | EXHIBIT NO. 17 MARKED |
| 15:05:05 | 15 | Q. What I have shown you is marked Weiner |
| 15:05:10 | 16 | 17. It looks to be on the cover page an |
| 15:05:13 | 17 | e-mail from you to Veronica Madden, with a |
| 15:05:16 | 18 | series of attachments, and I will let you have |
| 15:05:18 | 19 | a look through that, and let me know when |
| 15:05:21 | 20 | you're ready to answer questions. |
| 15:06:42 | 21 | Let's go back to No. 12 before we |
| 15:06:45 | 22 | do 17. |
| 15:07:01 | 23 | A. Yeah. |
| 15:07:03 | 24 | Q. No. 12 is the Fenway response to the |

Page 189

| | | |
|---|---|---|
| 15:07:05 | 1 | Osborne report? |
| 15:07:06 | 2 | A. Yeah. |
| 15:07:07 | 3 | Q. The date of the report is March 1, '06. |
| 15:07:12 | 4 | A. Yes. |
| 15:07:13 | 5 | Q. You testified before lunch that you did |
| 15:07:16 | 6 | see this — |
| 15:07:16 | 7 | A. Yep. |
| 15:07:17 | 8 | Q. — more or less around when it arrived? |
| 15:07:21 | 9 | A. Yes. |
| 15:07:23 | 10 | Q. Now, I believe you testified, both in |
| 15:07:34 | 11 | your affidavit and today, that among the |
| 15:07:37 | 12 | concerns about the Fenway report was a whole |
| 15:07:40 | 13 | list of things that you or somebody felt that |
| 15:07:43 | 14 | the Fenway people had not adequately |
| 15:07:45 | 15 | considered. Is that a fair statement? |
| 15:07:46 | 16 | A. Uh-huh. |
| 15:07:47 | 17 | MR McFARLAND: "Yes"? |
| 15:07:52 | 18 | Q. As you go through this report, are |
| 15:07:56 | 19 | there any of the issues that Osborne said they |
| 15:07:59 | 20 | needed to consider that they didn't address in |
| 15:08:05 | 21 | this report? |
| 15:08:10 | 22 | MR McFARLAND: Take your time |
| 15:08:11 | 23 | A. So my — I don't know if you want to |
| 15:08:41 | 24 | sit here and have me go through 22 pages of |

Page 194

| | | |
|---|---|---|
| 5:16:55 | 1 | that we still have, you know, Fenway saying |
| 5:16:58 | 2 | one thing, and the Cynthia Osborne saying |
| 5:17:01 | 3 | something different. Whether they agree in |
| 5:17:04 | 4 | tone and tenor -- |
| 5:17:06 | 5 | Q. Earlier when you said that your problem |
| 5:17:09 | 6 | with UMass at one point in time was that you |
| 5:17:13 | 7 | didn't feel that they had done a sufficient |
| 5:17:15 | 8 | review, or you didn't feel like the Osborne |
| 5:17:22 | 9 | concerns had been reviewed and considered. |
| 5:17:24 | 10 | Is that a fair statement? |
| 5:17:25 | 11 | A. And that they also felt it easy to take |
| 5:17:28 | 12 | the path of least resistance in signing off on |
| 5:17:32 | 13 | these evaluations, without really doing a due |
| 5:17:36 | 14 | diligence and considering other treatment |
| 5:17:38 | 15 | thorough. |
| 5:17:38 | 16 | Q. Putting aside whether you agreed with |
| 5:17:42 | 17 | it or not, did you consider the Fenway |
| 5:17:44 | 18 | response to the Osborne report to have been |
| 5:17:50 | 19 | thorough? |
| 5:17:51 | 20 | A. Oh, I think that was thorough. It was |
| 5:17:54 | 21 | a thorough response, with literature |
| 5:17:57 | 22 | citations, absolutely. |
| 5:17:58 | 23 | Q. Do you think there is anybody at UMass |
| 5:18:00 | 24 | that knows more about these questions that |

Page 195

| | | |
|---|---|---|
| 5:18:03 | 1 | Fenway is addressing with all the literature |
| 5:18:07 | 2 | citations and the experts at Fenway? |
| 5:18:08 | 3 | A. No, I do not. |
| 5:18:10 | 4 | Q. It is not that these concerns were not |
| 5:18:13 | 5 | ultimately addressed? The problem is back to |
| 5:18:15 | 6 | what we talked about, that you didn't agree |
| 5:18:17 | 7 | with it? |
| 5:18:17 | 8 | A. Uhm, I think it was one very narrow |
| 5:18:21 | 9 | perspective on how to deal with a very complex |
| 5:18:27 | 10 | individual with a very complex disorder. |
| 5:18:29 | 11 | Q. What's your understanding about what |
| 5:18:31 | 12 | the most commonly accepted standards of care |
| 5:18:34 | 13 | are in American medicine today for treating |
| 5:18:37 | 14 | gender identity disorder? |
| 5:18:38 | 15 | A. The most common -- |
| 5:18:43 | 16 | Q. The most widely accepted standards of |
| 5:18:45 | 17 | care for treatment of gender identity |
| 5:18:47 | 18 | disorder. Do you have understanding -- |
| 5:18:49 | 19 | A. Do I have an understanding of the Harry |
| 5:18:52 | 20 | Benjamin standards of care? |
| 5:18:53 | 21 | Q. I am not using that title. The |
| 5:18:56 | 22 | standard of care in a generic sense. |
| 5:18:58 | 23 | So Prozac might be an accepted |
| 5:19:02 | 24 | standard of care for a certain disorder. |

Page 196

| | | |
|---|---|---|
| 5:19:03 | 1 | That's the context. |
| 5:19:04 | 2 | What in your understanding is most |
| 5:19:06 | 3 | widely accepted standard of care or treatment |
| 5:19:10 | 4 | or protocol for gender identity disorder? |
| 5:19:14 | 5 | A. I would guess -- I would imagine |
| 5:19:18 | 6 | psychotherapy, hormones. |
| 5:19:25 | 7 | You know, I mean, I am familiar with |
| 5:19:28 | 8 | Harry Benjamin standards of care. I don't |
| 5:19:31 | 9 | think they call it that anymore, but, uhm, you |
| 5:19:34 | 10 | know, I think it calls for -- you know, I |
| 5:19:37 | 11 | mean, again, so they are not criteria, per se, |
| 5:19:39 | 12 | I mean, or recommendations. They are just |
| 5:19:42 | 13 | guidelines for managing, you know, the |
| 5:19:43 | 14 | treatment of GID. |
| 5:19:45 | 15 | I think that they are fairly broad. |
| 5:19:46 | 16 | You know, I don't think they say, you know, |
| 5:19:48 | 17 | the only treatment for GID is boom, boom, |
| 5:19:52 | 18 | boom. |
| 5:19:54 | 19 | It asks people to consider a lot of |
| 5:19:56 | 20 | things. I would say -- I don't have -- do not |
| 5:20:00 | 21 | have any experience with the treatment of GID |
| 5:20:02 | 22 | outside of prison. I don't know what the |
| 5:20:04 | 23 | widely accepted treatment, protocol is. |
| 5:20:11 | 24 | Q. In this report, the Fenway doctors have |

Page 197

| | | |
|---|---|---|
| 5:20:16 | 1 | cited some literature that suggests -- in |
| 5:20:21 | 2 | support of the point that many if not all |
| 5:20:25 | 3 | other approaches to GID, short of the triadic |
| 5:20:29 | 4 | approach and the standards of care have been |
| 5:20:35 | 5 | proven to be ineffective. |
| 5:20:35 | 6 | Do you recall reading that? |
| 5:20:36 | 7 | A. I do not. |
| 5:20:37 | 8 | Q. Did you review any of the literature |
| 5:20:40 | 9 | they cited? |
| 5:20:41 | 10 | A. I don't think I did. I may have. You |
| 5:20:44 | 11 | know, I don't... |
| 5:20:46 | 12 | Q. Did you ask anybody to help you |
| 5:20:48 | 13 | understand it? "They are just blinding me |
| 5:20:51 | 14 | with cites" or "Is this for real?" Did you |
| 5:20:54 | 15 | consult any experts? |
| 5:20:55 | 16 | A. I think that other experts said that is |
| 5:20:59 | 17 | the only -- |
| 5:21:00 | 18 | Q. Did you take this report to anybody |
| 5:21:03 | 19 | with GID expertise and say, "This is what they |
| 5:21:07 | 20 | have said. Does this sound credible to you?" |
| 5:21:09 | 21 | A. No. |
| 5:21:10 | 22 | Q. Okay. Now we will go to 17. |
| 5:21:24 | 23 | A. Which is? |
| 5:21:24 | 24 | Q. The e-mail from you to Veronica Madden |

## Page 198

| | | |
|---|---|---|
| 15:21:28 | 1 | in which you have draft documents attached. |
| 15:21:30 | 2 | MR McFARLAND: Do you want to note |
| 15:21:32 | 3 | for the record the second page of this |
| 15:21:34 | 4 | document also raised the concerns that this |
| 15:21:39 | 5 | was just -- she never signed and had never |
| 15:21:43 | 6 | seen and probably wasn't -- but she never |
| 15:21:46 | 7 | signed it |
| 15:21:52 | 8 | MS SMITH-LEE: I understand these |
| 15:21:53 | 9 | are drafts |
| 15:21:55 | 10 | Q. I think somebody stole my 17. There it |
| 15:22:10 | 11 | is. |
| 15:22:16 | 12 | I think I interrupted you halfway |
| 15:22:18 | 13 | through looking at that. |
| 15:22:19 | 14 | A. That's okay. |
| 15:22:34 | 15 | Q. Did you recognize this e-mail and |
| 15:22:38 | 16 | attachment? |
| 15:22:38 | 17 | A. I mean, I don't recognize it as an |
| 15:22:42 | 18 | e-mail. I recognize this as a letter, uhm. |
| 15:22:46 | 19 | Q. The date is June 5th, 2006, from you to |
| 15:22:49 | 20 | Veronica Madden, and there is a list of |
| 15:22:53 | 21 | attachments by document title. |
| 15:22:54 | 22 | Do you see that? |
| 15:22:54 | 23 | A. Yeah. |
| 15:22:55 | 24 | Q. And on the e-mail the first listed |

## Page 199

| | | |
|---|---|---|
| 15:22:59 | 1 | document title is "sec rev let supt.doc." |
| 15:23:05 | 2 | A. Yes. That's the same title that is on |
| 15:23:07 | 3 | the top of the first attachment, right. |
| 15:23:10 | 4 | Q. What I am seeing here is what you |
| 15:23:13 | 5 | attached to your e-mail? |
| 15:23:15 | 6 | A. Yes. |
| 15:23:16 | 7 | Q. And the same question: The attachments |
| 15:23:22 | 8 | listed "treatment recommendation |
| 15:23:23 | 9 | response.doc," which also looks to be the |
| 15:23:27 | 10 | title on the second attachment? |
| 15:23:28 | 11 | A. Right. |
| 15:23:30 | 12 | Q. Are these two attachments things that |
| 15:23:33 | 13 | you drafted? |
| 15:23:34 | 14 | A. I believe so. |
| 15:23:36 | 15 | Q. And your purpose in sending them to |
| 15:23:40 | 16 | Veronica Madden was what? |
| 15:23:41 | 17 | A. I'm guessing for review. |
| 15:23:46 | 18 | Q. But you don't specifically remember? |
| 15:23:52 | 19 | A. No. I mean, I think that, you know, |
| 15:23:56 | 20 | clearly the letter to Patti Onorato was a |
| 15:24:01 | 21 | response to the April 19th, uhm, document with |
| 15:24:04 | 22 | the treatment plan recommendations that -- our |
| 15:24:06 | 23 | response to them. |
| 15:24:09 | 24 | I wouldn't send out -- I may draft |

## Page 200

| | | |
|---|---|---|
| 15:24:11 | 1 | things. You'll see my signature isn't on |
| 15:24:14 | 2 | anything. Uhm, so it's at a higher pay grade, |
| 15:24:18 | 3 | to a certain extent. So it's up to them to |
| 15:24:21 | 4 | determine what they want to do with it. |
| 15:24:23 | 5 | Q. On that, for just a second, so I'm |
| 15:24:26 | 6 | clear. I completely understand what you are |
| 15:24:29 | 7 | saying. |
| 15:24:30 | 8 | Is it fair to assume if you drafted |
| 15:24:36 | 9 | this to send to Veronica Madden or anybody |
| 15:24:38 | 10 | else above you, that you wouldn't have done |
| 15:24:41 | 11 | that on your own initiative, you would have |
| 15:24:43 | 12 | been asked to draft a letter? |
| 15:24:45 | 13 | A. I think it's safe to say that the |
| 15:24:48 | 14 | determination as to whether or not UMass was |
| 15:24:51 | 15 | being clear enough with us at this point was |
| 15:24:54 | 16 | beyond a decision that Larry would get to |
| 15:24:56 | 17 | make. |
| 15:24:56 | 18 | Q. Okay. |
| 15:24:57 | 19 | A. By himself. |
| 15:24:58 | 20 | Q. So let's go to the second attachment. |
| 15:25:03 | 21 | It is a draft of a letter to Patti |
| 15:25:09 | 22 | Onorato in response to the treatment |
| 15:25:10 | 23 | recommendation that we were discussing |
| 15:25:12 | 24 | earlier. |

## Page 201

| | | |
|---|---|---|
| 15:25:12 | 1 | A. Yes. |
| 15:25:13 | 2 | Q. In this you're asking, the second |
| 15:25:29 | 3 | paragraph, "For example, what hormones are you |
| 15:25:33 | 4 | recommending be prescribed and when and how |
| 15:25:35 | 5 | are they to be administered?" |
| 15:25:38 | 6 | Do you see that? |
| 15:25:38 | 7 | A. So, yes. I signed an affidavit |
| 15:25:41 | 8 | indicating that it had been done in 2005. |
| 15:25:46 | 9 | Q. So you really didn't need them to |
| 15:25:48 | 10 | answer this question in the summer of 2006, |
| 15:25:51 | 11 | did you? |
| 15:25:52 | 12 | A. It would seem redundant. |
| 15:26:00 | 13 | Q. Then the first attachment, also dated |
| 15:26:09 | 14 | June '06. |
| 15:26:11 | 15 | This does appear to be a draft -- |
| 15:26:14 | 16 | it looks to be a draft of a letter from Terry |
| 15:26:16 | 17 | Marshall to Superintendent Murphy. |
| 15:26:19 | 18 | Do you see that? |
| 15:26:20 | 19 | A. Yes. |
| 15:26:20 | 20 | Q. That's a draft, as I read this -- and |
| 15:26:25 | 21 | correct me if I am wrong -- that had it been |
| 15:26:27 | 22 | sent would authorized Superintendent Murphy to |
| 15:26:30 | 23 | start the security review on the hormone |
| 15:26:32 | 24 | piece, and it says, "We're waiting for further |

## Page 218

16:01:49  1  Q. And is it a correct reading of this
16:01:51  2  that he's stating as one caution that the
16:01:55  3  hormone therapy should be done within the
16:01:57  4  context of therapy where "he can face his
16:01:59  5  fears about their dangers and slowly come to
16:02:02  6  grips with their limitation"?
16:02:06  7  A. What number was that?
16:02:08  8  Q. No. 3. Page 5.
16:02:13  9  A. Yes.
16:02:15  10  Q. So one concern is that hormone
16:02:17  11  treatment should be accompanied by adequate
16:02:20  12  psychotherapy?
16:02:20  13  A. Yes.
16:02:22  14  Q. And another concern is this potential
16:02:27  15  interaction with estrogens and whatever
16:02:33  16  treatment she is getting for her congential
16:02:36  17  adrenal hyperplasia?
16:02:36  18  A. Correct.
16:02:40  19  Q. Do you know whether MHM or Dr. Levine
16:02:46  20  considers the therapy that Sandy has been
16:02:49  21  getting, the counseling she has been getting
16:02:51  22  over the last couple of years, to be adequate
16:02:54  23  therapy to support the administration of
16:02:56  24  hormones?

## Page 219

16:02:58  1  A. My -- you're asking me to interpret
16:03:05  2  what I believe other people to feel?
16:03:08  3  Q. I wouldn't want you to guess. I would
16:03:11  4  want you to answer if somebody has offered an
16:03:13  5  opinion about that.
16:03:14  6  A. My sense is that they feel it hasn't
16:03:17  7  necessarily been all that adequate.
16:03:19  8  Q. What steps are being taken to
16:03:22  9  supplement the psychotherapy she is receiving
16:03:27  10  to something that would be considered
16:03:27  11  adequate?
16:03:27  12  A. I would say also that our
16:03:30  13  responsibility when they had the contract was
16:03:32  14  to provide supervision to the therapists who
16:03:35  15  were providing, uhm, that treatment.
16:03:37  16  So there probably was that period of
16:03:39  17  time where that supervision wasn't taking
16:03:41  18  place, where Fenway wasn't involved in the
16:03:43  19  contract, but I would say the anecdotally my
16:03:47  20  understanding of what took place in those
16:03:49  21  supervision sessions were more of a bitch
16:03:52  22  session. It wasn't so much looking at
16:03:54  23  clinical issues, just dealing with the
16:03:56  24  frustrations of the delays and moving forward

## Page 220

16:04:00  1  with the treatment, which isn't clinical
16:04:03  2  supervision.
16:04:03  3  Q. When you say that, are you referring to
16:04:05  4  the meetings Sandy had with her counselor —
16:04:08  5  A. No, the counselors had with the Fenway.
16:04:13  6  So I raise that as just -- to point
16:04:20  7  out the differences between what I think
16:04:22  8  Dr. Levine envisions as what appropriate
16:04:24  9  supervision for the therapist should be.
16:04:27  10  I mean, I think the position that —
16:04:29  11  you know, the Mass. Medical Society thing from
16:04:34  12  Diane Ellaborn who has evaluated Sandy Jo was
16:04:38  13  that the therapy should sort of be a one
16:04:42  14  process. You know, that, you know, part of
16:04:45  15  the -- maybe the most, uhm, profound impact of
16:04:50  16  that treatment will be on that therapeutic
16:04:53  17  relationship formed between patient and
16:04:55  18  clinician, and there should be a prolonged
16:04:58  19  period of evaluation therapy, helping the
16:05:02  20  inmate to explore all the different issues,
16:05:05  21  not just "I want this, and I am going to work
16:05:07  22  to get that. I'm focused on that, and I'm not
16:05:10  23  dealing with your issues."
16:05:11  24  That's dealing with your

## Page 221

16:05:13  1  frustrations, but not getting what you think
16:05:15  2  is the most appropriate treatment for you.
16:05:17  3  Q. Do you know what has been addressed in
16:05:19  4  Sandy's sessions with her therapist?
16:05:22  5  A. I don't. I haven't reviewed the record
16:05:26  6  in, uhm, a few years.
16:05:28  7  So I would say that I can — I am
16:05:32  8  speaking anecdotally, because I have a
16:05:35  9  relationship with, uhm, Diane McLaughlin, who
16:05:38  10  was his therapist, and maybe still.
16:05:41  11  She would tell me what was going on,
16:05:43  12  uhm, you know, in a basic sense. You know,
16:05:49  13  basically they get frustrated with the
16:05:52  14  process. They get an inmate why isn't this
16:05:55  15  moving forward, and that's where the therapy
16:05:57  16  gets stuck. They felt like it's out of their
16:05:59  17  control as to what moves forward or not. They
16:06:03  18  weren't really competent enough to figure out
16:06:06  19  within the therapy — to take that
16:06:08  20  relationship to another level.
16:06:10  21  I think Dr. Levine would be more
16:06:12  22  appropriate. I think that's what Dr. Levine
16:06:14  23  and Dr. Zakai would say to you.
16:06:16  24  Q. So what steps are being taken right now

Page 222

| | | |
|---|---|---|
| 16:06:19 | 1 | to adjust the kind of therapy that Sandy is |
| 16:06:22 | 2 | getting such that it would be considered by |
| 16:06:24 | 3 | these people to be adequate to support |
| 16:06:27 | 4 | hormones therapy? |
| 16:06:28 | 5 | A. Supervision and training. |
| 16:06:30 | 6 | Q. Has any of that happened yet? |
| 16:06:32 | 7 | A. Yes. |
| 16:06:32 | 8 | Q. Has Diane McLaughlin --- |
| 16:06:35 | 9 | A. Diane McLaughlin was at the training I |
| 16:06:38 | 10 | was at that Dr. Levine put on out in Worcester |
| 16:06:42 | 11 | at UMass, uhm, and whether or not the |
| 16:06:45 | 12 | supervision groups have started, I'm not clear |
| 16:06:48 | 13 | on that one yet or not. |
| 16:06:50 | 14 | Q. And has anybody with respect the second |
| 16:06:57 | 15 | concern about the interplay between estrogens |
| 16:06:59 | 16 | and someone with congential adrenal |
| 16:07:03 | 17 | hyperplasia, has any effort been made to reach |
| 16:07:06 | 18 | out the to endocrinologist to see if that is a |
| 16:07:09 | 19 | concern for her? |
| 16:07:10 | 20 | A. I'm not aware of whether or not that |
| 16:07:13 | 21 | has happened. |
| 16:07:14 | 22 | I would say, you know, I mean, I |
| 16:07:18 | 23 | don't read this as a recommendation for |
| 16:07:19 | 24 | hormones necessarily. |

Page 223

| | | |
|---|---|---|
| 16:07:21 | 1 | You know, again, I also say I don't |
| 16:07:22 | 2 | necessarily read -- it says recommendation for |
| 16:07:24 | 3 | the management of GID, but I don't necessarily |
| 16:07:27 | 4 | read this as a treatment plan. |
| 16:07:28 | 5 | It talks about hormones treatment |
| 16:07:30 | 6 | being a possibility. I don't know if it would |
| 16:07:32 | 7 | be preemptive or not. |
| 16:07:34 | 8 | I mean to contact Dr. Wirth. I |
| 16:07:37 | 9 | don't know if it's happened or hasn't |
| 16:07:38 | 10 | happened. My suspicion is that it hasn't, but |
| 16:07:41 | 11 | I'm not in -- I don't know. |
| 16:07:42 | 12 | Q. Now, you received the Fenway report |
| 16:07:54 | 13 | initial report in November of 2004, |
| 16:07:57 | 14 | thereabouts, or it was issued in November of |
| 16:08:00 | 15 | 2004? |
| 16:08:00 | 16 | A. Uhm, when you say "you," do you mean |
| 16:08:02 | 17 | the department? |
| 16:08:02 | 18 | Q. The department. Excuse me. |
| 16:08:04 | 19 | A. That's what the date on it is. I don't |
| 16:08:07 | 20 | know when they got it. |
| 16:08:08 | 21 | Q. You weren't present? This is before |
| 16:08:11 | 22 | your time? |
| 16:08:11 | 23 | A. Right. |
| 16:08:12 | 24 | Q. And assuming that that was even the |

Page 224

| | | |
|---|---|---|
| 16:08:19 | 1 | first time that the department saw the |
| 16:08:22 | 2 | diagnosis, we are inching up on four years, |
| 16:08:25 | 3 | aren't we? |
| 16:08:26 | 4 | A. Uh-huh. |
| 16:08:27 | 5 | Q. You talked about due diligence early |
| 16:08:30 | 6 | on, that you wanted UMass to do some due |
| 16:08:34 | 7 | diligence, and you guys wanted to do some due |
| 16:08:36 | 8 | diligence. |
| 16:08:37 | 9 | Have you ever had a case where it |
| 16:08:39 | 10 | has taken four years to do due diligence on a |
| 16:08:43 | 11 | treatment recommendation? |
| 16:08:44 | 12 | A. Partially -- not that I can recall. |
| 16:08:49 | 13 | Q. Aware of any in all your years in |
| 16:08:52 | 14 | correction? |
| 16:08:53 | 15 | A. I'm not aware of any. |
| 16:08:56 | 16 | Q. Does that seem like a reasonable amount |
| 16:09:03 | 17 | of time to you? |
| 16:09:03 | 18 | A. Uhm, no. I think that due diligence |
| 16:09:09 | 19 | should have been done much quicker. |
| 16:09:12 | 20 | EXHIBIT NO. 24 MARKED |
| 16:10:25 | 21 | Q. I have handed you Weiner 24, which is |
| 16:10:27 | 22 | the third affidavit of Lawrence Weiner. |
| 16:10:32 | 23 | Flip to the last page. |
| 16:10:33 | 24 | A. I am on it. |

Page 225

| | | |
|---|---|---|
| 16:10:34 | 1 | Q. That's your signature there? |
| 16:10:35 | 2 | A. Yes. |
| 16:10:35 | 3 | Q. Signed under the pains and penalties of |
| 16:10:38 | 4 | perjury on December 1, '06? |
| 16:10:40 | 5 | A. Yes. |
| 16:10:41 | 6 | Q. Do you recall what caused to you submit |
| 16:10:46 | 7 | this affidavit? |
| 16:10:48 | 8 | A. Uhm, you know, as I review it, the only |
| 16:10:53 | 9 | new thing in this one is about our request to |
| 16:10:56 | 10 | have Cynthia Osborne review Sandy Jo in |
| 16:11:05 | 11 | person. |
| 16:11:05 | 12 | Q. In your prior affidavit in October of |
| 16:11:09 | 13 | '05 -- does that sound right to you? |
| 16:11:10 | 14 | A. We will go with that. |
| 16:11:12 | 15 | Q. More or less. |
| 16:11:13 | 16 | In your prior affidavit you had |
| 16:11:14 | 17 | submitted to the court Cynthia Osborne's |
| 16:11:20 | 18 | review of the Fenway evaluation? |
| 16:11:20 | 19 | A. Yes. |
| 16:11:21 | 20 | Q. You told me you felt it was important |
| 16:11:24 | 21 | for the court to have an update on the review? |
| 16:11:26 | 22 | A. Yes. |
| 16:11:27 | 23 | Q. Did you consider submitting the Fenway |
| 16:11:31 | 24 | response to the Osborne report when you sent |

Page 226

| | | |
|---|---|---|
| 6:11:34 | 1 | in this affidavit? |
| 6:11:36 | 2 | A. I don't think so. |
| 6:11:39 | 3 | Q. Okay. You agree with me it is not |
| 6:11:42 | 4 | attached? |
| 6:11:42 | 5 | A. I would agree it is not attached. |
| 6:11:44 | 6 | Q. And that the department had that in its |
| 6:11:47 | 7 | possession by the time you signed this |
| 6:11:49 | 8 | affidavit? |
| 6:11:49 | 9 | A. Yes. |
| 6:11:50 | 10 | Q. And the April 2006 GID treatment |
| 6:11:55 | 11 | recommendation form, where UMass had filled |
| 6:11:58 | 12 | out all of categories you asked for, you had |
| 6:12:00 | 13 | that in your possession? |
| 6:12:02 | 14 | A. Yes. |
| 6:12:02 | 15 | Q. That is neither submitted or mentioned |
| 6:12:04 | 16 | in this affidavit? |
| 6:12:05 | 17 | A. Correct. |
| 6:12:05 | 18 | Q. To the best of your knowledge, did |
| 6:12:07 | 19 | anybody ever give Sandy a copy of Fenway |
| 6:12:10 | 20 | response? |
| 6:12:11 | 21 | A. I don't know. I do not know. |
| 6:12:15 | 22 | Q. You didn't? |
| 6:12:17 | 23 | A. I did not. It's possible that his |
| 6:12:22 | 24 | therapist did or UMass did, but I did not. |

Page 227

| | | |
|---|---|---|
| 6:12:35 | 1 | Q. What's your understanding about the |
| 6:12:40 | 2 | potential effects of gender identity disorder |
| 6:12:44 | 3 | that is not adequately treated? |
| 6:12:46 | 4 | A. I'm sorry, will you repeat? |
| 6:12:49 | 5 | Q. Do you have an understanding about the |
| 6:12:51 | 6 | potential risks, potential effects, negative |
| 6:12:55 | 7 | effects to an inmate with GID that is not |
| 6:12:58 | 8 | appropriately treated or managed? |
| 6:13:00 | 9 | A. Yes. |
| 6:13:00 | 10 | Q. What is that understanding? |
| 6:13:02 | 11 | A. It was mentioned in one of the UMass |
| 6:13:07 | 12 | letters: dysphoria, potential self-injury, |
| 6:13:11 | 13 | uhm, decompensation. |
| 6:13:15 | 14 | Q. And as a trained as clinician, as a |
| 6:13:21 | 15 | clinician, do those rise to the level of a |
| 6:13:24 | 16 | serious concerns? |
| 6:13:26 | 17 | A. Do those -- yes. Yes. |
| 6:13:29 | 18 | Q. And do you have any understanding one |
| 6:13:31 | 19 | way or the other way what has been Sandy's |
| 6:13:37 | 20 | mental state over the past couple of years? |
| 6:13:39 | 21 | A. I haven't reviewed his medical records |
| 6:13:43 | 22 | in a couple of years. |
| 6:13:45 | 23 | Anecdotally, we know that he had the |
| 6:13:48 | 24 | incident of self-injury. I don't remember the |

Page 228

| | | |
|---|---|---|
| 16:13:50 | 1 | exact date on of that, but that he -- you |
| 16:13:58 | 2 | know, I know he had been employed in -- that |
| 16:14:01 | 3 | he had been doing better, uhm, in both mental |
| 16:14:05 | 4 | status and behaviorally. |
| 16:14:09 | 5 | Q. You know he had at least one incident |
| 16:14:11 | 6 | of attempted self-castration? |
| 16:14:13 | 7 | A. I'm aware of that, yes. |
| 16:14:15 | 8 | Q. Are you aware that there have been |
| 16:14:16 | 9 | other incidents where she has been placed on |
| 16:14:19 | 10 | watch for fear of self-harming behavior? |
| 16:14:23 | 11 | A. My affidavit would indicate that there |
| 16:14:25 | 12 | was an incident where he was placed on watch; |
| 16:14:30 | 13 | and to be honest, as I re-read that in the |
| 16:14:32 | 14 | preparation for this, as I recall that, I |
| 16:14:34 | 15 | think it was because Sandy Jo had sent like a |
| 16:14:36 | 16 | letter that was received after he already been |
| 16:14:38 | 17 | cleared from a watch, but the letter wasn't |
| 16:14:41 | 18 | received. So people put him on the watch, |
| 16:14:43 | 19 | because they received that letter and |
| 16:14:45 | 20 | evaluated him again. There was confusion. |
| 16:14:48 | 21 | Q. Understood. The attempted |
| 16:14:51 | 22 | self-castration I will represent was in |
| 16:14:53 | 23 | October of 2005. |
| 16:14:56 | 24 | Have you seen any letters from |

Page 229

| | | |
|---|---|---|
| 16:14:58 | 1 | Sandy or anything else in which she described |
| 16:15:05 | 2 | the intensity of her feeling in October 2005 |
| 16:15:10 | 3 | as the let down from having thought she was |
| 16:15:14 | 4 | going to get hormone therapy and then having |
| 16:15:18 | 5 | it denied? |
| 16:15:19 | 6 | A. I don't recall any letters. |
| 16:15:20 | 7 | Q. Do you have any familiarity with that |
| 16:15:22 | 8 | being one of the things that she attributed |
| 16:15:26 | 9 | her intense behavior to? |
| 16:15:27 | 10 | A. Not as I sit here today, no. |
| 16:15:29 | 11 | Q. As the mental health administrator, do |
| 16:15:33 | 12 | you have any concern that she's currently |
| 16:15:37 | 13 | vulnerable, having received the report from |
| 16:15:39 | 14 | Dr. Levine that appears to support her |
| 16:15:41 | 15 | diagnosis, if she again feels let down by a |
| 16:15:46 | 16 | delay or further challenges to her treating |
| 16:15:51 | 17 | her GID? |
| 16:15:52 | 18 | A. Her past behavior is good predictor for |
| 16:15:56 | 19 | future outcome, and it would be reasonable to |
| 16:15:58 | 20 | make that leap. |
| 16:15:59 | 21 | Q. To be concerned about that? |
| 16:16:00 | 22 | A. Yes. |
| 16:16:01 | 23 | EXHIBIT NO. 25 MARKED |
| 16:16:44 | 24 | Q. Let me know when you are ready. |

# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

SANDY J. BATTISTA,

    Plaintiff

    v.                                Civil Action No.  02-10137-MEL

ROBERT MURPHY, et al.,

    Defendants.

## AFFIDAVIT  OF GREGORY J. HUGHES, LICSW

I, Gregory J. Hughes, do hereby depose and say that:

1.    I am an employee of the Massachusetts Department of Correction ("DOC"), and presently serve as a Regional Administrator for the Health Services Division. I am a licensed social worker and my primary responsibility as a Regional Administrator is to monitor the mental health care provided to the inmates within Department of Correction facilities. I have reviewed Sandy J. Battista's DOC medical records, paying particular attention to the records pertaining to his mental health treatment. The information provided herein is based upon my personal knowledge.

2.    The DOC contracts with private vendors to provide medical, dental and mental health services to inmates within the Department's custody. Currently, Correctional Medical Services ("CMS") is under contract to provide medical, dental and mental health services to inmates.  In addition, the University of Massachusetts Medical School ("U. Mass. Medical"), under the direction of psychiatrist Kenneth Applebaum, is presently under contract with CMS to provide direct management of all inmate mental health services.    Pursuant to the terms of the CMS contract, the private medical contractor has full responsibility for decision-making with regard to the type, timing,

DOC 000104

2

and level of medical and mental health services. The sex offender treatment program at the Massachusetts Treatment Center is under contract with the Forensic Health Services ("FHS"), a private clinical contractor.

3.    Sandy Jo Battista is currently housed at the Massachusetts Treatment Center awaiting a trial on a sexually dangerous person petition brought by the Worcester County District Attorney pursuant to M.G.L. 123A, § 12. Since 1997, Mr Battista has been evaluated by a number of mental health professionals regarding his self reported gender disorder, including Victoria Russell, M.D. a psychiatric consultant to the DOC with experience in treating gender disorders and Tyler Carpenter, Ph.D. a psychologist employed by CMS who conducted an evaluation which included the administration of numerous psychological tests. See Attachments A and B.

4.    In response to the suggestions offered by Judge Wolf in his recent decision in the case of Kosilek v. Maloney, the DOC has decided to retain a mental health professional with experience in treating gender disorders to provide evaluations and treatment recommendations for inmates who report to be suffering from gender disorders and who seek treatment for this disorder. It is also expected that the mental health professional with experience in gender disorders sought by the DOC will provide therapy to inmates diagnosed with a gender identity disorder or supervise other mental health professionals providing therapy. Presently, the DOC is working with the U. Mass. Medical School Mental Health Program to identify mental health professionals with experience in treating gender disorders who may be available to work with the DOC in this capacity. It is my understanding that upon hiring a mental health professional with experience in gender disorders, Mr. Battista will undergo a comprehensive medical and psychological evaluation regarding his claimed gender disorder and a treatment plan will be developed to address medical and mental health issues.

3

Signed under the pains and penalties of perjury this _7th_ day of October, 2002.

Gregory J. Hughes LICSW

DOC 000106

# EXHIBIT H



FENWAY COMMUNITY HEALTH

Mental Health and Addictions
Department
7 Haviland Street
Boston, Massachusetts 02115-2685

Telephone 617 927-6200
Facsimile 617 267-3667

www.fenwayhealth.org

EXHIBIT
10
(Pg. 1 of 7)

Fenway Community Health
7 Haviland Street
Boston, MA  02115

Re: Sandy Jo Battista (formerly known as David Megarry)
DOB:  12/30/61
DOC Case #: M-15930
Date of evaluation: 8/10/04



BOARD OF DIRECTORS
2004-2005

Stewart B. Clifford, Jr.
President

Tomas T. Ayoub
Vice President

Allison Sutter
Treasurer

Lisa Damon, Esq.
Clerk

Terrence M. Keane, PhD*
At-Large

Elisa Alonso
David J. Breen, Esq.
Richard Marshall, MD
Carl Nagy-Koechlin
Richard D. Olson, Jr.
Arnold E. Saperstein
Scott B. Squillace, Esq.*

* Past President

Stephen L. Boswell, MD
Executive Director

**Reason for Evaluation**

This evaluation of Sandy Jo Battista was done at the request of University of
Massachusetts Medical School, who provides mental health care for the Department
of Corrections, to assess the possible diagnosis of Gender Identity Disorder, and to
help determine treatment planning.  The inmate reported that she filed a lawsuit
two years ago to be evaluated for Gender Identity Disorder.  She reported becoming
severely depressed in May 2003, when she was civilly committed to this institution,
secondary to being evaluated as a sexually dangerous person.  She stated that she
is not too concerned about her freedom at this time; rather she is focusing on being
able to transition from male to female.

This evaluation is based on a 90-minute interview with Kevin Kapila, MD and Randi
Kaufman, PsyD, as well as reviewing the inmate's chart.

**Developmental and Gender History**

Inmate is a 43-year-old biological male who identifies as female.  Hereafter female
pronouns will be used.  Inmate reported that she was born in Oxford, MA, the
middle child of three, with a sister one year older, and a brother two years younger.
Inmate was born with a medical condition called Congenital Adrenal Hyperplasia,
which caused early physical maturity, and is considered to be an intersex condition.
Inmate reported that mother rejected her early, due to her atypical physical
presentation from CAH.  Paternal grandmother was also rejecting, reportedly saying
inmate should not be bathed.  Inmate reports that she took medication to slow the
growth process, but her body did not "catch up" until she was 14 or 15.  Inmate
reported that she was also born "pigeon-toed", but was not put into corrective
braces.  At 6 or 7 she had surgery to correct this, including full casts on her legs.

Inmate reported that father was violent toward her, beating her often for playing
with her sister's toys and dressing in her clothing.  Father is reported as frequently
yelling at mother, and while inmate could not recall witnessing physical violence,

she states that father once beat mother so badly that she had a brain hemorrhage, which led to her death. Client was 8 at that time. Father was incarcerated for involuntary manslaughter, and maternal grandmother raised inmate for some time. Maternal grandmother reportedly did not like inmate, as she was "father's junior", the man who had killed her daughter. Inmate states she "heard" that grandmother was physically and emotionally abusive to her, but does not remember this. A previous evaluation, done by Katrin Rouse, Ed.D., indicates that inmate was subjected to pornographic material and sexual acting out by grandmother and her friends. Paternal grandmother reportedly learned that inmate was being mistreated and petitioned for, and received, legal guardianship. Inmate remained with her until father was released from prison, when inmate was 10.

Inmate stated that she could not remember her thoughts about her gender while growing up, but was always jealous of women. She thought about what it would be like to have a woman's body, and did not like her own body. Inmate stated that she thought this was "normal", and that all males thought this way. She hated sports, and played house and with dolls with her sister.

Inmate and siblings lived with father after he was released from prison. He remarried, and stepmother was reported as being "okay" toward inmate. Inmate stated that father changed while he was in prison, and no longer beat inmate. He reportedly spent much of his time drunk for the remainder of his life. Father moved the family to Homestead, Florida, where he joined a motorcycle gang called the Devil's Disciples". This brought a lifestyle of "parties, beer and girls", but inmate recalled that for the first time she felt she had a normal home. The family did things together like going on picnics and fishing. Father continued using drugs and drinking for some time, and inmate recalled that she did not like seeing father passed out. She attended school, and they ate together as a family, remaining in Florida until inmate was in the 8th grade. Inmate reported that she was a loner, without friends, but always got along with sister, who was "the only one who stuck by me". She used alcohol and marijuana in an effort to be accepted by peers. Inmate reports that she herself was violent and aggressive, getting into lots of fights, and that she lifted weights for years.

Inmate reported that she left school in the 8th grade. When she was 15 father took out a CHINS petition, as she was setting fires in garbage cans in the woods, running away, stealing from stores, and committing acts of vandalism. Previous reports indicate that inmate had sexual contact with female family members, and that this led to father seeking to place inmate outside the home. From age 15 through 18 inmate attended school in a DYS facility, and lived in two foster homes. She reported that the foster homes were "not bad", and she went on field trips and picnics.

A previous evaluation, by Katrin Rouse, Ed.D., forensic psychologist, reflects that inmate was also placed in Worcester State Hospital adolescent unit in July 1977, the Metropolitan State Hospital adolescent program in 1978 and 1979, and was housed in a DYS facility on the grounds of Medfield State Hospital in July 1979 for two years, and but this information was not discussed with these evaluators.

2

11/30/2004 23:09 FAX 5084753258            DR BREWER                                    @005
: 11/16/2004  10:33    61.7257  57                   FENWAY COM HEA                         PAGE  04/08

The family then moved to Mayville, Kentucky, until inmate was 18. She was unsure why they moved, but thought father might have done this to break ties with the motorcycle gang. A rival bike gang reportedly killed Father's brother. Father then became religious and the family participated in retreats. The family then moved to Ohio briefly, where father got a job as an assistant cop.

Inmate reported that she dated some women, and that they always wanted to go further with her sexually than she was able or willing to do. She stated that she was never able to have sex willingly, and recalls having sex with women twice, at the age of 18. She was not able to perform, as she was extremely fearful of rejection, recalling mother's early rejection of her, and needed to have the woman put inmate inside of her.

At inmate's age of 19 the family moved back to Massachusetts and lived in a trailer in Wilkinsonville. Inmate joined the army as "there was not much work", and was ejected after a few months for wearing women's undergarments. Inmate stated that she was unaware that the army did inspections, and had been wearing women's undergarments since the age of 14 or 15. The undergarments, which were believed to have been stolen from the women's barracks, were confiscated, despite inmate claiming ownership. Inmate was sent to the army therapist, who she told she wore women's undergarments, as she felt more comfortable, but did not say that she wished to be women. Inmate was ejected with an "uncharacterized discharge", with the understanding that inmate was emotionally unstable. However it should be noted that a previous evaluation done by Katrin Rouse, Ed.D., indicated that inmate was ejected from the military due to fighting and drinking.

Inmate then lived with father's ex-wife. In 1983 inmate was convicted and began serving a sentence of 12-20 years for the rape of a child, as well as armed robbery and kidnapping, for which she received 9-10 year sentences.

Father died in 2001. Inmate reports that sister, who lives in Ohio, is inmate's only "life-line" to the outside, and only relationship she maintains outside of prison. They talk approximately every two months. Sister has five children and little money, and inmate is afraid to come out to her about her gender dysphoria. When she changed her name legally in 1995 inmate took mother's maiden name (Battista), and although she wanted a girl's name, this made her anxious, and instead she chose an androgynous name (Sandy).

Prison History:

Inmate reported that she has been in prison since February 1983, following the rape of a child, kidnapping, and robbery, for which she received a sentence of 12-20 years, and 9-10 years respectively. Inmate and previous reports indicate that when she was 15, inmate grabbed a 10-year old girl at the bus stop, and brought her into the woods to rape her, but a neighbor intervened. The incident for which she was convicted involved a 10-year old girl selling fudge. Inmate pulled her into her car, brought her to a wooded area, and sexually molested her. Further details are contained in the report of a Sexually Dangerous Person, by Katrin Rouse, Ed.D. This report also details inmate's frequent misconduct throughout her prison history,

3

including escape, fighting, assault on a guard, and making obscene phone calls to young girls.

Inmate noted that she has never been able to have sex willingly, and that because of this she was sexually frustrated. She stated that she did not see anything wrong with being sexually abusive, as she herself was abused. She noted that due to her shame, she had to put a vest over the child's face in order to perform sexually. Inmate also noted that being around young girls is risky for her, and that she should avoid such situations.

Inmate reported that she first came out about her gender dysphoria in 1996, when she was at MCI Norfolk. She reported that most of the inmates accepted her, but that this acceptance was likely due to the fear they had of inmate, who was allegedly physically built at that time. Inmate began to shave her body, and "got away with it", as body builders shave. Around that time she was put into segregation for eight months, where she did not have access to weights, and she stopped lifting. She began to lose her strength and size rapidly, and continued to shave her body. Inmate told her mental health counselor of her overwhelming thoughts, her hatred of her body and desire to change her sex. She began to starve herself, wanted her genitals removed, and thought of suicide. Inmate began to take her anger out on others, verbally and physically, and often received punishment. She reported that she tied her testicles with rubber bands and tried to freeze them. She continued to starve herself for days at a time. She complained that the prison staff did not help her, and that putting her on Prozac and in a paper johnny did not address her issues.

Inmate reported that she needed to find something to occupy herself in the absence of weightlifting, and she began to go to the library. She began to file lawsuits, beginning in 1997. The first lawsuit was inmate's attempt to get treatment for Gender Identity Disorder, alleging that her civil rights were being violated. The case was reportedly dismissed because inmate had diagnosed herself. Inmate's second case was in Federal district court, and stated that this case was dismissed because there was a chance inmate could be released, and it was not "ripe for review".

Five days before she finished serving her sentence, in May 2001, inmate was evaluated for being a sexually dangerous person. She was found to be sexually dangerous, as she had committed more than one incident, and was then committed to the Mass Treatment Center for sexual offenders in May 2003. This is a civil commitment, where inmate is entitled to more treatment considerations, and can file for annual reviews. She will remain in the treatment center until she is deemed to be sufficiently rehabilitated to be released. Inmate reported that she became severely depressed after this commitment, due to the loss of hope that she would be freed, and cried for a week.

In 2002 inmate filed another lawsuit, which was also dismissed. This suit was based on an evaluation inmate had done by Diane Ellaborn, a gender therapist, to show she suffers from Gender Identity Disorder. Inmate used her own money, which she received from father's death, to pay for this evaluation. The evaluation was allegedly not considered by the court, as Ms. Ellaborn was retained independently, and not through the state.

4

Inmate reported that she has attempted to have herself castrated surgically, as this would ostensibly lower the chance that she would re-offend sexually. The media covered this story, and inmate's sister viewed it on TV. Inmate initially lied about her gender issued, but later came out to sister. Inmate stated that when her attempts to have herself castrated medically failed, she has tried to get herself castrated in prison. She sent for brochures on how to do this, and has asked inmates if they would be willing to do this; looking for someone she trusts. Inmate stated that she is not currently trying to castrate herself, but might try to do so if things became "drastic" and she had no hope. She noted that recently she has become a little more hopeful, as she has heard about two other inmates being started on hormone therapy.

Inmate has continued to come out to other inmates, and has both lost friends, and made new ones. She noted that in coming out as transgender other inmates think she wants sex, and that while she has never been forced or assaulted, inmates have tried to be sexual with her. Inmate admitted to sexual contact with two men, both of whom are reported to be more feminine than herself, but finds herself attracted to women. She noted that inmates have difficulty understanding that she both wishes to be a woman, and is attracted to women. She stated that she is only able to masturbate if she fantasizes that she is a woman.

Inmate stated that she is no longer a "trouble-maker" since coming out about her gender. She continues to starve herself, as she immediately puts on muscle if she eats. She reported that she isolates herself, cries, and has tried repeatedly to get treatment. Inmate stated that she has had cognitive-behavioral treatment by Sean Thomas, to help with past behaviors, but has been told that the mental health department in prison does not treat gender identity disorder.

Inmate talked about her belief that her gender dysphoria is related to her history of being a sexual offender, in that she is angry, frustrated, and has low self-esteem.

When asked what she hopes for inmate stated that she would like to be on hormones, to be castrated, and to have cosmetic surgery for her face. She had researched this, and knew the name of Dr. Ousterhaut, a well-known feminine facial surgeon. Eventually she hopes to have full sex reassignment surgery, and had also researched this.

Medically inmate reported that she has had two hernia surgeries, and is pigeon-toed. She was on Prozac a few years ago, and was also on Doxypin for sleep difficulty, which she stated made her feel like a "zombie". Inmate asserted that she is supposed to be taking Dexymethezone at the hour of sleep, but she is not allowed to hold it on her person, as it is an oral steroid, and she cannot obtain it later than 9PM. She was taken off of the medication, administered tests, and is waiting to hear if she should continue taking it, or take another medication.

### Mental Status:

Sandy Jo is quite thin and petite, was dressed neatly, and had plucked eyebrows and light eye make-up, that she said she had improvised from other materials. She appeared to feel somewhat self-conscious or shy when this was inquired about. On the surface the inmate appeared to be cooperative, and she was clearly happy to be evaluated, with the hope that this would help her move into a gender transition. The history she provided contained some inconsistencies, but in general her overall story matched with previous evaluations. Her affect was flat, her answers somewhat superficial, and she appeared to want to downplay the impact of her family history.

The inmate was oriented to person, place and time. She impressed as average in intelligence. She denied hallucinations, delusions, ideas of reference, and homicidal or suicidal ideation. However, she admitted to having thought about taking pills if she did decide to kill herself. She asserted again that currently she has more hope than she has had in the past. Her speech was normal in rate and rhythm. She had no psychomotor changes, and there was no evidence of a thought disorder or cognitive impairment. Her insight was limited to poor, and her judgment appeared based on what she has learned in treatment. Inmate stated that she has learned to think more before she reacts.

### Diagnostic Impressions and Recommendations:

Sandy Jo appears to fit the diagnosis for Gender Identity Disorder, NOS. There appears to be some evidence that inmate's particular intersex condition, Congenital Adrenal Hyperplasia, has some correlation with male to female transsexuals. It is notable that the history Sandy Jo presents is common for someone with GID, in that her experiences illustrate her gender dysphoria, as well as attempts to relieve her distress (wanting to tie and cut off her testicles). She has had a strong, persistent cross-sex identification as female since early childhood, long before she was aware of this clinical diagnosis. Her identification with women is seen in her early cross-dressing, her discomfort with her male sexual organs to the point of being unable to be sexual in a willing manner, and her sexual fantasies of being a woman. Finally, the inmate's symptoms have caused significant impairment in her life, both prior to, and since her incarceration.

The Harry Benjamin Standards of Care, an internationally accepted treatment protocol, the purpose of which is to "articulate ... professional consensus about the psychiatric, psychological, medical, and surgical management of gender identity disorders", notes that that are various activities and processes that people often engage in to provide more personal comfort. These activities, which often include things such as cross-dressing, spending time with females partaking in activities common to women, removing facial and body hair through laser treatment or electrolysis, and cosmetic surgery, are not available to persons who are incarcerated.

The Benjamin Standards of Care call for the patient to be both eligible, and ready, to begin hormone treatment.

11/30/2004 23:11 FAX 5084753258        DR BREWER                              ☑009
11/29/2004 12:17  61726736

Eligibility requirements include:

1. that the person be 18 years of age or older
2. that he demonstrates knowledge of what hormones medically can and cannot do, as well as their social benefits and risks
3. either a real-life experience in the desired gender role for a minimum period of three months, or a period of psychotherapy specified by a mental health professional after the initial evaluation.

The Readiness Criteria include:

1. the patient has had further consolidation of gender identity during the real-life experience or psychotherapy;
2. The patient has made some progress in mastering other identified problems leading to improving or continuing stable mental health (this implies satisfactory control of problems such as sociopathy, substance abuse, psychosis and suicidality;
3. The patient is likely to take hormones in a responsible manner.

The Benjamin Standards of Care includes a short discussion about incarcerated people. It states that "Persons who are receiving treatment for gender identity disorders should continue to receive appropriate treatment following these Standards of Care after incarceration. For example, those who are receiving psychotherapy and/or cross-sex hormonal treatments should be allowed to continue this medically necessary treatment to prevent or limit emotional lability, undesired regression of hormonally-induced physical effects and the sense of desperation that may lead to depression, anxiety and suicidality ... Housing for transgendered prisoners should take into account their transition status and their personal safety". This inmate had not begun treatment prior to incarceration, as she had neither been aware of, nor diagnosed with Gender Identity Disorder. However, given that this inmate qualifies for the diagnosis of Gender Identity Disorder, she should be afforded the clinical treatment outlined by the Standards of Care.

It is therefore the clinical recommendation of these evaluators that Sandy Jo have her Gender Identity Disorder addressed through hormone administration and ongoing psychotherapy to support the adjustment of the transition the hormones will bring. The psychotherapy should be with a clinician who is knowledgeable about gender identity issues, and/or is being supervised by a clinician with expertise in this area.

Respectfully submitted by:

Kevin Kaplia, MD                    Randi Kaufman, PsyD

November 16, 2004

7

# EXHIBIT I

*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Legal Division*
*70 Franklin Street, Suite 600*
*Boston, MA 02110-1300*
*(617) 727-3300, Ext. 124*
*www.magnet.state.ma.us/doc*



**Argeo Paul Cellucci**
*Governor*

**Jane Swift**
*Lieutenant Governor*

**Jane Perlov**
*Secretary*

**Michael T. Maloney**
*Commissioner*

**Kathleen M. Denneh**
*Deputy Commissioner*

**Nancy Ankers White**
*General Counsel*

## FAX COVER SHEET

TO: GREG HUGHES          Fax No. 727-8569

FROM: Richard C. McFarland    Fax No. (617) 727-7403

RE: SANDY JO BATTISTA

DATE: 8/7/01

MESSAGE: I THOUGHT YOU MIGHT BE INTERESTED IN THE ATTACHED JRI EVALUATION OF BATTISTA FROM 1998. PLEASE NOTE TREATMENT RECOMMENDATIONS ON PG. 8.

Rich McFarland

**TOTAL NUMBER OF PAGES INCLUDING COVER SHEET:**

**(If you experience any problems in the receipt of this fax, please call the
Department of Correction Legal Department at (617) 727-3300, ext. 124.)**

## **CONFIDENTIALITY NOTE**

The documents accompanying this facsimile transmission contain information from th
Department of Correction which may be CONFIDENTIAL AND/OR PRIVILEGED. Th
information is intended to be for the use of the individual or entity named on this transmitt
sheet. If you are not the intended recipient, be aware that any disclosure, copying, distributio
or use of the contents of this information is prohibited. If you have received this facsimile i
error, please notify us by telephone immediately and return the original to us by U.S. mail. Than
you.

DOC 000702

# EXHIBIT J

                        0723Mar (5).txt
6  - - - - - - - - - - - - - - - - - - - - - - x

7  Sandy Battista,

8                    Plaintiff,

9      v.

10  Kathleen Dennehy, et al,

11          Defendants.

12  - - - - - - - - - - - - - - - - - - - - - x

13

14          DEPOSITION OF WITNESS

15            Wednesday, July 23, 2008

16                 10:10 a.m.

17          MCDERMOTT WILL & EMERY

18              28 State Street

19          Boston, Massachusetts 02109

20

21

22

23  Reporter:  Lori-Ann London, RPR

24                                                    3


1  A P P E A R A N C E S:

2

3      By Dana McSherry, Esquire

4      MCDERMOTT WILL & EMERY

5      28 State Street

6      Boston, Massachusetts 02109

7      617.535.4000

8      Appearing for the Plaintiff

9

10     By Richard C. McFarland, Esquire

11     THE COMMONWEALTH OF MASSACHUSETTS

12     EXECUTIVE OFFICE OF PUBLIC SAFETY
                        Page 2

0723Mar (5).txt

18  gender history Fenway says that her CAH is

19  considered to be an intersex condition, and I

20  think other evaluations had raised questions about

21  that.  Also, they referenced an evaluation by

22  Katrin Rouse.  I don't think I've seen that.

23      Q    Well, actually I know that you -- I know

24  that we talked about that you and Mr. Weiner and

                                                    155

1  Mr. Hughes felt that there were sort of

2  inconsistencies in this report relating to other

3  evaluations?

4      A    Yes.

5      Q    But what I'm asking now is you said that

6  the recommendations in the Fenway reports were not

7  clear.  And so?

8      A    It may not have been in this one.

9      Q    I will direct you to -- it looks like

10  the recommendations are on the second to last and

11  the last page of this report.  And I just want to

12  know what about these recommendations are not

13  clear.

14      A    I don't think I was referencing her

15  evaluation.

16      Q    Okay.

17      A    But other evaluations.

18      Q    So the last paragraph of this report

19  where it says therefore it is the clinical

20  recommendation of these evaluators that Sandy Jo

21  have her GID addressed through hormone

22  administration and on going psychotherapy to

23  address the transitions the hormone the

Page 123

0723Mar (5).txt

7    Q    Okay.  And so how far did Sandy's case

8  progress on this chart while you were the director

9  of mental health -- medical services?

10    A    I think it got to the point of

11  recommendation reviewed by UMass medical program

12  director.

13    Q    Okay?

14    A    I don't think that happened.

15    Q    Okay.  And did a security review happen?

16    A    I don't -- I don't think so.

17    Q    Okay.

18    A    But given the fact that hormones were

19  being given in other facilities, I'm -- that may

20  have been cooccurring or already been decided or

21  something.

22    Q    Okay.

23    A    I'm not sure.

24    Q    Okay.                                    163


1    Q    Okay.  This actually helps me a lot I'm

2  going to put that aside and we'll probably come

3  back to it with some more questions, but let's

4  look at these meeting minutes dated April 20th,

5  2005.  And we'll mark them as Exhibit 36.

6              (Document marked as Exhibit No. 36.)

7              (Witness perusing document.)?

8    A    I'm all set.

9    Q    Okay.  These are the meeting minutes

10  from an April 20th, 2005 meeting that it likes you

11  attended, correct?

12    A    Yes.

Page 129

0723Mar (5).txt

13     Q    And there are two sentences in these

14  minutes that I just want to highlight for you.

15  The first sentence at the second bullet point

16  which reads, Ms. Martin said Drs. Brewer and

17  Appelbaum should review GID consultations like any

18  other consult to determine if recommendations are

19  medically appropriate.

20                And then the first sentence at the

21  third bullet says, Miss Martin reiterated the need

22  for UMCH to review Fenway evaluations, needs

23  specific recommendations.   Correct?

24     A    Yes.                                164


1     Q    Okay.  And at this point it sounds like

2  you'd asked UMass to review the Fenway evaluations

3  several times?

4     A    I was -- I think I'm asking them to do

5  two different things here.

6     Q    Okay.

7     A    The first instance I'm asking them to

8  review the consults like they would review any

9  other consult.

10     Q    Okay.

11     A    Which they weren't doing.  Specifically

12  for GID.

13     Q    They were just?

14     A    They were just.

15     Q    Passing on it?

16     A    Yes.

17     Q    Do you know why?

18     A    I think it was a legal stance.

19     Q    A legal stance of UMass.

0723Mar (5).txt

14    A    I believe so.

15        Q    Okay.  And so it's April 27, 2005,

16  you've asked UMass several times for specific

17  orders and clear recommendations about the Fenway

18  evaluations, and then this meeting happens and it

19  says Dr. Brewer reported HT recommended with

20  regard to Sandy.  Was that specific enough for you

21  to continue along the protocol steps?

22    A    No.

23        Q    Why not?

24    A    He was reporting that hormone therapy

169

1  was recommended by Fenway Clinic.  He wasn't

2  saying what he had decided clinical was

3  appropriate.

4        Q    He didn't indicate what he decided was

5  clinically appropriate?

6    A    No.

7        Q    So you have these meetings all in one

8  room?

9    A    Yes.

10        Q    Are you all at a table?

11    A    Yes.

12        Q    Or you're all near each other?

13    A    Yes.

14        Q    And you've had several meetings prior to

15  this where you said we need recommendations we

16  need to know what you think about Fenway's

17  evaluation and all he does at this meeting is

18  report that hormone therapy was recommended?

19    A    According to the minutes.

20        Q    I mean didn't you know that already?

Page 134

0723Mar (5).txt

21      A    Yes.

22      Q    So you don't think that this was

23  Dr. Brewer reporting that UMass recommended

24  hormone therapy?                                170


1       A    No.

2       Q    Okay.  So then at -- okay.  So what did

3   you want from -- what would have been a

4   recommendation from Dr. Brewer about Sandy's case

5   that would have satisfied you?

6       A    He would have had to say I'm ordering

7   hormone therapy he would have had to do the order.

8   He needs to write the order.

9       Q    So all that he would have had to do is

10  write the order?

11      A    Well, he would have had to decide that

12  the information that he had in his own mind and

13  judgment, there was -- that that was the

14  clinically appropriate thing to do.

15      Q    And then write the order?

16      A    Correct or have the other doctor write

17  the order.

18      Q    Okay.

19      Q    How's Sandy Jo being dealt with during

20  this period when you are -- when the DOC and UMass

21  are going back and forth about needing more

22  specific recommendations, how is she being

23  treated?

24      A    I think -- her recommendations were --   171


1   her recommendations were clear.  It wasn't that --

Page 135

0723Mar (5).txt

2  those are two different issues, her

3  recommendations are clear, UMass needs to make a

4  decision.

5      Q    Okay.  I'm sorry can you restate that.

6  I don't....?

7      A    For Sandy Jo her recommendations were

8  pretty clear about what was recommended by Fenway.

9      Q    Okay?

10     A    UMass needed to make a decision about

11 clinical appropriateness.

12     Q    Okay.  Do you know if Sandy was

13 receiving any treatment during the time that you

14 were waiting for UMass to make the decision by

15 clinical presentness?

16     A    Well according to the letters it seems

17 that she was being followed by mental health and

18 medical.  For issues.

19     Q    But she wouldn't have been receiving any

20 of the recommendations from the Fenway report?

21     A    As far as medication?  No, probably not.

22     Q    How about psychotherapy?

23     A    Psychotherapy, probably yes.

24     Q    So is psych?
                                               172

1      A    She was receiving psychotherapy anyway.

2      Q    Okay.  Let's mark this as Exhibit 38.

3  They are meeting minutes from May 4th, 2005 I

4  believe.  Although it's a little blacked out.

5              (Document marked as Exhibit No. 38.)

6              (Off record.)

7      Q    Have you had a chance to review this

8  document?
                        Page 136

0723Mar (5).txt

9      A    Yes.

10     Q    You attended this executive staff

11  meeting on May 4th, 2005?

12     A    Yes.

13     Q    And in the fourth line down the first

14  sentence reads Miss Martin said no forward

15  movement on decisions for SJB, correct?

16     A    That's what it says, yes.

17     Q    Do you know why you would be reporting

18  that there had been no forward movement on any

19  decisions tore Sandy?

20     A    No, I really don't.  I don't know what I

21  meant by this.

22     Q    At this point the ball was in UMass's

23  court, correct?

24     A    Yes.                                173


1      Q    So the DOC hadn't put a hold on GID

2   treatment generally?

3      A    I don't know why we would.  We didn't --

4   unless it was a security review.

5      Q    No forward movement on the security

6   review?

7      A    I think I would have said security

8   review.  I don't know what this is.

9      Q    Okay.  Do you know if there was a

10  general hold on providing treatment to GID

11  patients during this time period?

12     A    I don't think so, no.

13     Q    Was there ever a general hold?

14     A    No.

Page 137

0723Mar (5).txt

15    Q    Okay.

16         MS. MCSHERRY:  We'll mark this

17  document as Exhibit 39.

18         (Document marked as Exhibit No. 39.)

19    Q    And it is a letter from you to Sandy

20  Battista dated May 9, 2005, correct.

21    A    Yes.

22    Q    Have you had a chance to review this?

23    A    Yes.

24    Q    Okay.  So at this point we're getting

                                              174

1  pretty close to your leave, correct?

2    A    Yes.

3    Q    You left to go to Harvard in July of

4  '05?

5    A    Yes.

6    Q    Okay.  And in this letter you respond to

7  Sandy's letter of April 20th, and you indicate

8  that you're aware there was a recommendation for

9  treatment made by Dr. Warth but at this time the

10  recommendation is under review by both UMCHP

11  medical professionals to determine its

12  appropriateness and necessity and DOC

13  administrators to determine any potential security

14  contraindications.  You told Sandy that she would

15  be advised at the outcome of the review once it's

16  completed; is that right?

17    A    Yes.

18    Q    Okay.  So at this point had the security

19  review begun?

20    A    I don't know.

21    Q    This letter seems to indicate that it

                      Page 138

0723Mar (5).txt

5   and this was written in September.

6       Q    Which would not be inconsistent with the

7   typical timeline of letter writing between the DOC

8   and UMass.

9               At the end of the second paragraph

10  UMass indicates, nevertheless we think it is time

11  for DOC to make a decision with regard to the

12  approval of the treatment recommendations that

13  have been made regarding the above referenced

14  patients.  Correct?

15      A    That's what it says, yes.

16      Q    Do you have any understanding about why

17  UMass would think that the decision that needed to

18  be made was by the DOC?

19      A    I think that they put this in here for

20  legal reasons.  Because I think they know quite

21  well that it wasn't us that they needed to get a

22  decision from.  That we were waiting for their

23  decision.

24      Q    And you think that this is their

                                                216

1   decision to cover their?

2       A    Yes.

3       Q    Bases?

4       A    Yes, I do.

5       Q    Does this suffice as an order to you to

6   implement the recommendations for the inmates

7   listed in paragraph one?

8       A    We don't implement orders the vendor

9   does.  But I do think that they finally did say

10  something.

# EXHIBIT K

## UMASS CORRECTIONAL HEALTH

## PHYSICIAN'S ORDER

### PRESCRIPTION ORDER - FOR DEPARTMENT OF CORRECTION INSTITUTIONAL USE ONLY

NAME _Battista, Sandy Jo_     ID NUMBER _M15930_     D.O.B. _12/30/61_

INSTITUTION _MTC_     ALLERGIES _NKDA_

DATE _4/14/05_     TIME _10 Am_

**ORDERS**

1 Estradiol 0.015 mg/d via transdermal patch

Lupron ↑ 50 days                                    ↑ 100 tabs
KOP

1 Cont Depakene 0.5 g po qhs

Please fax endocrine consult + these orders
to Dr Brewer for approval

F/u Endocrine clinic 6WKS

Robert Sing Brunnville RN 4/14/05

SIGNATURE _____

Interchange is mandatory unless the prescriber writes the words
"no substitution" in this space:

PRINT NAME _Robert Friedman, MD_

8006 Rev. 4/01                     Original (White): Retain in Inmate Medical Record

DOC 001403

# EXHIBIT L

# UMASS CORRECTIONAL HEALTH

## PHYSICIAN'S ORDER

PRESCRIPTION ORDER - FOR DEPARTMENT OF CORRECTION INSTITUTIONAL USE ONLY

NAME _Ba Hista, Sandy_    ID NUMBER _M15930_    D.O.B. _12/30/61_

INSTITUTION _MTC_    ALLERGIES _____

DATE _4/15/05_    TIME _1115_

ORDERS

Please D/C previous order for
estradiol + luprron. ✓ done
Please send copy of Dr Watts consult
to security for approval. Sent to security
for review.

Flu measure 6 wks - done

Noted Terry Bournival on 4/15/05 2pm

SIGNATURE _[signature]_

Interchange is mandatory unless the prescriber writes the words
"no substitution" in this space:

PRINT NAME    Robert Friedman, MD

8008 Rev. 4/01

Original (White): Retain in Inmate Medical Record

DOC 001402

# EXHIBIT M

ROUGH DRAFT

U.S. DISTRICT COURT FOR MASSACHUSETTS

No. 099620225

- - - - - - - - - - - - - - - - - - - - - - - - - - -

SANDY BATTISTA,

      Plaintiff

v.

KATHLEEN DENNEHY, et al.

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

ROUGH DRAFT

DEPOSITION of VERONICA MADDEN

Friday, August 1, 2008

10:15 a.m.

McDermott Will & Emery

28 State Street

Boston, Massachusetts

- - - - - - - - -

Reporter:  Dana Welch, CSR, RPR, CRR

Page 126

ROUGH DRAFT

1           ROUGH DRAFT
2      A. (Nodding head up and down).
3      Q. Would you agree with me that somebody
4  suffering from GID who guess to the lengths of
5  trying to self-castrate is suffering from a serious
6  -- a serious form of the disorder?
7      A. I wouldn't -- I wouldn't be able to say
8  what form of the disorder.
9      Q. But you'd agree that the consequences for
10  that individual are serious?
11     A. I believe that anyone who gets to the
12  point of several injurious behavior for whatever
13  the reason is a serious case that deserves
14  significant scrutiny and treatment.
15     Q. I'm getting there. Check marks are good.
16  I think I have one more document for you.
17  You're going to get to see my highlighting again.
18  We'll call that Exhibit 13.
19     (Exhibit No. 13, DOC 000887, marked for
20     identification.)
21  BY MS. SMITH-LEE:
22     Q. What we've shown you as marked as
23  Exhibit 13, I'm not reading from my own copy, but
24  it is from memory an e-mail involving you in around

Page 127

ROUGH DRAFT

1           ROUGH DRAFT
2  April of 2005. Have I got that date right?
3      A. Yes. April 13th.
4      Q. And it's the very bottom entry that I'm
5  interested in having you look over.
6      A. Okay.
7      Q. Okay. Do you recall being part of that
8  e-mail chain?
9      A. I must have been. My name is there.
10     Q. Okay.
11     A. I remember in a general way when Cynthia
12  Osborne was being considered to be a consultant.
13     Q. Okay. And am I correct Cynthia Osborne's
14  original retention was in connection with the other
15  case that's in litigation?
16     A. Yes. I believe so.
17     Q. And she was retained in that case after
18  litigation was filed?
19     A. Yes.
20     Q. So I think what you said is there's a time
21  when her retention was under consideration. Is
22  that how you described the conversation that's
23  going on in that e-mail?
24     A. Yes.

Page 128

ROUGH DRAFT

1           ROUGH DRAFT
2      Q. Do you recall any of the factors that went
3  into the decision to retain her as opposed to
4  somebody else?
5      A. I remember that it was difficult to find
6  anyone who had an expertise in the area and I
7  remember that I think that she was at a reputable,
8  I believe it was John Hopkins -- at a reputable
9  medical facility.
10     Q. Do you recall -- do you know whether the
11  department spoke to other GID experts before
12  getting to Ms. Osborne who declined to get involved
13  in the case?
14     A. I'm not sure.
15     Q. So when you say it was difficult to find
16  them, you mean it's difficult to identify them or
17  was it difficult to find one who was willing to get
18  involved?
19     A. My understanding it was a very small pool
20  of people who specialized in this. And that one or
21  two people that were known had retired or were no
22  longer practices.
23     Q. So who was involved this that selection
24  process in identifying the people to approach and

Page 129

ROUGH DRAFT

1           ROUGH DRAFT
2  approaching them?
3      A. It looks like Sue Martin was. I believe
4  that -- I think it would have been Greg Hughes at
5  the time. Yes, Greg Hughes is here. Put my
6  glasses back on. I can tell that. I believe
7  health services and perhaps in consultation with
8  counsel.
9      Q. And what was your understanding of the
10  scope of Ms. Osborne's retention in the other case?
11     A. I believe she was being asked to testify.
12     Q. Okay. And were you involved in a similar
13  way in the decision to also retain her in
14  connection with Sandy Battista's case?
15     A. I was involved in a very general way in
16  sort of approving the appropriate -- the money, and
17  having it presented to me that she would be
18  involved in the cases. So in a very general way.
19  I never spoke with her.
20     Q. And do you have an understanding about
21  that the scope of Ms. Osborne's retention was with
22  respect to Sandy?
23     A. No, I don't.
24     Q. But her involvement with the department,

Page 130

**ROUGH DRAFT**

1   if I understood you correctly, began as a
2   litigation expert?
3       A. That's my understanding.
4       Q. Okay.
5       A. But I think it says here that she may
6   review other cases as well.
7       Q. Do you see there's a line in that last
8   paragraph that talks about and again I'm
9   paraphrasing because I don't have a copy, Cynthia
10  Osborne having a view on whether the real life
11  experience was possible in a prince son setting?
12      A. Yes.
13      Q. Would you mind just reading that sentence
14  out loud so that?
15      A. "She has worked with both Virginia and
16  Wisconsin and stated that it is her view that a
17  real life test cannot occur in a prison setting."
18      Q. And do you have an understanding about
19  what the nature of work she had done in Virginia
20  and Wisconsin was?
21      A. I don't.
22      Q. Do you have an understanding about what
23  that sentence means that it's her view that a real

Page 131

**ROUGH DRAFT**

1   life experience is not possible in a prison
2   setting?
3       A. My understanding is that there is a
4   minimum period of time, I believe a year, that a
5   person is to live as -- in the community as a
6   member of the opposite sex and as sort of a basis
7   to determine if they want to go forward or if they
8   -- the diagnosis is appropriate or they feel
9   comfortable. But there's a period of time they are
10  to live as a member of the opposite sex.
11      Q. And is it your understanding that that's a
12  period of time that's general to diagnosis for GID
13  or considered as a prerequisite to surgery
14  specifically.
15      A. I consider it -- I don't know.
16      Q. Okay.
17      A. I don't know.
18      Q. That's a fair answer. So would it
19  ordinarily be the case if you were consulting with
20  an expert for a second opinion on a clinical matter
21  that you would wish to know in advance their views
22  on a subject like that?
23      A. I think that everything that we do has an

Page 132

**ROUGH DRAFT**

1   overriding effect of its being done in a prison
2   environment, in a prison setting and I think it's a
3   general consideration of not everything, but of
4   many of the things that we do. So it's not
5   unusual.
6       Q. So if you've got a consultant who believes
7   that a real life experience is simply not possible
8   in a prison setting and the real life experience is
9   a prerequisite to some or all of the treatments for
10  GID being appropriate, considered clinically
11  appropriate, isn't that going a little farther than
12  just considering the prison setting?
13      A. Well, in this circumstance, my
14  understanding is the person is to live with members
15  of the opposite sex and I think that's a real
16  difficult thing to have happen in a prison setting.
17  And it may be that the person is to be maintained
18  in some level of appropriate treatment until they
19  return to the community.
20      Q. Okay. Understood. I guess my question
21  was a little bit more general than that. You
22  mentioned that it's important for all of your
23  people that you consult with to have the overlay of

Page 133

**ROUGH DRAFT**

1   considering a prison setting, right?
2       A. I think that's important.
3       Q. Because that's where the patients are,
4   right. What I'm asking you, I guess is whether
5   it's not going farther than just considering a
6   prison setting but instead expressing an opinion
7   that a certain treatment would never be appropriate
8   in prison based on the views that are reflected of
9   Cynthia Osborne's in that paragraph. That was a
10  very complicated sentence so if you didn't
11  understand it I'll try again.
12      MR. MCCARTHY: Yeah. I object to that as
13  to the form of the question.
14      A. Do you want to see this in order to do it?
15      Q. No. This is my own problem, in the
16  absence of the document. So Cynthia Osborne could
17  have said it's my view that you need to consider
18  the prison context in making this decision, right?
19      A. (Nodding head up and down). Yes.
20      Q. Sorry. You have to speak up. And instead
21  what see said or what's reported that she said is
22  that it's her view that this real life experience
23  simply is not possible in a prison setting.

# EXHIBIT N

(4/4/2008) Veronica Madden – Re: GID/Sandy Jo Battista

**From:** Lawrence Weiner
**To:** Madden, Veronica
**CC:** Heffernan, Peter
**Date:** 7/13/2005 3:10 PM
**Subject:** Re: GID/Sandy Jo Battista

Roni,

Basically where we are it with Sandy Jo is that the Fenway has recommended hormone therapy and we have drafted a letter to UMASS asking for their clarification as to whether they agree that hormone therapy is both clinically appropriate and medically necessary. Asking UMASS for this clarification letter has been a new step in the whole GID approval process and this did delay things with Sandy Jo somewhat as he already had a consult with endocrinology and was approved for hormone therapy. He was most likely under the impression that things had progressed to the security review phase, but until we receive a response from UMASS, that is on hold.

Procedurally, if we do decide to have Cynthia Osborne review this case, I'm not sure if it wouldn't make more sense to have this completed before we move forward with any of the treatment recommendations.

Larry

# EXHIBIT O

### CYNTHIA S. OSBORNE, MSW
**Forensic Consultant**
**Assistant Professor, Department of Psychiatry & Behavioral Sciences**
**Johns Hopkins University School of Medicine**
501 Edgevale Rd., Baltimore, MD 21210
Home Office Phone: 410.433.0775    Cell Phone: 443.622.5077
Fax: 410.433.6646    Home Office Email: csosborne@comcast.net    Hopkins Email: cosborne@jhmi.edu

Inmate Name:          Sandy Jo Battista (DOC ID# M15930)
Nature of Report:     Peer report review
Reviewing Clinician:  Cynthia S. Osborne, M.S.W.
Date of Report:       October 10, 2005

**IDENTIFICATION:**

Sandy Jo Battista is a single 43 y.o. Caucasian biological male, whose former legal name was David Megarry, Jr., with a stated preferred female identity. Mr. Battista has completed his sentence for conviction of rape, kidnapping, and robbery of a 10 y.o. female in 1982. He is currently held at the Massachusetts Treatment Center in Bridgewater, MA, following temporary civil commitment in May 2001 and formal civil commitment in May, 2003, secondary to being determined to be sexually dangerous. He has filed several legal suits against the Commonwealth of Massachusetts, most recently for allegedly failing to provide hormonal treatment of Gender Identity Disorder, as recommended by clinicians at Fenway Community Health in August, 2004, and subsequently prescribed by Dr. Wirth, MD of the Lemuel Shettuck Hospital, in the spring of 2005.

I was contacted by Larry Weiner, Mental Health Administrator, in July, 2005, and asked to provide a review of the clinical evaluation conducted by clinicians at Fenway Community Health in Boston. The Fenway evaluation culminated in a written report dated August 10, 2004, and is based on a clinical interview of 90 minutes duration and a review of the inmate's chart. It did not apparently include the administering of any formal psychological tests. I agreed to review the report and provide opinion about its adequacy.

My review process included a review of the following documents:
- Physician's Order dated August 3, 2005 by Robert Friedman, MD
- Physician's Order dated July 14, 2005 by Martin Bauermeister, MD
- Progress Note dated July 14, 2005 by Martin Bauermeister, MD
- Core Treatment Transfer Assessment Report date April 12, 2005, by Sharon Kelley, Psy.D. and Ruth Khowais, Psy.D., Forensic Health Services, Inc., Bridgewater, MA
- Forensic Health Services Treatment Plan dated March, 2005, Forensic Health Services
- Annual Treatment Review Report dated March 14, 2005, Brent Thibault, MA, for the B Unit Treatment Team, MA Treatment Center, Bridgewater, MA
- Report dated August 10, 2004, by Kevin Kapila, MD and Randi Kaufman, PsyD, of Fenway Community Health, Boston, MA
- Community Access Board Annual Review Report dated April 21, 2004, by DiCataldo, Ph.D., for the Community Access Board, MA Treatment Center, Bridgewater, MA
- Intake Assessment dated June 19, 2003, by Katherine Gotch, MA, and Anne E. Johnson, Ph.D., Forensic Health Services, MA Treatment Services, Bridgewater, MA

1

DOC 000799

- Report of Qualified Examiner to the Court dated April 1, 2002, by Katrin Rouse, Ed.D., Forensic Health Services, Inc., Boston, MA
- Sexual Dangerousness Assessment Report dated March 30, 2002, by Robert H. Joss, Ph.D., Consultant Psychologist, Forensic Health Services, Allston, MA
- Report dated October 19, 2001, by Ronald S. Ebert, Ph.D., Director, Psychological Services, Inc, Braintree, MA
- Report dated October 17, 2001, by Diane Ellaborn, LICSW, Framingham, MA
- Report dated November 18, 1998, by David Campopiano, MA and Robert Prentky, Ph.D., Justice Resource Institute, Rehabilitation and Treatment Program, Bridgewater, MA
- Report dated October 4, 1997 by J. Tyler Carpenter, Ph.D., Correctional Medical Services, MA DOC
- Report dated March 17, 1997, by Victoria Russell, MD, Consultant in Psychiatry
- Endocrine consult note dated August 8, 1983, by Brian Berelowitz, MD and George T. Griffing, MD., Evans Medical Group
- Discharge Summary dated October 24, 1979, by James C. Melby, MD

This report is based solely on a review of the documents, noted above, provided me. I have not conducted a clinical evaluation of Mr. Battista and, therefore, it is not within the scope of my present role to diagnose him. Accordingly, my report is based on the assumed accuracy of the inmate's existing diagnosis of Gender Identity Disorder, about which all reports appear to agree.

**PEER REVIEW RESPONSE:**

**I.    *Lack of comprehensive diagnostic formulation:***

*In my opinion, the Fenway report fails to address critical questions regarding the presence, absence or possible contraindicative significance of Axis I and Axis II co-morbidity, including sociopathy and/or psychopathy, suicidality and/or self-harming tendencies, and pedophilia.*

Mr. Battista has, based on the Fenway and other reports, a complex history. It includes childhood abuse and neglect, a violent father, a rejecting mother, an abusive, neglectful custodial grandparent, multiple changes in residence and custodial care during childhood and adolescence, apparent conduct disorder by early adolescence, a serious, chronic medical illness with onset in infancy, early exposure to pornography, substance abuse problems, psychosexual conflict – including reports of pedophilic attraction to prepubescent females – manifesting in severe sexual aggression beginning in adolescence, adult incarceration characterized by chronic conduct problems, a determination of sexual dangerousness, and recent descriptions, including in the Fenway report, of self-starvation, manipulative behavior, limited insight, poor judgment, and superficiality. Given this presentation, the absence of any consideration of co-morbid Axis I and Axis II conditions, and their potentially complicating impact on diagnosis, treatment and prognosis, reflects an incomplete evaluation. The Fenway report itself references possible Axis II traits, but does not name them as such, and does not discuss their potential significance. *In my opinion, clarity regarding the presence, absence, nature and severity of co-morbid conditions is critical in the effort to determine with any degree of certainty Mr. Battista's motivation for self-harming or suicidal threats or behaviors, or his demands for particular treatments, as well as to weigh the potential benefits and risks of any particular treatment. To make treatment decisions in the absence of a full diagnostic picture is clinically unsound.*

2

DOC 000800

*Psychopathy*

Earlier reports reference high levels of sociopathy and psychopathy. Indicators of psychopathy include superficial attempts to display one's self in good light; deceitfulness, inconsistent explanations that change when one is challenged with facts; an inflated view of one's self and one's status; the view of one's self as a victim of others and of the system; lack of regret for one's crimes or remorse or empathy for one's victims; denial of responsibility for one's actions or indifference regarding their significance in impact on others, such as claims of blackouts for events surrounding one's offenses; lacking realistic long term goals; and impulsivity. Psychopathy is a significant predictor of criminal recidivism, violence and disruptive behavior during incarceration, and poor treatment outcomes. It follows logically that it is important to consider the level of psychopathy when formulating the diagnostic picture and treatment recommendations for inmates with GID. Doing so is consistent with good practice and with the Harry Benjamin Foundation's recommended Standards of Care. *Interventions based on diagnostic formulations that fail to consider personality instability, when it is present, may cater to and fuel that instability. Worsening one psychiatric illness with the treatment for another is clinically unjustified. More specifically, in cases involving potentially high levels of psychopathy, GID treatment strategies that iatrogenically worsen symptoms of entitlement and manipulativeness may lead to increased risk of threats and gestures of self harm. Such an outcome is not in the best interest of the inmate nor the Commonwealth of Massachusetts.*

*Suicidality and self harm*

There is evidence of high psychiatric co-morbidity with GID. A recent study (Hepp, Kraemer, Schnyder, Miller & Delsignore, 2005) found that 42% of the individuals diagnosed with GID also met criteria for one or more personality disorders. This is consistent with other studies, with the DSM-IV, and with the descriptive data from many gender clinics. However, there is no evidence that GID is the cause of that co-morbidity. Because there is, on the other hand, considerable evidence that personality disorders, and history of severe abuse, do motivate self-harming and are associated with higher than average rates of suicide, they should not be dismissed as insignificant in formulating the diagnostic picture of a case.

The Fenway report does not explicitly state that Mr. Battista is at risk of self-harm and suicide, but implies so in references (page 6) to ideation regarding "taking pills if she did decide to kill herself," and in the description (page 5) of threats of self-castration "…if things become 'drastic.'" Self-harm and/or suicidal gestures sometimes reflect severe gender dysphoria, but may also reflect underlying personality psychopathology. It is well documented that individuals with Borderline Personality Disorder engage in self-harm in a maladaptive pursuit of affective relief. It is also known that some individuals with Antisocial Personality Disorder engage in self-harm, or threats of the same, in order to manipulate others into meeting their demands. The evidence base about the correlation between self-harm and personality disorders is considerable. The same is not true for any assumed causal correlation between GID and self-harm. The evidence base is poor – based largely on anecdotal case reports – and insufficient as a basis for claims of certainty. I also know of no evidence that inmates with GID engage in more self-harm and suicide gestures than other inmates. Obvious indicators of personality psychopathology should not be ignored or minimized in the effort to understand patients presenting with complex histories.

3

DOC 000801

Similarly, the Fenway report emphasizes Mr. Battista's early history of trauma. Yet, there is no discussion of any possible associations between that history and the inmate's considerable psychiatric difficulties, including reported substance abuse, criminality, suicidality, self-starvation and attempts at genital self-mutilation.

Gestures of self-harm or suicidality, as well as both overt and masked threats, reflect serious mental illness, apart from GID, that requires treatment in and of itself. They are clear contraindications for hormonal or surgical intervention in most community settings. *Significant comorbidity – on both Axis I and II – complicates a GID diagnosis, and renders it difficult to say with certainty that GID, even if clearly present, is the "cause" of suicidal or self-harming behaviors. While it may be tempting to hypothesize that untreated GID causes these problems, there s no evidence for such claims. A positive outcome from hormonal treatment and/or surgery in such cases is far from inevitable.*

## II.    *CAH and GID*

*While Mr. Battista may have suffered psychologically secondary to a reportedly chaotic, abusive childhood, a violent father, and a mother who was unable to cope with her son's medical condition, he does not suffer from a somatic intersex condition per se, and there is no evidence to support a hypothesis that he is at increased risk of GID as a result of his having CAH.*

Mr. Battista was reportedly diagnosed in infancy with Congenital Adrenal Hyperplasia. The specific variant of CAH – e.g. whether or not he suffered salt wasting or repeated electrolyte crises – and how it was treated early in Mr. Battista's life – e.g. whether he was treated consistently and effectively throughout his history – is not clear from the records. The Fenway report states "...Congenital Adrenal Hyperplasia has some correlation with male to female transsexuals." It further states that CAH "...is considered to be an intersex condition." It is important to clarify that CAH in males is quite a different matter than CAH in females. In some cases of CAH in females, prenatal exposure to high levels of androgens results in ambiguous external genitalia. However, males with CAH do *not* have somatic intersexuality – they are normal genetic males, have normal internal reproductive structures (except for possible medical problems with fertility), and have normal – albeit prematurely developing – male external genitalia. Males with CAH have not been identified as a psychologically vulnerable group – they tend to do reasonably well psychologically, as far as we know via scientific evidence. There is no supportive evidence that CAH in males is associated with increased risk of cross gender identity or GID. The most recent and relevant study (2004, Hines, Brook and Conway) was consistent with most earlier studies, in that it showed that male children with CAH engage in male-typical play behavior, with no differences between them and non-CAH males. *Of greatest relevance, this study showed no affect of CAH on either gender identity or sexual orientation in males.*

Given the lack of evidence to the contrary, it should be assumed that the reasons for Mr. Battista's GID are not primarily hormonal. Further, the significant dynamic factors in Mr. Battista's early life, as described in some detail in the Fenway report, and including his mother's reported rejection of him secondary to his early masculinization, are far more etiologically compelling, relative to Mr. Battista's life problems, than any evidence of an "intersex" condition per se. *While the Fenway report does not explicitly say so, by naming Mr. Battista's medical condition as an "intersex" condition associated with GID it implies the possible medical*

4

*justification for sex reassignment in order to correct that intersex condition. It is important to be clear that Mr. Battista has no somatic intersexuality, and that there is no supportive evidence for using CAH as justification for hormonal or surgical reassignment.*

### III.    *Sexual dangerousness*

*The Fenway report fails to address the critically important question of whether Pedophilia and/or sexual dangerousness, co-occurring with GID, present contraindications for hormonal or surgical reassignment.*

In reports dated 4/1/02, by Katrin Rouse, Ed.D., and 3/30/02, by Robert Joss, Ph.D., Mr. Battista was determined to be sexually dangerous. The Joss report emphasizes the predatory and impulsive nature of Mr. Battista's sexual offenses, the presence of deviant arousal patterns, his minimal participation in treatment efforts during incarceration, his failure to address the substance abuse issues in his history, and a psychiatric history that includes being assessed as carrying traits of both Borderline Personality Disorder and Antisocial Personality Disorder. The report concludes that the risks of reoffending would be high in an unconfined setting. Similarly, the Rouse report emphasizes the presence of both Pedophilia and Antisocial Personality Disorder, a pattern of inconsistent self-reporting, and minimal insight, remorse and acceptance of responsibility for his crimes. The Rouse report concludes that Mr. Battista presents with an overall pattern of antisocial behavior and meets criteria as a sexually dangerous person.

The Fenway report offers no response to the concerns raised in these reports. It does state (page 5) that Mr. Battista "...has attempted to have herself castrated surgically, as this would ostensibly lower the chance that she would re-offend sexually." It further states (page 4) that the inmate stated that "being around young girls is risky for her, and that she should avoid such situations," and that he made obscene phone calls to young girls while incarcerated. The report also then describes (page 5) Mr. Battista's continuing efforts to achieve surgical castration, although implying that these efforts are motivated not by the desire to curb pedophilic urges, but by the desire for sex reassignment. The report fails to address the serious implications of these factors or the described contradictions in Mr. Battista's motivation for castration. In one moment his motive is reportedly to curb pedophilic urges, but in another it is described as manipulative – to get the DOC to provide partial surgical reassignment.

The literature on the paraphilias – described as chronic conditions that are manageable through intensive treatment, but not curable – does not offer much reason to believe, if Mr. Battista's pedophilic urges were compelling enough to motivate several sexual assaults against children, and obscene phone calls to girls even after incarceration, that those urges have spontaneously disappeared, or transferred to adult women. And there is no evidence in the Fenway report or any of the earlier report that Mr. Battista has participated in a level of psychosexual therapy consistent with such an implied "cure." There is no way to say with certainty, even if Mr. Battista's level of therapeutic engagement had been high (which it has not), that a claim of attraction to adult women, as it has evolved in the context of incarceration, in which he has had no access to prepubescent females, would "hold" in a real world context should he be released, and thereby be exposed to females of all ages. It is clinically irresponsible to recommend hormonal reassignment without considering these possible implications.

5

*The Fenway report states (page 6) that Mr. Battista's history is "common for someone with GID..." To the contrary, co-occurring Pedophilia and GID are far from common.* Pedophilia has been documented as co-occurring with some cases of Transvestic Fetishism, but there is a virtual absence of literature regarding the co-occurrence of Pedophilia and Gender Identity Disorder. The Fenway report neither endorses nor disputes the diagnosis of Pedophilia in Mr. Battista, failing, in fact, to address the question in any way. It provides, and fails to reconcile, two contradicting details about Mr. Battista's age of attraction – first (page 4), noting the inmate's self-description, during interview, of being at risk around young girls (suggesting ongoing, current pedophilic attraction), and, second (page 5), stating that he "finds herself attracted to women."

The Fenway report minimizes (page 4) the 2002 reports documenting that the inmate was found to be sexually dangerous, saying that this determination was made "as she had committed more than one incident." More accurately, the reasons given in the 2002 reports are numerous and compelling. *I cannot imagine a more explicit contraindication for sex reassignment than Mr. Battista's clinical presentation. It is anything but common as a presentation of GID. The Fenway report wholly fails to address the themes of sexual dangerousness and Pedophilia.*

IV.    *The Harry Benjamin International Gender Dysphoria Association Standards of Care*

*The Fenway report fails to accurately represent the SOC as flexible treatment guidelines rather than as a declaration of any one treatment as "the" recommended, appropriate or medically necessary treatment for all individuals diagnosed with GID. Further, the SOC were developed for non-incarcerated individuals, contain inherent contradictions related to incarcerated individuals, offer little relevant guidance to decision-making regarding incarcerated individuals who were not already in treatment for GID prior to incarceration, and do not represent consensus of the psychiatric community regarding what constitutes proper treatment for GID.*

The Fenway report states (page 6) that the purpose of the Harry Benjamin Standards of Care is to "articulate ...professional consensus about the psychiatric, psychological, medical, and surgical management of gender identity disorders." More completely, that statement in the Standards reads "...articulate this *international organization's* professional consensus..." While the Harry Benjamin Foundation has made unquestionable contribution to the quality of care of gender identity disordered individuals, it is a collegial organization, not a regulatory body with any formal authority. It has developed recommended guidelines, not enforceable "requirements," and its guidelines reflect the consensus of the organization's members, not the entire psychiatric community. To the contrary, there is considerable collegial disagreement about what constitutes appropriate treatment of GID. *There is currently no universal professional consensus regarding what constitutes medical necessity in GID, and regarding which treatments are medically necessary for which patients. There is no empirical basis for claims otherwise.*

Further, the Fenway report describes (page 6) the SOC as "...an internationally accepted treatment protocol..." More specifically with regard to Mr. Battista, the Fenway report states (page 7) that "...given that this inmate qualifies for the diagnosis of Gender Identity Disorder, she should be afforded the clinical treatment outlined by the Standards of Care." The report then states "It is therefore the clinical recommendation of these evaluators that Sandy Jo have her Gender Identity Disorder addressed through hormone administration..." These statements imply

6

DOC 000804

that the SOC recommend a particular "protocol" for anyone diagnosed with GID. That position does not accurately reflect the reality of clinical practice in the community, nor, as I understand it, the intent of the SOC. The Introductory Concepts section of the SOC state "The SOC is intended to provide flexible directions for the treatment of persons with gender identity disorders." It further states that clinicians may modify the "requirements" for a number of reasons, and that there are many and varied options for helping gender identity disordered individuals achieve improved functioning. Neither full triadic therapy, nor hormonal treatment alone, nor any other protocol, comprises *the single correct or recommended* treatment for all patients diagnosed with GID. In fact, while the SOC state that hormones and/or surgery are medically necessary in some cases ("transsexualism or profound GID"), nowhere do the SOC define what constitutes "profound." Further, the Standards note a number of possible therapeutic directions, saying "the diagnosis of GID invites the consideration of a variety of therapeutic options, only one of which is the complete therapeutic triad." There is considerable variation in application of the Standards in the psychiatric community. Some clinicians and clinics lean toward a more liberal and others toward a more conservative application. No where has it been empirically demonstrated that one is better than the other.

In the last several years the SOC have been revised to include a few brief clauses regarding GID in incarcerated individuals. However, there are inherent contradictions in efforts to adapt standards developed for community treatment to a prison environment, in which there are undeniably higher safety risks. The Readiness criteria for both hormones and surgery include "The patient has made *some progress* in *mastering* other identified problems leading to improving or continuing stable mental health (this implies *satisfactory control* of problems such as sociopathy, substance abuse, psychosis and suicidality;" "Some progress" and "mastering" constitute an oxymoron, as well as a diagnostic conundrum regarding how a clinician determines how much "progress" constitutes "some," and how much "mastery" justifies a recommendation for hormones. Similarly, "satisfactory control" is undefined, leaving important questions unanswered, such as "In a criminal context, is anything less than full control satisfactory?" and "What constitutes satisfactory control of suicidality?" and "How does a clinician judge, with a reliable degree of certainty, that an incarcerated individual has gained control of his sociopathy when he is in a confined environment that is fundamentally structured to externally control individuals who are deemed incapable of doing so for themselves?" Criminality and sociopathy are, without exception, contraindications for hormones or surgery, in reputable gender clinics throughout the world. Incarceration presents an inherent and irresolvable contradiction to this standard, and to the notion of personal mastery over one's sociopathic leanings. And the Harry Benjamin SOC do not at this time address these questions to a degree that warrants use of the Standards as justification for any treatment of GID – other than emphasizing the importance of continuance of treatments initiated prior to incarceration – in incarcerated individuals.

Mr. Battista's suicidal and self-harming threats and gestures represent an explicit failure regarding this criterion. The position that hormones or surgery are contraindicated in individuals who are incapable of or unwilling to prevent self-harm is wholly consistent with the SOC. In my opinion, prescribing hormones to incarcerated individuals reflects, rather than compliance with the existing SOC, an explicit violation. While exceptions may at times be clinically justified, and while hormonal treatment might in some cases of incarcerated individuals be helpful to both inmates and departments of correction, in terms of improving the manageability of inmates, exceptions should be made only following thorough debate of all potential implications and consequences – both clinical and institutional – and only following a thoroughly formulated

7

diagnostic picture that considers not just GID but all Axis I and Axis II co-morbidity. The Fenway does not represent such a debate, nor a thorough diagnostic formulation. And the Harry Benjamin SOC do not at this time provide any guidance in this area.

## V.    *Lack of corroborating reports*

*There is no evidence that the Fenway report considered any sources of information other than the inmate's self-reports and existing records.*

There is contradicting information in the various reports, some indicating that Mr. Battista is in close contact with his sister, and some describing no contact. If his sister, or other relatives are available, collateral interviews may be helpful in validating the inmate's self-reports, in clarifying some aspects of his history and, therefore, in reaching diagnostic clarity. The Fenway report describes the inmate as unable to "remember her thoughts about her gender while growing up," but also states that the inmate has suffered lifelong gender dysphoria and that he began cross dressing in female undergarments as an adolescent. The presence of childhood GID is not required for a diagnosis of GID in adulthood. However, it is known that some individuals falsify, exaggerate or minimize aspects of their history – such as transvestic arousal and cross dressing – in their efforts to qualify for reassignment. Collateral interviews can validate or invalidate self-reported history, and can help identify clinical variants or subtypes of GID. This, in turn, may influence treatment decisions. When evaluating incarcerated individuals, because of the particularly high risk of self-reports being influenced by sociopathy and psychopathy, it is particularly important to try to determine to what extent inconsistent or deceptive self-reporting reflects a pervasive pattern of deception, manipulation and/or entitlement indicative of significant chronic personality pathology. Since individuals with high levels of sociopathy or psychopathy are often unreliable historians, treatment decisions in cases of incarcerated individuals should not, in my opinion, rely solely on self-reports. As noted in previous sections of my report, such decisions may cater to and exacerbate, rather than diminish, significant psychiatric symptoms.

## V.    *Lack of psychometric assessment*

*The Fenway report apparently relied on no formal psychometric assessment to supplement clinical impressions, and no mention is made of previous assessments, referenced in the institutional records, that suggest severe psychopathology.*

Conclusions in the Fenway report were apparently based solely on the 90-minute clinical interview and chart review. While self-report psychometric measures have limited value in forensic assessments due to the tendency of the subject to engage in image management -- responding to items in such a way as to present himself in the best light – the same limitation applies to the clinical interview. Psychometrics, while imperfect, provide additional information to compare with clinical impressions. Discrepancies between current and prior results of psychometric assessment and clinical impressions may highlight areas that warrant further inquiry. The assessment of complex cases warrants the gathering of data from as many sources as possible. To not do so leaves a serious gap, in particular in cases of such serious consequence as Mr. Battista's.

## VI.    *Sexuality themes*

8

Based on the Fenway report, the course of development of GID in Mr. Battista is not clear. The report contradicts itself regarding the inmate's reported history of sexual dysfunction – saying (page 3) that the dysfunction was due to fear of rejection, but later (page 6) linking it causally to discomfort with his male anatomy. The report also states (page 3) that Mr. Battista reported being discharged from the army as a result of emotional instability after being discovered wearing women's undergarments, but then notes a previous evaluation that described the discharge as being due to fighting and drinking. The report makes no effort to explain these inconsistencies or their possible relevance to the diagnostic formulation.

Further, the Fenway report does not indicate whether or not a differential diagnosis between GID and Transvestic Fetishism was conducted. While gender dysphoria does develop in some cases of Transvestic Fetishism, and while some of those individuals in the real world community seek reassignment, it is important to differentiate the two conditions, and to develop a specifically applicable treatment plan. An earlier report (Elleborn) states that "No sexual arousal is reported in these early crossdressing experiences." However, as noted earlier, patients seeking reassignment often deny fetishistic arousal, and there is no evidence of collateral reports validating Mr. Battista's self-reports.

Further, the Fenway report describes (page 6) Mr. Battista as having had "a strong, persistent cross-sex identification as female since early childhood." However, the report offers little in the way of details documenting that supposed history, other than to say (page 3) that he began wearing female undergarments at age 14 or 15, that he (page 2) "was always jealous of women," and "played house and with dolls with her sister." Those few descriptors hardly prove a "strong, persistent" cross-sex identity. In fact, they raise the question of whether a diagnosis of Transvestic Fetishism (fetishistic arousal related to cross-dressing) with associated autogynephilic preoccupation (admiration of self in the image of a woman), either currently or in the past, has been adequately considered.

The DSM-IV describes autogynephilic males with GID as sometimes "…more fluctuating in the degree of cross-gender identification, more ambivalent about sex-reassignment surgery, more likely to be attracted to women, and less likely to be satisfied after sex-reassignment surgery." While Mr. Battista is not requesting surgery at this time, he has reportedly made it clear that it his goal. A cautious approach toward treatment, that carefully assesses for transvestic fetishism and autogynephilic traits, and that considers the increased risks of the autogynephilic subtype, is advised before initiating hormonal treatment. The Fenway report does not take such a stance. Based on my reading of the Fenway and other reports, Mr. Battista's sexual identity may still be evolving and unstable, or may have been distorted as a result of his isolation in a prison environment.

## VII.    *The effects of isolation on psychopathology*

*The Fenway report fails to address this theme of isolation as a possible contributing factor in the intensification of Mr. Battista's cross gender preoccupation during incarceration.*

Incarcerated individuals do not have the same resources and role models available to them as non-incarcerated individuals do for resolving gender identity conflict. In real-world communities today, individuals with cross gender identity can participate in treatment groups, community

9

DOC 000807

support groups, and online support groups. These groups are often comprised of individuals making varied choices, and with whom each can reality test their own feelings and assumptions. They also have varied choices for sex partners. Some choose reassignment surgery but many do not. Some enter treatment with one idea about what they need and change their minds after exposure to alternatives. Some would prefer full reassignment but are unable to because of financial or other life constraints. Some choose hormonal treatment, while others do not.

Incarcerated individuals, by virtue of their isolation, do not have the resources described above. Their isolation, especially when accompanied by Antisocial, Borderline or Narcissistic personality traits, may intensify an inclination toward a cross gender identity as the only possible solution for internal psychosexual conflict, and rigidify the false assumption that particular interventions are the only viable choices. As long as an individual remains confined, there is no way to determine with certainty whether his cross-gender identity would be as profound if he were living in a real world context, with real life challenges, opportunities and more varied choices. It is unlikely that inmates, because of their isolation, are aware of the extent to which real world individuals choose adjustment over reassignment strategies. Appropriate treatment provides inmates with education about these themes, psychotherapeutic opportunities to explore them fully, and assistance in learning to embrace an attitude of responsible, contextually appropriate choices rather than angry entitlement. The lack of exposure to alternatives has isolated Mr. Battista in such a way that, in my opinion, it is impossible to predict with certainty his sex of attraction, age of attraction, or his core gender identity, in the real world. With such uncertainty, a cautious treatment plan is a responsible one.

Many individuals in the real world never access their desired feminizing options. Indeed, there are many individuals who have severe GID but who cannot access the supposed medically necessary treatment in such cases – hormones and surgery. The real world imposes constraints on people's choices. Many cannot afford the cost of such interventions; most third party payers won't cover them; often individuals themselves recognize that their preferred interventions would complicate life in ways that they're not willing to risk; many settle for choose imperfect options that lead to a better life adjustment without imposing significant disruption; many choose to live "between" the traditional sexes as true he/shes; some make peace by defining themselves as being a "third gender," neither fully male nor fully female, but integrating aspects of both. Demands by inmates that prison life provide *no* constraints or obstacles to cross gender preferences are unreasonable, unrealistic, and outsides the bounds of good clinical practice to try to meet. And, as I have emphasized throughout this report, the risks are high that catering to these demands deepens the same underlying psychiatric pathology that landed Mr. Battista in prison and that motivated his poor adjustment to prison. The Fenway report fails to address these risks in any way.

## VIII. *Summary*
*To provide primary treatment of GID, with the focus on feminization, within a context of a patient's severe, chronic psychiatric and psychosexual instability would be unethical, clinically unwise, and a breach of community standards.*

It is clinically unwise to make treatment for gender identity disorder – via hormones or other interventions – primary over treatment of severe co-morbid conditions for which there is no evidence that they have been sufficiently addressed. In cases involving sociopathy or psychopathy, and in Mr. Battista's case, apparently Pedophilia, this concern is especially grave.

10

Mr. Battista has committed several sex crimes in his past. He admits to current risk of being around young females. He has a history, reportedly, of severe childhood emotional and physical abuse. He has demonstrated serious maladaptations consequent to that problematic early history – including possible substance abuse, lack of impulse control, and interpersonal difficulties. He has been determined to be sexually dangerous. He has attempted and threatened genital self-harm, self-starvation, and suicide. He has shown low motivation to complete a sex offender treatment program.

The fact that Mr. Battista wants and demands a particular treatment do not obligate the DOC to meet those demands and should not be the defining criteria for clinical decisions. Interpretations of the SOC vary from clinic to clinic in the real world. While one clinic, for example, might interpret an individual's adequate psychosexual functioning on hormones as indicating the appropriateness of proceeding to surgery, another clinic might interpret it as indicating that hormones have been successful and that surgery is unnecessary or unwise. In some clinics, full triadic therapy is common; in others, it is rare. *Conservative management of GID, in which attending to comorbid Axis I and Axis II problems is emphasized, is a valid approach. It is utilized in real world gender clinics with patients who present with far less psychiatric vulnerability than Mr. Battista appears to. It is certainly valid in the context of correctional systems.*

The Fenway report fails to even raise the question of other possible treatment options, to provide a clinical rationale for the recommendation of hormones over other options, or to address the question of the possible consequences and implications of hormonal treatment of incarcerated individuals in general, or Mr. Battista in particular. For example, the Fenway report explicitly states (page 5) that Mr. Battista's goals go beyond hormonal treatment. He apparently sees hormones as just the first step, and hopes to also have surgical reassignment. While hormonal treatment of incarcerated individuals may sometimes be helpful – by improving affective stability – it should not be undertaken lightly. It should be preceded with a process of clear informed consent, in which future additional feminizing treatment options and limitations are made thoroughly transparent. It should be preceded with a systematic process of psychotherapy in which clear treatment goals and the criteria for "personal mastery" of serious problems are clearly defined, met and sustained. And it should be preceded by thorough planning for possible consequent security risks – of, for example, having an increasingly feminized individual in an all male institution – will be managed. To administer hormones in the absence of such planning caters to inmates unrealistic expectations and could lead to continuing or worsening conduct problems rather than resolution to psychiatric vulnerabilities.

The goal of the treatment of GID is not feminization per se. It is improved affective and psychosocial functioning and the amelioration of dysphoria. There are a variety of treatment paths to that end. Mr. Battista's expectations reflect an unrealistic overvaluing of physical feminization as the only possible solution to his discomfort. Based on my impressions of the inmate as described in the Fenway report, it is possible, if not likely, that both GID and underlying personality pathologies fuel this entitlement. Further, and of considerable significance, Mr. Battista apparently suffers not just from GID but from severe Pedophilia – as evidenced by multiple sexual assaults on female children (both familial and non-familial victims), an egosyntonic attitude about his attraction to young girls, continued sexual acting out via obscene phone calls even after incarceration, and lack of motivation to complete sex offender treatment. These symptoms clearly suggest that Mr. Battista needs psychiatric treatment, but in

11

DOC 000809

no way would qualify him for hormonal or surgical reassignment in any reputable clinic in the real world.

Cynthia S. Osborne, M.S.W.
Forensic Consultant
Assistant Professor
Department of Psychiatry and Behavioral Sciences
Johns Hopkins University School of Medicine

12

October 14, 2005

Addendum:

After completion of the attached report, I was informed on October 12, 2005 that on October 8, 2005 Mr. Battista engaged in genital self-mutilation. Mr. Battista reportedly stated that it was an expression of frustration over delays in hormonal treatment. Having never met nor evaluated the inmate myself, I cannot say with any certainty what this gesture means. However, it appears consistent with my warnings all through this report that there is a high risk of iatrogenic effects of an improper treatment plan. By offering Mr. Battista a simplistic solution of hormones, with full knowledge that he expects surgery to follow, and without considering the risks associated with his significant co-morbidity, one may fuel angry entitlement, and exacerbate maladaptive, manipulative, self-harming coping patterns. In my opinion, the DOC was responsible in its decision to delay hormonal treatment. A more thorough assessment is warranted.

Cynthia S. Osborne, M.S.W.
Forensic Consultant
Assistant Professor
Department of Psychiatry and Behavioral Sciences
Johns Hopkins University School of Medicine

13

DOC 000811

# EXHIBIT P

FENWAY COMMUNITY HEALTH

Mental Health and Addictions
Department
7 Haviland Street
Boston, Massachusetts 02115-2683

Telephone 617 927-6200
Facsimile 617 267-3667

www.fenwayhealth.org

### Response to Cynthia Osborne's
### Peer report review
### on Sandy Jo Battista

Date of Report: 3/1/06
Written by: Randi Kaufman, PsyD and Kevin Kapila, MD
Re: Sandy Jo Battista (formerly known as David Megarry)
DOC Case No.: M-15930



BOARD OF DIRECTORS
2004-2005

Stewart B. Clifford, Jr.
*President*

Joanne T. Ayoub
*Vice President*

Allison Salke
*Treasurer*

Lisa Damon. Esq.
*Clerk*

Terence M. Keane. PhD*
*At-Large*

Elisa Alonso
David J. Breen, Esq.
Richard Marshall, MD
Carl Nagy-Koechlin
Richard D. Olson, Jr.
Arnold E. Sapenter
Scott E. Squillace, Esq.*

* *Past President*

Stephen L. Boswell, MD
*Executive Director*

#### Purpose of Report

This paper is a response to the "peer report review" written by Cynthia S. Osborne, MSW, dated October 10, 2005. Osborne's report contests the clinical evaluation and recommendations made by these writers, Randi Kaufman, PsyD, and Kevin Kapila, MD, for the clinical care of the inmate Sandy Jo Battista. Osborne specifically notes that "I have not conducted a clinical evaluation of Mr. Battista, and therefore it is not within the scope of my present role to diagnose him". Given that she did not meet with Battista, Osborne's report was based on previous evaluations of the inmate. Based on this review, Osborne contests the recommendation for hormone therapy made by Kaufman and Kapila.

To provide a context, University of Massachusetts, Medical School (UMass), which is contracted by the Department of Corrections (DOC) to provide medical and mental health care to inmates in the Massachusetts prison system, requested that Kaufman and Kapila evaluate Battista to determine whether she met criteria for Gender Identity Disorder (GID), and to make treatment recommendations. This request came in the context of a contract initiated in 2003 by UMass Medical with Fenway Community Health, for Kaufman, who has served as Coordinator of the Transgender Health Program at Fenway Community Health, and Kapila, MD, who is Medical Director of Mental Health and Addiction Services at Fenway, to evaluate inmates throughout Massachusetts, to determine whether they have GID, and to make clinical recommendations for their care.

Prior to Kaufman's and Kapila's evaluation of Battista on 8/10/04, Diane Ellaborn, LICSW, a well-known and respected clinician in the area of Gender Identity Issues, had evaluated Battista and wrote a report dated October 17, 2001. She concluded that Battista qualifies for the diagnosis of Gender Identity Disorder, which Battista has been requesting since 1996. Ms. Ellaborn states that if she does not received treatment for her gender dysphoria, Battista would be "at high risk for depression, anxiety, suicide, and self-abuse".

1

DOC 005552

## Statement on Pronoun Usage

Battista, who was formerly known as David Megarry, made a legal name change to Sandy Battista in 1995. Her rationale for changing her name was two-fold: she chose mother's maiden name for her surname, as she wished to distance herself from father and his family, who were highly abusive to both Battista and her mother; and she chose Sandy to have a name more closely identified with her gender identity of female. Battista stated that although she wanted to choose a name that was more clearly feminine, she was anxious about taking this step, and therefore chose the androgynous name Sandy. Battista identifies as female, and prefers to have female pronouns used. Due to this preference, and her persistent efforts to transition from male to female, it is appropriate that female pronouns be used. Osborne, despite noting that Battista stated a "preferred female identity", uses male pronouns throughout her report. Osborne states, not having met Battista, that she assumes the accuracy of previous reports that diagnose Battista with GID; thus, it seems she is not contesting Battista's gender. However, Osborne makes no attempt to explain her inappropriate use of male pronouns. This is an interesting, and peculiar, contrast to Osborne's statement in her published article (Osborne & Wise, 2000) that decisions regarding pronoun usage should take into account "a desire to establish trust and convey respect in the therapeutic relationship". When the patient makes it clear that she prefers pronouns that fit her gender identity, the decision to use biologically congruent pronouns instead does not convey trust or respect.   In contrast, using inappropriate pronouns shows disrespect in the refusal to acknowledge the person's gender identity.

### Response to Osborne

### Diagnostic Formulation

Osborne begins by raising the idea that our report was not comprehensive in its diagnostic formulation, and does not address critical questions regarding the possible contraindications of Axis I or Axis II co-morbidity. While we obviously considered other diagnoses, and their possible impact on the treatment of GID, it is true that we did not clearly delineate this in our writing. Therefore, we will address these issues here. Diagnostically, Battista is seen as:

Axis I:  302.6  Gender Identity Disorder NOS
         300.4  Dysthymic Disorder
         307.50  Eating Disorder NOS
         r/o 300.7  Body Dysmorphic Disorder
         r/o 302.2  Pedophilia
         h/o 305.20  Cannabis Abuse
         h/o 305.00  Alcohol Abuse

Axis II:  301.7  Antisocial Personality Disorder

Axis III:  Congenital Adrenal Hyperplasia (CAH)

Axis IV: Problems with access to health care services
         Problems related to the social environment
         Housing problems
         r/o Problems with primary support group

2

DOC 005553

Axis V: 50

To further explain this diagnostic formulation, we will discuss these diagnoses and
our rationale behind them.

Battista qualifies for Gender Identity Disorder, Not Otherwise Specified (GID
NOS). This diagnosis is slightly different from Gender Identity Disorder, in that
"Not Otherwise Specified" is used to indicate that the gender identity disorder is
different in some way from classical GID. Examples of the difference of GID NOS
include intersex conditions, and a persistant preoccupation with castration or
appendectomy, without a desire to acquire the sex characteristics of the other
sex. Battista qualifies for GID NOS due to her intersex condition, as well as her
preoccupation with castration. While she does indicate an early curiosity about
having a female body, and the desire to be seen as female, it is notable that
Battista tends to focus on castration, rather then on the desire to have breasts
and a vagina. In our evaluation she did state a wish for sexual reassignment
surgery, but she also indicated ambivalence around whether she would actually
want to have surgery to obtain female genitalia. She noted that she might feel
more clear about surgery to fashion female genitalia after she was able to be on
hormone therapy, and to be castrated. Battista's therapist Tyler Carpenter, PhD,
also indicated that Battista is ambivalent about SRS, sometimes wanting it, and
other times not wanting it. What is notable here is that Battista's focus has been
on removing her male genitalia, rather than fashioning female genitalia. This
preoccupation, along with her intersex condition, qualify Battista for GID NOS.

Battista also qualifies for Dysthymic Disorder. This disorder is characterized by
having a depressed mood for most of the day, for more days than not, as
indicated either by subjective account, or observation by others, for at least two
years. It also includes at least two symptoms specified by a list in the DSM.
From this list Battista qualifies for three symptoms, including poor appetite (or
overeating), low self-esteem, and feelings of hopelessness. According to
Battista's report, she has been dysthymic for many years. She also appears to
have qualified for a Major Depressive Disorder at least once in the past, most
clearly seen when she first came out about her gender dysphoria in 1996. Her
depressive symptoms seem to be most closely connected with her gender
dysphoria.

Battista also qualifies for an unspecified eating disorder, seen in her persistence in
restricting her eating. Battista explained this voluntary food restricting in terms of
her gender dysphoria. She stated that she easily puts on muscle if she eats more
than a minimal amount of food, and that this musculature causes her to look
more masculine. This in turn increases her gender dysphoria and depressive
feelings. Much more typical of eating disorders is concern about body weight;
that is, the fear of being fat. Whether anorexic or bulimic, hallmarks of eating
disorders include a concern about gaining weight, and significant disturbance in
the perception of the shape or size of one's body. This disturbance of perception
is around whether one's weight is in the normal range. Battista's disordered
eating is not about the fear of gaining weight. She does not appear to have a
distorted perception of her body weight. However, it is clear that her eating
behavior is problematic. But rather than a fear of being overweight, the rationale
for Battista's food restriction is an attempt to find a way to avoid looking more
masculine, in an attempt to look more feminine. Therefore, Battista's eating

3

DOC 005554

disorder is directly related to her gender dysphoria. It is likely that if her gender issues are treated adequately, her eating disorder will resolve.

Body Dysmorphic Disorder is another diagnosis that was considered, and ruled out. Body Dysmorphic Disorder refers to a preoccupation with a defect in appearance. The defect is either imagined, or, if a slight physical anomaly is present, the individual's concern is markedly excessive. The preoccupation is not better accounted for by another mental disorder. In ruling out Body Dysmorphic Disorder, we considered several things. Battista clearly considers her body to be defective, in having male genitalia and secondary male sex characteristics. Therefore, a physical anomaly is present in this situation. However, the criteria for the disorder specifies that if present, the physical anomaly is not "slight". The mismatch of one's anatomy with one's gender identity is not slight. It is a radical disconnect, impacting every aspect of one's general functioning and psychological well-being. Battista's preoccupation with the defect in her body is understandable, and not considered to be excessive. It is also better accounted for by Gender Identity Disorder. Therefore she does not qualify for the diagnosis of Body Dysmorphic Disorder.

Pedophilia should be ruled out as a diagnosis. While Battista clearly has a history of pedophilia, the DSM-IV diagnosis specifies that to qualify for this diagnosis the person must have recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child over a period of at least 6 months. Again, while Battista clearly has a history of this, we did not assess her current sexual fantasies or urges related to children, as it was not relevant to diagnosing GID or making treatment recommendations. Whether Battista qualifies for the diagnosis of pedophilia currently, or whether it should be noted that she has a history of this, this was not relevant for our assessment.

Battista has a history of cannabis and alcohol dependence, both of which have been in remission for many years. Given that she is not currently using substances, these diagnoses do not impact the diagnosis of GID/GID NOS, or the treatment recommendations.

On Axis II Battista qualifies for the diagnosis of Antisocial Personality Disorder. This diagnosis specifies that there is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, indicated by three or more of the following:

1. failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest
2. deceitfulness, as indicated by repeated use of lying, use of aliases, or conning others for personal profit or pleasure
3. impulsivity or failure to plan ahead
4. irritability and aggressiveness, as indicated by repeated physical fights or assaults
5. reckless disregard for safely of self or others
6. consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations

The diagnosis includes evidence of Conduct Disorder with onset before age 15, and the individual is at least 18 years of age. Therefore, Battista qualifies for Antisocial Personality Disorder.

4

DOC 005555

## CAH and GID

Axis III is used for reporting current general medical conditions that are potentially relevant to the understanding or management of the individual's mental disorder.  On this Axis we denoted that Battista has Congenital Adrenal Hyperplasia (CAH), an intersex condition.  In females CAH is most obviously manifested by ambiguous genitalia.  In males CAH most obviously manifests in early puberty, which Battista experienced.  These physical manifestations of both ambiguously genitalia in females and early puberty in males are due to the overproduction of androgens, the male hormone.

Our evaluation of Battista noted that CAH has some correlation with male to female transsexuals.
Specifically, in a study done by Eicher, Spoljar, Richter, Cleve, Murken, Stengel-Rutkowski, & Steindl (1980) 8 out of 11 male (XY) to female transsexuals were found to be lacking the H-Y antigen, which is normally present in males and absent in females.  In addition, 9 out of 11 female (XX) to male transsexuals were positive for the H-Y antigen.  This study suggests there may be a biological component to Battista's female gender identity in relation to her intersex condition.

Osborne contests this, citing a study done by Hines, Brook & Conway (2004), which shows that male children with CAH engage in male-typical play behavior.  Osborne states that this study concluded that CAH showed no effect on GID, or sexual orientation in males, and that it therefore "should be assumed that the reasons for Mr. Battista's GID are not primarily hormonal".
It is unclear why and how Osborne makes this leap to say that Battista's GID is not primarily hormonal in nature.  It is also unclear why she seem to think that male children with CAH showing male-typical play behavior shows that CAH has no effect on GID.  While they may be a correlation between the two, it is also the case that CAH, and any other intersex condition, can exist alongside GID.

A study done by Hines (2003) (without Brook & Conway), suggests why males with CAH would be expected to show sex-typical behavior for males.  The article notes:

> "Gonadal hormones, particularly androgens, direct certain aspects of brain development and exert permanent influences on sex-typical behavior in nonhuman mammals. Androgens also influence human behavioral development, with the most convincing evidence coming from studies of sex-typical play. Girls exposed to unusually high levels of androgens prenatally, because they have the genetic disorder, congenital adrenal hyperplasia (CAH), show increased preferences for toys and activities usually preferred by boys, and for male playmates, and decreased preferences for toys and activities usually preferred by girls ... These findings suggest that androgen during early development influences childhood play behavior in humans at least in part by altering brain development".

Following this line of reason, if androgens exert influence to show increased preference for toys and activities usually preferred by boys, the same would be seen in boys with CAH, who also have higher than normal levels of androgen.

5

DOC 005556

Randi Kaufman    (617)441-2100    p.7

Most critical to note here, however, is that whether or not Battista's CAH has a correlation with her gender identity disorder, these conditions are discrete, and can exist independently of each other. Even if one assumes that Battista's CAH does not genetically predispose her to GID, Battista still meets the criteria for GID NOS. She still has a gender identity disorder, and she still requires treatment appropriate for this disorder.

## Psychopathy, Suicidality, and Self-Harm

Osborne states that it is important to consider the level of psychopathy, suicidality and self-harm in order to make treatment recommendations. She states that in "cases involving high levels of psychopathy, GID treatment strategies that iatrogenically *worsen* (italics ours) symptoms of entitlement and manipulativeness may lead to increased risk of threats and gestures of self-harm".

It is unclear what Osborne is trying to say here. What she appears to be suggesting is that Battista is acting in a manipulative and entitled manner, and that somehow treating Battista's GID will iatrogenically worsen any possible "entitlement"" and "manipulativeness". She also suggests that we did not consider Battista's potential for suicidality or self-harm. Her statements have no basis, and they pathologize Battista.

To address the first point, there is no evidence that Battista is being "manipulative" in wanting to receive treatment for her gender identity disorder. Rather, her acting out appears to be a cry for help. Battista is suffering from an uncommon and debilitating condition, where it is often hard to get appropriate treatment. One reason is because, at this point in time, relatively few professionals have the knowledge to appropriately diagnose the condition, or to provide the appropriate treatment. Osborne's implication that Battista's episodes of self-harm are attempts to be manipulative suggests a possible lack of knowledge about GID and how it manifests. Self-harm in the transgender population frequently takes the form of mutilating one's genitalia specifically (Krieger, McAninch, Weimer, 1982; Master & Santucci, 2003; Murphy & Murphy, 2001; Sirota, Megged, Stein, & Benatov, 1994; van Kammen & Money, 1977; Wylie, 2000). Mutilation of the genitalia in the transgender population is often with the aim and purpose of removing the offending genitalia, due to the person's inability to tolerate their anatomy, which is ego-dystonic (Haberman & Michael, 1979). The goal to remove the genitalia may be with, or without, being able to fashion new genitalia. As mentioned in our evaluation, Battista self-harmed her genitalia by tying off her testicles with rubber bands and trying to freeze them. She researched castration, and tried to entrust other inmates to castrate her. She specifically says she wants her genitalia removed, and that she will continue to try to remove it herself if she cannot get the professional help to do so. This is clearly a symptom of her GID.

The literature contains similar stories of patients mutilating themselves because they could not tolerate the length of waiting time before treatment began. One such study reports a case of self-castration in a transsexual who was unhappy with the length of time spent waiting for sex reassignment surgery (Murphy & Murphy, 2001). Michel & Mormont (2002) note that transsexuals often castrate themselves to end a state of anxious waiting. Sirota et al., (1994) note that self-

6

DOC 005557

castration is not done impulsively, but rather is due to long-standing conflict, usually related to difficulties with male identity. Similarly, Haberman & Michael (1979) note that two transsexual patients who castrated themselves were not delusional, nor impulsive. The patients had studied the anatomy of the area, did not butcher themselves, and following their auto-castration they eventually attained their long-term goals of SRS.

Osborne states that there is no evidence of a link between GID and self-harm, but that there is a substantial amount of data associating personality disorders and self-harm. She implies that Battista's self-harm is related to Antisocial or Borderline Personality Disorder. A review of the literature shows both a link between self-harm and GID, as well as self-harm and personality disorders. The basic populations who engage self-mutilation include people who are psychotic, those who have severe personality disorders, transsexuals (Greilsheimer & Groves, 1979; Alao, Yolles, & Huslander, 1999), and those who self-mutilate for religious or cultural reasons (Bhatia & Arora, 2001).

In regard to personality disorders, Borderline Personality Disorder is the diagnosis that surfaces in the literature again and again, showing a high correlation with self-mutilation (Brodsky, Cloitre, & Dulit, 1995; Dubo, Zanarini, Lewis, & Williams, 1997; Dulit, Fyer, Leon, Brodsky, & Frances, 1994; Favazza, 1998; Favazza, DeRosear & Conterio, 1989; Fowler, Hilsenroth, & Nolan, 2000; Joyce, Mulder, Luty, McKenzie, & Sullivan, 2003; McKay, Gavigan, & Kulchycky, 2004; McKay, Kulchycky & Danyo, 2000; Schinagle, 2002; Paris, 2005; van der Kolk, Hostetler, Herron, & Fisler, 1994). Favazza (1998) notes that self-mutilation has typically been associated with borderline behavior, and historically has been misidentified as a suicide attempt. Borderline self-mutilators are most frequently female, and are likely to receive co-morbid diagnoses of major depression, anorexia nervosa, and bulimia nervosa (Dulit et al., 1994; Zlotnick, et al., 2002; Schinagle, 2002; Parry-Jones & Parry-Jones, 1993; Turell & Armsworth, 2003; Paul, Schroeter, Dahme, & Nutzinger, 2002).

The particular type of self-harm can often be correlated with specific diagnoses. Self-harm in people with GID is qualitatively different from self-harm in people who have Borderline Personality Disorder. Types of self-mutilating behavior typically associated with people with Borderline Personality Disorder include cutting, burning, scratching (Paul, et al., 2002), and skin picking or abraiding (Fowler, et al., 2000), suicidal gestures, and parasuicidal behavior, such as overdosing (Gunderson, 2001). The most common areas that are cut or burned tend to be the arms, legs, and sometimes the torso (Babiker & Arnold, 1997; Favazza, 1998; Gardner, 2001; Paris, 2004; Paul, et al., 2002). Current knowledge of the borderline population suggests that self-mutilating behavior is an attempt to regulate affect (Paris, 2005; Sachsse, Von-der-Heyde, & Huether, 2002), to cope with dissociative states (Favazza, 1998; Paris, 2005), depressive states, depersonalization (Sachsse, U., Von der Heyde, S., & Huether, G., 2002), and to express aggression (Goodman & New, 2000), or chronic anger, somatic anxiety and impulsivity (Simeon, et al., 1992; Stanley, Gameroff, Michalsen, & Mann, 2001). Despite the abundance of information about self-mutilation in people with Borderline Personality Disorder, reference to mutilation of the genitals in this population is virtually absent.

Dialectical Behavioral Therapy (DBT), developed by Marsha Linehan about 15 years ago, was developed specifically to target intervention around these self-

7

DOC 005558

harming behaviors and parasuicidal gestures in the borderline population. DBT has been shown to be highly effective in changing the behaviors of borderline patients (Linehan, Heard, & Armstrong, 1993; Linehan, Tutek, Heard, & Armstrong, 1994). The clinical knowledge of Borderline Personality Disorder and the now standard clinical treatment with Dialectical Behavioral Therapy highlights a major difference between the borderline population and transsexuals. For transsexuals, only hormone therapy and SRS are found to be effective(Gallarda et al., 1997). DBT has never been a standard of care for the transgender population.

Regarding Osborne's point that "GID treatment strategies that iatrogenically worsen symptoms of entitlement and manipulativeness may lead to increased risk of threats and gestures of self-harm" implies that GID treatment will cause the person to get worse, particularly in the area of "entitlement" and "manipulativeness". It is unclear what Osborne thinks is wrong with feeling entitled to appropriate mental health and medical treatment. Any prisoner is entitled to feel that she or he should receive basic medical and mental health care, regardless of what their crimes were, or what diagnoses they carry. There is no reason why Battista shouldn't feel entitled to the proper treatment for GID; it is no different than a prisoner asking for the appropriate treatment for depression, or high blood pressure for example. Without treatment, the condition does not improve. Gallarda et al. (1997) note that without treatment, the clinical condition of someone with GID is chronic, without remission, and that social and surgical reassignment remains the only way to improve their clinical condition, and avoid the onset of many dramatic complications.

Regarding Osborne's suggestion that GID treatment worsens threats or gestures of self-harm, this is simply misinformed. Despite the opinion held by some, empirical research does not confirm the belief that suicide is strongly associated with surgical transformation, or that people become worse with treatment (Aude et al., 2002; Snaith, et al., 1993) . Similarly, others conclude that there is neither a higher rate of suicide, nor psychotic decompensation after surgery and hormone therapy (Gallarda et al., 1997; Hunt & Hampson, 1980). A 30 year review of psychological testing done by Lothstein (1984) concluded that male patients became stabilized psychologically once they began living as female, and even more stable after hormone therapy and surgery.

The Benjamin Standards of Care state unequivocally that:

> "sex reassignment surgery, along with hormone therapy and real-life experience is a treatment that has proven to be effective. Such a therapeutic regimen, when prescribed or recommended by qualified practitioners, is medically indicated and medically necessary. Sex reassignment is not 'experimental', 'investigational', 'elective', 'cosmetic', or optional in any meaningful sense. It constitutes very effective and appropriate treatment for transsexualism or profound GID" (Standards of Care, 2001).

In actuality, the failure to take proactive steps is a primary reason for the escalation of psychological problems, including suicide, alcohol and drug abuse, and homelessness (Van Wormer & McKinney, 2003). The literature is full of studies showing that suicidal feelings and gestures, and self-harming behaviors go down drastically with treatment. The most comprehensive study of the effects

8

of sex reassignment surgery, which looked at more than 2000 patients in 13 countries, over the course of 30 years, showed satisfactory results in more than 70% of Male-to-Females, and in nearly 90% of Female-to-Males. Pfafflin & Junge (1991) conclude that SRS is effective in relieving gender dysphoria, and that any negative consequences are greatly outweighed by positive consequences.

More specifically, positive outcome of sex reassignment surgery shows the following: a decrease or disappearance of psychopathological features (Ross & Need, 1989), greater satisfaction with interpersonal relationships and social functioning (Bodlund & Kullgren, 1996; Rakic, et al., 1996; Rehman, et al., 1999; Ross & Need, 1989), a better attitude toward the patient's own body (Rakic, et al., 1996), greater acceptance by family members -- who described the patient as much happier and easier to get along with (Hunt & Hampson, 1980), an increase in occupational functioning (Rakic, et al., 1996), less difficulty finding sexual partners (Ross & Need, 1989), an increase in experiencing orgasm (Rakic, Starcevic, Maric & Kelin, 1996), and/or more sexual satisfaction (Bodlund & Kullgren, 1996).

Despite Osborne's concerns that GID treatment might carry negative iatrogenic effects, the literature shows that in regard to suicide, there is a "marked decrease in suicidal tendencies postoperatively" (Stein, Tiefer & Melman, 1990) in male to female transsexuals. Most patients developed strong support systems, and did well in other ways. Hunt & Hampson (1980) found in their study that patients no longer viewed themselves as "deviant" as they did before the surgery. All of the 17 subjects in this study stated that despite the pain, expense and delay involved in surgery, they would choose the same course again.

In stark contrast, the rate of suicidality is extremely high prior to treatment. The literature is replete with studies linking suicide with people who have GID (Bockting & Robinson, 2005; Burgess, 1999; Clements-Nolle, Marx, Guzman, & Katz, 2001; Denny, 1995; Fitzpatrick, Euton, Jones, & Schmidt, 2005; Gallarda et al., 1997; King & Stuntz, 1997; Kenagy, 2005; Kreiss & Patterson, 1997; Mathy, 2002; Morrow, 2004; Van Wormer & McKinney, 2003; Xavier, et al. 2004). Studies of transgender populations in Philadelphia, Washington, Chicago, San Francisco, and Houston (Xavier, et al., 2004) report suicidal ideation rates ranging from 16% up to 64%, with most people attributing their suicidality to their gender identity issues. Huxdly and Brandon (1981) surveyed 72 transsexuals, and found that 53% had made suicide attempts (in Martell, Botzer, & Williams, 2004). Clements-Nolle et al. (2001) found that 62% of 392 male-to-female transgender people were depressed, and 32% had attempted suicide.

It has also been established that suicide risk is specifically related to gender role. Fitzpatrick, et al., (2005) found that cross-gender role is a unique predictor of suicidal symptoms, concluding that cross-gendered people, regardless of sexual orientation, appear to have a higher risk for suicidal symptoms. Similarly, Van Wormer & McKinney (2003) found that gender non-conformity is a risk factor for suicide, especially for boys.

Quite simply, when patients with GID are given appropriate care, they get better.

To address Osborne's implication that we did not assess Battista for suicidality and self-harm, our assessment is clearly discussed on pages 4 and 5 of our evaluation. We discuss Battista's history of self-harm, her (then) current

9

DOC 005560

statement that she is not planning to self-harm in the immediate future, since she is feeling hopeful about getting treatment, and that she is not currently suicidal. Although Battista did comment that she would take pills if she did decide to commit suicide, to imagine becoming suicidal in the future, and being currently, imminently suicidal, are very different things. It is not uncommon for people with gender identity disorders to have suicidal thoughts, particularly in thinking about this as an option for the future if they are not able to receive treatment; therefore Battista's statement does not seem outside the norm.

But again, imagining suicide as a future possibility, if treatment is not forthcoming, and being imminently suicidal, are not the same. The very fact that Battista can think about the future demonstrates that she is not suicidal currently. Clearly, issues of suicide are to be taken very seriously. However, there is no way to know whether Battista's imagined suicidality in the future would come to bear. Current treatment cannot be based on theoretical situations in the future. Battista's statement is clearly an attempt to communicate the extent of her current misery. During our evaluation Battista appeared to be more hopeful about the future then she had been, and she had therefore stopped trying to castrate herself, hopeful that treatment would be forthcoming.

Osborne noted in an addendum to her report that Battista again engaged in genital self-mutilation, stating that she did so as an expression of frustration over delays in hormonal treatment. Despite Battista's statement, Osborne writes that she "cannot say with any certainty what this gesture means". Having worked with many transgender patients, we have learned that acts of self-harm towards one's genitalia are frequently an expression of psychological distress around not being able to tolerate one's body as it is. The self-harm is also Battista's attempt to provide herself with the treatment she needs, if the professionals will not provide it for her. Looking back at our evaluation of August 2004, we noted that Battista stated that she might try again to castrate herself in the future, if she had no hope of receiving treatment. This act of self-harm in 2005 was predicted, and was borne out, because hormone therapy still had not commenced.

To further explain Battista's symptoms of self-harm, we would like to emphasize the chronology involved with her case. Battista has been trying to get treatment since 1996. Three years before our evaluation Battista was evaluated by Diane Ellaborn, LICSW, in October 2001. This evaluation was procured and paid for by Battista herself, since five years of trying to get the appropriate treatment for herself had failed. Ellaborn's evaluation states explicitly that without treatment for GID, Battista would be "at high risk for depression, anxiety, suicide, and self-abuse". Ellaborn also noted that Battista had been trying to get the appropriate treatment since 1996. Ellaborn's evaluation was dismissed, because it was solicited by Battista herself, not by the court.

Three years after Ellaborn's evaluation we were retained through UMass to evaluate Battista. We recommended hormone therapy. However, more than a year later Battista still had not been put on hormone therapy. By the time Osborne wrote her peer report in October 2005, fourteen months after our evaluation, Battista had been trying to get treatment for GID for nine years.

It is understandable why someone would lose her hope after nine years of effort. Even when professionals retained by UMass Medical (who provide medical and mental health care for the DOC) recommended hormone therapy for her GID, Battista was still not given this treatment. When she self-harmed again in 2005

10

DOC 005561

after Osborne's report, which consistently states that hormone therapy and surgery are not the appropriate treatments, Battista's hopefulness that she expressed to us in 2004 was likely gone. It really is not unexpected, then, that she returned to genital self-harm. Furthermore, it is likely that Battista will continue to self-harm, and possibly even attempt suicide.

Osborne, however, suggests that Battista's episode of self-harm is indicative of Osborne's concern that "there is a high risk of iatrogenic effects of an improper treatment plan". On this point we agree. The improper treatment plan that has been in place for nine years, that is, no treatment, despite evaluations recommending hormone therapy and possibly surgery in the future, has caused Battista to try to provide her own treatment. If she were to be put on hormone therapy, with a future evaluation to determine whether surgery should be undertaken, it is likely that Battista will stop self-harming her genitalia. She would not need to provide her own treatment if the professionals provided it for her.

Regarding Osborne's statement that "the level of psychopathy" needs to be considered in forming treatment recommendations suggests that she is confusing diagnosis with behavior. That is, although Battista qualifies for Antisocial Personality Disorder, an Axis II diagnosis is not a rule out for the diagnosis of GID, nor does it set any guidelines relevant to the diagnosis or clinical treatment of GID. What is important in making treatment recommendations is to judge whether someone is psychologically ready to adjust to the major changes that hormone therapy, or other treatment, would bring. Having a criminal history does not disqualify Battista from being ready for the appropriate treatment for her gender identity disorder. Having an Axis II diagnosis, which is indicative of other types of mental health issues outside of GID, does not indicate that the person should not receive treatment for other mental health conditions. In fact, it is sometimes the case that treating an Axis I disorder also causes improvement with an Axis II disorder.

### Sexual dangerousness

As stated previously, other mental disorders, such as personality disorders or paraphilias, are not a rule-out for GID, nor a reason to refuse to provide the standard treatment. Battista states that castration would lower the chance that she would re-offend sexually, which Osborne suggests is a manipulative attempt to get the DOC to provide partial surgical reassignment. While Battista's belief that castration might decrease the possibility that she would re-offend sexually, and might make castration appear even more attractive to her, her desire to be castrated clearly relates to her gender identity disorder as well. Given that we are not treaters of sexual offenders, our recommendation for hormone therapy is based on Battista's diagnosis of GID NOS. Whether she is recommended for surgery in the future will depend on the impact of hormone therapy in addressing her gender dysphoria.

### Lack of corroborating reports and lack of psychometric testing

Osborne raises concern that our report did not consider any sources of information other than the inmate's self-reports and record, and did not include psychometric testing. While there are some diagnoses where external information is important to clarifying diagnosis (one example is ADD), external

11

DOC 005562

Hai  u/  uo  u/:jjp     Kandi  Kaufman                (617)441-2100              p.13

information to validate, for the reasons of assessing or recommending treatment for GID, is not indicated. This diagnosis is made by self-report. As previously noted, in the absence of a biological marker GID can only be defined with clinical criteria (Gallarda, Amado, Coussinoux, Poirier, Cordier, & Olie, 1997). External validation is not called for by the DSM-IV, or the Harry Benjamin Standards of care. External validation of one's self-report of GID is not commonly accepted to be the standard of care, and to do so would be subjecting Battista to a different standard than anyone else assessed for GID.

The standard of care regarding diagnosis for GID does not call for any type of psychological testing. There is no agreement in the field regarding any tests that would help clarify or rule out the diagnosis of GID, or that would assist in treatment planning, and no mental tests show any type of consistent psychodynamic pattern (Money & Gaskin, 1970-1971). There is consensus, however, that the disorder can only be defined with clinical criteria in the absence of a biological marker (Gallarda et al., 1997).

However, at times using psychological testing may be helpful for obtaining further information, which cannot always be assessed through clinical information. We have ordered testing for other inmates that we have assessed for GID, but we did not feel that doing a new battery of testing was clinically indicated in Battista's case at this point in time. We did review the results of Battista's psychological testing done in 1997, by Tyler Carpenter, PhD. The reason given for Battista's testing was help determine appropriate therapy goals and because testing is sometimes "given to people considering sex reassignment surgery". The testing report noted a long history of gender dysphoria, and the plan to "go on a liquid diet to avoid gaining weight and to prevent the return of bulk to his arms, legs, and chest". The results stated that there was "no compelling evidence of malingering, dissimulation, unreliability, psychosis, or organicity". The test report also indicated "critical concern about self-destructive potential".

An interesting report of testing in the literature shows confirmation for the need for treatment with sex reassignment surgery. One particular study compares the results of the Minnesota Multiphasic Personality Inventory (MMPI) between a group of biological males applying for SRS who were living predominantly as men, a group of biological males applying for SRS who were living full-time as women, and groups of psychiatric inpatients and outpatients (Greenberg & Laurence, 1981). Findings showed that both groups of SRS applicants scored higher on a measure of femininity than the psychiatric patients. More notable, however, was the finding that the SRS applicants living as men were as disturbed as the psychiatric patients on all other measures of psychopathology, while SRS applicants living as women showed a notable absence of psychopathology. Similar to the psychiatric patients, the SRS applicants living as men showed significant elevations on the scales for depression, psychopathic deviate, psychasthenia, and schizophrenia.

### Sexuality themes

In this section Osborne raises questions about the course of development of Battista's GID, and whether the diagnosis of Transvestic Fetishism was considered. She suggests that details of Battista's gender history are not enough to validate Battista's persistent cross-sex identification as female since early childhood. She expresses concern that if Battista qualified for the diagnosis of

12

DOC 005563

Transvestic Fetishism, that this could indicate more ambivalence about sex reassignment surgery, and the possibility that she would be less satisfied after sex reassignment surgery.

The diagnosis of Transvestic Fetishism, which we ruled out, is described in the DSM-IV as follows:

> Over a period of at least 6 months, in a heterosexual male, recurrent, intense, sexually arousing fantasies, sexual urges, or behaviors involving cross-dressing.
>
> The fantasies, sexual urges, or behaviors cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

This diagnosis was ruled out for several reasons. Clearly, Battista's dysphoria manifests in many ways, far more extensive than only cross-dressing. Her gender dysphoria is seen in a life-long history of strong, persistent cross-sex identification. This cross-sex identification is seen in her jealousy of women when she was a child, her thoughts about what it would be like to have a female body, cross-dressing in sister's clothing, and dislike of her own body. It is also seen in her strong and persistent preference for cross-sex roles, including playing house, playing with dolls, and her dislike of sports. As an adult her cross-gender identification is seen in her continued cross-dressing, use of various materials to affect the appearance of wearing make-up, persistent work to lose muscle mass by restricting her food intake and cessation of lifting weights, discomfort with her male genitalia - to the point of being unable to be sexual, unless she fantasizes that she is female, episodes of genital self-harm, and her repeated requests for castration.

These symptoms are not indicative of Transvestic Fetishism, which is limited to cross-dressing only. Similarly, Ellaborn's evaluation also rules out Transvestic Fetishism, noting that Battista does not experience sexual arousal in relation to her cross-dressing or cross-gender identification.

The diagnosis of Gender Identity Disorder is described in the DSM-IV as follows:

> A. A strong and persistent cross-gender identification (not merely a desire for any perceived cultural advantages of being the other sex).
>
> In children, the disturbance is manifested by four (or more) of the following:
>
> > 1) repeatedly stated desire to be, or insistence that he or she is, the other sex
> > 2) in boys, preference for cross-dressing or simulating female attire;
> > 3) strong and persistent preferences for cross-sex roles in make-believe play or persistent fantasies of being the other sex
> > 4) intense desire to participate in the stereotypical games and pastimes of the other sex
> > 5) strong preference for playmates of the other sex

13

DOC 005564

Mar 07 08 08:00p     Randi Kaufman          (617)441-2100          p.15

In adolescents and adults, the disturbance is manifested by symptoms such as a stated desire to be the other sex, frequent passing as the other sex, desire to live or be treated as the other sex, or the conviction that he or she has the typical feelings and reactions of the other sex.

B. Persistent discomfort with his or her sex or sense of inappropriateness in the gender role of that sex.

In children, the disturbance is manifested by any of the following: in boys, assertion that his penis or testes are disgusting or will disappear or assertion that it would be better not to have a penis, or aversion toward rough-and-tumble play and rejection of male stereotypical toys, games, and activities ...

In adolescents and adults, the disturbance is manifested by symptoms such as preoccupation with getting rid of primary and secondary sex characteristics (e.g. request for hormones, surgery, or other procedures to physically alter sexual characteristics to simulate the other sex) or belief that he or she was born the wrong sex.

C. The disturbance is not concurrent with a physical intersex condition [when there is an intersex condition the diagnosis of GID NOS is given].

D. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Clearly, Battista's symptoms qualify her for the diagnosis of Gender Identity Disorder, NOS, not Transvestic Fetishism.

**Effects of isolation on psychopathology**

In this section Osborne raises the question of isolation as a possible contributing factor to Battista's cross-gender preoccupation. She notes that "incarcerated individuals do not have the same resources and role models available to them as non-incarcerated individuals do for resolving gender identity conflict". This is an important point. The lack of accessibility of resources to contend with gender dysphoria cause an inmate to have to rely on the system to provide the appropriate care. If that care is not forthcoming, the inmate has little recourse. This is often when suicidal feelings, gestures, and self-harm increase.

Osborne states that due to being incarcerated inmates likely do not know the extent to which "real world" individuals choose "adjustment" over "reassignment strategies". It is unclear what she means by "adjustment", but from our experience in working with many individuals with gender identity disorder, most people do not "adjust" without making some sort of change in their gender expression. Change can include things such as cross-dressing, facial and body hair removal, use of make-up, use of wigs, hormone therapy, and surgery. Gender dysphoria does not go away simply by participating in "treatment groups", community or online support groups, or having "varied choices for sex partners", as Osborne implies. While support groups are often extremely helpful to people with gender dysphoria, this support does not allow for people to "adjust" to their gender identity conflicts. Generally being able to hear the stories of others often

14

DOC 005565

helps reassure individuals that they are not the only one, that they are not "crazy" or a "freak", and that others have been able to find ways to alleviate their gender dysphoria, so they are able to have a more productive and fulfilling life. Often hearing other people's stories allows a transgender individual to feel more empowered to make the decisions that they feel are right for them. As far as being able to access information about options in the "real world" regarding treatment for GID, a plethora of information is available on the Internet. There are countless web pages on transgender issues. There is also a transgender newsletter for inmates, which is read by several of the inmates we have met with. In this day and age, access to information outside of prison is hardly a concern.

Osborne suggests that having access to "varied choices for sex partners" is important in formulating a treatment plan for GID, and that this access is not possible in prison. This shows confusion in understanding the difference between gender identity and sexual orientation. Gender identity refers to the feeling that one is a female, or a male. Sexual orientation refers to the sex that one is attracted to. Having a varied choice of sex partners has no relevance to the treatment of GID. Many people with GID are unable, uninterested, or unwilling to have sex. Their bodies can feel so wrong that they are not able to find pleasure from them in the ways that non-dysphoric people do. It is not uncommon, when a person with GID is able to be sexual, that this is dependent upon the person fantasizing that they have the body of the sex they feel they are. This is true for Battista, and is noted in our evaluation on p. 4.

Osborne states that individuals in the "real world" may not be able to access feminizing options to help contend with their gender dysphoria, raising constraints such as cost and lack of assistance by health insurance. She makes the point that those who cannot afford the interventions they desire "settle" for "imperfect options", such as choosing to live "between the traditional sexes as true he/shes". This statement suggests that treatment is that easy; that one can simply decide to "settle" with the options they have. This is far from the case. When we see individuals in our practice who are not able to access necessary medical treatment for GID, we often see an increase in other mental health disorders, such as depression, anxiety, suicidality, self-harm and substance abuse. The work then needs to turn to helping them come to grips with their inability to make change in the ways that they feel they need. These situations are very sad, and difficult to sit with.

Some patients are so desperate that they resort to unhealthy ways of trying to address their gender dysphoria. One very common thing that people do is to get hormones on the black market or through the Internet. They take them on their own, deciding upon their own doses, and without being medically monitored. This means they do not know whether the hormones are in fact what they are purported to be, and they do not know how this illegal substance will affect their health. When hormones are taken in this unhealthy, illegal manner, the person is subject to a variety of adverse reactions, that will depend on what substances they are taking. In cases where the substance is actually hormones, there is no one to monitor their liver function, or to check the levels of the hormones, to make sure they are in the appropriate range. Side effects of female hormones can include blood clots, hypertension, cardiovascular disease, hyperlipidemia, hypercalcemia, gallbladder disease, GI upset, and pituitary adenoma (tumor).

15

DOC 005566

In addition, when hormones are procured on the black market it is common for people to inject them, believing this will provide a greater effect from a more concentrated product. In these scenarios the individual relies on the black market provider for needles, which may not be clean. This increases the risk of HIV and Hepatitis C.

When individuals are not able to afford facial feminization surgery it is not uncommon for them to procure silicone injections on the black market to try to feminize their appearance. The injections are almost always given by people who are not medical providers. Like taking hormones procured illegally, there is no way to know whether silicone injections are actually silicone. It is not uncommon for people to be taking some other, unknown substance, which may cause any number of health issues, and may not provide the desired effects. Similarly, silicone injections given by non-medical providers can include using dirty needles, increasing the risk of HIV and Hepatitis C.

At an illegal "silicone party" last year two of five transgender individuals who were injected by a non-medical provider had trouble breathing and needed to be put on life support, according to San Diego police. One of the women died shortly thereafter. The article notes that:

> "the two victims were told they were being injected with silicone. But the only person who knows for sure what was being injected is the person who gave the shots. There have been reports of people being injected with brake fluid diluted to fit through a syringe. Other reports describe the use of silicon-based caulking, which is normally used to seal cracks around plumbing fixtures" (NBC 4 website, 2005).

A recent article from the New York Times (January 26, 2006) entitled "Injecting Silicone, and Risk", discusses the impact of silicone procured legally through plastic surgeons. The article
emphasizes that even in the hands of a medical professional, silicone carries great risks:

> "The small percentage of people who have reactions look so bad that it makes using silicone not worth the risk," he said. "If, God forbid, silicone becomes widespread and every doctor starts injecting it, it will become a disaster."

> "Silicone is a time bomb," said Dr. Marvin J. Rapaport, a dermatologist in Beverly Hills, Calif., who has collected case reports on 80 patients who have had side effects from silicone shots since 1974. One of these patients had 50 inflamed nodules at injection sites on her face, and she needed injections of steroids several times a year to reduce the swelling, he said. "Delayed reactions to silicone can happen 1 to 25 years after treatment," he said. "You can't predict who is going to react or when."

Clearly, these health risks can be very dangerous. The fact that individuals would take such risks in order to address their gender dysphoria shows their desperation to make their bodies feel right.

While it may seem unfair that there are situations where inmates receive medical treatment that non-inmates cannot, this is actually the basic state of things in our

16

DOC 005567

current health system. Many non-incarcerated individuals are not able to receive various necessary medical treatments, due to lack of funds, lack of medical insurance, or other reasons. However, the prison system would not deny medical help to inmates that require it, because there are non-incarcerated individuals who cannot afford care.

### The Harry Benjamin International Gender Dysphoria Association Standards of Care

In this section Osborne attacks the use of the Standards of Care in making treatment recommendations for Battista. She suggests both that we do not apply the Standards as a "flexible treatment guideline", and that the standards are not applicable to inmates. This makes it unclear whether her concern is that we did not flex the guidelines, or whether they are not applicable at all to inmates.

Furthermore, Osborne states that the Harry Benjamin Association is a "collegial organization, not a regulatory body with any formal authority". She states that there is a wide range of disagreement in the psychiatric community about what constitutes appropriate care in the treatment of GID. However, Osborne does not cite the literature, or her sources of information providing evidence for "disagreement" in the community.

The Harry Benjamin Standards of Care were first written in 1979 by Harry Benjamin, a pioneering endocrinologist who worked in the 1950's with a large number of people who had gender dysphoria. Because there were no standards of care at that point in time, Benjamin developed his own. This original document grew into the Standards of Care that are used today. The Standards have been changed and updated six times by a special committee of the Harry Benjamin Association. These changes were made to reflect the growing body of knowledge in theory and clinical practice. It is likely that the Standards of Care will continue to change over time.

The Harry Benjamin International Gender Dysphoria Association (HBIGDA) is an international, interdisciplinary, professional organization, whose mission is to:

> "further the understanding and treatment of gender identity disorders by professionals in medicine, psychology, law, social work, counseling, psychotherapy, family studies, sociology, anthropology, and sexology. It provides opportunities for professionals from various subspecialties to communicate with each other in the context of research and treatment of gender dysphoria including sponsoring biennial scientific symposiums. HBIGDA publishes the Standards of Care and Ethical Guidelines, which articulate a professional consensus about the psychiatric, psychological, medical, and surgical management of gender identity disorders, and help professionals understand the parameters within which they may offer assistance to those with these conditions".

In addition to the Standards of Care committee and biennial conferences, the HBIGDA includes committees on: ethics, intersex issues, legal issues, children and adolescents, and transgender medicine (research discussion, sexually transmitted diseases and blood born diseases). HBIGDA publishes the International Journal of Transgenderism, the first-ever peer-reviewed journal on transgender issues. To become a member of the Harry Benjamin International

17

Gender Dysphoria Association (HBIGDA) one cannot simply join; one must apply and be accepted. The application includes showing that one has a certain level of training in issues relevant to the treatment of gender identity disorder.

Despite Osborne's claim that HBIGDA is "not a regulatory body with any formal authority", the organization is widely accepted as the standard of care in the field of gender identity. When put into the search engine Google 32,300 references show up for HBIGDA. Most gender clinics around the world use the HBIGDA Standards of Care as their model for treatment. Even when clinics create their own protocol, it is often modeled after the Standards of Care (as is the case at Fenway Community Health).

HBIGDA's Standards of Care specifically include a statement regarding the care for transgender inmates:

> "Persons who are receiving treatment for gender identity disorders should continue to receive appropriate treatment following these Standards of Care after incarceration. For example, those who are receiving psychotherapy and/or cross-sex hormonal treatments should be allowed to continue this medically necessary treatment to prevent or limit emotional lability, undesired regression of hormonally-induced physical effects and the sense of desperation that may lead to depression, anxiety and suicidality. Prisoners who are subject to rapid withdrawal of cross-sex hormones are particularly at risk for psychiatric symptoms and self-injurious behaviors. Medical monitoring of hormonal treatment as described in these Standards should also be provided. Housing for transgendered prisoners should take into account their transition status and their personal safety".

This would seem to contradict Osborne's contention that the standards are not applicable to inmates. Osborne states that there are "inherent contradictions" in adapting the Benjamin Standards of Care to the prison environment. She points out that the Standards call for "some progress in mastering other identified problems leading to improving or continuing stable mental health (this implies satisfactory control of problems such as sociopathy, substance abuse, psychosis, and suicidality". Osborne raises the questions: "In a criminal context, is anything less than full control satisfactory?" and "How does a clinician judge, with a reliable degree of certainty, that an incarcerated individual has gained control of his sociopathy when he is in a confined environment that is fundamentally structure to externally control individuals who are deemed incapable of doing so for themselves?"

Here again it seems that Osborne is confusing behavior with character structure. While someone may qualify for a diagnosis that reflects sociopathy as a structure of her character, this is not a predictor of behavior, nor an assessment of her current mental stability. Character structure is also not an indicator of one's psychological readiness to begin gender transition. Keeping Battista's criminality under satisfactory control is part of the reason she is in prison. In the prison environment she does not have access to minors, so that she cannot continue to offend.

Osborne goes on to say that "criminality and sociopathy are, without exception, contraindications for hormones or surgery...." and that "*In my opinion* (italics

18

DOC 005569

In addition, when hormones are procured on the black market it is common for people to inject them, believing this will provide a greater effect from a more concentrated product. In these scenarios the individual relies on the black market provider for needles, which may not be clean. This increases the risk of HIV and Hepatitis C.

When individuals are not able to afford facial feminization surgery it is not uncommon for them to procure silicone injections on the black market to try to feminize their appearance. The injections are almost always given by people who are not medical providers. Like taking hormones procured illegally, there is no way to know whether silicone injections are actually silicone. It is not uncommon for people to be taking some other, unknown substance, which may cause any number of health issues, and may not provide the desired effects. Similarly, silicone injections given by non-medical providers can include using dirty needles, increasing the risk of HIV and Hepatitis C.

At an illegal "silicone party" last year two of five transgender individuals who were injected by a non-medical provider had trouble breathing and needed to be put on life support, according to San Diego police. One of the women died shortly thereafter. The article notes that:

> "the two victims were told they were being injected with silicone. But the only person who knows for sure what was being injected is the person who gave the shots. There have been reports of people being injected with brake fluid diluted to fit through a syringe. Other reports describe the use of silicon-based caulking, which is normally used to seal cracks around plumbing fixtures" (NBC 4 website, 2005).

A recent article from the New York Times (January 26, 2006) entitled "Injecting Silicone, and Risk", discusses the impact of silicone procured legally through plastic surgeons. The article
emphasizes that even in the hands of a medical professional, silicone carries great risks:

> "The small percentage of people who have reactions look so bad that it makes using silicone not worth the risk," he said. "If, God forbid, silicone becomes widespread and every doctor starts injecting it, it will become a disaster."

> "Silicone is a time bomb," said Dr. Marvin J. Rapaport, a dermatologist in Beverly Hills, Calif., who has collected case reports on 80 patients who have had side effects from silicone shots since 1974. One of these patients had 50 inflamed nodules at injection sites on her face, and she needed injections of steroids several times a year to reduce the swelling, he said. "Delayed reactions to silicone can happen 1 to 25 years after treatment," he said. "You can't predict who is going to react or when."

Clearly, these health risks can be very dangerous. The fact that individuals would take such risks in order to address their gender dysphoria shows their desperation to make their bodies feel right.

While it may seem unfair that there are situations where inmates receive medical treatment that non-inmates cannot, this is actually the basic state of things in our

16

DOC 005570

ours) prescribing hormones to incarcerated individuals reflects, rather than compliance with the existing SOC, an explicit violation". However, there is nothing in the HBIGDA Standards of Care that says inmates should not receive treatment because they are sociopathic, or have criminal backgrounds. It is interesting to note the juxtaposition of Osborne discrediting the Benjamin Standards of Care, in favor of her "opinion", which does not appear to be clinically grounded. It is also interesting that despite Battista's past behavior, the testing report done by Tyler Carpenter, PhD, noted that Battista "is well below the diagnostic cutoff for psychopathy" (p. 13).

It is true that Battista has had a difficult adjustment to prison. In the Community Access Board Annual Review in April 2004 it is noted that she has about 68 disciplinary reports, but that many of these "are due to his appearance, either because cross-dressing is against policy or due to his getting into fights with other inmates because of his cross-dressing".

Social and surgical reassignment is reported to be the *only* treatment found to be effective (Gallarda et al., 1997). Recently a male-to-female psychiatrist (Anonymous, 2004) wrote about her experience in making several unsuccessful attempts to resolve her gender dysphoria. Her dysphoria was only resolved when she underwent sex reassignment surgery. In looking at her other mental health issues, Battista's gender dysphoria is paramount. The other diagnoses she carries either stem from, or are related to, her gender identity disorder. Her disordered eating, her depressive symptoms, and preoccupation with her body are all related to her gender dysphoria. These symptoms will likely not improve *until and unless* her gender identity issues are treated.

<u>Conclusion</u>

In conclusion, we -- Kaufman & Kapila -- continue to recommend hormone therapy for Sandy Jo Battista. We appreciate the seriousness inherent in making such a recommendation, and we make this recommendation only after considering other possible treatment options.

Osborne's numerous challenges to our recommendation for hormone therapy have now been shown to be either clinically unfounded, or irrelevant. Other than one or two citations, she does not use the literature to ground her opinions in clinical and research data. It should again be noted that Osborne never met with the inmate. Rather, she based her challenges to our treatment recommendation on a review of Battista's chart, without meeting and evaluating Battista. Osborne admitted to the inappropriateness for her to diagnose Battista, so it is unclear why she does not appear to see the inappropriateness for her to form clinical judgments and treatment recommendations.

Hormone therapy and gender transition is a difficult situation in prison. Because inmates are housed according to sex, transitioning one's gender will likely bring up issues of housing and safety. While we can sympathize with the inherent complexities of such a situation, it remains true that hormone therapy and sex reassignment surgery are the only clinical treatments found to be effective for GID.

Battista has been unwavering in her wish for hormone therapy and castration, and has been working actively for almost 10 years to achieve this. There is no

19

DOC 005571

evidence that she might change her mind. Given her continued psychological distress, including increased distress and further self-harm after hormones were recommended, but not implemented, it is again recommended that hormone therapy begin. After Battista is on hormones for a year she should be re-evaluated to determine whether surgery would be appropriate. Consideration for her safety should be paramount.

Randi Kaufman, PsyD            3/7/06
                               Date

Kevin Kapila, MD               3/7/06
                               Date

20

References

Alao, A., Yolles, J. C., Huslander, W. (1999). Female Genital Self-Mutilation. Psychiatric Services, 50 (7): 971.

Anonymous, (2004). The Psychoanalytic Treatment of Gender Dysphoria: A Personal Reflection. Journal of Gay & Lesbian Psychotherapy, 8 (1-2): 19-24.

Aude, M., Ansseau, M., Legros, J. J., Pitchot, W. & Mormont, C. (2002). The Transsexual: What about the Future? European Psychiatry, 17 (6): 353-362.

Babiker, G. & Arnold, L. (1997). The Language of Injury. United Kingdom: Blackwell Publishing.

Bhatia, M. S., & Arora, S. (2001). Penile self-mutilation. The British Journal of Psychiatry, 178: 86-87.

Bockting, W.O., & Robinson, B.E. (2005). Transgender HIV prevention: a qualitative needs assessment. AIDS Care, 10 (4): 505-25.

Bodlund O., & Kullgren G. (1996). Transsexualism -- general outcome and prognostic factors: a five-year follow-up study of nineteen transsexuals in the process of changing sex. Archives of Sexual Behavior, 25(3): 303-16.

Brodsky, B. S , Cloitre, M. & Dulit, R. A. (1995). Relationship of dissociation to self-mutilation and childhood abuse in borderline personality disorder. The American Journal of Psychiatry, 152 (12): 1788-92.

Burgess, C. (1999). Internal and external stress factors associated with the identity development of transgender youth. Journal of Gay and Lesbian Social Services, 10 (3/4): 35-47.

Clements-Nolle, K., Marx, R., Guzman, R., & Katz, M. (2001). HIV prevalence, risk behaviors, health care use, and mental health status of transgender persons: implications for public health intervention. American Journal of Public Health, 91 (6): 915-21.

Denny, D. (1995). Transgendered Youth at Risk for Exploitation, HIV, Hate Crimes. American Educational Gender Information Service, Inc. http://www.aidsinfonyc.org/Q-zone/youth.html

Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition. (1994). Washington, DC: American Psychiatric Association.

Dulit, R. A., Fyer, M. R., Leon, A.C., Brodsky, B.S., & Frances, A.J. (1994). Clinical correlates of self-mutilation in borderline personality disorder. The American Journal of Psychiatry, 151 (9): 1305-11.

Dubo, E. D., Zanarini, M. C., Lewis, R. E., & Williams, A.A. (1997). Childhood antecedents of self-destructiveness in borderline personality disorder. Canadian Journal of Psychiatry, 42 (1): 63-9.

21

DOC 005573

Eicher, W., Spoljar, M., Richter, K., Cleve, H., Murken, J. D., Stengel-Rutkowski, S., & Steindl, E. (1980). Transexuality and X-Y antigen (abstract), Geburtshilfe Frauenheilkd, 40 (6): 529-40.

Favazza, A. R., (1998). The coming of age of self-mutilation. The Journal of Nervous and Mental Disorders, 186 (5): 259-68.

Favazza, A. R., DeRosear, L., & Conterio, K. (1989). Self-mutilation and eating disorders. Suicide and Life-Threatening Behavior, 19 (4): 352-61.

Fitzpatrick, K.K., Euton, S.J., Jones, J.N., & Schmidt, N.B. (2005). Journal of Affective Disorders,
87(1): 35-42.

Fowler, J. C., Hilsenroth, M. J., & Nolan, E. (2000). Exploring the inner world of self-mutilating borderline patients: a Rorschach investigation. Bulletin of the Menninger Clinic, 64 (3): 365-85.

Gallarda, T., Amado, I., Coussinoux, S., Poirier, M. F., Cordier, B., & Olie, J. P. (1997). The Transsexualism Syndrome: clinical aspects and therapeutic prospects. Encephale, 23 (5): 321-6.

Gardner, F. (2001). Self-Harm. New York: Brunner-Routledge.

Goodman, M., & New, A. (2000). Impulsive aggression in borderline personality disorder. Current Psychiatry Reports, 2 (1): 56-61.

Greenberg, R. P, & Laurence, L. (1981). A comparison of the MMPI results for psychiatric patients and male applicants for transsexual surgery. The Journal of Nervous and Mental Disease, 169 (5): 320-3.

Greilsheimer, H., & Groves, J. E. (1979). Male genital self-mutilation. Archives of General Psychiatry, 36 (4): 441-6.

Gunderson, J. G. (2001). Borderline Personality Disorder: A Clinical Guide. Washington, DC: American Psychiatric Press

Gunderson, J. G., & Ridolfi, M. E. (2001). Borderline Personality Disorder Suicidality and Self-Mutilation. Annals of the New York Academy of Sciences, 932: 61-77.

Haberman, M. A., & Michael, R. P. (1979). Autocastration in transsexualism. The American Journal of Psychiatry, 136 (3): 347-348.

Harry Benjamin International Gender Dysphoria Association. (2001). Standards of Care for Gender Identity Disorders, Sixth Version. www.hbigda.org

Hines, M. (2003). Sex Steroids and Human Behavior: Prenatal Androgen Exposure and Sex-Typical Play Behavior in Children. Annals of the New York Academy of Sciences. 1007: 272–282.

DOC 005574

Hunt, D. D., & Hampson, J. L. (1980). Follow-up of 17 biologic male transsexuals after sex-reassignment surgery. The American Journal of Psychiatry, 137: 432-438.

Joyce, P. R., Mulder, R. T., Luty, S. E., McKenzie, J. M., Sullivan, P. F. (2003). Borderline personality disorder in major depression: symptomatology, temperament, character, differential drug response, and 6-month outcome. Comprehensive Psychiatry, 44 (1): 35-43.

Kenagy, G. P. (2005). Transgender Health: findings from two needs assessment studies in Philadelphia. Health and Social Work, 30 (1): 19-26.

King, V. L, & Stuntz, R.C. (1997). Gender Dysphoria and Dyssocial Behavior. In L. B. Schlesinger, & E. Revitch, (Eds.), Sexual Dynamics of Anti-Social Behavior (pp. 88-112). Springfield, IL: Charles C. Thomas.

Kreiss, J.L., Patterson, D.L. (1997). Psychosocial issues in primary care of lesbian, gay, bisexual, and transgender youth. Journal of Pediatric Health Care, 11(6): 266-74.

Krieger, M. J., McAninch, J. W., & Weimer, S. R. (1982). Self-performed bilateral orchiectomy in transsexuals. Journal of Clinical Psychiatry, 43 (7): 292-3.

Linehan, M. M., Armstrong, H. E., Suarez, A., Allmon, D. & Heard, H. L. (1991). Cognitive-behavioral treatment of chronically parasuicidal borderline patients. Archives of General Psychiatry, 48 (12): 1060-4.

Linehan, M. M., Heard, H. L. & Armstrong, H. E. (1993). Naturalistic follow-up of a behavioral treatment for chronically parasuicidal borderline patients. Archives of General Psychiatry, 50 (12): 971-4.

Linehan, M. M., Tutek, D. A., Heard, H. L., & Armstrong, H. E. (1994). Interpersonal outcome of cognitive behavioral treatment for chronically suicidal borderline patients. The American Journal of Psychiatry, 151: 1771-1776.

Lothstein, L. M. Psychological testing with transsexuals: a 30-year review. (1984). Journal of Personality Assessment, 48(5): 500-7.

Martell, C. R., Botzer, M., & Williams, M. (2004). Gay, Lesbian, Transgender, and Bisexual Individuals. In Strode, A. D., (Ed.), Mental Health Best Practices for Vulnerable Populations (pp. 58-75). Handbook, Washington State Department of Social and Health Services, Mental Health Division.

Master, V., & Santucci, R. (2003). An American hijra: a report of a case of genital self-mutilation to become India's "third sex". Urology, 62 (6): 1121.

Mathy, R. M. (2002). Transgender identity and suicidality in a nonclinical sample: sexual orientation, psychiatric history, and compulsive behaviors. Journal of Psychology and Human Sexuality, 14 (4): 47-65.

McKay, D., Gavigan, C. A., & Kulchycky, S. (2004). Social skills and sex-role functioning in borderline personality disorder: relationship to self-mutilating behavior. Cognitive Behavioral Therapy, 33 (1): 27-35.

23

DOC 005575

McKay, D., Kulchycky, S., & Danyo, S. (2000). Borderline personality and obsessive-compulsive symptoms. Journal of Personality Disorders, 14(1): 57-63.

Meyer W., Bockting, W., Cohen-Kettenis, P., Coleman, E., DiCeglie, D., Devor, H., Gooren, L., Joris Hage, J., Kirk, S., Kuiper, B., Laub, D., Lawrence, A., Menard, Y., Patton, J., Schaefer, L., Webb, A., Wheeler, C. (February 2001). The Standards Of Care For Gender Identity Disorders, Sixth Version. Int J. Transgenderism, 5 (1). http://www.symposion.com/ijt/soc_01/index.htm

Michel, A., & Mormont, C. (2002). Was Snow White a Transsexual? Encephale, 28 (1): 59-64.

Money, J. & Gaskin, R. (1970-1971). Sex reassignment. International Journal of Psychiatry, 9: 249-69.

Morrow, D. (2004). Social Work Practice with Gay, Lesbian, Bisexual and Transgender Adolescents. Families in Society, 85 (1), 91-99.

Murphy, D., Murphy, M., & Grainger, R. (2001). Self-castration. Irish Journal of Medical Science, 170 (3): 195.

NBC 4 – 4 Your Health. (2005, July 11). Transgender Woman Injected At 'Silicone Party' Dies
http://www.nbc4.tv/health/4708246/detail.html?rss=la&psp=news

Osborne, C. & Wise, T. N. (2002). Split-gender identity: Problem or solution? Proposed parameters for addressing the gender dysphoric patient. Journal of Sex and Marital Therapy, 28: 165-173.

Paris, J. (2004). Half in Love with Easeful Death: The Meaning of Chronic Suicidality in Borderline Personality Disorder. Harvard Review of Psychiatry, 12 (1): 42-48

Paris, J. (2005). Understanding self-mutilation in borderline personality disorder. Harvard Review of Psychiatry, 13(3): 179-85.

Parry-Jones, B., & Parry-Jones, W. L. (1993). Self-mutilation in Four Historical Cases of Bulimia. The British Journal of Psychiatry, 163: 394-402 .

Paul, T., Schroeter, K., Dahme, B., & Nutzinger, D. O. (2002). Self-Injurious Behavior in Women With Eating Disorders. The American Journal of Psychiatry, 159: 408-411.

Pfafflin, F., & Junge, A. (1992). Sex Reassignment: Thirty Years of International Follow-Up Studies after SRS: A Comprehensive Review, 1961-1991. (Translated from German into American English by Roberta B. Jacobson and Alf B. Meier); IJT Electronic Books, on-line available at
http://www.symposion.com/ijt/pfaefflin/1000.htm

Rakic, Z., Starcevic, V., Maric, J., & Kelin, K. (1996). The outcome of sex reassignment surgery in Belgrade: 32 patients of both sexes. Archives of Sexual Behavior, 25(5): 515-25.

24

DOC 005576

Rehman, J., Lazer, S., Benet, A. E., Schaefer, L. C. & Melman, A. (1999). The reported sex and surgery satisfactions of 28 postoperative male to female transsexual patients. Archives of Sexual Behavior, 28 (1): 71-89.

Ross, M. W., Need, J. A. (1989). Effects of adequacy of gender reassignment surgery on psychological adjustment: a follow-up of fourteen male-to-female patients. Archives of Sexual Behavior, 18(2): 145-153.

Sachsse, U., Von-der-Heyde, S., & Huether, G. (2002). Stress Regulation and self-mutilation. The American Journal of Psychiatry, 159 (4): 672.

Schinagle, M. (2002). Recurrent suicide attempts, self-mutilation, and binge/purge behavior: a case report. Harvard Review of Psychiatry, 10 (6): 353-63.

Simeon, D., Stanley, B., Frances, A., Mann, J. J., Winchel, R., & Stanley, M. (1992). Self-mutilation in personality disorders: psychological and biological correlates. American Journal of Psychiatry, 149: 221-226.

Singer, Natasha. (2006, January 26). Injecting Silicone, and Risk. New York Times.

Sirota, P., Megged, S., Stein, D., Benatov, R. (1994). Self-Castration. Harefuah, 126 (4): 186-8, 239, 240.

Snaith, P., Tarsh, M. J. & Reid, R. (1993). Sex reassignment surgery: a study of 141 Dutch transsexuals. The British Journal of Psychiatry, 162: 681-5.

Stanley, B., Gameroff, M. J., Michalsen, V., & Mann, J. J. (2001). Are Suicide Attempters Who Self-Mutilate a Unique Population? The American Journal of Psychiatry, 58: 427-432 .

Stein, M., Tiefer, L., Melman, A. (1990). Follow-up observations of operated male-to-female transsexuals. Journal of Urology, 143 (6): 1188-92.

Turell, S. C., & Armsworth, M. W. (2003). A log-linear analysis of variables associated with Self-mutilation behaviors of women with histories of child sexual abuse. Violence Against Women, 9 (4): 487-512 .

van der Kolk, B. A., Hostetler, A., Herron, N., & Fisler, R. E. (1994). Trauma and the development of borderline personality disorder. The Psychiatric Clinics of North America, 17 (4): 715-30.

van Kammen, D. P., & Money, J. (1977). Journal of Homosexuality, 2 (4): 359-6.

Van Wormer, K., & McKinney, R. (2003). What schools can do to help gay, lesbian, and bisexual youth: a harm reduction approach. Adolescence, 38 (151): 409-20.

Wylie, K. R. (2000). Suction to the breasts of a transsexual male. Journal of Sex and Marital Therapy, 26 (4): 353-6.

25

DOC 005577

Xavier, J., Hitchcock, D., Hollinshead, S., Keisling, M., Lewis, Y., Lombardi, E.
Lurie, S. Sanchez, D., Singer, B., Moonhawk River Stone, & Williams, B. (2004).
An Overview of U.S. Trans Health Priorities: A Report by the Eliminating
Disparities Working Group. National Coalition for LGBT Health, August 2004.

Zlotnick, C., Rothschild, L., & Zimmerman, M. (2002). The role of gender in the
clinical presentation of patients with borderline personality disorder. Journal of
Personality Disorders, 16 (3): 277-82.

26

DOC 005578

# EXHIBIT Q



University of
Massachusetts
**UMASS.** Medical School

UMass Correctional Health
University of Massachusetts Medical School
One Research Drive, Suite 120C
Westborough, MA 01581-3922 USA
508.475.3220 (office)   508.475.3270 (fax)

*A Program of Commonwealth Medicine*

September 1, 2005

Peter Heffernan
Acting Director
Health Services Division
Department of Correction
15 Administration Road
Bridgewater, Massachusetts 02324

Re: Patients with Gender Identity Disorder

Dear Mr. Heffernan:

We are writing in response to the letters that you have sent to us regarding treatment recommendations for inmates ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ M15930, and ▮▮▮▮▮▮ and to document our prior discussions with you and/or your colleagues at DOC in that regard.

As a preliminary matter, we note that over the past several years we have shared with DOC the unique challenges posed by providing treatment to inmates with Gender Identity Disorder ("GID"). From our contact with multiple experts, involvement in legal proceedings and discussions with DOC staff, it seems that we have been pioneering new territory with the implementation of treatment recommendations for GID patients in prison. The issues we have confronted along the way have been difficult to resolve and we share some of your frustration with the lack of an easy answer to this complex problem. Nevertheless, we think it is time for DOC to make a decision with regard to the approval of the treatment recommendations that have been made regarding the above referenced patients.

As you know, each of these patients has been diagnosed with GID by Kevin Kapila, M.D. and Randi Kaufman, PsyD from Fenway Community Health. Dr. Kapila and Dr. Kaufman have supplied us with written reports regarding their evaluations and treatment recommendations for these patients and we have forwarded them to DOC for approval and implementation. Each of those reports confirms the diagnosis of GID and identifies the Harry Benjamin Standards of Care ("Benjamin Standards") as internationally recognized guidelines for the treatment of GID. The reports also provide specific treatment recommendations for each patient. However, the treatment recommendations have not yet been implemented because we continue to wait for approval by DOC.

We recently met with Dr. Kapila and Dr. Kaufman to discuss the concerns that you have raised about the "medical necessity" of their treatment recommendations and your perception that the recommendations may not be detailed enough. Dr. Kapila and Dr. Kaufman have again emphasized that GID patients do often experience emotional distress from being the "wrong" gender. As a result, they believe that any GID patient should be afforded ongoing psychotherapy, as well as the opportunity to undergo any obvious feminizing procedure short of sexual reassignment surgery, such as hormone therapy, hair removal from the face and chest and laryngeal shave, to attempt to alleviate any ongoing distress that they may experience from GID. They have unequivocally stated that such treatment is "medically necessary" in their view because it is well-established that such treatment is often the only way to alleviate the distress caused by GID.

Dr. Kapila and Dr. Kaufman have also informed us that after a patient has been diagnosed with GID, such treatment does not require an independent evaluation by them or any other expert in the field of GID to demonstrate medical necessity, although a request for sexual reassignment surgery would require such an evaluation. Rather, psychotherapy and any obvious feminizing procedure should be discussed with, and made available to, any GID patient who expresses a desire to undergo any such procedure due to continued distress from their gender dysphoria. The patient's psychotherapist and medical provider would be responsible for providing the patient with appropriate information regarding such procedures and in obtaining appropriate informed consent.

In addition Dr. Kapila and Dr. Kaufman have informed us that they are still working on a detailed written response to the report by Cynthia Osborne, but their opinion regarding inmate ███████ has not altered.

As you know, we must now obtain DOC approval for any GID treatment that would alter a patient's treatment plan. We have requested that approval with regard to the above referenced patients quite a while ago and continue to wait for that approval. Your multiple requests for further detailed information regarding the specific treatment recommendations for these individuals seem to ignore our many discussions regarding this topic. Moreover, those requests appear contrary to the procedure DOC has requested we follow for handling the treatment of these patients, as outlined in the Addendum To The Contract Between The Department Of Correction And The University Massachusetts Medical School. Even under the Addendum, once a request for certain treatment of GID has been forwarded to DOC to review any "safety or security concerns that may be posed" we are supposed to receive a response from DOC regarding the approval or rejection of the recommendations. Rather than provide us with a response approving or denying the treatment recommendations for these patients, you have sent us letters requesting further details, which we believe have already been explained to you, without approving or denying the specific treatment recommended.

Based upon our prior discussions and correspondence, DOC should be aware of our position regarding the "medical necessity or clinical appropriateness" of the recommendations we have received from the Fenway evaluators. Nevertheless, we

restate it here as clearly and concisely as we can. It is our understanding that the Benjamin Standards provide the most widely-accepted guideline presently available to clinicians for treating GID. We are aware of no medical or mental health basis upon which to question the diagnosis of GID that Dr. Kapila and Dr. Kaufman have rendered for each of the patients identified above and we consider them to have considerable expertise in this field. The recommendations we have received from Dr. Kapila and Dr. Kaufman with regard to each of these patients appear to be reasonable and appropriate and, in our view, there is no medical or mental health reason of which we are aware to warrant the delay of such treatment. To the contrary, relying upon Dr. Kapila and Dr. Kaufman, we have endorsed each treatment plan and have forwarded all of them to you for your review and approval.

From what we have been told by Dr. Kapila and Dr. Kaufman, it is our understanding that further delay in providing the recommended treatment likely will result in continued or increased levels of distress for each afflicted individual, with the possibility of self-inflicted injury. To that extent, we also view the treatment recommendations as medically necessary. As a result, we respectfully request that you provide us with a response regarding the treatment recommendations for each of these patients without further delay.

We look forward to continuing to work with you and would be pleased to meet with you at any time to discuss the medical and/or mental health treatment of these challenging patients.

Very truly yours,

Kenneth L. Appelbaum
Director, Mental Health Program

Arthur Brewer, MD
Medical Director

cc:    Kathleen Dennehy, Commissioner
       Veronica Madden, Associate Commissioner
       Patti Onorato, Executive Director, UMass Correctional Health
       Thomas Manning, Vice Chancellor
       Patricia O'Day, Assistant Vice Chancellor
       Stephen O'Shea, Esq.
       Tim Slowick

# EXHIBIT R



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*50 Maple Street, Suite 3*
*Milford, Massachusetts 01757-3698*
*(508) 422-3301*
*www.mass.gov/doc*

**Mitt Romney**
*Governor*

**Kerry Healey**
*Lieutenant Governor*

**Robert C. Haas**
*Secretary*

**Kathleen M. Dennehy**
*Commissioner*

**James R. Bender**
*Deputy Commissioner*

**Veronica M. Madden, Esq.**
*Associate Commissioner*
*Reentry & Reintegration*

April 3, 2006

Patti Onorato, Executive Director
University of Massachusetts Medical School
Health and Criminal Justice Program
One Research Drive, Suite 120C
Westborough, Ma. 01581

Dear Ms Onorato: *Patti*

I am writing to request another meeting be scheduled to discuss the recommendations for treatment on those inmates diagnosed with Gender Identity Disorder. We had, what I considered to be a very productive meeting on December 21, 2005, and I was under the impression that we had reached an understanding regarding the Department of Correction's need for very specific recommendations for treatment for each inmate diagnosed with GID. You may recall that we expressed concern that what we were receiving were in many cases, very general and non-specific recommendations that referenced the diagnosis and the need to follow the Harry Benjamin standard of care and treatment.

We discussed, and I thought agreed upon, the need for specific recommendations on each inmate regarding which of the Benjamin treatments were being recommended based upon the individual assessment of the inmate, any clinical contraindications and the cooperation of the inmate. UMASS clinical staff, as the medical provider, was to take the report of the outside consultant, as is customary in all outside consultations, and make specific and detailed recommendations that was to include the specific nature and amount of feminine products and clothing, mental health treatment, prescription medication, hair removal, other cosmetic procedures such as tracheal shave and other surgery. We have provided some suggested forms to use to present these recommendations upon which the Superintendent and Commissioner may make critical security reviews.

Thus far, despite the lapse of time since that meeting, we have not seen the development of any individualized treatment plans for those inmates diagnosed with Gender Identity Disorder (GID). It is difficult to understand why we have not received even one set of recommendations since our meeting, it simply cannot take that long to review the consultation, review the medical record,

Printed on Recycled Paper

P.Onorato, UMMS
April 3, 2006
Page 2 of 2

meet with the inmate and formulate a recommended course of treatment. If we cannot obtain these necessary detailed recommendations, as we had agreed upon, I would ask that we meet and that you come to this meeting prepared to discuss each inmate's specific and individualized treatment needs, so that in that meeting we can complete a clinical treatment plan that can be presented to the Superintendent and Commissioner for security review to allow us to move forward on these cases.

As the contractual medical and mental health provider, it is your role and responsibility to assess the clinical appropriateness and medical necessity of an outside consultant's evaluation, and develop specific treatment recommendations. Again, I will restate, that the Superintendents of the institutions where these inmates reside, as well as Commissioner Dennehy, are in no position to make medical decisions by interpreting the broad recommendation set forth in the Fenway Clinic evaluations, that each inmate diagnosed with GID should be afforded the Harry Benjamin Standards of Care.

Please inform me of your availability for a meeting at DOC Central Office on the mornings of either April 25, 2006 or April 27, 2006. I look forward to hearing from you soon.

Sincerely,

Veronica

Veronica M. Madden
Associate Commissioner, Reentry and Reintegration

cc. Peter J. Heffernan, Acting Director of Health Services
    Lawrence Weiner, LICSW, Regional Administrator

# EXHIBIT S

## GID TREATMENT RECOMMENDATION REQUEST FORM

NAME: Battista, SJ        COMMIT# M15930        INST: MTC

Dx: Axis I    GID
    Axis II    Pers D/O NOS
    Axis III    Congenital Adrenal Hyperplasia
    Axis IV    GID treatment issues, civil commitment
    Axis V    64

Specific treatment recommendation:
As per attached consultant report, including counseling, hormones, facial and chest hair removal, feminine clothing and canteen products.

Rationale for clinical appropriateness and medical necessity of recommendation:
See attachment A

Risks/Benefits of recommendation: See Attachment B.  Attempted self-castration in context of GID treatment delay.

Are there any medical or mental health contraindications? Explain:
The patient has no known absolute contraindications to treatment.  The risks and uncertainties noted in Attachment B represent potential contraindications for this patient.

Give a detailed explanation of what procedures, medications, treatments and restrictions the recommendation entails:
Endocrine consult and hormones, facial and chest hair removal, feminine clothing and canteen products.

Has the inmate been informed of the recommendation and given their informed consent?

YES ☑        NO ☐

Kenneth L. Appelbaum, M.D.    Date        Arthur Brewer, M.D.    Date
Director, Mental Health Program            Medical Director
UMass Correctional Health                UMass Correctional Health

Sandy Jo Battista: Attachment A: Rationale for clinical appropriateness and medical necessity of recommendation

The clinical indication and medical necessity are set forth in the attached Fenway report dated 11/16/04 and the Fenway response dated 3/7/06 to Cynthia Osborne's peer report review, both of which we provided to you with our endorsements immediately after we received them. We have consistently and repeatedly endorsed the report and recommendations since then both orally (e.g., during UMCH/DOC HSD meetings and/or quarterly facility health services meetings) and in writing (e.g., in the attached letter to Peter Heffernan, Acting Director of DOC HSD, dated September 1, 2005). As noted in the Fenway report, and as we have explained to you in the past, this patient has been diagnosed with Gender Identity Disorder (GID) and is seeking this treatment because of distress resulting from that condition.

Treatment delay or denial may result in continued or increased distress for this patient, which may increase the risk of self-inflicted injury, and, to that extent, the treatment recommendations are medically necessary. Otherwise, there is no known universal professional consensus on what constitutes medical necessity in the treatment of GID

## Attachment B: Risks/Benefits of recommendation

Clinical risks broadly include the following:

- misdiagnosis of Gender Identity Disorder (GID) resulting in unnecessary treatment;
- appropriate diagnosis of GID but misdiagnosis of co-morbid disorders that are contributing to the patient's stated desire for GID-related treatment or compromise the patient's readiness for GID treatment;
- appropriate diagnosis of GID and of co-morbid disorders but lack of treatment readiness resulting in treatment that the patient is not adequately prepared for;
- and appropriate diagnosis and treatment readiness but poor treatment outcome or subsequent dysphoria and dissatisfaction with treatment results.

Some treatment effects may be permanent and irreversible, which adds to the risks associated with misdiagnosis, lack of treatment readiness, poor treatment outcome, or dissatisfaction with treatment results.

Psychological risks include post-treatment regrets, increased distress and dysphoria, diminished psychological well-being, depression or other types of psychiatric decompensation, and increased risk of self-injury and suicide.

The medical risks associated with hormone therapy for this patient include the following: venous thromboembolytic disease, pulmonary embolism, myocardial infraction, stroke, and adverse liver effects.

The medical risks associated with laser hair removal for this patient include the following: pain during the procedure and skin tenderness or burning and stinging sensations, temporary redness in the treated area, temporary swelling in the treated area, pigmentary (light or dark) changes in the skin, in rare cases blistering may occur, superficial skin infection, allergic reaction to a product used on the treated skin, and persistence of hair.

Other non-clinical risks may also exist, including social stigma and isolation, security risks (e.g., risk of sexual assault or victimization), and dissatisfaction with classification into specialized housing units or new gender facilities necessitated by treatment-induced gender-related changes. Very little is known about gender reassignment treatment in correctional settings, which makes these risks difficult to predict or quantify.

Clinical benefits include relief or avoidance of distress, lasting personal comfort, improved psychological well-being, and diminished risk of self-inflicted injury.

DOC 005622

# EXHIBIT T

1

2          UNITED STATES DISTRICT COURT

3          DISTRICT OF MASSACHUSETTS

4

5    SANDY BATTISTA

6        Plaintiff

7    v.          C.A. No. 099620225

8    KATHLEEN DENNEHY, et al.

9        Defendants

10

11

12        - - - - - - - -

13        DEPOSITION OF TERRE K. MARSHALL

14          Friday, June 27, 2008

15           10:16 a.m.

16          McDermott Will & Emery

17           28 State Street

18          Boston, Massachusetts

19        - - - - - - - -

20

21        Reporter:  Deborah Roth, RPR/CSR

22

23

24

TERRE K. MARSHALL  6/27/2008  10:16:00 AM

193

1 originally. Exhibit No. 3
2    A  Yes
3    Q  It's the gender identity disorder
4 decision points
5       Can you look at this document and
6 tell me whether it accurately depicts the
7 process that Sandy Battista's treatment was
8 going through?
9    A  I really don't know. because it
10 happened — I mean. if the first -- if the top
11 elements happened. it has happened before my
12 time
13    Q  If you look at this document. can you
14 tell me where you would place Ms. Battista's
15 progress as of right now?
16    A  "The DOC house services sends
17 recommendation to assistant deputy
18 commissioner and superintendent." which would
19 be for the security review
20    Q  It would have been after the
21 recommendation reviewed by UMass medical
22 program director?
23    A  Yes
24    Q  Where does Osborne fit in here?

194

1    A  She would fit in where we say that the
2 "GID specialist conducts evaluation or issues
3 treatment recommendation "
4    Q  That's not Fenway?
5    A  Well. it would be Fenway. but it would
6 also be Cynthia Osborne  That's where she
7 would also fit
8       Because we question -- well. the
9 Fenway's evaluation was questioned  So that's
10 where Cynthia Osborne would also come into the
11 picture. where she did in the past
12    Q  Do you know who initially raised
13 questions about Fenway's recommendations and
14 treatment plan?
15    A  It was prior to my arrival; and at that
16 point. it seemed to be a consensus
17    Q  So do you know who would have been in
18 the position to raise concerns about Fenway's
19 recommendations prior to you -- who preceded
20 you?
21    A  Peter Heffernan. the deputy director of
22 health services. was the acting director of
23 health services for. I think. about a year
24    Q  And Susan Martin preceded him?

195

1    A  Yes
2    Q  You don't know whether it was Peter or
3 Susan who originally raised concerns about
4 Fenway's treatment recommendations?
5    A  No. I would only say. because of the
6 date of the Fenway initial evaluation. it
7 might have been Sue
8    Q  Do you know whether the Department of
9 Correction legal department would have been
10 involved in initially raising concerns about
11 Fenway's clinical recommendations?
12    A  No
13    Q  Would there be any reason that legal
14 would be involved?
15    A  No  Other than they were the contact
16 at that point to Cynthia Osborne because of
17 the other case
18    Q  What other case?
19    A  Kosilek
20    Q  Do you know Cynthia Osborne in any
21 other capacity?
22    A  No
23    Q  You said from 2006 on. when the
24 contract for the GID consultant was under

196

1 review. that sort of the GID patients were in
2 a holding pattern?
3    A  With regard to the initiation of
4 hormone therapy and beyond that
5    Q  Okay  So prior to this time. which was
6 what you said. June '06 --
7    A  I came in in May of '06
8    Q  Prior to that time. were they on hold?
9    A  I'm not sure I would say they are on
10 hold. but we were -- UMass was going back and
11 forth with Fenway about the contract  I think
12 the issues had been raised about the Fenway
13 reports  So all of that was ongoing at that
14 time
15    Q  Okay  But there wasn't an official
16 hold on initiating treatment?
17    A  No
18    Q  Were you aware that Ms. Battista was
19 written a prescription shortly after April
20 15th. 2005 for hormones?
21    A  Actually. I didn't realize that until
22 this week
23    Q  How does that affect your opinion on
24 whether or not the recommendation for hormones

197

1  was specific enough in 2005?
2      A  I think the recommendation for hormones
3  was specific enough
4      Q  In 2005?
5      A  Yes
6      Q  So prior to UMass's reiteration of it
7  in their October 17. 2006 letter?
8      A  Yes  Whenever Dr  Warth had seen the
9  patient
10     Q  But you indicated that there were sort
11  of two issues that you were dealing with: One
12  was that there was a question about the actual
13  GID diagnosis; and the other was there was a
14  question about the specificity of the
15  treatment plan recommended by Fenway. correct?
16     A  Yes  Although the Fenway issue I would
17  say was more than specificity
18     Q  Okay
19     A  It was --
20     Q  It was the one-size-fit-all type thing?
21     A  Yes
22     Q  I will consider that sort of
23  specificity. along with the specifics about
24  hormones and laser hair removal and canteen

198

1  items
2      You said that you pursued the
3  questions about the specificity in those
4  letters back and forth with UMass. but at the
5  same time there was this overarching question
6  with the actual GID diagnosis for
7  Ms  Battista?
8      A  Yes. in that case
9      Q  So I'm confused about why the DOC would
10  choose to write these letters and engage in
11  this extensive discussion with UMass over the
12  specifics of the treatment if they disagreed
13  with the diagnosis in the first place?  Why
14  would you get to the step about the specifics
15  of the treatment?
16     A  Again. I would say. I think it's erring
17  on the side of caution. that what would be the
18  next step were the diagnosis to be confirmed.
19  because the discussion with UMass about
20  specificity was not specific to this
21  individual case
22     Q  Okay
23     A  It appeared across the board
24     Q  But you did have specific discussions

199

1  with UMass about the specificity in this case
2  because you wrote a letter?
3      A  I didn't have conversations with UMass
4  about the specificity with regards to Sandy Jo
5  Battista  I had the conversation with them
6  overall
7      Q  But you authored letters to UMass
8  specifically with regard to the specifics of
9  Ms  Battista's treatment?
10     A  Probably for four individuals
11     Q  The exhibits we looked at earlier
12  include the letters you wrote to UMass about
13  Ms  Battista?
14     A  Yes
15     Q  I want to go back and talk a little bit
16  about the new GID process or plan that is
17  currently in the works
18     You indicated that that started to
19  be worked on around what time?
20     A  Really heavily focused on at the time
21  of the retention of Dr  Levine and
22  identification of what we wanted him to deal
23  with as far as aspects of treatment.
24  evaluation and training

200

1      Q  Okay  Do you know what sort of
2  experience Dr  Zakai has with GID patients?
3      A  I don't know specific experience. but
4  he came to us from an affiliation with Brown
5  University. and being the director of post-
6  traumatic stress management for the V.A  in
7  Providence. and it was in the context of that
8  experience that he encountered GID patients. a
9  number of patients
10     Q  Okay  So he has experience with GID
11  patients?
12     A  Yes
13     Q  Okay  And when we talked about the new
14  process that was being put into place before.
15  we discussed that the clinician would do an
16  initial evaluation for GID. or there would be
17  a self-report of GID. and then the GID
18  diagnosis would be elevated to Dr  Zakai. who
19  is the chief psychiatrist for consultation?
20     A  Yes
21     Q  Let's say that the clinician did not
22  agree with an inmate's self-report of GID.
23  what is the process for getting that elevated
24  path to the clinician. or is there a process?

89

1  Q  Okay
2  A  It's also a crossover to the sex
3  offender treatment plan
4  Q  Okay  How so?
5  A  We are working to integrate our
6  services through a care coordination
7  committee. so that our substance abuse
8  provider. our sex offender treatment provider.
9  our mental health provider. and our medical
10  provider all are able to share information. so
11  that we don't have different providers
12  interacting with an individual in antithesis
13  of each other's actions
14  Q  Okay
15  A  We're just really working on that
16  Q  You have not seen a copy of
17  Ms Battista's treatment plan?
18  A  Not that I remember
19      MS  McSHERRY: We will mark as
20  Exhibit No  2 the June 18th report of Stephen
21  Levine regarding Sandy Battista
22  A  Yes
23      EXHIBIT NO  2 MARKED
24  Q  Are you familiar with this document?

90

1  A  Yes
2  Q  What is it?
3  A  It is Dr Levine's recommendations to
4  Dr Zakai. basically his report of the
5  assessment of seeing Sandy Jo Battista
6  Q  And have you reviewed this report?
7  A  I have read the report
8  Q  What is your understanding of why
9  Stephen Levine provided this report?
10  A  Because we've asked him to provide an
11  initial assessment evaluation report on each
12  individual that has either been identified or
13  has self-identified with the diagnosis of
14  gender identity disorder
15  Q  In the report. Dr  Levine confirms
16  Ms  Battista's diagnosis for gender identity
17  disorder. correct?
18  A  Yes
19  Q  So this report is dated June 18. 2008
20      Has anything been done since you
21  received this report to institute Dr  Levine's
22  recommendations?
23  A  No. not yet
24  Q  Nothing?

91

1  A  Not specific to Battista
2      Dr Zakai is working on a treatment
3  plan format to propose to utilize so that we
4  prompt the clinicians uniformly to deal with
5  some specific issues --
6  Q  Okay
7  A  -- even though there's unique
8  individual issues to each
9  Q  What is your understanding of the DOC's
10  plans to take steps -- what steps are they
11  going to take as a result of this report?
12  A  We are going to -- I guess it depends
13      We are going to put this
14  recommendation in front of the committee that
15  we have yet to establish to initiate the
16  treatment plan and the process of certainly
17  intensive individual therapy in the very near
18  future
19  Q  What about with respect to the hormone
20  recommendation?
21  A  Dr Levine did not recommend hormones
22  He recommended that hormones be considered
23  after a period of significant in-depth
24  evaluation  Generally he has indicated six

92

1  months to a year
2  Q  And are you aware that Ms  Battista was
3  diagnosed with gender identity disorder in
4  November 2004. over three years ago?
5  A  Yes
6  Q  And you're aware that the prescription
7  for the hormones was written and approved on
8  April 14. 2005. over three years ago?
9  A  I became aware of that recently
10  Q  So Ms  Battista has not received her
11  hormones for over three years, and now there
12  is this new evaluation by Stephen Levine
13  confirming the GID diagnosis. recommending
14  hormones. and the DOC's position is that it's
15  going to take another six months to a year to
16  provide her with the treatment necessary to
17  give her those hormones?
18  A  I absolutely disagree with your
19  characterization that Dr  Levine has
20  recommended hormones
21  Q  You didn't answer my question
22  A  I think it's a mischaracterization
23  Q  How would you characterize Dr  Levine's
24  recommendation about hormones?

# EXHIBIT U



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*
*Department of Correction*
*Legal Division*
*70 Franklin Street, Suite 600*
*Boston, MA 02110-1300*
*(617) 727-3300 Ext. 124*
*www.mass.gov/doc*



**Deval L. Patrick**
Governor

**Timothy P. Murray**
Lieutenant Governor

**Kevin M. Burke**
Secretary

**Kathleen M. Dennehy**
Commissioner

**James R. Bender**
Deputy Commissioner

**Nancy Ankers White**
General Counsel

February 9, 2007

Sandy Jo Battista
Massachusetts Treatment Center
One Administration Rd.
Bridgewater, MA 02324

Re:    Battista v. Dennehy, et al.,
       U.S.D.C. C.A. No. 05-11456

Dear Sandy Jo Battista:

Your letter of January 8, 2007 to Commissioner Dennehy has been referred to me for response. Your letter asserts that you were diagnosed as having a gender identity disorder ("GID") by the Fenway Clinic, but to date, you have not received the treatment recommended by the Fenway Clinic. As you are well aware, the issue of the validity of your diagnosis for GID is the subject of the above-cited litigation. The Department of Correction's Health Services Division has consistently questioned the accuracy of the November 2004 diagnosis. In fact, Judge Woodlock, in his March 22, 2006 decision in this case, Battista v. Dennehy, et al., 2006 WL 1581528 (D. Mass.), refused to grant your request for injunctive relief regarding treatment for GID in light of the divergent opinions held by mental health professionals regarding the appropriateness of the diagnosis provided by the Fenway Clinic. As you also know, the defendants have filed a motion asking the court for leave to have an expert in gender disorders, Cynthia Osborne, come to Massachusetts to conduct your evaluation on behalf of the defendants. It is anticipated that Ms. Osborne's evaluation will shed additional light into your mental health issues. Presently, it appears that the status of your medical treatment for GID will have to be resolved through the litigation you initiated.

Also, as the defendants' legal representative, I request that all communications with the defendants, including Commissioner Dennehy, having anything to do with the above-cited civil action be addressed to me.

Thank-you for your anticipated cooperation in this matter.

RECEIVED
FEB 13 2007
ASSOCIATE COMMISSIONER OF
CLINICAL & REINTEGRATION

FEB 12 2007

- C2207-0155
07-1x774

COPY

DOC 000512

Sincerely,

Richard C. McFarland

RCM/am
Cc:    Kathleen M. Dennehy., Commissioner

2

DOC 000513

# EXHIBIT V

# UMASS CORRECTIONAL HEALTH

## PROGRESS NOTES

|  |  |  |
|---|---|---|
|  | MTC | |
|  | Institution | |
| NAME: BAPTISTA, Sandy | ID # M15930 | D.O.B. 12/30/61 |

| DATE | TIME | NOTES |
|---|---|---|
| 4/26/05 | 9:00 | PSYCHIATRY, Bauermeister, M.D. |
|  |  | This is a 43 year old inmate, well known (5 volumes of record available today), who carries a diagnosis of Gender Identity Disorder and Depression. |
|  |  | He was referred to me by Dr. Carpenter: |
|  |  | "Recent complaints about depression, dissociation, decreased sleep, increased irritability. Not SI c intent...". |
|  |  | I/M confirmed the above referral. |
|  |  | He told me that he felt a mixture of anxiety, depression, but mostly anger at a delay in his hormone treatment. |
|  |  | I had him on Doxepin in the past. He remembered having responded well. We decided on another trial. |
|  |  | I gave I/M the PDR and DMH information, he signed the consent form. |
|  |  | Start Doxepin 50 mg po hs. |
|  |  | Next 5/24/05. |
|  |  | Martin Bauermeister, M.D. |
| 5/7/05 9AM |  | chronic congenital adrenal hyperplasia; varicose veins REFUSED |
|  |  | MARK SCHNABEL, NP |
| 5/9/05 | 8:30 | S/O Resident to HSU c DOC states pacing + anxious + refuses to go back in cell stating his roommate + he are not getting along d/t his pacing + crying. VS T 98 2 BP 110/72 R16 P 82 Resident contracts for safety. Resident states upset over DOC stopping his hormonal treatment. A/P I/M to Seg. Nurse McLaughlin notified. Ø MH watch ordered. Refer to MH — Tina Boca |

DOC 001378

# EXHIBIT W

# UMASS CORRECTIONAL HEALTH

## PROGRESS NOTES

<table>
<tr><td></td><td></td><td>MTC</td></tr>
<tr><td></td><td></td><td>Institution</td></tr>
</table>

NAME: BATTISTA, Sandy          ID # M15930          D.O.B. 12/30/61

| DATE | TIME | NOTES |
|---|---|---|
| 5/17/05 | 9:00 | PSYCHIATRY, Bauermeister, M.D. <br> This is a 43 year old inmate who carries a diagnosis of <br> GENDER IDENTITY DISORDER. <br> On 4/26/05 I put him on Doxepin 50 mg po hs since he had <br> complained to Dr. Carpenter about depression. <br> I received a referral from Dr. Carpenter which stated that I/M <br> had been increasingly agitated, tearful, irritable and could <br> not concentrate. "I/M recently requested 'time out' 2° agitation <br> and depression over delay in hormone treatment. Tx was contributing <br> to increased conflict with roommate. Please evaluate for med <br> increase or augmentation". <br> I/M confirmed the complaints. <br> We discussed his response to Rx.: He told me that he had not noticed <br> anything. I take this as a good sign that his Rx is tolerated without <br> immediate side effects. <br> We decided to double his Doxepin. <br> Doxepin 100 mg po hs. <br> Next 6/15/05.  *Martin Bauermeister, M.D.* |
| 6/8/05 | 2 Pm | Pt presents to discuss ongoing GID + endocrine consult <br> Pt is still wait for DOC – specifically due Mother approval for hormone Rx <br> Pt is scheduled for 6 wk interval PH + <br> will order repeat DHEA, 170H progesterone Am cortisol, ACTH <br><br> *Robert Friedman, MD* |
| 6/14/05 | 9:15 | PSYCHIATRY, Bauermeister, M.D. <br> Review of record shows continued exasperation over delay in hormonal <br> treatment. <br><br> Today no show. <br> Rx renewed. <br> next 7/12/05.   *Martin Bauermeister, M.D.* |

7113W 1/95

DOC 001265

# EXHIBIT X

# UMASS CORRECTIONAL HEALTH

## PROGRESS NOTES

Institution: _____ MTC _____

NAME: __BATTISTA, Sandy__    ID # __M15930__    D.O.B. __12/30/61__

| DATE | TIME | NOTES |
|------|------|-------|
| )/4/05 | 9:15 | PSYCHIATRY, Bauermeister, M.D. |
| | | This is a 43 yr old inmate who carries the diagnosis of |
| | | GENDER IDENTITY DISORDER. |
| | | Rx.: Prozac 20 mg po am and Doxepin 100 mg po hs. |
| | | I received a referral from Dr. Carpenter: |
| | | "Patient complains about feeling jittery and "drugged out" – "the |
| | | meds are not working"... |
| | | Mr. Battista made the case that the Rx had not helped him – |
| | | with which I concur. |
| | | We also had reached an understanding that his disappointment and |
| | | anger might be justified feelings not amenable to change from |
| | | any medication. |
| | | He told me that he had been under the impression that he had to |
| | | take the medication and that if not, he would be accused of |
| | | "refusing treatment". |
| | | Nothing in my dealing with Mr. B. indicates that I ever wanted |
| | | to "force him". It also shows that I had been quite open with |
| | | him about the possible failure of medication. Certainly, I do |
| | | not consider Rx a treatment "must". |
| | | After having failed to make him feel better on Rx and in view |
| | | that I have never given him any diagnosis other than gender identity |
| | | disorder, for which there is no medication indication in the |
| | | first place, I shall discontinue his Rx, not because he |
| | | "refusses" Rx, but because I do not see any indication for it |
| | | after failed trial to decrease his disappointment and anger. |
| | | Martin Bauermeister, M.D. |

7113W 1/95

DOC 001256

# EXHIBIT Y

ROUGH DRAFT

U.S. DISTRICT COURT FOR MASSACHUSETTS

No. 099620225

- - - - - - - - - - - - - - - - - - - - - - - - - - -

SANDY BATTISTA,

         Plaintiff

v.

KATHLEEN DENNEHY, et al.

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION of ROBERT F. MURPHY JR.

Monday, June 30, 2008

10:00 a.m.

McDermott Will & Emery

28 State Street

Boston, Massachusetts

- - - - - - - -

Reporter:  Dana Welch, CSR, RPR, CRR

COMPUTER UNCERTIFIED ROUGH DRAFT ONLY

THIS DRAFT CANNOT BE QUOTED

Page 190

ROUGH DRAFT

1 cooperate with the scheduling.
2     Q. And that worked in that situation?
3     A. Reasonably well. It's very difficult to
4 manage because they have to be compliant and you
5 can't always supervise people all the time.
6     Q. You stated that their relationship, I
7 don't know it is, what I would term it, is -- is
8 that resolved now, any issues between them?
9     A. I'm not aware of any current issues
10 between them, no.
11     Q. Are there no more security precautions in
12 place then with the regard to the two of them?
13     A. That's correct.
14     Q. So they're able to make contact and carry
15 on as normal?
16     A. I believe so, yes.
17     Q. All right. If you just give me one
18 minute. I just want to look something up.
19     I'm going to have the reporter read back a
20 portion; is that right?
21     COURT REPORTER: "Question: 'Okay. So if
22 Ms. Battista's treatment for -- with hormone
23 therapy eventually arrives to your desk, is it

Page 191

ROUGH DRAFT

1 your view that you would allow that or not
2 allow that?'
3     "Answer: 'Well, if the doctor prescribed
4 it and hormone therapy was going to be
5 provided, then I wouldn't interfere with what
6 the doctor wanted. I would have to determine
7 how I was going to address Mr. Battista.'
8     "Answer: 'And how do you imagine that
9 would be?'
10     "Question: 'I would begin by having the
11 security review, bringing people together to
12 get an understanding of what was happening,
13 what we needed to watch for, what the climate,
14 so to speak, of the housing unit would be,
15 what his interaction with other people would
16 be. And then I would develop a continuous
17 security review.'"
18 BY MS. SHENG:
19     Q. So you recall that conversation we just
20 had earlier?
21     A. Yes.
22     Q. Now, when we were going through the
23 chronology just now, you stated that you weren't

Page 192

ROUGH DRAFT

1 aware that there was a prescription pending; is
2 that correct?
3     A. Yes.
4     Q. You didn't have any knowledge one way or
5 another?
6     A. Didn't recall.
7     Q. Okay. And when did you become aware of
8 there being a prescription; was it not until today
9 or...
10     A. I don't recall.
11     Q. So you don't recall ever being notified
12 that there was a prescription?
13     A. I don't have memory of the prescription.
14     Q. Okay. Then the part the court reporter
15 just read back to us you stated that you wouldn't
16 want to interfere with the prescribed treatment and
17 that you would then -- what was it? You would then
18 bring people together for a security review to
19 determine how to proceed; is that correct?
20     A. Yes.
21     Q. So is it fair to say if the prescription
22 had landed on your desk in 2005, you would have
23 seen your role as approving or disapproving the

Page 193

ROUGH DRAFT

1 treatment, you would have seen it as developing a
2 plan to manage treatment in light of security
3 concerns?
4     A. Well, the prescription wouldn't come to me
5 because I'm not a clinician, I'm not a doctor, I'm
6 not in that loop. I'm not in position where I
7 could approve or deny. That's not within my
8 purview of responsibilities. What I would
9 anticipate is receiving information that the
10 treatment was going forward and then I would need
11 to do something like a security review.
12     Q. Okay. So if the treatment plan landed on
13 your desk and your role would be to go forward with
14 a security review of putting together those people
15 to implement the plan, to accommodate that
16 treatment plan; is that correct?
17     A. To review and assess it and determine what
18 course of action to take consistent with that, yes.
19     Q. Okay. And that course of action would not
20 include saying that it's not the -- the treatment
21 is not possible?
22     A. No. It wouldn't be for me to say that.
23 I'm not a clinician. That's a clinicians

Page 194

**ROUGH DRAFT**
1
2    determination, not mine.
3        MS. SHENG: Okay. Believe that's all the
4    questions I have for today.
5                EXAMINATION
6
7    BY MR. McFARLAND:
8        Q. I have one quick question for
9    superintendent Murphy. Showing you what's been
10   marked as Exhibit 1. And on the second tier, there
11   is a books, second box to the right talks about
12   superintendent, what does it say?
13       A. Superintendent conducts security
14   assessment and makes recommendations.
15       Q. And then what's the next block say?
16       A. Commissioner reviews and approved,
17   disapproved based upon security issues.
18       Q. So who's the final decision-making
19   authority with regard to security concerns as to
20   any treatment for Battista's sex -- Battista's GID
21   condition?
22       A. That's the commissioner of correction.
23       MR. McFARLAND: Okay. Thank you.
24                EXAMINATION

Page 195

1                ROUGH DRAFT
2
3    BY MS. SHENG:
4        Q. This step then the commissioner is not a
5    clinician, either; is that correct?
6        A. That's correct.
7        Q. So if they approved or disapproved based
8    on security issues, what do you take that to mean?
9        A. I'm not real sure. I haven't seen it
10   happen yet. I would anticipate that if I had a
11   concern and brought it to the commissioner, that
12   the commissioner may either approve the plan that
13   I've put in place or send it back asking me to
14   revise it for some reason.
15       Q. In order to accommodate the treatment?
16       A. I would anticipate that, yeah.
17       Q. Okay. But the reviewer approving or
18   disapproving would be based on on your security
19   plan; is that correct?
20       A. As far as I know without ever having done
21   this, certainly whatever legitimate security issue
22   there is would have to be taken into consideration.
23   And the commissioner is the person to make that
24   final decision.

Page 196

**ROUGH DRAFT**
1
2    MS. SHENG: That's all then.
3    MR. McFARLAND: I'm done.
4    (Whereupon, this deposition was concluded
5    at 3:40 a.m.)

Page 174

**ROUGH DRAFT**

1
2   treatment center?
3       A. I don't think I had enough information at
4   that time to formulate an opinion.
5       Q. Okay. Do you feel you have enough
6   information now?
7       A. No, I don't.
8       Q. Now, you wrote this e-mail to Mr. Weiner;
9   is that correct?
10      A. Yes.
11      Q. Why were you e-mailing him?
12      A. It appears he sent me an e-mail on
13  September 27th in the morning. So I replied to
14  that later that same day. And that e-mail is
15  described below here. And -- let me just read it
16  here. Larry Weiner has made an inquiry in the
17  second paragraph would you get back to me
18  indicating you understand what services they are
19  requesting. Could you indicate if a security
20  review has been conducted.
21      Q. So you were replying that security review
22  had not been conducted?
23      A. Right.
24      Q. Had you had any other discussion with

Page 175

**ROUGH DRAFT**

1
2   Mr. Weiner at that point?
3       A. I can't recall.
4       Q. It's possible that you did?
5       A. Possible.
6       Q. Okay.
7       MS. SHENG: This will be Exhibit 14.
8       (Exhibit No. 14, DOC 000913, marked for
9   identification.)
10  BY MS. SHENG:
11      Q. Can you identify for me what this is?
12      A. This appears to be an unsigned letter, not
13  on letterhead to myself dated June 1st from Terre
14  Marshall director health services division.
15      Q. Does this look familiar to you?
16      A. Not at all.
17      Q. Can you review the first paragraph?
18      A. It states enclosed please --
19      Q. You don't have to read it, just review.
20      A. Good. Okay.
21      Q. Did you ever receive this?
22      A. I don't recall ever seeing this.
23      Q. This seems to be Ms. Marshall stating that
24  you should begin a security review; is that

Page 176

**ROUGH DRAFT**

1
2   correct?
3       A. Yes.
4       Q. Did you ever begin a security review?
5       A. No, I didn't.
6       Q. Do you recall Ms. Marshall ever telling
7   you to begin a security review?
8       A. No.
9       Q. Do you recall anybody telling you not to
10  begin a security review?
11      A. No, not specifically.
12      Q. More generally was there a discussion of
13  not doing a security see review?
14      A. The discussions I had with Larry Weiner
15  pertained to upon notification in terms of where
16  the flow chart was progressing that I would do a
17  security review.
18      Q. But not until that time?
19      A. Right.
20      Q. Okay. In this letter Ms. Marshall
21  mentions counseling by mental health staff. Did
22  you understand Ms. Battista to be receiving mental
23  health counseling at that time?
24      A. Yes.

Page 177

**ROUGH DRAFT**

1
2       Q. And who was that with?
3       A. Diane McLaughlin.
4       Q. Was that specific to GID treatment?
5       A. I don't know.
6       Q. From the last e-mail that you wrote to
7   Mr. Weiner and this one which is dated June 1st,
8   2006, do you recall anything changing in the
9   circumstances of Ms. Battista's treatment?
10      A. No, I don't.
11      Q. So the situation was the same as far as
12  you were concerned?
13      A. As far as I understood, yes.
14      Q. So nothing had progressed on this flow
15  chart?
16      A. That I was aware of.
17      MS. SHENG: So this is Exhibit 15.
18      (Exhibit No. 15, DOC 000501, marked for
19  identification.)
20  BY MS. SHENG:
21      Q. Can you identify for me what this is?
22      A. This is a letter from me to Sandy Jo
23  Battista dated November 30th, 2006.
24      Q. Can you read for me the two short