UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SANDY J. BATTISTA,<br><br>Plaintiff,<br><br>v.<br><br>HAROLD W. CLARKE,<br>KATHLEEN M. DENNEHY,<br>ROBERT MURPHY,<br>TERRE K. MARSHALL, and<br>SUSAN J. MARTIN, in their official and individual capacities;<br><br>Defendants. | Civil Action No.<br>05-11456-DPW |

**MOTION TO EXTEND DEADLINE FOR PLAINTIFF'S
<u>REBUTTAL EXPERT REPORT</u>**

Pursuant to the discovery schedule set by this Court on May 14, 2008, Plaintiff, Sandy J. Battista's ("Ms. Battista" or "Plaintiff") rebuttal expert report is currently due to be filed by August 15, 2008. Plaintiff hereby moves for a brief extension of time to determine whether a rebuttal expert is necessary. Specifically, she requests an extension for submitting a rebuttal expert report until two weeks after this Court rules on Plaintiff's pending Renewed Motion for Preliminary Injunction, or two weeks after the Defendants indicate whether and how they intend to use Dr. Levine as an expert in this matter. In support hereof, Plaintiff states as follows:

1. On June 24, 2008, the Department of Corrections ("DOC") provided Plaintiff with a copy of the report of its new contracted gender identity disorder ("GID") expert, Dr. Steven Levine, who conducted his own evaluation of Ms. Battista on June 4, 2008. In this report, Dr. Levine concluded that "of course" Ms. Battista

- 2 -

suffers from GID and that she needs treatment. See Report of Dr. Steven Levine, Ex. A.

2. Dr. Levine's report necessarily puts to rest Defendants' alleged concerns about the "legitimacy" of Plaintiff's GID diagnosis and thus eliminates the basis upon which Defendants' have refused to provide Ms. Battista the treatment recommended by the DOC's own GID specialists.

3. Larry Weiner, the DOC's Mental Health and Substance Abuse Coordinator, confirmed that Plaintiff's GID diagnosis is no longer in question during his deposition on July 30, 2008:

> Q. So you have no plans to engage in another peer review of Dr. Levine's report to find out if he is right about the diagnosis?
>
> A. I do not.
>
> Q. The and department has no plans to do that to your knowledge?
>
> A. They have not made me aware of that. I am not -- I think I think we are comfortable with Dr. Levine and his opinions.
>
> Q. Fair enough to the best of your knowledge, the question of diagnosis is now settled?
>
> A. I would say that is accurate.

Deposition of Larry Weiner at 79:3-15, Ex. B.

4. Accordingly, the central dispute in this litigation-- whether Ms. Battista suffers from GID and not some other mental health disorder-- has been resolved and Plaintiff does not require a rebuttal expert on this subject.

5. However, it remains unclear what position the Defendants intend to take with respect to implementing Ms. Battista's original treatment plan. Asked at

deposition in late June about what the next steps were for Ms. Battista, Terre Marshall, the DOC's Director of Health Services, testified:

> We are going to- I guess it depends. We are going to put this recommendation in front of the committee we have yet to establish to initiate the treatment plan and the process of certainly intensive individual therapy in the very near future.

Deposition of Terre Marshall at 91, Ex. C.

6. Further, according to Ms. Marshall's testimony, the DOC anticipates deferring a decision on the administration of hormone therapy until after a period of six to twelve months of this "intensive individual therapy," and that decision will be left up to yet another clinician (the contracted chief psychiatrist, who is not a GID specialist).

7. It is Plaintiff's position at this time that the medical issues requiring expert testimony have been resolved, and that the Defendants are now obligated to implement the original treatment plan, without further need for conflicting medical or expert testimony.

8. If, however, Defendants intend to create another treatment plan, and depending on what is in that treatment plan, Plaintiff may require an expert to explain why the new treatment plan is inadequate to meet Ms. Battista's needs. Because the Defendants do not yet have such a plan, it is not currently possible to determine whether expert testimony is necessary, or even the parameters of any possible expert testimony.

9. In order to address the current uncertainty about a treatment plan, Ms. Battista has respectfully renewed her original Motion for a Preliminary Injunction, asking the Court to order the Defendants to authorize the implementation of the treatment

- 3 -

she was originally prescribed no later than September 30, 2008, and to take whatever steps are reasonably necessary to update the prescription, implement a plan to minimize any legitimate security risk, and ensure that she receives psychotherapy sufficient to support hormone therapy.

10. Plaintiff will be prepared to provide a rebuttal expert report, if needed, within two weeks of the Court's order, or two weeks after the Defendants indicate whether and how they intend to use Dr. Levine as an expert in this matter.

11. Counsel for the Defendants has indicated that he does not plan to oppose the request for an extension.

Accordingly, Plaintiff respectfully requests that this Court allow this motion and extend the deadline for Plaintiff to file a rebuttal expert report in this matter until two weeks after this Court rules on Plaintiff's Renewed Motion for Preliminary Injunction, or two weeks after the Defendants indicate whether and how they intend to use Dr. Levine as an expert in this matter.

Dated: August 6, 2008

Respectfully submitted,

SANDY J. BATTISTA

by her attorneys,

/s/ Dana M. McSherry
Emily Smith–Lee (BBO# 634223)
Neal E. Minahan (BBO#661371)
Dana M. McSherry (BBO #664430)
Ada Sheng (BBO#664775)
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109
tel: 617.535.4000
fax: 617.535.3800

BST99 1583902-1 099705.0013

- 5 -

## CERTIFICATE OF RULE 7.1 CONFERENCE

Pursuant to Local Rule 7.1, I hereby certify that, on August 6, 2008, I conferred by telephone with Defendants' counsel Richard McFarland. Mr. McFarland indicated that he would not oppose this Motion.

/s/Emily-Smith-Lee

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 6, 2008.

/s/ Dana M. McSherry
Dana M. McSherry

# EXHIBIT A

06/24/2008  16:03   5084223386                 DEPUTY COMM MADDEN                PAGE  06/18

**Stephen B. Levine, MD**
Center for Marital and Sexual Health
23230 Chagrin Boulevard #350
Beachwood, Ohio 44122
216 831 2900
fax 216 831 4306

Wednesday, June 18, 2008

Aminadov Zakai, MD
MHM Services, Inc.
50 Commerce Way
Norton, Massachusetts, 02766-3313

Re: **Sandy J. Battista formerly named David Megarry**

Dear Dr Zakai,

Thank you for enabling the 1 hour 50 minute interview at the Treatment Center today with this 45 year old never married man who has served three sentences for robbery and kidnapping and rape of a ten year old girl. No longer serving a sentence for these crimes, Sandy is civilly committed as a registered sex offender until a panel decides that he is no longer a great risk to society. At this point, his civil commitment is for an indefinite duration—1 day to forever

Sandy is again in litigation trying to force the implementation of 2004 recommendations of the Fenway Clinic to begin hormones. He hopes to get hormones at his current institution and eventually be free man. He thinks about flying to Thailand to obtain sex reassignment surgery but he says he is not actually certain that he wants surgery, in part, because he thinks that the surgery is mutilating. Sandy describes himself as generally pessimistic about getting what he wants.

Sandy is a 5 feet 7 inch, 136 lb well groomed clean shaven frontally balding male with a slightly feminine handshake and wave. He says his waist is 28 inches. Sandy's long hair was carefully braided. His overall appearance reflected considerable care in clothing. Sandy sat still, conversed rationally, seemed to be forthcoming, and possessed an adequate vocabulary. Sandy's appearance did not show his anticipatory anxiety about this interview. He said that he had trouble sleeping and cried a lot with worry that I would not support the recommendations for hormones. He demonstrated no gross abnormalities of mental status—mood, cognition, or perception.

I see Sandy's gender problem in the light of six issues:
1. He has been cared for by foster families and various prison systems for almost 30 years. Prior to adolescent foster placements, he lived with his mother, maternal grandmother, paternal grand parents, and his father for varying lengths of time. His parents and grandparents are now deceased

    and he is basically alone in the world except for a sister who lives in southern Ohio, where he does not wish to reside. She may not know about his GID.

2. He has the most common form of male congenital hyperplasia (CAH) and is on prednisone. It is not the salt wasting variety. He claims that he feels the same on and off prednisone. Medically, without prednisone, he might experience adrenal insufficiency, however, which can be fatal if unrecognized. Although CAH is a form of intersex condition, in his case it resulted in precocious puberty in his second year of life not ambiguous genitalia. Sandy's genitalia were normal at birth and still are apparently. The influence on males with CAH is not well studied. The adolescent and adult sexual identities in girls with CAH have been scientifically carefully scrutinized. The general conclusion is that CAH does not lead to GID, at most, it leads to masculine gender role behaviors without an increase of lesbianism. Although Sandy has CAH, I don't think it would be justified to say that his GID is due to an intersex condition. He does not have an intersex condition; his genitalia are not ambiguous by report and I presume by repeated physical examinations.

3. He is a convicted pedophile who continues today to have transient awareness of the attractiveness of 9-11 year old girls—that is, those who are on the cusp of puberty. He has made considerable progress in developing victim empathy and effective avoidance techniques for not allowing himself to dwell on his pedophilic eroticism. He claims to think about with regret his crimes almost on a daily basis and now he feels badly for his victims.

4. He has very poor recall of his childhood, does not remember anything about the "accidental" murder of his mother by his father in front of him. He denies being abused and only has good memories of his times with his grandparents and father. He has forgiven his mother so much so that in choosing a new gender-neutral name in 1995, he took his mother's maiden name to honor and to forgive her. He does not now recognize himself as abused and suggests that the recurrent references to these events may be an error in understanding. (Numerous evaluators have described him as being sexually abused.) He emphasized that his father was convicted of manslaughter, not murder, and that he accidently killed his mother. Sandy gave the impression of not wanting to recall. He claims not to have any intrusive disturbing memories of his youth, although he thinks his crime almost daily. This suggests to me that the fixation on the bodily discomfort and wish to have it relieved may play a major role in suppressing his memories of early life chaos and pain.

5. Sandy seems to have come a long way in prison from his impulsive aggressive molesting irresponsible uneducated youth that is recurrently described in the numerous reports about him that were provided to me. Apparently, this maturation is real, he is calm, has not been a behavior

21

2

      problem in recent years. He is motivated to get out of prison and to get hormones. It would be hard not to consider David Megarry in his early years in prison as poorly socialized irresponsible dangerous psychopathic man. Sandy never accomplished any vocational success outside of prison. He was separated from the US Army after 8 months of disciplinary problems which may have included drunkenness and wearing of female underpants. Today, he is proud of his accomplishments. He works in prison—he landed a prime position in Property on Dec 26, 2007 and has been working effectively there since. He has worked in other prison roles as well. He says he is now somewhat educated, takes personal responsibility for his crimes, is honest and compassionate, and is no longer violent. Generally, he is untrusting and pessimistic. He states that he wants a normal life, to be reconnected with his family (all dead but a sister), and make something of himself. He hopes to get into a two-year post prison program in Boston where he can get support, counseling, and work. St Andrews is the only place he knows that takes sexually dangerous offenders. It has a long waiting list, he claims.

6. Having been rejected by his mother for his pigeon-toed deformity and his precocious puberty as a "freak", he remains sensitive to any form of rejection as a freak. He distinguishes himself from the sexual perverts in Bridgewater who masturbate in a closet when they see an attractive Corrections Officer or who have two or three way homosexual sex. His masturbation is irregular, perhaps averages monthly, and only involves his rectum. "I don't stimulate my penis." He rarely ejaculates. He is embarrassed by this revelation. I am not sure he has shared his masturbatory method with other evaluators. This sensitivity to being labeled a "freak" means to me that his self categorization as a Trans person removed Sandy from the category of freak and placed him in a new unstigmatized one. While corrections officers or prisoners may refer to Trans prisoners as freaks, Sandy is able to see this as a reflection of their ignorance. Out in the free world a man who appears dressed as a woman often encounters name calling and sometimes the threat of violence. It is important that Sandy work on this issue since Sandy values so highly the lack of recent personal violence.

Of course, Sandy is some form of gender identity disorder. While this initial reevaluation did not have the luxury of time to review the development and evolution of his gender identity, orientation, and intention as a child, adolescent, and adult, the subject deserves tracing as accurately as possible. Currently, he does not use his penis for masturbation, he sits to urinate, and likes to think of himself as a woman. When he is seen naked by others, he is embarrassed by having male genitalia. He said that when he tried to increase his masculine gender roles through beards, tattoos, or weight lifting, these activities eventually made him less comfortable. Once he realized this, he allowed his slender petite body to revert to its natural form. In the process of starving himself for days on end for this purpose, he lost 40 lbs. His quest is to gain access to female clothing and

hormonal treatment in the immediate future. He denies any autogynephilia, in fact, he laughs uncomprehendingly that anyone would be turned on to the image of the self as a female. He is says that his dominant orientation is directed at women. But his interest in attractive women is not so much to their bodies as it is to their clothing and styling opportunities He imagines loving and making love with a woman as a woman, a woman as petite as he now is. He is sexually attracted to men but not romantically. "I am bisexual." He has had four sexual experiences with men in prison, one with a woman prior to prison. But his description of orientation as bierotic is actually incomplete. Sandy acknowledges that he is still capable ("always will be!") of being attracted to prepubertal girls. Since 1995 when he announced and obtained a name change, he has expressed his femininity socially. This has caused him to lose and gain a few friends It has enabled him to learn about his legal rights and to focus his life on his eventual becoming a woman. He claims never to have had sexual arousal to girl's or women's clothing. (that is, he denies a fetishistic transvestitic pattern) Sandy's sexual drive is not strong, never was, he claims. He does not like having a penis. His last sexual experience with a man was three years ago. He won't do this again because the few moments of pleasure of having an erection in him is not worth the consequences of being discovered to be a rule breaker who can't control himself. The benefit/risk ratio is terrible for him. He sees himself as a woman but not a transsexual woman—a woman! He seems a bit disinterested in exploring the relationship between his sexual identity mosaic and his inconstant, shifting, unsoothing parental attachments. If he had freedom to select an ideal sexual partner, it would be a small woman with his shape. He would then think of himself as a lesbian.

Apparently, Sandy tried to castrate himself in 2005 to lower his testosterone level and its unwanted masculinizing effects after he felt thwarted by the DOC's refusal to honor Fenway's recommendations for hormones for him. . He did this in his cell with a razor blade and although he carefully studied the procedure in advance, he was surprised by the anatomy, the blood, and the pain. He sewed his incision up, packed himself with gauze, and went to bed. By the next day, he had an infection and sought help. He was put in the hole for this behavior. While he was cited for this disruptive behavior, he emphasized that it was considered carefully, researched, and planned; it was not impulsive Sandy sees this as different from tickets for bad behavior that he got when he was younger The castration attempt was the culmination of nervous breakdown he gradually had He could not stop pacing in his cell and crying all the time. He would not eat or shower. His cell mate complained that he smelled. He was temporarily placed in the crisis unit He is not interested in self surgery any longer.

Sandy claims that he has always been afraid of actual sex with a woman because she might not like his body. Children seem less dangerous and critical to him and are less likely to see him as a freak. This was his sense of why he attacked and molested little girls He is very sensitive because of his mother's perception of him as a freak to any labeling of him now

I have read/scanned the report of *lengthy* commentary of consultant Ms. Cynthia Osbourne, MSW and the *lengthier* rebuttal of Drs. Kapila and Kaufman, the original

41                                                                                                 4

evaluators at Fenway Clinic. While each has made some cogent points about the other party's views, my view of both written reports and the diagnosis and treatment of GID are fundamentally different. I don't really expect most readers to be able to find the time, interest, and concentration to read over 20 single spaced pages on most topics. The issue is that this prisoner has a form of GID, complicated by his horrendous early life history, his demonstration of his capacity to violently harm a child, and his imprisonment for an indefinite amount of time. The two reports represent a distinctly pro triadic therapy (real life experience, hormones, and SRS) and a distinctly con triadic therapy approach. Both are extreme. There is no reason to doubt that Sandy has a form of GID; Osbourne's major point is that the therapy approach should take into consideration many more factors than this diagnosis per se.

**Tentative Diagnoses:**
Axis I  "Sexual identity mosaicism" characterized at least by
    Gender Identity Disorder of Adulthood, attracted to women and men,
    AND
    Pedophilia
Axis II
    Psychopathic Personality Disorder, much improved in prison environment
Axis III
    Congenital Adrenal Hyperplasia, 21-hydroxylase deficiency (likely), relatively mild without genital malformation.
Axis IV
    Frustration over not getting the treatment that Fenway recommended
    Frustration over not knowing when he is to be released from Bridgewater (it is reasonable to speculate that he is also very frightened about leaving Bridgewater)
Axis V  very low prior to imprisonment
    Relatively high in recent several years considering the prison environment

**Recommendations for the management of GID**
1. Draw AM testosterone level to see if he is actually hypogonadal (note the low sex drive)
2. Assign someone to continue this evaluation with the aim of getting him positioned to be part of the DOC gender identity program
3. Hormone treatment is a possibility but it is preferable that it be done within the context of therapy where he can face his fears about their dangers and slowly come to grips with their limitations. We need to recognize that there probably is no medical experience with giving estrogens to someone with CAH so they must be given cautiously with careful monitoring. Sandy Je Battista is a strong argument for developing a GID program. It will likely help the prisoner considerably just being part of it.
4. I think he would make a very good core group member if there was a group for Trans prisoners.

5. Make every effort to value his continuing high level work in property and his ability to remain honest in that position, as this is evidence that his psychopathy is better controlled now
6. Every effort should be made to praise his accomplishments in prison in the last few years and he can be given access to more feminine canteen materials once these are specifically defined and judged to be safe for the environment.
7. Since Sandy has such a horrendous early life history with masochistic underpinnings, he needs to understand that for some peers in prison, his feminine expressions may excite them into trying to attain domination of him, in a manner that is representative of his past abuse. The social risk of feminization for him must be balanced by his capacity to resist being treated intimately as a female only to be abused anew.
8. Staff should be mindful that by increasing his feminization through hormones and participating in a gender problem is not likely to permanently end his pedophilic attractions. While estrogen is likely to lessen the intensity of his sexual drives, it will not alter the direction of it (towards 9-11 year old girls). If his testosterone levels are hypogonadal prior to estrogen administration, it may be that no attenuation of his sexual interest in girls will occur. The medical staff might consider using Provera in the future as an inexpensive but effective antiandrogen.

Respectfully,


Stephen B Levine, MD

# EXHIBIT B

Page 78

```
11:48:33   1    A. I would imagine it was with the DOC,
11:48:35   2    absolutely.
11:48:37   3    Q. Why are you so clear about that?
11:48:39   4    A. Because this women, Ellen Jacobs, was
11:48:43   5    involved, and she is a department person,
11:48:45   6    so...
11:48:45   7    Q. Is it more typically the case that if
11:48:48   8    an expert in a particular field is retained to
11:48:51   9    review an inmate or a resident's treatment
11:48:54  10    plan or diagnosis, is it typically the case
11:48:57  11    that that person would be retained by the DOC,
11:48:59  12    or is it typically the case that your vendor
11:49:02  13    would retain, would subcontract with an
11:49:04  14    expert?
11:49:04  15    A. I guess it would depend on who wanted
11:49:09  16    to...
11:49:10  17    Q. Your GID specialist, which was Fenway,
11:49:14  18    and is currently Dr. Levine, right?
11:49:16  19    A. Correct. They are retained by the
11:49:20  20    vendor. The contract wasn't between Fenway
11:49:22  21    and the DOC. It was between Fenway and UMass,
11:49:25  22    and the contract with Dr. Levine is between
11:49:28  23    MHM and Dr. Levine and not the DOC.
11:49:30  24    Q. That's not the standard protocol for
```

Page 79

```
11:49:34   1    clinical consultations with experts?
11:49:39   2    A. I'm not sure.
11:49:40   3        I mean, you know, I don't know that
11:49:42   4    we have a lot -- I don't have a lot of
11:49:45   5    experience with that. I'm not comfortable
11:49:47   6    saying what is routine in this matter.
11:49:49   7    Q. Are you aware of any other contract
11:49:52   8    that the DOC has directly with an expert in
11:49:57   9    any area of the mental health field?
11:50:00  10    A. Getting back to the peer reviews, I
11:50:02  11    talked about with the suicides or the deaths,
11:50:05  12    mortality reviews, yeah.
11:50:06  13        To me those are contracts that we
11:50:08  14    have with people -- uhm, that the department
11:50:11  15    has. We have one with Lindsay Hayes, who is a
11:50:16  16    suicide prevention expert. That's one the
11:50:19  17    department has.
11:50:20  18    Q. That's for sort of backwards-looking --
11:50:22  19    A. No. Lindsay Hayes, that's more
11:50:26  20    forward-looking. That's looking, you know, at
11:50:28  21    procedures, protocols, policies related to
11:50:30  22    suicide prevention. How are we doing? What
11:50:33  23    do we need to do?
11:50:36  24    Q. Fair enough. She is not coming in and
```

Page 80

```
11:50:38   1    looking at any individual's mental health
11:50:42   2    treatment plan? She's looking at your overall
11:50:44   3    approach to suicide --
11:50:47   4    A. It is a he.
11:50:50   5        Within the context of looking at
11:50:52   6    individual cases, he would base his -- I
11:50:55   7    think, you know, yes, he looked at it
11:50:57   8    globally, but maybe he would have to look at
11:51:00   9    some outcomes of individual cases to look more
11:51:04  10    globally.
11:51:05  11    Q. Individual cases might inform where he
11:51:07  12    is telling to you go?
11:51:08  13    A. That's a better way to put it.
11:51:11  14    Q. He is not saying this is what you
11:51:13  15    should do with inmate X in terms of treatment?
11:51:15  16    A. No. No.
11:51:16  17    Q. Putting aside what the contract says,
11:51:29  18    did you have an understanding of what the
11:51:31  19    scope of Cynthia Osborne's services were when
11:51:35  20    she was first retained with respect to Sandy?
11:51:37  21    A. To review the Fenway report.
11:51:44  22    Q. Were you the primary point of contact
11:51:46  23    with Ms. Osborne when she was retained for
11:51:49  24    Sandy's case?
```

Page 81

```
11:51:50   1    A. I think that's fair.
11:51:52   2    Q. When was the first time you spoke to
11:51:54   3    her, communicated with her?
11:51:55   4    A. I don't know. I would say -- I would
11:51:59   5    ask if, uhm -- was -- you know, is that
11:52:05   6    produced in discovery?
11:52:09   7    Q. We can fix some dates. I can't
11:52:12   8    represent they are the --
11:52:13   9    A. Yeah, sometime within the summer.
11:52:16  10    Without seeing an e-mail or something, I
11:52:20  11    don't...
11:52:20  12    Q. Do you recall having live conversations
11:52:23  13    with her in addition to e-mails?
11:52:25  14    A. I do.
11:52:31  15        EXHIBITS NOS. 5 AND 6 MARKED
11:53:18  16    Q. What I have shown you is we have marked
11:53:20  17    as Weiner 5 and 6.
11:53:22  18        Why don't you have a look at those
11:53:23  19    and let me know when you are done.
11:53:25  20    A. I'm good.
11:53:25  21    Q. The first one, Weiner 5, appears to be
11:53:29  22    an e-mail from Cynthia Osborne to you dated
11:53:31  23    August 12, 2005. The second has the same
11:53:35  24    date, but looks to be about six minutes later.
```

# EXHIBIT C

1

2             UNITED STATES DISTRICT COURT

3             DISTRICT OF MASSACHUSETTS

4

5   SANDY BATTISTA

6         Plaintiff

7   v.              C.A. No. 099620225

8   KATHLEEN DENNEHY, et al.

9         Defendants

10

11

12            - - - - - - - -

13         DEPOSITION OF TERRE K. MARSHALL

14         Friday, June 27, 2008

15             10:16 a.m.

16         McDermott Will & Emery

17            28 State Street

18         Boston, Massachusetts

19            - - - - - - - -

20

21         Reporter: Deborah Roth, RPR/CSR

22

23

24

89

1   Q   Okay
2   A   It's also a crossover to the sex
3   offender treatment plan
4   Q   Okay  How so?
5   A   We are working to integrate our
6   services through a care coordination
7   committee, so that our substance abuse
8   provider, our sex offender treatment provider,
9   our mental health provider, and our medical
10  provider all are able to share information, so
11  that we don't have different providers
12  interacting with an individual in antithesis
13  of each other's actions
14  Q   Okay
15  A   We're just really working on that
16  Q   You have not seen a copy of
17  Ms  Battista's treatment plan?
18  A   Not that I remember
19       MS McSHERRY: We will mark as
20  Exhibit No. 2 the June 18th report of Stephen
21  Levine regarding Sandy Battista
22  A   Yes
23       EXHIBIT NO. 2 MARKED
24  Q   Are you familiar with this document?

90

1   A   Yes
2   Q   What is it?
3   A   It is Dr Levine's recommendations to
4   Dr Zakai, basically his report of the
5   assessment, of seeing Sandy Jo Battista
6   Q   And have you reviewed this report?
7   A   I have read the report
8   Q   What is your understanding of why
9   Stephen Levine provided this report?
10  A   Because we've asked him to provide an
11  initial assessment evaluation report on each
12  individual that has either been identified or
13  has self-identified with the diagnosis of
14  gender identity disorder
15  Q   In the report, Dr Levine confirms
16  Ms Battista's diagnosis for gender identity
17  disorder, correct?
18  A   Yes
19  Q   So this report is dated June 18, 2008
20       Has anything been done since you
21  received this report to institute Dr Levine's
22  recommendations?
23  A   No, not yet
24  Q   Nothing?

91

1   A   Not specific to Battista
2       Dr Zakai is working on a treatment
3   plan format to propose to utilize so that we
4   prompt the clinicians uniformly to deal with
5   some specific issues --
6   Q   Okay
7   A   -- even though there's unique
8   individual issues to each
9   Q   What is your understanding of the DOC's
10  plans to take steps -- what steps are they
11  going to take as a result of this report?
12  A   We are going to -- I guess it depends
13      We are going to put this
14  recommendation in front of the committee that
15  we have yet to establish to initiate the
16  treatment plan and the process of certainly
17  intensive individual therapy in the very near
18  future
19  Q   What about with respect to the hormone
20  recommendation?
21  A   Dr Levine did not recommend hormones
22  He recommended that hormones be considered
23  after a period of significant in-depth
24  evaluation  Generally he has indicated six

92

1   months to a year
2   Q   And are you aware that Ms Battista was
3   diagnosed with gender identity disorder in
4   November 2004, over three years ago?
5   A   Yes
6   Q   And you're aware that the prescription
7   for the hormones was written and approved on
8   April 14, 2005, over three years ago?
9   A   I became aware of that recently
10  Q   So Ms Battista has not received her
11  hormones for over three years, and now there
12  is this new evaluation by Stephen Levine
13  confirming the GID diagnosis, recommending
14  hormones, and the DOC's position is that it's
15  going to take another six months to a year to
16  provide her with the treatment necessary to
17  give her those hormones?
18  A   I absolutely disagree with your
19  characterization that Dr Levine has
20  recommended hormones
21  Q   You didn't answer my question
22  A   I think it's a mischaracterization
23  Q   How would you characterize Dr Levine's
24  recommendation about hormones?