UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDY JO BATTISTA,

       Plaintiff,

       v.                                  C. A. No.  05-11456-DPW

HAROLD W. CLARKE, et al.,

       Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION

       Defendants, Harold W. Clarke, Kathleen M. Dennehy, Robert Murphy, Susan J. Martin, and Terre K. Marshall, through counsel, hereby submit this memorandum of law in opposition to plaintiff's renewed motion for a preliminary injunction.

## INTRODUCTION

       Plaintiff, Sandy Jo Battista  ("Battista"), an individual presently under civil commitment to the Massachusetts Treatment Center for Sexually Dangerous Persons ("Treatment Center") as a sexually dangerous person pursuant to M.G.L. c. 123A, has brought this action alleging a denial of treatment for a gender identity disorder ("GID"). The renewed motion for a preliminary injunction alleges that the failure to provide plaintiff with hormone therapy for treatment of GID violates plaintiff's rights under the Eighth and Fourteenth Amendments. The motion seeks an order from this Court requiring defendants to initiate hormone therapy for treatment of plaintiff's GID no later than September 28, 2008. Named as defendants are: Harold W. Clarke, Commissioner of the Massachusetts Department of Correction ("DOC"); Kathleen M. Dennehy, formerly DOC Commissioner; Robert Murphy,

Treatment Center Superintendent; Terre K. Marshall, DOC Director of Health Services; and Susan J. Martin, formerly DOC Director of Health Services.

## ARGUMENT

In order to succeed on a request for injunctive relief, a plaintiff must show: 1) a probability of success on the merits of his claims; 2) that he will suffer an immediate and irreparable harm without injunctive relief; 3) that the harm he will suffer if injunctive relief is not granted outweighs the harm to the defendants; and 4) that granting injunctive relief is in the public interest. *See Pagan v. Calderon*, 284 F.3d 184, 191 (1st Cir. 2002); *Jackson v. Fair*, 846 F.2d 811, 814 (1st Cir. 1988). The purpose of a preliminary injunction is to preserve the status quo. *Itek v. First Nat. Bank of Boston*, 566 F. Supp. 1210 (D. Mass. 1983), *aff'd*, 730 F.2d 19 (1st Cir. 1983). In general, injunctive relief is "to be used sparingly, and only in a clear and plain case." *Rizzo v. Goode*, 423 U.S. 362, 378 (1976). When a government agency is involved, the requirement that the government be granted the "widest latitude in the dispatch of its own internal affairs" must be observed. *Rizzo*, 423 U.S. at 378-379. Such considerations are strengthened when a state agency is involved due to federalism concerns. *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974) ("proper balance in the concurrent operation of federal and state courts counsels restraint against the issuance of injunctions against state officers"). Where a plaintiff seeks injunctive relief against a state officer, relief is warranted only when "irreparable injury" is demonstrated. *City of Los Angles v. Lyons*, 461 U.S. 95, 111 (1983); *Lewis v. Casey*, 518 U.S. 343 (1996) (courts are limited to "providing relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm").

Moreover, where a party seeks an injunction which alters the status quo by mandating some positive act by the non-moving party, the moving party must meet a higher standard. A party seeking a mandatory injunction must show that the factors supporting injunctive relief "weigh heavily and

3

compellingly in the movant's favor." *SCFC ILC, Inc. v. Visa USA*, 936 F.2d 1096, 1098-99 (10th Cir. 1991); *Mass. Coalition of Citizens with Disabilities v. Civil Defense Agency and Office of Emerg. Preparedness*, 649 F.2d. 71, 76 n.7 (1st Cir. 1981) ("Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of situation demand such relief."); *Lewis v. General Electric Company*, 37 F. Supp. 2d 55, 62-63 (D. Mass. 1999) (the judiciary's disfavor of mandatory injunctions is reflected by the higher standard required for granting mandatory injunctive relief). The heightened standard is particularly important where the injunctive relief would provide the moving party with largely all the relief sought and where the relief could not be undone even if the non-moving party subsequently prevails at trial. *Phillip v. Fairfield University*, 118 F.3d 131, 133 (2nd Cir. 1997).

I.   **PLAINTIFF WILL NOT SUCCEED ON THE MERITS OF THE CLAIMS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.**

   A.   **Plaintiff Is Unable To Demonstrate That The Available GID Treatment Violates The Constitution.**

   Individuals subject to involuntary civil commitment have a constitutional right to minimally adequate medical care. *See Battista v. Dennehy*, 2006 WL 1581528 *8 (Memorandum and Order on Motion for Preliminary Injunction) (Mar. 22, 2006), *citing Youngberg v. Romeo*, 457 U.S. 307, 319 (1982); *Cameron v. Tomes*, 783 F. Supp. 1511, 1515-16 (D. Mass. 1992), *modified, Cameron v. Tomes*, 990 F.2d 14 (1st Cir. 1993). Generally, courts have determined that the deliberate indifference standard utilized for Eighth Amendment claims serves as an appropriate minimum guideline for the review of claims brought under the Fourteenth Amendment by involuntarily committed persons alleging inadequate treatment. *See Battista, supra; Cameron*, 783 F. Supp. at 1515; *Garcia v. City of Boston*, 115 F.Supp.2d 74, 82 (D. Mass. 2000).

4

The Eighth Amendment protects prisoners from punishments which "involve unnecessary and wanton infliction of pain... totally without penological justification." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "But the Constitution does not mandate comfortable prisons . .." *Rhodes Chapman*, 452 U.S. 337, 349 (1981). Conditions may be "restrictive and even harsh" without violating constitutional norms. *Rhodes,* 452 U.S. at 347. The Eighth Amendment provides that prison officials and doctors violate the Eighth Amendment if they exhibit "deliberate indifference to serious medical needs" of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A prisoner must show that his medical treatment "shocks the conscience" or "offends evolving standards of decency." *Estelle*, 429 U.S. at 106.

The standard applied under the Eighth Amendment in this Circuit is that inmates should receive adequate medical care based on the exercise of professional judgment. *United States v. DeCologero*, 821 F.2d 39, 44 (1st Cir. 1987). This does not mean that civilly committed individuals and prisoners have a constitutional right to ideal treatment. *See Doe v. Gaughan*, 898 F.2d 871, 886 (1986). The state must provide "adequate services: services at a level at least commensurate with modern medical science and of a quality acceptable within prudent professional standards." *DeCologero*, 821 F.2d at 43. Allegations which reflect disagreement as to the appropriate course of treatment do not state a constitutional violation, even if they present a claim of negligence. *DesRosiers v. Moran*, 949 F.2d 15, 20 (1st Cir. 1991); *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993) ("The courts have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment..."); *Layne v. Vinzant*, 657 F.2d 468, 474 (1st Cir. 1981) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second

5

guess medical judgments..."); *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987).

In its memorandum of decision and order on plaintiff's earlier motion for a preliminary

judgment, this Court stated:

> "It is sufficient, for constitutional purposes, for professional judgment to
> have been exercised. *Youngberg*, 457 U.S. at 321. Once that judgment has
> been exercised, '[I[t is not appropriate for the courts to specify which of several
> professionally acceptable choices should have been made.' *Id*.at 321-22.
> Decisions made by professionals enjoy a presumption of validity; 'liability may
> be imposed only when the decision by the professional is such a substandard
> departure from accepted  professional judgment, practice or standards as to
> demonstrate that the person responsible actually did not base the decision on
> such a judgment.' *Id*. at 323.

*Battista*, *supra* at *9.*

In order to succeed on a claim of cruel and unusual punishment, a prisoner must satisfy both

an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 846 n.9 (1994).  Under

the objective component, an inmate must show that he suffers from a serious medical condition that

has received inadequate treatment. *See Mahan v. Plymouth County House of Correction*, 64 F.3d 14,

18 (1st Cir. 1995); *Kosilek v. Maloney*, 221 F. Supp.2d 155, 180 (D. Mass. 2002).  To succeed under

the subjective component, a plaintiff must demonstrate that the prison official "knows of and

disregards an excessive risk to inmate health or safety; the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and he must also

draw the inference." *Farmer*, 511 U.S. at 837.  The Supreme Court has defined the subjective

component of the deliberate indifference standard as requiring conduct that rises to the level of

recklessness as defined under criminal law. *See Farmer* 511 U.S. at 836-837; *Wilson v. Seiter*, 501

U.S. 294, 299-300 (1991); *DesRosiers*, 949 F.2d at 9.  To obtain injunctive relief on a claim of

deliberate indifference to medical treatment, an inmate must "prove that: 1) he has a serious medical

6

need; 2) which has not been adequately treated; 3) because of [defendants'] deliberate indifference; and 4) that deliberate indifference is likely to continue in the future." *Kosilek,* 221 F. Supp.2d at161.

With regard to medical treatment for transsexual inmates, the federal courts have generally held that GID is a psychiatric condition which constitutes a serious medical need entitling the inmate to some form of medical treatment for the disorder, but that there is no constitutional right to a particular kind of treatment. *See Praylor v. Texas Department of Criminal Justice*, 430 F.3d 1208 (5th Cir. 2005) (finding that prison's refusal to provide GID inmate with hormone therapy did not constitute deliberate indifference); *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986) (transsexual inmate entitled to some form of medical treatment, but failure to treat with female hormones does not constitute deliberate indifference); *Meriwether v. Faulkner*, 821 F.2d 408, 413-14 (7th Cir. 1987) (transsexualism constitutes a serious medical condition "entitled to some type of medical treatment," but hormone therapy is not constitutionally mandated); *Brown v. Zavaras*, 63 F.3d 967, 970 (10th Cir. 1995) (transsexual not entitled to receive hormones but is entitled to receive some type of treatment); *Long v. Nix*, 877 F. Supp. 1358, 1365 (S.D. Iowa 1995) (transsexual inmates have no constitutional right to any particular treatment), *aff'd* 86 F.3d 761, 764 (8th Cir. 1996); *Farmer v. Moritsugu*, 163 F.3d 610 (D.C. Cir. 1998) (mere diagnosis of transsexualism, without more, does not necessarily mandate providing a transsexual prisoner with medical or psychological treatment); *Maggert v. Hanks*, 131 F.3d 670, 671-72 (7th Cir. 1997) ("except in special circumstances ... the Eighth Amendment does not entitle a prison inmate to curative treatment for his gender dysphoria"). In *Kosilek v. Maloney*, *supra*, the court held:

> A gender disorder is not, however, necessarily a serious medical need for which the Eighth Amendment requires treatment. As with other mental illnesses, gender identity disorders have differing degrees of severity. As the Standards of Care explain, some individuals with gender identity disorders manage to find

7

their own comfortable, effective ways of living that do not require psychotherapy, hormone therapy, a real life experience, or sex reassignment surgery. (Citing to *Farmer*, 163 F.3d at 615).

*Kosilek*, 221 F. Supp.2d at 184.

In the instant case, a mandatory preliminary injunction requiring the DOC and its mental health services provider, MHM, to initiate hormone therapy is not warranted where plaintiff is presently receiving treatment for GID in accordance with a recent assessment by an experienced GID professional. On June 18, 2008 Stephen Levine, M.D., the GID consultant retained by MHM, completed his assessment of plaintiff, finding that plaintiff suffers from a form of GID and making a number of specific treatment recommendations. *See* June 18, 2008 evaluation by Dr. Levine (Ex. 1). A treatment plan was then prepared by Dr. Aminadav Zakai, chief psychiatrist for the MHM mental health program, in conjunction with Dr. Levine. *See* Affidavit of Aminadav Zakai. M.D. (Ex. 2). The July 30, 2008 treatment plan provides treatment for plaintiff's GID in accordance with Dr. Levine's June 18, 2008 evaluation. Ex. 3; Zakai Aff. at ¶ 7. Dr. Levine's June 18, 2008 assessment recommended that plaintiff be provided with ongoing long-term psychotherapy, as well as group therapy, if available. Dr. Levine's assessment specifically addressed the issue of treating plaintiff's GID with hormone therapy, stating that the consideration of hormone therapy should take place in the context of plaintiff's psychotherapy. Dr. Levine stated that the focus of psychotherapy would be to assist plaintiff in understanding "the complexity of her gender mosaic … explore her psychosexual developmental origins" and determine the "interplay of co-morbid conditions." Dr. Levine stated that psychotherapy would assist plaintiff in exploring the "variety of treatment options and feminization options available" as well as the risks and benefits of the treatment options. *See* Ex. 1. The treatment plan calls for monthly supervision of plaintiff's progress in psychotherapy with the therapist and Dr.

8

Zakai and Dr. Levine (as available) in order to gauge plaintiff's progress in meeting the goals of therapy and readiness for hormone treatment. *See* Ex. 3; Zakai Aff. at ¶ 7. In addition, the treatment plan provides that once the decision to initiate hormone therapy for plaintiff is made, an endocrine consult will be scheduled in order to determine if there are any medical contraindications to hormone therapy based on plaintiff's Congenital Adrenal Hyperplasia and the best and safest approach to hormone therapy. *See* Zakai Aff. at ¶ 10.

On the other hand, the renewed motion for a preliminary injunction seeks the immediate initiation of hormone therapy. However, plaintiff's demand for the immediate initiation of hormone therapy is not supported by the June 18, 2008 assessment by Dr. Levine or any GID professional who has recently evaluated plaintiff. Even if plaintiff could obtain another assessment from a GID expert which calls for the immediate initiation of hormone therapy, this would amount to a disagreement among mental health professionals as to the most appropriate treatment for plaintiff's GID. It is well established that a disagreement among medical professionals as to which of several available treatment options is the best course of treatment for an inmate fails to state a claim under the Eighth or Fourteenth Amendments. *See Youngsberg*, 457 U.S. at 321-322; *DesRosiers*, 949 F.2d at 20; *Watson*, 984 F.2d at 540; *Sires*, 834 F.2d at 13.

In his June 18, 2008 assessment, Dr. Levine makes it clear that he believes that the immediate initiation of hormone therapy for plaintiff is not appropriate, but that hormone therapy should be considered within the context of ongoing psychotherapy. Dr. Levine's assessment states that permitting plaintiff to explore the issue of hormone therapy in the context of psychotherapy will enable plaintiff to face her fears about the dangers of hormone therapy and slowly come to grips with the limitations of hormones. Ex. 1 at p. 5. Plaintiff is unable to demonstrate that the August 8, 2008

9

treatment plan falls outside the scope of prudent professional standards for the treatment of GID or that it is based on unsound medical judgment. *See Youngberg*, 457 U.S. at 321-322.

The claim of inadequate treatment is further diminished by the absence of facts demonstrating that plaintiff's present state of mental health has deteriorated. There are no allegations that plaintiff is presently suffering from a depression, or has made any recent attempts or threats to engage in acts of self-injury, or is unable to engage in ordinary daily activities. In fact, plaintiff describes an active life in the Treatment Center, including going to the gym everyday to lift weights, running three to five times a week, socializing with friends in the law library, participating in a computer lab class, and attending various programs. Deposition of Sandy Jo Battista at 121:1-127:24; 142:1-144:134 (Ex. 4). Dr. Levine's assessment states that plaintiff "demonstrated no gross abnormalities of mental status – mood, cognition, or perception." Ex. 1. The assessment also notes that plaintiff has been successful in handling a work assignment in the Treatment Center property office. *Id.* At most, Dr. Levine indicates that plaintiff experiences frustration over not getting hormone therapy and the uncertainty regarding her eventual release from the Treatment Center. *Id.*

Accordingly, where plaintiff is presently receiving treatment for GID based on the recent treatment plan prepared by MHM's chief psychiatrist, Dr. Zakai, and Dr. Levine, based on Dr. Levine's June 18, 2008 assessment and treatment recommendations, it is clear that plaintiff will not succeed on claims for inadequate medical treatment in violation of the Eighth Amendment or substantive due process under the Fourteenth Amendment.

    **B.**    **Plaintiff Is Unable To Show That Defendants Are Acting With Deliberate Indifference To GID Treatment.**

The subjective prong of the deliberate indifference standard requires more than mere negligence, it requires that prison officials had a "culpable state of mind and intended to wantonly

inflict pain." *DesRosiers*, 949 F.2d at 18-19.    *See also Wilson,* 501 U.S. at 299-300; *Whitley,* 475 U.S. at 321. The subjective prong is directed to the "official responsible for making the relevant decisions regarding an inmate's medical care." *Farmer*, 511 U.S. at 847; *Kosilek*, 221 F. Supp. 2d at 181.    In *Farmer*, 511 U.S. at 837, the Supreme Court held that under the deliberate indifference standard:

> ...a prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.... The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments. An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage...[b]ut an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.  *Id*. at 837.

In evaluating the actions of a prison official under the subjective component, "deliberate indifference should be determined in light of the prison authorities' current attitudes and conduct." *Id*. at 845. To succeed on the subjective component, a plaintiff must show that defendants are "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Id*. at 846.

Plaintiff is unable to show that the defendants' actions amount to deliberate indifference to the treatment of plaintiff's GID in light of treatment available through the DOC's mental health services provider.  First, plaintiff is unable to show that the defendants have played any role in the clinical decisions pertaining to plaintiff's current GID treatment.  With regard to plaintiff's GID treatment, as previously stated, Dr. Levine completed his assessment of plaintiff on June 18, 2008.  A treatment

11

plan has been developed by Dr. Zakai, in conjunction with Dr. Levine.   MHM is responsible for the

implementation of plaintiff's treatment plan. Deposition of Terre K. Marshall at 104:14-105:21 (Ex.

5); Zakai Aff. at ¶¶ 4-9.

Second, plaintiff has not demonstrated that defendants know of and have disregarded an

excessive risk of harm to plaintiff's health or safety due to the GID treatment.  Plaintiff has not shown

that the defendants are both aware of the facts from which the inference could be drawn that an

excessive risk of harm to plaintiff exists as a result of the available GID treatment, and that they drew

the inference that there is an excessive risk of harm to plaintiff based on the available GID treatment.

*See Farmer*, 511 U.S. at 837.  Plaintiff has not shown that an excessive risk of harm presently exists

as a result of the GID treatment available.  The facts demonstrate that while plaintiff is experiencing

frustration in not receiving hormone therapy, plaintiff is not presently suffering from a depression, has

not made any attempts or threats to engage in acts of self-injury in almost three years, and is able to

engage in ordinary daily activities at the Treatment Center. *See* Exs. 1, 4.

On March 22, 2006, this Court issued its decision on plaintiff's motion for preliminary

judgment. *See Battista, supra*.[1]/ This Court denied the motion for preliminary injunction for alleged

inadequate treatment of plaintiff's GID under the Eighth and Fourteenth Amendments, finding that:

> "there is no evidence that Defendants have neglected Plaintiff's medical needs,
> let alone exhibited the 'wanton disregard' required to establish a constitutional
> violation.  *See DesRosiers,* 949 F.2d at 19.

_____

1/  Shortly after its March 22, 2006 decision, this Court appointed an attorney to represent plaintiff.  The court-
appointed attorney later withdrew, and on March 22, 2007, a second attorney was appointed to represent plaintiff.  The
second court-appointed attorney subsequently accepted a position in another state, and on July 9, 2007, notified this
Court of her decision to withdraw as plaintiff's counsel.  Contrary to plaintiff's assertions, counsel for defendants made
numerous efforts to meet with both court-appointed attorneys to discuss the instant action, exchange documents, and
agree on a schedule for discovery.  Unfortunately, these efforts were largely fruitless since both court-appointed
attorneys withdrew as plaintiff's counsel.  During this period of time, defendants also sought to have plaintiff examined
by a GID professional, Cynthia Osborne, L.I.C.S.W., pursuant to Fed. R. Civ. P. 35.

12

*Battista*, 2006 WL 1581528 at *11.

It is undisputed that prior to the March 22, 2006 decision of this Court on the original motion for a preliminary injunction and during the period of time that has followed the decision, plaintiff has been provided with regular psychotherapy sessions with a qualified therapist, Diane McLaughlin, L.I.C.S.W., in accordance with the recommendations of the Fenway Clinic and other GID and mental health professionals. *See* Marshall Depo. at 86:22-87:24. Nor is it disputed that plaintiff has been free of any incident of self-injury for almost three years.

Moreover, the undisputed facts establish that, far from ignoring GID treatment as alleged by plaintiff, the DOC has undertaken the task of creating a comprehensive GID treatment program for its GID inmates in concert with MHM. As made clear in the deposition of Terre K. Marshall, the DOC, beginning in 2006 with the development of the Request for Response ("RFR") for the 2007-2008 contract for mental health services, emphasized the need for the mental health services vendor to assist in establishing a comprehensive GID program for the management of treatment of its GID inmates. Marshall Depo. at 71:1-77:9. The new mental health services provider, MHM, began providing services on July 1, 2007, and hired as its chief psychiatrist, Dr. Aminadav Zakai. Notably, Dr. Zakai has previous experience in the treatment of individuals with GID. Marshall Depo. at 73:2-13; Zakai Aff. at ¶ 1. MHM next retained Dr. Levine, a nationally known expert on the treatment of GID, to provide training for mental health staff, provide supervision of clinical staff treating GID inmates, conduct evaluations of GID inmates, and assist in the development of a comprehensive GID program. Zakai Aff. at ¶ 3. Dr. Zakai is working closely with Dr. Levine in the development of treatment plans for inmates with GID. Marshall Depo. at 73:2-79:13; Zakai Aff. at ¶ 2. In conjunction with MHM, DOC has begun the process of creating a comprehensive GID treatment program. Ms. Marshall is drafting a GID policy that provides for a clinical treatment committee that

13

oversees GID treatment and a separate committee that oversees any security aspects related to GID treatment.  Marshall Depo. at 77:11-81:12; 107:22-110:22.

Plaintiff is unable to meet the burden of proof under the subjective component of the deliberate indifference standard with regard to the GID treatment.  The undisputed facts demonstrate that MHM has conducted an assessment of plaintiff's GID by a nationally known GID professional and developed a new treatment plan.  Moreover, defendants have begun the task of creating a new GID treatment program and policy in conjunction with MHM.  These facts belie plaintiff's claim that defendants are acting with wanton and culpable intention to inflict pain upon plaintiff in violation of the Eighth and Fourteenth Amendments.

**C.     Initiation of Hormone Therapy in The Future Raises Significant Safety and Security Concerns**.

It is well established that, "[i]n evaluating the quality of medical care in an institutional setting, courts must fairly weigh the practical constraints facing prison officials."  *DesRosiers*, 949 F.2d at 19, *citing Wilson v. Seiter*, 501 U.S. 294, 302-303 (1991) ("assuming the conduct is harmful enough to satisfy the objective component of the Eighth Amendment claim, whether it can be characterized as 'wanton' depends upon the constraints facing the official"); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (deliberate indifference inquiry is "an appropriate vehicle to consider arguments regarding the realities of prison administration.").  In determining whether medical care satisfies Due Process, this Court held that "a court must weigh the civilly committed individual's liberty interest against the States' asserted reasons for restraining that liberty."  *Battista v. Dennehy, supra* at *9, citing to *Youngberg*, 457 U.S. at 320.

In addition, the Eighth Amendment imposes upon prison officials the duty to provide for the safety and security of inmates.  *See Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984) (prison officials "are under an obligation to take reasonable measures to guarantee the safety of the inmates

14

themselves"); *Farmer*, 511 U.S. at 832 ("In particular, as the lower courts have uniformly held, and as we have assumed, 'prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners,'" *quoting Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)); *Whitley v. Albers*, 475 U.S. at 320 ("prison administrators are charged with the responsibility of ensuring the safety of the prison staff, administrative personnel, and visitors, as well as the 'obligation to take reasonable measures to guarantee the safety of the inmates themselves..."). In fact, the *Farmer* case, which established the present deliberate indifference standard, concerned the alleged failure of prison officials to protect a preoperative transsexual inmate from an assault and rape by another inmate. *Farmer*, 511 U.S. at 825.

In *Kosilek*, 221 F. Supp.2d at 161, the court held,

> It is conceivable that a prison official, acting reasonably and in good faith, might perceive an irreconcilable conflict between his duty to protect safety and his duty to provide an inmate adequate medical care. If so, his decision not to provide that care might not violate the Eighth Amendment because the resulting infliction of pain on the inmate would not be unnecessary or wanton. Rather, it might be reasonable and reasonable conduct does not violate the Eighth Amendment.

*Kosilek, supra* at 181-182.

While the issue of whether safety and security concerns may preclude the initiation of hormone therapy for plaintiff in the Treatment Center is not ripe since the mental health and medical professionals presently treating plaintiff have not yet recommended the initiation of hormone therapy, the DOC has, nevertheless, considered the potential safety and security concerns that would be raised should hormone therapy be ordered for plaintiff in the future. Based on a security review, the DOC has determined that the initiation of hormone therapy for plaintiff would present significant safety and security concerns. *See* DOC Gender Identity Disorder Security Review for Sandy Jo Battista (Ex. 6).

First, plaintiff's involuntary civil commitment as a Sexually Dangerous Person ("SDP"),

pursuant to M.G.L. c. 123A, § 14(d), prohibits a transfer to another correctional facility.    Pursuant

to M.G.L. c. 123A, § 2, the Commissioner of Correction has designated the Treatment Center (also

known as the Nemansket Correctional Center) as the correctional institution "for the care, custody,

treatment and rehabilitation of persons adjudicated as being sexually dangerous."   While the DOC

may transfer a SDP who is currently under criminal sentence to another correctional institution if the

person is not amenable to or has failed to progress in treatment, or poses a danger to staff or other

residents, or needs to be placed in higher security for the protection of the public, the transfer

provisions do not apply to an SDP who is civilly committed and not subject to a criminal sentence,

such as plaintiff.  *See* M.G.L. c. 123A, § 2A; 103 CMR 460.00 *et seq*, *Transfer Procedures for the*

*Massachusetts Treatment Center*.   Accordingly, the DOC lacks the authority to transfer plaintiff to

another correctional institution.  *See* Affidavit of Robert Murphy, ¶ 13 (Ex. 7).

In his deposition, Treatment Center Superintendent Robert Murphy set out his serious

concerns for plaintiff's safety at the Treatment Center should hormone therapy be initiated.

Superintendent Murphy described the Treatment Center as follows:

> The Treatment Center is a facility for sex offenders.  They're sexual
> predators.  They have victimized others sexually.  They have been determined
> to be very likely to reoffend and to victimize again.  That's the nature of the
> facility.  That's why we exist, so that these sex offenders can be in – one place
> and be managed especially as the legislature determined.   The facility is
> comprised of all sex offenders, has 600 plus sex offenders who, again, each of
> them probably had multiple victims reported, unreported, prosecuted or
> unprosecuted.  They're all residing in the – in the same close, tight, somewhat
> overcrowded housing units with a lot of free time where they can move about
> within – their units and within the facility.   And sex offenders are somewhat
> difficult to manage in the sense that many of them have personality issues,
> personality disorders.  They are known to be manipulative and deceitful, some
> are psychopathic.  They're – they're not a group of offenders that is prone to
> stabbing or assaulting each other or staff, but they are a group of offenders
> that are known to be manipulative and have other types of management issues
> that staff need to address because of the nature of their offenses.

16

Deposition of Robert Murphy at 70:10-71:11 (Ex. 8).  *See also* Murphy Aff. at ¶ 4.

Superintendent Murphy has recently conducted a security review concerning the possibility that Battista may receive GID treatment in the form of female hormones and access to female clothing and canteen items.  Superintendent Murphy has concluded that to the extent hormone treatment and female property items would give plaintiff a female appearance, plaintiff would be placed at significant risk of harm for a sexual assault by other Treatment Center residents since many of the residents have committed repeated sexual offenses against adult women. Murphy Aff. at ¶¶ 8-10;  Murphy Depo. at 74:11-75:23.  Superintendent Murphy stated that he could not guarantee plaintiff's personal safety if placed in the general population of the Treatment Center while on hormone therapy due to the prevalence of sex offenders and the open housing units.  Murphy Aff. at ¶11; Murphy Depo. at 81:1-82:20.  Superintendent Murphy further indicated that while a GID inmate on hormone therapy at MCI-Norfolk had not been sexually assaulted, the population of the Treatment Center is significantly different from MCI-Norfolk because the sex offenders at the Treatment Center have been adjudicated as sexually dangerous and likely to commit sexual offenses in the future.  Murphy Depo. at 77:14-79:2.  Superintendent Murphy further stated that his concerns for plaintiff's safety if treated with hormones also stem from his knowledge of plaintiff at the Treatment Center, including recently being observed engaged in a sexual encounter with another resident in the yard, the alleged rape of Battista by another resident several years ago, a prior assault by another resident, the fact that plaintiff is not a reliable reporter, and has a history of non-compliance with DOC rules.   Murphy Aff. at ¶  10; Murphy Depo.  at  121:24-127:15.

Superintendent Murphy states that the only way he could provide for plaintiff's safety at the Treatment Center if treated with hormones would be to place plaintiff in the institution's Minimum Privileges Unit ("MPU") on protective custody status. Superintendent Murphy described the MPU

as a very restrictive unit providing 23 hours a day confinement in a cell, with one hour out for exercise. Superintendent Murphy expressed his concern that plaintiff's long-term placement in the highly restrictive MPU would adversely affect Battista's ability to engage in the sex offender treatment program. Superintendent Murphy stated that the longest a Treatment Center resident has been held in the MPU is one and a half to two years. In addition, Superintendent Murphy has expressed his concerns that Battista's long-term placement in the MPU would place additional operational burdens on the MPU staff and the availability of the MPU cell for other residents should the need arise. Murphy Aff. at ¶14; Murphy Depo. at 88:5-89:21.

Commissioner Clarke has reviewed the security review conducted by Superintendent Murphy and has approved the conclusions, determining that security requirements would require him to deny the provision of hormone therapy for plaintiff at the Treatment Center. *See* Ex. 6.

Accordingly, should plaintiff be recommended for hormone therapy under the current treatment plan, Commissioner Clarke's decision to deny the treatment would be in response to the Commissioner's duty to provide for plaintiff's safety and the safety of other residents and staff, and would *not* constitute deliberate indifference. *See Kosilek,* 221 F. Supp.2d at 193-195.

## II.    INJUNCTIVE RELIEF IS NOT WARRANTED WHERE PLAINTIFF DOES NOT FACE AN IMMEDIATE AND IRREPARABLE HARM.

In order to pursue a claim for injunctive relief, a plaintiff must show that he faces a "real and immediate threat" of ongoing or future irreparable harm. *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983); *Smith v. Boyd*, 945 F.2d 1041 (8th Cir. 1991) .

In the case at bar, there is no demonstration that plaintiff is faced with a "real and immediate threat" of irreparable harm resulting from the lack of treatment for GID. As described above, plaintiff was recently assessed by MHM's GID consultant, Dr. Levine, and a treatment plan has been developed for plaintiff's GID. The treatment plan calls for the consideration of hormone therapy in

the context of ongoing psychotherapy with a mental health professional under the supervision of MHM's chief psychiatrist, Dr. Zakai, and Dr. Levine. Certainly, neither Dr. Levine's June 18, 2008 assessment nor the recent treatment plan rule out plaintiff's treatment with hormone therapy, but provide that the consideration of hormone therapy in the context of ongoing psychotherapy will permit plaintiff to "explore the variety of treatment options and feminization options available to them, risks and benefits of each as it pertains to her medical condition." Ex. 1.    Moreover, it is undisputed that plaintiff is not presently suffering from a depression, is not taking any prescribed medications for treatment of depression or anxiety, and has not experienced any episodes of self-injury in several years and is able to engage in the ordinary activities of life in the Treatment Center. *See* Exs. 1, 4. Therefore, in light of the GID treatment presently available to plaintiff through MHM, the DOC's mental health services provider, and in the absence of a showing that plaintiff faces an immediate and irreparable threat of harm as a result of the GID treatment, the renewed request for a preliminary injunction relief should be denied.

## III. DEFENDANTS WILL SUFFER THE GREATER HARM IF INJUNCTIVE RELIEF IS GRANTED.

Injunctive relief is not warranted in this action and the DOC will suffer the greater harm should the requested injunctive relief be allowed. Plaintiff's request for injunctive relief, in effect, seeks to have this Court step in and resolve a disagreement over the proper course of treatment for plaintiff's GID. Such decisions should be left in the hands of qualified medical and mental health staff and prison administrators. In light of the fact that GID treatment is presently available to plaintiff through a treatment plan prepared by experienced mental health and GID professionals, but plaintiff seeks a different course of treatment, defendants would suffer the greater harm should the requested injunctive relief be granted. While plaintiff can point to earlier psychological evaluations that support her preferred course of treatment, i.e., the immediate initiation of hormone therapy, this

19

alone is insufficient to override the adequate GID treatment plan presently available. It is well established that prison administrators should be accorded the latitude in making decisions which ensure that an inmate is provided with appropriate treatment which does not create an unnecessary threat to safety and the internal order and running of the correctional facility. *See Cameron*, 990 F.2d at 19; *Watson v. Caton*, 984 F.2d at 540. Here, defendants have made clear their significant concerns for plaintiff's safety and the orderly running of the Treatment Center should treatment in the form of female hormones be mandated by this Court. *See* Murphy Aff.

In order to provide for the safety of the public as well as the safety of staff and inmates within its institutions, it is imperative that prison administrators have the ability to work with competent medical staff to provide appropriate medical and mental health treatment. Defendants will suffer the greater harm if the requested injunctive relief is granted.

## IV.    GRANTING THE REQUESTED RELIEF IS NOT IN THE PUBLIC'S INTEREST.

It is in the public's interest that the defendants, working with medical and mental health professionals, be provided the flexibility to respond to medical and mental health issues which may also raise safety and security concerns. Such issues should remain in the hands of those with the expertise and experience to handle them. The management of the Treatment Center is an extremely difficult task and it is in the public's interest that qualified administrators and medical and mental health professionals be permitted to make decisions and establish procedures which provide for the safety and security of residents staff and provide adequate medical treatment. The public benefits from having secure correctional facilities that are safe and well maintained.

## CONCLUSION

For the foregoing reasons, defendants, Harold W. Clarke, Kathleen M. Dennehy, Robert Murphy, Terre K. Marshall, and Susan J. Martin, request that injunctive relief be denied.

20

Dated: September 5, 2008

Respectfully submitted,

NANCY ANKERS WHITE
Special Assistant Attorney General


/s/  Richard C. McFarland
Richard C. McFarland, BBO# 542278
Legal Division
Department of Correction
70 Franklin Street, Suite 600
Boston, MA   02202
(617) 727-3300   ext. 132


## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 5, 2008.

/s/ Richard C. McFarland
Richard C. McFarland

# EXHIBIT 1

**Stephen B. Levine, MD**
Center for Marital and Sexual Health
23230 Chagrin Boulevard #350
Beachwood, Ohio 44122
216 831 2900
fax 216 831 4306

Wednesday, June 18, 2008

Aminadov Zakai, MD
MHM Services, Inc.
50 Commerce Way
Norton, Massachusetts, 02766-3313

Re: Sandy J. Battista formerly named David Megarry

Dear Dr. Zakai,

Thank you for enabling the 1 hour 50 minute interview at the Treatment Center today with this 45 year old never married man who has served three sentences for robbery and kidnapping and rape of a ten year old girl. No longer serving a sentence for these crimes, Sandy is civilly committed as a registered sex offender until a panel decides that he is no longer a great risk to society. At this point, his civil commitment is for an indefinite duration—1 day to forever.

Sandy is again in litigation trying to force the implementation of 2004 recommendations of the Fenway Clinic to begin hormones. He hopes to get hormones at his current institution and eventually be free man. He thinks about flying to Thailand to obtain sex reassignment surgery but he says he is not actually certain that he wants surgery, in part, because he thinks that the surgery is mutilating. Sandy describes himself as generally pessimistic about getting what he wants.

Sandy is a 5 feet 7 inch, 136 lb well groomed clean shaven frontally balding male with a slightly feminine handshake and wave. He says his waist is 28 inches. Sandy's long hair was carefully braided. His overall appearance reflected considerable care in clothing. Sandy sat still, conversed rationally, seemed to be forthcoming, and possessed an adequate vocabulary. Sandy's appearance did not show his anticipatory anxiety about this interview. He said that he had trouble sleeping and cried a lot with worry that I would not support the recommendations for hormones. He demonstrated no gross abnormalities of mental status—mood, cognition, or perception.

I see Sandy's gender problem in the light of six issues:

1.  He has been cared for by foster families and various prison systems for almost 30 years. Prior to adolescent foster placements, he lived with his mother, maternal grandmother, paternal grand parents, and his father for varying lengths of time. His parents and grandparents are now deceased

11

1



and he is basically alone in the world except for a sister who lives in southern Ohio, where he does not wish to reside. She may not know about his GID.

2. He has the most common form of male congenital hyperplasia (CAH) and is on prednisone. It is not the salt wasting variety. He claims that he feels the same on and off prednisone. Medically, without prednisone, he might experience adrenal insufficiency, however, which can be fatal if unrecognized. Although CAH is a form of intersex condition, in his case it resulted in precocious puberty in his second year of life not ambiguous genitalia. Sandy's genitalia were normal at birth and still are apparently. The influence on males with CAH is not well studied. The adolescent and adult sexual identities in girls with CAH have been scientifically carefully scrutinized. The general conclusion is that CAH does not lead to GID, at most, it leads to masculine gender role behaviors without an increase of lesbianism Although Sandy has CAH, I don't think it would be justified to say that his GID is due to an intersex condition. He does not have an intersex condition; his genitalia are not ambiguous by report and I presume by repeated physical examinations.

3. He is a convicted pedophile who continues today to have transient awareness of the attractiveness of 9-11 year old girls—that is, those who are on the cusp of puberty. He has made considerable progress in developing victim empathy and effective avoidance techniques for not allowing himself to dwell on his pedophilic eroticism. He claims to think about with regret his crimes almost on a daily basis and now he feels badly for his victims.

4. He has very poor recall of his childhood, does not remember anything about the "accidental" murder of his mother by his father in front of him. He denies being abused and only has good memories of his times with his grandparents and father. He has forgiven his mother so much so that in choosing a new gender-neutral name in 1995, he took his mother's maiden name to honor and to forgive her. He does not now recognize himself as abused and suggests that the recurrent references to these events may be an error in understanding. (Numerous evaluators have described him as being sexually abused.) He emphasized that his father was convicted of manslaughter, not murder, and that he accidently killed his mother. Sandy gave the impression of not wanting to recall. He claims not to have any intrusive disturbing memories of his youth, although he thinks his crime almost daily. This suggests to me that the fixation on the bodily discomfort and wish to have it relieved may play a major role in suppressing his memories of early life chaos and pain.

5. Sandy seems to have come a long way in prison from his impulsive aggressive molesting irresponsible uneducated youth that is recurrently described in the numerous reports about him that were provided to me Apparently, this maturation is real, he is calm, has not been a behavior

21

2

problem in recent years. He is motivated to get out of prison and to get
hormones. It would be hard not to consider David Megarry in his early
years in prison as poorly socialized irresponsible dangerous
psychopathic man. Sandy never accomplished any vocational success
outside of prison. He was separated from the US Army after 8 months
of disciplinary problems which may have included drunkenness and
wearing of female underpants. Today, he is proud of his
accomplishments. He works in prison—he landed a prime position in
Property on Dec 26, 2007 and has been working effectively there since.
He has worked in other prison roles as well. He says he is now
somewhat educated, takes personal responsibility for his crimes, is
honest and compassionate, and is no longer violent. Generally, he is
untrusting and pessimistic. He states that he wants a normal life, to be
reconnected with his family (all dead but a sister), and make something
of himself. He hopes to get into a two-year post prison program in
Boston where he can get support, counseling, and work. St Andrews is
the only place he knows that takes sexually dangerous offenders. It has
a long waiting list, he claims.

6.     Having been rejected by his mother for his pigeon-toed deformity and
his precocious puberty as a "freak", he remains sensitive to any form of
rejection as a freak. He distinguishes himself from the sexual perverts
in Bridgewater who masturbate in a closet when they see an attractive
Corrections Officer or who have two or three way homosexual sex. His
masturbation is irregular, perhaps averages monthly, and only involves
his rectum. "I don't stimulate my penis." He rarely ejaculates. He is
embarrassed by this revelation. I am not sure he has shared his
masturbatory method with other evaluators. This sensitivity to being
labeled a "freak" means to me that his self categorization as a Trans
person removed Sandy from the category of freak and placed him in a
new unstigmatized one. While corrections officers or prisoners may
refer to Trans prisoners as freaks, Sandy is able to see this as a
reflection of their ignorance. Out in the free world a man who appears
dressed as a woman often encounters name calling and sometimes the
threat of violence. It is important that Sandy work on this issue since
Sandy values so highly the lack of recent personal violence.

Of course, Sandy is some form of gender identity disorder. While this initial reevaluation
did not have the luxury of time to review the development and evolution of his gender
identity, orientation, and intention as a child, adolescent, and adult, the subject deserves
tracing as accurately as possible. Currently, he does not use his penis for masturbation,
he sits to urinate, and likes to think of himself as a woman. When he is seen naked by
others, he is embarrassed by having male genitalia. He said that when he tried to increase
his masculine gender roles through beards, tattoos, or weight lifting, these activities
eventually made him less comfortable. Once he realized this, he allowed his slender
petite body to revert to its natural form. In the process of starving himself for days on
end for this purpose, he lost 40 lbs. His quest is to gain access to female clothing and

31

hormonal treatment in the immediate future. He denies any autogynephilia, in fact, he laughs uncomprehendingly that anyone would be turned on to the image of the self as a female. He is says that his dominant orientation is directed at women. But his interest in attractive women is not so much to their bodies as it is to their clothing and styling opportunities He imagines loving and making love with a woman as a woman, a woman as petite as he now is. He is sexually attracted to men but not romantically. "I am bisexual." He has had four sexual experiences with men in prison, one with a woman prior to prison. But his description of orientation as bierotic is actually incomplete. Sandy acknowledges that he is still capable ("always will be!") of being attracted to prepubertal girls. Since 1995 when he announced and obtained a name change, he has expressed his femininity socially. This has caused him to lose and gain a few friends. It has enabled him to learn about his legal rights and to focus his life on his eventual becoming a woman. He claims never to have had sexual arousal to girl's or women's clothing. (that is, he denies a fetishistic transvestitic pattern) Sandy's sexual drive is not strong, never was, he claims. He does not like having a penis. His last sexual experience with a man was three years ago. He won't do this again because the few moments of pleasure of having an erection in him is not worth the consequences of being discovered to be a rule breaker who can't control himself. The benefit/risk ratio is terrible for him. He sees himself as a woman but not a transsexual woman—a woman! He seems a bit disinterested in exploring the relationship between his sexual identity mosaic and his inconstant, shifting, unsoothing parental attachments. If he had freedom to select an ideal sexual partner, it would be a small woman with his shape. He would then think of himself as a lesbian.

Apparently, Sandy tried to castrate himself in 2005 to lower his testosterone level and its unwanted masculinizing effects after he felt thwarted by the DOC's refusal to honor Fenway's recommendations for hormones for him. . He did this in his cell with a razor blade and although he carefully studied the procedure in advance, he was surprised by the anatomy, the blood, and the pain. He sewed his incision up, packed himself with gauze, and went to bed. By the next day, he had an infection and sought help. He was put in the hole for this behavior. While he was cited for this disruptive behavior, he emphasized that it was considered carefully, researched, and planned; it was not impulsive. Sandy sees this as different from tickets for bad behavior that he got when he was younger. The castration attempt was the culmination of nervous breakdown he gradually had He could not stop pacing in his cell and crying all the time. He would not eat or shower. His cell mate complained that he smelled. He was temporarily placed in the crisis unit. He is not interested in self surgery any longer.

 Sandy claims that he has always been afraid of actual sex with a woman because she might not like his body. Children seem less dangerous and critical to him and are less likely to see him as a freak. This was his sense of why he attacked and molested little girls He is very sensitive because of his mother's perception of him as a freak to any labeling of him now.

I have read/scanned the report of *lengthy* commentary of consultant Ms. Cynthia Osbourne, MSW and the *lengthier* rebuttal of Drs. Kapila and Kaufman, the original

41                                                                                              4

evaluators at Fenway Clinic. While each has made some cogent points about the other party's views, my view of both written reports and the diagnosis and treatment of GID are fundamentally different. I don't really expect most readers to be able to find the time, interest, and concentration to read over 20 single spaced pages on most topics. The issue is that this prisoner has a form of GID, complicated by his horrendous early life history, his demonstration of his capacity to violently harm a child, and his imprisonment for an indefinite amount of time. The two reports represent a distinctly pro triadic therapy (real life experience, hormones, and SRS) and a distinctly con triadic therapy approach. Both are extreme. There is no reason to doubt that Sandy has a form of GID; Osbourne's major point is that the therapy approach should take into consideration many more factors than this diagnosis per se.

**Tentative Diagnoses:**

Axis I   "Sexual identity mosaicism" characterized at least by
>   Gender Identity Disorder of Adulthood, attracted to women and men,
>   AND
>   Pedophilia

Axis II
>   Psychopathic Personality Disorder, much improved in prison environment

Axis III
>   Congenital Adrenal Hyperplasia, 21-hydroxylase deficiency (likely), relatively
>   mild without genital malformation.

Axis IV
>   Frustration over not getting the treatment that Fenway recommended
>   Frustration over not knowing when he is to be released from Bridgewater (it is
>   reasonable to speculate that he is also very frightened about leaving Bridgewater)

Axis V   very low prior to imprisonment
>   Relatively high in recent several years considering the prison environment

**Recommendations for the management of GID**

1   Draw AM testosterone level to see if he is actually hypogonadal (note the low sex drive)

2   Assign someone to continue this evaluation with the aim of getting him positioned to be part of the DOC gender identity program

3.   Hormone treatment is a possibility but it is preferable that it be done within the context of therapy where he can face his fears about their dangers and slowly come to grips with their limitations. We need to recognize that there probably is no medical experience with giving estrogens to someone with CAH so they must be given cautiously with careful monitoring. Sandy Je Battista is a strong argument for developing a GID program. It will likely help the prisoner considerably just being part of it.

4.   I think he would make a very good core group member if there was a group for Trans prisoners.

51

5       Make every effort to value his continuing high level work in property and his ability to remain honest in that position, as this is evidence that his psychopathy is better controlled now.

6.      Every effort should be made to praise his accomplishments in prison in the last few years and he can be given access to more feminine canteen materials once these are specifically defined and judged to be safe for the environment.

7       Since Sandy has such a horrendous early life history with masochistic underpinnings, he needs to understand that for some peers in prison, his feminine expressions may excite them into trying to attain domination of him, in a manner that is representative of his past abuse. The social risk of feminization for him must be balanced by his capacity to resist being treated intimately as a female only to be abused anew.

8.      Staff should be mindful that by increasing his feminization through hormones and participating in a gender problem is not likely to permanently end his pedophilic attractions. While estrogen is likely to lessen the intensity of his sexual drives, it will not alter the direction of it (towards 9-11 year old girls). If his testosterone levels are hypogonadal prior to estrogen administration, it may be that no attenuation of his sexual interest in girls will occur. The medical staff might consider using Provera in the future as an inexpensive but effective antiandrogen.

Respectfully,


Stephen B. Levine, MD

61

6

EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDY JO BATTISTA,

    Plaintiff,

    v.                                    C. A. No.   05-11456-DPW

HAROLD W. CLARKE, et al.,

    Defendants.

## AFFIDAVIT OF AMINADAV ZAKAI, M.D.

I, Aminadav Zakai, M.D., do hereby depose and say that:

1.   I am the Chief Psychiatrist for MHM's mental health services contract with the Massachusetts Department of Correction ("DOC"). I have held this position since September 16, 2007. I am board certified in psychiatry and neurology. I also have experience in the diagnosis and treatment of gender identity disorders ("GID") in that I have previously provided psychiatric treatment for several GID patients. The information provided herein is based upon my personal knowledge.

2.   As the Chief Psychiatrist for MHM's mental health services contract with the DOC, I have worked to develop a program for the diagnosis and treatment of inmates with gender identity disorders ("GID"). To assist in the development of a GID program, MHM hired Dr. Stephen Levine, a psychiatrist with extensive expertise and experience in the diagnosis and treatment of GID, to serve as a consultant. Dr. Levine's role is to make recommendations regarding the creation of a GID program for the


DEFENDANT'S
EXHIBIT
2

diagnosis and treatment of GID, to serve as a consultant.  Dr. Levine's role is to make recommendations regarding the creation of a GID program for the DOC, provide training and supervision for mental health staff and to conduct evaluations of the DOC inmates regarding the diagnosis and treatment of GID.

3.    Dr. Stephen Levine is a Clinical Professor of Psychiatry at the Case Western Reserve University Medical School and co-founder of the Case Western Reserve University Gender Identity Clinic.  Dr. Levine was appointed the chairman of the committee drafting the fifth version of the Harry Benjamin Standards of Care.  Dr. Levine has authored numerous peer-reviewed articles concerning GID.  During his thirty (30) year career as a psychiatrist, Dr. Levine has participated in the evaluation and/or treatment of approximately 325 to 400 individuals diagnosed with GID.  Dr. Levine also served as a court-appointed independent expert on the issue of GID treatment in the trial of <u>Kosilek v. Dennehy</u>, U.S.D.C. 00-12455-MLW (D. Mass.).

4.    Dr. Levine and I have conducted evaluations of a number of GID inmates in DOC custody, including Sandy Jo Battista ("Battista"), an individual under civil commitment to the Massachusetts Treatment Center for the period of one day to life as a sexually dangerous person.

5.    Dr. Levine conducted an interview of Sandy Jo Battista

on Wednesday, June 4, 2008, lasting one hour and fifty minutes.

I sat in on Dr. Levine's interview with Sandy Jo Battista. Dr.

Levine completed his report on Battista on June 18, 2008. Dr.

Levine's report states that "Sandy is some form of gender

identity disorder." Dr. Levine provided a "tentative diagnosis"

of:

> Axis I – Gender Identity Disorder of Adulthood,
> attracted to women and men, characterized by sexual
> identity mosaicism, and Pedophilia;
> Axis II – Psychopathic Personality Disorder, improved
> in prison environment;
> Axis III – Congenital Adrenal Hyperphasia, 21-
> hydroxylase deficiency (likely), relatively mild
> without genital malformation.

6.    Among the eight recommendations for the management of

Battista's GID listed in Dr. Levine's report are:

> (1) Draw AM testosterone level to see if he is
> actually hypogonadal (low sex drive);
> (2) Assign someone to continue this evaluation with
> the aim of getting him positioned to be part of the
> DOC gender identity program;
> (3) Hormone treatment is a possibility but it is
> preferable that it be done within the context of
> therapy where he can face his fears about their
> dangers and slowly come to grips with their
> limitations. We need to recognize that there
> probably is no medical experience with giving
> estrogens to someone with CAH so they must be given
> cautiously with careful monitoring. Sandy Jo
> Battista is a strong argument for developing a GID
> program; and
> (4) I think he would make a very good core group
> member if there was a group for Trans prisoners;

7.    On Friday, August 8, 2008 I completed a treatment plan

for Sandy Jo Battista based on Dr. Levine's report. The

treatment plan has been reviewed and approved by Dr. Levine.    I
have attached a copy of the treatment plan to this affidavit.
The treatment plan provides for providing Sandy Jo Battista with
ongoing long-term therapy with a mental health professional.
Because Battista's current primary therapist, Diane McLaughlin,
L.I.C.S.W., has recently accepted another position with MHM, a
new primary therapist will be assigned to continue to work with
Sandy Jo Battista on issues related to GID.    The treatment plan
calls for therapy to take place at least monthly, but possibly
weekly.    The frequency of the therapy sessions will be
determined by the primary therapist in conjunction with Sandy Jo
Battista.    The therapist will meet monthly with me and Dr.
Levine (when available), to review Sandy Jo Battista's treatment
progress.    The treatment plan will be amended based on
significant events in the therapy.    The purpose and goals of the
therapy focused on Sandy Jo Battista's GID is set out in the
treatment plan:

> During therapy, an ongoing assessment and evaluation
> will be done to determine appropriateness of further
> feminization.    Therapy will be focused on the
> inmate's understanding of the complexity of her
> gender mosaic, collect developmental history to
> explore her psychosexual developmental origins as
> well as determining interplay of co-morbid
> conditions, the nature of her crime and relatedness
> to her transgender state.    Inmate will also explore
> the variety of treatment option and feminization
> options available to them, risks and benefits of
> each as it pertains to her medical condition.    The
> goal of therapy is to improve the inmate's comfort

5

> and satisfaction with her unique gender identity while minimizing the potentially dangerous acting out behavior and surgical procedures.

8. The treatment plan reflects Dr. Levine's June 18, 2008 report which states that hormone treatment for Sandy Jo Battista's GID is a possibility, but should be approached cautiously using therapy to explore the complex nature of her gender disorder and co-morbid disorders, as well as the benefits and risks of hormone therapy.

9. The treatment plan provides that all clinical decisions regarding increasing Sandy Jo Battista's feminization, including hormones and access to female canteen items, will be made on a step by step basis, through the supervision and assessment process. It is very important that Sandy Jo Battista is a willing participant in the treatment and assessment process established in her treatment plan.

10. Dr. Levine's report further indicates that he is unaware of any medical studies or literature that have looked at the issue of giving hormones to an individual, such as Sandy Jo Battista, who suffers from Congenital Adrenal Hyperphasia ("CAH") and he recommends proceeding cautiously with careful monitoring should treatment with female hormones be prescribed for her in the future. Accordingly, the treatment plan for Sandy Jo Battista provides that once it is determined that treatment with female hormones is necessary and appropriate, a

6

consultation with an endocrinologist will be required "to ascertain safety and the best approach in consideration of her Adrenal Hyperplasia."

11.   Another concern raised by Dr. Levine in his report with regard to providing treatment that leads to Sandy Jo Battista's feminization is that such treatment may result in the sexual abuse and domination of Sandy Jo Battista by other Treatment Center residents that will serve as a reoccurrence of her history of abuse.

12.   While Dr. Levine's report suggests that Sandy Jo Battista would benefit from participating in group therapy with other Treatment Center residents who have been diagnosed with GID, presently there are no other individuals committed to the Treatment Center who are seeking treatment for GID.   However, the treatment plan provides that the treating clinician should determine whether there is an existing therapy group at the Treatment Center which may provide an appropriate environment for Sandy Jo Battista to discuss issues related to her gender disorder.


Signed under the pains and penalties of perjury this ___4___ day of September, 2008.

Aminadav Zakai, M.D.
Chief Psychiatrist, MHM

MASSACHUSETTS DEPARTMENT OF CORRECTION
HEALTH SERVICES

**GID TREATMENT PLAN SUPPLEMENT**

Institution: <u>The Treatment Center</u>

Name: <u>Sandy J. Battista aka David Megarry</u>  ID#: <u>M15930</u>  D.O.B.: <u>12/30/61.</u>

Date:  <u>7/30/08</u>

Clinician: <u>Diane McLaughlin</u>

Current Diagnosis

Axis I: GID

Axis II: Personality Disorder NOS

Axis III: Congenital Adrenal Hyperplasia

Axis IV: GID treatment issue, civil commitment

Axis V: 65

Treatment plan:

1. Staff and officers should make the effort of calling the inmate by her self-identified female name.

2. Inmate Batista will participate in at least monthly but not more often then weekly in individual assessment and long term therapy with a mental health professional.

   During therapy, an ongoing assessment and evaluation will be done to determine appropriateness of further feminization.  Therapy will be focused on the inmates understanding of the complexity of her gender mosaic, collect developmental history to explore her psychosexual developmental origins as well as determining interplay of co-morbid conditions, the nature of her crime and relatedness to her transgender state.  Inmate will also explore the variety of treatment option and feminization options available to them, risks and benefits of each as it pertains to her medical condition.  The goal of therapy is to improve the inmate's comfort and satisfaction with her unique gender identity while minimizing the use of potentially dangerous acting out behavior and surgical procedures.

3. Inmate Batista will be discussed monthly in supervision with Dr. Zakai and Dr. Levine (when available) to review treatment progress. Treatment plan will be amended around significant events in therapy.

4. All decisions on feminization (such as female canteen items and hormone treatment) will be made through the supervision and assessment process and is conditional on participation in the assessment.  The effect of each step in the feminization will be explored and reviewed before moving to the next feminization level.

5. Inmate Batista should also be part of group therapy if available.  Since not enough inmates with GID currently in her institution to form a diagnosis specific group, the treating clinician will explore existing groups with the group leaders for appropriateness.

6. Should the decision to initiate hormone therapy happen within the context of the evaluation, an endocrine consult will be required to ascertain safety and the best approach in consideration of her Adrenal Hyperplasia.

Current Treatment Issues & Goals:

1. Inmate Batista will verbalize the unique pathway to her transgendered identity.  Note specific area of explorations detailed in Dr. Levine's report of 6/4/08.

2. Inmate will verbalize understanding of various treatment options for her transgendered condition.
3. Inmate will verbalize treatment readiness; specifically her expectation and satisfaction from feminization process and therapy process.

Treatment Modality & Frequency:

Individual assessment and psychotherapy every 2-4 weeks

Group therapy, frequency and group availability to be determined

Anticipated Completion Date: March 1st, 2009  Next Review Date: March 1st, 2009

Clinician Signature: _____Patient Signature: _____

Date: _____Date: _____

EXHIBIT 3

MASSACHUSETTS DEPARTMENT OF CORRECTION
HEALTH SERVICES

## MENTAL HEALTH GID TREATMENT PLAN

Institution: The Treatment Center

Name: Sandy J. Battista aka David Megarry  ID#: M15930 _____ D.O.B.: 12·30·61

Date: 7/30/08

Clinician: Diane McLaughlin, LICSW

Diagnosis - Initial: Personality Disorder NOS

Current Working Diagnosis

Axis I: GID

Axis II: Personality Disorder NOS

Axis III: Congenital Adrenal Hyperplasia

Axis IV: GID treatment issue, civil commitment

Axis V: 65

Treatment plan:

1. Inmate Batista will participate in at least monthly but not more often then weekly in individual assessment and long term therapy with a mental health professional.
2. Inmate Batista will be discussed monthly in supervision with Dr. Zakai and Dr. Levine (when available) to review treatment progress.
3. All decisions on feminization (including female canteen items, hair removal and hormone treatment) will be made through the supervision and a assessment process and is conditional on participation in the assessment. The effect of each step in the feminization will be explored and reviewed before moving to the next feminization level.
4. Inmate Batista should also be part of group therapy if available. Since no other inmates with GID are currently in the institution, the treating clinician will explore existing groups with the group leaders for appropriateness.
5. Draw AM testosterone level to see if he is actually hypogonadal and consider the option of Provera as part of the feminization process. Medical and endocrine consultation once/if hormone therapy initiation is planned.

Current Treatment Issues & Goals:

1. Understanding Inmate Batista unique pathway to his transgendered identity.
2. Enhance the inmate understanding of options other than transforming his body.
3. Assess treatment readiness in an ongoing way; assess expectation and satisfaction from feminization process.

Treatment Modality & Frequency: 1:1 X 1 mo

Individual assessment and psychotherapy every 2-4 weeks

Group therapy, frequency and group availability to be determined

Anticipated Completion Date: March 1st, 2009  Next Review Date: March 1st, 2009

Clinician Signature: _____ LICSW    Patient Signature: Patient Refused to sign

9-2-08

DEFENDANT'S
EXHIBIT
3

EXHIBIT 4

Pages:  1-187
Exhibits:  1-6

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS


SANDY JO BATTISTA,

           Plaintiff

v                       No. <u>05-114566-DPW</u>

HAROLD W. CLARKE,

           Defendant


      DEPOSITION of **SANDY JO BATTISTA**, a witness called by and on behalf of the Defendant, pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Peter J. Wood, Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, taken by **RICHARD C. McFARLAND,** Esquire, **DEPARTMENT OF CORRECTIONS**, at the Massachusetts Treatment Center, 30 Administration Road, Bridgewater, MA 02324, on **Friday, August 15, 2008**, commencing at **10:05 a.m.**

———

**WOOD COURT & CONFERENCE REPORTING**
77 Summer Street
Cohasset, MA 02025
781-383-6621



2

# A P P E A R A N C E S

Neal E. Minahan, Jr., Esquire
**McDERMOTT, WILL & EMERY, LLP**
28 State Street
Boston, MA  02108
                    for the Plaintiff

Richard C. McFarland, Esquire
**DEPARTMENT OF CORRECTIONS - Legal Department**
70 Franklin Street
Boston, MA 02110
                    for the Defendant

- - - -

121

1   Q   Walkman's.  Okay.  So, 7 o'clock is the Count?

2   A   It's the Count, yeah.

3   Q   And then, what happens after Count?

4   A   Oh, you wait for it to clear.  It usually clears

5       about 6:15, 6:25; and then, they let you out; they

6       open up the doors and you wait to go to chow;

7       people come out and --

8   Q   I'm sorry.  What time is Count?

9   A   Count is at 7 o'clock.

10   Q   7 o'clock.

11   A   So --

12   Q   So, at 7:15 --

13   A   Well, usually, it will clear about 7:15 or 7:20;

14       and, at that time, the doors are unlocked and you

15       can come out of your rooms into the Day Room and

16       usually wait for chow.

17             And, at that time, people are doing

18       laundry or doing Unit jobs or whatever.

19   Q   And, is there a washer and dryer in the cell -- in

20       the Unit?

21   A   In the Unit, there is, yeah.

22   Q   Okay.  And, they're opened up for the Residents?

23   A   Huh?

24   Q   The Residents all have access to the --

122

1    A    Washer and dryer?  Yeah.

2    Q    -- washer and dryer?

3    A    Yeah.

4    Q    Okay.  And, you have your own hot-pot or do you

5         use a communal hot-pot?

6    A    Well, I have my own; but, while I'm out in the

7         Unit, I use --

8              It's not really a hot-pot.  I don't know

9         what you'd call it.

10              It's next to the sink, there's something

11         that you turn.  I think it's called an aerator or

12         something.  Hot water comes out of it.

13    Q    Okay.  And then, when you have -- it's time for

14         breakfast, you walk to the chow hall?

15    A    Yes.

16    Q    You walk as --  The whole Unit goes together?

17    A    The whole Unit goes together, yeah.

18    Q    And, there's no shackles, no --

19    A    No.

20    Q    And, how far away is the chow hall from your

21         current Unit A-2?

22    A    I don't know; not far.  It don't take long to walk

23         there.

24    Q    Okay.  And, how long do you get to have breakfast?

123

```
 1   A    It depends on the Officers; some of them like to

 2        rush you; but, about ten (10) -- ten (10) minutes,

 3        15 minutes.

 4   Q    And, after chow, what happens next?

 5   A    You go back to your Unit and you wait for

 6        movement; and then, like I said, depending on the

 7        day, because of the split population, one day,

 8        we'll have gym or yard in the morning; and,

 9        they'll have the Learning Center and the Library

10        in the morning; and then, the other day, it's

11        opposite, we'll have gym and yard --

12               Like today, for example, we'll take

13        Thursday.  Thursday, we have the building in the

14        morning; meaning that we -- Civil Population has

15        the Learning Center which consists of the

16        Educational, the Vocational and the Law Library;

17        and the Prisoners have access to gym and yard; and

18        then, it's the opposite after lunch.

19               After lunch, the Prisoners will have

20        access to the Learning Center and we'll have --

21        the Civil Population will have access to the gym -

22        - the gym and yard; and then, there's movement at

23        night.

24               So, this morning, for example, I knew
```

124

```
1          you guys were coming about 10 o'clock, I -- I went
2          to the Law Library and socialized with a few
3          friends that were on another Unit for about an
4          hour and a half; and then, came back to my Unit.
5    Q     So, when you have the building for the Learning
6          Center, you're allowed to use the Law Library if
7          you wish?
8    A     If you wish, yeah; or, the general Library.
9    Q     And, you can also --  There are classes that you
10         can attend, too, at that time?
11   A     Well, they have educational classes; but -- and
12         vocational as well as they have individual Pyscho-
13         Educational Classes which is therapy; they have an
14         Art Room; but, most of the educational and
15         vocational, you actually have to -- you can't just
16         go, you have to be --
17              They have semester or quarterly sign-
18         ups.  You have to be signed up for a class.
19              The only thing in the Learning Center
20         that you can actually utilize at will is -- is the
21         Art Room.
22              Other than that, the Computer Lab and
23         all that, you have to actually sign up during
24         semesters which is every three (3) months.
```

125

| | | |
|---|---|---|
| 1 | Q | And, are you presently signed up for any of those |
| 2 | | courses, yourself? |
| 3 | A | Nope. |
| 4 | Q | You didn't sign up for any of those courses in the |
| 5 | | past year or so? |
| 6 | A | Yes. |
| 7 | Q | And, what did you take in the past? |
| 8 | A | Oh, I've taken numerous Pyscho-Educational |
| 9 | | Classes, Cognitive Distortions I, II -- I and II, |
| 10 | | -- [Unintelligible] -- Prevention I, II and III, - |
| 11 | | - [Unintelligible] Empathy I and II -- |
| 12 | Q | What --  What empathy? |
| 13 | A | Victim Empathy I and II.  What else have I taken? |
| 14 | Q | And, these are all Sex Offender -- |
| 15 | A | Those are Sex Offenders, yes; but, the only |
| 16 | | educational that I've actually taken was a |
| 17 | | Computer Lab to learn a little bit more about |
| 18 | | computers. |
| 19 | | But, I don't consider their educational |
| 20 | | department equipped to provide me any education |
| 21 | | other than what I already have. |
| 22 | | I mean --  So, I mean, I could just |
| 23 | | maintain; but, there's -- there's no -- there's no |
| 24 | | college courses or anything like that. |

126

1              And, I consider myself educated, so, I

2          really don't --  For basic math or reading or

3          english, I'm -- I can do that.

4      Q    Do you have your G.E.D?

5      A    Yes, I do.

6      Q    When did you get that?

7      A    In --  I had to get it right before I went into

8          the Army back in '82 'cause you either had to have

9          a diploma or G.E.D; so, I took it at the Adult

10         Learning Center in Worcester.

11             But, I took my --  My current G.E.D. I

12         actually took when I was in Gardner because you're

13         allowed to take it and try to get better scores.

14         I mean -- you know --

15     Q    Okay.  So, in the afternoon, you're --  For

16         example, today, you were able to use the -- the

17         gymnasium --

18     A    Or the yard.

19     Q    -- or the yard?

20     A    Yeah.  Whatever I choose.  You can't go to both,

21         obviously.

22     Q    Okay.  And, do you vary which ones you go to?

23     A    I go to both every day.  I'll go to the gym.  I

24         work out with five (5) different people.

127

1          Obviously, I don't go heavy because I'm

2   not trying to get muscular or bulky.  I just try

3   to stay slim and fit and maintain a little bit of

4   strength.

5          And then, I go out in the yard the

6   second movement and I run.  I run like three (3)

7   to five (5) times a week.

8   Q   And, do other Residents play games like basketball

9       or --

10  A   Oh, in the gym, yeah.  They --  Depending on the

11      day, they have basketball.

12          They can only --  The gym is only so big

13      so it depends on what they're doing that day.

14          Sometimes, they play basketball; whiffle

15      ball; stuff like that.

16          They have pool tables; pingpong tables -

17      - you know --  They play cards -- you know --

18      whatever -- stuff like that.

19  Q   So, do you participate in these games?

20  A   I'm not really sport-oriented; but, I have played

21      pool on a -- you know -- once in a while.

22          But, I try to stay away from handball

23      and basketball and volleyball and stuff like that

24      because a lot of people have attitudes and stuff

141

1       to color in.

2                  It's not very much.

3    Q    Okay.  And, have you been told that you have to

4         return to the primary group at some point in the

5         future or is it up to you?

6    A    Well, monthly, they require --  Current policy is

7         it's a volunteer program, it's not mandatory; but,

8         there are -- there are --

9                  I guess their Forensic Health Contract

10        requires that your primary Therapist, once a

11        month, ask you if you're interested in returning

12        or not and that's the individual's -- person's

13        choice.

14   Q    Okay.  Have they asked you recently about

15        returning?

16   A    Yes.

17   Q    And, you said?

18   A    No.

19   Q    And, do you have any idea when you're going to --

20        if and when you might return to the primary group?

21   A    No, I don't.

22   Q    Does it depend on anything happening to get you to

23        go back to the primary group?

24   A    Nope.  Not --  Off the top of my head, no.

142

1    Q    Okay.  Okay.  But, you said you also use the

2         Library a lot?

3    A    The general Library mostly because it's more of a

4         meeting place to socialize with friends since we

5         can't go on each other's Units; but, I don't

6         really frequent the Law Library any hour -- any

7         longer.

8    Q    Well, Library, how often do you go to the Library

9         in a week?

10   A    Maybe --  In a week, maybe, three (3) times, three

11        (3) or four (4) times.

12   Q    And, you use that time to meet other Residents who

13        are not in your Unit?

14   A    Yeah.

15   Q    Is that in the evening hours usually?

16   A    No, just in the mornings and afternoons.

17   Q    And, you are not currently involved in any Civil

18        Litigation that you filed earlier pro se?

19   A    Other than the current action, no.  No.  Not

20        really, no.

21   Q    Are you currently involved with a Resident named

22        Blaisdell in a relationship?

23   A    Yes.

24   Q    And, when did that relationship first commence?

143

1    A    I met him while I was incarcerated; but, I never

2         really started -- I never really got involved with

3         him in any type of commitment or a relationship.

4                    I've known him for years while I was

5         incarcerated.

6                    But, I'd say about three (3) or four (4)

7         months.

8    Q    So, perhaps, April of this year, is that when it

9         started or --

10   A    May.  Maybe April or May, yeah.

11   Q    You think it was in May.  And, are you in the same

12        Unit?

13   A    No, no.

14   Q    You're in A-2.  What Unit is Mr. Blaisdell in?

15   A    B-1.

16   Q    And, can you describe your relationship to me with

17        regard to Mr. Blaisdell?

18   A    I care about him a lot.

19   Q    Okay.  And, how often do you meet with him in a

20        week?

21   A    Every day.  He is not only my friend; but, he's

22        also my spiritual adviser.

23                   He's the Chief of the Native American

24        Spiritual Circle which I belong to.  And, he's

144

```
 1            also my work-out partner.
 2                    He doesn't really run; so, I kind of
 3            like run by myself; but --
 4    Q    Okay.  And, did you recently join the Native
 5            American Spiritual Circle?
 6    A    Yeah.  I'd say around the same time.
 7    Q    Around April --
 8    A    Yeah.  Not --
 9    Q    -- of 2008?
10    A    Not necessarily --  Don't misquote me; it's not
11            necessarily my beliefs, it's -- I'm keeping an
12            open mind and I'm just going to -- you know --
13            learn a different religion or different beliefs.
14                    I haven't converted in other words; I
15            still believe in being a Roman Catholic.
16    Q    And, you are aware of the fact that cameras
17            photographed you and Mr. Blaisdell in the yard in
18            what was believed by Staff to be a sexual
19            relationship?
20                    MR. MINAHAN:  Objection.
21                    MR. McFARLAND:  I asked if he's aware of
22            it.
23                    MR. MINAHAN:  But, you're characterizing
24            what he's aware of.
```

# EXHIBIT 5

Page 1

1

2                UNITED STATES DISTRICT COURT

3                 DISTRICT OF MASSACHUSETTS

4

5 SANDY BATTISTA

6             Plaintiff

7 v.                        C.A. No. 099620225

8 KATHLEEN DENNEHY, et al.

9             Defendants

10

11                                          **COPY**

12             - - - - - - -

13        DEPOSITION OF TERRE K. MARSHALL

14             Friday, June 27, 2008

15                10:16 a.m.

16             McDermott Will & Emery

17                28 State Street

18             Boston, Massachusetts

19             - - - - - - -

20

21        Reporter:  Deborah Roth, RPR/CSR

22

23

24

**Esquire Deposition Services**
**1-866-619-3925**



```
 1  PRESENT:

 2

 3  Dana M. McSherry, Esq.

 4  McDermott Will & Emery

 5  28 State Street

 6  Boston, Massachusetts   02109

 7  617 535 4080

 8  Counsel for the Plaintiff

 9

10  Richard C. McFarland, Esq.

11  The Commonwealth of Massachusetts

12  Executive Office of Public Safety

13  Department of Correction, Legal Division

14  70 Franklin Street, Suite 600

15  Boston, Massachusetts   02110

16  617 727 3300

17  Counsel for the Defendants and the Deponent

18

19  ALSO PRESENT:   Karen Burhans (morning session)

20

21

22

23

24
```

Page 71

| | |
|---|---|
| 12:08:11 | 1    Q.   Okay.  All right.  I want to talk a |
| 1 .08:20 | 2 little bit about the comprehensive program |
| 12:08:24 | 3 that you guys are in the process of designing |
| 12:08:26 | 4 for GID. |
| 12:08:28 | 5           When did you start designing this |
| 12:08:32 | 6 program?  When did it begin? |
| 12:08:35 | 7    A.   With the request for response that was |
| 12:08:47 | 8 developed in 2006, the RFR identified that the |
| 12:08:58 | 9 mental health provider had to provide a GID |
| 12:09:05 | 10 consultant that would consult with the agency |
| 12:09:10 | 11 about the management of GID patients, and it |
| 12:09:15 | 12 took a length of time after the award of that |
| 09:20 | 13 contract for MHM to identify somebody who |
| 2:09:27 | 14 would be qualified and recognized as a GID |
| 2:09:31 | 15 expert to participate in advising the |
| 2:09:38 | 16 department about training for staff, |
| 2:09:44 | 17 supervision of staff, individual or group |
| 2:09:49 | 18 psychotherapy, the potential for hormones, and |
| 2:09:59 | 19 he has been working with us for only several |
| 2:10:09 | 20 months. |
| 2:10:09 | 21    Q.   Who is this person? |
| 2:10:11 | 22    A.   Dr. Stephen Levine.  I'm sorry. |
| 2:10:21 | 23    Q.   So Dr. Stephen Levine was recommended |
| 2:10:26 | 24 by MHM? |

Page 72

2:10:29    1    A.    He was essentially selected by MHM.

2:10:32    2    Q.    **And his position now is what?**

2:10:38    3    A.    He's a consultant to MHM about the

2:10:43    4 management of the GID patients.

2:10:47    5    Q.    **And would you say that he is in the**

2:10:51    6 **equivalent position that the Fenway Clinic was**

2:10:55    7 **prior to when Levine started working for the**

2:11:03    8 **DOC?**

2:11:03    9    A.    No.   Because the Fenway Clinic was

2:11:10    10 involved in individual evaluations only.

2:11:14    11    Q.    **Okay.**

2:11:15    12    A.    And was not -- excuse me.

11:21    13            Fenway did some supervision of

2:11:24    14 staff, but Dr. Levine is contracted to provide

2:11:29    15 extensive training for staff, clinical

2:11:32    16 supervision of staff, case reviews, patient

2:11:37    17 evaluations --

2:11:39    18    Q.    **Okay.**

2:11:40    19    A.    -- policy recommendations.

2:11:47    20    Q.    **So he does what Fenway did and more?**

2:11:51    21    A.    More.

2:11:52    22    Q.    **And if an inmate or civil commit is**

2:11:57    23 **going to get a GID evaluation, is it**

12:02    24 **Dr. Stephen Levine who would provide that**

| Time | |
|---|---|
| 12:12:04 | 1  evaluation? |
| 12:05 | 2      A.   The current practice would be that the |
| 12:12:11 | 3  clinician who is -- if the inmate is |
| 12:12:18 | 4  identified as an active or open mental health |
| 12:12:21 | 5  case, and GID is either self-declared or the |
| 12:12:24 | 6  clinician monitoring and working with that |
| 12:12:27 | 7  individual identifies that potential, then |
| 12:12:31 | 8  that individual would be referred to |
| 12:12:35 | 9  Dr. Zakai. |
| 12:12:36 | 10          Dr. Zakai is the chief psychiatrist |
| 12:12:41 | 11  for the prisons for MHM, and he has experience |
| 12:12:45 | 12  in managing GID patients, and it would go from |
| 12:52 | 13  there to Dr. Levine for input and review. |
| 2:12:55 | 14      Q.   So Dr. Zakai would do the initial |
| 2:12:59 | 15  evaluation for GID? |
| 2:13:00 | 16      A.   Well, the clinician himself would do |
| 2:13:04 | 17  the initial evaluation.  If they raised the |
| 2:13:08 | 18  issue, the person would be seen by Dr. Zakai; |
| 2:13:11 | 19  and then if Dr. Zakai felt that diagnosis was |
| 2:13:19 | 20  accurate or sustained or confirmed, then we |
| 2:13:26 | 21  would involve Dr. Levine. |
| 2:13:28 | 22      Q.   Okay.  Would Dr. Levine formulate the |
| 2:13:31 | 23  treatment plan? |
| 2:13:32 | 24      A.   Actually, we are formulating the |

Page 74

| | |
|---|---|
| 12:13:37 | 1 treatment -- excuse me -- the mental health |
| .13:41 | 2 clinicians that are involved with this |
| 12:13:45 | 3 specific individual are formulating the plan. |
| 12:13:51 | 4     Q.   MHM? |
| 12:13:57 | 5     A.   Yes.  Dr. Levine does an assessment and |
| 12:14:01 | 6 review of record.  Dr. Levine is the first to |
| 12:14:05 | 7 say that one encounter does not a GID |
| 12:14:12 | 8 evaluation make.  He would make |
| 12:14:14 | 9 recommendations for the treatment plan and the |
| 12:14:15 | 10 treatment would be initiated. |
| 12:14:19 | 11     Q.   The MHM clinician does the initial |
| 12:14:23 | 12 evaluation? |
| 1 14:24 | 13     A.   Yes. |
| .2:14:25 | 14     Q.   If the clinician determines that the |
| .2:14:29 | 15 inmate civil commit has GID, it is referred to |
| .2:14:37 | 16 Dr. Zakai? |
| .2:14:39 | 17     A.   Or if the inmate self-declares. |
| .2:14:42 | 18     Q.   Then the case is referred to Dr. Zakai. |
| .2:14:47 | 19 Then Dr. Zakai does what? |
| 2:14:49 | 20     A.   Well, it hasn't happened -- |
| 2:14:52 | 21     Q.   Okay. |
| 2:14:53 | 22     A.   -- since -- |
| 2:14:54 | 23     Q.   This is part of the program that you're |
| 2:14:57 | 24 developing? |

Page 75

| | | |
|---|---|---|
| .2:14:57 | 1 | A.   Yes. |
| .z:14:57 | 2 | Q.   Sort of the flow of -- |
| .2:14:59 | 3 | A.   Yes. |
| .2:14:59 | 4 | Q.    -- this would be part of the program? |
| .2:15:02 | 5 | A.   Yes. |
| .2:15:03 | 6 | Q.   How far along are you in developing the |
| .2:15:06 | 7 | program? |
| .2:15:06 | 8 | A.   We have identified the training.   We |
| .2:15:12 | 9 | are just now establishing the supervision |
| .2:15:14 | 10 | groups.   Dr. Levine has evaluated or had the |
| .2:15:23 | 11 | opportunity to at least interview maybe seven |
| .2:15:27 | 12 | individuals and has drafted reports with |
| 15:33 | 13 | recommendations on those individuals. |
| .2:15:37 | 14 |        He would be returning to see the |
| .2:15:40 | 15 | remaining individuals who are either diagnosed |
| .2:15:43 | 16 | or have self-declared. |
| .2:15:45 | 17 | Q.   Okay. |
| .2:15:47 | 18 | A.   Then the next step is to take his |
| .2:15:54 | 19 | recommendations, get the mental health |
| .2:15:56 | 20 | clinicians together and determine treatment |
| .2:16:00 | 21 | plan. |
| .2:16:00 | 22 | Q.   Okay.  So when Dr. Levine makes |
| .2:16:07 | 23 | recommendations, Dr. Zakai and the MHM |
| 16:13 | 24 | clinicians are responsible for implementing |

Page 76

12:16:17  1  Dr. Levine's recommendations?

12:16:19  2      A.  His recommendations are

12:16:24  3  recommendations.  It's not -- he is not

12:16:26  4  considered to be ordering various things.

12:16:30  5           So what Dr. Zakai and the clinician

12:16:33  6  would do is establish the treatment plan,

12:16:36  7  taking into consideration Dr. Levine's

12:16:42  8  recommendations.

12:16:42  9      Q.  What is the point of the consult with

12:16:45 10  Dr. Levine if the clinician and Dr. Zakai can

12:16:50 11  diagnose GID, and they are formulating the

12:16:53 12  treatment plan, what could possibly come of

16:56 13  Dr. Levine's recommendations?

12:16:58 14      A.  Dr. Levine's recommendations are taken

2:17:00 15  very seriously, and the issues of treating

2:17:05 16  that individual are taking into account, and

2:17:08 17  there are security aspects that need to be

2:17:10 18  considered.

2:17:12 19           Dr. Levine is the first to say he is

2:17:14 20  not an expert or familiar with the corrections

2:17:18 21  environment, the milieu, the community within

2:17:23 22  a correctional institution and the safety

2:17:25 23  issues.  He actually says that in his reports.

2:17:31 24           So he's making recommendations, but

.2:17:35   1 he is not seeing the person every day.  He's

.2:17:40   2 not seeing them -- well, every day.  He is not

.2:17:42   3 seeing them as a matter of routine.  He is not

.2:17:47   4 participating in an ongoing therapeutic-trust

.2:17:50   5 relationship with the individual.  So he sees

.2:17:57   6 himself as a consultant.

.2:18:00   7     Q.  And Dr. Zakai and his MHM clinicians

.2:18:08   8 are the treating --

.2:18:10   9     A.  Yes.

.2:18:11  10     Q.  -- doctors?

.2:18:14  11         What else is a part of this

.2:18:20  12 comprehensive program for GID inmates?

 18:22   13     A.  Well, it's under development.  So it's

.2:18:26  14 just to draft a policy that identifies that

.2:18:33  15 flow of activities on the clinical side as

.2:18:38  16 well as sequence of events for the security

.2:18:40  17 component --

.2:18:40  18     Q.  Okay.

.2:18:41  19     A.  -- which is entirely separate from the

.2:18:43  20 clinical aspects.

.2:18:44  21     Q.  Okay.  And so what would your

.2:18:47  22 involvement in the flow on the clinical side

.2:18:50  23 be?

 18:50   24     A.  Again, we are just discussing

| 12:18:58 | 1 involvement of a treatment team committee that |
| 19:05 | 2 would be presented the cases and have input. |
| 12:19:11 | 3        I would be a participant in that |
| 12:19:14 | 4 committee, but not the chair. |
| 12:19:15 | 5    Q.  **So would you have clinical input?** |
| 12:19:18 | 6    A.  No. |
| 12:19:18 | 7    Q.  **So all of the clinical decisions are** |
| 12:19:23 | 8 **made by MHM, the contracted medical provider?** |
| 12:19:29 | 9    A.  MHM is the contracted mental health |
| 12:19:32 | 10 provider. |
| 2:19:34 | 11    Q.  **And UMass?** |
| 2:19:36 | 12    A.  UMass is the contracted medical |
| 19:39 | 13 provider.  So if a determination were made by |
| 2:19:45 | 14 the group that hormones should considered, |
| 2:19:51 | 15 then UMass would be involved in the hormone |
| 2:19:57 | 16 therapy, endocrine consult. |
| 2:20:00 | 17    Q.  **Because that's a medical --** |
| 2:20:02 | 18    A.  Yes. |
| 2:20:02 | 19    Q.  **There's a lot of steps.** |
| 2:20:05 | 20        **The clinician and Dr. Zakai deal** |
| 2:20:08 | 21 **with the initial self-reports and concerns** |
| 2:20:12 | 22 **about whether there is a GID diagnosis.  It's** |
| 2:20:15 | 23 **then referred to Levine for a consult, or** |
| 2:20:19 | 24 **that's how it looks to be now?** |

| | |
|---|---|
| 12:20:20 | 1    A.  Yes. |
| .20:21 | 2    Q.  It then comes back to Dr. Zakai and the |
| 12:20:27 | 3  clinicians who formulate a treatment plan? |
| 12:20:29 | 4    A.  Yes. |
| 12:20:29 | 5    Q.  And then possibly that treatment plan |
| 12:20:31 | 6  is going to be run by this committee that you |
| 12:20:36 | 7  just -- |
| 12:20:38 | 8    A.  Well, Dr. Zakai and the treating |
| 12:20:43 | 9  clinician and the treating psychiatrist will |
| 12:20:47 | 10  be the ones who make the clinical |
| .2:20:51 | 11  determination of what treatment is necessary. |
| .2:20:58 | 12  The security committee is the one that looks |
| 21:02 | 13  at the safety and security issues if -- |
| .2:21:07 | 14    Q.  Is that separate from the other |
| .2:21:09 | 15  committee? |
| 2:21:10 | 16    A.  Yes. |
| 2:21:10 | 17    Q.  So the committee that you said that you |
| 2:21:14 | 18  would sit on that has clinicians on it, what |
| 2:21:17 | 19  is the point of that committee after you get |
| 2:21:19 | 20  the treatment recommendations from Dr. Zakai |
| 2:21:22 | 21  and the clinicians?  That committee does what? |
| 2:21:24 | 22    A.  In the mental health field, there is a |
| 2:21:29 | 23  great deal of cooperation with |
| 2:21:30 | 24  multidisciplinary treatment teams; and, like, |

Page 80

| | |
|---|---|
| .2:21:35 | 1 for instance, on a daily basis, the treating |
| .2:21:41 | 2 clinicians at each facility get together daily |
| .2:21:43 | 3 and discuss their biggest issues -- who is on |
| .2:21:46 | 4 crisis, who is on mental health watch -- and |
| .2:21:49 | 5 it is basically an extension of that.  So that |
| .2:21:52 | 6 one individual clinician is presenting their |
| .2:21:57 | 7 situation, and they're having discussion, |
| .2:22:02 | 8 recommendations, other considerations. |
| .2:22:06 | 9     Q.   Okay. |
| .2:22:07 | 10    A.   Just as UMass does with utilization |
| .2:22:11 | 11 management for off-site specialty consults. |
| .2:22:14 | 12    Q.   **After this committee, then the** |
| .22:16 | 13 **recommendations would go to UMass?** |
| .2:22:19 | 14    A.   Yes. |
| .2:22:24 | 15    Q.   **If hormones or some medical treatment** |
| .2:22:28 | 16 **was recommended?** |
| .2:22:29 | 17    A.   Yes. |
| .2:22:30 | 18    Q.   **And then UMass implements it, or how** |
| .2:22:34 | 19 **does the security review fit in?** |
| .2:22:36 | 20    A.   Before UMass would implement it, the |
| .2:22:40 | 21 security review has to take place. |
| .2:22:42 | 22    Q.   **Okay.** |
| .2:22:43 | 23    A.   And UMass has to evaluate the |
| .2·22:48 | 24 individual for medical appropriateness. |

Page 81

| | |
|---|---|
| 12:22:50 | 1  Q.  Okay. |
| 12:22:51 | 2  A.  We have an individual who is so |
| 12:22:53 | 3 medically compromised that the side-effects of |
| 12:22:57 | 4 hormones would absolutely contraindicate |
| 12:23:03 | 5 placing that individual on hormones. |
| 12:23:05 | 6      UMass has to be involved in |
| 12:23:08 | 7 determining what hormones would be used, the |
| 12:23:13 | 8 route of hormones, whether hormones are |
| 12:23:16 | 9 medically even a feasible treatment for the |
| 12:23:21 | 10 individual. |
| 12:23:23 | 11      Then if that is yes, then the next |
| 12:23:25 | 12 step would be the security review. |
| 23:30 | 13  Q.  It seems like a lot of steps in the |
| 12:23:32 | 14 process to getting hormones. |
| 12:23:35 | 15      Are there any other diagnoses and |
| 12:23:39 | 16 treatments that require this level of review? |
| 12:23:44 | 17  A.  Yes. |
| 12:23:45 | 18  Q.  What else? |
| 12:23:47 | 19  A.  The management of attention deficit |
| 12:23:51 | 20 hyperactivity disorder and the use of |
| 12:23:53 | 21 stimulants within the correctional system |
| 12:23:57 | 22 requires a panel of three psychiatrists to |
| 12:24:03 | 23 include psychological testing, evaluation. |
| 12:24:06 | 24      There are others, yes. |

Page 86

2:30:30    1    Q.    And what is your understanding of what

2:30:33    2 Ms. Battista is requesting through this

2:30:36    3 litigation?

2:30:36    4    A.    My understanding is that she's

2:30:42    5 requesting hormone therapy.

2:30:44    6    Q.    Okay.    Anything else?

2:30:45    7    A.    That's the only thing that comes to my

2:30:55    8 mind.

2:30:56    9    Q.    What is your understanding of what the

2:30:58   10 DOC's position in this case?

2:31:01   11    A.    Subject to the litigation?

2:31:08   12    Q.    Just your general understanding of the

31:11     13 position that the DOC has taken with regard to

2:31:13   14 Ms. Battista.

2:31:13   15    A.    The general position, since I've been

2:31:21   16 here, to date, has been that there are serious

2:31:29   17 concerns about the Fenway Clinic's evaluation

2:31:37   18 and the veracity of that, and then the

2:31:48   19 conflicting expert opinions subsequent to

2:31:51   20 their first evaluation, or even the first

2:31:57   21 evaluation by Diane Ellaborn, yes.

2:32:03   22    Q.    So the DOC is not providing

2:32:10   23 Ms. Battista treatment --

2:32:11   24    A.    The DOC is providing Sandy Jo

Page 87

| | |
|---|---|
| 2:32:14 | 1 treatment.  They are not providing hormones. |
| 2:32:17 | 2    Q.  Okay.  What is her current treatment |
| 2:32:21 | 3 plan? |
| 2:32:21 | 4    A.  Her current treatment plan is, I |
| 2:32:24 | 5 believe it's monthly individual therapy, but I |
| 2:32:27 | 6 have not seen the medical record. |
| 2:32:29 | 7    Q.  So monthly individual therapy, and |
| 2:32:35 | 8 that's your understanding of -- that would be |
| 2:32:38 | 9 it? |
| 2:32:38 | 10    A.  Yes, that's my understanding. |
| 2:32:40 | 11    Q.  Do you know who the individual therapy |
| 2:32:42 | 12 would be with? |
| 2:32:43 | 13    A.  I believe the name of the clinician is |
| 2:32:46 | 14 Diane McLaughlin. |
| 2:32:48 | 15    Q.  And how long are these sessions, these |
| 2:32:53 | 16 monthly sessions? |
| 2:32:55 | 17    A.  I really don't know. |
| 2:32:57 | 18    Q.  Would they be closer to an hour or 10 |
| 2:33:02 | 19 minutes? |
| 2:33:03 | 20    A.  I think they would probably be an hour. |
| 2:33:19 | 21         You know, I really don't know what |
| 2:33:20 | 22 Sandy Battista's treatment plan is right now. |
| 2:33:23 | 23 I have not seen that document.  I have not |
| 2:33:25 | 24 reviewed it. |

```
.3:55:32   1  medical and mental health, which they
.5:55:35   2  delivered from 2003 through June 30th of '07.
.3:55:39   3      Q.  At which point they stopped providing
.3:55:44   4  the mental health?
.3:55:45   5      A.  Yes.
.3:55:45   6      Q.  And what's your understanding as to the
.3:55:48   7  reason for why they stopped providing the
.3:55:53   8  mental health?
.3:55:54   9      A.  They were not selected by the
.3:55:56  10  evaluation committee.
.3:55:59  11      Q.  And MHM was selected by the evaluation
.3:56:03  12  committee?
  56:03   13      A.  Yes.
.3:56:04  14      Q.  Are you aware that the DOC regulations
.3:56:06  15  state that the private medical contractors
.3:56:10  16  have full responsibility for all decisions
.3:56:14  17  related to the type, timing and level of
.3:56:17  18  medical and mental health services provided to
.3:56:21  19  inmates?
.3:56:21  20      A.  Yes.
.3:56:24  21      Q.  Do you conduct internal annual reviews
.3:56:28  22  of the DOC's policies?
.3:56:30  23      A.  Yes.
.?-56:31  24      Q.  And have you conducted a review of
```

Page 105

| 13:56:36 | 1 | policy 610.01, which is what I just read to |
| 1 .56:41 | 2 | you? |
| 13:56:41 | 3 | A.  I honestly don't remember 610.01. |
| 13:56:46 | 4 | Q.  The policy -- |
| 13:56:47 | 5 | A.  I don't remember that specific policy |
| 13:56:49 | 6 | being reviewed, but we have a process to |
| 13:56:52 | 7 | review all of them. |
| 13:56:53 | 8 | Q.  Okay.  The policy that the medical |
| 13:56:57 | 9 | contractors have full responsibility for |
| 3:57:00 | 10 | clinical decisions is in effect and -- |
| 3:57:03 | 11 | A.  Consistent with the contract. |
| 3:57:04 | 12 | Q.  What do you mean by that, "consistent |
| 57:10 | 13 | with the contract"? |
| 3:57:10 | 14 | A.  The RFR, the contract document say the |
| 3:57:16 | 15 | same thing that the policy statement says, |
| 3:57:18 | 16 | that you read, I believe. |
| 3:57:21 | 17 | Q.  So the RFR and the contract documents |
| 3:57:26 | 18 | say that it is the contracted medical |
| 3:57:30 | 19 | provider's full responsibility for clinical |
| 3:57:33 | 20 | decisions? |
| 3:57:33 | 21 | A.  Yes. |
| 3:57:34 | 22 | Q.  Okay. |
| 3:57:49 | 23 | EXHIBIT NO. 3 MARKED |
| 3:58:07 | 24 | Q.  What is this document? |

Page 107

.3:59:10    1  like, in the upper left-hand corner, that's

.3:59:15    2  where you begin, and it looks to go across the

.3:59:23    3  page, and then back to the left side, and then

.3:59:29    4  across the page again.

.3:59:30    5     A.  Yes.

.3:59:30    6     Q.  That looks to be the flow?

.3:59:33    7     A.  Yes.

.3:59:33    8     Q.  Can you review these steps and tell me

.3:59:37    9  if they are consistent with your understanding

.3:59:42   10  of how gender identity -- people with gender

.3:59:50   11  identity disorder are dealt with?

.3:59:55   12            MR. McFARLAND:  You mean DOC

.  59:57   13  inmates?

.3:59:58   14            MS. McSHERRY:  Yes.

.3:59:59   15     A.  What I described earlier as the process

.4:00:03   16  that we now have in place differs from this,

.4:00:08   17  because this says, "Inmate initiates mental

.4:00:11   18  health services contact," and it may be the

.4:00:14   19  inmate or it may be the mental health

.4:00:16   20  clinician who is already in contact with the

.4:00:19   21  inmate.  So that's one difference.

.4:00:20   22     Q.  And you're talking about the policy you

.4:00:23   23  guys are working on?

.  00:24   24     A.  Yes.  Yes.

Page 108

14:00:30    1         Another difference is with regard to

L:.00:34    2 recommendation reviewed by UMass medical

.4:00:38    3 program director.  It appears that step would

.4:00:43    4 be consistent with our recommendation reviewed

.4:00:47    5 by MHM, chief psychiatrist.

.4:01:00    6         Then when the superintendent

.4:01:01    7 conducts security assessment and makes

.4:01:05    8 recommendations -- whoops, I skipped a point.

.4:01:10    9         After the recommendation reviewed by

.4:01:12   10 what would now be the UMass chief

.4:01:16   11 psychiatrist, the clinical committee,

.4:01:20   12 management treatment committee would be in

01:23      13 that step to review.

.4:01:25   14         Then it would go for the security

.4:01:27   15 review, which is more than just one

.4:01:30   16 superintendent.  It's a committee.  Then their

.4:01:36   17 recommendation goes to the Commissioner.

.4:01:38   18    Q.  So the clinical committee that you just

.4:01:41   19 referred to, you said it is called "the

4:01:46    20 management treatment committee"?

4:01:47    21    A.  Yes.  Management and treatment

4:01:50    22 committee.  We haven't named it.

4:01:51    23    Q.  Let's refer to it as "the management

4.01:54    24 treatment committee."

Page 109

```
4:01:55    1              Is that the committee that you
..01:58    2  would be on?  You said you would have a
4:02:01    3  position on it?
4:02:01    4     A.  I would be a member of that.
4:02:03    5     Q.  And who else would be on that
4:02:04    6  committee?
4:02:05    7     A.  It would be the UMass medical director
4:02:09    8  and the MHM chief psychiatrist and the MHM
4:02:21    9  medical director at the Bridgewater State
4:02:26   10  Hospital.  So one internist, two psychiatrists
4:02:31   11  and me.
4:02:32   12     Q.  And this is a clinical committee?
02:34     13     A.  Right.
4:02:35   14     Q.  So what is -- we just read the DOC
4:02:39   15  regulations that say that the contracted
4:02:43   16  medical providers have full responsibility for
4:02:46   17  clinical decisions.
4:02:48   18              What is your position?  Why do you
4:02:52   19  have a position on this clinical committee?
4:02:54   20     A.  Because their decision will have impact
4:02:57   21  on the agency.  Just like I am co-chair of the
4:03:00   22  pharmacy and therapeutics committee, but I
4:03:03   23  don't prescribe medications.
4:03:06   24     Q.  So you would have a say in the clinical
```

| | |
|---|---|
| 14:03:09 | 1 recommendation? |
| 1 .03:10 | 2    A.   No.   I participate on the committee, |
| 14:03:15 | 3 but the clinical recommendation would be made |
| 14:03:17 | 4 by the clinicians. |
| 14:03:20 | 5    Q.   **Which is the step prior to it going to** |
| 14:03:23 | 6 **this committee?** |
| 14:03:23 | 7    A.   No.   It is this committee. |
| 14:03:24 | 8    Q.   **The clinical recommendations are made** |
| .4:03:26 | 9 **by the three clinicians who are members of the** |
| .4:03:29 | 10 **committee?** |
| .4:03:29 | 11    A.   Right.   With consultation with |
| .4:03:32 | 12 Dr. Levine. |
| 93:33 | 13    Q.   **Okay.   And then I guess I really don't** |
| .4:03:36 | 14 **understand your -- what your role is in that** |
| .4:03:41 | 15 **clinical recommendation that comes out of the** |
| .4:03:46 | 16 **committee.** |
| 4:03:46 | 17    A.   The DOC cannot downstream risk |
| 4:03:49 | 18 entirely.   You can't contract away your |
| 4:03:52 | 19 agency's responsibility for actions. |
| 4:03:55 | 20         So my role is to represent the |
| 4:03:59 | 21 agency as far as discussion, not to make a |
| 4:04:03 | 22 clinical decision. |
| 4:04:05 | 23    Q.   **So what is the -- what interests does** |
| 4:04:18 | 24 **the agency have that need to be represented** |

# EXHIBIT 6

**MASSACHUSETTS DEPARTMENT OF CORRECTION**
**GENDER IDENTITY DISORDER**
**SECURITY REVIEW**

| Inmate Name | SANDY JO BATTISTA |
|---|---|
| Inmate Number | M15930 |
| Facility | MASSACHUSETTS TREATMENT CENTER |
| Facility Mission | INDEFINITE CIVIL COMMITMENT OF SEXUALLY DANGEROUS PERSONS |
| Housing Location and Type | SINGLE AND DOUBLE ROOMS, HOUSING UNIT CAPACITY IS 36-42 RESIDENTS. |

Superintendent:  ROBERT MURPHY

Consulting Assistant Deputy Commissioner and Superintendents or other security /correctional representatives:

1. _____
2. _____
3. _____

Admission/Commitment Date to Department of Correction:  2-28-83, committed under W39562, to 12-20 YR. sentence for Rape of Child. Released on 6-6-01.

5/29/01, committed under M15930, under the sexually dangerous person statute, MGL C. 123a. Found to be a sexually dangerous person on 5/13/03.

Offense(s):  Rape of Child, sexually dangerous person

Sentences(s) or Commitment:  12-20 YR. sentence (now served), sexually dangerous person – day to life civil commitment

Prior DOC Time Served:  as above

Classification/Security or Custody Level:  Medium Security

Risk Level:  C

Safety & Security Review of Clinical Indications for GID Treatment Plan

Check off Applicable Recommendations: NOTE: In this specific instance, the recommendations identified are potential recommendations rather than actual recommendations. The current treatment plan includes a six-month period of intensive individual therapy with clinical supervision of the therapist by psychiatrists with GID expertise, and the POTENTIAL for these therapies to be recommended in the future.

- X☐ Hormone Therapy
- X☐ Female Clothing (as Female DOC)
- X☐ Female Canteen Items (as Female DOC)
- ☐ Other (Specify) _____

Comments (based on the potential for the above identified recommendations):
Security review group members: Superintendent Robert Murphy, Deputy Ron Gagne, Director of Security S. Smith, met on August 8, 2008.
-Review of Stephen Levine, MD, report dated June 18, 2008

-Group determined that a security contraindication existed to female clothing/canteen items and alteration of appearance from male to female through the use of feminizing hormone treatment, should these therapies be formally recommended.


DEFENDANT'S EXHIBIT 6

-Contraindication is a legitimate security and safety concern based upon the purpose of the Massachusetts Treatment Center (MTC), nature of offender population and Battista's history of rule noncompliance.

-Purpose of MTC is to provide secure commitment and treatment of the state's most dangerous sex offenders who have been committed pursuant to G.L. C. 123a as sexually dangerous persons. MTC is a 600+ bed, male, medium security facility operated by the Department of Correction; however, its mission is to deal specifically with those individuals adjudicated as sexually dangerous or those with serious sexual offenses and sentences. Battista has been committed as a male by a superior court civil division pursuant to the above laws as a Sexually Dangerous Person for a one day to life commitment at the Massachusetts Treatment Center. Battista is not serving a criminal sentence and cannot be placed in any other facility in the Department of Correction. Battista has the opportunity on an annual basis to petition the court for a discharge hearing to present to the court that he is no longer sexually dangerous; therefore, it is a court's decision as to Battista's length of stay at MTC. The next hearing is scheduled in October of 2008.

-The Sexually Dangerous Persons are adult and child sexual offenders who are not separated by housing units. Battista currently interacts with sex offenders with a history of sexual abuse of adult female victims. There exists a significant threat to the safety of Battista should he begin to change his appearance from male to female as a result of his interaction with other residents who have a history of sexual assault of adult female victims. Battista has made a prior complaint of being a victim of sexual assault at the MTC. To ensure the safety and security of Batista, he would likely have to be removed from the population and placed in a more restrictive, more closely supervised setting for his own protection.

-Battista has a documented history of noncompliance with Department and facility rules and regulations, including sexual misconduct, and only minimally participates in sex offender treatment.

Signatures/Dates:

Superintendent: _____

Assistant Deputy Commissioner: _____ Kenneth W. Nelson  9/2/08

Two Other Superintendents or other security representatives consulted:

1. Ronald E. Duval

2. Sheila Smith

Deputy Commissioner of Prisons: _____

Commissioner: _____

EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDY JO BATTISTA,

     Plaintiff,

     v.                            C. A. No.  05-11456-DPW

HAROLD W. CLARKE, et al.,

     Defendants.

### AFFIDAVIT OF ROBERT MURPHY

I, Robert Murphy, do hereby depose and state as follows:

1.     I am an employee of the Massachusetts Department of Correction ("DOC"). I presently serve as the Superintendent of the Massachusetts Treatment Center for Sexually Dangerous Persons ("Treatment Center"). I have held this position since November, 1997. The information provided in this affidavit is based on my personal knowledge.

2.     I began my employment with the DOC in 1976. I received my Bachelor of Science in Criminal Justice from Northeastern University in 1977. At that time, I was a Correctional Social Worker at MCI Cedar Junction. In 1979, I became a Correction Counselor at MCI Norfolk. In 1980, I became a Correction Counselor at MCI Concord and, in 1982, I became a Supervising Correction Counselor at MCI Concord. I held that position until 1985, when I became Director of Treatment at MCI Plymouth and then Director of Classification at MCI Shirley. In 1987, I was promoted to the position of Deputy Director of Classification Services for the entire Department. In 1988, I was appointed to be Deputy Superintendent of Patient Services at Bridgewater State Hospital ("BSH"). In 1992, I became the Deputy Superintendent of Treatment at MCI Framingham. While in that position at MCI Framingham, I received my Masters of Arts in Business Administration from Framingham State College in 1994. Subsequently, in 1996, I became the Deputy Superintendent of Treatment at


DEFENDANT'S EXHIBIT 7

MCI Concord, a position I held until I was promoted to my present position as Treatment Center Superintendent.

3.        Pursuant to M.G.L. c. 123A, the Commissioner of Correction has designated the Treatment Center (also known as the Nemansket Correctional Center) as the correctional institution "for the care, custody, treatment and rehabilitation of persons adjudicated as being sexually dangerous." M.G.L. c. 123A, § 2. As Superintendent of the Treatment Center, I am responsible for the overall operation of the Treatment Center, including the care, custody, control and safety of residents, the physical plant of the institution, and the safety of staff, visitors and the public. The Treatment Center is a level four security facility administered by the DOC. The Treatment Center currently houses three populations of adult male sex offenders: (i) persons civilly committed as "sexually dangerous persons" ("SDP's") and committed for an indefinite period of one day to life pursuant to G.L. c. 123A; (ii) inmates committed to DOC's custody who are participating in DOC's voluntary sex offender treatment program ("SPI's"); and (iii) persons awaiting adjudication as SDP's pursuant to G.L. c. 123A, §§ 12-14. The Treatment Center is comprised of over 600 sex offenders; approximately one half of the population have committed sexual offenses against adults and the other half have committed sexual offenses against children. These sex offenders have been determined to be very likely to reoffend and to victimize again.

4.        As a result of the Superior Court's decision in Durfee v. Maloney, Consolidated Suffolk Civil Actions Nos. 98-2523B & 98-3082B, issued in July, 2001, the DOC decided to change its management of the Treatment Center to keep SDP's and SPI's separate and apart at all times. On December 10, 2001, the Treatment Center implemented its "separate and apart" management policy.

5.        The SDPs and the temporary committed persons are housed in the Treatment Center's main facility. Each housing unit in the main facility houses approximately 36-48 individuals in 24-

30 cells in an open environment, i.e., there are common areas used by the unit residents. In addition, the residents have freedom of movement within the Treatment Center to the dining area, education and program areas, and the gym and the yard during designated time periods.

6.    I am familiar with Treatment Center resident Sandy Jo Battista ("Battista"). Battista was transferred to the Treatment Center as a temporary commitment on December 19, 2001. On May 15, 2003, Battista was determined to be a sexually dangerous person as defined in M.G.L. c. 123A, § 1 and was committed to the Treatment Center for the period of one day to life as required under M.G.L. c. 123A, § 14(d).

7.    Recently, I received a request from the DOC's Director of Health Services Division, Terre K. Marshall, to commence a security review with regard to the safety and security issues which would be raised if the decision was made to provide Battista with treatment for a gender identity disorder ("GID") in the form of female hormones and access to female clothing and canteen items.

8.    In response to the request to conduct a security review of the GID treatment that may be provided Battista, I met with the Treatment Center Deputy Superintendent Ronald Gagne and Director of Security Sheila Smith to discuss the issue. I also discussed this matter with MCI-Norfolk Superintendent, Luis Spencer, who has experience in the management of inmates receiving GID treatment in the form of female hormones and female canteen items.

9.    Based on my security review, I have determined that to the extent that providing Battista with hormone therapy and access to female canteen items would cause Battista to have a feminine appearance, this would create a significant risk to Battista's safety in the Treatment Center. If Battista developed a feminine appearance as a result of hormone therapy, I believe that Battista would be at a very high risk for sexual assault by other Treatment Center residents due to the fact that many of the residents have committed sexual offenses against adult women. The open nature of

the housing units and residents' freedom of movement within the Treatment Center would render it extremely difficult for me to provide for Battista's personal safety in the general population.

10.    My concerns for Battista's safety also take into consideration the fact that Battista was recently observed by staff engaging in sexual contact with another resident in the yard of the facility. In addition, several years ago Battista alleged that he was sexually assaulted by another Treatment Center resident. Battista has a history of non-compliance with prison and Treatment Center rules which I believe would increase the difficulty of protecting Battista in the general population.

11.    If treatment with female hormones is initiated, I believe that the only place that I could safely house Battista would be in the Treatment Center's Minimum Privileges Unit ("MPU") on protective custody status. The MPU is a highly restrictive unit within the Treatment Center containing twelve (12) cells, in which residents are restricted to their cell twenty-three (23) hours a day. MPU residents eat their meals in their cells and are allowed out of their cells one hour a day for exercise and showers. Residents confined to the MPU do not have contact with other MPU residents, however, they may meet with a therapist one on one in the MPU. A modified sex offender treatment program would be offered to Battista in the MPU.

12.    Battista could not be placed in the Transition House maintained on the grounds of the Treatment Center, since that house is designated for residents who have completed the sex offender treatment program and are in the process of transitioning into the community. Battista is not presently a candidate for the Transition House and is not likely to be a candidate in the foreseeable future. Nor would Battista be appropriate for the Transition House based on a prior escape attempt while in custody.

13.    While I am aware of the fact that several inmates receiving female hormone treatment have not been subject to sexual assaults while confined in other DOC prisons, it is not possible to

transfer Battista to another correctional institution. Battista is subject to a day to life involuntary civil commitment to the Treatment Center as a Sexually Dangerous Person, pursuant to M.G.L. c. 123A, § 14(d). While the DOC may transfer a Sexually Dangerous Person who is currently under a criminal sentence to another correctional institution if the person is not amenable to or has failed to progress in treatment, poses a danger to staff or other residents, or needs to be placed in higher security for the protection of the public, the transfer provisions do not apply to Sexually Dangerous Persons who are civilly committed and not subject to a criminal sentence, such as Battista. M.G.L. c. 123A, § 2A; 103 CMR 460, *Transfer Procedures for the Massachusetts Treatment Center*.

14.     As a result of the day to life civil commitment, Battista's placement in the MPU for protective custody would likely be for a very long period of time. During my tenure as the Treatment Center Superintendent, the longest length of time a resident has been continuously confined in the MPU has been one and one half (1 ½) to two (2) years. I believe that long-term placement in the MPU would adversely affect Battista's ability to engage in sex offender treatment at the Treatment Center. In particular, Battista would not be able to participate in group therapy, a major component of the sex offender treatment program. Further, the long-term placement of Battista in the MPU would place additional operational burdens on the Treatment Center, including increased burdens on the MPU staff and the inability to use the MPU cell for other residents should the need arise.

Signed under the penalties of perjury this ___4th___ day of September, 2008.

Robert Murphy, Superintendent
Massachusetts Treatment Center

EXHIBIT 8

```
 1          U.S. DISTRICT COURT FOR MASSACHUSETTS

 2                    No. 099620225

 3

 4   ----------------------------

 5   SANDY BATTISTA,

 6        Plaintiff

 7   v.

 8   KATHLEEN DENNEHY, et al.

 9        Defendants.

10   ----------------------------

11

12          DEPOSITION of ROBERT F. MURPHY JR.

13               Monday, June 30, 2008

14                  10:00 a.m.

15

16          McDermott Will & Emery

17

18               28 State Street

19

20          Boston, Massachusetts

21

22              - - - - - - - -

23

24   Reporter:  Dana Welch, CSR, RPR, CRR
```

COPY



DEFENDANT'S
EXHIBIT

Page 2

```
 1 APPEARANCES:

 2 Appearing for Plaintiff:

 3        MCDERMOTT WILL & EMERY

 4        28 State Street

 5        Boston, Massachusetts 02109

 6        617.535.4080  Fax:  617.535.3800

 7        asheng@mwe.com

 8        By: Ada Y. Sheng, Esq.

 9

10 Appearing for Defendants:

11        The Commonwealth of Massachusetts

12        Executive Office of Public Safety

13        Department of Correction, Legal Division

14        70 Franklin Street, Suite 600

15        Boston, Massachusetts 02110

16        617 727 3300

17        By: Richard C. McFarland, Esq.

18

19

20

21

22

23

24
```

1    receives these items that passed security review at

2    Norfolk?

3        A.   I possibly could.

4        Q.   So given the nature of GID, is it fair to

5    say that you view residents with a GID diagnosis as

6    requiring a different type of management than other

7    non-GID residents?

8        A.   Yes.

9        Q.   And why would that be?

10       A.   The treatment center is a facility for sex

11   offenders.  They're sexual predators.  They have

12   victimized others sexually.  They have been

13   determined to be very likely to reoffend and to

14   victimize again.  That's the nature of the

15   facility.  That's why we exist, so that these sex

16   offenders can be in -- in one place and be managed

17   especially as the legislature determined.  The

18   facility is comprised of all sex offenders, has 600

19   plus sex offenders who, again, each of them

20   probably had multiple victims reported, unreported,

21   prosecuted or unprosecuted.  They're all residing

22   in the -- in the same close, tight, somewhat

23   overcrowded housing units with a lot of free time

24   where they can move about within the -- their units

Page 71

```
 1   and within the facility.  And sex offenders are

 2   somewhat difficult to manage in the sense that many

 3   of them have personality issues, personality

 4   disorders.  They are known to be manipulative and

 5   deceitful, some are psychopathic.  They're --

 6   they're not a -- a group of offender that is prone

 7   to stabbing or assaulting each other or staff, but

 8   they are a group of offenders that are known to be

 9   manipulative and have other types of management

10   issues that staff need to address because of the

11   nature of their offenses.

12        Q.  So in this context, somebody with GID, you

13   believe should be managed differently than somebody

14   who does not have GID?

15        A.  Yes.  There are rapists in the housing

16   units, rapists of adult females.  And if a person

17   begins to have the appearance of being a female, I

18   think it would be very likely that that person

19   could be a victim of sexual assault.

20        Q.  Okay.  Do you understand that this is the

21   view of the Department of Corrections, that GID

22   residents should be treated differently than

23   non-GID residents?

24        A.  I'm not really sure.
```

Page 74

1  such as OxyContin.  Dialysis, we've had discussions

2  regarding dialyzing somebody, which we do at the

3  treatment center.

4      Q.  And each of those has a different

5  procedure, different than the normal procedure?

6      A.  To some extent, yes.  There is a

7  customized process to address those issues.  Once

8  it's established, then superintendents determine

9  how it's going to be managed in their particular

10  facility.

11      Q.  So if Ms. Battista was prescribed hormone

12  treatment today, and you were told that she's to

13  begin treatment, what would the security review

14  consist of?

15      A.  Well, what -- what I understand about

16  hormone treatment is -- is the effect that estrogen

17  would have on the body and that over a period of

18  time the person may have the appearance of looking

19  female.  And my concern would be to have a resident

20  who looks like a female in a housing unit with

21  rapists.  That would be my concern.

22      Q.  That's your main concern?

23      A.  Yes.

24      Q.  Are there other concerns that you would

Page 75

1  have?

2      A.  Well, that in and of itself would mean I'd

3  be concerned for that person's safety.  I'd be

4  concerned for the effect that that would have on

5  the housing unit, how that would affect other

6  residents.  I would anticipate that residents would

7  begin to talk about it.  Because they're sex

8  offenders, they would probably speak of it in

9  referenced context of their own offending and

10  attractiveness to victims and identifying victims.

11  It would probably be discussed in the treatment

12  groups, treatment staff would have to be familiar

13  and prepared for it.  The housing officers would

14  have to be vigilant in monitoring it and there

15  would be some serious safety concerns for both the

16  resident as well as if it developed into dynamics

17  where other residents became attracted to that

18  resident and certain jealousies and collusions

19  could develop.  It could be very problematic to

20  manage.

21      Q.  So your concerns stem purely from if she

22  begins to appear female?

23      A.  Yes.

24      Q.  Is that correct?

Page 77

1    appearing feminine which is the concern?

2        A.   Yes.

3        Q.   In Ms. Kosilek's case, you spoke that you

4    spoke with Superintendent Spencer.  She's receiving

5    the hormones.  And to your knowledge, there has not

6    been any issues having to do with her appearing

7    feminine?

8        A.   I think -- I think I said serious issues.

9    I'm not really sure about such matters as

10   harassment, name calling and -- and that kind of

11   stuff.  I don't -- I didn't really ask him about

12   that.  But to my understanding, there hasn't been

13   serious issues.

14       Q.   So if in that situation Ms. Kosilek has

15   been given these items and the security

16   considerations have been -- that the facility is

17   able to accommodate Ms. Kosilek in terms of

18   security, do you think that would be possible in

19   Ms. Battista's case?

20       A.   I don't.

21       Q.   You don't think it's possible?

22       A.   I don't, no.

23       Q.   Why is that?

24       A.   The treatment center is a sex offender

Page 78

1   population.   MCI-Norfolk is not a sex offender

2   population.

3        Q.   Are there -- but the -- there are similar

4   types of inmates at Norfolk, are there not?

5        A.   There may be some sex offenders.

6        Q.   Would she not face the same issues of

7   being victimized there as she would at the

8   treatment center?

9        A.   Are you referring to --

10       Q.   Ms. Kosilek.

11       A.   -- Kosilek?

12            I'm not really sure of the question.

13       Q.   Wouldn't she be facing these same types of

14   issues regarding victimization because of her

15   feminine appearance as Ms. Battista would?

16       A.   As Ms. Battista, I -- I don't know.  I --

17   I don't manage Norfolk.  I know what I spoke with

18   Superintendent Spencer about and understand how

19   he's managed it so far to some extent in a brief

20   conversation.  But I think the difference is that

21   the population at Norfolk isn't sexually dangerous

22   persons who are determined to be too dangerous to

23   be released.  They're state prison inmates who, for

24   the most part, are going to be released at some

Page 79

1   point in time and may -- most likely are not sex

2   offenders.

3       Q.  How is Mr. -- sorry, Superintendent

4   Spencer dealing with his security concerns with

5   Ms. Kosilek?  Did he share those with you?

6       A.  He identified to me that as items are

7   requested and as he receives information about

8   certain procedural changes or other -- other

9   matters that are different than current operation,

10  that he gains an understanding of what those items

11  are or whatever that matter is and he discusses it

12  with his managerial staff, particularly with his

13  security staff.  And they have a meeting.  I'm not

14  -- can't quite say who attends that meeting.  It

15  may or may not involve medical/mental health staff,

16  it does involve his security staff.  He reviews

17  each of the items and he makes a determination if

18  there are any security considerations and/or

19  accommodations or special ways that he wants to

20  handle those items.  And then they develop a course

21  of action.  If they've determined that the -- that

22  Michelle Kosilek is to receive certain items, they

23  identify a means for accomplishing that, which may

24  mean it's a little different than a normal means of

Page 81

1    Q.   Okay.  So in the setting of the treatment

2   center, are there measures that you could take to

3   ensure Ms. Battista's physical safety if she were

4   to be on hormones?

5    A.   The only way I could manage the safety

6   would be to place him in a special management unit.

7    Q.   And can you describe for me what a special

8   management unit is?

9    A.   It's a -- it's a lock in unit, it's

10   23-hour a day lock in on protective custody status.

11    Q.   Is she -- I mean, in the other situation,

12   it's my understanding that Ms. Kosilek lives among

13   the general male population?

14    A.   In the general population, yes.

15    Q.   And in Ms. Battista's situation, is that

16   not possible?

17    A.   Your previous question was guaranteeing

18   safety.  I cannot guarantee safety in the general

19   population.

20    Q.   Do you think she would be at -- let me

21   rephrase.

22        How would you rate her risk of security

23   concerns if she were to be on hormone therapy in

24   the general population?

Page 82

```
 1      A.  Very high rate of potential for sexual
 2  victimization.
 3      Q.  Is there a way to rearrange housing that
 4  would lessen that risk within the general
 5  population?
 6      A.  I would say no.  I'm crowded right now.
 7  I've doubled up many -- half the housing units.
 8      Q.  Is Ms. Battista currently living with a
 9  roommate?
10      A.  No.
11      Q.  Would -- if she continued in -- can I call
12  it a single room?
13      A.  (Nodding head up and down.)
14      Q.  Would that alleviate some of the risk?
15      A.  I think the difference would be that
16  Sandy-Jo Battista doesn't appear to be female and
17  is in a single room.  Once Sandy-Jo appears to be
18  female, I think that that is a very significant
19  change that would change, I think, my concerns
20  about managing him in the facility.
21          MS. SHENG:  We'll mark this as Exhibit 1.
22          (Exhibit No. 1, Gender Identity Disorder
23      Decision Point chart, marked for
24      identification.)
```

Page 88

1       A.   Operational changes in the facility would

2   involve grave concern that Sandy-Jo could be

3   assaulted and may result in placement of Sandy-Jo

4   in protective custody.

5       **Q.   Let me ask you this:  When there are other**

6   **inmates, residents at the treatment center who you**

7   **are concerned with, perhaps because of their age or**

8   **their appearance as we mentioned before, what do**

9   **you do with those residents to protect their**

10  **safety?**

11      A.   It depends --

12          MR. McFARLAND:  Objection.  Form of the

13      question.  Do you understand?

14          THE WITNESS:  Yes.

15          MR. McFARLAND:  Okay.

16          THE WITNESS:  Yes.  Depending upon

17      whatever has happened, whatever the incident

18      is or behaviors that have been identified or

19      if there's a degree of injury or potential for

20      assault; if it's a grave degree of safety to

21      an individual, they would be placed in a

22      special management unit in protective custody

23      in order to provide a safe environment.  And

24      then later on, we would take a look at if they

Page 89

```
 1        were to be released from the special

 2        management unit how they could best be managed

 3        and generally it's a separation from those

 4        individuals who present the imminent threat.

 5        But at the treatment center, sexually

 6        dangerous persons can't go anywhere else.

 7        They -- they're at the treatment center for

 8        life.  The only time that they can be

 9        transferred somewhere else is a provision in

10        the statute.  If they have a criminal

11        sentence, they can be transferred to a state

12        prison.  So if the individual can't be placed

13        in our population, which has happened, they

14        remain in the special management unit,

15        sometimes for lengthy periods of time.

16   BY MS. SHENG:

17        Q.  Indefinitely?

18        A.  Not indefinitely.  I don't have anyone

19   there indefinitely.  I've had -- I have had people

20   there for two years.  One and a half to two years,

21   two.

22        Q.  So if there is not -- you just mentioned

23   imminent threat.  If there's not an imminent

24   threat, do you -- does anything need to be done
```

1    Management Plan included a number of items that the

2    Department of Correction committed to in order to

3    manage the sexually dangerous persons at the

4    treatment center.  One of the items had to do with

5    should the capacity of the treatment center exceed

6    the number of single rooms and there was a need to

7    begin to double up the sexually dangerous persons,

8    we call it double bunking, placing two sexually

9    dangerous persons into one room, there was criteria

10   that had been established that would be reviewed by

11   both the security staff and the clinical staff for

12   determining appropriate roommates.

13        Q.  **And what do you take into consideration**

14   **when considering roommates?**

15        A.  Well, there's something called

16   compatibility which is kind of a broad term, but

17   basically it has to do with willingness of two

18   people to room together.  Then there are

19   considerations such as a medical problem, you know,

20   health issues.  There are religious considerations.

21   There are considerations if a resident is viewed as

22   being violent, has a history of violence.  And --

23   that's all I can remember at this point.

24        Q.  **Ms. Battista currently does not have a**

Page 122

1   roommate; is that correct?

2      A.   That's correct.

3      Q.   Is that based on any specific

4   consideration or is it seniority or lottery, how is

5   it that she is in a room by herself?

6      A.   Sandy-Jo is in a room by herself because

7   of the GID and Sandy-Jo had had roommates, I

8   believe, that it was becoming problematic.  And I

9   can't recall specifically at what point in time a

10  decision was made, but I do know that a decision

11  was made that Sandy-Jo would have a single room

12  because of GID.

13     Q.   Are there current concerns about

14  Ms. Battista's safety?

15     A.   Yes, there are.

16     Q.   Can you list those concerns?

17     A.   Sandy-Jo has claimed to be raped.

18  Sandy-Jo has been assaulted.  Sandy-Jo finds

19  himself in compromising positions such as occurred

20  the other day.  Sandy-Jo is not a reliable

21  reporter.  And there's concerns about Sandy-Jo's

22  interaction with others in the facility.

23     Q.   Of a romantic nature?

24     A.   Of a safety nature.

Page 123

1    Q.  Are your concerns that she will be

2  assaulted?

3    A.  Yes.

4    Q.  Okay.  And what measures have been taken

5  to minimize that risk?

6    A.  Single cell -- Sandy-Jo resides closest to

7  the officers, call it a trap, control room.  And

8  Sandy-Jo in the past had restricted movement to

9  separate Sandy-Jo from the person that he alleged

10  raped him, but that's no longer in effect.

11    Q.  Are there other -- other precautions that

12  are being taken?

13    A.  No.  That's -- that's all that I'm aware

14  of.

15    Q.  How many years have you known

16  Ms. Battista?

17    A.  Somewhere around five.

18    Q.  Okay.  So was that when she came to the

19  treatment center?

20    A.  Yes.

21    Q.  Okay.

22    A.  Not before.

23    Q.  Can you describe Ms. Battista to me?

24    A.  Sandy-Jo is a small statured, possibly

Page 124

1  5-6, possible weight is 140 pounds.  Notable for a

2  lot of tattoos.  Distinct facial features.

3       **Q.   Is she an aggressive person?**

4       A.   Can be verbally aggressive, yes.

5       **Q.   Is she cooperative?**

6       A.   It depends upon the situation.  Not

7  always.

8       **Q.   Do you view her as a troublemaker in the**

9  **facility?**

10      A.   Not in terms of relating with others, not

11 as a troublemaker in that extent.

12      **Q.   Do you view her as a troublemaker in any**

13 **other -- to any other extent?**

14      A.   Well, I view Sandy-Jo as -- as having been

15 in circumstances or situations in the past where

16 Sandy-Jo did not follow the rules and felt

17 justified in doing -- being involved in the

18 behavior and made it clear that the ends justified

19 the means, so to speak, and that -- felt justified

20 in what Sandy-Jo did.

21      **Q.   In that respect, do you view her as**

22 **different than other residents?**

23      A.   Some.  Some; not others, yeah.

24      **Q.   Would you view her as typical in terms of**

1    troublemaking at the facility?

2       A.   In some ways, yes.

3       Q.   And in other ways?

4       A.   No.

5       Q.   As far as disregarding rules?

6       A.   In which respect?  Which part of your

7    question was that referring to?

8       Q.   Is she -- is she atypical as far as being

9    disobedient or violating disciplinary rules?

10      A.   No.

11      Q.   Do you know what she does with her time?

12      A.   I don't know.

13      Q.   Do you consider her in her present

14   presentation to be effeminate?

15      A.   No.

16      Q.   No?  What leads you to say that?

17      A.   There's no physical characteristic that to

18   me appears to be effeminant, except occasionally

19   Sandy-Jo will put ribbons in his hair.

20      Q.   Are there other residents that you do

21   consider to be effeminate?

22      A.   No.

23      Q.   So there's nobody at the treatment center

24   at this time who you consider to present themselves

Page 126

1   in a feminine fashion?

2       A.   That's correct.

3       Q.   **Have you observed Ms. Battista interact**

4   **with other residents?**

5       A.   No.   Mostly Sandy-Jo stays in his room.

6   Only at work have I seen him interact with other

7   residents.

8       Q.   **Do you know if she has friends?**

9       A.   I believe Sandy-Jo is mostly a loner.

10      Q.   **Do you know if she has enemies?**

11      A.   Other than the prior incidents, I'm not

12  aware of anybody else.

13      Q.   **When you say prior incidents, do you mean**

14  **the August 2006 incident involving the other**

15  **resident?**

16      A.   And the subsequent assault on Sandy-Jo by

17  another resident.

18      Q.   **Was that the October 2006 incident?**

19      A.   It was soon after the first incident.   I

20  don't recall exactly.

21      Q.   Is that the assault that involved -- I

22  believe Ms. Battista was punched in the face?

23      A.   Yes.

24      Q.   **Do you know if she has had run-ins with**

Page 127

1  other residents regarding her GID?

2      A.  No, I don't.

3      Q.  Do you know of other, or do you know of

4  romantic relationships that she has had with other

5  residents?

6      A.  No, I don't.

7      Q.  You don't know of any?

8      A.  No.

9      Q.  So the August 2006 incident, in the report

10  it states that both residents stated they were in a

11  romantic relationship.  Were you not aware that

12  that was a romantic relationship?

13      A.  After the fact, yes.

14      Q.  After the fact.  Okay.

15      A.  That's the only one that I can recall.

16      Q.  Okay.  Ms. Battista writes you a lot of

17  letters and files a lot of grievances, is that

18  irksome to you?

19      A.  If a lot of residents write me a lot of

20  letters and a lot of grievances they tend to pile

21  up and become time consuming.  I answer all letters

22  as a rule, but sometimes I can't get to every

23  single letter and I try to address the letters in

24  other ways, either through verbal contact or if